DARON TOOCH (State Bar No. 137269)
dtooch@kslaw.com
DAVID J. TASSA (State Bar No. 314308)
dtassa@kslaw.com
KING & SPALDING LLP
633 West Fifth Street, Suite 1700
Los Angeles, CA 90071
Telephone:     +1 213 443 4355
Facsimile:      +1 213 443 4310

Attorneys for Plaintiffs NORTHBAY
HEALTHCARE GROUP – HOSPITAL DIVISION
dba NORTHBAY MEDICAL CENTER and
VACAVALLEY HOSPITAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NorthBay Healthcare Group – Hospital Division dba NorthBay Medical Center and VacaValley Hospital,<br><br>Plaintiff,<br><br>v.<br><br>Blue Shield of California Life & Health Insurance Company; California Physicians' Service dba Blue Shield of California; and Does 1-50, inclusive<br><br>Defendant. | Case No. 17-cv-02929-WHO<br><br>**PLAINTIFF NORTHBAY HEALTHCARE GROUP'S CONSOLIDATED MOTIONS IN LIMINE**<br><br>Date:     2019-01-18<br>Time:    2:00 p.m.<br><br>Trial Date:  2019-02-04<br>Judge:   Hon. William H. Orrick |

Pursuant to the Federal Rules of Civil Procedure, this Court's Local Rules, and Judge Orrick's Civil Standing Order, Plaintiff NorthBay Healthcare Group ("NorthBay") hereby respectfully submits these consolidated motions in limine.  These motions are brought pursuant to Federal Rules of Evidence Rules 401, 402, 403, 701, 702, 703, and Federal Rules of Civil Procedure Rules 26 and 37.  NorthBay reserves the right to make additional evidentiary or other objections to any evidence presented at trial.

# TABLE OF CONTENTS

MOTION IN LIMINE TO EXCLUDE REPORT AND TESTIMONY OF BRUCE DEAL .... 1

I.      INTRODUCTION ................................................................. 1

II.     FACTUAL BACKGROUND...................................................... 1

III.    LEGAL STANDARD ............................................................ 2

IV.     LEGAL STANDARD FOR REASONABLE VALUE OF NON-
        CONTRACTED HEALTHCARE SERVICES ........................... 4

V.      MR. DEAL'S OPINION SHOULD BE EXCLUDED................. 5

        A.    Mr. Deal Ignores the *Children's* Standards ....................... 5

        B.    Mr. Deal Ignores The Contract Between NorthBay and Blue
              Shield ...................................................................... 6

        C.    Deal Ignores All Contracts, Including All Contracts Still in Effect ............... 8

        D.    Deal Ignores The *Gould* Factors .................................. 11

        E.    The Data Mr. Deal Relies On To Do His Analysis Is Seriously
              Flawed...................................................................... 12

VI.     CONCLUSION ................................................................. 16

MOTION IN LIMINE TO EXCLUDE OPINION TESTIMONY OF DR. SCHRIGER ........ 16

        A.    Dr. Schriger is Not an Expert on the Subject of His Testimony................... 16

        B.    Dr. Schriger's Opinion Rests on an Unjustified Assumption...................... 18

        C.    The Probative Value of Dr. Schriger's Testimony is Substantially
              Outweighed by the Danger of Unfair Prejudice, Confusing the
              Issue, Misleading the Jury, and Wasting Time ................................. 19

        D.    Dr. Schriger's Testimony Was Belatedly Disclosed, Resulting in
              Unfair Prejudice to NorthBay ...................................... 20

MOTION IN LIMINE TO EXCLUDE OPINION TESTIMONY OF MICHAEL PUGH...... 21

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

### Cases

4

*In re 3dfx Interactive, Inc.*,
389 B.R. 842 (Bankr. N.D. Cal. 2008) ...................................................................8

5

6

*Amorgianos v. National R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)....................................................................................3

7

*Berry v. City of Detroit*,
25 F.3d 1342 (6th Cir. 1994) .................................................................................16

8

9

*Bragdon v. Abbott*,
118 S.Ct. 2196 (1998)..............................................................................................3

10

11

*Cayuga Indian Nation*, 83 F. Supp. 2d 318, 324, 327 (N.D.N.Y. 2000) .......................15

12

*Champagne Metals v. Ken-Mac Metals, Inc.*,
458 F.3d 1073 (10th Cir. 2006) ...............................................................................7

13

14

*Children's Hospital Central California v. Blue Cross of California*,
226 Cal. App. 4th 1260 (2014) ..................................................................... *passim*

15

*Daubert v. Merrell Dow Pharm., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ...................................................................................3

16

17

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993)...................................................................................... *passim*

18

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
53 F. Supp. 3d 191 (D.D.C. 2014), *aff'd*, 843 F.3d 958 (D.C. Cir. 2016)...............7

19

20

*Gould v. Workers' Comp. Appeals Bd.*,
4 Cal.App.4th 1059 (1992) ........................................................................2, 4, 6, 11

21

22

*Joiner v. General Elec. Co.*,
522 U.S. 136 (1994)................................................................................................11

23

24

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)..................................................................................................3

25

*Lightfoot v. Union Carbide Corp.*,
175 F.3d 1008, 1999 WL 110424 (2d Cir. Mar. 1, 1999)......................................15

26

27

*Mike's Train House, Inc., v. Lionel L.L.C.*,
2005 WL 6529493 (6th Cir. 2005) ..........................................................................7

28

*Ollier v. Sweetwater Union High Sch. Dist.*,
    768 F.3d 843 (9th Cir. 2014) ...........................................................................23

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir.1997).........................................................................6, 15

*Student Mktg. Grp., Inc. v. Coll. P'ship, Inc.*,
    247 F. App'x 90 (10th Cir. 2007) ..................................................................14

*Terrell v. Childers*,
    No. 93 C 2460, 1996 WL 385310 (N.D. Ill. July 3, 1996) ........................15

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016) ..................................................14

*United States v. Locascio*,
    6 F.3d 924 (2d Cir. 1993) ................................................................................6

*United States v. Regents of N.M. Sch. of Mines*,
    185 F.2d 389 (10th Cir.1950) ..........................................................................8

*Yeti By Molly Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ................................................................10, 21

**Statutes**

Immigration Reform and Control Act (IRCA) of 1986 ..............................................13

Knox-Keene Health Care Service Plan Act of 1975 ....................................................4

**Rules**

32 C.F.R. § 199.14 .......................................................................................................13

Cal. Code Reg. tit. 28 § 1300.71(a)(3)(B) .................................................................11

Cal. Code Regs. tit. 8 §§ 9789.10 *et seq.*..................................................................13

Cal. Code Regs., tit. 28 § 1300.71(a)(3) ......................................................................4

Fed. R. Civ. P. 26 ........................................................................................................21

Fed. R. Civ. P. 26(a) ........................................................................................10, 21, 22

Fed. R. Civ. P. 26(a)(1)(A)(i) ......................................................................................21

Fed. R. Civ. P. 26(a)(2)(A) ..........................................................................................20

Fed. R. Civ. P. 26(a)(2)(B) ..........................................................................................20

Fed. R. Civ. P. 26(e) ....................................................................................................21

Fed. R. Civ. P. 37(c)(1) ...................................................................................................21

Fed. R. Evid. 104 ...........................................................................................................3

Fed. R. Evid. 403 ...........................................................................................................19

Fed. R. Evid. 702 ...................................................................................................1, 3, 16

**Other Authorities**

8B *Charles Alan Wright & Arthur R. Miller*, Federal Practice and Procedure §
    2289.1 (3d Ed.2014) ...............................................................................................21

https://oshpd.ca.gov/wp-content/uploads/2018/07/HospManualch8000.pdf..............................13

**MOTION IN LIMINE TO EXCLUDE REPORT AND TESTIMONY OF BRUCE DEAL**

## I.    INTRODUCTION

Pursuant to the parties' stipulation and the Court's order, the only issue to be decided at the Phase I trial currently scheduled for February 4, 2019 is the reasonable value of the emergency and post-emergency medical services provided by NorthBay to Blue Shield's members.  Plaintiffs and Defendants (and their experts) agree that the applicable standard for determining reasonable value of health care service under California law is set forth in *Children's Hospital Central California v. Blue Cross of California*, 226 Cal. App. 4th 1260, 1275, (2014) (*Children's*).  Accordingly, the jury will be charged with determining the reasonable value of NorthBay's services in light of the legal and evidentiary standards set forth in *Children's*.

