1    DARON TOOCH (State Bar No. 137269)
     dtooch@kslaw.com
2    DAVID J. TASSA (State Bar No. 314308)
     dtassa@kslaw.com
3    KING & SPALDING LLP
     633 West Fifth Street, Suite 1700
4    Los Angeles, CA 90071
     Telephone:    +1 213 443 4355
5    Facsimile:    +1 213 443 4310

6    Attorneys for Plaintiffs NORTHBAY
     HEALTHCARE GROUP – HOSPITAL DIVISION
7    dba NORTHBAY MEDICAL CENTER and
     VACAVALLEY HOSPITAL

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  NorthBay Healthcare Group -- Hospital Division dba NorthBay Medical Center and VacaValley Hospital,<br><br>13<br><br>14               Plaintiff,<br><br>15       v.<br><br>16  Blue Shield of California Life & Health Insurance Company; California Physicians' Service dba Blue Shield of California; and<br>17  Does 1-50, inclusive<br><br>18               Defendant. | Case No. 17-cv-02929-WHO<br><br>**DECLARATION OF DARON TOOCH IN SUPPORT OF PLAINTIFF NORTHBAY HEALTHCARE GROUP'S OPPOSITION TO BLUE SHIELD'S MOTIONS IN LIMINE**<br><br>Date:    2019-01-18<br>Time:    2:00 p.m.<br><br>Trial Date:  2019-02-04<br>Judge:   Hon. William H. Orrick |

19

20

21

22

23

24

25

26

27

28

I, Daron L. Tooch, declare as follows:

1.     I am a partner of the law firm King & Spalding, LLP, counsel of record for Plaintiff in this case.  I am admitted to practice before this Court.  I have personal knowledge of the facts set forth herein, and if called as a witness in this action I could and would testify competently to them.

2.     On February 21, 2018, Blue Shield served discovery requests seeking evidence of, *inter alia*, NorthBay's profit and loss statements, annual financial statements, and service specific costs.

3.     In response to these requests, NorthBay agreed to produce, and did produce, evidence of its overall revenues, expenses, profits and losses in the form of its Consolidated Financial Statements for the years 2007-2017.

4.     Attached hereto as Exhibit A is a true and correct copy of excerpts from the deposition testimony of Dr. David Schriger.

5.     Attached hereto as Exhibit B is a true and correct copy of excerpts from the deposition of Bruce Deal.

6.     Attached hereto as Exhibit C is a true and correct copy of an article titled "Hospital & Physician Cost Shift: Payment Level Comparison of Medicare, Medicaid, and Commercial Payers," which Mr. Deal cites in his report.

7.     Attached hereto as Exhibit D is a true and correct copy of excerpts from the deposition of Tracy Barnes.

8.     Attached hereto as Exhibit E is a true and correct copy of NorthBay's Initial Disclosures, dated August 29, 2018.

9.     Attached hereto as Exhibit F is the 30(b)(6) Deposition Notice served by Blue Shield, dated June 29, 2018.

10.     Attached hereto as Exhibit G is a true and correct copy of NorthBay's Supplemental Initial Disclosures, dates June 29, 2018.

11.     Attached hereto as Exhibit H is a true and correct copy of excerpts from the

1   deposition of Heather Venezio.

2        12.    Attached hereto as Exhibit I is a true and correct copy of the Curriculum Vitae of

3   Sarah Jewel.

4        13.    Attached hereto as Exhibit J is a true and correct copy of excerpts of the

5   deposition of Michael Heil.

6

7        Executed January 1, 2018 at Los Angeles, California.

8

9

10

11                     By: _____

                         Daron Tooch

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DARON TOOCH IN SUPPORT OF PLAINTIFF NORTHBAY HEALTHCARE
GROUP'S CONSOLIDATED MOTIONS IN LIMINE

DMSLIBRARY01\33706218.v1

# Exhibit A

1    that they need a cath lab, was there anything unusual

2    about these patients that made them atypically complex

3    or requiring atypically sophisticated services?

4          That's what I'm saying.

5    **Q     Okay.  So if I understood your answer -- and I**

6    **apologize that the question wasn't perfectly phrased --**

7    **but if I understood your answer, your assignment was to**

8    **compare like to like.**

9          **You didn't want to compare NorthBay to the**

10   **dodgiest hospital in the world and say, "NorthBay could**

11   **have -- NorthBay gave better care than that hospital."**

12   **You were comparing NorthBay to any hospital offering**

13   **similar services?**

14         MS. SHVARTS:  Objection.  Misstates testimony.

15         THE WITNESS:  Well, first of all, I wasn't

16   commenting anything about better care.  I just want to

17   be clear on that.  I'm not talking -- I was not asked

18   to comment on quality.  So anything when you start

19   talking about care, that's not what I concerned myself

20   with.  I just want to make that clear.

21         But my understanding of what I was asked to do

22   was to say imagine the NorthBay, imagine another -- per

23   NorthBay.  Let's leave VacaValley to the side for a

24   moment.

25         Imagine NorthBay, imagine another hospital,

**David Schriger, M.D.**                    **NorthBay Healthcare vs. Blue Shield**

1   another community hospital that offered similar

2   services.  So, yes, NorthBay has a cath lab; the

3   hospital has a cath lab.  NorthBay has a NICU; a

4   hospital that has a NICU.

5           Was there anything unusual about this

6   particular group of patients, you know, that would be

7   atypical from the case mix of patients one would see at

8   that type of hospital.

9           And, secondly, was there anything unusual

10  about the care they received that would be markedly

11  different than the care you would expect them to

12  receive at another similarly configured hospital.

13  BY MR. TASSA:

14      Q    Do you know if any of the other hospitals in

15  Solano County are similarly -- similarly configured?

16          MS. SHVARTS:  Objection.  Vague and ambiguous.

17          THE WITNESS:  I don't know one way or the

18  other.

19  BY MR. TASSA:

20      Q    All right.  Let's go to the spreadsheet.  I

21  believe that's Exhibit A of your report.  That's the

22  first spreadsheet, at least.  Oh, you brought your own.

23  Perfect.  We're on the same exhibit.

24          So let's talk about Patient BC, which I

25  believe is row 3 of the spreadsheet.  This patient got

# Exhibit B

CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1   or she not attempt to negotiate the highest price that

 2   he or she can get from a health plan?

 3        MS. BRIGGS:  And he answered that question, and

 4   it included a public policy reference.  So regardless of

 5   whether or not you're interested in it, that's part of

 6   his answer.

 7        THE WITNESS:  I think I'd give the same answer.

 8   BY MR. TOOCH:

 9   Q    From a public policy perspective, should a health

10   plan not try and negotiate the lowest rate possible with

11   a hospital?

12   A    We sort of -- we talked about variations of this

13   question before, but that in general, you know, the

14   dynamic, obviously, is payors would generally prefer to

15   pay less; hospitals would prefer to get more.  There's

16   nothing wrong with that directional point.

17        I think you're asking a slightly different

18   question, as I understand it here, about -- and I would

19   sort of phrase it as are there limits, that would be

20   from a public policy perspective, that are reasonable.

21   And there, I think that there can be real questions

22   about that.

23        So to answer your question about the payor side,

24   in general I think payors should be -- again, from a

25   public policy perspective, payors should pay rates that

Page 127

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    are, you know, market rates and allow hospitals to, you

2    know, earn a return to be able to stay in business, a

3    financial return to stay in business.

4         So if they say, you know, I'll pay you 1 cent per

5    patient and you got no choice because I'm the only payor

6    in town, I'm not -- I wouldn't endorse that as a good

7    public policy perspective on negotiating.

8    Q    What rate of return should hospitals get?

9    A    Certainly a competitive rate of return that would

10   allow hospitals to remain in business.  I mean by and

11   large, in the sense that I don't think every hospital

12   should be able to -- if it's an inefficient hospital, if

13   it's a poor quality hospital, I'm a free market

14   economist.  I think that, you know, in those kinds of

15   situations we're not obligated to keep every hospital in

16   business at all time.

17        But in terms of a competitive market rate out

18   there, I do think it's a good thing to have hospitals

19   available out there, and I think hospitals should make a

20   return that's sufficient, in general, to remain in

21   business.

22   Q    Please answer my question.

23   A    I think I just did.

24   Q    What rate of return do you think is reasonable

25   for a hospital to make?  1 percent?  2 percent?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    are, you know, market rates and allow hospitals to, you

2    know, earn a return to be able to stay in business, a

3    financial return to stay in business.

4         So if they say, you know, I'll pay you 1 cent per

5    patient and you got no choice because I'm the only payor

6    in town, I'm not -- I wouldn't endorse that as a good

7    public policy perspective on negotiating.

8         Q    What rate of return should hospitals get?

9         A    Certainly a competitive rate of return that would

10   allow hospitals to remain in business.  I mean by and

11   large, in the sense that I don't think every hospital

12   should be able to -- if it's an inefficient hospital, if

13   it's a poor quality hospital, I'm a free market

14   economist.  I think that, you know, in those kinds of

15   situations we're not obligated to keep every hospital in

16   business at all time.

17        But in terms of a competitive market rate out

18   there, I do think it's a good thing to have hospitals

19   available out there, and I think hospitals should make a

20   return that's sufficient, in general, to remain in

21   business.

22        Q    Please answer my question.

23        A    I think I just did.

24        Q    What rate of return do you think is reasonable

25   for a hospital to make?  1 percent?  2 percent?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   competition, and market solutions are typically the best

2   for allocating scarce resources.

3       Q   And that's -- and does that apply to hospital

4   contracts with payors?

5       A   It can.  Obviously there's kind of a -- the

6   reason I'm hesitating a little bit is it's -- in the

7   context of this particular case and the reasonable value

8   estimate that I'm providing, while I -- these

9   independently negotiated contracts, I think, are not

10  reflective of the reasonable value framework for this

11  matter.

12          In general, I tend to be someone that, again,

13  believes that largely independent entities negotiating

14  with one another is a good way to allocate scarce

15  resources and to develop solutions.  So I'm not one that

16  thinks it would be better if government regulated

17  everything on that.  So I think that -- anyway, go

18  ahead.

19      Q   It's your position that 12.2 percent is a

20  reasonable -- of billed charges is a reasonable rate to

21  pay NorthBay for its services.

22      A   I think you're referring back to my blended rate

23  there, which I think is, what, 1.8 times what Medicare

24  pays?  I think I've given the answer to that.  I think

25  it is, subject to this distinction of the kind of -- the

Page  135

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    finder of fact, whether or not the proper view for the

2    finder of fact is a blend across payors, which is that

3    1. -- or the 2.12.  Or, sorry, the 12 percent is

4    equivalent to my 1.8 times Medicare.

5        Q    Would you answer -- sorry.  Didn't mean to cut

6    you off.

7        A    And I've given the other -- the 4 times Medicare

8    or a little more than 4 times Medicare for commercial

9    side of it.  But I do believe that that's -- that both

10   of those are representative of reasonable value,

11   somewhat depending on one's perspective on the proper

12   framework.

13       Q    If the hospital received 12.2 percent of its

14   billed charges as payments from commercial payors, would

15   it be able to stay in business?

16            MS. BRIGGS:  Beyond scope.

17            THE WITNESS:  I haven't been asked to answer that

18   specific question.  I do know that 1.8 times Medicare

19   certainly would cover its operating expenses and more.

20   BY MR. TOOCH:

21       Q    Have you done any analysis to determine whether

22   or not -- if NorthBay received 12.2 percent of its

23   billed charges, whether it could stay in business?

24       A    I think it would be the same answer, which is to

25   say I haven't been asked to do a comprehensive analysis

Veritext Legal Solutions
866 299-5127

1    of their finances.  I do know that -- because I have

2    looked at it, that 1.8 times Medicare is higher than --

3    would more than cover their operating expenses for that

4    business and to earn a return as well.

5         Q    What do you base that on?

6         A    The OSHPD data.

7         Q    Anything else?

8         A    No.  But that's adequate.

9         Q    You just need to look at OSHPD data to determine

10   if a hospital got 12.2 percent of its billed charges, it

11   would stay in business.

12        A    I think I've given -- that's not an accurate

13   recitation of my answer.  My answer to your question was

14   I did look at does 1.8 times Medicare, would that be

15   adequate to cover Blue Shield's reported operating

16   expenses for that equivalent business.  The answer is

17   yes.

18        Q    You mean NorthBay's, not Blue Shield's.

19        A    Yes.  Thank you for correcting me.  Yes.

20        Q    And how do you determine what NorthBay's

21   operating expenses are based upon OSHPD data?

22        A    They have to report it to OSHPD.

23        Q    Okay.  And what is -- do you know what the margin

24   of NorthBay's revenues over expenses are?

25        A    That's a knowable fact.  I don't know it off the

# Exhibit C

# HOSPITAL & PHYSICIAN COST SHIFT

## PAYMENT LEVEL COMPARISON OF

## MEDICARE, MEDICAID, AND

## COMMERCIAL PAYERS

**Presented by:**
**Will Fox, FSA, MAAA**
**John Pickering, FSA, MAAA**

**December 2008**



BSC018880

At the request of America's Health Insurance Plans, the American Hospital Association, the Blue Cross Blue Shield Association, and Premera Blue Cross, Milliman has prepared this comparison of hospital and physician payment levels among Medicare, Medicaid and commercial payers.

We understand that this report will be shared with health plans, hospitals, physicians, employer groups, legislators, and others to support a constructive dialogue among all stakeholders regarding the provider payment rates paid by public programs.

## SUMMARY OF FINDINGS

Nationwide, attention is increasingly being focused on the provider payment levels of the Medicare and Medicaid programs relative to those of commercial payers. In many areas, public programs pay providers significantly lower rates than do commercial health plans. Nationwide, this discrepancy has widened in recent years, as Medicare and Medicaid hospital payments have not kept up with costs and Medicare physician payment levels have remained flat.

