Pages 1 - 56

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

NORTHBAY HEALTHCARE GROUP -      )
HOSPITAL DIVISION doing          )
business as NORTHBAY MEDICAL     )
CENTER and VACAVALLEY HOSPITAL,)
                                 )
            Plaintiff,           )
                                 )
  VS.                            )     NO. C 17-02929 WHO
                                 )
BLUE SHIELD OF CALIFORNIA LIFE )
& HEALTH INSURANCE COMPANY; et )
al.,                             )
                                 )
            Defendants.          )
_____)
                          San Francisco, California
                          Friday, January 18, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiff:
                    KING & SPALDING LLP
                    633 West 5th Street - Suite 1700
                    Los Angeles, California  90071
                BY: **DARON L. TOOCH, ATTORNEY AT LAW**
                    **DAVID J. TASSA, ATTORNEY AT LAW**

For Defendants:
                    MANATT, PHELPS & PHILLIPS LLP
                    11355 W. Olympic Boulevard
                    Los Angeles, California  90064
                BY: **GREGORY N. PIMSTONE, ATTORNEY AT LAW**
                    **JEFFREY J. MAURER, ATTORNEY AT LAW**

                    MANATT, PHELPS & PHILLIPS LLP
                    One Embarcadero Center - 30th Floor
                    San Francisco, California  94111
                BY: **AMY B. BRIGGS, ATTORNEY AT LAW**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**Friday - January 18, 1995**                              **2:03 p.m.**

                        **P R O C E E D I N G S**

                          **---oOo---**

        **THE CLERK:**  We are here in Case Number 17-2929,

NorthBay Healthcare Group, Incorporated, versus Blue Shield of

California Life & Health Insurance.

        Counsel, please come forward and state your appearance for

the record.

        **MR. TOOCH:**  Good afternoon, Your Honor.  Daron Tooch

on behalf of NorthBay, and I have with me David Tassa.

        **THE COURT:**  Good afternoon.

        **MR. PIMSTONE:**  Good afternoon, Your Honor.  I'm Greg

Pimstone and with me is Amy Briggs and Jeff Maurer of Manatt,

Phelps & Phillips for Blue Shield.

        **THE COURT:**  Welcome.

        **MR. PIMSTONE:**  Thank you.

        **THE COURT:**  So let me tell you what I think about the

*motions in limine* --

        **MR. PIMSTONE:**  Okay.

        **THE COURT:**  -- first, and then you can argue and then

we'll go through the other things that we need to go through.

        **MR. PIMSTONE:**  Sounds good.  Should we go back or --

        **THE COURT:**  You may want to take notes and then come

on up.

        So the only motion that I intend to grant is Blue Shield's

1    Number 6, which was the tax exempt big insurance company

2    status, but I'm going to give you some guidance on the others.

3        Most importantly, the relevance of the evidence concerning

4    reasonable value of services is not cabined to the *Gould*

5    factors.  The trial should focus on the actual services at

6    issue and not the entire array of services provided by

7    NorthBay.  For example, evidence of a swimming pool is not

8    relevant but a first class ER may be.

9        It's okay for NorthBay to put on a little evidence

10   concerning its overall quality for background purposes.  It's

11   not clear to me that some of NorthBay's listed witnesses have

12   testimony germane to the services at issue in this case.

13       I'm going to be limiting the time each side has to present

14   its case to 12 hours per side, including opening and closing,

15   and we can discuss that later; but neither side is going to

16   have the luxury of presenting barely relevant testimony.

17       Generally the objections to evidence considered by Heil

18   and Deal go to the weight and not the admissibility of their

19   opinions.  They're not going to be excluded.  Cross-examination

20   can expose whether the experts are using the appropriate

21   comparator information.

22       Deal relies on more than the aggregated data from OSHPD

23   and NorthBay can point out why the Medicaid/Medicare

24   reimbursements are not apples-to-apples comparisons for

25   purposes of the reasonable value of services or why every

1   contract should have been excluded.  I will disclose the

2   sufficient basis for the 15 percent adjustment to allow for

3   cross-examination.

4       NorthBay can rely on its lapsed contract with Blue Shield

5   and Barnes may testify concerning the reasons why Blue Shield

6   did not renew the contract.

7       The parties have sufficient information to address the

8   sample claims.  If a witness refused to provide answers to

9   questions in depositions or documents, however, he will be --

10  he or she will be precluded from doing so at trial.

11      NorthBay agrees that it won't offer evidence explaining

12  billed charges or the WHA contract.

13      The Schriger testimony is sufficiently timely in light of

14  two stipulated discovery deadline continuances and the lateness

15  of identifying the claims and claim records and the ability

16  that NorthBay had to depose him.  Cross-examination can expose

17  his lack of community hospital experience.

18      And Pugh may rebut the array of services testimony to the

19  extent that NorthBay relies on it.

20      So that's the way that I looked at all of the

21  *motions in limine*, and I hope you can see the consistency.  You

22  may not agree with how they came out, but I hope you can see

23  the consistency in it.

24      So we'll start.  Mr. Tooch, do you want to point me to any

25  particular matters in that?

1          **MR. TOOCH:**  Thank you, Your Honor.

2      I understand exactly where the Court is going.  I wanted

3  to talk about just a few things.  In particular, Mr. Deal in

4  his report gives three reasons why he didn't look at the

5  contracts.  He says "NorthBay having relationships with

6  physicians in the relevant market geographic area where the

7  physicians only have admitting privileges at NorthBay."

8  Nothing to support that in his report.

9      At his deposition, he said, "I didn't look at that.  I

10  didn't study it."  That's one of the -- and so there's nothing

11  to cross-examine him on.

12      The second reason he says, "Some payers believe they need

13  NorthBay network for network access reasons."  So he claims

14  that he spoke to some payers.

15      First of all, let's take Mr. Barnes.  As we have in

16  Mr. Barnes' deposition, Mr. Barnes said he was asked about his

17  opinion about the marketplace, what was his opinion based upon.

18  His opinion was based upon the opinions of his sales force.

19  What were those opinions based on?  Those opinions were based

20  upon their conversations with others in the marketplace.

21      So we have Mr. Deal relying on Mr. Barnes who's relying on

22  his market -- his team who's speaking to other people.  There's

23  nothing in -- and Mr. Barnes can't remember the subject of what

24  he discussed.

25      And then the third thing he says is "NorthBay's marketing

1  having created a community perception that causes payers to

2  feel like they need NorthBay in network."  Again, at his

3  deposition:

4       "Did you study the market -- the marketing?

5       "No.

6       "Can you point to one piece of marketing that was not

7  appropriate?

8       "No."

9       So we have these bold statements in his report, and we're

10  concerned that he's going to be able to relay these to the jury

11  under the guise of, well, experts can rely on hearsay.  Yes,

12  experts can rely on hearsay but not this type of evidence.  So

13  that's a major issue that I have with Mr. Deal.

14       And the same issue with respect to Barnes.  If Barnes is

15  going to testify, he's saying "My opinions are based upon my

16  conversations," well, that's all hearsay.  I'm going to make

17  the appropriate objection at the time, but that's kind of the

18  main issue that we have with Deal.

19       With respect to the OSHPD data which he relies on --

20  that's capital O-S-H-P-D -- he's representing to the jury two

21  things.  Number one, that that's commercial data, which it's

22  not.  It's all bundled together.

23       Number two, he's representing that this is what a willing

24  buyer/willing seller has relied upon.  Again, that's false.

25  This is basically unilateral payments by the payers.  It

1   doesn't take into account any of the appeals or the disputes or

2   even the claims in this case are included in the OSHPD data.

3   So it's his representation that is false.

4        **THE COURT:**  Well, why can't you bring that out in

5   cross-examination?  Why isn't that a matter for

6   cross-examination?

7        It seems to me that it's relevant to have a listing of all

8   the charges paid and whether -- and some pieces of it would be

9   more relevant than others.  I don't know that anybody has got

10  the perfect comparators in this case, but we'll see during the

11  course of the case.  But why isn't it relevant to have that and

12  then you can point out all the problems?

13       I think you raise some interesting problems with that

14  data, but I don't know why it's not relevant and why you

15  couldn't expose it.

16       **MR. TOOCH:**  Because the question is:  Do we have

17  standards for what the experts can do in this case?  I would

18  argue, as Mr. Deal puts in his report and Mr. Heil puts in his

19  report, as both sides said, the *Children's Hospital* case sets

20  the standard, and the standard says *Gould* plus contracts plus

21  other evidence.

22       And his analysis is so far from any of standard.  You

23  know, he says willing buyer/willing seller but there's just

24  really no standard to what he has done over here.  It's just --

25  I think it's a subject of a *Daubert* motion in that it is so far

1    off from what any expert does in this case that it's just

2    nonsense, frankly.