The report and testimony of Blue Shield's expert, Bruce Deal, should be excluded because it does not come close to clearing the bar set for expert testimony set by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589-90 (1993), because (i) Mr. Deal misinterprets the valuation standards in *Children's,* (ii) Mr. Deal ignores all of the most direct market evidence of reasonable value, (iii) Mr. Deal offers no facts to support his ad hoc reasons for ignoring the most relevant evidence on reasonable value, and (iv) the only evidence on which Mr. Deal's opinion does rely cannot reliably approximate what is paid and accepted for emergency services.

## II.    FACTUAL BACKGROUND

NorthBay and Blue Shield had a contract that set the rates that Blue Shield would pay NorthBay for the services it provided to Blue Shield's members from October 1, 2009, through November 30, 2016.  (Tooch Decl. Ex. C at 11.)  The rates agreed to in the contract ranged between 65% and 80% of NorthBay's billed charges.  (*Id.*)

NorthBay also has contracts with other payors.  Some of these are full in-network contracts with health plans, such as Anthem, United Cigna, etc., and some of these are essentially for emergency and post-emergency services only, with payors such as Kaiser, First Health, MultiPlan, etc.  (Tooch Decl. Ex. C ("Heil Report").)  The full in-network contract rates range from 38% to 78% of NorthBay's charges, and the emergency services contracts rates range from

70% to 85% of NorthBay's charges. (Tooch Decl. Ex. E pp. 25-26. )

After terminating the contract NorthBay in November 2016, Blue Shield has been paying NorthBay's claims at 41% of charges.  (*Id.* at 27.)  This lawsuit is challenging the reasonableness of those payments.

NorthBay's expert witness, Michael Heil, has determined that the reasonable value of NorthBay's non-contracted services is 88% of its charges.  (Heil Report, p. 21)  Mr. Heil based his opinion on three separate analyses.  First, he considered the most relevant evidence of a willing buyer/willing seller of NorthBay's services – the contract between NorthBay and Blue Shield.  Second, he considered the contracts between NorthBay and  other commercial payors.  Finally, Mr. Heil performed an analysis taking into account the factors set forth in *Gould v. Workers' Comp. Appeals Bd.*, 4 Cal.App.4th 1059 (1992).  He compared NorthBay's charges to the charges of other similar hospitals in the geographic region, taking into account the nature of services provided by NorthBay and the economic aspects of NorthBay versus its peer hospitals. (*Id.*)

Blue Shield's expert, Mr. Deal, opines that NorthBay should be paid at either 12.2% of its charges (if the trier of fact uses Medicare and Medi-Cal data) or 21.9 to 27.7% of charges (if the trier of fact includes only what Deal calls "commercial" payment data).  (Tooch Decl. Ex. A ("Deal Report"), Figs. 17a, 17b, p. 38)  Mr. Deal ignores the contract between NorthBay and Blue Shield, ignores the contracts between NorthBay and all other payors, and ignores the *Gould* factors.  Instead, Mr. Deal uses aggregated data provided by hospitals to California Office of State Healthcare Planning and Development ("OSHPD") and aggregated payments made by Blue Shield to other hospitals in the area, and calculates the payments as a multiple of Medicare or Medi-Cal.

### III.    LEGAL STANDARD

The district court serves as a gatekeeper for expert testimony and such testimony should be excluded if it is not relevant or reliable.  *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589-90 (1993).  This means that "the party presenting the expert must show that the

1   expert's findings are based on sound science, and this will require some objective, independent

2   validation of the expert's methodology." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311,

3   1316 (9th Cir. 1995) (excluding expert opinion on remand even though proffered experts had

4   impressive credentials ).  The court's "gatekeeping" requirement is "to ensure the reliability and

5   relevance of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999).  The

6   requirement is designed "to make certain that an expert, whether basing testimony upon

7   professional studies or personal experience, employs in the courtroom the same level of

8   intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*  Further,

9   the expert testimony must have a traceable, analytical basis in objective fact.  *Bragdon v. Abbott*,

10  118 S.Ct. 2196, 2212 (1998) (citation omitted).

11  When deciding whether to admit highly specialized or scientific expert testimony, a trial

12  court must conduct an inquiry into the following areas: (i) whether the expert's testimony assists

13  the trier of fact (i.e., whether it concerns matters beyond the understanding of ordinary lay

14  persons and is supported by factual evidence and scientific reasoning) and (ii) whether the

15  expert's opinion is based on a sound, adequately-founded, scientific methodology and

16  information of the type reasonably relied upon by experts in the field.  Fed. R. Evid. 104; Fed. R.

17  Evid. 702; *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 597 (1993).  It is also "critical

18  that an expert's analysis be reliable at every step," and "any step that renders the analysis

19  unreliable under the Daubert factors renders the expert's testimony inadmissible." *Amorgianos

20  v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).   If the court finds that the

21  expert fails to identify the factual bases, explain the methodology and demonstrate the scientific

22  reliability of his or her opinion and findings, the proffered testimony is inadmissible.  *Id.*

**IV.    LEGAL STANDARD FOR REASONABLE VALUE OF NON-CONTRACTED HEALTHCARE SERVICES**

The first case to deal with the quantum meruit or reasonable value of medical services was *Gould v. Workers' Comp. Appeals Bd.*, 4 Cal.App.4th 1059 (1992).  In Gould, the court held that certain factors should be considered in determining the reasonable value of a provider's services including "the medical provider's training, qualifications, and length of time in practice; the nature of the services provided; the fees usually charged by the provider; the fees usually charged in the general geographic area in which the services were rendered; other aspects of the economics of the medical provider's practice that are relevant; and any unusual circumstances in the case."  *Id.* at 1071.  The DMHC later adopted these six *Gould* factors in promulgating its regulations under the Knox-Keene Health Care Service Plan Act of 1975 relating to the reasonable value of non-contracted health care services. Cal. Code Regs., tit. 28, section 1300.71(a)(3).

In *Children's Hospital*, the Court of Appeal addressed the standard and evidence that can be considered in determining the reasonable value of non-contracted emergency services.  The court held that "[t]he 'reasonable value' of the services has been described as the 'going rate' for the services or the 'reasonable market value at the current market prices." 226 Cal.App.4th at 1274.  "Reasonable market value, or fair market value, is the price that 'a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts.'"  *Id.* (emphasis added).

The *Children's* court also held that while the *Gould* factors establish the minimum criteria for reimbursement of a claim, they are not the exclusive criteria.  226 Cal.App.4th at 1273.