The payment rate differential can be thought of as a cost shift from the public programs to commercial payers. That is, if Medicare and Medicaid paid higher rates, commercial payers could pay lower rates with healthcare providers still achieving the same overall reimbursement. As it is, commercial payers subsidize the cost of Medicare and Medicaid, essentially through a hidden tax. The hidden nature of this subsidy makes it difficult to quantify and debate. With this study quantifying the cost shift, we hope to further the public discussion.

This report quantifies the cost shift for the most recent time periods with data available, 2006 for hospitals and 2007 for physicians.

We define the cost shift for each payer as the difference between the actual payment and the payment amount that would have resulted in an equal margin by payer. We estimate the total annual cost shift in the United States from Medicare and Medicaid to commercial payers is approximately $88.8 billion. Chart 1 presents our estimates.

| Chart 1 Medicare & Medicaid Cost Shift in billions | | | | |
|---|---|---|---|---|
| | *Medicare* | *Medicaid* | *Commercial* | *Total* |
| Hospital | ($34.8) | ($16.2) | $51.0 | $0.0 |
| Physician | ($14.1) | ($23.7) | $37.8 | $0.0 |
| Total | ($48.9) | ($39.9) | $88.8 | $0.0 |

Chart 1 shows Medicare paid $48.9 billion less and Medicaid paid $39.9 billion less than they would have if all payers paid equivalent rates. Commercial payers paid $88.8 billion more than they would have if all payers paid equivalent rates. That is, we calculate the cost shift by holding total provider reimbursement constant, but redistributing the source of payment.

BSC018881

The measurement of the cost shift throughout this report includes only the payment level differences among Medicare, Medicaid and commercial payers.  It does not separately value costs that providers must bear stemming from bad debt and charity care provided to individuals without insurance coverage.

Chart 2 shows that the estimated cost shift from public to private payers of $88.8 billion is estimated to be 15% of the current amount spent by commercial payers on hospital and physician services.  Stated differently, if there were no cost shift, commercial hospital and physician costs would be 15% lower.



Charts 3a and 3b show that the cost shift figures more prominently in hospital payments than in physician payments, at 18% compared to 12%.




BSC018882

Chart 4 translates the cost shift into extra costs paid by employers and employees through premium and additional cost sharing amounts (deductibles, copays, and coinsurance).  Chart 4 represents the annual cost shift burden borne by a typical family of four in a commercial PPO plan.

| **Chart 4** | | | | | | |
|---|---|---|---|---|---|---|
| **Annual Medicare & Medicaid Cost Shift Burden for** | | | | | | |
| **Typical Family of Four in a Commercial PPO Plan** | | | | | | |
| | Total Annual Cost[1] | | | | Portion Due to Cost Shift | |
| | *Cost* | | | | *Cost* | |
| | *Premium* | *Sharing* | *Total* | *Premium* | *Sharing* | *Total* |
| Employer | $10,481 | | $10,481 | $1,115 | | $1,115 |
| Subscriber | $3,731 | $2,420 | $6,151 | $397 | $276 | $673 |
| Total | $14,212 | $2,420 | $16,632 | $1,512 | $276 | $1,788 |
| % of Total | | | | 10.6% | 11.4% | 10.7% |
| 1) Based on the 2007 Milliman Medical Index, with an 85% loss ratio assumed. | | | | | | |

We estimate that the cost shift is responsible for 10.7% of total health care spending for the family, or an additional $1,788 annually.  Note that Chart 2 looks at the cost shift as a percent of only hospital and physician costs, whereas Chart 4 looks at the cost shift as a percent of all medical spending (prescription drugs and miscellaneous services) as well as health plan administration costs.

When broken down, we estimate the cost shift adds $1,512 annually, or 10.6%, to the premium of a family of four.  Of this cost shift amount, we estimate employers pay $1,115 and subscribers $397 annually.  The cost shift also increases member cost sharing by approximately $276 annually.

The percentage of total cost stemming from the cost shift varies between the premium and cost sharing components of total cost for two reasons.  First, commercial premium includes health plan administration costs as well as health care costs, and the cost shift is measured only on health care costs.  Second, typical benefit plan designs have higher cost sharing on prescription drugs, and lower cost sharing on hospital and physician services, in proportion to the total cost of the services.  These two effects combine to produce the estimates in Chart 4.

In this report, we have estimated the difference in payment rates among Medicare, Medicaid, and commercial payers.  The existence of the payment differential is established and well-known throughout the healthcare industry, although quantification of its magnitude has been lacking.  Other studies have reported large payment differentials, mainly for hospitals and to a lesser extent for physicians.  However, this study is the first that we are aware of that encompasses the payment differential in both hospital and physician costs throughout the United States.

BSC018883

## HOSPITAL

Our hospital findings are based on analysis of the 2006 American Hospital Association (AHA) Survey data. The survey includes data on the 4,927 short-term, community hospitals in the United States. The data represents each hospital's fiscal year 2006 results.

Please refer to the methodology section for details on the methodology behind the findings presented in this section.

Chart 5 presents hospital operating margins by payer.

| | (A) | (B) | (C)=A+B | (D) | (E)=C+D | (F)=E/C |
|---|---|---|---|---|---|---|
| | | *Other* | | | | |
| | *Patient* | *Operating* | *Total* | *Operating* | | *Operating* |
| | *Revenue* | *Revenue* | *Revenue* | *Expense* | *Gain* | *Margin* |
| Medicare | $195.7 | $10.0 | $205.7 | ($225.1) | ($19.4) | -9.4% |
| Medicaid | $67.8 | $4.8 | $72.6 | ($83.3) | ($10.7) | -14.7% |
| Commercial | $276.4 | $10.7 | $287.1 | ($220.6) | $66.5 | 23.1% |
| Subtotal | $539.9 | $25.6 | $565.5 | ($529.1) | $36.4 | 6.4% |
| Other Gov't & Self Pay | $43.7 | $6.7 | $50.5 | ($63.2) | ($12.7) | -25.1% |
| Operating Total | $583.6 | $32.3 | $616.0 | ($592.3) | $23.7 | 3.8% |

Chart 5
2006 Hospital Operating Margins
in billions

Chart 5 shows that hospitals experienced significant losses on Medicare and Medicaid business in 2006 and significant gains on commercial payers. This study primarily focuses on these three types of payers, but in order to present the overall operating performance, Chart 5 also includes Other Government & Self Pay, on which hospitals experienced a significant loss.

Chart 5 shows that while hospitals posted a 3.8% overall operating margin in 2006, it was composed of a 23.1% margin on commercial payers offsetting large losses on public payers and self pay.

This discrepancy is of concern not just to commercial payers, but also to hospitals that primarily serve Medicare and Medicaid populations. These hospitals may not be able to offset low public payments with higher commercial payments.

The Medicare and Medicaid values in Chart 5 include both the traditional programs and managed care plans. The Other Government category includes military, workers compensation, Native American, indigent, and other public programs.

Chart 6 presents hospital operating margins over the last 12 years. It shows the divergence of operating margins beginning in 2000. In 1999, there was approximately an 11.3 percentage point gap in operating margin between Medicare and commercial payers, and a 16.0 point gap between Medicaid and commercial. By 2006, this had widened to a 32.5 percentage point gap between Medicare and commercial, and 37.8 points between Medicaid and commercial.

BSC018884



Chart 7 translates the operating margin gap in 2006 to the hospital cost shift by payer type. For the cost shift calculation, we focus only on the three largest payer segments: Medicare, Medicaid and commercial. If the cost shift were eliminated, hospitals would achieve the same operating margin from each payer.

**Chart 7**
**2006 Medicare & Medicaid Hospital Cost Shift**
**in billions**

|  | (A) | (B) | (C) | (D)=C/A | (E)=A-C | (F) |
|---|---|---|---|---|---|---|
|  | Actual, with Cost Shift | | | *Percent of* | With Cost Shift Removed | |
|  | *Patient* | | *Cost* | *Patient* | *Patient* | |
|  | *Revenue* | *Margin* | *Shift* | *Revenue* | *Revenue* | *Margin* |
| Medicare | $195.7 | -9.4% | ($34.8) | -17.8% | $230.5 | 6.4% |
| Medicaid | $67.8 | -14.7% | ($16.2) | -23.9% | $84.0 | 6.2% |
| Commercial | $276.4 | 23.1% | $51.0 | 18.4% | $225.4 | 6.6% |
| Total | $539.9 | 6.4% | $0.0 | 0.0% | $539.9 | 6.4% |

Chart 7 shows that in 2006, if Medicare, Medicaid and commercial payers had each supplied revenue in the same proportion to their expense, Medicare would have supplied an additional $34.8 billion in revenue and Medicaid an additional $16.2 billion in revenue. The commercial segment would have needed to supply $51.0 billion less in revenue.

Column F in Chart 7 shows margins that vary somewhat by payer. This is due to differences in the mix of Medicare, Medicaid, and commercial business by hospital. For each hospital, the margin would be the same among these three payer types with the cost shift removed.

BSC018885

## PHYSICIAN

Our physician findings are based on 2007 fee schedule levels for Medicare, Medicaid, and commercial payers.

Chart 8 compares physician payment levels.

| Chart 8 2007 Physician Payment Levels | |
|---|---|
| | *Relative Payment Level* |
| Medicare | 89% |
| Medicaid | 60% |
| Commercial | 114% |
| Total | 100% |

Chart 8 shows that Medicare payment rates are approximately 89% of the overall average rate for these three payer types.  Medicaid rates are approximately 60% of the overall average, and commercial rates are approximately 114% of the average.  For the same service, then, Medicare would pay 11% less than average, Medicaid would pay 40% less than average, and commercial payers would pay 14% more than average.  The cost shift is estimated as the difference between each payer's actual payment level and the average.

Commercial payment levels vary by payer and further may vary by geographic area, physician specialty or other factors.  Our estimate is intended as an average commercial payment level across all payers, areas, and services.  Similarly, Medicare and Medicaid payment levels vary by geographic area and other factors.  The estimates represent nationwide averages.

Chart 9 quantifies the physician cost shift.

| | (A) | (B) | (C) | (D)=C/A | (E)=A-C | (F) |
|---|---|---|---|---|---|---|
| | Actual, with Cost Shift | | | | With Cost Shift Removed | |
| | | *Relative* | *Cost* | *% of* | | *Relative* |
| | *Allowed* | *Payment Level* | *Shift* | *Allowed* | *Allowed* | *Payment Level* |
| Medicare | $111.2 | 89% | ($14.1) | -13% | $125.3 | 100% |
| Medicaid | 35.9 | 60% | ($23.7) | -66% | 59.6 | 100% |
| Commercial | 311.0 | 114% | $37.8 | 12% | 273.2 | 100% |
| Total | $458.2 | 100% | $0.0 | 0% | $458.2 | 100% |

**Chart 9**
**2007 Medicare & Medicaid Physician Cost Shift**
**in billions**

Chart 9 shows that the estimated cost shift resulted in Medicare paying $14.1 billion less and Medicaid paying $23.7 billion less than they otherwise would have.  In the absence of the cost shift, commercial payers would have paid $37.8 billion less.

BSC018886

The physician results are based purely on payment rate differences between payers, whereas the hospital results are based on hospital operating margins, which take into account hospital costs as well as payment rates. The reason for this difference in approach is that reliable information about physician practice costs at a detailed level was not available.

## METHODOLOGY

All values in this report are presented as best estimates. While we present point estimates to ease interpretation, the reader should realize that, in reality, the values are not precise and should be thought of as center points of ranges of likely values. Different approaches would lead to different results.

### *Hospital*

The hospital estimates are based on 2006 AHA Survey data. The data includes values for 4,927 short-term, community hospitals in the United States. The data includes survey responses from approximately 71% of these hospitals. The data for the remaining 29% were imputed by an algorithm developed by the AHA. Of the responses, approximately 58% were stated to be based on audited financial statements.

In performing our analysis, we relied on the AHA survey data. We reviewed the data for reasonableness and compared it to other available data points. However, we have not audited the data. If the underlying data is inaccurate or incomplete, the results of our analysis may likewise be inaccurate or incomplete.

We excluded results for 310 hospitals with unusable survey data. We adjusted our subsequent results (based on the remaining hospitals) upward to account for the exclusion of these hospitals.

The commercial category in this report includes the survey categories "third-party payers" and "other non-government" payers. The majority of this category is commercial PPO, HMO, and other types of health plans.

We applied the following methodology to calculate the financial values in this report:

- Net Patient Revenue: Net patient revenue is reported in the survey by payer. Net patient revenue is gross of bad debt (which is treated as an expense) but net of charity care (which is treated as a deduction from revenue). Net patient revenue includes disproportionate share payments.

- Other Operating Revenue: Other operating revenue is reported in total in the survey data. We allocated it by payer in proportion to billed charges. We include tax appropriations in this category. We allocated tax appropriations primarily to the self-pay line of business.

BSC018887

- Operating Expense: Operating expense is reported in total in the survey data.  We allocated operating expense, net of bad debt, by payer in proportion to billed charges.  We used a single hospital specific cost-to-charge ratio to allocate expenses.  If actual hospital charges represented a consistent percentage mark-up over costs for all services, the use of a single cost-to-charge factor by hospital would accurately allocate expenses.  In reality, hospital mark-ups vary by type of service, and payer service mixes vary.  However, payer specific billed charges by service type are not available.  We think the use of the single cost-to-charge ratio by hospital is a reasonable substitute, and allocates expenses reasonably well.