3         **THE COURT:**  Nonsense?

4         **MR. TOOCH:**  Yes.

5         **THE COURT:**  Okay.  Anything further?

6         **MR. TOOCH:**  It frankly is.  He says --

7         **THE COURT:**  You said it three times now so I hear what

8    you're -- I hear your disdain.

9         **MR. TOOCH:**  So that's the major issue -- those are the

10   two major issues that I have with Mr. Deal, and that also

11   relates to Mr. Barnes' testimony about, you know, that's the

12   hearsay-within-hearsay issue.

13        **THE COURT:**  Okay.  Thank you.

14      Mr. Pimstone?

15      **MR. PIMSTONE:**  I could spend a fair amount of time

16   explaining why Mr. Deal's opinions are not nonsense, but I

17   don't think that the Court needs to hear that now.  I think the

18   Court will hear that at trial.

19        As to Mr. Deal's methodology, which was well laid out in

20   our opposition, he takes a market approach.  He looks at the

21   reasonable value of the services in the market.

22        Mr. Heil takes a different approach.  He looks at

23   NorthBay, what NorthBay gets, and doesn't really consider the

24   market other than looking at full billed charges.  So the two

25   experts take different approaches.

1        I don't think I need to here discuss exactly why Mr. Deal

2   did what he did.   I think the Court heard those arguments in

3   the papers; and unless there's anything that the Court wants me

4   to address specifically with respect to Mr. Tooch's argument,

5   I'll submit.

6           **THE COURT:**   Okay.   All right.

7        So I will take a look one more time, but I'm not inclined

8   to change my tentatives with respect to that.

9        Mr. Tooch, were there other matters in the

10  *motions in limine* that you thought we ought to discuss?

11          **MR. TOOCH:**   There's just actually a clarification

12  issue here.   There was discussion about the Western Health

13  contract, the WHA contract.   They're trying to -- this is what

14  I don't want him to say, "Oh, Mr. Heil did not consider that

15  contract," but then we can't say why he didn't consider that

16  contract or our witnesses are precluded from saying why he

17  didn't consider that contract.

18       So that's -- you know, I just want to know what the ground

19  rules are now because there are a lot of things that he didn't

20  consider and he didn't put in his report, and the reason why he

21  didn't consider that contract was because WHA is 50 percent

22  owned by NorthBay and it's for its employees, and so it's not

23  an arm's length transaction.

24       So I just want to make sure that we understand exactly

25  what the issue is here.

1          **THE COURT:**  Well, so my understanding from the

2     briefing, and you can sort me out on this, was that nobody was

3     going to be mentioning WHA at all; that it was just -- it was

4     not going to be involved in the case.

5          **MR. TOOCH:**  That's fine.

6          **THE COURT:**  And that was your position.

7          **MR. TOOCH:**  Yes.

8          **THE COURT:**  And is that also the position of

9     Blue Shield?

10         **MS. BRIGGS:**  Thank you, Your Honor.

11         I think there is a disconnect on the WHA issue.  The WHA,

12    regardless of whether it's 50 percent owned by NorthBay or not,

13    it is a contract and it's a payor contract with NorthBay.

14    NorthBay agreed to produce all its pay-work contracts and did

15    not produce the WHA contract.  The reason for that I suspect is

16    that the rates are very low.  That's reflected in NorthBay's

17    pay claims data, very, very low reimbursement rates.  So

18    Mr. Heil completely disregarded it.

19         So what Mr. Tooch has just gotten up and said to you about

20    50 percent ownership and some arm's length transaction, we have

21    no way of testing that.  So the remedy is not for both sides

22    not to mention it because it's really their expert who

23    purported to base his whole analysis on NorthBay's contracts

24    but they withheld a contract.  Mr. Heil then disregarded it

25    because he didn't like what was in it, and now we have no way

1    to test that.

2         So our expert will, in fact, say that Mr. Heil disregarded

3    a contract that was -- that had extremely low reimbursement

4    rates, and what I don't want is for NorthBay then to be able to

5    get up and talk about a contract that it failed to produce in

6    response to specific discovery requests.

7              **MR. TOOCH:**  If I may respond.

8              **THE COURT:**  Yes.

9              **MR. TOOCH:**  NorthBay did produce the contract at the

10   same time it produced all of the other contracts months before

11   the close of discovery.

12        Mr. Heil did not include that contract in his analysis.

13   They knew about this contract because it was produced to them,

14   and they asked Ms. Eichenberger, who is the percipient witness

15   at NorthBay, about the contract and she explained the

16   50 percent ownership of NorthBay in this entity.  And so they

17   had full -- they had knowledge of the contract and they asked

18   Ms. Eichenberger at her deposition about the contract.

19        So if they open the door, we want to be able to explain

20   why the contract was not considered.  If they don't talk about

21   it, we won't talk about it.

22             **MS. BRIGGS:**  We have obviously a factual disagreement.

23   There's no evidence before the Court that that contract was

24   produced because it wasn't.  In fact, the only evidence before

25   this Court is that I asked for it to be produced once I learned

1    that it was something that Mr. Heil had not considered, and

2    Mr. Tooch told me he would not produce it because discovery was

3    closed.  That's in a declaration attached to the

4    *motion in limine*.

5              THE COURT:  Did you ask Ms. Eichenberger about this?

6         MS. BRIGGS:  I did not and my colleague took that

7    deposition so I was not there.  It's very possible that the

8    subject of WHA came up; but keep in mind, Ms. Eichenberger's

9    deposition just occurred within the last couple weeks.

10             THE COURT:  All right.

11        MS. BRIGGS:  And we asked for that contract in

12   advance.

13             THE COURT:  I'm not inclined to deal with your

14   discovery problems at this point.  If you raise the issue of

15   the failure to produce the contract, then NorthBay has the

16   right to explain why it is that they didn't -- Mr. Heil didn't

17   consider it.

18        MS. BRIGGS:  Fair enough.

19        And is that also true, Your Honor, on cost evidence that

20   was not produced?  So if we -- generally if we open the door to

21   something that they refused to produce, they can still come in

22   and respond to it?

23             THE COURT:  You'll need to be specific with me,

24   Ms. Briggs.

25             MS. BRIGGS:  So let me give you an example.  Let's go

1   to the billed charges motion.  A bill was essentially

2   undisputed by NorthBay.  We moved on the grounds that there had

3   been -- NorthBay had refused to produce discovery into the

4   setting of its billed charges.

5        As you heard Mr. Pimstone explain, Mr. Heil's approach,

6   his methodology is to look at NorthBay's billed charges as well

7   as the billed charges of other hospitals in the surrounding

8   communities.

9        We anticipate that Mr. Deal, our expert, will be

10  testifying that billed charges are essentially a fictitious

11  number that hospitals set.

12       What I was trying to raise by virtue of that motion was,

13  then having refused to provide us discovery, which you know

14  because I appeared before Your Honor, as did Mr. Tooch, on that

15  issue, they cannot then come in and offer an entire explanation

16  of billed charges.  That was really what I was trying to get

17  at.

18       **THE COURT:**  Well, so my understanding again of the

19  briefing is that NorthBay specifically disclaims putting in any

20  of that evidence, and so that's my expectation.

21       **MS. BRIGGS:**  That is true.  They say they will not.

22  It was really our expert who will testify in rebuttal what

23  billed charges are or aren't; and because -- what I don't want

24  is, then, for Mr. Heil to get up and give an explanation of

25  NorthBay specific billed charges that we were not able to get

1   at in discovery.

2        **MR. TOOCH:**  There's a difference here between -- we're

3   not going to be entering any evidence to say "This is how we

4   developed our billed charges based upon cost information."

5   We're not going to do that, and we said so in our papers and we

6   won't do that.  That doesn't mean that we can't discuss billed

7   charges.  Part of the analysis of actually both experts is to

8   compare the billed charges of NorthBay to other hospitals in

9   the area, and they have different calculations with respect to

10  that.

11       And so there's a mixing of costs and charges over here,

12  and we're not going to be bringing anything on how those

13  charges were developed.  In other words, what was the cost for

14  an MRI?  What was the cost for a lab test, et cetera?  None of

15  that stuff is going to come in, but that doesn't mean we can't

16  speak about charges.  That's the whole -- that's what this case

17  is about.

18       **THE COURT:**  Yes, and I want to be sure that the

19  lawyers don't talk passed each other.  You may have been doing

20  that throughout the entire case up till now, but it has to stop

21  when we're in trial and in front of the jury.

22       So if you refused to provide documents that you are then

23  going to rely on during the course of the trial, Mr. Tooch,

24  then I will sustain any objections and keep that information

25  out.  So I'd be just very careful to live up to the

1    representations that you've made in the papers before me.