> In determining value in quantum meruit cases, courts accept a wide variety of evidence. For example, the party suing for compensation may testify as to the value of his services or offer expert testimony. Evidence of value can also be shown through agreements to pay and accept a particular price.  The court may consider the price agreed upon by the parties as a criterion in ascertaining the reasonable value of services performed. Accordingly, in an action for the reasonable value of services, a written contract providing for an agreed price is relevant to determining reasonable value. Additionally, evidence of a health care provider's customary charges and earnings is relevant and admissible to demonstrate the value of the services rendered.

> As can be seen from the above examples, the facts and circumstances of the particular case dictate what evidence is relevant to show the reasonable market value of the services at issue, i.e., the price that would be agreed upon by a willing buyer and a willing seller negotiating at arm's length.   …
>
> … The market value is not ascertainable from Hospital's full billed charges alone.  … In a given case, the reasonable and customary amount that Blue Shield has a duty to pay "might be the bill the [medical provider] submits, or the amount the [health care service plan] chooses to pay, or some amount in between.'"  *Id.* at 1275 (emphasis added) (citations omitted).

## V.   MR. DEAL'S OPINION SHOULD BE EXCLUDED

### A.   Mr. Deal Ignores the *Children's* Standards

Mr. Deal agrees that the "the most recent relevant legal authority on this subject [the subject of his report] comes from the California Court of Appeals, in its decision entitled *Children's Hospital Central California v. Blue Cross of California*, 226 Cal. App. 4th 1260 (2014)."  (Deal Rep., p. 1; Deal Dep., Ex. B, 27:12-28:4.)  In fact, Mr. Deal relies on no other valuation standard other than the *Children's* case.  However, Mr. Deal ignores most of the standards set forth in the *Children's* opinion.  Instead, he cherry picks portions of the *Children's* case favorable to Blue Shield, ignores the standards and evidence unfavorable to Blue Shield, and creates his own improper standard. He describes the *Children's* holding as follows:

> From an economic perspective, Children's Hospital provides guidance that reasonable value is not measured by provider billed charges, but instead requires a market analysis based on the 'facts and circumstances of the particular case.'  In addition, the rates for various types of providers in the region, including for government programs, such as Medicare and Medicaid and private payments through commercial payors such as Blue Shield, are relevant for determining reasonable value. (Deal Rep., p. 1)

Based on his myopic view of *Children's*, Mr. Deal completely distorts the bedrock concept of a willing buyer/willing seller.  As discussed in detail below, he does this in a number of ways.  First, he ignores the most relevant evidence of what a willing buyer and a willing seller would agree upon as a price for NorthBay's services – the contracts between NorthBay and Blue Shield, and the contracts between NorthBay and other payors. As discussed below, Mr. Deal summarily dismisses this evidence based on unfounded speculation and assertions that are not supported by any facts in his report or deposition testimony.  Instead, Mr. Deal bases his analysis on aggregated data submitted by <u>other</u> hospitals to the California Office of State Healthcare Planning and Development ("OSHPD").  This data only reflects the total amounts that government and private

payors have paid to hospitals in total.  The data cannot be reviewed on a claim-by-claim basis.
The data also does not show whether any claims were paid at the correct rate, or whether the
hospital has disputed those payments.  It does not reflect whether the hospitals agreed to those
payments.  Mr. Deal also fails to take into account any of the *Gould* factors.

### B.   Mr. Deal Ignores The Contract Between NorthBay and Blue Shield

The most relevant evidence of what Blue Shield (as a willing buyer) would pay for the
type of hospital services provided by NorthBay (as a willing seller) is the contract rate that was
in existence between NorthBay and Blue Shield for the 8 years just before the disputed claims at
issue arose.  There is no evidence or testimony that Blue Shield was not a willing buyer of
NorthBay's services during these 8 years, that NorthBay was not a willing seller of services at
those rates, or that the contract was not an arms-length transaction between sophisticated parties.

Yet Deal completely ignores the NorthBay – Blue Shield contract in his initial report.
His report does not mention the rates in the contract, or why these do not constitute an agreement
between a willing buyer and a willing seller.  His opinion is inadmissible for this reason alone.
*Raskin v. Wyatt Co.*, 125 F.3d 55, 67 (2d Cir.1997) (expert may not selectively omit relevant
facts to arrive at a self-serving conclusion)

Because NorthBay's expert witness, Michael Heil, relies on the contract in formulating
his opinion, Mr. Deal was forced to deal with the contract in his rebuttal report.  However, Mr.
Deal summarily dismisses the contract based on the fact that Blue Shield terminated it because
the rates were too high.  (Tooch Decl. Ex. B ("Deal. Rebut. Rep.") p. 4; Deal Dep. pp. 46, and
90-91)  Mr. Deal bases this assertion on a discussion he had with a Mr. Barnes at Blue Shield,
who is a witness that was never disclosed during fact discovery in the case, and was only
belatedly disclosed after the close of fact discovery to bolster Mr. Deal's rebuttal report.  (See
discussion below.)

While experts may be entitled to rely on some forms of hearsay statements, they can do
so only to the extent that such hearsay statements are of the kind generally relied on by experts in
the field.  *See United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993) ("expert witnesses can
testify to opinions based on hearsay or other inadmissible evidence" only if "experts in the field

reasonably rely on such evidence in forming their opinions.").  Mr. Barnes' statements fall far

short of the kind of reliable statements on which a valuation expert may reasonably rely.  As an

initial matter, any statements made by Mr. Barnes to Deal regarding the contract cannot have

been made on the basis of first-hand knowledge:  Mr. Barnes did not negotiate or sign the

contract, and was not himself responsible for determining that the rates were too high.  (Tooch

Decl. Ex. P.)  During his deposition, Mr. Barnes made clear that all of the statements he made to

Deal were based on information he received from <u>others</u> at Blue Shield that Deal never spoke

with.  (*Id.*)  Moreover, Mr. Barnes also stated that the other Blue Shield employees from whom

he received the information he relayed to Mr. Deal themselves received the information from

other third parties.  (*Id.*)  *See Gilmore v. Palestinian Interim Self-Gov't Auth.*, 53 F. Supp. 3d

191, 213–14 (D.D.C. 2014), *aff'd*, 843 F.3d 958 (D.C. Cir. 2016) ("Because Eviatar's opinion

consists entirely of generalized and conclusory assertions that lack any basis in his specialized

knowledge, the Court concludes that he is simply repeating hearsay evidence without applying

any expertise whatsoever, a practice that allows [Plaintiffs] to circumvent the rules prohibiting

hearsay.") (quotation marks and internal citations omitted).

Even if Mr. Barnes' out of court statements were not double or triple hearsay, they would

still not be the kind of hearsay statements on which an expert may properly rely.  The self-

serving statements of the employees of an expert's client, relating to the very issue disputed in

litigation, are simply not a sufficient basis on which an expert may draw conclusions.

*Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n.4 (10th Cir. 2006)

(affirming district court exclusion of expert's testimony on the grounds that "[n]o reasonable

economist would simply accept the self-serving statement of an interested party as fact").  This is

especially true here, where Blue Shield's counsel actively participated in Mr. Deal's

conversation with Mr. Barnes.  And, as Mr. Barnes made clear during his deposition, his

statements to Deal were statements of opinion, not of fact.  (Tooch Decl. Ex. P ("The group was

asking questions about the Solano marketplace and my opinions.").  Mr. Deal did nothing to

independently validate Mr. Barnes' opinions, which is sufficient to render any of Deal's opinions

that rely on Mr. Barnes' statements inadmissible.  *Mike's Train House, Inc.,  v. Lionel L.L.C.,*

2005 WL 6529493 (6th Cir. 2005) (expert witness "cannot properly act as a conduit by presenting an opinion that is not his own opinion but that of someone else") (quoting Mueller & Kirkpatrick, Federal Evidence § 357, at 685 (2d ed. 1994)).