  We separately allocated bad debt, since the self-pay line of business experiences much higher bad debt than do other lines.  We allocated bad debt as a percentage of net patient revenue by payer, with the self-pay target percentage much higher than the target percentage for the other payers.

*Physician*

In order to estimate the physician cost shift, we needed to estimate both the payment level differences for physician services among Medicare, Medicaid, and commercial payers, as well as the overall magnitude of payments from each payer.

To estimate the first component, the relative reimbursement levels, we estimated both the Medicaid fee schedules and typical commercial fee schedules as a percent of Medicare.  For Medicaid, we gathered the fee schedule from each state that was in effect as of July 1, 2007.  In some instances, the July 1, 2007 fee schedule was not available, in which case we used the available fee schedule closest to July 1, 2007.  We were able to gather the Medicaid fee schedules for all states except Tennessee.

We based our comparison on approximately 100 high volume procedure codes, based on a Medicaid utilization distribution, which account for approximately 55% of total medical charges.  For each procedure code, we assigned the Medicaid and Medicare allowable fees, and summarized results weighted on a Medicaid utilization distribution, expressing results as the Medicaid fee divided by the Medicare fee.  The Medicare fees assigned take into account Medicare GPCI area adjustments, as well as the Medicare site-of-service adjustment.

To estimate typical commercial physician fee levels relative to Medicare, we relied on three proprietary databases which contain commercial physician claims, nationwide.  Physician fee levels vary among commercial payers.  Our values are intended to reflect an average reimbursement level in 2007, across all professional services and across all commercial payers.  Our databases enabled us to develop estimates of physician fee levels at the three digit zip code level.

Similar to the Medicaid approach, we based our comparison on a sample of approximately 150 high volume procedure codes, based on a commercial utilization distribution, which account for approximately 67% of total RBRVS RVUs.  By three-digit zip code, we assigned the commercial allowed fee, as well as the Medicare allowed fee.  We rolled these up to the state level based on commercial membership by zip code.  We report results as the ratio of the commercial fee to the Medicare fee.

BSC018888

The second component required to estimate the cost shift is the overall magnitude of physician payments by payer.  We used information from CMS' State Health Care Expenditure Data in order to estimate professional payments by Medicare, Medicaid and commercial payers.

### Premium and Cost Sharing Impact

Chart 4 presents estimates of the magnitude of the Medicare and Medicaid cost shift in relation to premium and cost sharing amounts for a typical commercial PPO plan for a family of four. The underlying premium and cost sharing estimates are based on the 2007 Milliman Medical Index.  The Milliman Medical Index examines the total cost to deliver healthcare and how the cost is allocated between the employer and the employee.  To the underlying medical cost, we added 15% administration costs in order to estimate the typical premium level.

The Milliman Medical Index provides estimates of the premium split between employer and employee, as well as cost sharing amounts by type of service (hospital, physician, prescription drugs, and other).  These distributions were used to estimate the impact of the cost shift separately on premium and on cost sharing amounts.  The premium and cost sharing estimates in this report represent nationwide averages.  Healthcare costs and premiums vary by geographic area.

### CAVEATS AND LIMITATIONS

Milliman is an independent consulting firm that was engaged by AHIP, AHA, BCBSA, and Premera Blue Cross to develop a best estimate of the cost shift in United States.  Using the methodology presented in this report, we have objectively estimated the cost shift.

Milliman makes no representations or warranties regarding the contents of this report to third parties.  Likewise, third parties are instructed that they are to place no reliance upon this report that would result in the creation of any duty or liability under any theory of law by Milliman or its employees to third parties.  The estimates included in this report cannot and do not consider every variation from the key assumptions and the effect of variations on the results.

BSC018889

# Exhibit D

**Tracy Barnes**                              **NorthBay Healthcare vs. Blue Shield**

```
 1  outpatient; if -- you know, comparing it, how it might
 2  be impacted, PPO versus HMO, if we see differentials,
 3  because sometimes there's different rate differentials
 4  for different products.  So they'll take that data,
 5  those rate inputs, and sort of create a view of how Blue
 6  Shield sees that contract in light of our business.
 7       Q    When you say "how Blue Shield sees that
 8  contract" --
 9       A    Uh-huh.
10       Q    -- do you mean from a financial expensive?
11       A    Correct.
12       Q    So, how much the contract is worth or is going
13  to cost Blue Shield?
14       A    Well, I guess, "worth" is -- they'll --
15  they'll have some baseline data, previous experience,
16  and then they apply that to the future to say, Okay, if
17  we have that same experience at these new rates, what
18  does that do to our costs?
19       Q    And that data helps you, as a contract
20  manager, negotiate the contract?
21       A    Correct.
22       Q    You mentioned baseline data.  What did you
23  mean by that?
24       A    Well, at some point, if you're going to
25  model -- you -- you need some experience.  So you've got
```

**Page 25**

**Tracy Barnes**                                    NorthBay Healthcare vs. Blue Shield

1              evidence regarding the Blue Shield contract

2              and rates formally paid thereunder, which Blue

3              Shield does not consider relevant to issues in

4              this litigation."

5         Do you have an understanding what the

6    paragraph I just read means?

7              MS. BRIGGS:  Outside of anything you may have

8    discussed with counsel.

9              THE WITNESS:  I'm not a lawyer.  All I know is

10   that there's a possibility I'd be a rebuttal witness.

11   BY MR. TASSA:

12        Q    Okay.  Let's go back to the first sentence.

13   It says:

14              "Mr. Barnes may provide testimony

15              regarding the terminated contractual agreement

16              between Blue Shield and Plaintiff NorthBay

17              Healthcare Group . . . ."

18        Do you intend to give any other testimony

19   beyond the topic I just read in that one sentence?

20              MS. BRIGGS:  I'm going to instruct the witness

21   not to answer.

22              MR. TASSA:  The basis for that instruction?

23              MS. BRIGGS:  It's -- he's not -- first of all,

24   it would be revealing attorney-client privileged

25   communications to the extent there have been

1  communications regarding additional testimony.

2         Secondly, as the witness, he has no idea what

3  he's going to be giving in terms of testimony beyond

4  what has been designated here.  You're asking a lay

5  person what they're going to testify to at trial.

6  That's highly improper.

7  BY MR. TASSA:

8      Q   Other than the terminated contractual

9  agreement between Blue Shield and NorthBay, will you be

10 providing testimony on any other topics?

11         MS. BRIGGS:  I'm going to instruct the witness

12 not to answer on the same grounds.

13         MR. TASSA:  No further questions.

14         THE REPORTER:  Ms. Briggs, you'd like a copy

15 of the transcript, yes?

16         MS. BRIGGS:  Yes, please.

17         MR. TASSA:  Do you have any redirect?

18         MS. BRIGGS:  No.

19         THE REPORTER:  Any roughs?

20         MR. TASSA:  Oh, yes, please.

21         MS. BRIGGS:  Yes, a rough, please.

22         (The deposition concluded at 1:31 p.m.)

23                   --oOo--

24

25

# Exhibit E

1  DARON L. TOOCH (State Bar No. 137269)
   E-Mail: dtooch@health-law.com
2  DAVID J. TASSA (State Bar No. 314308)
   E-Mail: dtassa@health-law.com
3  **HOOPER, LUNDY & BOOKMAN, P.C.**
   1875 Century Park East, Suite 1600
4  Los Angeles, California 90067-2517
   Telephone: (310) 551-8111
5  Facsimile: (310) 551-8181

6

7  Attorneys for Plaintiff NORTHBAY
   HEALTHCARE GROUP – HOSPITAL
   DIVISION dba NORTHBAY MEDICAL
8  CENTER AND VACAVALLEY
   HOSPITAL

9

10              **UNITED STATES DISTRICT COURT**

11   **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

12

13  NORTHBAY HEALTHCARE GROUP        Case No. 3:17-CV-02929-WHO
    – HOSPITAL DIVISION dba
14  NORTHBAY MEDICAL CENTER          **PLAINTIFF NORTHBAY**
    AND VACAVALLEY HOSPITAL,         **HEALTHCARE GROUP --**
15                                   **HOSPITAL DIVISION DBA**
            Plaintiff,               **NORTHBAY MEDICAL CENTER**
16                                   **AND VACAVALLEY HOSPITAL'S**
         vs.                         **INITIAL DISCLOSURES**
17
    BLUE SHIELD OF CALIFORNIA        The Hon. William H. Orrick
18  LIFE & HEALTH INSURANCE
    COMPANY; CALIFORNIA              Trial Date:        None Set
19  PHYSICIANS' SERVICE dba BLUE
    SHIELD OF CALIFORNIA; and
20  DOES 1-50, inclusive,

21          Defendants.

22

23

24

25

26

27

28
                                                    3:17-CV-02929-WHO

1235578.1

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1    Plaintiff NorthBay Healthcare Group – Hospital Division dba NorthBay

2  Medical Center and VacaValley Hospital ("NorthBay") provides these initial

3  disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1)(A).

4    NorthBay makes these disclosures based on information reasonably available

5  to it at this time.  NorthBay has not completed discovery in this action.  NorthBay

6  provides these initial disclosures without prejudice to its right to introduce at trial

7  any evidence discovered after serving these initial disclosures.  NorthBay hereby

8  reserves its right to clarify, amend, modify, or supplement the information in these

9  initial disclosures in accordance with the Federal Rules of Civil Procedure and any

10  applicable Local Rules.

11  **I.   INDIVIDUALS WITH KNOWLEDGE THAT MAY BE USED TO**

12  **SUPPORT DEFENDANTS' CLAIMS OR DEFENSES**

13    Pursuant to Rule 26(a)(1)(A)(i) of the Federal Rules of Civil Procedure,

14  NorthBay identifies the following individuals likely to have discoverable

15  information – along with the subjects of that information – that NorthBay may use

16  to support its claims or defenses, unless that use would be solely for impeachment:

17    A.   Lori Eichenberger.  Ms. Eichenberger may provide testimony relating

18        to claims, billing, and appeal information for NorthBay;

19    B.   Elnora Cameron.  Ms. Cameron may provide testimony relating to

20        claims, billing, and appeal information for NorthBay;

21    C.   Jaye-Lynn Ravenstad.  Ms. Ravenstad may provide testimony relating

22        to claims, billing, and appeal information for NorthBay;

23    D.   Art Denio.  Mr. Denio may provide testimony relating to claims,

24        billing, and appeal information for NorthBay;

25    E.   Holly Hansen.  Ms. Hansen may provide testimony relating to claims,

26        billing, and appeal information for NorthBay; and

27    F.   Witnesses from Defendants on topics relating to its methodology for

28        calculating the reasonable and customary rate for NorthBay's services.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

2

3:17-CV-02929-WHO

All of the above witnesses, with the exception of any witnesses from Defendants, can be contacted through NorthBay's counsel.  NorthBay hereby reserves the right to designate additional witnesses, including witnesses that Defendants identify in this litigation and expert witnesses.

## II.   DOCUMENTS

Pursuant to Rule 26(a)(1)(A)(ii), NorthBay identifies the following categories of documents likely to be in its possession, custody, or control that may be used to support its claims or defenses, unless that use would be solely for impeachment:

A.   Documents relating to each bill for the claims at issue in this action, including but not limited to claims submission forms, explanations of benefits, remittance advices, assignments of benefits, communications between NorthBay and Defendants, records of payments, and appeal records;

B.   Any and all responses to discovery propounded by any party to this action;

C.   Any and all further documents and materials identified during the course of discovery; and

D.   Any and all other evidence and/or exhibits produced by any other party for introduction at the time of trial.

NorthBay will produce documents it intends to rely upon once an agreement on the format of the document production, a reasonable time for production, and a stipulated protective order is agreed upon by the parties.  NorthBay reserves the right to designate additional documents, including but not limited to documents designated or otherwise produced by Defendants in this action.

## III.   COMPUTATION OF DAMAGES

NorthBay presently estimates damages in excess of $10 million in non-payments and underpayments of insurance reimbursement claims submitted to Defendants, plus applicable interest and allowable costs and attorneys' fees.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1  Defendants' policies and plan documents and California law require Defendants to

2  pay the usual, customary, and reasonable amount for NorthBay's services.

3  NorthBay's billed charges are the usual, customary, and reasonable amount which

4  Defendants are required to pay.  NorthBay has already provided Defendants with a

5  list of patient claims at issue, which includes the amount of NorthBay's charges

6  relating to each patient claim as well as the amount paid by Defendants for each

7  claim.  NorthBay's damages are calculated by subtracting the amount paid by

8  Defendants from the amount charged by NorthBay.  Defendants' members and

9  insureds continue to be treated by NorthBay during the pendency of this action, and

10  NorthBay hereby reserves the right to supplement its list of patient claims that have

11  been underpaid by Defendants with new claims relating to such patients.

12          NorthBay avers that Defendants have suffered no damages due to any act or

13  omission by NorthBay.

14

15  Dated:  August 29, 2017          HOOPER, LUNDY & BOOKMAN, P.C.

16

17

18  By: _____/s/ David J. Tassa_____

19          DAVID J. TASSA
    Attorneys for Plaintiff NORTHBAY

20  HEALTHCARE GROUP – HOSPITAL
    DIVISION dba NORTHBAY MEDICAL

21  CENTER AND VACAVALLEY HOSPITAL

22

23

24

25

26

27

28

PLAINTIFF NORTHBAY HEALTHCARE GROUP -- HOSPITAL DIVISION DBA NORTHBAY MEDICAL
CENTER AND VACAVALLEY HOSPITAL'S INITIAL DISCLOSURES

1235578.1

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 1875 Century Park East, Suite 1600, Los Angeles, CA 90067-2517.