2          **MS. BRIGGS:**  So just a quick clarification,

3    Your Honor.  Your rulings do not allow -- I mean, do not

4    preclude us from making specific trial objections; correct?

5          **THE COURT:**  Not at all.  And you should.

6          **MS. BRIGGS:**  Understood.

7          **THE COURT:**  *Motions in limine* in general are made

8    without all of the information that will become even more

9    evident at the time of trial.

10         **MS. BRIGGS:**  Thank you.

11         **THE COURT:**  Okay.

12         **MR. TOOCH:**  One more point of clarification,

13   Your Honor.  You said you were going to discuss the 12 hours.

14   Did you want --

15         **THE COURT:**  Yes.  We'll go on to that in just a

16   second.

17         **MR. TOOCH:**  Okay.

18         **THE COURT:**  Is there anything, Mr. Pimstone, that you

19   wanted to raise on the *motions in limine* besides what we've

20   talked about?

21         **MR. PIMSTONE:**  I think your guidance is clear,

22   Your Honor.  No, thank you.

23         **THE COURT:**  All right.  It doesn't seem to be so thank

24   you for saying that.  I hope that it is.

25       All right.  So now I have a question for you.  Are any

causes of action in the complaint resolved by the verdict in this case?  Is the seventh cause of action or the third through the sixth causes of action?  Are compensatory damages resolved by this?

MR. PIMSTONE:  No.  The jury is being asked -- you know, there are a lot of different claims in the case of different types and there is a lot of financial information in terms of monetizing what the jury comes up with.  So the answer is no.  The jury is being asked to answer one simple question, which is:  What is the reasonable value of NorthBay's services of the services at issue?

I'm not quite sure yet how they're going to express that. In some cases that I've had, it's been expressed as a multiple of Medicare.  NorthBay services are 1.8 times Medicare. Sometimes it might be expressed as a percentage of billed charges, but they -- and then I think what we're all going to do is take that guidance, then apply that in subsequent phases of the case to determine sort of what the damages would be flowing one direction or the other direction.

So I don't think that this entirely resolves any cause of action, including *quantum meruit*, because they're not going to attach a dollar figure to the value that they find.

THE COURT:  Okay.  Well, I was going to ask about that question because your verdict forms are a little different in that regard.  Who is going to calculate -- if it's -- if the

1    jury comes back with a percentage of billed charges, who's

2    going to make the calculation, then, of what that actually

3    means dollar-wise?

4            **MR. TOOCH:**  If I may, Your Honor.

5            **THE COURT:**  Yes.

6            **MR. TOOCH:**  So what I've done in prior cases like this

7    is for most claims, for a large portion of the claims, we can

8    meet and confer about that.  And so let's say the jury comes

9    back with 50 percent of charges and Blue Shield can take that

10   number, recalculate the claims at that number, give us the

11   information.  We can either say yea or nay as far as we agree

12   or we don't.  I don't think there's going to be much

13   disagreement with respect to that calculation.  So -- because

14   they need to calculate a patient's responsibility on a lot of

15   these claims and what's been paid already, et cetera.  That's

16   in their documents.

17           **THE COURT:**  Well, so is there a done deal with respect

18   to this particular damage amount when the jury comes back or do

19   you then have to agree on a calculation?  And what happens if

20   you don't agree?

21           **MR. TOOCH:**  Well, there is no done deal with respect

22   to that, but we can certainly discuss alternatives with

23   Blue Shield's counsel as to that.  In the case I did in 2017 on

24   this issue, that wasn't an issue -- that wasn't an issue

25   between me and Blue Cross' counsel.  They did the calculations.

1    We said fine.  It was the end of the case.

2         There are alternatives as to that that can be referred to

3    a referee.  It could be referred to an arbitrator or we'll see

4    if there are issues that come up at that point in time; but I

5    don't foresee that now, but we can meet and confer about that.

6         **MR. PIMSTONE:**  Yeah.  Most of these cases that I've

7    litigated, I've litigated -- we've had some in front of juries

8    but they've been more simple cases.  Most of the cases that

9    I've had have been in front of arbitrators or courts, and so

10   you can do it in several phases.  You can determine what the

11   reasonable value is.  Then the experts go fight it out; and if

12   they don't agree, then the Court will make -- or the arbitrator

13   will make a determination about what the monetary value is in

14   terms of the judgment.

15        So I think what we had contemplated was that once the jury

16   renders its decision, if the experts don't -- or if the parties

17   don't agree, I think the contemplation would be that either we

18   find a neutral and get it resolved on that basis; or I guess

19   the question is:  Would it be appropriate to come back to the

20   Court in a phase II as a bench trial or a bench evidentiary

21   proceeding to have the Court affix a monetary value to what the

22   jury has determined?

23        **THE COURT:**  All right.  Well, I want you to talk about

24   that.  I'm not doing a mock trial here.  So the determination

25   that this jury makes needs to be as final as it can be with

1    respect to this element.  And if you decide that you present it

2    to me, if you can't agree at the end, that's okay.  I'll do it

3    that way.  But I don't want this to be some --

4            **MR. PIMSTONE:**  It's not.

5            **THE COURT:**  -- hanging chad that we have to deal with

6    before the next trial.

7        The description of what you're saying this phase was about

8    is a little different from what you told me in the beginning,

9    which was that this would allow you to resolve your

10   differences.  So I'm hopeful that that at the end of the day is

11   what the outcome is, but --

12           **MR. PIMSTONE:**  I think in these kinds of cases the

13   vast gulf between plans and hospitals comes in terms of the

14   value, which is:  Is reasonable value, as Mr. Heil says,

15   88 percent of billed charges or, as Blue Shield says, far, far

16   less?

17       And so once the jury resolves that issue, I think at that

18   point it gets to really just a question of attaching dollars.

19   So it's not going to be a mock trial.

20       I anticipate that if we don't reach resolution, that the

21   most efficient thing would be to come back to the Court and

22   have you do it, but I think clearly what the jury will

23   determine is going to resolve the big difference between the

24   parties.

25           **THE COURT:**  Okay.

1          **MR. TOOCH:**  I agree.

2          **THE COURT:**  Good.

3     So just be clear with each other so that you can tell me

4   before I impanel the jury how the end of this particular

5   question is going to be handled.

6          **MR. PIMSTONE:**  Understood.

7          **THE COURT:**  Okay.  That raised another issue in my

8   mind, which I will may or may not remember.

9          **MR. PIMSTONE:**  So there is another issue that is not

10  directly related to *motions in limine*.  It's something that

11  Mr. Tooch and I have discussed, and we should probably get your

12  approval and any guidance on it as well.

13         Again, many of these kinds of cases are done in front of

14  courts or in front of arbitrators, and so I think sometimes the

15  experts have gotten used to in their expert reports to

16  discussing the law.  You know, an expert will say, "Well, I

17  looked at this factor because *Children's Hospital* says that I

18  must look at this factor or I should."  And the parties have

19  some disagreement as to what the law means here, and Your Honor

20  will be instructing the jury as to what the law means.

21         So in my discussions with Mr. Tooch, we have both

22  agreed -- and he'll tell me if I'm misstating, you know, the

23  agreement -- that we will tell our experts not to reference the

24  law.  So the experts will not be discussing the *Gould* factors.

25  The experts will not be discussing *Children's Hospital*.

1   Because then you get into this situation where an expert is

2   telling the jury his interpretation of the law, which then

3   requires opposing counsel to cross-examine on that, and then it

4   gets complicated.

5         **THE COURT:**  Yeah.  No, they shouldn't be testifying

6   what the law is.  They should be talking about the economic

7   factors that make whatever their analysis is reasonable or not.

8         **MR. PIMSTONE:**  That's what our intent is.

9         **THE COURT:**  Okay.  Good.

10      All right.  So now the trial schedule and the clock.

11      I gave you 12 hours.  Mr. Tooch, did you want to address

12  that?

13        **MR. TOOCH:**  No.  I need to count up the hours.  I

14  understand what -- I heard the Court and we will get our

15  witnesses appropriately to fit within that time.

16      I think it will -- you know, I don't think we're going to

17  go past a week on our testimony and so I think -- you know, I

18  assume -- I don't know whether we'll finish picking the jury --

19  I assume on the 4th we'll finish picking the jury.  Whether we

20  start opening statements on that day, we'll have our first

21  witness available.

22        **THE COURT:**  So this is my hope:  My hope is that we

23  will pick the jury.  If we've got a jury before 2:00 o'clock in

24  the afternoon, then we'll go ahead with opening statements that

25  day.  You don't have to have your first witness ready, and

1  we'll start with the first -- we'll start with the evidence on

2  Tuesday morning, and then we'll go 8:00 to 1:00 for the rest of

3  the days that week.