Even if Mr. Barnes' statements to Mr. Deal are reliable, they are irrelevant to reasonable value: "When evaluating reasonable value, the actual considerations of the actual buyers and sellers whose contracts constitute the market are simply not relevant." *In re 3dfx Interactive, Inc.*, 389 B.R. 842, 882 (Bankr. N.D. Cal. 2008) ("Fair market value … is what a hypothetical willing buyer and seller agree upon when possessed of relevant facts. The considerations of the actual buyer or seller are irrelevant.")  Market value is based on the prices agreed to by many buyers and sellers, not the motivations of one buyer.  Further, *quantum meruit* is not based on the motivations of a party to a single transaction.  *Cf. United States v. Regents of N.M. Sch. of Mines*, 185 F.2d 389, 391 (10th Cir.1950) (holding that evidence of unaccepted offers made to buy property inadmissible to determine value in part because "usually no opportunity is offered for cross-examination of the persons said to have made the offers, and collateral inquiries are injected into the case which may tend to confuse the main issue").

Mr. Deal apparently believes that because a contract is terminated, that it is no longer relevant to the concept of willing buyer-willing seller.  What Mr. Deal fails to grasp is that almost every non-contracted dispute involves a situation where there is a terminated contract between the parties.  (If there were still a contract in existence, there would be no dispute over rates for non-contracted services.)  The contract that the *Children's* case discussed was the contract between Children's Hospital and Blue Cross that had been terminated. 226 Cal.App.4th at 1265.  Yet the *Children's* court nevertheless held that the parties' contract was relevant to the reasonable value of the hospital's services during the period in which the parties were non-contracted.  That is particularly true here, when the contract was in existence for many years and was terminated just before the claims in dispute arose.

## C.   Deal Ignores <u>All</u> Contracts, Including All Contracts Still in Effect

In his report, Mr. Deal asserts that all of NorthBay's contracts with other commercial payors are also irrelevant for three baseless and unsupportable reasons:

- "NorthBay ha[s] relationships with many physicians in the relevant geographic area where the physicians only have admitting privileges at NorthBay, thus making not contracting with NorthBay more difficult"

- "Some payors believing they need NorthBay in- network for network access reasons (excluding NorthBay may require multiple "one -off' negotiations for specific services that may be needed by members for various reasons);" and

- "NorthBay's marketing ha[s] created a community perception that causes payors to feel they need NorthBay in- network in order to appeal to local healthcare purchasers, even at rates elevated above market rates."

(Deal Rep. at 28-29.)

Mr. Deal provides no support in his report or deposition for any of these statements. For example, the report contains no analysis of how many physicians only have admitting privileges at NorthBay versus how many physicians have admitting privileges at NorthBay and other hospitals. The report contains no analysis of how the number or percentage of physicians who only have admitting privileges at NorthBay compares to physicians who only have admitting privileges at other hospitals. In his deposition, Mr. Deal admits he did not study what percentage of physicians only have admitting privileges at NorthBay.

> Q.    What percentage of physicians only have admitting privileges at NorthBay?
> A.    I believe Mr. Heil did a calculation. I think it might have been something like half of the physicians he found, something like that. I don't remember exactly the percentage, but something like that.
> Q.    How does that compare to the physicians at Kaiser?
> A.    I don't know for a fact. I haven't studied that question. But my guess is that a high percentage of Kaiser physicians are only admitting at Kaiser. It wouldn't surprise me if it was quite a bit higher than half.
> Q.    How does NorthBay compare to Sutter physicians as far as having exclusive admitting privileges at Sutter hospitals?
> A.    I haven't done that analysis. I don't know.
> Q.    Have you done that analysis with respect to any other hospitals or hospital systems?
> A.    I haven't. It certainly wasn't necessary for my analysis. It's not the main point I'm making, but I haven't done that analysis. (Deal Dep. at 122-123)

Mr. Deal's report also contain no facts or analysis of NorthBay's marketing, whether that marketing was somehow improper, or how NorthBay's marketing compares with other hospitals' marketing. In his deposition, Mr. Deal admitted that he performed no such analysis.

> Q.    How is NorthBay's marketing different from Sutter's marketing?
> A.    I haven't studied that. I don't know. Sutter certainly markets as well.
> Q.    How is it different from Dignity's marketing?
> A.    Again, I haven't studied that particular question. …

> Q.      Is there any specific marketing that you can point to that NorthBay is doing that is different from other hospitals?  A specific ad, a specific video, a specific whatever?
> A.      Again, I haven't studied any of the specific marketing materials.  I'm reporting what payors have – to the degree Mr. Barnes had reported.  (Deal Dep. at 147-150)

Mr. Deal's report also contain no facts to support his statement as to what "some payors believe" concerning NorthBay.  At his deposition, Mr. Deal claimed to have spoken with some payors, but he could not remember the details of whether he or his staff spoke to the payors, what the names of the people they spoke to were, or the details of what they discussed.[1]  Moreover, Deal's deposition testimony makes clear that he only spoke to these payors <u>after</u> he had already prepared his reports – that is, after he had already decided to ignore all of NorthBay's contracts.

> Q.      Did you speak to anybody at Aetna about NorthBay in connection with this case?
> A.      Yes.
> Q.      Who?
> A.      I'm trying to go from memory on this, but I – what may be useful here is I spoke to a number of payors. .. I don't have the names memorized. …
>
> Q.      … Aetna, do you recall who you spoke with?
> A.      Again, not if I'm – not from a memory test perspective.  I have that name written down.
>
> Q.      When did you speak to this person?
> A.      Sometime in the last few days.  [i.e., long after his report was prepared]
>
> Q.      So who – did you speak to anyone at CIGNA?
> A.      Again, I want to refer to my notes on that.  I did speak to several payors.  I believe CIGNA was on the list, but I need to confirm that.
> Q.      Who?
> A.      I or my staff did. …
>
> Q.      Okay.  What about United Healthcare?  Did you speak to anyone at United Healthcare?
> A.      No one whose currently at United Healthcare.  I believe Mr. – I think its John Picket had previously been at United Healthcare, but nobody who's currently at United Healthcare.
> Q.      And where is Mr. Picket currently?
> A.      I believe he's at Anthem.
> Q.      Did you speak to him about Anthem's contract with NorthBay?
> A.      Not any details of the contract …
>
> Q.      Did you speak to anyone at Health Net?
> A.      I don't recall.  I don't think so.
>
> Q.      Did you speak to any of the rental network payors, Multiplan, First Health, all

---

[1] These purported conversations with other payors were also not disclosed in either of Deal's reports, requiring exclusion of these conversations and any opinions based on these conversations at trial.  *Yeti By Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1105-1107 (9th Cir. 2001) (holding "exclusion is an appropriate remedy for failing to fulfill the required disclosure requirements of Rule 26(a)").

1
those?
A.      I did not speak to any of the rental network payors.
Q.      … Did you speak to anyone at Kaiser?
2
A.      I did not. …

3
(Deal Dep. at 98 – 118).  Mr. Deal did no independent analysis to confirm the opinion statements

4
of these other payors' employees, nor is there any indication that any of these other employees

5
even possessed personal knowledge on which to base their opinions.