On August 29, 2017, I served true copies of the following document(s) described as **PLAINTIFF NORTHBAY HEALTHCARE GROUP -- HOSPITAL DIVISION DBA NORTHBAY MEDICAL CENTER AND VACAVALLEY HOSPITAL'S INITIAL DISCLOSURES** on the interested parties in this action as follows:

**BY HAND DELIVERY:**  I caused such envelope(s) to be delivered by hand to the office of the addressee(s).

| | |
|---|---|
| Gregory N. Pimstone, Esq. | Defendant BLUE SHIELD OF |
| MANATT, PHELPS & PHILLIPS, LLP | CALIFORNIA LIFE & HEALTH |
| 11355 West Olympic Blvd. | INSURANCE COMPANY |
| Los Angeles, CA 90064-1614 | |
| Telephone:   (310) 312-4000 | |
| Facsimile:   (310) 312-4224 | |
| E-Mail:  gpimstone@manatt.com | |

**BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with Hooper, Lundy & Bookman, P.C.'s practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.  The envelope was placed in the mail at Los Angeles, California.

| | |
|---|---|
| Amy Briggs, Esq. | Defendant BLUE SHIELD OF |
| MANATT, PHELPS & PHILLIPS, LLP | CALIFORNIA LIFE & HEALTH |
| One Embarcadero Center, 30th Floor | INSURANCE COMPANY |
| San Francisco, CA 94111 | |
| Telephone:   (415) 291-7400 | |
| Facsimile:   (415) 291-7474 | |
| E-Mail:  abriggs@manatt.com | |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on August 29, 2017, at Los Angeles, California.

Elizabeth Gomez

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL. (310) 551-8111 • FAX: (310) 551-8181

3:17-CV-02929-WHO

PLAINTIFF NORTHBAY HEALTHCARE GROUP  HOSPITAL DIVISION DBA NORTHBAY MEDICAL CENTER AND VACAVALLEY HOSPITAL'S INITIAL DISCLOSURES

1235578.1

# Exhibit F

1   MANATT, PHELPS & PHILLIPS, LLP
    GREGORY N. PIMSTONE (Bar No. 150203)
2   Email:  gpimstone@manatt.com
    11355 West Olympic Boulevard
3   Los Angeles, CA 90064-1614
    Telephone: (310) 312-4000
4   Facsimile: (310) 312-4224

5   MANATT, PHELPS & PHILLIPS, LLP
    AMY B. BRIGGS (Bar No. CA 194028)
6   Email:  abriggs@manatt.com
    One Embarcadero Center, 30th Floor
7   San Francisco, CA 94111
    Telephone: (415) 291-7400
8   Facsimile: (415) 291-7474

9   *Attorneys for Defendants*
    BLUE SHIELD OF CALIFORNIA LIFE & HEALTH
10  INSURANCE COMPANY *and* CALIFORNIA PHYSICIANS'
    SERVICE d/b/a BLUE SHIELD OF CALIFORNIA

11

12             UNITED STATES DISTRICT COURT

13           NORTHERN DISTRICT OF CALIFORNIA

14             SAN FRANCISCO DIVISION

15  NORTHBAY HEALTHCARE GROUP –    CASE NO: 3:17-CV-02929-WHO
    HOSPITAL DIVISION dba NORTHBAY
16  MEDICAL CENTER and VACAVALLEY    **DEFENDANTS BLUE SHIELD OF**
    HOSPITAL,                    **CALIFORNIA LIFE & HEALTH**
17                        **INSURANCE COMPANY'S &**
                Plaintiff,    **CALIFORNIA PHYSICIANS' SERVICE'S**
18                     **30(b)(6) NOTICE OF DEPOSITION OF**
       v.                     **PLAINTIFF NORTHBAY HEALTHCARE**
19                     **GROUP – HOSPITAL DIVISION, DBA**
    BLUE SHIELD OF CALIFORNIA LIFE &    **NORTHBAY MEDICAL CENTER**
20  HEALTH INSURANCE COMPANY;
    CALIFORNIA PHYSICIANS' SERVICE
21  dba BLUE SHIELD OF CALIFORNIA; and    Date: July 30, 2018
    DOES 1-50, inclusive,          Time: 9:00 a.m.
22                       Place: Manatt, Phelps, & Phillips, LLP
              Defendants.        One Embarcadero Center, 30th Floor
23                          San Francisco, CA 94111

24                        Action Filed:  May 22, 2017

25

26

27                       EXHIBIT  5

28                     Deponent  *Eichenberg*
                       Date  12-7-18
                       Gina Carbone, CSR

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1

1     TO PLAINTIFF NORTHBAY HEALTHCARE GROUP – HOSPITAL DIVISION DBA

2   NORTHBAY MEDICAL CENTER AND ITS ATTORNEYS OF RECORD:

3     PLEASE TAKE NOTICE THAT Defendants California Physicians' Service dba Blue

4   Shield of California and Blue Shield of California Life and Health Insurance Company

5   (collectively, "Blue Shield" or "Defendants"), by and through their attorneys, Manatt, Phelps &

6   Philips, LLP, will take the deposition of Plaintiff NorthBay Healthcare Group – Hospital Division

7   dba NorthBay Medical Center (hereinafter "NorthBay" or "Plaintiff") in the above-entitled matter

8   on July 30, 2018 commencing at 9:00 a.m., at the office of Manatt, Phelps & Phillips, LLP, One

9   Embarcadero Center, 30th Floor San Francisco, CA 94111, regarding the matters described in

10   **Exhibit A**.  The deposition will be taken upon oral examination before a certified court reporter

11   or other officer authorized to take depositions.  The oral examination will continue from day to

12   day during the hours of 9:00 a.m. to 5:00 p.m., excluding Saturdays, Sundays and holidays, until

13   completed.

14     **PLEASE TAKE FURTHER NOTICE** that Blue Shield intends to cause the proceedings

15   to be recorded by videotape, audiotape, and/or stenographic means and Blue Shield reserves the

16   right to use said videotaped recordings at the trial of this action.

17     Pursuant to Federal Rule of Civil Procedure 30(b)(6), you are notified that the deponent is

18   not a natural person and that NorthBay is to designate and produce for its deposition those of its

19   officers, directors, managing agents, employees, or agents who are most qualified to testify on its

20   behalf as to the matters set forth in **Exhibit A**.  Furthermore, NorthBay is directed to produce the

21   documents identified in **Exhibit B** .

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

NOTICE OF DEPOSITION OF NORTHBAY HEALTHCARE GROUP – HOSPITAL DIVISION
DBA NORTHBAY MEDICAL CENTER

1

2   Dated:  June 29, 2018                 MANATT, PHELPS & PHILLIPS, LLP

3

4                                          By:  s/Amy B. Briggs
                                                 Amy B. Briggs
5                                                *Attorneys for Defendants*
                                                 BLUE SHIELD OF CALIFORNIA LIFE &
6                                                HEALTH INSURANCE COMPANY and
                                                 CALIFORNIA PHYSICIANS' SERVICE dba
7                                                BLUE SHIELD OF CALIFORNIA

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

3
NOTICE OF DEPOSITION OF NORTHBAY HEALTHCARE GROUP — HOSPITAL DIVISION
DBA NORTHBAY MEDICAL CENTER

**EXHIBIT A**

**TOPICS OF EXAMINATION**

1.      The manner and/or methodology pursuant to which Plaintiff determined the amount of its billed charges, including the amount of Plaintiff's billed charges for the claims at issue in this case, from January 1, 2015, to the present.

2.      The information relied upon and factors considered by Plaintiff in determining the amounts of its billed charges, including the amount of Plaintiff's billed charges for the claims at issue in this case, from January 1, 2015, to the present.

3.      The sources of data and information considered by Plaintiff in determining the amounts of its billed charges, including the amount of Plaintiff's billed charges for the claims at issue in this case, from January 1, 2015, to the present.

4.      Any studies or reports created or maintained by or for Plaintiff that analyze Plaintiff's billed charges, including the amount of Plaintiff's billed charges for the claims at issue in this case, from January 1, 2015 to the present.

5.      The impact of any factor set forth in California Code of Regulations § 1300.71(a)(3), including the prevailing rates charged by other hospitals for services in Plaintiff's geographic area, on Plaintiff's determination of its billed charges.

6.      The justification, if any, for Plaintiff's billed charges, including but not limited to Plaintiff's billed charges for the claims at issue in this case, exceeding those of other hospitals in Plaintiff's geographic area.

7.      The manner and methodology pursuant to which Plaintiff updates its billed charges from January 1, 2015, to the present.

8.      The financial performance of Plaintiff covering the years 2015 to the present, including (without limitation) its revenues, expenses, and profitability.

9.      The creation, preparation, and content of any data, records, or reports created or maintained by or for Plaintiff that reflect Plaintiff's total billings and collections for any time period between January 1, 2015, and the present, including, at a minimum, data, records or reports that reflect (1) amounts billed by Plaintiff, (2) amounts collected (both from

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

NOTICE OF DEPOSITION OF NORTHBAY HEALTHCARE GROUP – HOSPITAL DIVISION
DBA NORTHBAY MEDICAL CENTER

1    patient/member or applicable payor), (3) contractual write-offs, (4) charity write-offs, (5) bad

2    debt, or (6) any other categories that account for the difference between gross billings and

3    collections.

4          10.     The extent and frequency pursuant to which Plaintiff accepts less, or was paid less,

5    than its billed charges as compensation for any medical services provided by Plaintiff during the

6    years 2015 to the present.

7          11.     The terms, eligibility requirements, and justification for Plaintiff's financial

8    assistance programs including, but not limited to, Plaintiff's "Financial Assistance Program" for

9    patients who have no health insurance to pay for medically necessary care or have insurance with

10   a high medical cost or out-of-pocket expenses.

11         12.     The terms of any agreement, contract or understanding (including, without

12   limitation, agreements with insurers, health plans, Medicare or Medicaid) pursuant to which

13   Plaintiff agreed to accept less than its billed charges as compensation for any medical services

14   provided by Plaintiff during the years 2015 to the present.

15         13.     The terms or factors in agreements, contracts, or understandings with payors that

16   affected Plaintiff's negotiated rates.

17         14.     Plaintiff's policies, procedures and/or practices regarding the collection of

18   copayment, co-insurance, deductibles, or any other sums deemed to be patient responsibility from

19   Plaintiff's patients.

20         15.     Plaintiff's calculation of the alleged balance due on the claims at issue in this case.

21         16.     Plaintiff's accounting for bad debt, including whether any recoveries of debt

22   previously written off or sent to collections set off the alleged amount owed on disputed claims.

23         17.     The data and/or information relied upon to create Plaintiff's spreadsheets of claims

24   at issue in this litigation that have been provided to Blue Shield, including (without limitation) the

25   location of such data/information, the identity of the hardware, software or other instruments used

26   to store such data/information, any quality control or other means used to verify the accuracy of

27   such data/information, and how such data/information is entered, maintained, and updated by

28   Plaintiff.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

5

NOTICE OF DEPOSITION OF NORTHBAY HEALTHCARE GROUP – HOSPITAL DIVISION
DBA NORTHBAY MEDICAL CENTER

1      18.    The termination of any contracts between Plaintiff and other payors from January

2 1, 2015, to the present.

3      19.    The basis for Plaintiff's contention that Blue Shield improperly manipulates data

4 in its systems to calculate reimbursement amounts.

5      20.    The terms and amounts agreed upon in any settlement agreements entered into on

6 or after January 1, 2015 with payors related to disputes over the reimbursement rate for medical

7 services provided by Plaintiff.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

6

NOTICE OF DEPOSITION OF NORTHBAY HEALTHCARE GROUP – HOSPITAL DIVISION
DBA NORTHBAY MEDICAL CENTER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT B**

**DOCUMENTS TO BE PRODUCED**

**REQUEST FOR PRODUCTION NO. 1:**

      1.      All documents used, or relied upon, or reviewed by the person(s) designated by Plaintiff to testify pursuant to this Notice of Deposition in preparation for testimony regarding the matters set forth in Exhibit A.

**REQUEST FOR PRODUCTION NO. 2:**

      2.      All documents in Plaintiff's possession, custody, or control not previously produced that refer or relate to the matters listed in Exhibit A.

**REQUEST FOR PRODUCTION NO. 3:**

      3.      All Documents requested by Blue Shield's Request for Production of Documents, Set One, to the extent not previously produced.

320353578.3

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

7

NOTICE OF DEPOSITION OF NORTHBAY HEALTHCARE GROUP – HOSPITAL DIVISION
DBA NORTHBAY MEDICAL CENTER

1

<u>**PROOF OF SERVICE**</u>

2

I, T. M. Walker, declare as follows:

3

I am employed in Los Angeles County, Los Angeles, California.  I am over the age of eighteen years and not a party to this action.  My business address is MANATT, PHELPS & PHILLIPS, LLP, 11355 West Olympic Boulevard, Los Angeles, California  90064-1614.  On June 29, 2018, I served the within:

4

5

**DEFENDANTS BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE COMPANY'S & CALIFORNIA PHYSICIANS' SERVICE'S 30(b)(6) NOTICE OF DEPOSITION OF PLAINTIFF NORTHBAY HEALTHCARE GROUP – HOSPITAL DIVISION, DBA NORTHBAY MEDICAL CENTER**

6

7

8

on the interested parties in this action addressed as follows:

9

        Daron L. Tooch
        dtooch@health-law.com
        David Tassa
        dtassa@health-law.com
        Hooper, Lundy & Bookman, P.C.
        1875 Century Park East, Suite 1600
        Los Angeles, CA 90067
        Phone:  (310) 551-8111
        FAX:  (310) 551-8181

10

11

12

13

14

15

16

☒  **(BY OVERNIGHT MAIL)** By placing such document(s) in a sealed envelope, for collection and overnight mailing at Manatt, Phelps & Phillips, LLP, Los Angeles, California following ordinary business practice. I am readily familiar with the practice at Manatt, Phelps & Phillips, LLP for collection and processing of overnight service mailing, said practice being that in the ordinary course of business, correspondence is deposited with the overnight messenger service, **GOLDEN STATE OVERNIGHT**, for delivery as addressed.