4      I'm going to tell the jury that in the following week

5  we'll keep the 8:00 to 1:00 schedule while it's evidence and

6  then their deliberations, hopefully they'll choose a different

7  and later-into-the-afternoon schedule, but that will be up to

8  them.

9          **MR. TOOCH:**  Does the clock count when it's

10 cross-examination of your witnesses?

11         **THE COURT:**  Yes.  It's whenever you've got control of

12 the witness, the clock is moving.  So if you're cross-examining

13 somebody, you've got control --

14         **MR. TOOCH:**  No.  No.  Their cross-examination of our

15 witnesses.

16         **THE COURT:**  Well, it works both ways it turns out.

17 But when you're on direct with your first witness, the clock

18 runs against you.  When it's cross-examination of your witness,

19 the clock runs against the defendant.  So that's how it works.

20         **MR. TOOCH:**  Okay.

21         **THE COURT:**  Does that make sense?

22         **MR. TOOCH:**  No, yeah.  I just -- yes, that makes

23 sense.

24         **THE COURT:**  So that's how it works.

25         **MR. TOOCH:**  We'll limit the direct and cross.

1          **THE COURT:**  So when you're at the podium, the clock is

2    running against you.

3          **MR. TOOCH:**  Okay.

4          **THE COURT:**  When you're not at the podium, it's not.

5          **MR. TOOCH:**  So the 12 hours includes the

6    cross-examination of the other witnesses?

7          **THE COURT:**  Yes.

8          **MR. TOOCH:**  Okay.  That's a tight schedule but, yes, I

9    understand.

10         **THE COURT:**  It's a tight schedule but not overly

11   tight.  So I'm thinking, and you both have experience, so you

12   should tell me if I'm wrong, but the two main witnesses are

13   Mr. Deal and Mr. Heil, and four hours apiece of them testifying

14   on direct and cross I would think would be adequate.

15       And then you've got -- if you take two more hours for your

16   opening and closing total, which is generous -- hopefully

17   you'll take less -- then you've still got six hours to put on

18   or to cross-examine folks.

19       And for the plaintiff that will help you think through how

20   much bragging you want to do about how great NorthBay is, and

21   the same with the defendant's cross.

22         **MR. TOOCH:**  I understand.

23         **THE COURT:**  Okay.  So I ask people to be here at

24   7:30 on trial days because it just seems like things come up

25   that have to be dealt with.  When the jury is here, I want them

1  listening to your evidence.  So they'll come at 8:00.  We'll

2  stop at 1:00.

3      And if you never -- if you don't need me at 7:30, I'm very

4  happy, but I'll come out here just to see what's going on.

5      I think this case, if we follow the schedule, closing will

6  probably be on Tuesday the 12th.  It might be Wednesday just

7  depending on where things are.  I'm picking a jury in another

8  case on the 15th just so that you know.  I don't think that's

9  going to interfere.  I don't know how long the jury will be

10 deliberating, but I've got another trial that's going to start

11 on the 18th or the 19th, whatever that Tuesday is.

12     Jury selection.  So my plan is to seat eight jurors and

13 I've asked for a *venire* of 32 folks.  I'm going to -- assuming

14 that there aren't an abnormal number of cause and hardships, I

15 think I'll give you each four peremptories.

16     I conduct the *voir dire*.  The questions that you both had

17 I think were good questions.  I'll use many of them.  And I'll

18 give you 15 minutes each or so to follow-up on any of the

19 people or questions that you're concerned about.

20         **MR. TOOCH:**  15 minutes per juror or 15 minutes --

21         **THE COURT:**  No way.

22         **MR. TOOCH:**  I was thinking that sounded generous.

23         **THE COURT:**  How many jury trials in federal court have

24 you done where somebody says, "Oh, just take 15 minutes per

25 juror"?  My good, no.  15 minutes.  It turns out 15 minutes is

1    a lot.

2         **MR. TOOCH:**  It is a long time, yes.  I was just being

3    careful.

4         **THE COURT:**  And you both may be extraordinarily great

5    trial lawyers.  I never figured out really effective *voir dire*.

6    It just never -- it either came naturally from the questions,

7    and I think you've given the questions that should pull out

8    bias and be interesting.  I don't think you'll need more, and

9    you won't get it.

10        **MR. TOOCH:**  My last trial I thought I had a juror all

11   through the trial and she ruled against me.  She was one of the

12   ones that ruled against me.  And I said to her, "I thought I

13   had you."  I asked her.  She said, "You had me until I walked

14   into the jury room."  So it's an art, a science.

15        **THE COURT:**  You never know.  The ones who nod along

16   with you, don't trust them.

17        So if you're making real progress with the jurors, you're

18   asking really good questions and I think it's worth letting you

19   go a little longer, I will do that.  Most people I thank them

20   and take over again.

21        All right.  So we talked about that.

22        Of the peculiarities that I have, I don't want anybody to

23   get too close to the jury.  So everybody will probably be using

24   the plaintiffs' podium.  And basically if you draw a line from

25   the edge of the plaintiffs' table that is closest to the jury,

1    don't get closer.

2        I don't like speaking objections.  I can usually figure

3    out why you're objecting.  If I need help, I'll ask.

4        I don't like sidebars.  I tend to give them in the

5    beginning with people when they ask, but I really don't like

6    them, and the clock will go against you on a sidebar if we have

7    to go take 10 minutes to resolve something.  If I overrule your

8    objection, you'll lose the time.

9        So make sure that it's really important.  Sometimes I

10   won't charge time if I think it's really important and I needed

11   to think it through better.

12       One of my least favorite objections and the one that

13   troubles me the most is when somebody will say that the expert

14   has gone beyond the scope of the report.  I will never know

15   that without looking at the report.  That always takes time;

16   and if it turns out that you're wrong, it's really bad for you.

17   So make sure that it's very -- that your objection matters and

18   that you're right on those.

19       I've learned to hate that because we all think that we

20   know what's there and sometimes we're wrong.  And when I say

21   "we," I was referring to lawyers as opposed to judges.

22       So with respect to the jury instructions, I think we've

23   got -- it looks like you're in agreement.  I'm inclined to give

24   the special instructions that you've done at the beginning of

25   the case as well as at the end so that the jury is focused on

1    the damages question and what the standards are.

2        I'm also going to give the Ninth Circuit Model

3    Instructions 1.3, 1.15, and 1.18, which you just didn't have in

4    yours but they're part of the standard package.

5        So I'll give the preliminary instructions before you open

6    and then I'll give closing instructions before you close, and

7    I'll show them the -- show the jury the verdict form before --

8    during the course of my instructions so that they know what

9    they're shooting at.

10       So you have factual stipulations.  Do you want me to read

11   those before the first witness on Tuesday?  Do you want me to

12   read them on Monday after I do the preliminary instructions?

13           **MR. TOOCH:**  I think after the ordinary instructions.

14           **MR. PIMSTONE:**  Yes, that's fine.

15           **THE COURT:**  Okay.  So I'll do those, and then you

16   can -- and there are no -- those stipulations are in the

17   pretrial statement.  I don't know that I have a separate -- I

18   can't remember whether I've got a separate --

19           **MR. PIMSTONE:**  We can give it to you separately.

20           **THE COURT:**  Okay.  That would be helpful.

21       Let's see, and then my plan would be just to check in on

22   Friday the 8th for a final jury instruction conference in case

23   something's come up during the course of trial that we need to

24   address differently than you have already.

25       Back to the verdict form, and this is the thing that I was

1    thinking about.  The experts express -- or the two sides

2    express damages here, the reasonable value, in a couple of

3    different ways.  It would be very helpful I think to the jury

4    if it always ended up the same way.

5        So I think the percentage -- Mr. Heil uses the percentage

6    of NorthBay's services.  I think translating that, which

7    Mr. Deal does, he sometimes does it both ways but I think it

8    would be helpful to them -- it would be helpful to focus on one

9    standard.  So he can say 1.8 times Medicare, which equals

10   12 percent of NorthBay's charges, or whatever.

11           MR. PIMSTONE:  Understood.

12           THE COURT:  And the other thing is that I want to be

13   sure that you have for me copies of the depositions that you're

14   going to be using, the expert reports.

15       And I think I've got this in my pretrial order but if

16   you've got a witness with a number of exhibits, it's very

17   useful for him or her to have a binder and for me to have a

18   binder that is just special to that person.

19           MR. PIMSTONE:  And then in terms of having the jury

20   see, if we have a courtroom technology individual, is that

21   something that we should just clear with your clerks in advance

22   of how the courtroom technology gets set up?