6
       Mr. Deal also asserts in his deposition that NorthBay is using its geographic location to

7
demand higher contract rates than other hospitals.  (Deal Dep. pp. 92, 101)  Yet, his report

8
contains no analysis of NorthBay's geographic location compared to the geographic location of

9
other hospitals whose data Deal used.  Mr. Deal also could not offer any specific facts to support

10
his assertion at his deposition.  "[N]othing in either Daubert or the Federal Rules of Evidence

11
requires a district court to admit opinion evidence which is connected to existing data only by the

12
ipse dixit of the expert."  *Joiner v. General Elec. Co.*, 522 U.S. 136, 146 (1994)

13
       In sum, Deal opines that all of NorthBay's contracts are irrelevant based upon unfounded

14
and unsupported speculation.  Mr. Deal does not, and cannot, state any valid, empirical basis for

15
assertions.

16
### D.      Deal Ignores The *Gould* Factors

17
       The *Children's* court held that Code of Regulations, title 28 section 1300.71(a)(3)(B)'s

18
"directive to pay noncontract providers the reasonable and customary value of their services

19
embodies the concept of quantum meruit, and that "in adopting section 1300.71(a)(3)(B), the

20
DMHC established the **minimum** criteria for reimbursement of a claim, not the exclusive

21
criteria."  226 Cal.App.4th at 1273-1274 (emphasis added).

22
       In his report, Mr. Deal does not do an analysis of quantum meruit based on the *Gould*

23
factors, and admits as much in his deposition.  (Deal Dep. p. 62)  For example, Mr. Deal fails to

24
consider the nature of the services provided at NorthBay and its peer hospitals.  Mr. Deal

25
considers all hospitals and hospital services the same, and makes no attempt to determine

26
whether the reasonable value of NorthBay's services should differ based on the nature of the

27
services it provides.

28
       Mr. Deal also fails to consider the economic factors of NorthBay that are relevant.  For

example, Mr. Deal makes no effort to consider whether NorthBay's charges and contract rates need to be higher due to its adverse payor mix (i.e., the percentage of Medi-Cal and low income patients it serves.)  While Mr. Deal concedes that a hospital needs to get a rate of return that allows it to remain in business (Deal Dep. p. 128), Mr. Deal makes no effort to determine whether his opinion as to the reasonable rate of return to NorthBay would allow it to remain in business. (Deal Dep. p. 131)

Mr. Deal  does not consider NorthBay's billed charges, despite the clear holding of *Children's* that "evidence of a professional's customary charges and earnings is relevant and admissible to demonstrate the value of the services rendered."  *Id.* (Deal Dep. 73:4-74:5 ("I certainly believe a billed charges analysis for a hospital services [sic] is essentially irrelevant to determine reasonable value.").)  Mr. Deal justifies his failure to conduct any analysis of charges by reinterpreting *Children's* reference to "charges" to mean "payments."  (Deal Dep. 73:10-14.) But *Children's* simply cannot support this flexible reading.  The *Children's* court was very clear, saying that "full billed charges [are] relevant." There is no way to substitute "payments" for "charges" in this context without rendering this part of the court's opinion into gibberish, especially because payments are discussed at length in other parts of the *Children's* opinion.

**E.    The Data Mr. Deal Relies On To Do His Analysis Is Seriously Flawed**

Having decided to ignore the most direct evidence of reasonable value, Mr. Deal relies on aggregated data from the OSHPD to perform his analysis.  There are a number of problems with this data.

First, Mr. Deal does not understand the nature of the data on which he relies.  Mr. Deal claims that OSHPD's "Third Party/Commercial" data category allows him to analyze "how much more" commercial payors pay than Medicare or Medi-Cal, and therefore uses this data to derive his reasonable value estimates.  (Deal Rep. at p. 26.)  However, the "Third Party/Commercial" category does not exist in OSHPD's data.  According to the OSHPD Hospital Reporting Manual (which Deal himself cites), the data category he is referring to does not include the word "commercial" in its name, but is instead simply called "Other Third Parties – Traditional" and "Other Third Parties – Managed Care."  This "Third Party/Commercial"

1  category includes charges to and payments by multiple **government** payors that pay at legislated

2  or regulated rates.   https://oshpd.ca.gov/wp-content/uploads/2018/07/HospManualch8000.pdf

3  ("The Other Third Parties – Traditional category includes all other forms of health coverage

4  excluding managed care plans.  Examples include Short-Doyle (a Medi-Cal program), Tricare

5  (CHAMPUS), State Legalization Impact Assistance Grants (SLIAG) as part of the Immigration

6  Reform and Control Act (IRCA) of 1986, Children's Medical Services, and Worker's

7  Compensation.").  Payments under these programs are payments made by the federal or state

8  government, and are not made through contract or negotiation.  *See e.g.* 32 C.F.R. § 199.14

9  (setting forth payment methodology for Tricare (CHAMPUS) hospital reimbursement); Cal.

10  Code Regs. tit. 8, § 9789.10 *et seq.* (setting forth worker's compensation fee schedule)., Mr.

11  Deal's inclusion of these payments in what he calls his "OSHPD Commercial Ratio" (Deal Rep.

12  at p. 39 Figs. 17a, 17b) shows that he is either ignorant about the data on which he relies or he is

13  purposefully attempting to mislead the jury.

14        Furthermore, the OSHPD data only shows in the aggregate the total amount of what each

15  hospital charges and the total amount it was paid by all payors in the "Other Third Parties"

16  category.  (Tooch Decl. Ex. G.)  The data does not distinguish between payors in this category,

17  and does not allow one to analyze any single claim.  (*Id.*)  It is therefore impossible to determine

18  whether the payments made on any given claim were paid pursuant to a government rate, a

19  contract rate, or a non-contracted rate.  It is also impossible to determine what percentage of the

20  Other Third Parties category is made up by government payors versus commercial payors.

21  (Tooch Decl. Ex. D pp. 11-16.)

22        Relying on OSHPD data also prevents one from determining whether a hospital was a

23  "willing seller" of its services at the rate the claim was paid.  Because the OSHPD data is

24  aggregated, it is impossible for Mr. Deal or anyone else to determine **what was actually owed**

25  on any of the claims that make up the OSHPD data.  (*Id.*)  In other words, it is impossible to

26  determine whether any particular claim was paid at an agreed-upon or reasonable rate.  Deal's

27  reliance on this data therefore ignores the *Children's* court's observation that a health plan's

28  unilateral payment decisions are not the measure of reasonable value.

1        As any expert in the healthcare industry (or any patient that has dealt with a health plan)

2   should know, claims are underpaid by commercial payors all the time.  This case is illustrative.

3   The OSHPD data reflects the amounts Blue Shield paid NorthBay for its services.  But the very

4   fact that NorthBay has filed this lawsuit indicates that NorthBay has not "accepted" the rates

5   paid by Blue Shield the thousands of claims at issue.  In other words, it is not a "willing seller"

6   of its services at the rates paid by Blue Shield.  The same is true for payments made by other

7   health plans to NorthBay which NorthBay has contested, or is contesting, either through appeals

8   or litigation.  (*Id*. pp. 13-14.)

9        Furthermore, while claims may be paid at the correct contract rate, there still may be a

10  dispute as to the total amount owed on the claim.  There are many reasons for disputes may arise

11  as to the amount of payment on a claim, even though there is no dispute as to the rate of payment

12  owed on the claim.  For example: (a) the health plan may claim that the hospital did not properly

13  obtain authorization for the services; (b) the health plan may claim that some of the services were

14  not medically necessary; (c) the health plan may claim that the level of services provided were

15  not appropriate; (d) the health plan may claim that the hospital did not bill the right codes on the

16  claim; or (e) the health plan may claim that the hospital did not bill timely on the claim.