17

18

19

20

        I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made and that the foregoing is true and correct.

21

22

        Executed on June 29, 2018, at Los Angeles, California.

23

24

_____
                                        T. M. Walker

25

26

27

28

# Exhibit G

DARON L. TOOCH (State Bar No. 137269)
E-Mail:  dtooch@health-law.com
DAVID J. TASSA (State Bar No. 314308)
E-Mail:  dtassa@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
Telephone: (310) 551-8111
Facsimile: (310) 551-8181

Attorneys for Plaintiff NORTHBAY
HEALTHCARE GROUP – HOSPITAL
DIVISION dba NORTHBAY MEDICAL
CENTER AND VACAVALLEY HOSPITAL

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| NORTHBAY HEALTHCARE GROUP – HOSPITAL DIVISION dba NORTHBAY MEDICAL CENTER AND VACAVALLEY HOSPITAL,<br><br>                    Plaintiff,<br><br>          vs.<br><br>BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE COMPANY; CALIFORNIA PHYSICIANS' SERVICE dba BLUE SHIELD OF CALIFORNIA; and DOES 1-50, inclusive,<br><br>                    Defendant. | Case No. 3:17-CV-02929-WHO<br><br>**NORTHBAY HEALTHCARE GROUP DBA NORTHBAY MEDICAL CENTER AND VACAVALLEY HOSPITAL'S FIRST SUPPLEMENTAL INITIAL DISCLOSURES**<br><br>The Hon. William H. Orrick<br><br>Trial Date:          December 3, 2018 |

*(left margin, vertical)* HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

5646588.1

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1

2   Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiff NorthBay

3   Medical Group dba NorthBay Medical Center and VacaValley Hospital ("NorthBay") hereby

4   provide these first supplemental Rule 26(a) disclosures ("First Supplemental Disclosures").  These

5   First Supplemental Disclosures are made on the basis of information reasonably available to

6   NorthBay at this time, recognizing that discovery has not yet been completed in this matter and

7   that NorthBay has not yet completed their investigation of this matter.  Facts and information

8   discovered during investigation and discovery may reveal other information, add new facts,

9   documents or witnesses, or lend new meaning to facts already known.  NorthBay therefore makes

10  the following disclosures reserving all rights to amend, supplement, or modify the disclosures as

11  its investigation and discovery proceed.

12  **I.   WITNESSES**

13       A.   Amy Ziegler, Director of Advanced Nursing Practice.  Ms. Ziegler may provide

14  testimony relating to NorthBay's chest pain center, NorthBay's cardiovascular programs, and

15  other aspects of NorthBay's practice areas and nursing practice.

16       B.   Beth Gladney, Stroke Program Manager.  Ms. Gladney may provide testimony

17  relating to NorthBay's stroke and neuroscience programs.

18       C.   Joan Forbush, Director of Clinical Support Services.  Ms. Forbush may provide

19  testimony relating to NorthBay's neurology and neurosurgery programs, as well as other aspects

20  of NorthBay's neuroscience programs.

21       D.   Heather Venezio, Trauma Program Director.  Ms. Venezio may provide testimony

22  relating to NorthBay's trauma program.

23       E.   Katie Lydon, Director of Women's and Children's Services.  Ms. Lydon may

24  provide testimony relating to NorthBay's women's and children's services, including NorthBay's

25  NICU services.  Ms. Lydon may also testify about other of NorthBay's practice areas, including

26  NorthBay's cardiovascular unit.

27       F.   Edie Zusman, Chief of Neurosurgery and Medical Director, NorthBay Center for

28  Neuroscience.  Dr. Zusman may provide testimony relating to NorthBay's neurosurgery and

2                                           3:17-CV-02929-WHO

1  neuroscience practices.

2       G.      Courtney Chambers, General Surgery.  Dr. Chambers may provide testimony

3  relating to NorthBay's surgical practice.

4       H.      Jonathan Lopez, Oncology/Hematology.  Dr. Lopez may provide testimony relating

5  to NorthBay's oncology and hematology practices.

6       I.      Keni Horiuchi, Oncology/Hematology.  Ms. Horiuchi may provide testimony

7  relating to NorthBay's oncology and hematology practices.

8       J.      Louise Henry, Oncology/Hematology.  Ms. Henry may provide testimony relating

9  to NorthBay's oncology and hematology practices.

10      K.      Kim Williamson, Director of Cardiac Services.  Ms. Williamson may provide

11  testimony relating to NorthBay's cardiology services, including NorthBay's cardiac cath lab,

12  cardiology, cardiopulmonary rehabilitation, chest pain, and other cardiac services.

13      Each of the witnesses listed above may be contacted through NorthBay's counsel.

14  **II.    RESERVATION OF RIGHTS**

15      NorthBay reserves its right to further supplemental its Rule 26 disclosures as needed if

16  additional relevant information becomes available, as well as its right to amend its disclosures to

17  correct any inadvertent errors.

18      NorthBay also reserves the right to call on the witnesses disclosed by Defendants in their

19  own initial disclosures or any amendments or supplements thereto.

20  Dated:  June 28, 2018                    HOOPER, LUNDY & BOOKMAN, P.C.

21

22

23                                          By:  _____/s/ David Tassa_____

24                                               DAVID J. TASSA
                                            Attorneys for Plaintiff NORTHBAY HEALTHCARE
25                                          GROUP – HOSPITAL DIVISION dba NORTHBAY
                                            MEDICAL CENTER AND VACAVALLEY
26                                          HOSPITAL

27

28

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

5646588.1

1

## PROOF OF SERVICE

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 1875 Century

4

Park East, Suite 1600, Los Angeles, CA 90067-2517.

5

On June 29, 2018, I served true copies of the following document(s) described as **NORTHBAY HEALTHCARE GROUP DBA NORTHBAY MEDICAL CENTER AND**

6

**VACAVALLEY HOSPITAL'S FIRST SUPPLEMENTAL INITIAL DISCLOSURES** on the interested parties in this action as follows:

7

### SEE ATTACHED SERVICE LIST

8

**BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the

9

persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with Hooper, Lundy &

10

Bookman, P.C.'s practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course

11

of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred.  The envelope was placed

12

in the mail at Los Angeles, California.

13

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address dtassa@health-law.com to the persons at the e-mail

14

addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

15

I declare under penalty of perjury under the laws of the United States of America that the

16

foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

17

Executed on June 29, 2018, at Los Angeles, California.

18

19

20

Anne T. Kurke

21

22

23

24

25

26

27

28

**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

5646588.1

**SERVICE LIST**
**BorthBay Healthcare Group – Hospital Division vs. Blue Shield**
**of California Life & Health Insurance Company**
**3:17-CV-02929-WHO**

| | |
|---|---|
| Gregory N. Pimstone, Esq.<br>MANATT, PHELPS & PHILLIPS, LLP<br>11355 West Olympic Blvd.<br>Los Angeles, CA 90064-1614<br>Telephone: (310) 312-4000<br>Facsimile: (310) 312-4224<br>E-Mail: gpimstone@manatt.com | Defendant BLUE SHIELD OF<br>CALIFORNIA LIFE & HEALTH<br>INSURANCE COMPANY |
| Amy Briggs, Esq.<br>MANATT, PHELPS & PHILLIPS, LLP<br>One Embarcadero Center, 30th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 291-7400<br>Facsimile: (415) 291-7474<br>E-Mail: abriggs@manatt.com | Defendant BLUE SHIELD OF<br>CALIFORNIA LIFE & HEALTH<br>INSURANCE COMPANY |

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3:17-CV-02929-WHO

5646588.1

# Exhibit H

Heather Venezio

Page 259

03:27:46  1          (Whereupon, Exhibit 25 was marked for
03:27:46  2          identification.)
03:28:00  3          THE WITNESS:  Actually, there's some
03:28:01  4  duplication.  I apologize.  Looks like.
03:28:07  5          No, maybe not.  Sorry.  My error.
03:28:33  6          Okay.
03:28:39  7  BY MR. MAURER:
03:28:39  8      Q.  And if you see something missing, just
03:28:41  9  chime in.
03:28:47 10          All right.  So let's deal with Exhibit A
03:28:50 11  first within Exhibit 25.  So when was the last time
03:29:05 12  you looked at this -- these documents?
03:29:08 13      A.  When I discussed with the lawyer with the
03:29:10 14  accent.
03:29:10 15      Q.  Okay.  So that was the very first meeting
03:29:12 16  you had with your lawyers?  Well, strike that.
03:29:17 17          The first meeting you had in preparation
03:29:18 18  for this deposition that you talked about?
03:29:19 19      A.  Yes.
03:29:20 20      Q.  Okay.  And since that meeting, you haven't
03:29:24 21  looked at this sheet until now?
03:29:25 22      A.  No.
03:29:26 23      Q.  Apart from giving it to someone to produce
03:29:28 24  today?
03:29:28 25      A.  No.

Heather Venezio

Page 260

03:29:28  1      Q.  Okay.  And between the meeting -- I may

03:29:35  2    have asked you this, but I'm just making sure.

03:29:36  3         Between the meeting that you had with the

03:29:38  4    guy with the accent and today, you haven't looked at

03:29:41  5    any of the medical records with respect to these --

03:29:43  6      A.  No.

03:29:44  7      Q.  -- patients?

03:29:44  8      A.  No.

03:29:45  9      Q.  Okay.  Do you know what the difference

03:29:54 10    between Exhibit A and Exhibit B is?

03:29:59 11      A.  I believe it was two different reviewers.

03:30:06 12      Q.  What does that mean?

03:30:08 13      A.  There was two different people looking at

03:30:11 14    charts -- a sampling of charts.

03:30:13 15      Q.  Okay.  And who were the people looking at

03:30:15 16    the sampling of charts do you think?

03:30:17 17      A.  I don't remember their names.

03:30:19 18      Q.  Okay.  Do you have any understanding

03:30:24 19    whether sort of one set of patients was chosen by

03:30:27 20    Blue Shield and one set of patients was chosen by

03:30:30 21    NorthBay?

03:30:30 22      A.  I have no idea.

03:30:32 23      Q.  No idea.

03:30:32 24         That doesn't ring a bell?

03:30:34 25      A.  No.

Heather Venezio

Page 261

03:30:34  1      Q.  Okay.  So when you were testifying about
03:30:41  2   these cases previously, you mentioned that there
03:30:44  3   were some cases that you agreed with and -- where
03:30:48  4   you agreed with Dr. Schriger, or at least the
03:30:51  5   comments that were made here, and some cases where
03:30:53  6   you disagreed; is that right?
03:30:54  7      A.  Yes.  Yes.
03:30:55  8      Q.  So why don't we go through Exhibit A, and
03:30:58  9   can you tell me which cases you agreed with and
03:31:01 10   which ones you disagreed with based on your notes.
03:31:04 11      A.  Yes, sir.
03:31:04 12      Q.  Okay.  And I just -- as I understand it,
03:31:07 13   I'll describe it a little bit, but there is a row --
03:31:13 14   there's row A in this exhibit that is a column for
03:31:18 15   the name of the patient which is just initials, and
03:31:20 16   so, for example, I think the -- on page 1 of this
03:31:24 17   exhibit, there's a B.C. there, but I think you have
03:31:26 18   to carry over patient B.C. to the next page to get
03:31:30 19   what the final conclusion is.  Does that make sense?
03:31:33 20      A.  Yes.
03:31:33 21      Q.  Okay.  I just want to make sure we're on
03:31:34 22   the same page.  So we're going to look at patient
03:31:37 23   B.C. first.
03:31:38 24          And again, if you could look at the -- you
03:31:40 25   know, that information and tell me if you agreed

Heather Venezio

Page 262

03:31:44  1    with Dr. Schriger or disagreed, that would be

03:31:46  2    helpful.

03:31:48  3        A.  Patient B.C., I put that the MRI is not

03:31:52  4    common at a community hospital, that this -- that

03:31:55  5    the Level II requires it 24/7.  So that would be a

03:31:59  6    disagreement with the reviewer.

03:32:04  7        Q.  Okay.  And you circled -- did you circle --

03:32:07  8    in row L, you circled -- is it CT and MRI or was

03:32:12  9    that both?

03:32:13 10        A.  No, just MRI.

03:32:14 11        Q.  Just the MRI was the bigger circle.

03:32:17 12            So in the analysis section on Exhibit A for

03:32:20 13    patient B.C., Dr. Schriger says, "Nothing unusual

03:32:25 14    about this case.  It is a classic presentation of a

03:32:28 15    relatively uncommon condition."

03:32:30 16            Do you agree with those statements by

03:32:32 17    Dr. Schriger?

03:32:35 18        A.  I agree with his end statement, but the

03:32:39 19    reason he can make that statement is because the

03:32:41 20    patient got the MRI expeditiously.

03:32:50 21        Q.  And then there's a comment here that says,

03:32:52 22    "Interesting that after all the imaging the LP was

03:32:55 23    deferred since it could have been diagnostic and

03:32:57 24    therapeutic."

03:32:59 25            Do you have -- what's your -- do you agree

Heather Venezio

Page 263

03:33:01  1   or disagree with that statement?

03:33:03  2        A.  I'm not qualified to make that judgment.

03:33:13  3        Q.  So it's your opinion or view, however you

03:33:15  4   want to call it, that this wasn't a service that

03:33:21  5   could have been provided at a nontrauma center?