23           THE COURT:  Yes.  Ms. Davis knows everything.

24           MR. PIMSTONE:  Thank you, Ms. Davis.

25           THE COURT:  So we now have this -- we became a 21st

1    Century courtroom about two weeks ago -- or about two months

2    ago, and it works some of the time and not all of the time.  So

3    Ms. Davis can describe the ins and outs of it to you, but

4    hopefully we've got it in a better place than it was during the

5    last trial.

6         **MR. TOOCH:**  With respect to the depositions for your

7    copy, Your Honor, would you prefer the full version or the mini

8    versions?

9         **THE COURT:**  The mini versions.  I love the mini

10   versions.

11        **MR. TOOCH:**  Okay.  All right.

12        **THE COURT:**  That will be great, yeah.  And I don't --

13   the thing I don't need to do is to rip open the seal.

14        **MR. TOOCH:**  Right.

15        **MR. PIMSTONE:**  So I'm assuming the parties can all

16   assume that if this shutdown continues, it's not going to

17   impact the trial date in this case?

18        **THE COURT:**  That's correct.

19        **MR. PIMSTONE:**  We heard a rumor as to what might

20   happen with the federal courts, you know, if the shutdown

21   continued, as to whether criminal trials would proceed but

22   civil trials get stayed, but --

23        **THE COURT:**  It's my understanding, and I checked a few

24   days ago, that not only will we proceed but the jury will be

25   paid.  They're always paid slowly so they may not feel anything

1    if the shutdown only lasts another month or so, but hopefully

2    things will resolve before then.   But I'm going ahead.   I've

3    got -- we've got work to do.

4            MR. PIMSTONE:   Okay.

5            MR. TOOCH:   I had another question.   Demonstratives in

6    opening, do you have any preferences or --

7            THE COURT:   Yes.   So exchange whatever -- if you're

8    going to use demonstratives, exchange them so that I can make a

9    call if there's disagreement about them, otherwise as long as

10   it's either going to -- it's something that is actually without

11   a doubt coming into evidence or it is a rhetorical device,

12   that's usually okay.

13           MR. TOOCH:   Yeah.   I'm thinking a lot of the charts of

14   the experts and stuff.

15           THE COURT:   So it's fine with me as long as you know

16   that it's coming in.   And if there's a dispute about that, I

17   tend to not allow it, and so that's your hint if you're

18   concerned about it.   So meet and confer and try to work that

19   out, but otherwise I'll deal with it on the morning that we

20   pick the jury.

21           MR. PIMSTONE:   And I'm assuming that rhetorical

22   devices does not extend into argument?

23           THE COURT:   It should not extend into argument, and

24   it's very hard for lawyers not to argue in openings.   You

25   should not.

1    If somebody says something, though -- and this happened in

2    the last trial -- if somebody says something that is

3    objectionable, you really think it's wrong, object.  You know

4    how you shouldn't object during an opening; but if it's

5    something that you think is really fundamental and you don't

6    object, I will let it go and I won't be very sympathetic when

7    you raise it afterwards.

8        So, let's see, I think that's it.

9        So when the jury comes in, there will be another row of

10   seats in front of the jury box and they'll be seated in the

11   juror number that you'll be selecting them from.  So they will

12   have already been premixed when they come in.  So you should be

13   focusing on the first eight.

14       And I will ask questions of the entire *venire* and I will

15   not reshuffle jurors in the box from the time they come in

16   until you've selected them.  So that you know, even if we

17   dismiss 10 people for cause, their seats will be vacant and

18   you'll know who it is that you're thinking about with the

19   people that remain.  So that's the way that I do it.

20       Okay.  What else?  Mr. Tooch, what else should we talk

21   about?

22       **MR. TOOCH:**  I don't think I have anything else other

23   than I'm trying --

24       **MR. PIMSTONE:**  I think Mr. Maurer might have

25   something, Your Honor.

1          THE COURT:  Okay.

2          MR. MAURER:  Yes.  Good afternoon, Your Honor.

3          THE COURT:  Good afternoon.

4          MR. MAURER:  So an issue sort of reared its head

5    during our meet and confer over exhibits, and we've submitted

6    some objections to the Court to the plaintiff's exhibits.

7          THE COURT:  All right.

8          MR. MAURER:  There are two blocks of exhibits -- it's

9    Block 45 through 51 and 94 through 105 -- where essentially we

10   understand the plaintiff is going to introduce evidence of

11   specific individual patient claims that are at issue in the

12   case.  It might be a list of the claims.  It might be some of

13   the records underlying the claims, like the bills or, you know,

14   what Blue Shield agreed to pay or the appeal correspondence.

15         And the issue we're having with those exhibit blocks,

16   Your Honor -- well, it's a couple of issues -- one, and maybe

17   the fundamental one, is that the parties agreed as -- you know,

18   I have an ECF cite for you.  I think it's 36.  It's in the case

19   management statement -- the parties agreed that they would only

20   present a certain sample of claims to the jury in this case.

21   So the parties selected 20 sample claims.  They got to choose

22   some, we got to choose some, and they were going to limit the

23   individual claim presentation to 10.

24         But these claims that appear, the claims that are listed

25   in some of their exhibits on those blocks, they're not the

1   agreed-upon sample claims.  So we've got an issue where the

2   parties have agreement where they -- you know, part of it was

3   to limit discovery and those types of things, and we had an

4   agreement and now we've got a situation where they're listing

5   these, you know, additional claims.  We haven't had a chance to

6   do discovery.  We haven't had a chance to investigate those

7   claims and so, in our view, those exhibits should not be

8   presented into evidence.

9        And, you know, this isn't a case -- reasonable value is a

10  case about the aggregate market.  It's not a case about

11  individual claims here and there.  And so, you know, in our

12  view it could confuse the jury.  I mean, I can talk about that

13  some further, Your Honor, but, again, we feel like we're being

14  prejudiced by this and wanted to bring it to your attention,

15  Your Honor.

16           **MR. TOOCH:**  Thank you, Your Honor.

17       So this is mostly rebuttal evidence.

18           **THE COURT:**  Say it again.

19           **MR. TOOCH:**  It's rebuttal evidence to Mr. Deal's

20  report.  And Mr. Deal, for example -- so this -- so we agreed

21  that for the claims in dispute, we would choose example claims.

22  That agreement never said we couldn't talk about other claims.

23       So, for example, let me give you an example.  Mr. Deal

24  says nobody pays 100 percent of billed charges for services.

25  Well, Blue Shield has paid 100 percent of billed charges

1  hundreds of times to NorthBay.  So these are not claims that

2  are in dispute because they paid 100 percent of billed charges.

3  So we want to show through our witness, our percipient witness,

4  that Blue Shield -- that Mr. Deal's statement is wrong and that

5  Blue Shield itself has paid 100 percent of billed charges

6  multiple times.  So that's an example of a claim where we

7  have -- and we've disclosed the reason why we're going to do

8  that.

9      Another example is this data, this OSHPD data that

10  Mr. Deal has relied upon, we want to show that these are the

11  types of claims which are in dispute with respect to NorthBay

12  and Blue Shield and NorthBay and other payers; and all of that

13  data, those types of claims are -- we're going to show the

14  jurors an example of where, for example, a health plan has

15  denied a claim because of medical necessity.  So that doesn't

16  go to the rate of the claim.  It just goes to the amount that

17  was paid.

18      So they may have paid the right rate for four out of the

19  six days that the patient was in the hospital, but if you just

20  look at the billed charges and the payment amount, it's going

21  to look like the rate is the wrong -- a different rate.  So it

22  may be $1,000 per day and if you look at the claim, it shows

23  4,000 paid on a $6,000 claim, but the rate paid was correct,

24  not -- but there's a dispute between the parties as to the two

25  days for medical necessity.

1      So this we want to show the jury that, through our

2  witness, that the evidence, the OSHPD data that Mr. Deal is

3  relying on is flawed for this reason so -- and we didn't know

4  that this was what Mr. Deal was going to do until Mr. Deal did

5  it.  He basically relied on this OSHPD data.

6      So that's the nature of these types of claims.  Again,

7  it's not the claims in dispute, but it shows why Mr. Deal has a

8  flawed analysis.

9        **THE COURT:**  All right.  So are you going to use these

10  in cross-examination of Mr. Deal?  Do you intend to do that,

11  or --

12       **MR. TOOCH:**  No.  I was going to use the claims person

13  at the hospital, who's our main witness, to say, "Okay.  Show

14  me an example of a claim."  And she's the one who reports the

15  data to OSHPD, and so she would explain why the OSHPD data is

16  problematic on a macro level but also on a micro level to say,

17  "I've had this type of claim.  Yes, this payment amount would

18  be reported to OSHPD, but that's not the correct payment on the

19  claim; and so when you look at the OSHPD data, the OSHPD data

20  is problematic for this reason."