17  Accordingly, payment on any given claim may be below the amount due on the claim, separate

18  and apart from the rate issue.  Yet, Mr. Deal represents that this data reflects what a willing

19  buyer and willing seller agree upon as reasonable rates for service.  (*Id.* pp. 11-16.)

20       Mr. Deal himself recognizes the problem with relying on aggregated data, which is why

21  he removes any claims where payment is zero from the Blue Shield "Paid Claims Data" he uses

22  in his report.  (Tooch Decl. Ex. Q.)  But this adjustment is impossible in the OSHPD data

23  because that data is reported and published only in the aggregate.  And even for the Blue Shield

24  "Paid Claims Data," getting rid of zero payments only gets him so far:  He has still not accounted

25  for claims on which Blue Shield paid some, but not all, of what the hospital is owed.  *See Tyson

26  Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1048, 194 L. Ed. 2d 124 (2016) ("Representative

27  evidence that is statistically inadequate or based on implausible assumptions could not lead to a

28  fair or accurate estimate . . . .")  *Student Mktg. Grp., Inc. v. Coll. P'ship, Inc.*, 247 F. App'x 90,

102 (10th Cir. 2007) (affirming exclusion of expert testimony because data relied on was an "unworkable proxy" because it included "an unknown error rate.")

Mr. Deal acknowledges that market value is based upon "the price at which a willing buyer and a willing seller would consummate a transaction, neither of whom are required to do so."  (Deal Rep. p. 7)  He claims: "In my market analysis, I consider factors that a willing buyer and willing seller would consider."  (Deal Rep. p. 8)  But the OSHPD data does not reflect what a willing buyer and a willing seller agree upon as a reasonable rate of payment, and it is a gross misrepresentation for Mr. Deal to claim that his analysis is based on a willing buyer-willing seller concept.  Given the data relied upon by Mr. Deal, his opinion is inadmissible in a case deciding "the price that 'a willing buyer would pay to a willing seller" for the services at issue here.  *Children's* at 1274.  *See Daubert,* 509 U.S. at 593 (court must evaluate "whether [the expert's] . . . methodology properly can be applied to the facts in issue."); *Lightfoot v. Union Carbide Corp.*, 175 F.3d 1008, 1999 WL 110424, at *2 (2d Cir. Mar. 1, 1999) (unpublished table opinion) (stating that "where the record indicates that the expert failed to consider necessary factors or that his analysis rests on faulty assumptions, the trial court has discretion to exclude his proffered testimony for lack of probative value"); *Cayuga Indian Nation*, 83 F. Supp. 2d 318, 324, 327 (N.D.N.Y. 2000) ("obviously, to the extent the sales data used in the first step of this process is inaccurate, it significantly impacts all subsequent calculations upon which it is based"); *Raskin v. Wyatt Co.*, 125 F.3d 55, 67-68 (2d Cir. 1997) (finding expert report irrelevant and therefore inadmissible where it failed to consider necessary comparison groups and was premised on a statistical error); Lightfoot, at *2 ("where the record indicates that the expert failed to consider necessary factors . . . the trial court has discretion to exclude his proffered testimony for lack of probative value");  *Terrell v. Childers*, No. 93 C 2460, 1996 WL 385310, at *10 (N.D. Ill. July 3, 1996) (excluding expert opinion on damages when the expert admitted in this deposition that he was not asked to consider certain facts).

1   **VI.    CONCLUSION**

2        Mr. Deal's report is based upon an incorrect standard for reasonable value, fails to

3   consider relevant facts and evidence, is unsupported by verifiable facts, is not based on sound

4   science, relies on inappropriate data, and is false and misleading to the jury.  It does not come

5   close to satisfying the standards for expert testimony under by Federal Rule of Evidence 702 and

6   *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589-90 (1993).  It should be excluded

7   in its entirety.

8   **MOTION IN LIMINE TO EXCLUDE OPINION TESTIMONY OF DR. SCHRIGER**

9        Blue Shield proffers the testimony of Dr. David L. Schriger to opine on whether "the

10  types of services provided to the exemplar patients could have been provided in any hospital

11  offering similar services."  (Tooch Decl. Ex. I ("Schriger Rep.") p. 2.)  In order to provide his

12  opinion on this topic, Dr. Schriger determined whether the care provided was more "complex"

13  than the care provided in a "typical community hospital," and concluded that the care provided

14  "was no more complex than typically provided at non-teaching hospitals."  (Schriger Rep. 2-3.)

15       Dr. Schriger's opinions are inadmissible for four separate reasons:  First, Dr. Schriger is

16  not an expert on what care a typical community hospital provides.  Second, even if he were

17  qualified to testify as an expert on the care provided by "community hospitals" in general, such

18  generalized testimony has no bearing on any issue to be decided by the jury.  Third, Dr.

19  Schriger's testimony would unduly prejudice the jury by confusing them on whether the sample

20  claims are representative of the more than 1700 claims at issue in the case, and by injecting the

21  question of whether the care provided to these sample patients was reasonable or appropriate

22  when any question as to the appropriateness of the care provided to any specific patient was

23  expressly reserved by the parties for a subsequent phase of this case.  Finally, Dr. Schriger's

24  testimony was belatedly disclosed, resulting in undue prejudice to NorthBay.

25       **A.    Dr. Schriger is Not an Expert on the Subject of His Testimony**

26       In order to be admissible, an expert witnesses' area of expertise must be brought to bear

27  on the opinion sought by the party proffering his testimony.  *Berry v. City of Detroit*, 25 F.3d

28  1342, 1351 (6th Cir. 1994) ("The issue with regard to expert testimony is not the qualifications

1    of a witness in the abstract, but whether those qualifications provide a foundation for a witness to

2    answer a specific question.")

3           Dr. Schriger, whose general expertise in emergency medicine NorthBay does not

4    challenge, is not qualified to opine on the care that "community" hospitals are capable of

5    providing.  Dr. Schriger's CV, while impressive, includes not a single job, publication,

6    professional association, or experience as an expert witness which would qualify him to opine as

7    an expert on the care that community hospitals are capable of providing.  (Schriger Rep. Ex. C.)

8    Dr. Schriger's only experience during the last two decades has been an UCLA Medical Center.

9    In his deposition, Dr. Schriger was candid in conceding that his most recent relevant experience

10   at a community hospital was more than 18 years ago.  Dr. Schriger concedes that community

11   hospitals have changed since that time in ways relevant to the kinds of care they typically

12   provide.  (Schriger Dep. 9:5-19; 36:8-37:6.)  Also in his deposition, Dr. Schriger explained that

13   nearly all of his expert testifying experience relates to whether individual patients were stable for

14   transfer, an issue that has no bearing here.  (Schriger Dep. 38:4-39:21.)

15          Moreover, Dr. Schriger's deposition testimony reveals that he has very little familiarity

16   with the types of services that community hospitals generally offer.  (Schriger Dep. 75:15-24;

17   76:21-77:3; 105:19-106:3 (Q. Is it typical for a community hospital to have an MRI? A. . . . my

18   guess would be that more than 50 percent of community hospitals in California have an MRI

19   machine. . . . I'm not claiming any expertise in terms of that I have specific knowledge).)  He

20   admits that he is not familiar with the hospitals in Solano County.  (Schriger Dep. 24)  He does

21   not know what services the hospitals surrounding NorthBay offer, such as whether they provide

22   trauma services, are primary stroke centers, have NICUs,  or have cardiac cath labs.  (*Id*. at 24,

23   72-73)   He does not know what hospitals have a trauma center, what criteria need to be met to

24   be a trauma hospital, what criteria need to be met to be a primary stroke center, he is unfamiliar

25   with NICU services, and he is unfamiliar with the criteria for being a STEMI receiving center.