03:33:27  6             MR. TASSA:  Objection.  That's not

03:33:29  7   Dr. Schriger's opinion.

03:33:30  8             MR. MAURER:  Okay.

03:33:31  9             MR. TASSA:  But....

03:33:32 10             THE WITNESS:  My opinion is that the

03:33:36 11   conclusion about this uncommon condition could not

03:33:41 12   have been come to as quickly as it did -- you'll see

03:33:47 13   admission date was 3/24, discharge was 3/24 --

03:33:52 14   without the MRI having been completed, which is as a

03:33:55 15   result of having it in place because of the trauma.

03:33:57 16   BY MR. MAURER:

03:33:59 17        Q.  Okay.  So in your view, unless you have an

03:34:03 18   MRI, the patient wouldn't -- you wouldn't -- the --

03:34:07 19   this conclusion couldn't have been made as quickly?

03:34:13 20        A.  I don't know that.  What I'm saying is it

03:34:14 21   got -- it reached so quickly because they did the

03:34:17 22   MRI.  I'm not asserting the negative; I'm only

03:34:20 23   asserting the positive.

03:34:25 24        Q.  Okay.  So you disagree with Dr. Schriger on

03:34:32 25   patient B.C.

Heather Venezio

Page 264

03:34:33  1          What about patient A.G.?

03:34:40  2      A.  A.G., I do not agree with him.

03:34:46  3      Q.  And why not?

03:34:48  4      A.  His statement that this is a very common

03:34:51  5   case and was a very typical version of that common

03:34:54  6   case.  That I do not find that laceration --

03:35:02  7   laceration repairs are common to emergency

03:35:06  8   departments.  But laceration repairs of psychiatric

03:35:10  9   patients are not common and are far -- a little bit

03:35:14 10   more complicated than a simple laceration repair.

03:35:19 11      Q.  Okay.  So is it your opinion that, for

03:35:23 12   example, patient A.G. couldn't have received care,

03:35:28 13   for example, at Sutter Solano or Kaiser Vallejo?

03:35:32 14      A.  I don't know.  I do know that the care was

03:35:35 15   not common and typical for a laceration repair.  For

03:35:40 16   a psychiatric patient, we assign -- and that's what

03:35:44 17   you see my note here.  The symbol is psych,

03:35:47 18   psychiatric.  One-to-one.  We had to provide

03:35:51 19   one-to-one safety attendant.  That's the "attendant"

03:35:55 20   you see here.  24/7.  So it does cause an extra

03:36:00 21   burden to our emergency department to provide this

03:36:04 22   care.

03:36:05 23      Q.  And do other -- do you know if, like,

03:36:08 24   Kaiser Vallejo, Sutter Solano, do they have safety

03:36:11 25   attendants that they could use in similar

Heather Venezio

Page 265

03:36:13  1   circumstances, if you know?

03:36:14  2       A.  I don't know how they do psychiatric care

03:36:18  3   for their ER patients.  I just know what we provide

03:36:22  4   in our emergency department.

03:36:25  5          And to say that it was common did not ring

03:36:28  6   true for me.

03:36:28  7       Q.  Okay.  So your disagreement is with his use

03:36:32  8   of the word "common" because there was a psychiatric

03:36:34  9   element to this case?

03:36:34 10       A.  Correct.  And the patient clearly stayed at

03:36:41 11   least a day.  I don't know if it was 24 hours or

03:36:44 12   less than that, but it was an extended course of

03:36:46 13   care for a common laceration.

03:36:50 14       Q.  So anything else that you think made this

03:36:52 15   case uncommon?

03:36:53 16       A.  No, sir.

03:36:56 17       Q.  So let's look at patient T.P.  Can you tell

03:36:59 18   me whether or not you agree with Dr. Schriger's

03:37:01 19   analysis.

03:37:01 20       A.  I agree.

03:37:02 21       Q.  Okay.  Let's go to patient B.E.  Do you

03:37:10 22   agree with Dr. Schriger's analysis there?

03:37:12 23       A.  No.

03:37:22 24       Q.  Why do you disagree?

03:37:25 25       A.  He put in here that they were surprised

Heather Venezio

Page 266

03:37:29  1    that they discharged the patient so soon given that

03:37:32  2    he had a positive troponin and a BNP.  "Nothing

03:37:37  3    difficult or unusual about this case."

03:37:40  4         I appreciate that he describes us as being

03:37:43  5    efficient, but the efficiency is a result of us

03:37:45  6    being a STEMI center and putting processes into

03:37:49  7    place so that we can efficiently discharge these

03:37:54  8    patients.  I have an extra tech assigned just to do

03:37:57  9    code rule-outs.  And the cath lab was able to get

03:37:59 10    the patient in, and it required a cath lab visit.

03:38:05 11    Previously we would have had to transfer that

03:38:06 12    patient.  That's what "transfer" note is here.

03:38:09 13         But it's only as a result of us being a

03:38:11 14    STEMI center with cath lab.  If this patient had

03:38:14 15    been at any other facility, they would have had to

03:38:16 16    go out to a cath lab to get this evaluated, because

03:38:20 17    the patient had a cardiac cath lab visit.  I

03:38:24 18    believe.  I can't speak to that a hundred percent.

03:38:26 19    But based on what my notes are here -- or it's that

03:38:29 20    we have a cath lab and -- for a STEMI center and

03:38:33 21    that allows us to have efficient care.

03:38:35 22         Q.  Okay.

03:38:36 23         A.  I don't know that this efficient care would

03:38:37 24    have been so efficient at another facility without

03:38:41 25    these internal processes and performance improvement

Heather Venezio

Page 267

03:38:45   1   in place.

03:38:45   2       Q.   Do you know if Queen of the Valley Medical

03:38:47   3   Center is a STEMI Receiving Center designation?

03:38:50   4       A.   Remember we talked about this.   I am not a

03:38:52   5   hundred percent sure, but I would make the

03:38:53   6   assumption that they are

03:38:55   7       Q.   Do they have cardiac cath labs there?

03:38:59   8       A.   I would assume that they do.

03:39:01   9       Q.   So do you think the QVMC emergency

03:39:05  10   department/trauma center could have handled a case

03:39:08  11   like this?

03:39:08  12       A.   Yes.   But not Sutter Solano.

03:39:10  13       Q.   Okay.

03:39:11  14       A.   Or Kaiser Vacaville.

03:39:12  15       Q.   And -- because Kaiser Vacaville is not a

03:39:14  16   STEMI Receiving Center?

03:39:15  17       A.   Correct.

03:39:15  18       Q.   Okay.   But if a facility has the capability

03:39:21  19   of a STEMI Receiving Center designation and a

03:39:24  20   cardiac cath lab, then you would assume they could

03:39:27  21   provide similar care to this patient?

03:39:28  22       A.   Yeah, if they were doing -- if they were a

03:39:30  23   chest pain center accredited facility.   Because we

03:39:33  24   have a standard of care that's met by being a chest

03:39:35  25   pain center accredited facility.

Heather Venezio

Page 268

03:39:37  1        Q.  Okay.  Anything else you disagree with with
03:39:40  2    respect to Dr. Schriger on patient B.E.?
03:39:43  3        A.  No.
03:39:44  4        Q.  Let's talk about patient P.H.  Do you have
03:39:46  5    any disagreements with Dr. Schriger regarding
03:39:49  6    patient P.H.?
03:39:50  7        A.  No.
03:39:51  8        Q.  How about disagreements with Dr. Schriger
03:39:53  9    with respect to patient J.P.?
03:39:55 10        A.  No.
03:40:05 11        Q.  Do you have any disagreements with
03:40:07 12    Dr. Schriber (verbatim) with re- -- Schriger with
03:40:11 13    respect to patient T.P.?
03:40:12 14        A.  No.
03:40:13 15        Q.  Do you have any disagreements with
03:40:15 16    Dr. Schriger with respect to patient R.C.?
03:40:17 17        A.  No.
03:40:17 18        Q.  Do you have any disagreements with
03:40:19 19    Dr. Schriger with respect to patient J.K.?
03:40:21 20        A.  No.
03:40:27 21        Q.  Do you have any disagreements with
03:40:29 22    Dr. Schriger with respect to patient T.B.?
03:40:31 23        A.  Yes.
03:40:32 24        Q.  And what's your -- what do you disagree
03:40:34 25    with Dr. Schriger on?

Heather Venezio

Page 269

03:40:35  1        A.   This was a trauma patient.  Let me look at
03:40:39  2    it just for a second.
03:41:08  3            Okay.  So this was a limited activation,
03:41:10  4    and it requires one-to-one nursing care until the
03:41:12  5    patient is deemed to be stable.  So although
03:41:17  6    retrospectively he is looking at this as a minor
03:41:20  7    case that could have been managed as an outpatient,
03:41:23  8    this patient met criteria based on his motorcycle
03:41:27  9    crash, which is a county criteria and a CDC criteria
03:41:29 10    for a hospital.  They appropriately activated it.
03:41:33 11            Our limited activations require the ED
03:41:38 12    physician, RT lab, and radiology.  It does require a
03:41:42 13    call to the trauma surgeon, and you'll see that
03:41:45 14    "Fulton" here.  And I cut off the time.  I'm sorry.
03:41:47 15    It was 12:0-something.  Noon-ish.  And then
03:41:53 16    Dr. Fulton did see the patient at 12:51 and did his
03:41:57 17    orders.
03:42:00 18            And the patient -- we have a policy that on
03:42:03 19    the limited activations, when the emergency
03:42:07 20    department physician calls a trauma surgeon for an
03:42:10 21    admission, that they are to respond within one hour
03:42:12 22    if it's an admission to the medical surgical units.
03:42:15 23    And so he clearly met that criteria there by being
03:42:19 24    there at 12:51.
03:42:22 25            The patient -- he said the patient could

Page 270

03:42:23  1    have been managed as an outpatient.  However, the

03:42:27  2    trauma surgeon felt like the patient needed a

03:42:30  3    minimum of 24 -- well, a 24-hour stay to do his

03:42:34  4    tertiary survey to make sure that the patient didn't

03:42:37  5    have any occult injuries.  So although he says this

03:42:41  6    could be managed as an outpatient, I think if the

03:42:44  7    patient had not been in a motorcycle crash and been

03:42:47  8    activated, perhaps he's correct.  But due to the

03:42:49  9    activation and the physician's judgment that the

03:42:51 10    patient may need an additional evaluation, that I

03:42:55 11    disagreed with that.

03:42:56 12        Q.   Okay.

03:42:57 13             And sorry, real quick on the analysis

03:43:03 14    section of patient T.B., there's a note that says --

03:43:07 15    I think it's a time note -- "0708 called B.S."

03:43:12 16             What does that refer to?

03:43:14 17        A.   Called Blue Shield.

03:43:15 18        Q.   Oh.  Okay.  And what's that a reference to,

03:43:18 19    other than --

03:43:19 20        A.   That's the notification piece that I was

03:43:20 21    referring to early -- you know, us doing some audits

03:43:24 22    of our staff about whether that -- so I'm finding

03:43:26 23    that, was there a note in the electronic medical

03:43:30 24    record.  It does not reflect whether or not a call

03:43:32 25    was made, because I haven't checked with the

Heather Venezio

Page 271

03:43:34  1    transfer center on these, but are my techs actually

03:43:37  2    documenting that they're calling the transfer center

03:43:39  3    for that notification.  So it was just a note to

03:43:42  4    myself about, hey, since I'm looking in there, can I

03:43:44  5    check on my staff.  So....

03:43:46  6        Q.  Okay.  So that's the only reason you were

03:43:49  7    noting the Blue Shield aspect of it was to check on

03:43:51  8    your own staff?

03:43:53  9        A.  Yes.  And to also -- you know, if they --

03:43:57 10    if they didn't want the patient -- if Blue Shield

03:43:59 11    did not want the patient to stay, they could have

03:44:01 12    requested for the patient to go to Sutter Roseville,

03:44:03 13    which is their trauma center, and our trauma surgeon

03:44:07 14    could have consented to that.

03:44:12 15        Q.  Okay.  And then back to the -- to the

03:44:18 16    analysis and the care at issue here.  I just want to

03:44:21 17    make sure I'm understanding what you're saying.

03:44:23 18            So the issue here is, in your mind, at

03:44:25 19    least one of the issues, is this patient, because of

03:44:28 20    the motorcycle accident and the treating physicians,

03:44:30 21    you had to activate the patient to a trauma, sort

03:44:34 22    of, level -- I'm not using the right terms, but I

03:44:37 23    know you used the middle of the three levels for

03:44:39 24    this patient?

03:44:40 25        A.  Yes, sir.

Heather Venezio

Page 272

03:44:40  1        Q.  Okay.

03:44:45  2            All right.  So let's talk about -- I'm

03:44:47  3    going to give the row number, too, now, just to make

03:44:49  4    sure there's no confusion on the record.  But row

03:44:52  5    13, patient J.C.  Do you agree with Dr. Schriger's

03:44:55  6    analysis there?

03:44:56  7        A.  Yes.

03:44:59  8        Q.  Row 14, patient J.E., do you agree with

03:45:02  9    Dr. Schriger's analysis there?

03:45:03 10        A.  I have no opinions.  Out of my scope.

03:45:06 11        Q.  Okay.  Fair enough.

03:45:10 12            Row 15, patient D.J., do you disagree with

03:45:13 13    Dr. Schriger there?

03:45:14 14        A.  Yes.

03:45:14 15        Q.  And why do you disagree with Dr. Schriger?

03:45:16 16        A.  He writes it's "routine repeat chest pain

03:45:19 17    with no complications from an autoimmune disease and

03:45:22 18    no need for extraordinary treatment."  But it looks

03:45:25 19    like there's a consult.