21      And so that's the nature of these types of claims.  It's

22  not the claims in dispute.

23        **THE COURT:**  So as far as timing is concerned, is this

24  something that you would raise in rebuttal?

25       **MR. TOOCH:**  I could do it either, either as part of

1  her initial report -- her initial testimony, which is what I

2  was planning to do, is to put it on to say:

3       "Okay.  Did you read this part of Mr. Deal's report?

4       "Yes.

5       "And do you report the OSHPD data?  Is it problematic?

6       "Yes.

7       "Let's just look at a few examples of why it's

8  problematic."

9       That's the nature of this type of evidence.

10          **THE COURT:**  Okay.  Mr. Maurer?

11          **MR. MAURER:**  May I respond, Your Honor?

12          **THE COURT:**  Yes.

13          **MR. MAURER:**  So a couple issues there.  You know, he's

14  mentioning the 100 percent of billed charges.  You know, as I

15  mentioned, we haven't had an opportunity to conduct any

16  discovery with respect to those claims; and so, you know, I've

17  looked at some of the claims listing and there are all types of

18  reasons why a payer may have paid billed charges in a

19  particular case.  It may have been the fact that it's a

20  self-funded ERISA plan and that's what the plan requires.  It

21  may be an out-of-state Blue Shield plan that says you have to

22  pay 100 percent of billed charges, things that we have to

23  investigate in order to be able to explain.

24       And because the parties have an agreed-upon list of claims

25  that we thought were going to be at issue in this case, we

1   haven't had the opportunity to look into those types of claims.

2        **THE COURT:**  Yes, but this is -- Mr. Tooch is saying

3   something different it seems to me.  He's saying your expert

4   has an opinion about nobody pays 100 percent, and so one of the

5   ways that he wants to attack that is, well, that actually

6   happens at NorthBay all the time.  That's what I understand him

7   to be saying, and to me that's a different issue than the 20

8   claims.

9        Now, the question is:  Do you have the information where

10  you can test what the billing person is going to be testifying

11  to?

12       **MR. PIMSTONE:**  If I may, Your Honor.

13       **THE COURT:**  Yes.

14       **MR. PIMSTONE:**  Am I allowed?  Thank you.

15       I think the answer on that is no.  Because this hasn't

16  been the subject of discovery, we don't have information from

17  which we could test why it is in a particular case NorthBay may

18  have received 100 percent of billed charges.  We have no

19  information whatsoever on these claims because, as we've

20  indicated, the case has not proceeded on a claims-specific

21  basis other than on an agreed-upon sample.  So we just don't

22  know.

23       I would also say that to the extent that the Court allows

24  this kind of testimony in, it seems to me it would have to be

25  purely in the rebuttal stage as opposed to using Mr. Deal's

1   report.  It's not my understanding that the reports are going

2   to be coming into evidence.  The witness is going to testify,

3   and whatever he testifies to may or may not create a rebuttal

4   need for this kind of evidence.

5        So Mr. Deal may clarify, you know, in front of a jury what

6   his opinion is as to the frequency in which in the industry

7   billed charges are actually paid, which may then make this

8   evidence not pure rebuttal evidence.

9        So I think it would be improper for NorthBay to assume

10  that Mr. Deal is going to testify in a particular way based on

11  something -- a line taken out of his report.  I think we should

12  wait and see what each witness testifies to to determine what

13  would be appropriate rebuttal and then, you know, what would be

14  fair rebuttal given what was disclosed in discovery.

15       **THE COURT:**  I do agree with the timing of things.

16  This sounds very much like rebuttal evidence, and perhaps

17  because you've raised these problems, they'll solve themselves

18  before rebuttal.  You'll save a little time.

19       **MR. TOOCH:**  Yeah, so let me just clarify things.

20       So the Blue Shield payments to NorthBay, Blue Shield has

21  all the information of why it made the 100 percent of charges

22  payments.  That's Blue Shield's payments.  It's not -- they can

23  look at them.  We've given them the patient names and the

24  patient ID numbers and the dates of services.  They can look at

25  all that information.  So it's not something that they can't

1    look at.

2        If I need to bring up -- if I need to bring

3    Ms. Eichenberger back to the stand to rebut what Mr. Deal says

4    on his direct, I can do that.  That's fine.  The timing is not

5    a problem for us.

6            **MR. MAURER:**  May I respond to one point, Your Honor,

7    because it's not just Blue Shield information that's at issue

8    here?

9        So he mentions attacking sort of Mr. Deal's OSHPD data;

10   and so if you look at some of their exhibits, again which we,

11   you know, didn't have a chance to conduct discovery on, it's

12   claims not related to Blue Shield.  So it may be -- the names

13   that have come up is an entity called Symetra.  So the exhibit

14   will be a bill from NorthBay and an explanation of payment from

15   Symetra, you know, some third-party payer that we don't know

16   about.  And apparently, you know, it sounds like the testimony

17   is going to be, "Oh, well, the paid claims data relied upon by

18   Mr. Deal isn't reflected by these documents."

19       We've had no opportunity to look behind just these two

20   documents that they're putting in their exhibit to say, "Oh,

21   you know, the plan paid, you know, X because of some reason or

22   not because of some reason"; or, "Oh, six months later there

23   was, you know, another payment that was made on those

24   particular claims."  So, I mean, that's the concern that I

25   have, Your Honor, with things that we haven't had a chance to

1  look underneath.

2       MR. TASSA:  As far as the other payer claims that I

3  think Jeff was referring to there, those were produced months

4  ago and they asked Ms. Eichenberger about those at her

5  deposition.  They were paid at the rate they were paid.  I

6  think it's fair game to ask on cross if there have been any

7  payments made since we made that production.

8       But you were free to do any further discovery at the time.

9  This isn't something that was just raised when we submitted our

10  exhibit list.  This was as to Ms. Eichenberger and was produced

11  after we got Mr. Deal's report, which is when we knew that they

12  would be relying on this data.

13       MR. MAURER:  Well, again, Your Honor, you know, at the

14  time we took Ms. Eichenberger's deposition, the purpose of

15  those documents were not clear to us and we haven't had a

16  chance to, you know, do underlying discovery with respect to

17  those claims, which would have taken some time.

18  Ms. Eichenberger was just deposed, you know, a few weeks ago.

19       MR. TASSA:  December 7th.

20       THE COURT:  So what are you asking me to do,

21  Mr. Maurer?

22       MR. MAURER:  Well, my preference would be to exclude

23  those exhibits when it comes to it, but --

24       THE COURT:  What's your next request?

25       MR. MAURER:  Give us an opportunity to conduct some

1   discovery with respect to those claims.

2          THE COURT:  All right.  Well, that's what I think is

3   the most logical thing to do.  If there are documents that have

4   been identified that you want to use at trial that were not the

5   subject, for whatever reason -- without casting blame one way

6   or another -- that were not asked about at depositions, then

7   the person who's going to testify about them should be

8   presented for deposition sometime in the next week and with the

9   documents that you want to ask them about; and then if there

10  are further problems after that, we can take them up.

11         MR. TOOCH:  Okay.

12         MR. MAURER:  Thank you, Your Honor.

13         THE COURT:  All right.  Anything else?

14         MR. PIMSTONE:  I have a list.  Let me just check.

15         THE COURT:  Okay.

16                      (Pause in proceedings.)

17         MS. BRIGGS:  I have a question by way of

18  clarification.

19         THE COURT:  Come on up, Ms. Briggs.

20         MS. BRIGGS:  Part of this, Your Honor, relates to the

21  *motion in limine* but part of it relates to a development 48

22  hours ago so I just want to know how your rulings on the

23  motions intersect.

24      There was a witness -- NorthBay filed supplemental

25  disclosures in the pretrial statement.  You probably saw that.

1    One of the witnesses, at least one who we had already deposed,

2    is now being designated as a nonretained expert rebuttal

3    witness to Dr. Schriger.

4        So it's not clear to me how objections to that witness

5    should be handled.  I can certainly do them at trial, object to

6    that, if that's the preference.

7        And then, likewise, within the motions, a similar problem.

8    There were designations that were made either -- during the

9    deposition.  For example, in the case of Ms. Venezio, NorthBay

10   told us in the middle of that deposition that she would be

11   designated as a nonretained rebuttal expert to Dr. Schriger on

12   the sample claims.  Of course, the attorney, who was

13   Mr. Maurer, didn't have any of the materials.

14       It wasn't -- so are those things that are still in play as

15   legitimate objections?

16           **THE COURT:**  So what enlightenment would you like to

17   give me?