26   (I*d*. at 24, 52, 57, 63, 69 )  Indeed, Dr. Schriger's report does not use any recognized definition of

27   the phrase "community hospital" at all, making his methodology of comparing NorthBay to a

28   typical community hospital even less useful or relevant.  (Schriger Dep. 78:5-80:3.)

1    An expert, even one who may be qualified as to other subjects, may not testify as to

2    opinions based on guessing or speculation.  Dr. Schriger's deposition testimony revealed that his

3    opinions relating to the services that community hospitals are capable of providing was based on

4    speculation, not on any facts, and are therefore inadmissible.  Indeed, Dr. Schriger himself

5    seemed to stray from his assigned task into areas where his expertise may have actually been

6    relevant.  (Schriger Dep. 87:10-16.)

7    **B.    Dr. Schriger's Opinion Rests on an Unjustified Assumption**

8    Dr. Schriger concludes that "there was nothing unique or special about [the sample

9    patients'] medical conditions or the treatment they received" as compared with patients at typical

10   community hospitals.   (Schriger Rep. p. 3.)  But Dr. Schriger's conclusion necessary flows

11   directly from a key <u>assumption</u> that community hospitals offer "similar services" to those offered

12   by NorthBay.  Given this assumption, Dr. Schriger's testimony is nothing more than a tautology:

13   If we simply <u>assume</u> that a "typical community hospital" offers the same services offered by

14   NorthBay, then of course all of the services offered by NorthBay to the sample patients could

15   have been provided by these entirely hypothetical community hospitals.

16   Dr. Schriger's report, along with his deposition testimony, make clear that Dr. Schriger

17   did not do any investigation of his key assumption.  For example, as Dr. Schriger notes in his

18   report that several of the sample patients received MRI scans in order to help diagnose their

19   conditions.  But, as discussed above, Dr. Schriger does not have any knowledge of whether a

20   "typical community hospital" has an MRI, and conceded that he does not "have that specific

21   knowledge."  (Schriger Dep. 105:19-106:3.)  Without his assumption that community hospitals

22   offer the same services at NorthBay, it was therefore impossible to determine whether the care

23   offered to these patients could have been provided at a typical community hospital, as opposed to

24   the hypothetical community hospital that Dr. Schriger imagined in preparing his opinions.

25   The same is true for other specialized services offered by NorthBay and provided to the

26   sample patients.  Consider NorthBay's cardiac catheterization lab.  As Dr. Schriger testified, a

27   cardiac catheterization lab in necessary to perform heart certain heart procedures, including

28   procedures performed on the sample patients.  (Schriger Dep. 42:2-8; Schriger Rep. Ex. A Row 6

Column 12.)  Nothing in Dr. Schriger's report or deposition testimony indicates that "typical community hospitals" have catheterization labs and can therefore perform these procedures.  Yet Dr. Schriger candidly conceded during his deposition that his opinion required the assumption that the hospitals to which NorthBay was being compared have cath labs.  (Schriger Dep. 80:4-82:12.)  Further, Dr. Schriger conceded that it would be "unusual" for a typical community hospital to offer all of the specialized services offered by NorthBay. (Schriger Dep. 76:21-77:3.)

### C.   The Probative Value of Dr. Schriger's Testimony is Substantially Outweighed by the Danger of Unfair Prejudice, Confusing the Issue, Misleading the Jury, and Wasting Time

Even if it is otherwise admissible, the testimony of an expert must still exceed the bar for relevance set by Federal Rule of Evidence Rule 403.  The probative value of his testimony is minimal, at best.  Dr. Schriger has no knowledge of the services provided at any of the hospitals in either expert's peer group, and his opinions are not based on any such knowledge specific to NorthBay or its peers.  To the extent that Dr. Schriger has any knowledge of the services that NorthBay provides, that knowledge was gleaned only through a cursory review of the NorthBay website.  And, as discussed above, Dr. Schriger's comparison of the services provided to the sample patients does not use any of the peer hospitals in the relevant geographic area selected by either of the parties' reasonable value experts.  Instead, Dr. Schriger's comparison uses a hypothetical "typical community hospital" that somehow provides all of the same services as NorthBay, despite his admission that this would be "unusual."  Given all of the other evidence of reasonable value here, evidence that is so completely unmoored from the specific factual circumstances of the case should have little or no relationship with the jury's ultimate determination.

Against this minimal probative value, the Court must weigh the danger of unfair prejudice, confusing the issue, misleading the jury, and wasting time.  Allowing the jury to hear Dr. Schriger's testimony would result in all of the above:  First, the sample claims on which Dr. Schriger's testimony is based were not selected to be representative of the claims as a whole.  Dr. Schriger's testimony, even if it is relevant and admissible as to the 37 sample claims, would necessarily invite the jury to reach conclusions on all 1700 claims at issue without any basis in

evidence.  Second, Dr. Schriger's testimony risks misleading the jury into believe that other hospitals in the general geographic area , and which are the basis of the parties' valuation expert testimony, could have provided the same care as that provided by NorthBay to all 1700 patients in issue.  None of the evidence that Blue Shield will offer has any bearing on that issue, and allowing the jury to hear Dr. Schriger's testimony on what a "typical community hospital" can provide is misleading insofar as it will allow them to draw that conclusion when it appears nowhere in Blue Shield's evidence.  Third, Dr. Schriger's opinion testimony is a waste of time: As discussed above, Dr. Schriger simply assumed that the "typical community hospital" to which he was comparing NorthBay offered the same services that NorthBay provided to the sample patients, even though he has no basis for believing this to be the case.

### D.   Dr. Schriger's Testimony Was Belatedly Disclosed, Resulting in Unfair Prejudice to NorthBay

The parties were originally scheduled to make expert disclosures on June 30, 2018. However, because of the delay in exchanging contracts and paid claims data, full disclosure of all materials required under Rule 26(a)(2)(B) was postponed until November 9th by mutual agreement.  However, this agreement was expressly made so that it did not apply to disclosure of "the identity" of any testifying experts under Rule 26(a)(2)(A).  (Tooch Decl. Ex. K.).  Thus, the parties exchanged the names and identities of their experts on June 30, notwithstanding their agreement to postpone the exchange of expert reports until the contracts and claims data had been exchanged.  Blue Shield disclosed a single expert witness on June 30:  Bruce Deal.  Blue Shield did not disclose Dr. Schriger and Mr. Pugh.  (Tooch Decl. ¶ 12.)

This delay in disclosure was unjustified, and will result in substantial harm to NorthBay if Blue Shield's belatedly disclosed experts are permitted to testify.  The purpose of disclosing the identities of the parties' experts while fact discovery was still ongoing was so that the parties could continue to conduct discovery on issues relating to those on which expert testimony was anticipated so that any expert opinions would ultimately conform to the facts of the case.

By waiting to disclose Dr. Schriger until after the close of fact discovery, Blue Shield deprived NorthBay of the opportunity to conduct discovery, including third party discovery, that

1   would bear on the opinions of these witnesses.  For example, with respect to Dr. Schriger's

2   testimony, NorthBay was deprived of the opportunity to conduct third party discovery relating to

3   what a "typical community hospital" generally provides, and how that differs from the services

4   offered by NorthBay to the sample patients.