03:45:27 20            If we did not have a STEMI program and a

03:45:29 21    cath lab, then there could not have been a consult.

03:45:31 22    If we had needed a consult in the past, it's just a

03:45:34 23    routine community facility, would have sent that

03:45:37 24    patient someplace else to get that expert opinion.

03:45:56 25        Q.  So what you are referring to is some

Heather Venezio

Page 273

03:45:58  1   hospitals may not have a cardiac cath lab and a

03:46:03  2   STEMI receiving designation and, therefore, the

03:46:07  3   patient wouldn't have had the ability to have a

03:46:10  4   consult immediately with the cardiologist?

03:46:14  5       A.  Yes.

03:46:15  6       Q.  Okay.  Would you expect a hospital like

03:46:19  7   Queen of the Valley Medical Center to have provided

03:46:20  8   those services to the patient that has a STEMI

03:46:25  9   receiving designation and a cardiac cath lab?

03:46:29 10       A.  Yes.

03:46:30 11       Q.  Let's talk about row 16, patient W.P.  Did

03:46:34 12   I skip one?

03:46:35 13       A.  No.

03:46:35 14       Q.  Okay.  Do you agree with Dr. -- you agree

03:46:39 15   or disagree with Dr. Schriger's analysis?

03:46:42 16       A.  Agree.

03:46:48 17       Q.  All right.  Patient -- let's talk about row

03:46:53 18   17, patient B.R.  Do you agree or disagree with

03:46:56 19   Dr. Schriger's analysis?

03:46:57 20       A.  Disagree.

03:46:57 21       Q.  Okay.  And why do you disagree?

03:46:59 22       A.  This is another trauma patient, that what

03:47:09 23   I'm reading here is that this was ordinary

03:47:13 24   orthopedic care.  However, again, this is a

03:47:15 25   motorcycle crash for a patient who activated per

Heather Venezio

Page 274

03:47:23  1    county criteria and hospital criteria, and until
03:47:28  2    otherwise noted, was considered a multisystem trauma
03:47:33  3    patient.
03:47:35  4         The trauma surgeon was called.  Our policy
03:47:39  5    does say that the trauma surgeon does not have to
03:47:42  6    come in and attend the patient, but the orthopedic
03:47:47  7    surgeon was called at 2025 and had orders at 2045.
03:47:51  8    We do require a 30-minute response by orthopedics
03:47:54  9    when requested by the trauma surgeon.  That clearly
03:47:57 10    was taken care of here.
03:47:59 11         And then the patient got a FAST, which is
03:48:01 12    credentialing by the emergency department physician.
03:48:05 13    So again, this patient could have been much more
03:48:08 14    serious and needed much more intensive treatment,
03:48:12 15    and so needed to be at a trauma center.
03:48:15 16    Q.  Okay.  And when you say -- you are talking
03:48:17 17    about this is a situation where the patient might
03:48:19 18    have required something more, but it turned out that
03:48:21 19    he or she didn't?
03:48:23 20    A.  Yes.
03:48:23 21    Q.  Okay.  And then there's a note here about
03:48:27 22    authorized notifications.  Is that the Blue Shield
03:48:30 23    reference you're talking about?
03:48:31 24    A.  Yes, sir.
03:48:31 25    Q.  Okay.  What do you mean by "FAST

Heather Venezio

Page 275

03:48:35   1    credentialing"?

03:48:36   2         A.  FAST is an acronym for focused abdominal

03:48:39   3    sonography for trauma.  It is a procedure that the

03:48:45   4    ED physicians are credentialed to do.  It's not just

03:48:48   5    something that is willy-nillied.  It is

03:48:51   6    credentialing that is a result of us being a trauma

03:48:54   7    center that we credential our ED physicians to do

03:48:57   8    that specifically for trauma.

03:49:02   9         Q.  Okay.  Any other reason why you disagree

03:49:05  10    with Dr. Schriger with respect to patient B.R.?

03:49:09  11         A.  I would say that I also -- since this was

03:49:11  12    an open -- was it an open tib/fib or was it closed?

03:49:16  13    No, it was closed.  So never mind.

03:49:20  14         Q.  How about let's go to row 18, patient B.S.

03:49:23  15    Do you agree or disagree with Dr. Schriger's

03:49:25  16    analysis?

03:49:26  17         A.  Agree.

03:49:26  18         Q.  Okay.  Patient S.H. in row 19.  Do you

03:49:40  19    agree or disagree with Dr. Schriger's analysis?

03:49:43  20         A.  Both.

03:49:44  21         Q.  Okay.  Tell me what you disagree with.

03:49:49  22         A.  That it was the same patient three times.

03:49:53  23         Q.  Okay.

03:50:00  24         A.  It was three different visits but it's the

03:50:01  25    same patient.  In a random sampling, I would not

Heather Venezio

Page 276

03:50:04  1   be -- there's something wrong with your sampling if

03:50:08  2   you've got three of the same patient.  Just my first

03:50:12  3   disagreement.

03:50:16  4       Q.  Well, did -- okay.  So what -- what about

03:50:19  5   with respect to Dr. Schriger's conclusions with

03:50:21  6   respect to the -- you know, each particular patient

03:50:25  7   episode?  Do you have any agreements or

03:50:26  8   disagreements with those?

03:50:27  9       A.  The only disagreement of mine is the CTA

03:50:30  10  chest.  The CTA of the chest is accomplished from

03:50:36  11  us having the higher grade scanner that I don't know

03:50:38  12  that everyone has.

03:50:40  13      Q.  Okay.  So in each of the -- well, in

03:50:42  14  each --

03:50:43  15      A.  Just the two.

03:50:44  16      Q.  In those two, yeah --

03:50:45  17      A.  Correct.

03:50:45  18      Q.  In those two patient encounters in row 19

03:50:49  19  and row 20, there is a diagnostic test done, a CTA

03:50:53  20  chest.  What does "CTA chest" refer to?

03:50:57  21      A.  It's a CT with angiography of the chest.

03:51:02  22      Q.  Well, before you were talking to me

03:51:03  23  about -- or telling me about -- was it 256-slice?

03:51:07  24      A.  Yes.

03:51:07  25      Q.  Is that the CTA chest or is that something

Heather Venezio

Page 277

03:51:10  1    different?

03:51:10  2        A.  We can effect CTAs by having a 256.  And

03:51:15  3    you can do CT angios, which is a CTA, on a bunch of

03:51:20  4    different things.

03:51:21  5        Q.  Okay.  Do -- do -- would you expect Sutter

03:51:26  6    Solano and Kaiser Vallejo to have a CTA capability?

03:51:31  7        A.  I am unclear if they do or do not.

03:51:33  8        Q.  Okay.  You don't know one way or the other?

03:51:36  9        A.  No.

03:51:36 10        Q.  Would you expect the trauma centers --

03:51:40 11    other trauma centers to have a CTA capability?

03:51:44 12        A.  Yes.

03:51:45 13        Q.  So then your minor disagreement with

03:51:46 14    Dr. Schriger on rows 19 and 20 have to do with the

03:51:49 15    CTA chest notation here.  Those may -- in your view,

03:51:52 16    they may not have been available at all facilities?

03:51:54 17        A.  Yes.

03:51:55 18        Q.  Okay.

03:52:05 19            MR. TASSA:  21.

03:52:06 20            MR. MAURER:  Oh -- we may be missing a

03:52:08 21    page.  Are we missing a page?

03:52:10 22            THE WITNESS:  I think so.  I think you're

03:52:12 23    correct.

03:52:13 24            MR. MAURER:  Yeah.

03:52:13 25            MR. TASSA:  Are we missing a page?  Yeah,

Heather Venezio

Page 278

03:52:15  1   we're missing a page.

03:52:16  2   BY MR. MAURER:

03:52:16  3      Q.  We're missing page 22.  Can you tell from

03:52:18  4   your notes with respect to patient M.S., row 22,

03:52:22  5   whether you agreed or disagreed with Dr. Schriger?

03:52:24  6      A.  I agreed.

03:52:25  7      Q.  Okay.

03:52:27  8          All right.  Let's make our way through

03:52:29  9   Exhibit B of Exhibit 25.  All right.  Let's look at

03:52:38 10   row 3, patient M.M.  Do you agree or disagree with

03:52:42 11   Dr. Schriger's analysis?

03:52:43 12      A.  Agree.

03:52:47 13      Q.  Row -- let's look at row 4, patient U.C.

03:52:50 14   Do you agree or disagree with Dr. Schriger's

03:52:53 15   analysis?

03:52:54 16      A.  Yes.

03:52:55 17      Q.  You agree?

03:52:55 18      A.  Yes.

03:52:56 19      Q.  Okay.  Row 5, patient C.H.  Do you agree or

03:53:01 20   disagree with Dr. Schriger's analysis?

03:53:03 21      A.  Agree.

03:53:14 22      Q.  And you made a notation -- so -- well,

03:53:18 23   let's talk about row 6, patient C.H.  I see you made

03:53:23 24   a notation about the same patient.  Do you think

03:53:25 25   possibly it's the same patient as row 5 C.H.?

Page 279

03:53:30  1      A.  It is the same patient.

03:53:31  2      Q.  It is the same patient.  Okay.  You had

03:53:33  3  medical records you probably could see.

03:53:35  4          Well, then let's talk about -- so other

03:53:37  5  than that notation, row 6, patient C.H., did you

03:53:42  6  agree or disagree with Dr. Schriger's analysis?

03:53:44  7      A.  Agree.

03:53:44  8      Q.  Okay.  Row 7, patient J.K.  Did you agree

03:53:49  9  or disagree with Dr. Schriger's analysis?

03:53:51 10      A.  I disagreed.

03:53:53 11      Q.  And why did you disagree?

03:53:54 12      A.  Because of the MRI.

03:53:58 13      Q.  Okay.  Is that the only reason you

03:54:01 14  disagreed, because there was an MRI done?

03:54:03 15      A.  Yes.

03:54:03 16      Q.  And then I apologize if we talked about

03:54:06 17  this before.

03:54:07 18          So in your understanding, Sutter Solano,

03:54:11 19  Kaiser Vallejo don't have MRIs?

03:54:14 20      A.  No, that's not what my statement is.

03:54:16 21      Q.  Okay.

03:54:18 22      A.  That they may have MRIs, but as a trauma

03:54:21 23  center, we are required to have 24/7 access to an

03:54:26 24  MRI, which is not common.

03:54:28 25      Q.  And do you have any idea one way or the

Heather Venezio

Page 280

03:54:29  1    other if patients at Kaiser Vallejo or Sutter Solano

03:54:33  2    have 24/7 access to an MRI?

03:54:35  3         A.  I do not.

03:54:35  4         Q.  Okay.  Would you expect patients at other

03:54:41  5    trauma centers -- other trauma centers to have 24/7

03:54:43  6    access to an MRI?

03:54:45  7         A.  Level II and above, yes.

03:54:46  8         Q.  Okay.  But not Level III?

03:54:50  9         A.  Correct.

03:54:50 10         Q.  All right.  So then let's go to row No. 8,

03:54:54 11    patient J.B.  Do you agree or disagree with

03:54:56 12    Dr. Schriger there?

03:54:57 13         A.  Agree.

03:55:02 14         Q.  Row No. 9, patient C.N.  Do you agree or

03:55:05 15    disagree with Dr. Schriger?

03:55:07 16         A.  Agree.

03:55:09 17         Q.  Row 10, patient C.D.  Do you agree or

03:55:12 18    disagree with Dr. Schriger?

03:55:14 19         A.  Disagree.

03:55:15 20         Q.  And why do you disagrees?

03:55:17 21         A.  The MRI and -- because he writes here that

03:55:22 22    "this is a pretty clear case of fortification

03:55:26 23    spectra, the prodrome of a migraine headache.

03:55:31 24    Stroke does not often present with wavy lines in one

03:55:36 25    eye.  This is a routine case that got lots of care."

Heather Venezio

Page 281

03:55:39  1        Because we have the stroke program in
03:55:40  2   place, the staff overtriage in order to make sure
03:55:45  3   that they don't miss something.  So they proceed as
03:55:48  4   if the patient has a serious medical condition until
03:55:52  5   ruled out.  And that requires one-to-one nursing
03:55:54  6   care and Q15 monitoring, so it significantly alters
03:56:01  7   the staffing in my department.
03:56:03  8        Q.  Is that all stroke-related -- stroke
03:56:05  9   program-related staffing?
03:56:06 10        A.  Yes.
03:56:06 11        Q.  Okay.  So other facilities that had similar
03:56:09 12   stroke programs would be able to provide a similar
03:56:11 13   level of care as NorthBay; is that right?
03:56:14 14        A.  I don't know what their nursing strategy
03:56:16 15   is.
03:56:17 16        Q.  Okay.
03:56:17 17        A.  If it's one-to-one care or not, but I know
03:56:20 18   at NorthBay it is one-to-one care for the stroke
03:56:22 19   rule-outs.
03:56:24 20        Q.  Okay.  Anything else that you disagree with
03:56:27 21   with Dr. Schriger in that -- on patient C.D. in row
03:56:31 22   10?
03:56:32 23        A.  The MRI.  We got an MRI expeditiously.  And
03:56:35 24   were able to come up with the diagnosis that he has
03:56:40 25   here.  So without the MRI, perhaps the patient would

Heather Venezio

Page 282

03:56:42  1   have stayed longer.

03:56:45  2       Q.  Okay.  Is that speculation on your part?

03:56:47  3       A.  Yes.

03:56:47  4       Q.  Okay.  Let's look at row -- well, anything

03:56:51  5   else?  Any other disagreements?

03:56:53  6       A.  No, sir.