18           **MR. TASSA:**  Well, I think that's the same issue as, I

19   think it was, *Motion in Limine* Number 4.  I can't remember

20   exactly.  But the designation of Ms. Venezio as a rebuttal

21   expert was done I think the day before or the day that rebuttal

22   expert designations were due.

23       Is there any issue with the lateness of the designation?

24           **MS. BRIGGS:**  She was not designated -- she was -- the

25   designation came in the middle of her deposition.

1          **MR. TASSA:**  That's not right.  She's listed on the

2     designation.  I mean, it looks like we just have a factual

3     dispute.  I can submit the designation to the Court.

4          **THE COURT:**  Well, so drill down on this for me.  Give

5     me an example of something that she would be testifying to as

6     an expert as opposed to a fact witness.

7          **MR. TASSA:**  So Dr. Schriger in his report has a list

8     of I think 37 of the sample claims.  I think that's all of them

9     because some of the parties chose the same claim.  And for each

10    one he gives his opinion as to whether the care provided at

11    NorthBay could have been provided at any other community

12    hospital.  And so her opinion would be rebuttal to that.  She

13    looked at the care.  She looked at some of the services that

14    were provided to the patient that she knows were not available

15    in the area.

16       And so I think to the same extent that Dr. Schriger's

17    opinion on that subject is expert testimony, Ms. Venezio's

18    would be as well.

19          **THE COURT:**  I wonder whether it matters.

20          **MR. TASSA:**  I'm thinking the same thing, Your Honor.

21    It's percipient witness testimony to the extent that she knows

22    this through her work and she knows what services are offered.

23    So I'm not sure it ultimately matters whether we can ask her

24    for her opinion on any given thing.  We can stick to the facts

25    and get the same thing.

1          **THE COURT:**  When I was reading through this, that's

2     what I was thinking.

3          Ms. Briggs, what difference do you think it makes?  What

4     will she be able -- what do you worry that she'd be able to

5     testify to that she can't given her position and knowledge?

6          **MS. BRIGGS:**  It wasn't a qualification issue,

7     Your Honor, that I was raising.  It was a timeliness of the

8     disclosure.  I think it's fundamentally unfair in the middle of

9     a deposition to announce that somebody is going to be a

10     rebuttal nonretained expert on a series of clinical claims that

11     presumably we would have prepared differently to ask her about.

12          **THE COURT:**  But if she didn't have to be disclosed in

13     the first place, you knew that these claims were going to be

14     potentially in the case and that somebody was going to speak to

15     them.

16          **MS. BRIGGS:**  We did, Your Honor.  And since Mr. Maurer

17     was the attorney deposing her, he has some more direct comments

18     in response to your questions.

19          **MR. MAURER:**  Yeah.  So that one of the issues,

20     Your Honor, was that at the deposition I asked Ms. Venezio

21     about the particular claims.  She had looked at them months --

22     a couple months before and really couldn't give me specific

23     information.

24          You know, I mean, so, in other words, you know, if she

25     had -- if she's testifying as an expert, she should have an

1    opinion in her report and documents and things that I can look

2    at to then depose her on what her opinion is, not have a

3    situation where she looked at things two months ago.  Now she's

4    going to look at things between her deposition and the trial

5    and then testify.

6        That just doesn't seem fair.  I mean, we should have a

7    full disclosure of what her -- whatever her views are on those

8    particular claims.  They shouldn't be able to hide behind the

9    fact that, "Oh, she's not an expert so -- or she's a

10   nonretained expert so, therefore, I don't have to give you the

11   full information.  I'm just going to give you partial -- a part

12   of it because you looked at it earlier."

13       **THE COURT:**  So was this the deposition excerpt I think

14   that somebody gave me was what's the purpose of your testimony

15   on this claim?

16       **MS. BRIGGS:**  No.

17       **MR. MAURER:**  Maybe not.

18       **MS. BRIGGS:**  No, Your Honor.  Actually, that was a

19   different witness.

20       Let me just read you a very brief exchange of the type of

21   testimony that we got when we did try to ask about these sample

22   claims (reading):

23       **"Q.**  As you sit here today, what do you remember about the

24       cases that you disagreed with with respect to the

25       physician?"  Referring to Dr. Schriger.

1        "A.   I would really need to look at my notes to speak

2        clearly about what I thought about that."

3        That's just one example.   We asked every single witness

4   about the sample claims.   Not one of them, not a single witness

5   could tell us a thing about the sample claims.

6        MR. TASSA:   Well, just sticking with Ms. Venezio, we

7   provided her notes as to each of the sample claims at her

8   deposition.   There's later testimony after those notes were

9   provided asking about each of the sample claims on which she

10  had an opinion, and she was able to elaborate based on those

11  notes.

12       And just more generally, I think we're still in the same

13  position we were a few minutes ago.   I'm not sure it matters

14  whether her testimony comes in as expert testimony or

15  percipient witness testimony.   She has knowledge of the

16  services NorthBay provided.   She can read a medical record.

17  They were free to have her -- ask her about any specific

18  medical record.   It was clear to them who she was.   She's a

19  nurse who's the head of the Emergency Department.

20       I'm not sure if they're saying we had an obligation to

21  make sure she could testify as to each of the sample claims

22  from memory.   It's just not clear to me.

23       I'm fine if she can't render an opinion, but I'm not sure

24  how that relates to any factual testimony she might offer.

25  And, again, she was disclosed as an expert on the day that

 1  expert rebuttal disclosures were due.

 2       **MR. MAURER:**  If I may, Your Honor, you know, first of

 3  all, with respect to the designation -- and Ms. Briggs can

 4  correct me if I'm wrong -- they didn't say anything about them

 5  testifying to the sample claims.  So when we went into those

 6  depositions, we didn't know specifically that anybody was going

 7  to testify about sample claims.

 8       So, you know, my concern, again, is that you're going to

 9  have a witness who can't provide testimony on the spot at a

10  deposition but then prepares between deposition and trial to

11  say more than she said in deposition.  It just doesn't seem

12  fair.

13       **THE COURT:**  I think I just heard, though, that there

14  may be a disagreement about whether questions were answered

15  about these sample claims.

16       **MR. MAURER:**  Yes, Your Honor.  So they did produce her

17  notes at the end -- you know, towards the middle of the

18  deposition, and I did ask some questions.  So, you know, if

19  she's limited to, you know, her answers just as to those she

20  provided in deposition, I guess that's one thing; but my

21  concern was that, you know, again, she's going to take time to

22  review things between now -- between the deposition and trial

23  and provide more information.  It seems like I should have that

24  information when I'm deposing her.

25       **THE COURT:**  Ms. Briggs?

1          **MS. BRIGGS:**  And it was NorthBay who designated her as

2     the expert.  All of these witnesses were designated as experts.

3     You know, when you take --

4          **THE COURT:**  Yeah, but so I'm a little past that,

5     though, Ms. Briggs, because if it's not necessary for her to be

6     an expert, then that part doesn't really matter.  What does

7     matter to me is the argument that Mr. Maurer was making, which

8     is that they haven't had a fair shot at knowing what the

9     problems are with Dr. Schriger's testimony that the plaintiff

10    intends to bring forward.

11         **MR. TASSA:**  Well, with respect to Ms. Venezio, they

12    had that shot at her deposition.  And just a note on that,

13    Ms. Venezio's deposition was the week after I think our initial

14    slate of clinical witness depositions.  By then it was more

15    than clear to them that none of these witnesses -- as they

16    could have expected, that none of these witnesses would be able

17    to testify as to details of 40 claims by memory.

18         They went through sample -- Mr. Maurer at the beginning of

19    every one of these depositions asked "Have you reviewed any

20    claims at issue in this case?"  Some of them said, "I think

21    so."  Some of them said, "Yes."  Mr. Maurer asked for the

22    details.  They explained that it's hard to give details about a

23    claim they reviewed.

24         They could have brought these claims to the deposition.

25    That was one of the purposes in limiting this to 40 claims, so

1    that we wouldn't have 1700 going back and forth.

2         This was a strategy on their part.  Once they had that

3    first deposition and got those answers, they thought, "Hey,

4    this might be a way to keep them out so I'm not going to bring

5    those documents to any of the other depositions."  They knew

6    that the --

7              THE COURT:  Who else is going to be testifying about

8    the claims?

9              MR. TOOCH:  So the percipient witness is going to talk

10   about -- the billing person is just going to be talking about

11   the billing with respect to the claims.  Then we're going to

12   have -- we've designated two of these people as experts.  The

13   rest are all percipient, the clinical.  So there's Dr. Zusman,

14   who's head of neuroscience, and she's worked at Dignity and

15   Sutter and Kaiser so she knows what's happening.  And

16   Ms. Venezio, who is head of trauma and emergency room services,

17   and she has knowledge of the state of trauma and emergency

18   services in Solano County.