5   **MOTION IN LIMINE TO EXCLUDE OPINION TESTIMONY OF MICHAEL PUGH**

6   As with Dr. Schriger, Mr. Pugh's testimony was not disclosed until months after the

7   parties had agreed to disclose the identities of their expert witnesses.  With respect to Mr. Pugh's

8   testimony, NorthBay was deprived of the opportunity to present its own quality evidence that

9   differs markedly from the publicly available quality measures that Mr. Pugh uses, and to conduct

10  third-party discovery on the quality of the hospitals which Mr. Pugh uses as comparators.

11  Because of Blue Shield's belated disclosure, these experts (to the extent they are permitted to

12  testify), will be far afield from the facts of the case and from any facts that could have been

13  gleaned through discovery.

14  **MOTION IN LIMINE TO EXCLUDE TESTIMONY OF TRACY BARNES**

15  The Federal Rules of Civil Procedure require parties to provide to other parties "the name

16  ... of each individual likely to have discoverable information—along with the subjects of that

17  information—that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P.

18  26(a)(1)(A)(i). And "[a] party who has made a disclosure under Rule 26(a) ... must supplement

19  or correct its disclosure" in a "timely manner if the party learns that in some material respect the

20  disclosure ... is incomplete or incorrect, and if the additional or corrective information has not

21  otherwise been made known to the other parties during the discovery process or in writing." *Id.*

22  R. 26(e). A party that does not timely identify a witness under Rule 26 may not use that witness

23  to supply evidence at a trial "unless the failure was substantially justified or is harmless." *Id.* R.

24  37(c)(1); *see also Yeti by Molly*, 259 F.3d at 1105. Indeed, Rule 37(c)(1) is "intended to put teeth

25  into the mandatory ... disclosure requirements" of Rule 26(a) and (e). 8B *Charles Alan Wright &*

26  *Arthur R. Miller*, Federal Practice and Procedure § 2289.1 (3d Ed.2014).

27  Fact discovery closed on October 4, 2019.  On November 30, 2018 Blue Shield first

28  disclosed that it intended to call one of its employees, Tracy Barnes, as a witness in this action.

1  (Tooch Decl. Ex. H.)  According to Blue Shield's disclosure, Mr. Barnes would provide

2  testimony "regarding the terminated contractual agreement between Blue Shield and Plaintiff."

3  (*Id.*)  This disclosure came long after the close of fact discovery, and after Blue Shield had made

4  multiple representations to the effect that it did not intend to call any fact witnesses at all.  (Dkt

5  no. 63; Tooch Decl. Ex. L.)  And Blue Shield refused to make Mr. Barnes available for

6  deposition until more than a month later, on January 4th, 2019.

7  Blue Shield's failure to disclose Mr. Barnes was neither substantially justified nor

8  harmless.  Blue Shield has been aware since the filing of the Complaint in this action that

9  NorthBay intended to present evidence of the parties' contract at trial.  (Compl., Dkt 1 ¶ 15.)

10  Moreover, NorthBay repeatedly sought discovery relevant to the contract, giving Blue Shield

11  further notice that NorthBay found the contract relevant to the current dispute.  (Tooch Decl. Ex.

12  M., Requests 31-33.)  NorthBay specifically sought all documents and communications relating

13  to Blue Shield's decision to terminate the contract in October of 2017.  (*Id.*)  Blue Shield refused

14  to produce any documents responsive to these requests on the grounds that they sought irrelevant

15  information.  (Tooch Decl. Ex. N.)  Finally, NorthBay's valuation expert discusses the contract

16  at length in his report, which was served on Blue Shield on November 9, 2018.   If Blue Shield

17  wanted to present evidence of its own on this topic, it was required to disclose any witnesses or

18  documents pursuant to Rule 26(a) and the Court's discovery orders.  After having notice that

19  NorthBay intended to make the contract at issue for more than a year, and refusing to produce

20  any documents on the subject, Blue Shield cannot now be permitted to put in evidence that was

21  never disclosed.

22  Blue Shield's disclosure delay is also not harmless.  Given Blue Shield's objections to

23  producing any documents or communications relevant to its decision to terminate the contract,

24  NorthBay does not have access to any Blue Shield documents that might otherwise have been

25  brought to bear on Mr. Barnes' self-serving testimony.  If Blue Shield believes that what Mr.

26  Barnes has to say is relevant to the contract (an issue that was explicitly raised in the Complaint),

27  it was not only required to disclose him months earlier, it was also required to withdraw its

28  objections to NorthBay's discovery requests seeking information relevant to the contract.  It did

not do so.  In fact, Mr. Barnes did not bring <u>any</u> documents his deposition, despite the fact that NorthBay's served document requests along with its deposition notice seeking documents relevant to his testimony.  (Tooch Decl. Ex. O.)  To date, Blue Shield has produced no documents relevant to the topic on which they have proffered Mr. Barnes' testimony, despite multiple outstanding discovery requests.  Blue Shield should not be permitted to put on a witness to testify as to the very topic on which it has repeatedly refused to produce documents.

In sum, Blue Shield had more than a year's worth of notice that NorthBay intended to use the parties' contract at trial.  When NorthBay sought internal Blue Shield documents and communications relating to the contract, Blue Shield objected and refused to produce them.  Now, nineteen months into this case and just over two months until trial, Blue Shield wants to present testimony which it had not previously disclosed, on a topic on which it continues to refuse to produce documents on the grounds that NorthBay's requests were irrelevant.  Allowing Mr. Barnes to testify would thus be to reward a party's blatant gamesmanship of the discovery process.  *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 863 (9th Cir. 2014) ("An adverse party should not have to guess which undisclosed witnesses may be called to testify. We – and the Advisory Committee on the Federal Rules of Civil Procedure – have warned litigants not to indulge in gamesmanship with respect to the disclosure obligations.")


DATED:  January 7, 2019                    KING & SPALDING LLP


By:   *s/ Daron Tooch*
          Daron Tooch
          Attorneys for Plaintiff NorthBay
          Healthcare Group -- Hospital Division dba
          NorthBay Medical Center and VacaValley
          Hospital,

1

## PROOF OF SERVICE

2

3 I am a citizen of the United States and resident of the State of California. I am employed in the county of Los Angeles, State of California, in the office of a member of the bar of this Court, at whose direction this service was made. I am over the age of eighteen years and not a party to the within action.

4

5 On January 7, 2019, I served the following documents in the manner described below:

6

## PLAINTIFF NORTHBAY HEALTHCARE GROUP'S CONSOLIDATED MOTIONS IN LIMINE

7

8 ☒     BY ELECTRONIC SERVICE: By serving a true and correct copy through the Court's ECF Filing System.

9

10 On the following part(ies) in this action:

11

12 Gregory Pimstone, Esq.                  Amy Briggs, Esq.
Manatt, Phelps & Phillips, LLP          Manatt, Phelps & Phillips, LLP

13 11355 West Olympic Boulevard            One Embarcadero Center, 30th Floor
Los Angeles, CA  90064-1614             San Francisco, CA  94111

14 Tel: (310) 312-4000                     Tel: (415) 291-7400
Fax: (310) 312-4224                     Fax: (415) 291-7474

15 Email: gpimstone@manatt.com             Email: abriggs@manatt.com

16

17 I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on January 7, 2019, at , California.

18

19                                              _____
                                             Patricia Newler

20

21

22

23

24

25

26

27

28