03:56:55  7       Q.  Row 11, patient C.T.  Do you agree or

03:57:00  8   disagree with Dr. Schriger?

03:57:01  9       A.  Agree.

03:57:06 10       Q.  Row 12, patient J.P.  Do you agree or

03:57:09 11   disagree with Dr. Schriger?

03:57:10 12       A.  Disagree.

03:57:11 13       Q.  And why do you disagree?

03:57:13 14       A.  The MR angiogram is something that is not

03:57:17 15   routinely available at all hospitals, routinely just

03:57:24 16   on-demand available.  You know, his blood pressure

03:57:30 17   required active management, but this is not uncommon

03:57:32 18   for someone with an intracranial bleed.

03:57:36 19            You know, intracranial bleeds are not

03:57:40 20   common at community hospitals to handle and to

03:57:43 21   manage.  Yeah.  This is -- this is a pretty high

03:57:50 22   acuity patient, in my opinion, and lots of staff

03:57:54 23   training were in this code stroke.  But it was just

03:58:02 24   odd that the patient had a brain bleed and had a

03:58:05 25   normal sensorium, but we have a neurosurgeon sitting

Heather Venezio

Page 283

03:58:08  1    around to evaluate that.

03:58:13  2         Q.  Anything else that you disagree with?

03:58:15  3         A.  No.

03:58:18  4         Q.  Well, I know you also mention -- there's

03:58:21  5    MRI note there, so the same criticism that you've

03:58:24  6    expressed before with respect to MRIs?

03:58:26  7         A.  Well, MRI and MR angio --

03:58:28  8         Q.  Right, which we --

03:58:29  9         A.  -- are in the same family.

03:58:30 10         Q.  Okay.

03:58:31 11         A.  So an MRI is magnetic resonance imaging,

03:58:34 12    and MR is magnetic resonance angiogram.  So it's

03:58:39 13    shooting dye while they're shooting the pictures.

03:58:41 14    Normally --

03:58:42 15         Q.  Same machine --

03:58:42 16         A.  Yes.

03:58:42 17         Q.  -- but just using dye?

03:58:45 18         A.  Correct.

03:58:45 19         Q.  Okay.  Okay.  And then you had some notes

03:58:50 20    in the right-hand column here that you crossed out.

03:58:53 21    Do you know why that was?  Looks like one of them --

03:58:57 22    oh, okay.

03:58:58 23         A.  It may have been that I was looking at a

03:58:59 24    different patient, honestly.

03:59:01 25         Q.  Okay.

Heather Venezio

Page 284

03:59:02  1        A.  You know, with the pages, I might have

03:59:03  2    gotten it -- so I scratched it out.

03:59:05  3        Q.  Okay.

03:59:06  4            Let's talk about row 13, patient P.W.  Do

03:59:11  5    you agree or disagree with Dr. Schriger?

03:59:13  6        A.  Agree.

03:59:13  7        Q.  Row 14, patient S.H.  Do you agree or

03:59:17  8    disagree with Dr. Schriger?

03:59:18  9        A.  Agree.

03:59:22 10        Q.  Row 15, patient L.S.  Do you agree or

03:59:25 11    disagree with Dr. Schriger?

03:59:27 12        A.  Yes and no.  I noted the CTA chest, but in

03:59:31 13    general, agreed.

03:59:32 14        Q.  Okay.  And then patient -- and then it's

03:59:37 15    the same issue with the CTA chest as you testified

03:59:40 16    with respect to another case, right?

03:59:41 17        A.  Yes.

03:59:42 18        Q.  Okay.  Row 16, patient L.L.  Do you agree

03:59:48 19    or disagree with Dr. Schriger?

03:59:51 20        A.  The -- disagree because they did an MRCP,

03:59:54 21    so the same machine, the magnetic resonance -- I'm

03:59:58 22    not going to try to pronounce that word.

04:00:01 23    Cholangiopancreatography.

04:00:05 24            So that requires the MRI machine.

04:00:11 25        Q.  And is that the only criticism you had was

Heather Venezio

Page 285

04:00:13  1   the use of the MRI machine?

04:00:15  2       A.  Yes.

04:00:16  3       Q.  No other disagreements with Dr. Schriger on

04:00:18  4   that one?

04:00:18  5       A.  No, sir.

04:00:19  6       Q.  Okay.  Row 17, patient A.C.  Agree or

04:00:24  7   disagree with Dr. Schriger?

04:00:26  8       A.  Agree.

04:00:28  9       Q.  Sort of feel like a game show host here.

04:00:32 10   Agree or disagree.

04:00:35 11           Row 18, patient B.R.  Agree or disagree

04:00:38 12   with Dr. Schriger?

04:00:39 13       A.  Disagree.  I put "same case" as in the

04:00:41 14   first report.  This is the same patient that was

04:00:44 15   B.R. in the previous exhibit.

04:00:48 16           MR. TASSA:  Both parties chose the same

04:00:49 17   case.

04:00:50 18   BY MR. MAURER:

04:00:51 19       Q.  So you've already expressed your opinions

04:00:52 20   on that one, so I'll move on to the next one.

04:00:55 21           Patient 19 -- sorry, row 19, patient S.L.

04:00:58 22   Do you agree or disagree with Dr. Schriger?

04:01:01 23       A.  Disagree strongly.

04:01:03 24       Q.  And why do you disagree?

04:01:04 25       A.  This was a full trauma team activation, so

Heather Venezio

Page 286

04:01:06  1   required all those services that we have to bear.

04:01:10  2   And it said -- even himself when he says, "This is a

04:01:14  3   moderately injured trauma patient who, fortunately,

04:01:17  4   did not require heroics," meaning he could have

04:01:21  5   required heroics, and I needed the full complement

04:01:26  6   of services in order -- sounds like he could have

04:01:28  7   used quite a bit.  He was here for five days, and

04:01:32  8   that's a pretty decent length of stay for a trauma

04:01:35  9   patient.

04:01:40  10       Q.  Any other reason why you disagree with

04:01:42  11  Dr. Schriger?

04:01:42  12       A.  No.  And then the ENT consultant, if we

04:01:45  13  didn't have a trauma center, then we would not have

04:01:47  14  robust ENT coverage.  But because of trauma, he was

04:01:51  15  able to get that service.

04:01:53  16       Q.  Is there any reason that you think this

04:01:55  17  particular patient could not have been treated

04:01:56  18  appropriately at another trauma center?

04:02:00  19       A.  At another trauma center?

04:02:01  20       Q.  Yeah.

04:02:03  21       A.  Prob- -- maybe not at a Level III.  But a

04:02:06  22  Level II, I would expect the same level of service.

04:02:08  23       Q.  Okay.  Any other disagreements you haven't

04:02:11  24  told me about with respect to row 19, patient S.L.?

04:02:15  25       A.  No, sir.

# Exhibit I

# Sarah Jewel

sjewel@northbay.org

DETAILS

707.646.3291

## PROFILE

A seasoned health care marketer with more than 30 years in the field. As the Director of Business Development for NorthBay Healthcare, I lead service development, brand manaagment and marketing for a 100+ provider medical group, two hospitals and a medical fitness center.

## EMPLOYMENT HISTORY

### Director of Business Development, NorthBay Healthcare

Jul 1990 – Present, Fairfield, CA

- Responsible for business growth; utilizes data to assess market, successfully launch new products and services
- Creates business plans and translates business goals into successful marketing strategies
- Plans and executes comprehensive marketing campaigns and manages a creative team of designers, writers, digital media specialists, videographers, and events experts
- Reports metrics and outcomes of marketing efforts
- Knowledgeable about CRM, innovations in digital marketing and social media
- A skilled and experienced healthcare business strategist who collaborates with operational leaders, physicians , and finance to promote the NorthBay brand and grow services.

### Marketing Representative, NorthBay Healthcare

Jul 1984 – Jul 1990, Fairfield, Ca

- Collaborated with clinical operations to design new services
- Performed market research
- Conducted feasibility studies for new services, created business and marketing plans for the hospitals and key services

### Marketing and Sales Representative, The George Washington University Health Plan

1978 – 1980, Washington, D.C.

- Sold this group model HMO to local employers and their employees
- Prepared collateral and participated in promotional strategy and advertising development
- Served as member advocate

## EDUCATION

### University of California, Berkeley, Masters Public Health, Administration

Sep 1980 – Jun 1982, Berkeley

### University of California, Santa Barbara, BA, Biology

Jun 1977, Santa Barbara

## AWARDS

**Aster Awards for Excellence in Medical Marketing**

| 2011 | Judge's Choice | Women's Health |
| 2015 | Bronze | Obstetrics |
| 2016 | Silver | Joint Replacement |
| 2017 | Bronze | HealthSpring Fitness |
| 2018 | Gold | Pediatrics -- Immunizations |
| 2018 | Bronze | Open Enrollment |

## PROFESSIONAL MEMBERSHIPS

**Society for Healthcare Strategy and Market Development**

# Exhibit J

Michael Heil, Volume I
CONFIDENTIAL

Page 188

1    points as opposed to 10 or 20?

2         A    Well, first of all, I'm aware of a

3    distribution, a range, which I've talked about.  I

4    looked -- I was particularly interested in the Sutter

5    arrangement, which is a kind of a classic emergency          03:20

6    only, and there the parties agreed on a 15 percentage

7    point discount for emergency only services at

8    NorthBay.

9              Sutter uses primarily for its elective

10   services its hospitals, so it's very much like any          03:20

11   other out-of-network provider.  So the parties there

12   agreed on 15.

13             15 is about in the middle of the pack for

14   what I see in --

15             MR. TOOCH:  Let him finish.                        03:20

16   BY MR. PIMSTONE:

17        Q    Go ahead.

18        A    -- about in the middle of the pack for what I

19   see for arrangements that are emergency dominant or

20   otherwise little or low steered volume.                     03:21

21             Which tells me that the residual amount, the

22   discount that is granted is what the parties think is

23   the value, the net value to the hospital of the piece

24   of paper.

25        Q    In those other contracts, what you've just        03:21

Michael Heil, Volume I
CONFIDENTIAL

Page 191

1      A      Yeah.  It's another example that's covered by

2    a protective order but is available to us here.

3         Q      In the scores of contracts that you've looked

4    at, I take it that you did not produce any of those

5    contracts in support of your opinion or as backup for      03:24

6    your opinion on the 15 percent?

7         A      I did not, and that was for two reasons.

8    One, we do have the Sutter arrangement to look at, and

9    we also have these contracts on page 25 which point to

10   the same number.                                           03:25

11           You'll notice the average there is 81.  So

12   the differential there, the Type 1 benefits are 19

13   percentage points.  So I've got 19 --

14      Q      I'm sorry, can you tell me where the 19 comes

15   from?                                                      03:25

16      A      The difference between 81 and 100.  So we

17   have 19 percentage points here from an average.  Then

18   we have the Sutter arrangement at 15.  And then we

19   have my best recollection of a middle of the road

20   where the range was between 40 and 5.                      03:25

21      Q      When you say your best recollection, these

22   are from other contracts you've looked at over the

23   course of your career?

24      A      Yeah.  In the footnote I've said I've

25   reviewed network contracts and/or emergency only          03:26

Michael Heil, Volume I
CONFIDENTIAL

Page 192

1    contracts as a part of 16 management consulting

2    engagements for business planning, 14 litigation

3    cases, and two executive management assignments.

4       Q    And if I wanted to test what those contracts

5    had to see whether your analysis is correct, how do I    03:26

6    do that?

7       A    You ask me to testify truthfully.

8       Q    But in terms of actually looking at those

9    contracts and looking at the data, I take it that

10   that's not information that you're willing to produce    03:26

11   as backup to your opinion?

12      A    That's correct.  And I -- the reason I think

13   one should be comfortable with that is that, A, these

14   are covered by confidentiality agreements; B, it

15   matches up quite closely to the Sutter arrangement and   03:27

16   closely and conservatively to page 25.

17           So I'm not asking you to completely trust me

18   as if I made this number up without there being

19   corroboration here.

20      Q    In the 16 management and consulting             03:27

21   arrangements and the 14 litigation cases, I take it

22   you're talking about hospitals located all over

23   California?

24      A    And the United States.

25      Q    And the United States.  So these could be       03:27

**PROOF OF SERVICE**

I am a citizen of the United States and resident of the State of California.  I am employed in the county of Los Angeles, State of California, in the office of a member of the bar of this Court, at whose direction this service was made.  I am over the age of eighteen years and not a party to the within action.

On January 11, 2019, I served the following documents in the manner described below:

**DECLARATION OF DARON TOOCH IN SUPPORT OF PLAINTIFF NORTHBAY HEALTHCARE GROUP'S OPPOSITION TO BLUE SHIELD'S MOTIONS IN LIMINE**

☒      BY ELECTRONIC SERVICE:  By serving a true and correct copy through the Court's ECF Filing System.

On the following part(ies) in this action:

Gregory Pimstone, Esq.
Manatt, Phelps & Phillips, LLP
11355 West Olympic Boulevard
Los Angeles, CA  90064-1614
Tel: (310) 312-4000
Fax: (310) 312-4224
Email:  gpimstone@manatt.com

Amy Briggs, Esq.
Manatt, Phelps & Phillips, LLP
One Embarcadero Center, 30th Floor
San Francisco, CA  94111
Tel: (415) 291-7400
Fax: (415) 291-7474
Email:  abriggs@manatt.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on January 11, 2019, at Los Angeles, California.

_____
Patricia Newler

Case No. 17-cv-02929-WHO
DECLARATION OF DARON TOOCH IN SUPPORT OF PLAINTIFF NORTHBAY HEALTHCARE GROUP'S CONSOLIDATED MOTIONS IN LIMINE

DMSLIBRARY01\33706218.v1