19        I just want to make something absolutely clear, is that at

20   her deposition she had her notes on each of Mr. Schriger's --

21   he had a spreadsheet that he provided as part of his report,

22   and she wrote as to each patient what she thought about his

23   opinion.  And they asked her questions on each of those sample

24   patients what her notes meant and why she came to that

25   conclusion and what she was saying.

1          So there's no unfair advantage with respect to that.

2     That's -- they had that opportunity to question her on each of

3     those claims at her deposition, and they did.

4          **THE COURT:**  And what about Dr. Zusman?

5          **MR. TOOCH:**  Dr. Zusman is not going to be talking in

6     particular about claims.

7          **THE COURT:**  Okay.

8          **MR. TOOCH:**  She may talk about -- you know, a couple

9     of the claims are, I think, stroke claims and she can be

10    talking about the example claims about that.

11         Again, they chose -- as Mr. Tassa said, they chose not to

12    bring any of these sample claims to any of the depositions.

13    And so they said to the witnesses, "Can you remember offhand by

14    memory what was the name of the patient?"  And they said, "No,

15    I can't."  But they were free to ask about any of the sample

16    claims.

17         **MR. TASSA:**  If I can add, as to Dr. Zusman

18    specifically, there were two volumes of her deposition.  She

19    had to leave in the middle of the first day.  I think there was

20    at least a week, possibly two, between the two depositions.

21    They asked about claims at the first one.  They knew she

22    couldn't remember without having anything in front of her.

23         This was -- this is gamesmanship.  That's what's going on

24    here.  They had all the opportunity, especially with respect to

25    Dr. Zusman, who had two separate days of deposition, the second

1    of which was well after she answered that she reviewed claims,

2    she couldn't remember which ones.  They didn't ask us between

3    those two days to tell us which ones.  It's just --

4         **THE COURT:**  Well, Mr. Tassa, I'm definitely getting

5    the sense that there's gamesmanship, but I'm not sure where all

6    the games are being played at the moment and I want to avoid

7    these games.  I find it rather surprising that I'm dealing with

8    discovery issues like this at a pretrial conference.  That's

9    just unusual.

10        So here's what we're going to do.  I'll give you a couple

11   of choices.  If you believe that the deposition of Dr. Venezio

12   is so clear that the defendants had every shot at being able to

13   prepare to ask questions and asked questions about the claims

14   and you want me to read that deposition and make that

15   determination, I will do that.  And if I do that and decide

16   that she wasn't sufficiently prepared to do it, then I'll just

17   exclude her testimony about the claims.

18        Or you can offer her for a deposition of no more than two

19   hours to go over whatever questions the defendants want with

20   respect to that.

21        With respect to Dr. Zusman -- with respect to any of

22   the -- anybody who's testifying about claims who was not

23   prepared to talk about them at their deposition, if that's what

24   happened, then those people should be offered up for a

25   deposition of no more than two hours, and otherwise their

 1   testimony will be excluded.

 2        **MR. TOOCH:**  Your Honor, they were all prepared to talk

 3   about the claims.  There were no claims presented to them at

 4   the depositions so --

 5        **THE COURT:**  No, I understand, but you have talked

 6   passed each other on this issue; and my goal is to make sure

 7   that the jury gets a fair presentation of the case where one

 8   side isn't springing something on somebody else, and the only

 9   way that I can know how to do that is to make sure that people

10   are offered.

11        And I'm not saying that anybody's trying to spring

12   something on anybody or people are playing games.  I am saying

13   that I want this trial to be on a level playing field, and I

14   don't want to have people screaming in the middle of trial that

15   there's some further discovery abuse.

16        **MR. TOOCH:**  Fair enough.

17        **THE COURT:**  All right.  Does that satisfy all of the

18   issues?

19        **MS. BRIGGS:**  It does, Your Honor.

20        And I just need to add that Lori Eichenberger, who was

21   just referenced as somebody who's going to talk about the

22   claims, we had the same issues with her.  She was asked

23   specifically and said that she knew nothing about the sample

24   claims, yet we've just been told that she's going to be

25   testifying about them.  So to the extent that your order

1   applies, I would ask that she be included in that.

2        **MR. TOOCH:**  Again, if I may, Your Honor, we chose

3   these sample claims.  She's the claims person.  They didn't

4   bring any of the claims to the deposition, and now they're

5   saying, "Well, we didn't know that she was going to talk about

6   claims."  She's the claims person.  She's the head of the

7   Claims Department, and they chose not to bring any of the

8   claims to her deposition and now they're saying "How were we

9   supposed to know what claims she's going to talk about?"  Well,

10  the sample claims that the parties chose.  I mean, that's --

11  but --

12       **MR. TASSA:**  And with respect --

13       **THE COURT:**  Well, you're making it sound as though

14  your adversaries are just total idiots because there is only

15  one purpose for that person to testify and they didn't ask

16  questions about it.  I don't accept that as being correct, and

17  I don't know why there is this gap in understanding, and I'm

18  not pointing fingers but I'm closing the gap.

19       **MR. TOOCH:**  I understand that.

20       **THE COURT:**  All right.  So we're going to close the

21  gap before trial.

22       **MR. TOOCH:**  Okay.

23       **MR. TASSA:**  I just feel the need to add, for

24  Ms. Eichenberger the initial disclosures in this case submitted

25  whenever initial disclosures were due say she will testify

 1    about claims.  There could be no mistake with her.  I don't

 2    understand how that could possibly mean she could testify from

 3    memory about claims that Blue Shield would like her to testify

 4    about at her deposition, but it's clear as day with her.  It's

 5    just not the same argument, and I just don't see how their

 6    failure to ask about any of the documents in this case is cause

 7    for another deposition.

 8         **MR. TOOCH:**  All these people were disclosed at the

 9    initial disclosure, and they chose not to take any of the

10    depositions until a couple of months ago, a lot of times after

11    the close of deposition -- after the close of fact discovery.

12    So Ms. Eichenberger, who we disclosed initially back in the

13    initial disclosures, they didn't take her deposition until

14    after the close of fact discovery.

15         And so, you know, it's like asking a witness, "Well, do

16    you remember a letter you wrote?"  But I'm not going to bring

17    to the deposition the letter.  So it's not like they're total

18    idiots.  I think it's a tactical decision, "Well, you can't

19    remember what's in the letter so now we want to exclude you

20    from testifying about that letter because we didn't ask you --

21    you couldn't testify by memory about that letter."  So, I mean,

22    that's the kind of -- that's what's happening here.

23         **MS. BRIGGS:**  I have two points, Your Honor, and

24    they're going to be quick.  The initial disclosures were done

25    before the sample claims ever arose in this case.  So it is

 1  virtually impossible that Ms. Eichenberger was disclosed to

 2  testify about sample claims which didn't even exist in concept

 3  at that time.  That's point number one.

 4       Point number two, I have Ms. Eichenberger's deposition

 5  transcript in front of me (reading):

 6       "Q.  You have not seen any documents related to these

 7       claims?

 8       "A.  Not to my knowledge.

 9       "Q.  Aside from the fact that NorthBay contends that these

10       claims are underpaid, do you know anything else about

11       these claims?

12       "A.  No."

13       That was Ms. Eichenberger's testimony.

14            **THE COURT:**  All right.

15            **MS. BRIGGS:**  Thank you.

16            **THE COURT:**  So with respect to all of them, I don't

17  know why these problems are being raised to me now.  It seems

18  like a bad idea, but we're going to solve this problem before

19  trial.  And so just make your witnesses available.  They now

20  know -- you know, I think in part people hadn't figured out

21  exactly how they were going to use the claims.  Once the

22  experts have testified, they now have an idea -- you have an

23  idea of where the evidence needs to go, and everybody just

24  needs to know what the evidence is so that we can have a trial

25  that works.

1          MS. BRIGGS:  Thank you, Your Honor.

2          MR. MAURER:  Thank you, Your Honor.

3          MR. TOOCH:  Fair enough.

4          THE COURT:  All right.  I will look forward to seeing

5     you in a couple weeks.

6          MR. PIMSTONE:  Thank you.

7          MS. BRIGGS:  Thank you.

8              (Proceedings adjourned at 3:24 p.m.)

9                      ---oOo---

10

11

12                  CERTIFICATE OF REPORTER

13          I certify that the foregoing is a correct transcript

14     from the record of proceedings in the above-entitled matter.

15

16     DATE:   Wednesday, January 23, 2019

17

18

19

20     _____

21          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                     U.S. Court Reporter

22

23

24

25