Volume 1

Pages 1 - 160

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

NorthBay Healthcare Group - )
Hospital Division, dba NorthBay)
Medical Center and Vacavalley )
Hospital, )
                                ) **NO. C 17-2929 WHO**
        Plaintiff, )
                                  )
  VS. )  Day:  Monday
                                    )  Date:  February 4, 2019
Blue Shield of California Life )
& Health Insurance Company; )
California Physicians' Service,)
dba Blue Shield of California; )
and Does 1-50, inclusive, )
                                  )  San Francisco, California
        Defendants. )
_____)

**JURY TRIAL - VOLUME 1**

<u>**APPEARANCES**</u>:

For Plaintiff:         King & Spalding, LLP
                        633 West 5th Street, Suite 1700
                        Los Angeles, CA 90071
           **BY:  DARON L TOOCH, ESQ.**
                     **DAVID J. TASSA, ESQ.**

For Defendants:       Manatt, Phelps & Phillips, LLP
                        11355 West Olympic Boulevard
                        Los Angeles, CA 90064
           **BY:  GREGORY N. PIMSTONE, ESQ.**
                     **JEFFREY J. MAURER, ESQ.**

                        Manatt, Phelps & Phillips, LLP
                        One Embarcadero Center, 30th Floor
                        San Francisco, CA 94111
           **BY:  AMY B. BRIGGS, ESQ.**

Reported By:         Vicki Eastvold, RMR, CRR
                        Katherine Sullivan, CSR, RMR, CRR

# **I N D E X**

Monday, February 4, 2019 - Volume 1

|                                          | **PAGE** | **VOL.** |
|------------------------------------------|----------|----------|
| Jury Voir Dire                           | 11       | 1        |
| Jury Instructions                        | 92       | 1        |
| Opening Statement by Mr. Tooch           | 104      | 1        |
| Opening Statement by Mr. Pimstone        | 115      | 1        |

PROCEEDINGS

P R O C E E D I N G S

---oOo---

        **THE CLERK:**  And we are here in case number 17-2929 for

initial attorney conference before selection of jury.

        **THE COURT:**  Morning, everybody.  All right.  The jury

is gathering.  I wanted to deal with the objections to the

demonstratives.

        And with respect to the objections to NorthBay's, costs

are irrelevant to the *quantum meruit* determination.  And

NorthBay objected to the discovery about costs.  And I

sustained its position and refusal to provide the discovery on

the costs.

        So the Medicare cost comparisons -- the other thing is

that the Medicare cost comparison wasn't even in Mr. Heil's

opinion.  So it's fine for NorthBay to discuss the things that

were in Mr. Heil's opinion about the distinction between

government coverage and everybody else, but those specific

slides can't be used in opening.

        The DTI slides, again, they can't be used by Heil because

he never used them.  But I don't see why any witness couldn't

substantiate those calculations.  So I'm not -- if -- I don't

care whether they're used or not, frankly, in the openings.

        So Mr. Tooch, I don't know whether there's anything you

want to say about that but --

1          **MR. TOOCH:**  No, Your Honor.

2          **THE COURT:**  Okay.  And then Blue Shield has withdrawn

3      its demonstrative.  If there is -- if Mr. Deal's going to say

4      something about customer pressure, I'd like to know whether

5      there's any basis for doing that beyond what Mr. Barnes has

6      said about that.

7          If you have something, you might as well -- please do.

8          **MR. PIMSTONE:**  I think that the hearsay issue doesn't

9      need to be addressed now because I'm not raising any such

10     issues in opening.  Mr. Deal's not going to come on for another

11     week.  We'll have lots of time to discuss.

12     I'm happy to explain the hearsay issue and --

13         **THE COURT:**  So, I understand hearsay experts.

14         **MR. PIMSTONE:**  Exactly, right.

15         **THE COURT:**  What I don't -- NorthBay presented some

16     excerpts from his deposition which would indicate that the only

17     source for the customer pressure was Barnes.  If that's true, I

18     don't think that's a sufficient basis.  And that's the point

19     I'm raising.

20         **MR. PIMSTONE:**  I understand.  There are different

21     issues that sort of -- that are wrapped up in that.  The

22     pressure issue that they objected to in the opening was not an

23     issue that relates to generally the market issues in that area

24     generally.  So Mr. Deal spoke to Mr. Barnes about what was it

25     about NorthBay's location, the market dynamics in that area,

that caused NorthBay -- that caused you, Blue Shield, to enter into the kinds of rates that you did?

But Mr. Deal did much more than that.  Mr. Deal also spoke with other contracting representatives, Blue Cross, from other plans in the area, to get the sense for the market.  Which is to say, in that market what were the factors that go into play in terms of -- because NorthBay is going to put these rates out and say, effectively, these are willing buyer/willing seller rates.  It's a normal market.  You should trust these rates.

Mr. Deal looked and said, Wait a minute.  These are outlier rates.  Is there something going on in this particular market?  These rates don't look like anything like the rates that the hospitals -- that other hospitals in the geographic area get.  So he spoke to representatives, contracting representatives, from different plans to say, Tell me a little bit about this market.  You entered into these contracts.  Was it related to emergency services?  You know, were there other factors such as your elective services needing NorthBay in network for your elective services?  Were there customer issues as to why it is you agreed to pay more to NorthBay than you pay for these other hospitals?  So he did a market survey, basically.

And so -- but those weren't issues that I was planning on raising in my opening.  It's way too complex, too detailed.  And my suggestion is I'm happy to go into all the hearsay --

1   not the hearsay issues but --

2           **THE COURT:**  You satisfied --

3           **MR. PIMSTONE:**  What he did.  But he's not coming on

4   for more than a week and we'll have time to play that out if

5   Your Honor would like to do that.

6           **THE COURT:**  So if the issue gets raised again we'll

7   deal with it --

8           **MR. PIMSTONE:**  Absolutely.

9           **THE COURT:**  -- at that time.

10          **MR. PIMSTONE:**  I expect it will.  Because before Mr.

11  Deal comes on I'm anticipating that NorthBay is going to want

12  to raise the issue.  They may or they may not, but we'll have

13  plenty of time to do that between now and then.

14          **THE COURT:**  So as soon as the jury is ready they'll

15  come down and we'll get going.

16      Mr. Tooch.

17          **MR. TOOCH:**  Two questions.

18          **THE COURT:**  Go ahead.  Why don't you come on up to the

19  mic.

20          **MR. TOOCH:**  The first rule was about etiquette.  So is

21  the one-hand rule, one-arm rule.

22          **THE COURT:**  Basically, the one-hand rule works.

23          **MR. TOOCH:**  Okay.  And from *voir dire* can I question

24  from the chair over there?

25          **THE COURT:**  Yes.  And the other thing you can do is

1  you can switch the podium around if that's more helpful at any

2  time.

3       MR. TOOCH:  Okay.  And the second is, there are

4  certain points in time where we're going to be dealing with

5  confidential contract rates from NorthBay and other payors.  So

6  we would like to exclude Blue Shield's witnesses during that

7  period of time.  So it's -- they produced under "attorney's

8  eyes only," privileged.  Both sides produced certain documents.

9  So, for example, NorthBay's contracts with Aetna, Cigna,

10  United.  These are truly confidential and trade secret.  And so

11  at that point in time we would like to exclude Blue Shield's

12  witnesses.  Or, Blue Shield's person who's at the table.

13       THE COURT:  And so at what point are you going to be

14  using that information?

15       MR. TOOCH:  I'm going to be using it during

16  Ms. Eichenberger's testimony, who's our first witness, and

17  during Mr. Heil's testimony.

18       THE COURT:  All right.

19       MR. TOOCH:  And it's just brief periods of time.  Five

20  to ten minutes.

21       THE COURT:  All right.  Is there an objection?

22       MR. PIMSTONE:  Just very briefly, Your Honor.  Just a

23  few points.  The only Blue Shield witnesses who are in the room

24  are our Blue Shield counsel and in-house counsel.  So we don't

25  have any contracting representatives.

1    And the only other point is that while during discovery

2  these materials were produced as "attorneys eyes only,"

3  subsequent to that they were placed in the public record by

4  NorthBay.  Mr. Heil's report, including those specific rates,

5  were filed with the Court not under seal, no request for

6  confidentiality, and they've been in the public record now for

7  weeks.  We did point that out to NorthBay a few days after when

8  we realized that, and they indicated that, yes, that was an

9  error of theirs.  But they haven't made any steps to correct

10  that or to remove them.

11    So at this point, Your Honor, our view is they've been in

12  the public record now for weeks and that the -- any protection

13  for discovery purposes was waived.

14    **THE COURT:**  Okay.

15    **MR. TOOCH:**  I had informed Mr. Tassa to file a motion

16  to seal those.  I guess he forgot to do it, didn't get around

17  to doing it.  We would ask that the confidentiality be

18  maintained.  That was an error of counsel and the hospital

19  should not be punished because of it.

20    **THE COURT:**  Well, the additional problem you have,

21  Mr. Tooch, is that we're a court of public record.  There are

22  going to be other witnesses -- there are other people who are

23  going to be in the courtroom.  And it sounds as though the only

24  Blue Shield folks who will be in the courtroom are lawyers who

25  I guess had the ability to look at the documents anyway.

1    **MR. TOOCH:**  Yeah.  And I don't mind Blue Shield's

2    in-house attorney seeing the record as long as he doesn't

3    disclose those rates to the contracting people.  But this is

4    generally -- this was an understanding that we had under the

5    protective order that is in place in this case with respect to

6    these records.

7        And so I'm asking Your Honor and asking Blue Shield to

8    live up to that --

9        **THE COURT:**  Well, that's not a very good argument.

10   Certainly when it comes time for trial, there's nothing in the

11   protective order -- I don't know whether there's anything in

12   the protective order, but I don't think there's something --

13   that would preclude me from allowing the public to see

14   information that's in the public record.  And, you've waived

15   whatever that issue is by having the record available to people

16   for the last several weeks.  And, trying to exclude certain

17   people, but not other people, doesn't really solve your

18   problem.

19       So your request is denied.

20       **MR. TOOCH:**  Thank you.

21       **MS. BRIGGS:**  If I may, Your Honor.  Good morning, Amy

22   Briggs.

23       Two procedural questions.  I'll start with the easy one.

24   With respect to the clock, who keeps that?

25       **THE COURT:**  Ms. Davis.

1    **MS. BRIGGS:** Thank you. And, Ms. Davis, will we get a

2  tally at the end of every day?

3    **THE CLERK:** It will be part of the minutes.

4    **MS. BRIGGS:** Secondly, another procedural issue. We

5  have a disagreement with NorthBay over whether or not they can

6  put on rebuttal testimony before Blue Shield's witnesses have

7  ever testified. And we did meet and confer and NorthBay

8  confirmed that it was their intent to do so.

9    That raises a lot of issues -- Your Honor heard about some

10  of them -- kind of anticipating what may or may not be said.

11  So I just wanted to get the Court's -- the Court's view on

12  whether or not rebuttal witnesses are going to be testifying

13  before Blue Shield puts on its case in chief.

14    **THE COURT:** Mr. Tooch?

15    **MR. TOOCH:** Your Honor, our witnesses are going to be

16  addressing some of the issues that have been raised by Mr. Deal

17  in his report and the basis for his opinion, and so we are

18  going to be addressing some of those. We could either do it in

19  our case in chief or bring back the witnesses afterwards.

20    **THE COURT:** To me it makes much more sense to do this

21  as a rebuttal, to have it as a rebuttal case, just given the

22  issues that have already been raised with me and the choices

23  that the defendant may make with respect to the evidence that

24  they're putting on. And your witnesses are relatively close,

25  to the Court. So I think save those questions and that

1   evidence as pure rebuttal.

2           MR. TOOCH:  Okay.  Will do.

3           MS. BRIGGS:  Thank you.

4           THE COURT:  All right.  So, when the jury is seated

5   I'll be back in and we'll get going.

6                   (Recess taken at 8:44 a.m.)

7               (Proceedings resumed at 9:30 a.m.)

8           (Prospective jurors entering the courtroom.)

9                          **JURY VOIR DIRE**

10          THE COURT:  Ladies and gentlemen, welcome.  I'm Judge

11  William Orrick and in a moment I'm going to ask the clerk to

12  administer an oath to all of you touching on your

13  qualifications as jurors.

14      Before I do that, though, I want to say a few words about

15  what you've been called to do.

16      The right to a decision by a jury of your peers comes as

17  far back as the Magna Carta in England in 1215, a time when the

18  king and his cronies could make whatever decisions they wanted

19  and there was no way to challenge them.  The nobles, pretty

20  powerful and rich people themselves, stood up to the king and

21  forced him to give this power to the people.  The rule of law

22  became more important than the king.

23      In those days it was just the barons who received that

24  power, but today the power belongs to each of us and it ensures

25  that cases get decided by people who are not appointed by a

1  politician but selected randomly from the area where the case

2  is proceeding and picked not by the judge, but by the parties

3  to the lawsuit.

4      Our Constitution recognizes that there are some cases

5  where the stakes are just too high to leave it up to one person

6  to decide.  Particularly, a judge.  I may know more about the

7  law than you do -- I hope I do -- but each of us has the

8  experience to judge the facts and consider the perspectives of

9  other jurors.  And it's the diverse experiences that you bring

10  to this courtroom and to jury service that's the best

11  protection for a fair trial.

12      As a juror, you'll apply the law that I give you to what

13  you learn in the courtroom about this case and you will render

14  the verdict.

15      I like to contrast right to vote and the duty to serve on

16  a jury.  The right to vote is extremely important even if

17  sometimes you think the one vote doesn't make a difference.  I

18  think we've seen recently how close elections can be and voting

19  really matters.  But on the other hand, your contribution to

20  the system of justice here is going to be immediately apparent

21  to you through your jury service.

22      There will only be eight of you deciding this case once

23  the evidence is in.  So what you think and how you work with

24  others is going to be critical in resolving a matter that has a

25  real impact on our society.

 1    So I just want to underscore how important what you're

 2   being called to do is.  I know people don't like being called

 3   for jury service.  You all have important things to do in your

 4   lives.  This isn't convenient and it can seem like an

 5   imposition.  But this is very important and it is your duty as

 6   a citizen, and it's essential if we're to deliver the promise

 7   of justice for all.

 8    So with that, I'll ask Ms. Davis to administer the oath.

 9   (Oath administered to the potential jury panel.)

10   **THE COURT:**  So let me tell you a little bit about this

11   case, how long it's going to take, what our trial days are

12   going to look like, and what's going to happen today as we pick

13   the jury.

14    This case involves hospital services performed by NorthBay

15   Hospital on patients who presented at the hospital emergency

16   department.  The parties had no existing agreement about what

17   NorthBay would be paid for the services at issue.  In this

18   scenario, the law requires that Blue Shield, which is the

19   defendant in the case, reimburse NorthBay Hospital, which is

20   the plaintiff, the reasonable value or the market rate for the

21   services at issue in the case.

22    The trial's going to take no more than seven days.  The

23   case will be to you by the middle of next week for your

24   decision.

25    A trial day typically lasts from 8 in the morning until 1

1  in the afternoon and will run Monday through Friday.  We'll

2  have about two 10 to 15 breaks during the course of the

3  morning.  The reason the trial day usually will stop at 1:00 is

4  that I've got calendars that start at 1:30 or 2:00.  I have 300

5  other cases that I'm managing at this point.  And I also found

6  that when I was a trial lawyer it was a lot more efficient for

7  me to have the afternoons to prepare for the day coming up in

8  trial.  And I've also found that this is a benefit for jurors

9  because you don't have to wait around the courthouse during a

10 long lunch break.  You can do the other work that you need to

11 do in the afternoons and you can avoid the commute rush.

12     But anyway, that's the trial day.  Once the case will go

13 to you for jury deliberations, the jurors will set your own

14 calendar and timing.  Hopefully you'll be able to stay past

15 1:00 while you're deliberating, but that will be up to you.

16     Today if you are selected for the jury we may run until

17 approximately 3 or so so that we can get the case underway.  So

18 that's today.

19     I know that jury service asks a lot of you and so I want

20 to promise to be as efficient with your time as I can be.  If I

21 need to meet with the lawyers or if they need to bring me an

22 issue that shouldn't be heard by you, we'll do it before 8:00

23 or after 1:00, unless there's something unusual going on.

24     I'm going to be prompt, the lawyers are going to be

25 prompt, and I ask you to be prompt.  There are a lot of people

involved in a trial; and making people wait because one of us isn't watching the clock is just discourteous and it will slow everything down.

If anyone has a personal emergency that causes you to need to be excused from further service, you should notify Ms. Davis, my courtroom deputy. She'll get in touch with me. Ms. Davis will provide everyone who's selected to serve on the jury with an information sheet that includes her contact information.

So now we're going to go on to jury selection. In a moment I'm going to ask you to introduce yourselves in order, answering the questions that are in front of you. After that I'll ask the lawyers to introduce themselves, their teams and clients, and to read off the name of witnesses who may appear at the trial to see if you know anybody. Then I'll have a number of questions for you to make sure the lawyers can pick an impartial jury. The lawyers may have a few follow-up questions after that. Then I'll determine whether any juror should be excused because of hardship. And I mean real hardship or some other good cause. And then the lawyers will pick the jury.

We will finish jury selection today without a doubt.

This is a civil case so the jury needs to include a minimum of six people. We'll select eight to protect against someone having an emergency and needing to drop out of the

1    panel for some reason.  Everyone selected for the jury will

2    participate in the deliberations.

3        For those who are selected to serve, if we have time today

4    we'll take a break after you're sworn in and then start the

5    trial with the opening statements and my preliminary

6    instructions.  And then the evidence will begin tomorrow at

7    8:00.

8        In the trial of this case, each side is entitled to have a

9    fair, unbiased and unprejudiced jury.  I have a lot of

10   questions for you so that I can determine whether any

11   prospective juror should be excused for cause or hardship and

12   so that counsel for the parties can exercise their individual

13   judgment with respect to peremptory challenges.  That is,

14   challenges to prospective jurors for which no reason at all

15   needs to be given.

16       It's important that you disclose any reason or fact why

17   any of you might be biased or prejudiced in any way in answer

18   to the questions that you're asked.  I'll explain that a little

19   more as we go along.

20       As we proceed, sometimes I'll ask a question that calls

21   for a "yes" or "no" response.  If your answer is "yes," please

22   raise -- this will be a question to everybody.  And if the

23   answer is "yes," please raise the card at your seat.  I may

24   follow up with you immediately or call you up to the bench in

25   awhile.

1    If at any time you're asked a question during the course

2    of this that you believe calls for a very personal or

3    embarrassing response or you just prefer to keep it private,

4    just let me know and we can hold a little conference over to

5    the side.  There's a noise machine so nobody will be able to

6    hear the conversation.  The lawyers will come with me to hear

7    what it is that you say and it will be taken down by the court

8    reporter.  But otherwise, it will be confidential.  So if

9    anything like that comes up, please don't hesitate to let me

10   know about that.  No one wants to pry into your personal

11   matters, but the question is maybe asked because it has

12   relevance to the case and might impact on your ability to sit

13   as an impartial juror.

14       So, with all of that, let's start with the juror

15   introductions.  You have a list of questions.  And let's start

16   with juror number 1.

17       **PROSPECTIVE JUROR CHAMORRO:**  Morning.  My name is Ana

18   Chamorro.

19       **THE COURT:**  We'll see whether our fancy technology in

20   this courtroom actually works.

21       **PROSPECTIVE JUROR CHAMORRO:**  My name is Ana Chamorro.

22   I live in Richmond, East Bay.  I was born in Managua Nicaragua.

23   I am married for 32 years.  And I been working with city and

24   county at the human services agency for 15 years.  I live with

25   my husband and two daughters.  My oldest daughter she's working

1    with UCSF as administrative assistant.  My youngest daughter is

2    living in Seattle, Washington.  She went to college for her

3    first year.

4        I complete some of the college in my country.  And I have

5    never served for jury duty.

6        **THE COURT:**  Ms. Chamorro, your daughter who works at

7    UCSF as administrative assistant, what kind of work does she

8    do?

9        **PROSPECTIVE JUROR CHAMORRO:**  I just know that she got

10    -- she was working with the renal department, but now she moved

11    to a different department.

12        **THE COURT:**  Does she do any billing or any work with

13    medical insurance, do you know?

14        **PROSPECTIVE JUROR CHAMORRO:**  She's the assistant for

15    one of the doctors.

16        **THE COURT:**  And have you ever talked with her about

17    the insurance billing that occurs in the hospital?

18        **PROSPECTIVE JUROR CHAMORRO:**  No.

19        **THE COURT:**  Do you have any medical insurance

20    yourself?

21        **PROSPECTIVE JUROR CHAMORRO:**  Yes.

22        **THE COURT:**  What kind of coverage?

23        **PROSPECTIVE JUROR CHAMORRO:**  Kaiser.

24        **THE COURT:**  Great.  Thank you.  We'll just pass the

25    microphone down the line.

1     Mr. Smith.

2          **PROSPECTIVE JUROR SMITH:**  Okay.  My name is Michael

3     Smith.  I live in San Francisco.  Place of birth is San

4     Francisco.  I'm not married.  I'm a bus driver.  Been a bus

5     driver for about four years.  Not with Muni, but with other

6     companies around the area.

7          No kids.  Got my GED.  And I never been on a jury before.

8          **THE COURT:**  All right.  And how about -- the reason I

9     ask about insurance coverage in this case is just because Blue

10    Shield's involved in it.  Do you have insurance?

11         **PROSPECTIVE JUROR SMITH:**  I think I have it through my

12    employer.  They just gave me a paper.  I don't know.  I'm not

13    sure.  It comes out of my check, though.  I don't know who they

14    are.

15         **THE COURT:**  All right.  Stay healthy.

16         **PROSPECTIVE JUROR SMITH:**  I'll try.

17         **PROSPECTIVE JUROR TRUONG:**  My name is Tan Truong.  I

18    live in San Leandro.  My birth place is Vietnam.  I am married.

19    I'm an optometrist.  I own my own practice and I also teach at

20    UC Berkeley.

21         My wife, she's a digital marketer at investment banking

22    company.

23         I have three children.  One is 13, female.  Another is 7,

24    male.  And one is six months, female.  And they are not

25    working.  They are in school.

1     Highest grade I completed in school, I've done a lot of

2  graduate work at UC Berkeley.  I've been a juror before once

3  back in 2010 for the state.  It was a civil case.  And we did

4  reach a verdict.

5         THE COURT:  And how about your insurance coverage?  Do

6  you have any?

7         PROSPECTIVE JUROR TRUONG:  PPO.  But I'm not sure if

8  it's Blue Cross or not.

9         THE COURT:  And in your practice, do you deal with

10  insurers?

11         PROSPECTIVE JUROR TRUONG:  Yes.  That's all I do.

12         THE COURT:  And so --

13         PROSPECTIVE JUROR TRUONG:  And patients.

14         THE COURT:  I was hoping the patient part.  As far as

15  dealing with the insurers, do you have business dealings with

16  Blue Cross/Blue Shield?

17         PROSPECTIVE JUROR TRUONG:  Yes, I do, through eye

18  insurance provider.

19         THE COURT:  Is there anything that has occurred in

20  your relationship with Blue Cross/Blue Shield that would impact

21  at all your ability to sit on a case involving reimbursement

22  that Blue Shield provides to providers?

23         PROSPECTIVE JUROR TRUONG:  That's a tough one.  I

24  would say I'm a little biased.

25         THE COURT:  In what way?

1    **PROSPECTIVE JUROR TRUONG:**  In terms of getting

2    reimbursement from insurance coverers.

3    **THE COURT:**  Just in general you like to get more

4    coverage -- more payment than you're getting.

5    **PROSPECTIVE JUROR TRUONG:**  Definitely.

6    **THE COURT:**  Do you think that in this case where

7    you're going to be hearing about a provider and a disagreement

8    on what the reasonable value of their services is, do you think

9    you could sit with an open mind and treat both sides the same,

10   which is of course your obligation to do?

11   **PROSPECTIVE JUROR TRUONG:**  I will try.  That's a tough

12   one.  I'd say I'll try to be unbiased honestly, but you never

13   know in terms of my dealings.

14   **THE COURT:**  Well, is there anything about your

15   dealings that would make you start -- when you think about this

16   case -- putting the provider ahead of the insurance company?

17   So both people in a court of law they start on an even basis.

18   The plaintiff in this case, the provider, will have the burden

19   of proof.

20   **PROSPECTIVE JUROR TRUONG:**  It all depends on what the

21   evidence is presented, you know.  In terms of -- it's hard to

22   say in terms of what's being presented and what's the argument.

23   **THE COURT:**  Will you be able to evaluate the evidence

24   fairly and follow my instructions on the law in order to come

25   up with your view on the case?

1    **PROSPECTIVE JUROR TRUONG:**  Yes.  I'll try.

2    **THE COURT:**  Is there any reason that you don't think

3    you'd be able to succeed?

4    **PROSPECTIVE JUROR TRUONG:**  No.  No.

5    **THE COURT:**  Okay.  Thank you.

6    **PROSPECTIVE JUROR ADORABLE:**  Hi.  I'm Larijohn

7    Adorable.  I live in South San Francisco.  I was born in San

8    Francisco.  I'm single.  My current occupation employer is --

9    I'm an application support specialist as a contractor for

10   Apple.  Actual contractor is Security Industry Specialists.

11   And I've been in this field for like two years almost.

12       The occupation -- well, right now I'm at home -- I'm

13   living with my parents and my aunt.  Both of my parents are

14   retired.  My mom was a doctor and a nurse.  My dad, he was an

15   electrical engineer.  And my aunt works with, like, people with

16   mental disabilities at a clinic.  I don't have any children.

17       Highest -- I graduated -- I have a bachelor of science in

18   gamesmanship programming.  And I'm planning to take a masters.

19   But I've never served on a jury before.  And --

20       Yeah.  That's about it.

21       **THE COURT:**  And how about coverage?  Do you have

22   insurance coverage?

23       **PROSPECTIVE JUROR ADORABLE:**  Yes.  It's through -- not

24   -- it's not like a really good name -- or, I've never heard of

25   it before.  It's called Benefit Administrative Services, or

1    something like that.  It's a PPO company.  So --

2         **THE COURT:**  All right.  Thank you.  And let me just

3    ask you about your parents in the medical field.  Have they

4    ever talked with you about insurance issues?

5         **PROSPECTIVE JUROR ADORABLE:**  Kind of.  My mom has

6    because she kind of had to deal with that often in a way.  But

7    more on getting like -- what's it called -- more about like

8    picking a plan and then choosing what options to do or getting

9    reimbursed for insurance, or whatnot.  Otherwise, not really

10   that much.

11        **THE COURT:**  Is there anything -- I know that I haven't

12   told you very much about this case so far, but is there

13   anything about what I have said that she told you that might

14   make you less than impartial on one side or the other?

15        **PROSPECTIVE JUROR ADORABLE:**  I don't think so, no.

16        **THE COURT:**  Okay.  Thank you.

17        **PROSPECTIVE JUROR YAP:**  Good morning, Judge.  Good

18   morning, everyone.  My name is Colleen Yap.  I'm a manager of

19   IT Financial Systems.  I work for a company called Coshen

20   (*phonetic*) Technology.  I live in Foster City.  And I was born

21   in the Philippines.

22        And I'm married with one kid, eleven years old, in middle

23   school.  Not working.  And --

24        How long have you worked in that field?  15 years.  And

25   what are the occupations of any adults?  My husband works for

1 OpenTable.  He's -- he does financial systems.  And children.

2 Highest grade, I have a masters in IT from the Philippines.

3 I've never served on a jury before.  Yeah.

4         THE COURT:  And how about insurance coverage?  Do you

5 have some?

6         PROSPECTIVE JUROR YAP:  Aetna.  Yeah.  So far it's

7 worked.

8         PROSPECTIVE JUROR REESOR:  Good morning.

9         THE COURT:  Good morning.

10         PROSPECTIVE JUROR REESOR:  My name is Christopher

11 Reesor.  I live in Oakland.  Place of birth was Berkeley.  I'm

12 married for 39 years.  I founded a business in '77 and passed

13 that along to my son a couple years ago in 2017.

14         In terms of occupations, of all my children are somewhat

15 adult.  I have a 51 year old, a 45 year old, a 27 year old and

16 a 26 year old.  And the younger children are employed at --

17 more or less starter jobs.  One of them for the business I

18 founded.  And the older children, my oldest child, has a mental

19 disability and has SSI.  And he's doing really well.  And the

20 45 year old is the child who I passed the business along to.

21         THE COURT:  And what kind after business is it?

22         PROSPECTIVE JUROR REESOR:  It was marketing and

23 design.

24         THE COURT:  Okay.

25         PROSPECTIVE JUROR REESOR:  I got a B.S. at Cal.  I was

1  called for a jury once before, but the judge and I were friends

2  so I was excused.

3      And that was a -- and that was a -- an Alameda County

4  Superior Court.  The jury did reach a verdict.  I talked to my

5  friend; and the defendant didn't come out well.

6      **THE COURT:**  Okay.  And what kind of -- do you have

7  currently insurance coverage?

8      **PROSPECTIVE JUROR REESOR:**  Well, I'm 72 so I have

9  Medicare at this time.  It's carried through Kaiser.  When I

10  owned the business we provided insurance for all our employees

11  and their families, and that also was through Kaiser.

12      **THE COURT:**  Great.  Thank you.

13      **PROSPECTIVE JUROR WHITEMAN:**  Good morning.  My name is

14  Jill Whiteman.  I live in San Rafael.  I was born in Ithaca,

15  New York.  I'm single.  I am a legal secretary, and I work for

16  Sheppard Mullin and I've been there for 18 years.  I don't have

17  any children.  I have an associates degree.  I have served on a

18  jury one time, when?  I don't know.  Maybe seven years ago.  It

19  was state, it was criminal, and we did reach a verdict.

20      **THE COURT:**  All right.  And do you have coverage?

21      **PROSPECTIVE JUROR WHITEMAN:**  I do.  It's Blue Shield

22  of California.

23      **THE COURT:**  And do you, in your job, are you working

24  with any lawyers that handle insurance-related issues?

25      **PROSPECTIVE JUROR WHITEMAN:**  Not at this firm, but in

1    a previous firm I worked for people that did insurance defense.

2         **THE COURT:**  All right.  Great.  Thank you.

3         **PROSPECTIVE JUROR RAUCH:**  My name is Catherine Rauch.

4    I live in Penngrove.  I was born in Santa Rosa.  I am not

5    married.  I currently work for the City of Rohnert Park.  I

6    work as a life guard and a manager.  I've been there for three

7    years.  My dad is a software engineer.  My mother -- because I

8    live with my parents -- my mother is currently a testing room

9    manager.

10        Do not have any children.  I am currently a sophomore in

11   college.  I have never served on a jury.  My first time being

12   summoned, actually.

13        **THE COURT:**  Welcome.  Do you have insurance coverage?

14        **PROSPECTIVE JUROR RAUCH:**  I have insurance with my

15   parents through Blue Shield.

16        **THE COURT:**  And -- great.  Thank you.

17        **PROSPECTIVE JUROR CHADALAVADA:**  Hi.  My name is Varun

18   Chadalavada.  I live in Millbrae.  I was born in India.  I am

19   married.  I'm an accountant.  I work for a company called

20   RingCentral, and I've been an accountant for nine years.  I

21   live with my wife.  She is in sales for Coca-Cola.

22        I have a seven month old daughter.  I have a bachelor's

23   from San Jose State.  And I've never served on jury.

24        **THE COURT:**  And how about coverage?

25        **PROSPECTIVE JUROR CHADALAVADA:**  Kaiser.

1    **THE COURT:**  Great.  Thank you.

2    **PROSPECTIVE JUROR CRAIG WILLIAMS:**  My name is Craig

3  Williams.  I live in San Leandro.  I was born in New Bedford,

4  Massachusetts.  I'm married.  Retired, but I've done a lot of

5  political work and other types of, you know, handyman type

6  jobs.

7    My wife is an RN.  I have a son who is 23 who's not

8  working right now.  I completed 16 years of education.

9    I served on a jury.  It was a criminal case, and that was

10  in Oakland.  One time.

11    Let's see.  What else?  I've actually done some writing on

12  emergency cases -- or, ambulances which were -- Sutter was

13  involved in situations where they were charging people -- or, a

14  couple of people who didn't want to use the service and who

15  ended up getting charged something like six, seven thousand

16  dollars.

17    And, also, I worked on the single-payer campaign for about

18  six months.  And Kaiser's my health care through my wife, as

19  well.  And I also have -- I'm also a senior citizen.

20    **THE COURT:**  So is there anything about the things

21  you've written, experienced, conversations you've had with your

22  wife, that makes you think you couldn't sit as a fair and

23  impartial juror in a question of what the reasonable value of

24  services that a provider provides is?

25    **PROSPECTIVE JUROR CRAIG WILLIAMS:**  You know, I don't

1  feel that I'm unbiased, but some people might think that I

2  might be, you know.

3      THE COURT:  Some people might think that you're biased

4  but -- say that again.  I'm sorry.

5      PROSPECTIVE JUROR CRAIG WILLIAMS:  I don't feel that

6  I'm biased.  But, you know, I have strong opinions about

7  different aspects of health care.

8      THE COURT:  And do you think you would be able to --

9  what you need to do as a juror is to set aside any biases that

10  you might have, listen to the evidence that's presented in the

11  courtroom, and then follow the instructions that I give you as

12  to what the law is, and then deliberate with your fellow jurors

13  about what, in this case, the reasonable value of the services

14  would be.  Do you think you'd be able to do that?

15      PROSPECTIVE JUROR CRAIG WILLIAMS:  Yeah, I think I

16  could do that.

17      THE COURT:  Okay.  Thank you.

18      PROSPECTIVE JUROR ADAMS:  Good morning.  My name is

19  Katrina Adams.  I live in Livermore where I also grew up,

20  though I was born in Castro Valley in the hospital.

21      I am single.  I am a college student.  I'm also just

22  getting ready to work as a substitute -- a classified

23  substitute for the Livermore Valley Joint Unified School

24  District.  Which is on-call.

25      I live with my parents and my sister.  My sister is also a

1    student and she is a certificated substitute for the school

2    district.  My mother teaches second grade in the same school

3    district.  My father is retired.  He worked for Livermore area

4    Park and Rec District, ending as a foreman for the park part of

5    the department.

6        I have no children.  I'm approximately a junior in

7    college.  I have never served on a jury.

8        **THE COURT:**  Okay.  And how about do you have insurance

9    coverage?

10       **PROSPECTIVE JUROR ADAMS:**  I have Medi-Cal.

11       **THE COURT:**  Okay.

12       **PROSPECTIVE JUROR ADAMS:**  One of the managed ones.

13       **THE COURT:**  Great.  Thank you.

14       **PROSPECTIVE JUROR ALBRANT:**  Hi.  I'm Michael Albrant.

15   I live in Oakland, California.  I was born in Royal Oak,

16   Michigan.  I'm in a domestic partnership.  I am a cheese and

17   specialties buyer for Farmstead Cheeses and Wines.  I've worked

18   in the field for seven years.  My partner is in marketing

19   research for Logitech.

20       I have no children.  I have an associates degree.  And I

21   have not served on a jury.

22       Medical, I have Cigna, HMO.

23       **THE COURT:**  Okay.  Thank you.

24       **PROSPECTIVE JUROR WAN:**  Good morning, Your Honor.  My

25   name is Danny Wan.  I was born in Hong Kong.  I live in Daly

1  City.  I'm married.  I'm a personnel analyst for San Francisco

2  Public Utilities Commission.  I've been doing HR about 18

3  years.

4      My wife is an account manager for a bank.  No kids.  I

5  have a BA from university.  And I never served on a jury

6  before.  And I have Kaiser.

7          THE COURT:  In your work with HR, do you work on

8  insurance-related issues?

9          PROSPECTIVE JUROR WAN:  Not for this job, but I have

10  before in the private industry.

11          THE COURT:  And what were you doing then?

12          PROSPECTIVE JUROR WAN:  I worked with benefits in

13  terms of open enrollment, signing up providers, and who's going

14  to take care of our employees.

15          THE COURT:  And is there anything about that prior

16  experience that makes you question whether you'd be a fair and

17  impartial juror in a case involving an insurance company and a

18  provider?

19          PROSPECTIVE JUROR WAN:  Trying to think of something.

20  But, no, I got nothing.

21          THE COURT:  Thank you.

22          PROSPECTIVE JUROR FAJARDO:  Hi.  I'm Angel Fajardo.  I

23  live in Oakland.  I was born in San Francisco.  I'm divorced.

24  I am a national accounts coordinator for Crown Lift Trucks.

25  I've worked there for 18 years.

 1    I live alone.  I have a daughter that's a nurse.  She's

 2  25.  I completed high school.  I've never served on a jury.

 3  And I have Kaiser.

 4    **THE COURT:**  Great.  Thank you.  Ms. Davis will get the

 5  mic from you, then we'll continue in order.

 6    **PROSPECTIVE JUROR WONG:**  Good morning.  My name is

 7  Fanny Wong.  I live in San Francisco, I'm born in San

 8  Francisco.  I'm single, and I'm currently a student at a

 9  post-bacc program.

10    I live with my parents.  My dad's about to retire.  He's a

11  construction worker.  And my mom just solely take care of my

12  grandma.

13    No children.  I completed my bachelor in Davis.  And I

14  have not served in a jury before.

15    I used to have Blue Shield in college, but the coverage

16  wasn't that great so I never really used it.  Now I have

17  Kaiser.

18    **THE COURT:**  Great.  Thank you.

19    **PROSPECTIVE JUROR YIM:**  My name is Mee Loi Yim.  I

20  live in San Francisco.  I was born in Hong Kong.  I was

21  married.  I'm other retired registered nurse, and I have been

22  working there for 40 years.

23    My husband is a retired engineer.  I had two daughter.

24  One is biochemical engineer.  One is AI -- I think she work for

25  the AI.  I complete my professional diploma.  I never serve as

 1    a juror.

 2            **THE COURT:**  Okay.  And do you have insurance coverage

 3    at this point?

 4            **PROSPECTIVE JUROR YIM:**  Yes.  City and county cover my

 5    whole life.  I work for city and county.

 6            **THE COURT:**  Okay.  And so are you covered --

 7            **PROSPECTIVE JUROR YIM:**  I cover by Kaiser Permanente.

 8            **THE COURT:**  Kaiser.  And is it through Medicare at

 9    this point or --

10            **PROSPECTIVE JUROR YIM:**  No.  Because I retire --

11            **THE COURT:**  Gotcha.  Okay.

12            **PROSPECTIVE JUROR MOODY:**  My name is Rodger Moody.  I

13    live in Livermore, California.  I was born and raised in

14    Arcadia, California.  Been married 44 years.  I'm sales

15    management for a packaging company, TriMas, located in

16    Michigan.

17        I've got two sons, 35 and 32.  The oldest is operations

18    manager for Cintas in Salt Lake City, Utah.  The younger is an

19    organic farmer.

20        I graduated from San Jose State.  I've served on a jury

21    three times.  Over the years I've probably -- five years in

22    between each one.  Criminal cases.  Two of the cases was a plea

23    deal.  Pled guilty during the case, and it was dismissed.  One

24    of them was a hung jury.

25        I have Blue Shield/Blue Cross insurance.

1    **THE COURT:**  Great.  Okay.

2    **PROSPECTIVE JUROR WHITTINGHAM:**  My name is Mike

3    Whittingham.  I live in Rohnert Park.  I was born in Jamaica.

4    I'm married.  I do benefits and financial services for American

5    Fidelity.  I've worked in that field for about five years.  My

6    wife is in sales for BiRite Foodservices.  I have two 18 year

7    old children.  I have a daughter and a son.  My son works for

8    the city of Rohnert Park part time as a lifeguard until he goes

9    off to college.  I have an associates.  Never served on a jury.

10   And I have Cigna.

11   **THE COURT:**  Okay.  You said American Fidelity.  What

12   is the nature of the business?

13   **PROSPECTIVE JUROR WHITTINGHAM:**  What we do is we do

14   benefits administration.  So we do open enrollment.  But I also

15   do investment, retirement planning, and all of their benefits

16   packages.  I put together all the benefits packages

17   specifically for teachers and teachers unions.

18   **THE COURT:**  And so as part of that, are you working

19   with different health insurance companies evaluating their

20   plans and those sorts of things?

21   **PROSPECTIVE JUROR WHITTINGHAM:**  Yes.

22   **THE COURT:**  Without knowing more about the case than

23   I've told you, which is very little, is there anything about

24   your job that you think would make you have any sort of a bias

25   one way or another start now?

1    **PROSPECTIVE JUROR WHITTINGHAM:**  Possibly.  I mean,

2  that's all I do.  I deal with the plans.  I sit through, I talk

3  with them, I come through the pros and cons of all the plans

4  with superintendents and --

5    **THE COURT:**  So does that include, if you evaluated

6  Blue Shield in the course of your --

7    **PROSPECTIVE JUROR WHITTINGHAM:**  Yes.  In the course of

8  my career, yes.

9    **THE COURT:**  -- your career.  All right.  Thank you.

10    **PROSPECTIVE JUROR MICHAEL WILLIAMS:**  My name is Mike

11  Williams.  I live in Walnut Creek.  I was born in Oakland.  I'm

12  married.  My wife and I are both retired.  I have a

13  stay-at-home mom daughter who's 35, and my son is a civil

14  engineer.

15    I have a master's degree.  I served on one jury, but as we

16  got started the guy changed his mind and he pled out.  So --

17    And I have Kaiser.

18    **THE COURT:**  Great.  Thank you.

19    **PROSPECTIVE JUROR DECKER:**  Hi.  My name is Jake

20  Decker.  Live in Oakland, but I was born in Howell, Michigan.

21    I've got a partner.  I work in politics, and I work for a

22  labor union.  And I've been doing that for about 20 years.  My

23  partner, she also works in politics trying to get better people

24  elected.  We don't have any children.

25    I've got a JD, and I've never served on a jury.  And I've

1   got Kaiser.

2       **THE COURT:**  So did you use your -- have you been a

3   lawyer in addition to that?

4       **PROSPECTIVE JUROR DECKER:**  I have not.  I just

5   graduated.

6       **THE COURT:**  Well, congratulations on that.

7       **PROSPECTIVE JUROR AGUSTIN:**  Good morning.  My name's

8   Elizabeth Agustin.  I was born in San Leandro.  I am not

9   married.  I live in Pinole.  I am a program associate with the

10  Make-A-Wish Foundation.  I've been there for three years.

11      I live with my partner.  He's a teacher here in San

12  Francisco.  I have no children.  I graduated college.

13      I've been on a jury once before.  It was about three years

14  ago.  It was a -- in the county of Richmond.  I think it might

15  have been criminal.  Not sure.  We did reach a verdict.

16      **THE COURT:**  Great.  And do you have insurance

17  coverage?

18      **PROSPECTIVE JUROR AGUSTIN:**  I have Kaiser.

19      **THE COURT:**  Okay.  Great.  Thank you.

20      **PROSPECTIVE JUROR WEVURSKI:**  Good morning.  My name is

21  Pete Wevurski.  I live in Brentwood.  Was born and raised in

22  Jersey City, New Jersey.  I'm unmarried, but in an unofficial

23  domestic partnership.  She's former retail and former real

24  estate.

25      I'm the -- I work at the San Francisco Chronicle as a

1 front page editor.  In my previous job I was an editor of a

2 paper in central valley where I directed some coverage about a

3 hospital situation that we -- may become sensitive.  I don't

4 know.

5     I have -- I have no children, but her two children are 45

6 -- 45 year old lives in New Zealand.  41 year old lives in

7 Houston.  She's a lead accountant for Bechtel.

8     I graduated college with a bachelor's degree.  I served on

9 one civil jury in New Jersey about 15 years ago.  We reached a

10 verdict.

11     I'm covered by Medicare, United Health Care, and I have VA

12 benefits as well.

13     **THE COURT:**  Okay.  Now Mr. Wevurski, you were

14 mentioning something about an article which I didn't quite

15 catch.  Tell me a little bit more about that.

16     **PROSPECTIVE JUROR WEVURSKI:**  I was editor of the paper

17 in Visalia.  We did a series on a hospital in Tulare County.

18 There was a problem with the company running the hospital.  We

19 did some investigation over quite a long period of time.  The

20 company's no longer running the hospital.  The County has

21 gotten its hospital back.

22     **THE COURT:**  So nothing about NorthBay.

23     **PROSPECTIVE JUROR WEVURSKI:**  No, not at all.

24     **THE COURT:**  And so will you be able to set that

25 information aside and just judge this case on the basis of what

1  you hear in the courtroom?

2          **PROSPECTIVE JUROR WEVURSKI:**  Certainly should.

3          **THE COURT:**  Okay.  Thank you.

4          **PROSPECTIVE JUROR RONNOW:**  Good morning, everyone.  My

5  name is Karey Ronnow.  I live in San Ramon, California.  I was

6  born in Hayward just down the road.  I am married.

7      I am currently a public school teacher for the past 14

8  years in Dublin Unified.  My children are eleven and eight so

9  they are in school.  Two daughters.  My husband is a

10  self-employed general contractor so he owns his own business.

11      I have a master's degree from USF.  And I have never

12  served on a jury before.

13          **THE COURT:**  And how about coverage?

14          **PROSPECTIVE JUROR RONNOW:**  I have Kaiser.  My children

15  have Blue Shield.

16          **THE COURT:**  Great.  Thank you.

17          **PROSPECTIVE JUROR CHASE:**  Hi.  My name's Patrick

18  Chase.  I live in Dublin, California.  I was born in

19  Bloomington, Indiana.  I'm married.  I'm a software engineer

20  and I work for Google.  I've worked in that field for 25 years

21  now.  My wife works as an emergency manager for a contractor at

22  NASA Ames.

23      I have children that are -- a boy who's eight and a girl

24  who's four.  I completed a bachelor of science and some

25  graduate school.

1    I have not served on a jury before.  And my insurance is
2  through Anthem Blue Cross.
3    **THE COURT:**  Great.  Thank you.
4    **PROSPECTIVE JUROR DRAPER:**  Good morning.  My name is
5  Alison Draper.  I live in San Mateo.  I was born in Fort Bragg,
6  North Carolina.  I've been married for 35 years.  I'm retired,
7  but I was an English teacher for about 25 years in private
8  schools around the country.
9    We have three children.  My stepdaughter is 50.  She works
10  for Microsoft in sales.  My stepson is 47 and works in Denver
11  for ALPS selling closed-end funds.  And our 33 year old works
12  for Square in the fraud division.
13    I have a masters degree.  And I have served on a jury, but
14  we didn't -- it was a criminal case in state court, but it was
15  dismissed two and-a-half weeks in because of a some
16  improprieties.
17    I have Medicare and Anthem.
18    **THE COURT:**  Great.  Thank you.
19    **PROSPECTIVE JUROR WONG:**  Good morning.  My name is
20  Diana Wong.  I live in Alamo, and I was born in San Francisco.
21  I'm married and have three grown children.  One of them works
22  for the County of San Mateo and the other is getting a second
23  degree in college.  The other one is married with kids.
24    Anyway, I worked in San Francisco for many years for a
25  utility company.  And since my retirement, I'm spending most of

my time being on call for the grandkids.  Because my son-in-law
works for the media, and he literally gets last-minute calls to
leave, and then I take over and go tend to the kids, pick them
up from school, and all that.

And living with me is -- right now is just my husband.
The other kids -- the kids are living in different cities.  I
have an associates degree.

And I've never served on a jury.  And my coverage is
Medicare and Blue Cross.

THE COURT:  Great.  Thank you.

PROSPECTIVE JUROR DADIOMOV:  My name is Leonid
Dadiomov.  I was born -- no.  I live in Daly City.  I was born
in South Union.  Married.  I have son, 33.  I am self-employed,
mechanical designer.  Worked almost 30 years.

And I see that's it.

THE COURT:  Have you ever served on a jury before?

PROSPECTIVE JUROR DADIOMOV:  No.

THE COURT:  All right.  And what kind of -- how far
did you go in school?

PROSPECTIVE JUROR DADIOMOV:  I'm sorry.  School, I
finished in 1972.

THE COURT:  And how many grades?  Did you finish high
school?

PROSPECTIVE JUROR DADIOMOV:  No, I was high grade
because I finish university.

1          **THE COURT:** And what kind of -- do you have any health

2    insurance coverage?

3          **PROSPECTIVE JUROR DADIOMOV:** I don't have. My wife

4    has Kaiser.

5          **THE COURT:** Do you have -- do you then have it through

6    her? Coverage through her? Or no?

7          **PROSPECTIVE JUROR DADIOMOV:** Coverage? What this

8    mean?

9          **THE COURT:** Do you have any -- if you were sick, could

10   you use her health insurance?

11         **PROSPECTIVE JUROR DADIOMOV:** My wife has for me, too.

12   Kaiser.

13         **THE COURT:** Yes. Okay. Great. Thank you.

14         **PROSPECTIVE JUROR YEE:** My name's David Yee. I'm born

15   in Hong Kong -- I live in San Francisco, born in Hong Kong.

16   Married. I was a Muni driver 36 years. I'm retired now. I

17   have two childrens. They both mechanical engineer.

18       I has been jury service for about three, four times. So I

19   guess -- for several case.

20         **THE COURT:** And did -- were you able to reach a

21   verdict in those cases?

22         **PROSPECTIVE JUROR YEE:** Pardon me?

23         **THE COURT:** Did the jury come to an agreement and

24   reach a verdict in those cases?

25         **PROSPECTIVE JUROR YEE:** Yes.

1    **THE COURT:**  And do you have any health insurance

2  coverage right now?

3    **PROSPECTIVE JUROR YEE:**  Oh.  Kaiser.

4    **THE COURT:**  Okay.  Thank you.

5    **PROSPECTIVE JUROR SISOL:**  Good morning.  I'm Eric

6  Sisol.  I live in Castro Valley.  I was born in Czechoslovakia.

7  I'm married.  I work for Wells Fargo.  I do financial

8  reporting.

9    I live with my wife who is in medical field.  She is a

10  dental hygienist.  And I have one son, seven years old.

11  Working, but I have to bring him in school every morning.

12    I completed master degree.  I never served on jury, but I

13  was called a couple times.

14    I have a health insurance through my employer.  And it's

15  now Aetna, but I had Blue Cross/Blue Shield a few years ago.

16  And my wife had a surgery, and we had to fight with them for a

17  year to get paid.  That's all.

18    **THE COURT:**  And so with respect to the fight with Blue

19  Shield, would that impact your ability, do you think, to sit as

20  a fair and impartial juror in this case where Blue Shield is

21  not fighting with a patient, an insured, but it is fighting

22  with someone else, the provider of the services?

23    **PROSPECTIVE JUROR SISOL:**  Well, since financially I

24  had a nightmare with them for a year, so I'm not sure if I have

25  a good opinion for them until now.

1    THE COURT:  Okay.  And so given that, are you thinking

2    that you would not be able to treat each of these parties as

3    you would be required to under the law?  Fairly, equally,

4    without bias or prejudice?

5        PROSPECTIVE JUROR SISOL:  I could try, but I don't

6    know.  It's still in my mind.

7        THE COURT:  Okay.  Thank you, Mr. Sisol.

8        PROSPECTIVE JUROR LYN WILLIAMS:  My name is Lyn

9    Williams.  I live in Hayward, California.  I was born in Sharon

10   Pennsylvania.  I'm married.  My husband has an IT business

11   supporting gas stations.  And I live with my mother-in-law, and

12   I have a six and-a-half year old son.  He goes to school.  He

13   doesn't work yet.

14       I work for the Bay Area Rapid Transit.  I'm an engineering

15   manager.  We have Kaiser Permanente through our employer.

16       I've completed an MBA and an engineering degree.  I have

17   not served on a jury before, but every year I get called.

18       THE COURT:  Thank you.

19       PROSPECTIVE JUROR WOIWODE:  Good morning.  I'm Rebecca

20   Woiwode.  I live in El Cerrito.  And I was born in San Diego,

21   California.  I am married.  I work for the United States

22   Government Accountability Office, which is the investigative

23   and auditing arm of Congress.  I have been there for 17 years.

24       My husband also works for the GAO.  We have one son.  He's

25   11.  He actually does have his first job.  He's a soccer

referee on the weekends.  But in school, obviously.

I have a masters in public policy from UC Berkeley.  I have served on a jury.  I think just once.  It was in Richmond, so I'm guessing that's state or county court.  It was criminal.  And we did reach a verdict.

Oh, and I do have Blue Cross/Blue Shield.

**THE COURT:**  Has any of the investigative work that you've been involved with related to health insurance or medical?

**PROSPECTIVE JUROR WOIWODE:**  I don't do health care.  I do employment and training.

**THE COURT:**  Okay.  Thank you.

**PROSPECTIVE JUROR DIKSHIT:**  Good morning.  My name is Puneet Dikshit, and I guess I'm the last one here now.

I live in Dublin.  I'm from India, so I was born there.  Happily married.  I'm a technical architect working as a contract employee with a company called Corporate Systems Associates.  Have been in the IT field for 25 years.

My wife is a homemaker.  I do have two children.  My son is 20 years old and he is at college.  My daughter is in high school, 18 years old.  My highest grade is masters.

And I have not served in any jury.  I've been summoned, but never served in a jury duty.

My insurance is with United Health Insurance.  And -- so my wife is going through some long-term treatment; so, yes, I

1   mean, I do deal with hospitals and United as an insurance

2   provider.

3          **THE COURT:**  Okay.  Thank you.

4          **PROSPECTIVE JUROR DIKSHIT:**  Thank you.

5          **THE COURT:**  All right.  So continuing with the

6   introductions let's go to the plaintiffs team.

7       And, Mr. Tooch, if you'd introduce your team and then the

8   witnesses that you expect to call.

9          **MR. TOOCH:**  Thank you, Your Honor.  My name's Daron

10  Tooch.  I'm representing NorthBay Hospital.  This is Sarah

11  Santos to my right.  She's our paralegal.  David Tassa, another

12  lawyer from our office.  Mr. Mike Stovall in the front row

13  there.  Lori Eichenberger, she's going to be a witness in this

14  case.  She is in collections at the hospital.  And Elnora

15  Cameron is the vice-president at the hospital.  In addition,

16  she's going to be testifying.

17      In addition to Ms. Eichenberger we're going to have a

18  nurse, Dr. Edith Zusman, testify.  I'm sorry.  She's a doctor.

19  She's a brain surgeon.

20      We're going to have two nurses testify.  One is Heather

21  Venezio.  She is a trauma and emergency nurse supervisor.

22  We're also going to have another nurse, Kim Williamson.  She is

23  in charge of the cardiovascular program at NorthBay.  And then

24  we're going to have our expert witness, Michael Heil.  And he's

25  going to talk about health care reimbursement.

1      **THE COURT:**  Does anybody on the jury know anybody who

2   was just introduced, either in the courtroom or the names of

3   the witnesses?

4      (No response.)

5      **THE COURT:**  All right.  Let's go on to the defense.

6   Ms. Briggs.

7      **MS. BRIGGS:**  Good morning, prospective jurors.  My

8   name is Amy Briggs and I represent Blue Shield.  Which is not

9   Blue Cross, by the way.  And we'll talk about that in just a

10  minute.

11     With me I have my colleague, Mr. Pimstone.  Greg Pimstone.

12  To my right is Paulette Taylor, a member of our team.  We have

13  our client representative from Blue Shield, Karen Wan, who is

14  the associate general counsel.  And another of my colleagues,

15  Jeff Maurer.

16     Out in the audience I have Chuck Swearis, who is also with

17  Blue Shield.

18     Testifying on behalf of Blue Shield will be a gentleman

19  named Tracy Barnes who is the director of provider contracting

20  for Northern California for Blue Shield.

21     We also have three expert witnesses.  Bruce Deal, who

22  works for a company in Menlo Park called Analysis Group.  We

23  have Dr. David Schriger, who is an emergency physician at UCLA;

24  and Michael Pugh, who is a consultant and expert on health care

25  quality issues.

1    Thank you.

2         THE COURT:  Does anybody on the jury know anybody who

3    was just introduced by Ms. Briggs?

4         (No response.)

5         THE COURT:  So has anyone on the jury ever received

6    treatment at NorthBay Hospital?

7         (No response.)

8         THE COURT:  How about anybody at Kaiser Vacaville or

9    Sutter Solano?

10        (No response.)

11        THE COURT:  Have you or any members of your immediate

12   family or close friends ever been employed by NorthBay, Blue

13   Shield, or any of the individuals that have just been named?

14        (No response.)

15        THE COURT:  How about any business dealings?  Have any

16   of you or any members of your immediate family or close friends

17   ever had any business dealings with NorthBay, Blue Shield, or

18   any of the individuals that I've named this morning?  And those

19   of you who are covered by Blue Shield, I'm not including that,

20   but anybody -- anything else?

21        (No response.)

22        THE COURT:  Have you or any members of your immediate

23   family or close friends ever been involved in a lawsuit

24   involving NorthBay, Blue Shield, or any of the individuals that

25   have been named?

1        (No response.)

2        **THE COURT:**  Anyone here involved in a lawsuit of any

3   type right now?

4        **PROSPECTIVE JUROR ADORABLE:**  Hi.  I'm Larijohn

5   Adorable.  I'm currently working on a small claims court case

6   as -- I'm still in the process of suing somebody.  But --

7        **THE COURT:**  Okay.  And is that over -- what's the

8   subject of that?

9        **PROSPECTIVE JUROR ADORABLE:**  It's over -- like,

10  somebody sold me a fraudulent phone on Craigslist.

11       **THE COURT:**  Okay.  Thank you.  And who else?  We had

12  -- juror number 1.

13       **PROSPECTIVE JUROR CHAMORRO:**  I'm not really sure if

14  this is, you know, regarding -- but I was sued by the mail

15  person, the post office, because my dog he bit the mail person.

16  It wasn't a big -- but --

17       **THE COURT:**  Okay.

18       **PROSPECTIVE JUROR CHAMORRO:**  So I don't know -- I just

19  wanted to make sure.

20       **THE COURT:**  Okay.  Thank you.  Is anybody else

21  currently involved in a lawsuit.  Currently.

22       (No response.)

23       **THE COURT:**  And has -- besides, I think, Ms. Whiteman,

24  have you or any members of your immediate family or close

25  friends ever worked for a judge or a lawyer or a law office?

1    **PROSPECTIVE JUROR RAUCH:**  My name's Catherine.  My

2  uncle is actually an insurance lawyer and my step cousin sells

3  life insurance.

4    **THE COURT:**  And is there -- do you know what kind of

5  work your uncle does?

6    **PROSPECTIVE JUROR RAUCH:**  Well, he started off as a

7  trademark lawyer, and he moved into the insurance.  So I

8  believe he's just a consultant.  I don't think he does like big

9  cases, but --

10    **THE COURT:**  Is there anything about those

11  relationships that would impact your ability to be a fair and

12  impartial juror, do you think?

13    **PROSPECTIVE JUROR RAUCH:**  I don't believe so, no.

14    **THE COURT:**  Okay.  Thank you.  Who else?

15    **PROSPECTIVE JUROR WHITTINGHAM:**  My name's Mike

16  Whittingham.  One of my best friends is a criminal attorney in

17  Florida.

18    **THE COURT:**  Okay.  Nothing about that, I assume, would

19  impact your ability to sit as a fair and impartial juror?

20    **PROSPECTIVE JUROR WHITTINGHAM:**  (Nod negatively.)

21    **THE COURT:**  Pass it two down.  All right.

22    **PROSPECTIVE JUROR DECKER:**  Yeah.  I worked for --

23    **THE COURT:**  Mr. Decker.

24    **PROSPECTIVE JUROR DECKER:**  Yes.  I worked for a number

25  of attorneys doing late stage death penalty defense in civil

1  rights litigation for, gosh, I don't know, maybe eight or ten

2  years.

3        THE COURT:  Is there anything about that or your prior

4  legal education that would have any -- make any impact on your

5  sitting as a fair and impartial juror here?

6        PROSPECTIVE JUROR DECKER:  I don't think so, Your

7  Honor.

8        THE COURT:  Thank you.

9        PROSPECTIVE JUROR CHASE:  Patrick Chase.  My

10  father-in-law is a retired attorney.

11        THE COURT:  What kind of work did he do?

12        PROSPECTIVE JUROR CHASE:  He was a town attorney for

13  several municipalities in New Hampshire and did wills and

14  trusts.

15        THE COURT:  Anything about that that would impact you?

16        PROSPECTIVE JUROR CHASE:  No.

17        THE COURT:  Okay.

18        PROSPECTIVE JUROR DRAPER:  Alison Draper.  My

19  stepfather was a partner at Davis Polk.  And so in college I

20  worked as a receptionist and a travel helper.  That will not

21  impact anything.

22        PROSPECTIVE JUROR WONG:  I don't know if this applies

23  to anything, but I neglected to --

24        THE COURT:  This is Ms. Wong.

25        PROSPECTIVE JUROR WONG:  I'm sorry.  Diana Wong.  I

don't know if you need to make note of this, but my husband he

works with pharmaceutical consultants. He provides engineering

consulting services for pharmaceutical companies. Since we're

in the area of medical.

THE COURT: Thank you.

PROSPECTIVE JUROR WONG: I don't think it will --

THE COURT: We have to get --

Ms. Woiwode.

PROSPECTIVE JUROR WOIWODE: Yes. Woiwode. 31. I

have numerous personal relationships with attorneys, but

nothing in the health care field. So environmental law, et

cetera. And then the audits that I manage all have attorneys

staffed to them, some of who also cover health issues. But

don't do that for me.

THE COURT: Okay. Thank you. So has anybody on the

jury heard about this case from any source whatsoever?

(No response.)

THE COURT: Has anyone ever applied to -- for coverage

at Blue Shield and been rejected by Blue Shield?

(No response.)

THE COURT: Has anyone here had any particularly

positive or negative experiences with their health insurer?

We've heard from Mr. Sisol.

Anybody else? Particularly positive or negative.

PROSPECTIVE JUROR RAUCH: I'm Catherine, number 8. My

younger brother broke his leg a couple years ago and there was

a big debate between the insurance company, I believe Blue

Shield, and my parents.  And -- who was going to pay for the

whole thing.

And so I'm not sure if it's still going on.  I know awhile

ago we switched away from Blue Shield.  But I do believe my

father got a new job and they do do Blue Shield.  But I don't

know if it's -- just like very negative, but it definitely was

a little frustrating for the whole family.

**THE COURT:**  So will you be able to set whatever -- I

don't know how much you know about that other than people being

annoyed.  But will you be able to set that information aside

and just view what this is about, which is not a dispute with a

patient?

**PROSPECTIVE JUROR RAUCH:**  Without the patient.  Yes, I

believe I could, yeah.

**THE COURT:**  Is there anything in your mind that makes

you think you couldn't be a fair and impartial juror in this

case?

**PROSPECTIVE JUROR RAUCH:**  No.

**THE COURT:**  Okay.  Who else?

**PROSPECTIVE JUROR WONG:**  My name is Fanny.  I

mentioned earlier I used to have Blue Shield when I was in

college and the benefit wasn't that great.  So we ended up

switching to Kaiser.  And I don't think I'll ever apply for

1  Blue Shield again.  So that's my take on it.

2      THE COURT:  So this is not a case about whether Blue

3  Shield or Kaiser is a better health provider.  It is about

4  whether -- what the reasonable value of services that were

5  provided at NorthBay were.  Do you think you could view those

6  -- that question fairly and impartially?

7      PROSPECTIVE JUROR WONG:  In regards to that?  Yes.

8  Thank you.

9      THE COURT:  Okay.  Thank you.  So the most important

10  people in the courtroom, besides jurors, are the court

11  reporters.  Every once in a while I get a ping.

12      So if you would introduce yourself again, go ahead,

13  Mr. Dikshit.

14      PROSPECTIVE JUROR DIKSHIT:  I'm Juror Number 32.

15      Last year when I was -- I don't know if it affects this

16  case, but last year when I was unemployed I had insurance from

17  not a very good insurance and, as I said, my wife was going

18  through a treatment so there were -- you know, there were

19  treatments like MRI and other treatments that was denied by the

20  insurance company.  And so I have to really take it out of my

21  own pocket.  And some of those services are expensive.

22      THE COURT:  So do you think that that experience would

23  impact your ability to make a determination on a case that's

24  involving the reasonable value of services that a provider

25  provides and is getting paid by the insurance company as

1  opposed to what the insured is receiving?

2      **PROSPECTIVE JUROR DIKSHIT:**  So I'm not sure on that

3  because there was some treatments that the doctors told me that

4  it may not be covered.  So there's always a struggle between

5  the provider and the payor.  So, yeah, patient from patient,

6  from caregiver perspective, I was caught in that quagmire.

7      If I can keep that separate, I will do my best to

8  segregate that and do impartial.

9      **THE COURT:**  The company that was involved was not

10  Blue Shield; is that right?

11      **PROSPECTIVE JUROR DIKSHIT:**  That's right.  The service

12  providers are under Sutter Health.  So I don't know if they're

13  covered under the NorthBay group of hospitals or not.  I'm not

14  sure on that.

15      **THE COURT:**  All right.  Thank you.

16      **THE CLERK:**  One more.

17      **PROSPECTIVE JUROR YAP:**  Good morning, Your Honor. I'm

18  Colleen Yap.

19      I just wanted to disclose something.  I'm not sure if it's

20  related, but I'm starting a new job in three weeks with a

21  company Genomic Health, so the company does a lot of business

22  with insurance providers.  I haven't started yet, but just

23  wanted to disclose it in case the information is useful.

24      **THE COURT:**  The company is called?

25      **PROSPECTIVE JUROR YAP:**  Genomic Health.  And we do

testing for diagnostics for cancer patients.  And I guess the company gets paid through insurance.

THE COURT:  What will you be doing?

PROSPECTIVE JUROR YAP:  I will be managing the financial system, the ERP system, there.

THE COURT:  Great.  Thank you.

Does anybody in the jury have any special training or experience in medical administration or billing?

PROSPECTIVE JUROR FANNY WONG:  My name is Fanny.  I used to work in the health care field, so I was a member service eligibility and enrollment coordinator for a while.  So I handle insurance and helping patients with their needs, so like renewing or applying for insurance.

THE COURT:  Is there anything about that experience that you think would impact your ability to be fair and impartial in this case?

PROSPECTIVE JUROR FANNY WONG:  I mean, just hearing what the patient have to say and helping them call, like, the insurance company, because most of the population we work with, their English isn't very up to par, so we kind of act like a -- you know, like a person to help them, yeah.

THE COURT:  So recognizing that, this is a dispute about the reasonable value of services that were provided.

Do you think you would be able to make that determination, treat both sides fairly, and be an impartial juror?

1    **PROSPECTIVE JUROR FANNY WONG:**  I think so.

2    **THE COURT:**  Thank you.

3    **PROSPECTIVE JUROR FANNY WONG:**  Thank you.

4    **THE COURT:**  Thank you.

5    Has anyone here either sued or made a formal complaint

6    about a medical provider?

7    Does anybody have any particularly positive or negative

8    experiences concerning medical providers?

9    Besides what you've already expressed, does anybody have

10   any strong feelings or opinions about medical facilities or

11   health insurers that might make it difficult for you to render

12   a fair and impartial verdict in this case?

13   Juror 29.

14   **PROSPECTIVE JUROR SISOL:**  Juror 29, Eric Sisol.  I

15   want to mention that last September I went to emergency room in

16   Oakland, so it's not that hospital, but I will not disclose it,

17   that in the same day I went to the urgent care and I had some

18   testing done, and they send me to emergency room.  And they

19   repeated the same testing even though I told them they already

20   have it.  And they charged me 12 times more the same day and

21   the same treatment.  So I'm in dispute with the hospital in

22   Oakland.

23   **THE COURT:**  Okay.

24   **PROSPECTIVE JUROR SISOL:**  That's all.

25   **THE COURT:**  All right.  Anybody else?

1    **PROSPECTIVE JUROR TRUONG:**  Well --

2    **THE COURT:**  Mr. Truong.

3    **PROSPECTIVE JUROR TRUONG:**  I also got a master's in

4 public health at UC Berkeley, in epidemiology.  So I've been

5 drinking the Kool-Aid of liberal Berkeley in terms of

6 healthcare, insurance, and all that.  Just to let you know

7 that.

8    **THE COURT:**  Okay.  Well, so does the Kool-Aid --

9    (Laughter)

10    **THE COURT:**  Will the Kool-Aid be impacting your

11 ability to evaluate evidence fairly and reach a verdict that is

12 impartial with respect to the reasonable value of services?

13    **PROSPECTIVE JUROR TRUONG:**  I'll try.  UC Berkeley

14 tries to instill some idealism.  So, yes, I think I can look at

15 the evidence impartially.

16    **THE COURT:**  That is -- part of what you're doing in

17 being a juror is being idealistic in that you are setting aside

18 your, you know, prejudices, the -- trying to identify implicit

19 biases that you have, and just listening.

20    It's a -- it's an unusual process for us today, but

21 learning from the same things as the other eight jurors from

22 what you hear here, applying the law as I describe it to you,

23 and then sitting down and working together to come up with a

24 verdict, that is sort of an idealistic thing.

25    So that probably fits right in with what you want to do.

1  Is that right, Mr. Truong?

2       **PROSPECTIVE JUROR TRUONG:** I just wanted to mention

3  that, yeah.

4       **THE COURT:** Okay. Does anybody have a job, that you

5  haven't discussed yet, where you had routine contact with

6  insurance companies or insurance personnel?

7       And, Mr. Truong, you talked about that. And I think I

8  asked you earlier, but, sir, given everything so far, do you

9  have any doubt that you would be able to sit as a fair and

10 impartial juror?

11      **PROSPECTIVE JUROR TRUONG:** No, I don't have any doubt.

12 I'll try.

13      **THE COURT:** Okay. Anybody else?

14      Does anybody have any particularly positive or negative

15 feelings about insurance companies? So --

16      (Laughter)

17      **THE COURT:** I don't know what's funny about that.

18      (Laughter).

19      **THE COURT:** Besides what has already been mentioned,

20 is there anyone who has a particularly strong feeling about

21 insurance companies that would make sitting on a jury difficult

22 in order to render a fair and impartial verdict.

23      Mr. Moody.

24      **PROSPECTIVE JUROR MOODY:** Roger Moody. You know, for

25 my own opinion, I think insurance companies are too powerful.

1    I think they've been too powerful for a long time.  And I think

2    medical industries are too powerful, and I think they take

3    advantage of people trying to just survive.

4         And is that something that I can take a case, I can listen

5    and reach my own verdict?  I think I can, but I'm not going to

6    say in the back of my mind there's a little bit of sway that

7    says I think they're guilty.  And so I'll say that.

8         And maybe it's because I think they're too powerful.  I

9    don't know which one may get it or not get it, but I think it's

10   an everyday life, especially now that I'm getting ready to

11   retire in six weeks, kind of working through that and trying to

12   figure out primary, secondary, COBRA, that whole bit.

13        And you sit there and you say how can you pay $1,500 a

14   month for COBRA insurance and expect to survive in the Bay Area

15   with costs the way they are?

16        So it's there.  It's in my mind.  And so I just thought

17   I'd say that.

18        **THE COURT:**  Well, and thank you for saying that.

19        And this is going to be about -- the topic is going to be

20   the reasonable value of services.  So people will be coming in

21   and testifying about what that -- what that is.

22        Do you think you can evaluate the credibility of people

23   fairly, and the evidence as it comes in, and render a verdict

24   that's fair?

25        **PROSPECTIVE JUROR MOODY:**  I believe that I can do

1   that.  It's not going to be fair to somebody.  I'm sure their

2   opinion is not that it's not going to be fair to them.  But,

3   you know, I'm reasonable.  I've worked all my life.  And I

4   think I can separate it.  And I'll do my best to if I'm

5   selected as a juror.

6          **THE COURT:**  Great.  Thank you.

7       Anybody else?  And this is --

8          **PROSPECTIVE JUROR ADAMS:**  Number 11, Katrina Adams.

9          **THE COURT:**  Ms. Adams, go ahead.

10         **PROSPECTIVE JUROR ADAMS:**  I feel strongly that

11  healthcare shouldn't be for profit.  So I don't -- I don't like

12  either hospitals for profit or insurance companies for profit.

13  So I don't think I'm more biased against one or the other, so I

14  think I can still look at everything fairly, but I still feel

15  strongly that it shouldn't be somewhere where they make money.

16         **THE COURT:**  This issue is not going to be about profit

17  one way or another.  It's going to be what's the reasonable

18  value of the services that are provided.

19      So there will be experts on both sides and, you know,

20  other witnesses will testify about different aspects of the

21  services and the companies.

22      Do you think you would be able to evaluate that and come

23  to a fair result?

24         **PROSPECTIVE JUROR ADAMS:**  I think so, yes.

25         **THE COURT:**  Thank you.

1    **PROSPECTIVE JUROR WILLIAMS:**  Craig Williams.  I don't

2    know if this is relevant, but 35 years ago I worked on a

3    campaign against insurance companies in Massachusetts where I

4    did the research and also a lot of the lobbying on a successful

5    campaign.

6    **THE COURT:**  So was it on medical?

7    **PROSPECTIVE JUROR WILLIAMS:**  No, it's actually in auto

8    insurance.

9    **THE COURT:**  And so was this for -- was this about

10   no-fault insurance or --

11   **PROSPECTIVE JUROR WILLIAMS:**  No.  Actually, they have

12   no-fault.  This was a lot like Prop 103, which was a case where

13   insurance companies were required to keep, you know, better

14   books and be more competitive in different areas.

15   **THE COURT:**  Do you think that that experience with

16   auto insurance companies would bleed over into your ability to

17   evaluate the reasonable cost of the medical services that's

18   going to be the subject of this case?

19   **PROSPECTIVE JUROR WILLIAMS:**  Yeah, in terms of

20   reasonable costs, I think that, you know, I could be objective.

21   That's what our goal was, was to get the insurance

22   companies to be more competitive; and, you know, they can pass

23   on a lot of different costs on to consumers.  And, you know, in

24   this particular case I think I could be unbiased.

25   **THE COURT:**  Okay.  Thank you.

1    **PROSPECTIVE JUROR CHASE:**  24, Patrick Chase.

2    So one thing that -- I don't think it would impact my

3    thinking or cause me to be overly biased, but recently I

4    believe there was a lot of forced disclosure of medical prices

5    by hospitals or major providers.

6    Just out of intellectual curiosity, I've looked at that

7    and was amazed at how opaque and indecipherable both the

8    service descriptions and the pricing were.

9    I'm no huge fan of insurance companies either and, to be

10   brutally honest, I think that the existence of a case like this

11   is testimony to structural inefficiencies in our healthcare

12   system.

13   **THE COURT:**  Well, that said --

14   (Laughter)

15   **THE COURT:**  -- would you be able to evaluate the

16   evidence that is -- comes in in this courtroom to determine

17   what the reasonable value would be of medical services that

18   were being provided at NorthBay?

19   **PROSPECTIVE JUROR CHASE:**  Yeah.  I didn't see

20   NorthBay's price list in particular.  I have no idea if they're

21   one of the, quote-unquote, offenders there.  And as I prefaced

22   my comment, I think I could look past that.

23   **THE COURT:**  All right.  Does anyone here suffer from

24   any mental, physical, or emotional impairment that would make

25   it difficult for you to sit as an impartial juror in this case?

1    Does anyone have any trouble -- I'm sorry.

2    **PROSPECTIVE JUROR WOIWODE:**  Rebecca Woiwode, 31.

3    It's not an impairment, but I -- if we're out by

4  1:00 o'clock, I think this should work, but I have to get shots

5  every once in a while.  And I have to go within the next two

6  days, so -- in Berkeley, so I think I'd be able to do it by

7  4:30.

8    **THE COURT:**  I promise you that we will be -- I'm

9  pretty punctual about things, and I do have other things to do,

10 so we will definitely be finished not today but every other day

11 we'll be finished by 1:00 o'clock.

12   Is anybody having any trouble understanding what I'm

13 saying today so far?

14   In this case, if you're selected as a juror, you'll be the

15 judge of the facts.  I'll instruct you on the law.  But

16 deciding the facts will be your job.  The jurors selected will

17 be the sole judges of the facts and you'll be duty-bound to

18 follow the law as stated by me and eventually to apply the law

19 to the facts from all the evidence presented to you.

20   The responsibility of judging the facts must be performed

21 without bias or prejudice to any party.  The law doesn't permit

22 jurors to be governed by sympathy, prejudice, or public

23 opinion.

24   The parties will expect that you will carefully and

25 impartially consider all of the evidence, follow the law as

1   stated by me, and reach a just verdict, regardless of the

2   consequences.

3        Does anyone know of any reason whatsoever why you couldn't

4   sit with absolute impartiality of both sides as a juror in this

5   case, other than anything that you've already said?

6        This is a civil case.  The burden of proof in a civil case

7   is different from that which prevails in a criminal case.  In a

8   criminal case every essential element of an offense charged

9   must be proven by the prosecutor beyond a reasonable doubt.

10       In a civil case, a fact may be established by

11  preponderance of the evidence; that is to say, by evidence that

12  establishes that a fact is more likely true than not.  That's

13  the difference between the required proof in a civil as opposed

14  to a criminal case.

15       Are you all prepared to follow the law as given to you by

16  me in your consideration of the evidence?

17       (Jurors nod.)

18       **THE COURT:**  Jurors may not form or express any opinion

19  on the merits of the case until the end of the trial when it's

20  been finally submitted to them for their verdict; that is to

21  say, until they've had the benefit of the arguments of counsel

22  and instructions by the Court.

23       Are you satisfied that you'd be able to listen to all of

24  the evidence from both sides and listen to and follow the

25  instructions of the Court before you form any final opinion on

the merits?

If you're selected to sit on this Court, will you be unable or unwilling to render a verdict based solely on the evidence presented in the court and the law as I give it to you in the instructions, or to disregard any other ideas, notions, or beliefs about the law that you may have encountered in reaching your verdict?

One of the instructions I'm going to give you is not to discuss the case with anyone until your jury service is concluded. Does anybody here have any trouble keeping things confidential?

The trial is going to last about seven days, not including the time it takes to deliberate.

Recognizing that service on a jury is inconvenient for everyone because it requires you to be doing something other than you'd ordinarily be doing and it interferes with a number of your plans, does anyone have any special disability or problem that would make serving as a member of the jury difficult or impossible?

(Show of hands.)

**PROSPECTIVE JUROR RAUCH:** I am a full-time student. I am taking 20 units this semester. I have been accepted to UC Davis, only with the guarantee I pass the semester with a 3.2. My midterms are not next week, but the week after.

I do not believe I would be able to give this case or my

1  schoolwork the attention it needed if I was -- happened to miss

2  class.  I think I would be -- if I had to be here, I would be

3  very focused and stressed on my grades and the possibility that

4  I wouldn't be able to attend college next year.

5       Yeah.  I don't know.  If I wasn't here, maybe I would feel

6  a little guilty.

7            THE COURT:  And what time are your classes?

8            PROSPECTIVE JUROR RAUCH:  I do actually have a class

9  scheduled today.  I did bring documents.  I go to two different

10  junior colleges.  My classes --

11       (Interruption due to computer malfunction.)

12            PROSPECTIVE JUROR RAUCH:  I go to two junior colleges;

13  College of Marin and Santa Rosa J.C.  At the J.C., the Santa

14  Rosa J.C., I have class every day, Monday through Thursday,

15  from 9:00 to 12:00.  I also have class there Tuesday and

16  Thursday nights, from 5:00 to 7:00.  As well as at college of

17  Marin I do have an online class and a Monday-Wednesday night

18  class, evening, 4:00 to 6:00.

19            THE COURT:  All right.  Thank you.

20            PROSPECTIVE JUROR FANNY WONG:  I'm Fanny.  My

21  situation is kind of similar except I'm taking classes right

22  now, and I'm a post BAC student.  I'm going to be applying for

23  a dental school this summer.  And I'm actually currently taking

24  classes while studying for the DAT exams.  And I will actually

25  be taking the exams soon, so I really need to focus for my

1  exams.

2        THE COURT:  And do you have classes that you're

3  currently attending?

4        PROSPECTIVE JUROR FANNY WONG:  I do.  I actually have

5  an independent study class and also intern as a dental

6  assistant, as well, in Milpitas.

7        THE COURT:  When I took independent study I could do

8  it whenever I wanted to.  Do you have a specific time that you

9  go to class --

10        PROSPECTIVE JUROR FANNY WONG:  The only reason why

11  that I decided to take independent study was I was hoping I can

12  at least finish that so I can solely study on my DAT exams.

13  It's coming up.  So I wanted to take the DAT exam so I can

14  start prepping for my applications.

15        THE COURT:  All right.  Thank you.

16     Mr. Truong.

17        PROSPECTIVE JUROR TRUONG:  Juror Number 3, Tan Truong.

18  I just opened up a practice, so I'm the only doctor.  If I'm

19  out, I lose money and can't pay my overhead.

20     The other issue is I also teach at UC Berkeley.  So I'm

21  teaching a course, and it's kind of hard for me to find

22  somebody to replace me as an instructor.

23        THE COURT:  When is that class?

24        PROSPECTIVE JUROR TRUONG:  Actually, I teach today.  I

25  had to call in and tell my co-instructor that I won't be there.

1    So she's handling double duty.

2        On Friday mornings, I also teach a course from 8:00 to

3    10:00.  That starts this week, as well, so I'm the one running

4    that course as well.

5            **THE COURT:**  So you've got a co-instructor with the one

6    that's on Mondays.  And on Fridays, are you the sole --

7            **PROSPECTIVE JUROR TRUONG:**  I'm the only one, yeah.

8            **THE COURT:**  Okay.  29.

9            **PROSPECTIVE JUROR SISOL:**  29, Eric Sisol.

10       As I mentioned in my introduction, I have 7-year-old son,

11   and I'm bringing him to school every day except Thursday.  And

12   my wife doesn't work, and I have no other replacement.  So I

13   would have to come here 9 o'clock.  I came today 9 o'clock

14   because I cannot just leave him on the street if I have to

15   report at 8:00.

16           **THE COURT:**  Okay.

17           **PROSPECTIVE JUROR SISOL:**  Thank you.

18           **THE COURT:**  Thank you.

19           **PROSPECTIVE JUROR WOIWODE:**  31, Rebecca Woiwode.  I

20   also am the primary caretaker for my 11-year-old son.  I work

21   part-time so I can get him to school every day.

22       I think, again, the timing could work; although, you

23   mentioned maybe deliberations go longer next week, which

24   concerns me a bit.

25       And then the other thing is, I know it's not important to

1  you, but a prepaid vacation starts on the 19th.

2        **THE COURT:**  Now, to the contrary, prepaid vacations

3  are extremely important.

4        **PROSPECTIVE JUROR MS. WOIWODE:**  They are to me.

5        **THE COURT:**  They are to everyone in this courtroom, I

6  suspect.

7      So two things.  One is, the deliberations will be up to

8  the jury.  So if people have specific needs and they've got to

9  get out by 1:00 or 2:00 to deal with them, that will be up to

10  the jurors.  And the 19th you would be safe.  I have another --

11        **PROSPECTIVE JUROR WOIWODE:**  Deliberations I don't know

12  how long that lasts.

13        **THE COURT:**  Deliberations can last as long as the jury

14  thinks it's appropriate for them to last.  But this case is

15  going to be focused enough, I think, that you would probably be

16  safe by then.

17        **PROSPECTIVE JUROR WOIWODE:**  All right.

18        **PROSPECTIVE JUROR DIKSHIT:**  Yeah, juror number 32,

19  Puneet Dikshit.  I'm a contract employee so I work on an hourly

20  basis.  I have a client on the East Coast.  I work from 5:30 in

21  the morning to 2:30.  And, you know, every hour that I work

22  with a client I get paid for that.  So -- and I'm the only

23  bread earner in my family.

24        **THE COURT:**  Thank you.

25        **PROSPECTIVE JUROR DADIOMOV:**  I am self-employed.

1          THE COURT:  Juror number?

2          PROSPECTIVE JUROR DADIOMOV:  27.

3          THE COURT:  Okay.

4          PROSPECTIVE JUROR DADIOMOV:  I am self-employed.  If I

5    work on the jury, how can I survive?  I cannot pay mortgage, I

6    cannot pay everything.

7          THE COURT:  Okay.  Thank you.

8          PROSPECTIVE JUROR AGUSTIN:  I'm Juror number 21.  I

9    also have a planned trip scheduled for over Valentine's Day,

10   the 14th.  I don't know if it's going to last that long, but I

11   am getting on a plane.

12         THE COURT:  So you've got a ticket?

13         PROSPECTIVE JUROR AGUSTIN:  Yes.

14         THE COURT:  And when are you coming back?

15         PROSPECTIVE JUROR AGUSTIN:  The 17th.

16         THE COURT:  And the 14th is Friday?

17         PROSPECTIVE JUROR AGUIAR:  Thursday, I think.

18         THE COURT:  Yes.  All right.  Thank you.

19         PROSPECTIVE JUROR DECKER:  Juror number 20.  I'm in

20   the same boat.  Plane ticket on the 14th, to D.C.

21         THE COURT:  Okay.  Anybody else?

22         PROSPECTIVE JUROR YIM:  Actually, I am retired.  But I

23   had my physical problem.  I have diabetic and high blood

24   pressure.  At nighttime I have insomnia.  Actually, I don't

25   know whether, you know, it will affect my decision or not.  But

1    anyway I let you know my situation is like that.

2        Like today, last night I cannot sleep because I need to

3    report to here.  And then I worry about the traffic -- today in

4    101 they had traffic -- and then so that's why I cannot sleep.

5        **THE COURT:**  Okay.  All right.  The good news about the

6    way that I run the trial is -- there are a couple of things.

7        One is, every hour and a half, hour-forty-five minutes I

8    take a 15-minute break so people can walk around and sort of

9    get their heads cleared.

10       And, in addition, if there is any point during the course

11   of the trial you would be more comfortable standing up, as

12   opposed to sitting down, you should feel free to do that as

13   well.  So that will help you stay alert.

14       Thank you for letting me know.

15       **PROSPECTIVE JUROR YIM:**  I will try my best, but my

16   situation like that.

17       **THE COURT:**  Thank you.  I appreciate that.  All right.

18       Besides what everyone has said, is there any other -- if

19   you were one of the parties in this case, do you know of any

20   other reason why you wouldn't be content to have the case tried

21   by someone in your frame of mind?

22       All right.  So, ladies and gentlemen, we'll take -- I'm

23   going to take a short 15-minute break for now.  It's

24   important -- and what's going to happen after that is that the

25   lawyers will each have about 15 minutes, more or less, to ask

1    some additional follow-up questions of you.  And then we'll

2    make a determination.  So I think we'll be able to get all of

3    that done before lunch.

4         But it's very important -- if we're going to keep to that

5    schedule, it's very important that you be back in your seats at

6    11:20.  This is just a matter of courtesy and respect.

7         And while you're on this break, please don't discuss the

8    case with anybody.  Don't do any research about the case.

9    Don't post any comments on social media.  Don't talk to the

10   lawyers or their clients.  This is really important.  If you're

11   chosen as a juror in this case, you need to learn everything

12   about the case here, together, in this courtroom.  And you

13   shouldn't discuss it until after all the evidence has been

14   presented and the lawyers have given their final arguments,

15   I've told you what the law is, and then you have the

16   opportunity to discuss the case with your fellow jurors who

17   have heard exactly what you've heard.

18        So failure to follow what I just told you could jeopardize

19   this entire proceeding and cause us to do it all over again.

20   Nobody would like that.

21        So please return here at 11:20.

22                   (Recess taken at 11:08 a.m.)

23              (Proceedings resumed at 11:22 a.m.)

24        **THE COURT:**  Mr. Tooch, go ahead and ask your questions

25   to the jurors.

1     **MR. TOOCH:**  Thank you, Your Honor.

2     Good morning.

3     Ms. Yap, please give us a little more detail as to what

4     you do on your job.

5          **PROSPECTIVE JUROR YAP:**  So currently I am the senior

6     manager of IT business applications.  I handle the financial

7     software for the company.  I support finance and handle the

8     Next Week application.  I'm not sure if people are familiar

9     with that program.  It's a cloud software.  And we primarily --

10    our team primarily supports finance and operations.  We help

11    them with the billing, I guess, sales orders and IT-related

12    stuff.

13         **MR. TOOCH:**  Are you more on the IT side or the finance

14    side?

15         **PROSPECTIVE JUROR YAP:**  I'm actually under the IT

16    team, but I work hands on with finance a lot.

17         **MR. TOOCH:**  Okay.  And tell us a little bit about the

18    company, what it does.

19         **PROSPECTIVE JUROR YAP:**  So the company I work for

20    right now is called Cogent Technology, which is formerly

21    coupons.com.  We do a lot of media advertising.

22    Let's say if you go to Target, you click on those links

23    for coupons.  So the engine behind that is provided by the

24    company I work for.

25         **MR. TOOCH:**  And the new company you're going to work

1  for?

2       **PROSPECTIVE JUROR YAP:**  So I am transferring to a new

3  job in three weeks.  It's a company called Genomic Health.

4  It's based out in Redwood City.  It does like diagnostics

5  testing for cancer patients.

6       So a lot of -- from what I've heard.  I've had like little

7  exposure to it during the interview session.  So the company

8  does a lot of work with insurance companies.  I guess they get

9  a lot of payments from insurance companies, from what I know.

10      **MR. TOOCH:**  And are you going to be working on the IT

11 side or the --

12      **PROSPECTIVE JUROR YAP:**  I will, yes.  It's pretty much

13 the same thing but under IT.  And then working with finance as

14 well.

15      **MR. TOOCH:**  Okay.  Thank you.

16    Mr. Reesor.

17      **PROSPECTIVE JUROR REESOR:**  Yes.

18      **MR. TOOCH:**  Could you tell us a little bit about your

19 company.

20      **PROSPECTIVE JUROR REESOR:**  Yes.  The company, I

21 founded it in '77.  And it morphed throughout the years,

22 according to what it -- according to what the market -- the

23 changes.  And so it started off as a graphics company that

24 included both printing and graphic design.  And as time went on

25 it became more graphic design and then evolved into marketing.

1    Mostly for smaller companies, but nonprofits.

2         **MR. TOOCH:** Okay.  Thank you.

3         Mr. Williams, I know you're retired, but what did you do

4    when you worked?

5         **PROSPECTIVE JUROR CRAIG WILLIAMS:** Well, I did a

6    variety of different things.  Political work.  I came to

7    California as a community organizer, working on environmental

8    campaigns.  Also, I did woodworking.  And I had a seasonal

9    flower business.

10         **MR. TOOCH:** Okay.  Mr. Chadalavada -- did I say that

11    correctly?

12         **PROSPECTIVE JUROR CHADALAVADA:** You're good.

13         **MR. TOOCH:** Tell me about the company you work for.

14         **PROSPECTIVE JUROR CHADALAVADA:** I work for a company

15    called Ring Central.  They provide phone services to businesses

16    and consumers.

17         **MR. TOOCH:** And what do you do?

18         **PROSPECTIVE JUROR CHADALAVADA:** I'm in the accounting

19    group.  So I work on the revenue accounting side, work closely

20    with sales and legal, as far as deals when it comes to month

21    ends and quarter ends, we work very closely as far as getting

22    customers signed up with our services.

23         Then I'm also involved in acquisitions as far as valuation

24    of acquisitions and correct accounting.

25         **MR. TOOCH:** Tell me about those acquisitions.

1    Acquisitions of what?

2         **PROSPECTIVE JUROR CHADALAVADA:**  Other companies.

3    Trying to incorporate their services into our offering.

4         And then, as far as that process goes, we do the valuation

5    of how much we purchased those companies for and then just

6    ensure that the accounting on our side is correct.

7         **MR. TOOCH:**  And do you do the valuations yourself?

8         **PROSPECTIVE JUROR CHADALAVADA:**  I'm part of the

9    process, but I'm not the main person involved.

10        **MR. TOOCH:**  And what do you do, kind of, on a

11   day-to-day basis as far as the accounting work is done?

12        **PROSPECTIVE JUROR CHADALAVADA:**  A lot of it is doing

13   deal reviews.  So we review contracts, see if there's any

14   implications as far as the accounting treatment of it, and then

15   the revenue recognition side to make sure that the company's

16   recognizing revenue correctly for those contracts.

17        **MR. TOOCH:**  Okay.  Thank you.

18        Mr. Moody, could you please tell us about your job.

19        **PROSPECTIVE JUROR MOODY:**  My job is I'm a sales

20   manager in packaging.  So we do -- we sell lids, primarily, to

21   go on jars for the food beverage and farm industry.

22        **MR. TOOCH:**  And so who are your clients?

23        **PROSPECTIVE JUROR MOODY:**  My what?

24        **MR. TOOCH:**  Your clients.

25        **PROSPECTIVE JUROR MOODY:**  The what?

1    **MR. TOOCH:**  Your clients.

2    **PROSPECTIVE JUROR MOODY:**  Oh, customers.

3    **MR. TOOCH:**  Customers.

4    **PROSPECTIVE JUROR MOODY:**  So the -- I mean, from Kraft

5    Foods to Herbalife, to a lot of co-packers that you wouldn't

6    know.  But Costco is one of my largest accounts.  So we do a

7    lot in the vitamin industry for them, a lot of packaging.  The

8    nuts and candies and stuff you find is our packaging.

9    **MR. TOOCH:**  And does your wife work?

10   **PROSPECTIVE JUROR MOODY:**  Do what now?

11   **MR. TOOCH:**  Does your wife work?

12   **PROSPECTIVE JUROR MOODY:**  My wife is retired, but she

13   does substitute teaching periodically.

14   **MR. TOOCH:**  And was she a teacher before she retired?

15   **PROSPECTIVE JUROR MOODY:**  Yeah, she was a teacher.

16   **MR. TOOCH:**  Thank you.

17   Mr. Whittingham, tell us what you do as an account manager

18   in your job.

19   **PROSPECTIVE JUROR WHITTINGHAM:**  So I do benefits

20   enrollment and open enrollment for teachers and school

21   districts.  I also do their supplemental insurance and

22   requirement planning and that financial aspect.

23   So I'm responsible for meeting with the superintendents

24   and the CVOs and going over various medical plans, the

25   differences, the benefits of them.  When I meet with them

1  during open enrollment, we give presentations.  I come in with

2  a team, try to educate the employees on their different plans,

3  and then based on the medical plans and what gaps they may

4  have, come up with benefit packages that may be suitable for

5  the specific employee or their family and then, in addition, do

6  their retirement planning and investing.

7           **MR. TOOCH:**  Okay.  So do you decide -- how do people

8  decide whether an HMO or PPO is better, high deductible low

9  deductible?

10          **PROSPECTIVE JUROR WHITTINGHAM:**  Yeah, based on their

11 circumstances.  Every school district we go into they want us

12 to have a different level of participation in that some school

13 districts, some superintendents want us to be a little bit more

14 involved in that process.  So it really depends.  We can -- we

15 do everything from laying out the plans for them and helping

16 them, advise them on which meets their needs and things like

17 that.

18          **MR. TOOCH:**  And then on the investment side what do

19 you do?

20          **PROSPECTIVE JUROR WHITTINGHAM:**  So we do their

21 403(b)s, their IRAs, all their financial investing, to help

22 them supplement their retirement, you know.  So stocks, bonds,

23 things like that.

24          **MR. TOOCH:**  And it's mostly for school districts?

25          **PROSPECTIVE JUROR WHITTINGHAM:**  Yeah.  So the company

1  I have, it has a couple of different sectors.  I specialize in

2  educational services, so I only work with educational

3  professionals.  We have other sides of the company that deal

4  with municipalities and public sector.  But I only deal with

5  educational professionals.

6       **MR. TOOCH:**  How big is the company?

7       **PROSPECTIVE JUROR WHITTINGHAM:**  We are nationwide.  We

8  are one of the largest privately owned insurance companies.

9       **MR. TOOCH:**  Okay.  Mr. Williams.

10      **PROSPECTIVE JUROR MICHAEL WILLIAMS:**  Yes.

11      **MR. TOOCH:**  What did you do before you retired?

12      **PROSPECTIVE JUROR MICHAEL WILLIAMS:**  I started out

13  working for Pacific Telephone & Telegraph, and ended up being

14  Pacific Bell.

15      **MR. TOOCH:**  What did you do?

16      **PROSPECTIVE JUROR MICHAEL WILLIAMS:**  Real estate,

17  finding, acquisitions, disposals, construction.

18      **MR. TOOCH:**  With respect to acquisitions, what did you

19  do?

20      **PROSPECTIVE JUROR MICHAEL WILLIAMS:**  I had real estate

21  negotiators working for me who bought property and sold

22  property, and did leases.

23      **MR. TOOCH:**  As part of that position, did you have to

24  analyze the value of particular real estate?

25      **PROSPECTIVE JUROR MICHAEL WILLIAMS:**  Yeah.  We ran

1  financial valuations on all the properties.  Sales versus

2  leases, you know.

3        MR. TOOCH:  And so -- I'm sorry, other than the real

4  estate part of what you did, what else did you do in that

5  position?

6        PROSPECTIVE JUROR MICHAEL WILLIAMS:  I was a

7  construction manager for a number of years, anywhere from

8  50,000 to $300 million.

9        MR. TOOCH:  And did you hire contractors?

10       PROSPECTIVE JUROR MICHAEL WILLIAMS:  Yes.

11       MR. TOOCH:  Both the generals and the subs?

12       PROSPECTIVE JUROR MICHAEL WILLIAMS:  Generally the

13  generals.  And then they hired their own subs.

14       MR. TOOCH:  I think you said your wife is a

15  stay-at-home mom.

16       PROSPECTIVE JUROR MICHAEL WILLIAMS:  No.  She's

17  retired.  When she worked, she was an animal health technician.

18  So she worked for a veterinarian.  Kind of a nurse,

19  all-inclusive type of thing.

20       MR. TOOCH:  Thank you.

21       PROSPECTIVE JUROR MICHAEL WILLIAMS:  Okay.

22       MR. TOOCH:  Mr. Wevurski, are you a reporter or a --

23       PROSPECTIVE JUROR WEVURSKI:  I'm an editor.

24       MR. TOOCH:  And were you a reporter before that?

25       PROSPECTIVE JUROR WEVURSKI:  Yes.

1    MR. TOOCH:  And do you cover any particular topics

2  within what you do at the paper?

3    PROSPECTIVE JUROR WEVURSKI:  No.  Very general role.

4  I'm a copy chief, one of the editors who correct the

5  previous -- the writing by the reporters and other editing done

6  before they reach me.  I'm pretty much the last read on the

7  front-page stories currently.  And that could be anything that

8  appears on the front page.

9    MR. TOOCH:  What about on the opinion page?

10    PROSPECTIVE JUROR WEVURSKI:  Do some of that as well.

11    MR. TOOCH:  Has your paper done any stories about

12  either the insurance industry or the healthcare industry?

13    PROSPECTIVE JUROR WEVURSKI:  I'm sure we have, but I

14  don't recall anything about this particular case whatsoever.

15    MR. TOOCH:  I'm not asking about this particular case,

16  but I'm asking about the topic of either insurance company

17  pricing or hospital pricing.

18    PROSPECTIVE JUROR WEVURSKI:  Not that specific.

19    MR. TOOCH:  Okay.  Ms. Whiteman, you said before you

20  worked at Sheppard Mullin you worked at a company that did

21  insurance defense?  I'm sorry, it's juror number 7.

22    What was the law firm that you worked at?

23    PROSPECTIVE JUROR WHITEMAN:  I'm sorry, what?

24    MR. TOOCH:  Before Sheppard Mullin, where did you

25  work?

1          **PROSPECTIVE JUROR WHITEMAN:**  Caroll, Burdick.

2          **MR. TOOCH:**  What type of insurance defense work did

3   they do?

4          **PROSPECTIVE JUROR WHITEMAN:**  You know, I didn't work

5   there very long, and so I just wasn't there very long.

6          **MR. TOOCH:**  Okay.  And the last 18 years you've been

7   at Sheppard Mullin?

8          **PROSPECTIVE JUROR WHITEMAN:**  Yes.

9          **MR. TOOCH:**  And the lawyers you work for, what type of

10  law do they do?

11         **PROSPECTIVE JUROR WHITEMAN:**  I have a transactional

12  desk.  And it's executive compensation, taxes, real estate.

13  That's -- that covers it pretty much.

14         **MR. TOOCH:**  Okay.  Thank you.

15     Ms. Wong -- Mr. Wong, sorry.  You said your wife is a

16  pharmaceutical consultant?

17         **PROSPECTIVE JUROR YEE:**  Can you repeat that, please.

18         **MR. TOOCH:**  Your wife, you said she is a

19  pharmaceutical consultant?

20         **PROSPECTIVE JUROR YEE:**  No, my wife a housewife.

21         **MR. TOOCH:**  Oh, it is Ms. Wong.  Your husband's a

22  pharmaceutical consultant?

23         **PROSPECTIVE JUROR WONG:**  Yes.  He founded -- he's the

24  founder and owner of a company that provides engineering

25  consulting to pharmaceutical companies.  He works in the

1  pharmaceutical industry.

2       **MR. TOOCH:** So what does he do as a consultant? Give

3  us some details, if you can.

4       **PROSPECTIVE JUROR DIANA WONG:** I guess, in general, he

5  helps pharmaceutical companies get people that they need to

6  help them, shall I say, pass FDA approval.

7       **MR. TOOCH:** I see. Okay. And tell us about the job

8  that you used to do.

9       **PROSPECTIVE JUROR DIANA WONG:** I was an exec admin at

10 the local utility company.

11      **MR. TOOCH:** Okay. I have no further questions.

12      **THE COURT:** All right. Thank you.

13 Ms. Briggs.

14      **MS. BRIGGS:** Thank you, Your Honor.

15 Good morning again, everyone.

16 First of all, I want to thank you very much for being

17 here. This is my only opportunity to talk to you as jurors.

18 The rest of the time is going to be spent putting on evidence.

19 So this is actually kind of the best part for a lot of the

20 attorneys because we get to hear from the people directly who

21 are going to be evaluating and ultimately judging our case.

22 So I appreciate not only your time but the honesty that

23 you have brought to this process and your forthrightness. If I

24 don't talk to one of you, it's not because I'm not interested.

25 It's only because the Court has given us each about 15 minutes,

1 and there are quite a number of you.  So don't read anything

2 into that either way.

3     I'd like to begin with Mr. Williams.

4     Mr. Williams, you described yourself as having strong

5 opinions about healthcare.  Could you share some of those

6 opinions.

7         **PROSPECTIVE JUROR CRAIG WILLIAMS:**  Well, we have the

8 highest healthcare system in the world.  And, you know, other

9 countries are able to keep those healthcare costs down, which

10 is good for the patients as well as good for -- in my opinion,

11 it's good for businesses.

12     You know, in Canada doctors like the system because they

13 have a lot less paperwork; nurses because they provide

14 Medicare; businesses because it's cheaper; unions because they

15 don't have to haggle over healthcare; conservatives because

16 there's less bureaucracy; and liberals because everybody is

17 covered.  So that's my opinion in a nutshell.

18         **MS. BRIGGS:**  And is that in reference -- I think you

19 said you did some work into a single-payor system.  Is that

20 where you developed your opinions on this?  Or could you tell

21 me a little bit more about your background on that.

22         **PROSPECTIVE JUROR CRAIG WILLIAMS:**  Yeah, basically,

23 you know, I was aware of, you know, what was going on with that

24 campaign.  And in my local area, in the San Leandro-Hayward

25 area, I was involved in a local democratic party where I did a

1   door-to-door campaign on that issue.

2           MS. BRIGGS:  Did you also take some time to educate

3   yourself on this issue?

4           PROSPECTIVE JUROR CRAIG WILLIAMS:  Yeah, I've read

5   several books on the subject.

6           MS. BRIGGS:  Does anybody else on the jury share

7   Mr. Williams' views about the healthcare system?

8       I see some -- could you raise your hands.

9       (Show of hands.)

10          MS. BRIGGS:  Okay.  Ms. Yap, could you tell us what

11  your views are.

12          PROSPECTIVE JUROR YAP:  So I have -- personally, I

13  have very little exposure with the healthcare industry.  But

14  from what I've heard, you know, just like people talking around

15  me, that it's very difficult to collect and all that.

16          MS. BRIGGS:  Have you -- do you do any reading on the

17  topic?

18          PROSPECTIVE JUROR YAP:  No, I have very little

19  exposure.  So he mentioned about, like, Canada.  I actually

20  gave birth there, and it's very fast and efficient so, you

21  know, very happy with it.

22          MS. BRIGGS:  Does your view translate in any way to

23  Blue Shield or other health insurance companies?

24          PROSPECTIVE JUROR YAP:  No.  Well, with regards to my

25  personal experience, I've had no insurance with like insurance.

1    I've always had like easy transactions, yeah.  So very little

2    exposure.  I just go for regular checkups, so yeah, haven't

3    claimed anything.

4         **MS. BRIGGS:**  Okay.  Thank you.

5       Mr. Whittingham, you indicated earlier that you evaluate a

6    lot of different plans, health insurance plans.  In the course

7    of your work, have you developed any specific views about --

8    about my client Blue Shield?

9         **PROSPECTIVE JUROR WHITTINGHAM:**  No.  I mean, what I do

10    is typically on a -- I mean, I do a broad-level analysis of

11    them all, but what I do is more specifically tailored to the

12    client that I'm meeting with at that particular point in time

13    and what their needs and their family history and things like

14    that may be, so.

15         **MS. BRIGGS:**  I think you had earlier indicated that

16    you might have some feelings one way or the other on this case.

17    Could you elaborate on that.

18         **PROSPECTIVE JUROR WHITTINGHAM:**  I don't have very

19    positive feelings about the medical industry as a whole.

20       I have had a wife who was diagnosed with cancer, a father

21    who passed away from cancer.  And I've seen a lot of what I

22    perceived as gaps in treatment and levels of coverage depending

23    on your financial status and especially with friends of mine

24    who have passed away.  So I have a lot of -- I don't want to

25    say biases, but maybe biases is the right word with the medical

industry.

And as far as how treatments are performed, I do work with clients that are going through specific treatments for certain things and see the hassle that goes on there.

So I think, like a lot of people, I'm a little bit jaded towards the medical industry because I see that, you know, it tends to be a for-profit thing.

And I see the level of attention that's given when there is money available, and then once that money tends to dry up the level of attention is no longer there. And I believe it directly affects people's lives. I've seen it.

**MS. BRIGGS:** And when you talk about the medical industry and your feelings about the medical industry, who's included in that from your perspective? For example, is it the health insurers?

**PROSPECTIVE JUROR WHITTINGHAM:** I've seen it -- I think it's on both sides. I have good friends of mine that are doctors. And a large portion of my family are nurses in Florida. I have friends that are internal medicine doctors. They teach at the colleges in Miami.

I've seen it, from my opinion, on both ends. Maybe I've just had the wrong side of it, the wrong side of the coin. But on both ends, I've seen overworked staff and I've seen medical providers that aren't providing, you know.

**MS. BRIGGS:** Does anybody else agree with

1  Mr. Whittingham, that there are problems on both sides of the

2  medical industry?

3      (Show of hands.)

4      **MS. BRIGGS:**  Not just one side or another.

5      Mr. Williams, you didn't raise your hand, but I thought

6  you indicated earlier the problems were on both sides.

7      **PROSPECTIVE JUROR CRAIG WILLIAMS:**  Well, I was

8  thinking, you know, when you said that there are more sides

9  than just the hospitals as well as the insurance companies, you

10  know, there are other factors involved, the AMA and just a

11  whole list of problems.

12      **MS. BRIGGS:**  Do you personally place blame on any one

13  particular side?

14      **PROSPECTIVE JUROR CRAIG WILLIAMS:**  No, not on one

15  particular side.  You know, the pharmaceutical industry is a

16  big part of the problem.  Like I say, the AMA is problematic as

17  well as the insurance and as well as the hospitals.

18      **MS. BRIGGS:**  Thank you.

19      Ms. Wan, earlier you indicated that you had at one time

20  had Blue Shield, and you did not think coverage was very good.

21      Was there a particular problem that you had with

22  Blue Shield?

23      **PROSPECTIVE JUROR WAN:**  I think it was just trying to

24  get treatment, and everything has some sort of copay or

25  coinsurance which is pretty high.  So, I mean, I was young, so

1    I just decided to not use it in general.

2         **MS. BRIGGS:**  So, in other words, it sounds like maybe

3    the cost structure of your health insurance wasn't very good

4    for you at that time; is that right?

5         **PROSPECTIVE JUROR WAN:**  Correct.

6         **MS. BRIGGS:**  You weren't denied coverage or anything,

7    were you?

8         **PROSPECTIVE JUROR WAN:**  No.

9         **MS. BRIGGS:**  Thank you.

10        I have no further questions.

11        **THE COURT:**  All right.  Thank you.

12        **MS. BRIGGS:**  Thank you very much.

13        **THE COURT:**  So, ladies and gentlemen, we now go

14   through a -- sort of a two-part process.  And the first part

15   I'm going to be meeting for a moment on the side with the

16   lawyers.  And during that time don't leave the courtroom.  You

17   can stand up.  There will be -- the noise machine will go on,

18   and then I'll be back to you and will tell you what comes after

19   that.

20        (The following proceedings were heard at the sidebar:)

21        **THE COURT:**  All right.  So I think we're going to be

22   fine.  I would excuse for cause juror number 29.

23        **MS. BRIGGS:**  Okay.

24        **THE COURT:**  Mr. Sisol.  And then for hardship I would

25   excuse jurors number 3, 8, 15, 20, 21.

1          **MS. BRIGGS:**  Right.

2          **MR. TOOCH:**  So between 15 and 20?

3          **THE COURT:**  15, 20 is the next one, 21, then 27.

4          **MR. PIMSTONE:**  Yes.

5          **THE COURT:**  And then 31 and 32.

6      So, Mr. Tooch, do you have other people that I should

7  consider, or do you have any questions about the ones -- this

8  is cause and hardship.  This is everybody I'm about to excuse.

9          **MR. TOOCH:**  No, I don't have any questions about that.

10         **THE COURT:**  Okay.

11         **MR. TOOCH:**  Let me ask about the peremptories.  Are

12  those to the first six or eight?

13         **THE COURT:**  So you're going to get four peremptories

14  because we're going to have plenty of people.  And they go to

15  the eight.

16         **MR. TOOCH:**  The eight.

17         **THE COURT:**  Yes.  So you're going to have an 8-person

18  jury.  You each have four peremptories.

19      Okay.  Ms. Briggs, do you have anybody else that I should

20  be thinking about for cause or hardship?

21         **MS. BRIGGS:**  No, Your Honor.

22         **THE COURT:**  Okay.  So we're in good shape.  All right.

23      (Sidebar concluded.)

24         **THE COURT:**  All right.  Ladies and gentlemen, so the

25  first -- I'm going to excuse a few people now.  And those

1  people should go up to the jury office and say that you've been

2  excused.  And you will have done your service for this jury.

3  And I appreciate it very much.

4      So I thank and excuse jurors number 3, Mr. Truong; 8,

5  Ms. Rauch; 15, Ms. Wong; 20, Mr. Decker; 21, Ms. Agustin; 27,

6  Mr. Dadiomov; 29, Mr. Sisol; 31, Ms. Woiwode; and 32,

7  Mr. Dikshit.  Thank you.

8      All right.  So then the next thing that happens is the

9  jurors -- the lawyers get to exercise their peremptory

10  challenges.  So these are challenges that they make as part of

11  the selection process.  They don't have to have any reason at

12  all to do it.  It's just it is the way that our system makes

13  sure that the juries are so reflected by the parties and not by

14  anybody else.

15      So what happens is the lawyers will be passing a piece of

16  paper back and forth.  This process takes a little while.

17  Again, you cannot leave, but you can talk amongst yourselves

18  and stand up if you want to.

19      (Pause in proceedings.)

20      **THE COURT:**  Can I see the lawyers over at the side for

21  a second.

22      (The following proceedings were heard at the sidebar:)

23      **THE COURT:**  All right.  I just want to confirm who we

24  have as our jurors.  We have Juror Number 1, Number 4, Number

25  6, Number 7, Number 9, 12, 13, and 16.  Is that right?

1          **MS. BRIGGS:**  Correct, Your Honor.

2          **MR. TOOCH:**  That's correct.

3          **THE COURT:**  All right.  Thank you.

4      (Sidebar concluded.)

5          **THE COURT:**  All right.  Ladies and gentlemen, I'm

6   going to thank and excuse a few people and then reorder the

7   jury box and swear the jury, and then let the rest of the

8   people who weren't selected go.

9      First, I want to thank everybody for the service that

10  you've given today.  Some of you will be providing more service

11  than others.

12     First I'm going to thank and excuse jurors number 2, 10,

13  5, 11, 14, 17, and 18.  You are all excused.  Thank you very

14  much.

15     All right.  And then -- all right.  Mr. Williams, if you

16  wouldn't mind sitting in the gallery for a moment.  You, yes.

17     So the people who will remain are -- sitting in the first

18  three rows here are the jury.  And so, Ms. Davis, if you will

19  swear the jury.

20         **THE CLERK:**  If you'll all stand, please, and raise

21  your right hand.

22     (Oath administered to the jury.)

23         **THE COURT:**  All right.  Please be seated for the

24  moment.

25     So everyone else who's come for jury selection, you are

now dismissed with our thanks.  You have done your duty as citizens.  Thank you very much.

All right.  Members of the jury, this is what we're going to do.  We're going to take -- Ms. Davis is going to take you back to the jury room to give you some organizational information.  And then you'll come back to the jury room at 1:00 o'clock.

And at 1:00 o'clock -- then we'll start -- I'll give you preliminary instructions, and you'll hear the opening arguments of counsel, the opening statements, where they're going to tell you what they expect is going to happen in this case, how the case is going to go along.

And after that we'll break.  So I'm not sure exactly what time that will be, but it will be well before 3 o'clock.

So if you would follow Ms. Davis into the jury room, that would be great.

(Jury out at 12:07 p.m.)

**THE COURT:**  All right.  So we'll be in recess until 1:00 o'clock.

**MS. BRIGGS:**  Thank you.

(Recess taken at 12:08 p.m.)

(Proceedings resumed at 1:05 P.m.)

(The following proceedings were held in open court, outside the presence of the jury:)

**MR. PIMSTONE:**  I don't expect the parties are going to

1  be objecting, but in the unlikely event something happens how

2  would you like to handle it?  Do we stand up and say

3  "objection" and come to side, or do we give a grounds?

4       **THE COURT:**  So I don't like speaking objections at any

5  time.

6       **MR. PIMSTONE:**  Correct.

7       **THE COURT:**  If you make an objection, I will probably

8  know what I think about it.

9       **MR. PIMSTONE:**  Understood.

10      **THE COURT:**  So you can say "improper argument" or

11  something --

12      **MR. PIMSTONE:**  I don't expect it's going to happen,

13  but I just wanted to understand what Your Honor's preferences

14  were.

15      Thank you.

16      **THE COURT:**  All right.

17      (Jury enters at 1:06 p.m.)

18      **THE COURT:**  All right.  Please be seated, everybody.

19      Ladies and gentlemen of the jury, you are now the jury in

20  this case.  And it's my duty to instruct you on the law.  It's

21  your duty to find the facts from all of the evidence in the

22  case.  To those facts you will apply the law as I give it to

23  you.

24      You must follow the law as I give it to you, whether you

25  agree with it or not.  And you must not be influenced by any

1    personal likes or dislikes, opinions, prejudices, implicit bias

2    or sympathy.  That means you must decide the case solely on the

3    evidence before you.  You will recall that you took an oath to

4    do that.

5        At the end of the trial I'll give you final instructions.

6    And it's the final instructions that will govern your duties.

7        Please don't read into these instructions, or anything

8    that I may say or do, that I have an opinion regarding the

9    evidence or what your verdict should be.

10       To help you follow the evidence, I will give you a brief

11   summary of the positions of the parties.

12       The plaintiff, NorthBay Healthcare Group, provided medical

13   services to patients who presented to the emergency departments

14   at NorthBay's hospitals and who had healthcare coverage from

15   the Blue Shield defendants.

16       The plaintiff and the defendants disagree on the

17   reasonable value of the services.  In this case it will be your

18   duty to determine the reasonable value of the services at

19   issue.

20       NorthBay is entitled to be paid the reasonable value of

21   the services that were provided to Blue Shield's members.

22       The reasonable value of the services is the "going rate"

23   for the services, or the "reasonable market value at the

24   current market prices."  Reasonable market value, or fair

25   market value, is the price that a willing buyer would pay to a

willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts.

In determining the reasonable value for the services at issue, you may consider a wide variety of evidence reflective of the market rate for the services in the geographic area.

The burden is on the plaintiff to prove, by a preponderance of the evidence, the reasonable value of the services at issue. When a party has the burden of proving any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You should base your decision on all the evidence, regardless of which party presented it.

The evidence you are to consider in deciding what the facts are consists of: The sworn testimony of any witness; the exhibits that are admitted into evidence; any facts to which the lawyers have agreed; and any facts that I have instructed you to accept as proved.

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

Arguments and statements by lawyers are not evidence. I'll say that again. What lawyers say is not evidence. The lawyers are not witnesses. What they will say in their opening

statements and in their closing arguments and at other times is intended to help you interpret the evidence.  It's not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

Testimony that is excluded or stricken or that you've been instructed to disregard is not evidence and must not be considered.  In addition, some evidence was received only for a limited purpose; when I have instructed to you consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

Anything you may have seen or heard when the Court was not in session is not evidence.  You are to decide the case solely on the evidence received at trial.

Some evidence may be admitted only for a limited purpose. When I instruct you that an item of evidence has been admitted only for a limited purpose, you may consider it only for that limited purpose and not for any other purpose.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.

Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it's not permitted by the rules of evidence, that lawyer may object. If I overrule the objection, the question may be answered or the exhibit received. If I sustain the objection, the question cannot be answered, and the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore that evidence. That means when you're deciding the case, you must not consider the stricken evidence for any purpose.

In deciding the facts of this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take

into account:  The opportunity and ability of the witness to
see or hear or know the things testified to; the witness's
memory; the witness's manner while testifying; the witness's
interest in the outcome of the case, if any; the witness's bias
or prejudice, if any; whether other evidence contradicted the
witness's testimony; the reasonableness of the witness's
testimony in light of all the evidence; and any other factors
that bear on believability.

Sometimes a witness may say something that is not
consistent with something else he or she said.  Sometimes
different witness also give different versions of what
happened.  People often forget things or make mistakes in what
they remember.  Also, two people may not see the same -- may
see the same event but remember it differently.  You may
consider these differences, but do not decide the testimony is
untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately
testified untruthfully about something important, you may
choose not to believe anything that witness said.  On the other
hand, if you think the witness testified untruthfully about
some things but told the truth about others, you may accept the
part you think is true and ignore the rest.

The weight of the evidence as to a fact does not
necessarily depend on the number of witnesses who testified.
What's important is how believable the witnesses were and how

much weight you think their testimony deserves.  I will now say

a few words about your conduct as jurors.

First, keep an open mind throughout the trial, and do not

decide what the verdict should be until you and your fellow

jurors have completed your deliberations at the end of the

case.

Second, because you must decide this case based only on

the evidence received in the case and on my instructions as to

the law that applies, you must not be exposed to any other

information about the case or to the issues it involves during

the course of your jury duty.  Thus, until the end of the case

or unless I tell you otherwise:

Do not communicate with anyone in any way and do not let

anyone else communicate with you in any way about the merits of

the case or anything to do with it.  This includes discussing

the case in person, in writing, by phone or electronic means,

via email, text messaging, or any Internet chat room, blog,

website or application, including but not limited to Facebook,

YouTube, Twitter, Instagram, LinkedIn, Snapchat, or any other

forms of social media.  This applies to communicating with your

fellow jurors until I have given you the case for deliberation.

And it applies to communicating with everyone else, including

your family members, your employer, the media or press, and the

people involved in the trial.  You may notify your family and

your employer that you have been seated as a juror in the case

# JURY INSTRUCTIONS

and how long you expect the trial to last.  But if you are asked or approached in any way about your jury service, or anything to do with the case, you must respond that you've been ordered not to discuss the matter and report the contact to the Court.

Because you will receive all the evidence and legal instruction you may properly consider to return a verdict, do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it, although I have no information that there will be news reports about this case; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.  Do not visit or view anyplace discussed in this case, and do not use Internet programs or other devices to search for or view anyplace discussed during the trial.  Also, do not do any research about this case, the law, or the people involved -- including the parties, the witnesses or the lawyers -- until you have been excused as jurors.  If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the

1   accuracy of their testimony is tested through the trial

2   process.

3        If you do any research or investigation outside the

4   courtroom, or gain any information through improper

5   communication, then your verdict may be influenced by

6   inaccurate, incomplete, or misleading information that has not

7   been tested by the trial process.  Each of the parties is

8   entitled to a fair trial by an impartial jury, and if you

9   decide the case based on information not presented in court,

10  you will have denied the parties a fair trial.  Remember, you

11  have taken an oath to follow the rules, and it is very

12  important that you follow these rules.

13       A juror who violates these restrictions jeopardizes the

14  fairness of the proceedings, and a mistrial could result that

15  would require the entire trial process to start over.  If any

16  juror is exposed to any outside information, please notify the

17  Court immediately.

18       If there is any news media or commentary about the case or

19  anything to do with it, you must ignore it.  You must not read,

20  watch or listen to any news media account or commentary about

21  the case or anything to do with it.  The case must be decided

22  by you solely and exclusively on the evidence that will be

23  received in the case and on my instructions as to the law that

24  applies.  If any juror is exposed to any outside information,

25  please notify me immediately.

1    I urge you to pay close attention to the trial testimony

2  as it's given.  During deliberations you will not have a

3  transcript of the trial testimony.

4    If you wish, you may take notes to help you remember the

5  evidence.  If you do take notes please keep them to yourself

6  until you go to the jury room to decide the case.  Do not let

7  note taking distract you.  When you leave, your notes should be

8  left in the jury room.  No one will read your notes.

9    Whether or not you take notes, you should rely on your own

10  memory of the evidence.  Notes are only to assist your memory.

11  You should not be overly influenced by your notes or those of

12  other jurors.

13    From time to time during the trial, it may become

14  necessary for me to talk with the attorneys out of the hearing

15  of the jury, either by having a conference at the bench when

16  the jury is present in the courtroom, or by calling a recess.

17  Please understand that while you are waiting, we are working.

18  The purpose of these conferences is not to keep relevant

19  information from you, but to decide how certain evidence is to

20  be treated under the rules of evidence and to avoid confusion

21  and error.

22    Or course, we will do what we can to keep the number and

23  length of these conferences to a minimum.  I may not always

24  grant an attorney's request for a conference.  Do not consider

25  my granting or denying a request for a conference as any

1    indication of my opinion of the case or of what your verdict

2    should be.

3       Trials proceed in the following way:

4       First, each side may make an opening statement. An

5    opening statement is not evidence. A statement by lawyers is

6    not evidence. It's simply an outline to help you understand

7    what that party expects the evidence will show. A party is not

8    required to make an opening statement. The plaintiff will then

9    present evidence, and counsel for the defendants may

10   cross-examine. Then the defendants may present evidence, and

11   counsel for the plaintiff may cross-examine.

12      After the evidence has been presented, I will instruct you

13   on the law that applies to the case, and the attorneys will

14   make closing arguments. After that, you will go to the jury

15   room to deliberate on your verdict.

16      The parties have greed to certain facts that I will read

17   to you now.

18      Number one, plaintiff NorthBay Healthcare Group - Hospital

19   Division, also called NorthBay, owns and operates two hospitals

20   in Solano County, California; NorthBay Medical Center in

21   Fairfield and NorthBay VacaValley Hospital in Vacaville.

22      The defendants in this action, California Physician's

23   Service, doing business as Blue Shield of California and Shield

24   Blue Shield of California Life & Health Insurance Company,

25   collectively referred to as the Blue Shield defendants, provide

health coverage to their respective members and insureds --

often referred to as members -- through health benefit plans

and insurance policies.

NorthBay was previously an in-network provider with the

Blue Shield defendants, pursuant to a contract between NorthBay

and California Physician's Service, doing business as

Blue Shield of California.

Blue Shield of California terminated its most recent

contract with NorthBay in November 2016.  NorthBay became an

out-of-network provider, with respect to the Blue Shield

defendants, as of December 1, 2016.

Between December 2016 and July 2018, NorthBay provided

hospital services to members of the Blue Shield defendants who

presented to one of the emergency departments at NorthBay's

hospitals.  Blue Shield made payments to NorthBay for those

services.

NorthBay contends that it was paid less than the

reasonable value for the services at issue.  The Blue Shield

defendants contend that its payments for the services at issue

exceed the reasonable value of those services.

So those were facts that the parties stipulated to, and

you must treat those facts as having been proved.  So with

that, we'll start with the opening statements.  Mr. Tooch.

### OPENING STATEMENT

**MR. TOOCH:**  Thank you, Your Honor.

1    I want to thank you for your service on this jury.  I know

2  that it can be an inconvenience.

3    On the Super Bowl yesterday there was a commercial which

4  suggested that serving on the jury is worse than a root canal.

5  I can tell you it's not going to be that bad.  In fact, I think

6  you're going to find this case quite interesting.

7    So what is this case about?  Well, this case is about my

8  client, NorthBay, which is a small hospital system that is

9  located between Oakland and Sacramento.  They have two

10  campuses; one in Fairfield and one in Vacaville.

11    So they are two hospitals, but they are under one license,

12  they are under one administration.  So it's the same managers

13  who manage both hospitals.  And doctors for both hospitals go

14  to one another, nurses go to one another, and nonclinical staff

15  work at both hospitals.

16    So you may have heard of the terms "in-network" and

17  "out-of-network."  What does that mean?  Well, if you're an

18  in-network hospital, that means that you have a contract with a

19  health plan.

20    So the evidence in this case will show that for eight

21  years NorthBay had a contract with Blue Shield.  And in this

22  contract they agreed on what was a fair price for the services

23  that NorthBay provided to Blue Shield members.

24    And the way that this contract worked was it depended upon

25  the number of Blue Shield members that were at NorthBay.  The

higher the number of Blue Shield members at NorthBay, the lower

the price.  The lower the number of Blue Shield members at

NorthBay, the higher the price.

As Mr. Albrant will tell you -- and he's selling wine and

cheese -- there's a volume discount.

So how do health plans like Blue Shield increase the

number of patients at a particular hospital?  Well, they do

that by lowering the copays.

You all know that when you go to an in-network doctor it's

a lower copay.  That's how health plans encourage their members

to see certain providers.  If you go to a in-network hospital,

it's a lower copay.  And that's how companies like Blue Shield

encourage their members to go to a particular hospital for

elective services.

What are elective services?  Let's say you have a shoulder

surgery or knee surgery but don't need that surgery right away.

You can have a surgery two or three months down the road.  You

and your doctor can decide where you are going to have that

surgery.  Are you going to NorthBay, or am I going to have it

at a Sutter Hospital, or a Dignity hospital, or even a surgery

center.  So these are elective services.

So the contract between NorthBay worked on this principle

that if Blue Shield encouraged more of its members to go to

NorthBay, it will pay less and less.

And the evidence in this case will show that for the first

1   seven years of that contract, Blue Shield was actually

2   successful in getting more and more and more of its members to

3   go to NorthBay.  And every time it got more of its members to

4   go to NorthBay, NorthBay lived up to its part of the contract

5   and agreed to reduce the prices that Blue Shield paid.  So

6   NorthBay complied with the contract all the time that it worked

7   to Blue Shield's benefit.

8       But what happened in the eighth year?  In the eighth year

9   of the contract, guess what happened?  The number of

10  Blue Shield members at NorthBay went down.  And when that

11  happened, guess what Blue Shield did?  It terminated the

12  contract.  All of a sudden Blue Shield said this is not a fair

13  deal.

14      So what is the other thing that it did?  After it

15  terminated the contract, Blue Shield decided to pay NorthBay a

16  lot less than it was paying under the contract.

17      And you say, well, if the contract was terminated why are

18  there Blue Shield members at NorthBay?  Well, these were for

19  emergency services.

20      If you're suffering from an emergency medical condition

21  you can go to the nearest hospital, or sometimes you're taken

22  by a family member or sometimes you're taken by an ambulance,

23  and -- you'll see some of the evidence in this case --

24  sometimes, if it's really bad, you're taken by a helicopter,

25  and they'll take you to the nearest hospital.

1    And the hospital has to provide that service to you.  They

2  have no choice.  The other thing is the health plan has to pay

3  a fair rate to the hospital to provide those services.

4    So this case involves Blue Shield members who were

5  suffering from life-threatening conditions, who were treated at

6  NorthBay, for which Blue Shield didn't pay NorthBay a fair

7  price.

8    So NorthBay appealed the claims after the -- it received

9  these low payments from Blue Shield.  And what was the rates in

10  the contract?  The evidence will show that during the eight

11  years the parties agreed that the charges would either be 55

12  percent of charges to 80 percent of charges.  That was the

13  price that both parties agreed upon.  So if there were a lot of

14  Blue Shield members at the hospital, Blue Shield paid the

15  reduced percent of 55 percent, or 55 cents on the dollar.  If

16  Blue Shield was not successful, they paid 80 percent of

17  charges, 80 cents on the dollar.

18    What were the amounts that Blue Shield paid after they

19  terminated the contract?  35 percent, 35 cents on the dollar.

20  19 percent.  Even 7 cents on the dollar.  That's what

21  Blue Shield paid.

22    NorthBay appealed these claims to Blue Cross and said,

23  these are not fair payments; we need to be paid more.  And

24  Blue Shield said, no, take us to court.  And that's why we're

25  here.

1    So your job is to decide what's the reasonable value of

2 NorthBay's services for the lifesaving care it gave to

3 Blue Shield's members.

4    Now, you may say, "I don't know how to do that.  I'm not

5 qualified to do that."

6    Well, we think you are.  We think you make these decisions

7 every day in your life.

8    We know that Mr. Chadalavanda does this every time.  All

9 the time.  He does valuation stuff all the time.  He values

10 real estate.

11    But we all do this.  Say you're looking for an apartment.

12 Say you're looking for a 3-bedroom apartment in the City.

13 What do you do?  You look at the listings for 3-bedroom

14 apartments.  You look at what they've rented for a particular

15 apartment in the past.  If you find an apartment you like, you

16 compare it to what other 3-bedroom apartments in that building

17 cost and what the other 3-bedrooms in the neighborhood are

18 going for.  And you compare like apartments to like apartments.

19    Say you want to have air conditioning or a washer and

20 dryer in your apartment, or a 2-car garage.  You compare

21 those -- that apartment to other 3-bedroom apartments, and you

22 say, is the price that they're offering me, say $3,000, a fair

23 price?

24    Well, that's what you're going to do in this case as well.

25 You're going to look at that type of evidence which I'm going

1    to get to in a minute.

2         The other thing is that the judge just read you a jury

3    instruction on reasonable value.  And he said reasonable value

4    is the services -- is the going rate for services of the

5    reasonable market value at current market prices.  Reasonable

6    market value or fair market value is the price that a willing

7    buyer would pay a willing seller, neither under compulsion to

8    buy or sell and both having full knowledge of all pertinent

9    facts.

10        Well, Mr. Albrant will tell you --

11            **THE COURT:**  Mr. Tooch.

12            **MR. TOOCH:**  Yes.

13            **THE COURT:**  Please don't refer to the jurors.

14            **MR. TOOCH:**  Okay.

15            **THE COURT:**  That's improper.

16            **MR. TOOCH:**  All right.

17        So what is the reasonable value of a price?  It's the

18   price that somebody who is a willing buyer -- in other words,

19   I'm willingly paying for the service at a particular amount --

20   and a willing seller.

21        If you go into a restaurant and you order a $12 hamburger

22   and you eat the hamburger, you're a willing buyer of that

23   hamburger at $12, and the restaurant is a willing seller of the

24   hamburger at $12.

25        If you go and you order the hamburger, and it's $12 and

1  you only pay $4, the restaurant is not a willing seller of that

2  hamburger at $4.

3      So what would be the testimony in this case?  Well, the

4  first witness you're going to hear from is Ms. Eichenberger,

5  sitting in the front with the white jacket.  She is the

6  director of patient financial services at NorthBay.  She's in

7  charge of making sure that health plans pay according to their

8  contracted prices.

9      Ms. Eichenberger will tell you, give you some background

10  description of what NorthBay's like and the type of hospital

11  that NorthBay is.

12      Now, NorthBay is a very special hospital.  It's a very

13  small hospital system if you compare it to Sutter or to Kaiser

14  or to Dignity Health.  They're just two hospitals.  But you'll

15  find that it has a wide variety of services, and it has

16  topnotch services.  It has topnotch services in trauma and

17  chest pain and strokes.

18      And the other thing you'll find out is that the community

19  that NorthBay services is low income people.  So it provides

20  topnotch services to low income people.

21      Ms. Eichenberger will also tell you about the contract

22  between Blue Shield and NorthBay.  And she'll describe how that

23  contract worked.

24      Ms. Eichenberger will also tell you about the contract

25  that NorthBay has with other health plans:  Blue Cross; Cigna;

1    Aetna; United.

2        Why is that important?  Because just like the apartments,

3    you're comparing one 3-bedroom apartment to other 3-bedroom

4    apartments, you're comparing one contract price to other

5    contract prices.  And so you're looking at what generally are

6    health plans paying NorthBay for its services.  It's a good

7    indication of what the market is.

8        Next you're going to hear from some clinical witnesses.

9    You're going to hear from a doctor and two nurses.  Why are you

10   going to hear from these people?  Because not all hospital

11   services, not all doctor services are the same.

12       You'll hear that Blue Shield will take the position that

13   all medical services are the same.  You have worked at one

14   place, it's the same as having worked at another place.  You

15   have an open heart surgery at one hospital, it's the same as

16   open heart surgery at another hospital.

17       We don't think so.  And so Dr. Zusman is going to be our

18   first witness, and she is a brain surgeon.  And she will you

19   tell you about the really high quality and types of brain

20   surgeries that are done at NorthBay.

21       The next witness you are going to hear is Ms. Venezio.

22   And she's a nurse in charge of the trauma and emergency

23   services at the hospital.

24       What's trauma?  Traumas are really bad emergencies where

25   there's, in most cases, severe injury to the brain.

1       And not all the hospitals are trauma centers.  And

2   Ms. Venezio will tell you about the special types of services

3   that NorthBay provides in its trauma unit and how that -- the

4   fact that it needs all these doctors for the trauma center

5   improves the care throughout the hospital.

6       So, for example, a -- for a trauma unit you need to have

7   really good plastic surgeons for, say, hands.  And so that

8   helps people who are not in trauma get really good hand

9   surgery.

10       Finally, you are going to hear from Kim Williamson.  And

11   she is the nurse in charge of the cardiovascular program at

12   NorthBay.  Cardio is heart; vascular is lungs.  And she will

13   tell you that this is a certified chest pain center with PCI.

14   That means stent surgery.  And it's one of the few hospitals in

15   the country that have the certification.

16       Finally, you're -- and, finally, you're going to hear from

17   our expert witness.  His name is Michael Heil.  Mr. Heil is

18   very experienced.  He ran hospitals for many years.  He's also

19   very experienced in trauma.  He helped the State of Alaska set

20   up its trauma program.

21       He's also very experienced in healthcare reimbursement.

22   And he's going to provide you an expert opinion that's going to

23   assist you in determining the reasonable value of the services.

24       How's he going to do this?  The same way that you

25   determine what's the reasonable value for a 3-bedroom

1    apartment.

2        The first thing he's going to do is he's going to look at

3    the course of dealings between the parties.  What was the

4    contract between Blue Shield and NorthBay?  That's important

5    because it shows what both parties thought was the fair price

6    for the services.

7        What's the second thing he's going to do?  He's going to

8    look at NorthBay's contracts with other payors:  Aetna; Cigna;

9    United.

10       Why?  That's like comparing the 3-bedroom apartment to

11   other 3-bedroom apartments.  And he's going to look at those

12   contracts and tell you which contracts are the same and which

13   ones are different.  Some of those contracts are for full

14   in-network services, like Blue Cross and Aetna and Cigna.  And

15   some of those contracts are just for emergency services.  So

16   it's, again, comparing, like, a 3-bedroom to a 2-bedroom versus

17   a 3-bedroom apartment.

18       Finally, he's going to look at what other hospitals charge

19   for similar services in the area, like looking at the listings

20   for 3-bedroom apartments.

21       And then he's going to use all this information and he's

22   going to come up with a reasonable value of the services.  And

23   the reasonable value of the services that Mr. Heil comes up

24   with is 88 percent of charges, 88 cents on the dollar.

25       The evidence in this case is going to show that 88 percent

1    of charges, or 88 cents on the dollar, is the fair and

2    reasonable value for the services that NorthBay provided to

3    Blue Shield's members in life-threatening situations.

4         Thank you.

5              THE COURT:  All right.  Thank you.

6         Mr. Pimstone.

7                      **OPENING STATEMENT**

8         **MR. PIMSTONE:**  Good afternoon, ladies and gentlemen of

9    the jury.  My name Greg Pimstone.  I represent Blue Shield of

10   California in this case.  And I come with props.  I'm going to

11   turn my back to you for just second and I'm going to get the

12   jury instruction that the judge gave you which I'll be using

13   throughout the presentation.

14        (Pause.)

15        **MR. PIMSTONE:**  Can you all see that?  I wanted to

16   before I started, I wanted to make sure that all of you guys

17   can see the screen because I'll have some slides to help follow

18   along with the presentation.  Some of these concepts are going

19   to be novel and some people like to acquire information by

20   looking as opposed to hearing.  I also want to make sure all of

21   the three jurors in the back row can see the screens that are

22   in front.  Otherwise, we do have two empty chairs if you wanted

23   to come in as well.

24        Again, I am Greg Pimstone.  With me you'll be hearing from

25   a couple of my colleagues this week as well.  Amy Briggs, Jeff

1     Maurer.  And that's my client, Karen Wan, with Blue Shield of

2     California.

3         As the judge instructed you, the parties in this case are

4     Blue Shield of California and NorthBay Medical Center which

5     operates two hospitals.

6         This is, as the judge instructed, a dispute over the

7     reasonable value of services that the two NorthBay hospitals

8     provided to people who have Blue Shield coverage when they came

9     to NorthBay's emergency rooms.

10         This is not a question of coverage.  These services were

11     all covered.  The patients were all covered for these services.

12     They weren't denied.  This is not a coverage question.  So the

13     services were provided, blue Shield paid for the services, the

14     patients got coverage for the services, and this is just a

15     question about what the services are worth in the geographic

16     market.

17         As Mr. Tooch indicated, how did this dispute arise?  Why

18     are we here today?  We're here today because Blue Shield and

19     NorthBay for the time in question, the 2017 year and 2018,

20     didn't have a contract for services, so there was no price

21     agreement as to what the services were worth.  What this means

22     is that NorthBay is an out-of-network hospital.  There was no

23     agreement between them regarding the reasonable value of the

24     services.

25         And so why are we here, as well?  Well, it's because that

1    even though Blue Shield and NorthBay weren't contracted,

2    patients still have a right -- all of us -- have a right to go

3    to the nearest emergency room when an emergency arises.

4    That's -- California law provides that to us.  And health

5    plans, like Blue Shield, must cover those services at no

6    additional cost to the patient even if the patient goes to an

7    emergency room, to a hospital that's not contracted with the

8    health plan.

9        By the same token, the non-contracted provider obviously

10    must treat all comers.  They can't turn a patient away just

11    because the patient is covered by a plan that doesn't contract

12    with them.  And so what you'll hear in this case is evidence

13    that these are called forced transactions.  They're forced

14    transactions because the patient is taken to the nearest

15    emergency room.  They're not choosing where to go.  Blue Shield

16    has no ability to steer the patient to a contracted facility

17    with whom it has a contract, so Blue Shield is sort of forced

18    into the transaction.  And, of course, the hospital is forced

19    into the transaction as well because they have to treat the

20    patient.

21        So these are not what they call willing buyer/willing

22    seller transactions where two parties are coming together

23    voluntarily.  These are sort of parties that are flung together

24    without any agreement on price.  And that's why you're here, is

25    to determine what the appropriate price is.

1    One thing also to make clear, this is not a question about

2   physician fees.  The physicians were all paid.  There's no

3   question about what the physicians were paid.  This case

4   involves hospital facility fees.  Facility fees.  What is the

5   reasonable value of an MRI?  What is the reasonable value of

6   supplies?  What is the reasonable value of the room and board

7   that a hospital may have provided?  It's those kinds of things

8   that are in question.  This is not a dispute with doctors.

9   This is a dispute about facility fees between the hospital and

10  Blue Shield.

11   And so Blue Shield and NorthBay disagree about the

12  reasonable value to pay for the services.  And when that

13  happens, the law allows NorthBay to sue for determination of

14  reasonable value of the services in the geographic area, and

15  it's your job to make that determination.  So at the end of

16  this trial, it is your job to look at all the evidence and

17  basically come up with a number.  To basically come up with a

18  number and say:  NorthBay's emergency services were worth X.

19   You're not going to be asked to do it by MRI or by supply.

20  It's going to be one global number that you're going to be

21  asked to come up with.

22   And so that's -- you're not going to be asked to determine

23  damages, either.  Nobody's going to ask you to determine how

24  much Blue Shield owes NorthBay, or how much NorthBay needs to

25  refund to Blue Shield.  This is just a question about coming up

1    with what the reasonable value is.  And at some later point the

2    parties will then determine with the Court at some later stage

3    how that's translated into money.

4        And so I'll get into that a little bit more in the

5    presentation.  Because it does go to what you guys are being

6    asked to do.

7        The most important thing in the case, as Judge Orrick

8    instructed, is to follow the law and to understand what the law

9    provides.  And the judge has given you one special instruction

10   here, which I've got blown up over here.  And that is that --

11   and it's divided into three parts.

12       The first part is that NorthBay's entitled to be paid the

13   reasonable value for the services that were provided to Blue

14   Shield members.  That's the basic charge.

15       I want to go to the last paragraph there because

16   ultimately the last paragraph is sort of where the rubber meets

17   the road.  How does one determine reasonable value?  What is

18   one doing?  What the judge has instructed is that in

19   determining the reasonable value for the services in question,

20   you may consider a wide variety of evidence reflective of the

21   market rate for the services in the geographic area.  Let's

22   pause a little bit and look into that.

23       So you will hear lots of evidence in this case, and your

24   job is to ask yourselves:  What is the market rate for the

25   services in the geographic area?  So the geographic area,

1   you'll hear both experts talk about the geographic area that's

2   around Solano County.  Fairfield and Vacaville's where these

3   hospitals were.  And both experts look at a series of hospitals

4   in the surrounding area.

5        And the question is, what are these services worth in the

6   geographic area?  And that's really important because what you

7   will hear is you'll hear two competing analyses.  I'm going to

8   go into them in a minute.

9        Blue Shield's analysis will really look at the geographic

10  area and say:  What are hospitals selling an MRI for in the

11  geographic area?  What are hospitals selling their services for

12  in the geographic area?  So we'll look at all different

13  hospitals and ask:  What is the market paying for these

14  services?  And you'll see in this case that NorthBay has a

15  different approach, and we'll get into that in just a few

16  minutes.

17       And the middle paragraph here describes a little bit what

18  kinds of transactions you'll be looking at to come up with the

19  market rate for the services in the geographic area.  And as

20  counsel for NorthBay indicated, you'll be looking at willing

21  buyer/willing seller transactions.  And what the instruction

22  says here is that reasonable market value -- and, again, the

23  word "market" here is used -- market value at current market

24  prices.

25       The word "current" is important as well, because the

1  evidence that will be relevant is what are these services being

2  sold for by hospitals in the geographic area during the time

3  period in question?  Not looking at years earlier.  Not looking

4  at old rates.  Not looking at old prices.  But what are the

5  current market prices in the geographic area?

6      And what the judge has instructed you, as well, is in

7  being looking at current market prices, you're looking at what

8  are the prices that willing buyers are paying to willing

9  sellers?  So again, because these are emergency transactions,

10 these are emergency transactions which are forced transactions

11 where people are forced together.  What your task is to do is

12 to say:  What are these same services being sold for in

13 transactions where the parties aren't forced?  So what are

14 hospitals in the geographic area selling these room and board

15 services, these MRI services, these supplies, what are they

16 selling them for in transactions where the parties are coming

17 together voluntarily?  And so you'll hear a lot of evidence

18 about that.

19     The judge has also instructed you that NorthBay here has

20 the burden of proof.  NorthBay has been the burden of proving

21 the reasonable value of its services.

22     You will hear two different cases.  Blue Shield and

23 NorthBay have very different approaches for determining the

24 reasonable value of services in the geographic area.

25     Let me start by talking about Blue Shield.  Blue Shield's

1   main expert witness is a gentleman and health care economist.

2   His name is Bruce Deal.  Mr. Deal is the managing principal at

3   Analysis Group located nearby in Menlo Park, and he has decades

4   of experience in health care analysis and in hospital pricing.

5       Let me take you up to 30,000 feet for a minute and talk

6   about the general approaches, and then I'm going to drill down

7   and tell you what the evidence is going to be from Blue Shield

8   and the evidence is going to be from NorthBay.

9       Blue Shield's approach is this:  Blue Shield looked at the

10  actual going rates in the geographic area.  Remember, the judge

11  told you to look at the geographic market rate in the

12  geographic area?  Blue Shield did that.  We looked at the

13  actual going rates in the geographic area for the same

14  services.  What were comparable hospitals in the geographic

15  area getting in the market -- actually getting in the market --

16  for those services?

17      NorthBay's approach is different.  NorthBay doesn't look

18  at what hospitals in the geographic area actually get for these

19  kinds of services.  It doesn't do that analysis at all.

20  NorthBay does look at other hospitals.  It does.  It has a

21  three-prong test, which I'll describe to you in a minute.  And

22  one of those prongs does actually look at other hospitals.  But

23  they don't look at what other hospitals were actually getting

24  for their services in the geographic area.  They look at what

25  NorthBay and other hospitals are charging for their services

1    even if they don't actually get those services.  Even if they

2    don't actually get those billed rates in the area.

3        And so you'll see that's a different approach between the

4    two.  We have Blue Shield's approach is to say:  We're doing a

5    market analysis.  We're doing a market analysis.  What were

6    hospitals in the geographic area actually getting for their

7    services?  And to the extent that NorthBay ever looks outside

8    of its own rates, it looks at a very different thing.  It looks

9    at what are the full rack rates that hospitals charge even if

10   they don't actually get those rates?

11       Bill charges.  Let's talk a little about bill charges.

12   Both experts agree.  Because I just talked about bill charges.

13   Hospital bill charges do not reflect what hospitals are

14   actually paid and accept in the market.  They can reflect --

15   there are some buyers, you know, who might pay bill charges.

16   But there are many, many, many buyers who don't.  And hospitals

17   set their bill charges wherever they want.  These are not

18   regulated.  Hospitals get to pick where they want to list their

19   prices.  There's no government agency that says to a hospital:

20   You have to have charges at a certain level.  They get to

21   choose.

22       So what is the first thing that one does in doing a market

23   survey?  Because that's really what this case is about, is a

24   market survey.  What are comparable hospitals in the geographic

25   area getting for these services?

1    So the first thing that Mr. Deal, who is our economist,

2  our expert, does is he builds the geographic area.  And he will

3  identify for you comparable hospitals around both of these

4  NorthBay facilities to determine what are those comparable

5  hospitals getting in the geographic area?

6    Mr. Deal will tell you that doing a survey like this,

7  doing an analysis like this, is no different than doing a

8  market survey for anything else.  If you're doing a market

9  survey for houses, house prices in the San Francisco area, you

10  would need to identify the appropriate market and you would

11  need to look at what the sales prices were for houses in that

12  area.  If you were looking at the sales price, what's the

13  market value of a 2016 Toyota Camry in San Francisco, you would

14  look at all dealers selling Camrys in San Francisco and you'd

15  look at what prices that they actually get.

16    And this is no different.  As Mr. Deal -- the first thing

17  he does is he defines the market and he defines what hospitals

18  are relevant in that market.

19    And then what Blue Shield does is it builds its analysis

20  as to how do you determine reasonable value?  What kind of

21  evidence is there out there as to what hospitals in the

22  geographic area are actually getting for these services?

23    Mr. Deal will take you through various different sources

24  of evidence.  He doesn't just look at one.  He looks at at

25  least four.  He looks at published studies, he looks at data

1  from an entity called OSHPD which I'll go into in a few

2  minutes.  It's a government agency that collects hospital data.

3  He looks at Optum, which is another database I'll go into in a

4  few minutes.  And he looks at Blue Shield data, as well,

5  because Blue Shield actually has experience with what hospitals

6  accept in the geographic area.  So he looks at Blue Shield

7  data.  He looks at all those sources to come up with a

8  definition of what "reasonable value" is.

9      The first source, very briefly, is published rates, and

10 published studies showing the rates that hospitals actually

11 get.  There are academics out there and other agencies out

12 there that look around the country and say:  What do hospitals

13 actually get paid in the market?

14     And I want to introduce a concept to you, because you'll

15 hear it throughout the week, and that is called the multiple of

16 Medicare benchmark.  What is the multiple of Medicare

17 benchmark?  Well, it's very simple.  And that is, it's a way

18 for us to standardize.  Because hospital charges can be

19 different for every hospital, this is a way to sort of be able

20 to compare rates that different hospitals are actually getting,

21 even though their charges might be different.

22     And the way we compare hospitals to see how they're doing

23 compared to each other in terms of what they're getting is you

24 compare them to what is that hospital getting compared to what

25 Medicare pays.  So, for example, very simply, if Medicare would

1  pay $100 for a service, and let's say that the hospital gets

2  $200 from a particular -- from buyers, from different sources,

3  then the hospital is receiving 200 percent of Medicare, or two

4  times Medicare.

5     And so here's another sort of graphic example sort of how

6  we do that.  And so here in my example, just to illustrate how

7  it works, I'm going to actually go through the --

8     There we go.

9     Okay.  So let's assume we've got a service that -- where

10 Medicare pays $1,000 for.  That's in this example right here.

11 If you knew that a hospital -- let's say you knew that a

12 hospital gets 40 percent of its bill charges in the market, and

13 you knew that the next hospital down the street gets 20 percent

14 of its bill charges from different payors.  Would you be able

15 to know sort of which hospital is getting more in the market?

16 You really couldn't because you would have to know what are

17 those hospital's charges?  And you'd have to mathematically

18 figure out what is 40 percent of one hospital's charges, what

19 is 20 percent of another hospital's charges.  You'd have to

20 know each hospitals charges in order to be able to compare the

21 two.

22    But if I told you that one hospital got $2,000 from

23 non-Medicare payors; so if I told you one hospital got two

24 times Medicare for its services, and I told you the other

25 hospital got two times Medicare for its hospital services, then

1    you know the hospitals are getting the same amount for their

2    services and you don't have to know what their bill charges

3    are.

4         So when you hear the multiple of Medicare benchmark, it's

5    giving you a way to compare what different hospitals are

6    getting compared to what they get from Medicare so you don't

7    have to actually know what their bill charges are or which bill

8    charges are higher.  It's just a tool for us to evaluate and

9    compare amongst different hospitals.

10        The other source that Blue Shield uses beyond the

11   published studies is Blue Shield looked at -- and its experts

12   looked at -- data from the OSHPD, which is the California

13   Office of Statewide Health Planning and Development Data.  And

14   what OSHPD does, if -- OSHPD is the official source in

15   California for collecting information from hospitals.  So OSHPD

16   collects millions of bits of information from hospitals.  They

17   report to OSHPD, and they report what they're actually paid for

18   their services.  And so they submit that data, and that data is

19   commonly used in the industry to be able to determine what

20   hospitals actually get for their services.

21        Blue Shield, in addition to looking at the OSHPD data,

22   looked at a different database also called Optum.  Optum

23   Healthcare Solutions is also another database.  It's not a

24   government database.  It's a private database.  And they do the

25   same thing.  They collect hundreds of millions of claims, claim

1    information, so they can tell what hospitals, what doctors, are

2    actually getting for their services.  Very widely used in the

3    industry to determine actual payment rates.

4         And then Blue Shield also looked at its own data.  Which

5    is, remember what are we doing here?  We're doing a market

6    survey.  Blue Shield looked at what are hospitals in the

7    geographic area actually getting from Blue Shield, actually

8    accepting, for the same kinds of services.  So we looked at all

9    of that data.

10        All right.  So let's all collate.  What is the evidence

11   going to show as to what the reasonable value is of NorthBay

12   services?

13        Well, if we look at the purple bar here, that's the bar on

14   the left; remember I told you one of the sources was published

15   studies?  What do published sturdies show that hospitals get

16   compared to what Medicare pays?  Well, published studies

17   typically show if you're looking at all different hospitals

18   they typically get -- hospitals typically get between 2.7 and

19   3.3 times what Medicare pays.  I'm talking about getting from

20   private commercial payors like Blue Shield or Cigna or Aetna.

21        And so if you're looking just at the private payor market

22   and what do they pay compared to what Medicare pays, the

23   published studies showed that hospitals typically get between

24   2.7 and 3.3 -- or, 3.2 times what Medicare pays.

25        Remember I told you that Mr. Deal also looked at the OSHPD

1    data and he looked at the Optum data and he looked at the Blue

2    Shield data?  In all of these analyses he looked at, he said:

3    I'm going to look at the actual hospitals in the geographic

4    area, including NorthBay, and I'm going to find out what did

5    those hospitals actually get for their services in the

6    geographic area from private payors?  So we're limiting it

7    right now to private payors like a Blue Shield, an Aetna,

8    Kaiser, Cigna, those types.

9        And what he found was depending on the data source that

10   you look at -- and he'll go through this with all of you guys

11   in mind-numbing detail -- but what he found out was in that

12   geographic area, in the Solano County geographic area,

13   hospitals in that geographic area looking at that evidence got

14   between 3.3 and 4.1 times what Medicare pays.  Just from the

15   private insurance.

16       And so that's a little bit higher.  So in this geographic

17   area, hospitals are getting a little bit more than they're

18   getting sort of in the published studies.  But not that much

19   more.  We're still talking about private payors paying

20   hospitals in the geographic area between 3.3 and 4.1 times what

21   Medicare pays.

22       Then what Mr. Deal did was he looked at, well, what do

23   these hospitals get in the geographic area from all payors?

24   Because remember, they're not selling their services.  That MRI

25   that's being used is not only being sold to patients who are

1  insured by Blue Shield or by Kaiser or by Aetna or Cigna.

2  Those hospitals are also selling those exact same services to

3  patients who happen to be insured by Medicare or Medi-Cal.

4  They're selling their services to a wide variety of buyers.

5  When I say "buyers," I'm just talking about people who are

6  purchasing these services.  They're the patients and they're

7  the companies who cover those patients.  Those are the buyers.

8  The sellers are the hospitals.

9      And so he looked at what are all these hospitals, in doing

10  the market survey, he looked at -- he said:  What are all the

11  sellers selling these same services that are at issue in this

12  case to all their buyers?  Okay?

13      And so, for example, if one were to say, again, just any

14  example, if you were making coffee cups, paper disposable

15  coffee cups, and you chose as your business to sell 50 percent

16  of your coffee cups to the state so they could use them in

17  their office buildings, and you sold the other 50 percent of

18  your coffee cups to Starbucks or to Peet's Coffee or to other

19  places.

20      If you look at what all the hospitals were selling to all

21  the buyers -- not just the privateer buyers now, but also all

22  their other customers who they choose to sell to -- what he

23  found was hospitals in the geographic area were getting between

24  1.8 to 2 times Medicare.

25      So when you look at the rate that Medicare is paying the

1   hospitals, when you look at the rate that other buyers are

2   paying, when you look at the rates that the private insurance

3   was paying, if you look at all the rates, the entire market,

4   then hospitals in the geographic area are getting between 1.8

5   and 2 times Medicare.

6   What is NorthBay's opinion as to what the reasonable value

7   of its services are worth?  That's the red bar.  Mr. Heil, who

8   was introduced by NorthBay's counsel, is NorthBay's expert.

9   And what he will tell you, using his methodology, is that he

10   thinks that the reasonable value of NorthBay's services here is

11   more than 13 times what Medicare would pay for those identical

12   services.  More than 13 times.

13   That MRI machine that is sold for one price when there's a

14   Medicare patient, his opinion is that reasonable value to Blue

15   Shield's patients to, Blue Shield's members when they come in,

16   they should pay more than 13 times that amount.  That's

17   88 percent of NorthBay's bill charges.  Same MRI machine, same

18   nursing care, same supplies, 13 times Medicare.

19   How does it get there?  How does it -- I told you how Blue

20   Shield got to its view.  The 1.8 to 2 times Medicare looking at

21   the entire market.  How did NorthBay build its model that

22   arrived at a conclusion that the reasonable value of its

23   services is worth 13 times what Medicare pays?  It looked at

24   three things.

25   It looked at its full rack rates, its full list prices,

1  what they call bill charges.  And the bill charges of other

2  hospitals in the geographic area.  Remember, those hospitals

3  can set their bill charges wherever they want.  There's no

4  regulation.

5     Number two, he looked at an old contract, a 2008 contract,

6  between Blue Shield and NorthBay from when NorthBay used to be

7  contracted with Blue Shield for all services, including

8  elective services.  So full network contract where Blue Shield

9  was getting the value of its enrollees in Fairfield and

10  Vacaville being able to use NorthBay's hospitals for all their

11  elective procedures rather than driving 10 or 15 also miles

12  down the road to the next hospital.

13     And he looked at -- the third thing he looked at were

14  certain other contracts between NorthBay and other entities.

15  So he looked at three things.  Those second two factors --

16  factors two and three -- the prior contract between Blue Shield

17  and NorthBay, and certain other contracts between NorthBay and

18  the other entities, those don't tell you anything about the

19  value of the services in the geographic area.  Those two

20  factors only relate to NorthBay and no one else.

21     Let's drill down just very briefly into the three factors

22  that NorthBay uses.  The first is bill charges.  And as I

23  indicated before, what NorthBay does is it looks at its own

24  full list prices and the full list prices for other hospitals

25  in the geographic area, and it basically says:  We're going to

1  look at what is the 75th percentile of bill charges?  And

2  that's factor number one.  And what NorthBay does is it takes

3  its three factors, the bill charges factor and the other two

4  factors, and just averages them together.  It comes up with a

5  value for each one and just averages it together.  So the first

6  factor it uses is what is the 75th percentile of the list

7  prices for these services in the geographic area?

8      And what the evidence that you'll hear from Blue Shield is

9  it doesn't make any sense to do that.  So while NorthBay in

10 this example right here -- if one were valuing a house, the

11 value of house prices in San Francisco, or anywhere -- what

12 NorthBay would do is it's looking at the full list prices for

13 those houses.

14     What Mr. Deal does, and what Blue Shield does, is it looks

15 at the average sale prices for the houses.  What are the houses

16 actually going for?  Not what the sellers hope to get.  Not

17 what the sellers listed the prices for.  What were the actual

18 sales prices?

19     And that's what Mr. Deal did.  And he'll tell you that

20 it's no different.  It's no different than doing any other kind

21 of valuation.

22     If you were valuing, in my other example, a Camry, he

23 would tell you that if you wanted to know what's the market

24 value for a Camry in San Francisco?  Do you look at the list

25 prices?  Do you look at the sticker prices for the Camry?  Or

1  do you look at what the dealers were actually selling the

2  Camrys for if you were looking at the fair market value of the

3  Camry.

4  So that's a big difference in our two analyses.  And as

5  you listen to the evidence, ask yourselves if you were doing a

6  survey about the reasonable value, the fair market value, in

7  the geographic area, what's better to use?  The hospital's full

8  list prices, even if they don't get them?  Or the prices that

9  the hospitals are actually getting for the services?  Remember,

10  this is one-third of the reasonable value estimate.

11  What Mr. Heil does is he builds, like Mr. Deal, a series

12  of comparable hospitals, and then he looks at their full rack

13  rates, their full list prices.  And what's interesting is that

14  if you look at what those hospitals actually get for their

15  services -- Mr. Deal will show you what they actually get for

16  their services -- that comes out to about between 2.7 and 2.8

17  times Medicare.

18  So again, if one's looking at sort of actual sales prices,

19  actually what these hospitals are selling their services for as

20  compared to the list prices, it comes out to about 2.7 to 2.8

21  times Medicare, even using Mr. Heil's group of comparable

22  hospitals.  Very similar to what Blue Shield found when looking

23  at the OSHPD date and what Blue Shield found looking at the

24  other data.  And certainly, nothing like the 13 times Medicare

25  that NorthBay is asking you for.

1     Another thing to recognize here is that in looking at

2  NorthBay's list prices, NorthBay -- the evidence will be that

3  NorthBay is a super high-charging hospital.  Their bill charges

4  are just astronomical, the evidence will be.  In fact,

5  NorthBay's charges for particular services are nearly twice the

6  level of comparable hospitals in the geographic area.  So if

7  you're looking at that room and board, if you're looking at

8  that MRI, if you're looking at those supplies, if you're

9  looking at whatever comes into a hospital service, NorthBay's

10 list prices are about twice that of the list prices at the

11 other comparable hospitals in the geographic area.

12     What is factor number two?  So we've gone over the list

13 prices.  Factor number two that NorthBay uses is the old Blue

14 Shield contract.  So what NorthBay does is they look at that

15 old contract and they take the highest value in that

16 contract -- because there were different scales, different

17 sliding scales -- and then Mr. Heil adds another 15 percent to

18 it.  Just adds another 15 percent to it to get to 95 percent of

19 bill charges.  And that's his second factor.  So one-third of

20 his analysis he's taking an old contract price between Blue

21 Shield and NorthBay and adding 15 percent to it.

22     And the evidence will be that Blue Shield terminated that

23 old agreement which was entered into in 2008 precisely because

24 those rates no longer made sense.  You'll hear testimony about

25 how the market had changed.  How the ACA came into being.  The

1    reasons for entering into that old deal no longer made sense by

2    2016.  Why those rates were just super expensive and were not

3    consistent with Blue Shield's needs and mission to offer

4    affordable health care in Californians.

5        So as a result of that outdated contract no longer being

6    appropriate and being too expensive, Blue Shield terminated it.

7    Much like any of us would do with our phone plan or cable plan

8    if we looked at it and said, You know what?  This doesn't make

9    any sense anymore.  It's too expensive.

10       So that's the old contract that Blue Shield entered into

11   in 2008?  That's NorthBay's second factor.  So a contract that

12   was terminated, the evidence will be, precisely because it

13   didn't make sense and it was too expensive, NorthBay uses that

14   as it's second factor.

15       The one thing to note there is that this is not a current

16   price.  It's an old contract.  And if you look at the jury

17   instruction, the jury instruction says that one looks at

18   current market pricing.

19       This is not current market pricing.  This is an old,

20   outdated contract.  It's apples to oranges.  It's a contract --

21   and Blue Shield is not getting the kind of value now that it

22   got under that old contract, the evidence will be.  The

23   evidence will be that old contract allowed Blue Shield members

24   to go into NorthBay for their elective services; and now Blue

25   Shield is not getting that value anymore.  If a Blue Shield

1  member wants to go in for elective services in the Fairfield

2  and Vacaville area, it can't go to NorthBay.  They have to

3  travel long distances.  So this is an apples to oranges

4  situation.  This contract that NorthBay wants to use, it

5  doesn't give Blue Shield -- Blue Shield doesn't have that value

6  anymore, and the market has changed completely.

7      What's also -- Mr. Deal will also tell you is that when an

8  economist is looking at the market value of something, a

9  product or service in the geographic area, that doesn't vary

10 depending on who the buyer is.

11     So if you think about it, what NorthBay is doing here is

12 they're saying because Blue Shield and NorthBay used to have

13 this particular rate, that the reasonable value of the services

14 depends on who happens to be insuring the patient.  If another

15 patient came into the ER using that identical MRI, or using

16 that identical service, and happened to be insured by Health

17 Net, which had a different course of dealing with NorthBay; or

18 by Aetna which had a different course of dealing; that the

19 identical service would be worth something different just based

20 on who happens to be insuring that particular patient.

21     And Mr. Deal's going to tell you that if you're looking at

22 the market rate for the service in the geographic area, it

23 doesn't vary depending on who happens to be providing the

24 coverage to the person.  That doesn't make any sense, he'll

25 tell you.  And that's a very big difference between the experts

1    in this case.

2        The last thing that NorthBay looks at, in addition to the

3    old terminated contract and its full list prices, is NorthBay

4    looks at a selected list of less than 1 percent of NorthBay's

5    transactions.  So NorthBay sells its services to -- about

6    80 percent of its services -- it sells to different government

7    -- to people insured by different government payors.  About

8    20 percent of its services it sells to people who are insured

9    by private carriers.

10        What NorthBay uses for its third factor is it takes the

11    teensiest sliver out of those commercial transactions,

12    .64 percent of all of its transactions.  And these mainly

13    relate to entities called rental networks.  I'm not going to go

14    into, right now, what a rental network is.  You'll hear

15    testimony on that.  But they're, basically, these contracts at

16    supper high prices that almost no one uses.  That's why the

17    percentage is .64.  Almost no one uses them because they're

18    super high prices.  That's what NorthBay looks at.

19        So what Mr. Heil does is he ignores the 80 percent of the

20    coffee cups that they sell to the government, as in my example.

21    He ignores the 80 percent of other services they sell to

22    government insurance.  He ignores most of the transactions that

23    NorthBay has with commercial.  And he uses .64 percent of the

24    transactions.  Which I think mathematically -- I wasn't a huge

25    math guy in college, but I think that comes out to about what

1  six buyers paid them out of every 1,000 transactions.  So every

2  thousand times they sold the service, he looks at what six

3  people paid and he ignores the other 994.

4      What Mr. Deal will tell you is two things.  He'll tell

5  you, number one, that knowing what NorthBay sells its services

6  to six out of a thousand customers doesn't tell you very much.

7  It tells you almost nothing about the market value of these

8  services.  What he'll also tell you -- more importantly -- is

9  that knowing what six buyers paid out of a thousand for the

10  services tells you absolutely nothing, absolutely nothing,

11  about what the going rate for those services are in the

12  geographic area.  Because, remember, Mr. Heil is focusing only

13  on NorthBay.  He doesn't focus on the geographic area.

14      So in doing your job in asking what is the going market

15  rate in the geographic area?  Ask yourselves, is knowing what

16  six buyers paid NorthBay out of a thousand, does that tell us

17  anything about the going market rate for that MRI in the

18  geographic area?

19      There are a few things that the parties do agree on, and

20  I'll just get those out of the way right now because it's nice

21  to have some commonality in these kinds of cases.

22      Point number one is that neither reasonable value expert

23  uses hospital costs in their calculation of reasonable value.

24  Reasonable market value looks at what the services are being

25  sold for in the market.  It doesn't look at what a particular

1    buyer is, what the costs are to produce.

2        And so in my coffee cup example.  Again, if one is looking

3    at what's the reasonable market value of paper disposal coffee

4    cups that you get at Starbucks or Peet's, what's the market

5    value for those?  The question is:  What are people buying

6    those coffee cups for?  What is Starbucks buying the coffee cup

7    for?  What are Peet's buying the coffee cup for?

8        The fact that it takes one manufacturer five cents to make

9    that coffee cup, and another one ten cents, makes no

10   difference.  The questions here is what is the market value?

11   What is the market paying for the product?  Not what it costs

12   the seller.  And both experts -- neither expert uses costs in

13   coming up with their analysis.

14       Number two.  Neither reasonable value expert uses hospital

15   quality in their calculations of market value.  You're going to

16   hear lots about NorthBay in this case about sort of their

17   offerings.  You know, the fact that they have a stellar

18   offering in this area, or that their unit in this area is

19   fantastic or world-class.  And they're going to -- they're

20   rightly proud of the services that they offer.  And you're

21   going to hear a lot about, from NorthBay, about how they're a

22   high quality operation.

23       But the fact is that when you hear from Mr. Heil,

24   NorthBay's expert, and from Mr. Deal, Blue Shield's expert,

25   neither of those experts used hospital quality in their

1   calculations of market value.  Because remember, the question

2   is, what is the going rate for that MRI?  What is the going

3   rate for that room and board in the geographic area?  And the

4   fact that one hospital believes that its got good quality

5   doesn't make a difference, and the experts are going to tell

6   you that.

7       So neither expert -- so you hear a lot about quality, but

8   when it comes to the actual reasonable value calculations

9   neither expert made any quality judgments in determining

10  reasonable market value.  The question is what are the services

11  worth in the geographic area?  Not, is NorthBay a little bit

12  better than hospital 1 or hospital 2 or hospital 3?

13      And the third thing that the experts agree on is neither

14  reasonable value expert made any determination that the

15  patients at issue went to NorthBay due to any particular

16  service or offering that NorthBay had.  These were emergency

17  patients who came to NorthBay in emergency situations, and

18  there's no evidence that any particular patient was taken to

19  NorthBay because only NorthBay could treat that patient and no

20  one else could.

21      So in conclusion here on the analyses, the two different

22  approaches you're going to hear about are as follows:

23  NorthBay's going to tell you what does it get in a small number

24  of contracts that it has.  And NorthBay is going to give you

25  evidence about what NorthBay and other hospitals full listed

1    bill charges are.

2         Blue Shield, on the other hand, is going to give you a lot

3    of evidence about what did NorthBay and comparable hospitals in

4    the geographic area actually get, actually get in the market,

5    for the same services in their willing buyer/willing seller

6    transactions?

7         Very briefly you're going to hear from a few Blue Shield

8    witnesses in this case.  This is Mr. Deal.  He heads the

9    economic practice -- consulting practice in Menlo Park.  Even

10   though he doesn't look like it from his picture, I can

11   guarantee you he has 30 years of experience with hospital and

12   health care data.  And you'll hear from Mr. Deal about the

13   reasonable value.

14        You'll hear from Dr. David Schriger.  Dr. Schriger is a

15   full professor and vice chair of emergency medicine at UCLA.

16   And he previously worked at community, county and academic

17   hospitals in the emergency department.

18        And Dr. Schriger was given 39 -- the parties in this case

19   picked a few sample claims in the event they wanted to give you

20   guys -- put a little flesh on the bones as to these services.

21   And Dr. Schriger was given 39 cases to review, 20 of them were

22   selected by Blue Shield, 19 of them were selected by NorthBay.

23   And he looked at those cases and provided an opinion that these

24   are routine emergency services that any comparable hospital in

25   the geographic area could have provided.

1    And then Mr. Pugh is an expert in hospital quality.  And

2  even though I told you that the reasonable value experts didn't

3  take into account hospital quality, because NorthBay is going

4  to present through some of its witness a picture of high

5  quality -- even though it's really irrelevant to reasonable

6  value -- Blue Shield will put on a witness just to testify.

7  And he's a quality expert.  He looks at all sorts of measures.

8  Published measures.  And he will testify that NorthBay's

9  quality and safety performance is pretty much similar to the

10  care at other comparable hospitals in the geographic area in

11  terms of quality.  And he'll build that model and show you what

12  he looked at and how he came to those conclusions.

13    The last witness you'll hear from -- I don't have a

14  picture for him -- is Tracy Barnes.  And Mr. Barnes is a

15  contracting manager at Blue Shield.  And he -- a contracting

16  director at Blue Shield.  And he'll testify regarding that old

17  2008 Blue Shield-NorthBay contract.  And he'll talk about what

18  changed in the market and why that contract no longer made

19  sense to Blue Shield.

20    The last thing I want to say is this:  As you know, as the

21  judge instructed you, NorthBay will put its case on first.

22  You'll hear from NorthBay's witnesses.  We'll have the chance

23  to cross-examine them.  But they're hearing NorthBay's side of

24  the story.  After that, Blue Shield will present its case.

25    And I'm asking all of you just to keep an open mind.

1  Every story has two sides, as you can see from the

2  presentation.  You'll hear from Blue Shield's witnesses second.

3  And I just want all of you to keep an open mind until you hear

4  all the evidence before you come to a conclusion about a

5  reasonable value.

6      Thank you so much for your time.

7      **THE COURT:**  All right.  So ladies and gentlemen, that

8  will be all that we do today.  The lawyers have just told you

9  what they think the evidence is going to show in the case, who

10  the witnesses are.  And tomorrow morning at 8:00 we start with

11  the witnesses and that's when the evidence begins.

12      I hope that you will come before 8:00 to the jury room.

13  The incentive that we have for you is coffee and pastries and

14  sometimes a little bit of fruit.  But come so that we can get

15  going promptly at 8:00.

16      And remember the admonition that I gave you, the

17  instructions that I gave you earlier.  Don't do any research

18  into any of the issues or the people that are involved.  Don't

19  talk about what the substance of the case is, even to describe

20  it briefly a spouse or anybody else.  You want to keep your

21  mind open and your mouth closed about the case until we get

22  done.  This is -- this case will go pretty efficiently, I

23  think.

24      And so I will look forward to seeing you in the morning.

25  Thank you.

1        (The jury exiting the courtroom.)

2   (The following proceedings were held in open court, outside the

3   presence of the jury:)

4        **THE COURT:**  All right.  We'll be in recess until 7:30

5   tomorrow.

6        Do the parties have a pretty good idea of the order of the

7   witnesses at this point?

8        **MR. TOOCH:**  Yes, Your Honor.  We are bringing,

9   according Ms. Eichenberger first.  We think she'll take up a

10  good part of the day, but we're going to have a witness in

11  reserve if she doesn't.  If she takes up the full day then

12  we're going to go with Dr. Zusman in the morning.  If she

13  doesn't go the full day, then we're going to put on Heather

14  Venezio first because we didn't want Dr. Zusman waiting around.

15       **THE COURT:**  All right.  So it is important you do have

16  somebody in the hall waiting, because if people aren't here

17  then I'm just going to assume that you've rested.

18       **MR. PIMSTONE:**  I just wanted to address, Your Honor --

19       **THE COURT:**  Please be seated, everybody.

20       **MR. PIMSTONE:**  I wanted to address, Your Honor, a

21  couple items that came up in opening and it will impact the

22  evidence that the jury hears.

23       The first is that -- I don't know whether it was an

24  unintentional slip by Mr. Tooch; but notwithstanding Your

25  Honor's ruling this morning about cost information there was a

1   reference in his opening statement to the fact that NorthBay

2   treats low income patients.  And I thought that was going to be

3   out.  I don't expect to hear any evidence being put in this

4   case in their evidentiary presentation about low income

5   patients that they treat.

6       So I didn't want to object, I didn't want to interrupt the

7   flow of the argument, but I did want to make sure that we're

8   all of the same mind as to whether we will be hearing evidence

9   in front of the jury on all the low income patients they treat.

10          **THE COURT:**  All right.  Mr. Tooch.

11          **MR. TOOCH:**  Is this was a subject of their motion *in*

12  *limine* which you denied.

13      We're not putting on evidence of cost.  *Children's*

14  *Hospital* does say that other economic factors of the provider

15  are relevant.  And this is a relevant economic factor of the

16  provider.  We're not going to put on evidence of the costs

17  related to the hospital.  And the *Children's Hospital* case

18  dealt with cost-specific information.  In other words, how much

19  do you pay for Tylenol?  How much do you pay for an X-ray?

20  What's your cost of that?

21      The economics of the provider are a relevant factor under

22  *Children's Hospital*.

23          **THE COURT:**  I'm allowing you some leeway on background

24  information that so that you can describe what you think

25  NorthBay is.  And so I don't mind the -- and I would allow you

1    to put in some evidence of who it is that you serve.

2        But it is not -- the argument that is going to be

3    presented to the jury is on the reasonable value of the

4    services, which has nothing to do with costs.  So it doesn't

5    have anything to do with the fact, whatever percentage of

6    people are low income or high income.  That's not relevant.  It

7    may be relevant as far as who do you look -- what are the

8    hospitals that you -- what are the comparators?  Should

9    Medicare be in or out?  And your experts each have different

10    views about that.

11        But if you're intending to argue that because NorthBay

12    treats 57 percent low income people that you should be

13    receiving a higher amount for services in the emergency room,

14    that will not fly.

15        **MR. TOOCH:**  If I may, Your Honor.  And I really want

16    to be heard on this issue because it's important.

17        Their expert is saying because -- and it was in the

18    opening statement with the bar chart.  They're saying because

19    NorthBay's, most of its payors, are government payors, it

20    should get paid less.  So if there's $100 in how much you get

21    paid, they're saying that, say, 70 percent of the revenues to

22    NorthBay are from government payors.  And so, therefore, the

23    private payors should pay 70 percent less.

24        And this is -- and so it's unfair for them to say, based

25    upon that bar chart, that NorthBay should get paid less because

 1   it has more government payors, but it's unfair for us to say

 2   that NorthBay should get paid more because of government

 3   payors.

 4       It's the flip side of the argument.  And it's a very

 5   important argument, Your Honor, because -- it's very unfair, in

 6   fact, for them to make the one argument but for us to make the

 7   other argument.

 8           **MR. PIMSTONE:**  If I may, Your Honor.

 9           **THE COURT:**  Mr. Pimstone.

10           **MR. PIMSTONE:**  Yes.  Those are completely different

11   comparisons.  All Blue Shield is doing is looking at the actual

12   sales of the services.  And Blue Shield is saying if you're

13   doing a market survey of what sellers are selling services for

14   to buyers, then you look at the entire market.

15       And, absolutely, NorthBay has ever right to say:  You

16   should only -- you, Jury, should only be looking at commercial

17   buyers, not Medicare buyers.  And we have no problem with that.

18       The only evidence we're putting on -- we're not putting on

19   any evidence of revenue, any evidence of cost.  We're saying

20   that if you're looking at what hospitals in the geographic area

21   are selling their services for to all buyers, those buyers are

22   in different forms.  And that's a market-based analysis.  That

23   is what is the sales price for these services?

24       What NorthBay is seeking to do here is different.  When

25   Mr. Tooch uses the word "economics of the practice," what he is

1   saying is because we choose to sell a chunk of our services to

2   low income people or to adverse buyers, because we choose to do

3   that that you should -- that Blue Shield should pay more to

4   subsidize those other sales.  And because our costs are higher

5   and because our margins are decreased.

6        And that was the exact subject of the papers that we filed

7   over the weekend and before where NorthBay, basically, made

8   representations to this Court, in no uncertain terms, they

9   weren't going to get into costs, that we couldn't investigate

10   costs.  And that the phrase "economics of the practice" is just

11   disguised way of saying that:  We get less, and so we should

12   get more from you, Blue Shield.

13        It's appealing to jury sympathies.  When NorthBay says,

14   "We treat low income people," what relevance does that really

15   have in a market-based analysis other than to say to the jury:

16   We treat no income people, so you should award us a higher rate

17   in this case from Blue Shield.

18        There's no other inference that one could possibly make

19   other than that from the phrase, you know:  The economics of

20   our practice are such that we deserve more from Blue Shield

21   because we treat a higher percentage of the under-compensated.

22        And that was the exact subject of what you looked at over

23   the weekend.  And *Children's Hospital* doesn't say anything

24   differently.  *Children's Hospital* says it unequivocally that

25   hospital costs, whether you're talking about service-specific

1    costs, whether you're talking about operating cost, it all

2    rolls up to the same place where you're talking about profit

3    margins. *Children's Hospital* says, and Your Honor has already

4    indicated, that has no place in market-based analysis.

5          And so I do think that it makes sense for all of us to be

6    very clear on this because I don't want to be objecting during

7    their evidence. I didn't object during the opening statement.

8    But I do think that we should all have very clear marching

9    orders as to what is fair game and not fair game. And I think

10   that using the term "economics of the practice" or using the

11   term "adverse buyer mix" or "adverse purchasers" or "low

12   income" is just another way of saying to the jury that, You

13   know, we provide a service to the community in this area so you

14   should award of us a higher value for the services.

15         It should be all about sales, and not about costs.

16         **MR. TOOCH:** I'd actually like to brief this, Your

17   Honor, because Mr. Deal in his -- the way that he gets to his

18   numbers is he looks at this information (indicating.) and he

19   says: Well, because 80 percent of your patients are Medicare

20   and Medi-Cal, I'm going to reduce my reasonable value

21   calculation based upon that.

22         **THE COURT:** Right. And this is what I thought I said

23   this morning, and I think I understand.

24         Mr. Heil says: You shouldn't be looking at Medicare for a

25   number of different reasons. And I think he's got three of

1   them.  And those reasons are, I think, fair game.  And there's

2   going to be a dispute.  And you're going to be trying to

3   persuade the jury about that.  And I imagine that's going to be

4   an important issue with respect to that.

5        But to argue that you deserve a higher rate simply because

6   you're seeing a greater percentage of low income people, that

7   doesn't work under the case law.

8        **MR. TOOCH:**  Well, I -- if I may, Your Honor.  I think

9   that the case law does permit that.  Because the *Children's*

10  *Hospital* case only talks about cost-specific information.  But

11  in particular, it's unfair for their expert witness to say that

12  the percentage of government payors results in a reduction of

13  what you are entitled to.

14       **THE COURT:**  Your experts get to battle over whether

15  that's an appropriate measure for reasonable value.  That's

16  what they get to do.  But what Mr. Heil has said, as I read and

17  re-read the opinions over the weekend, is not the same thing as

18  I think you're suggesting.

19       So I would do this.  Hear me on what I've just said.  If

20  Mr. Deal says something that is -- well, first of all, he

21  didn't say it in his report so I don't know how it would come

22  in.  But I'll let you brief what you want to brief.  And as

23  evidence comes in, you can deal with it.

24       But do not make the suggestion that just because you are

25  treating a lot of low income people you're entitled to a higher

1    rate.  You can make the argument -- which is what I thought

2    your argument was -- was that you shouldn't even be looking at

3    the government rate because that's a unilateral decision and

4    you should only look at the commercial rates.  I think that's

5    an argument that's a reasonable argument you can make to the

6    jury.

7         **MR. TOOCH:**  We are going to make that argument, Your

8    Honor.  But I do respectfully disagree with respect to the

9    first issue.  It does make a difference.  The economic -- it's

10   right there in *Children's Hospital*.  It's in the *Prospect* case,

11   in the California Supreme Court.  The *Gould* factors say that

12   the economics of the providers practice are relevant.

13        **THE COURT:**  Yes.  And if you had not said in discovery

14   that you were not providing any cost information, perhaps we'd

15   be in a different place.  But we're not.  So if you want to

16   brief it again, Mr. Tooch, that's fine.  I think I've gotten

17   about three briefs from you on this, but maybe I'll be

18   enlightened by the fourth.

19        So go ahead and brief it.  But until I change my mind

20   about that, do you understand where I am?

21        **MR. TOOCH:**  I understand, Your Honor.  I hear you

22   clearly, and I fully understand what the Court's ruling is.  I

23   just --

24        **THE COURT:**  You think it's wrong.

25        **LEFT #1:**  I think it's wrong, Your Honor.  I do.  And

**PROCEEDINGS**

1   I don't think it was the issue that was addressed in the motion

2   *in limine*.  That dealt with the cost specific.  And that wasn't

3   the information that they asked for in discovery.  What they

4   asked for, as we said in opposition to the motion *in limine*,

5   was cost-specific information.

6        And, in fact, they -- they didn't ask for this

7   information.  This was not the type of information they wanted.

8   It was:  How much do you charge for an aspirin?  How much do

9   you charge for an MRI?  What's your cost of an MRI?  What's

10  your cost of this?  This was not the subject of the motion in

11  limine.

12            **THE COURT:**  So, Mr. Tooch --

13        **MR. TOOCH:**  I hear you.

14            **THE COURT:**  We have circled around a couple of times.

15  You know what I think.

16        **MR. TOOCH:**  Absolutely.

17        **THE COURT:**  I'm happy to get a brief on it, as soon as

18  you can get it to me, that says something new or provides a

19  different spin on something old.

20        **MR. TOOCH:**  Okay.

21        **MR. PIMSTONE:**  Your Honor, my apologies for raising

22  another issue, but I think it's going to affect the evidence

23  that's going to come in.

24        There was another reference made in opening statement

25  about what Blue Shield actually paid to NorthBay.  Mr. Tooch

1    said, at various points, Blue Shield, on some claims, paid 5

2    cents on the dollar and 10 cents on the dollar.

3        And I guess we had thought that those issues were -- and

4    we actually can provide the Court with a brief, Ms. Briggs can

5    today, on that issue.  And that is, what Blue Shield actually

6    paid is not the relevant question because the jury is not being

7    asked to award damages to NorthBay or to Blue Shield based on

8    the differential between what Blue Shield paid.

9        And what Blue Shield paid -- the suggestion is going to be

10   that Blue Shield arrived at some arbitrary amount and gave

11   NorthBay a lowball offer.  But, in fact, what Blue Shield paid

12   was a product of its reasonable and customary regulatory

13   methodology that is established and that is presented to the

14   regulator.  And the regulator reviews that, and then it's

15   approved for use in California.

16       And that R & C methodology, which we've had a lot of

17   proceedings on before when Your Honor correctly ruled that the

18   R & C methodology was going to be irrelevant, that -- you know,

19   that we weren't going to be getting into whether Blue Shield's

20   R & C methodology produced appropriate amounts.

21       What you have now is the situation that NorthBay is

22   suggesting, that Blue Shield provided a pittance in terms of

23   payment, which would then require us to explain to the jury how

24   Blue Shield comes up with its payments; that these were not

25   random payments; that this is part of methodology; and that

1  the -- what NorthBay is choosing, it's picking and choosing,

2  sort of, how the methodology pays out against certain codes,

3  which sometimes Blue Shield pays a higher percentage, sometimes

4  Blue Shield pays a lower percentage.  A lot depends on the

5  hospital charge for that particular charge.

6      So then what you get is a bunch of evidence in front of

7  the jury as to what did Blue Shield actually pay.  And then we

8  would have to rebut that with evidence as to:  How did we come

9  up with the payment methodology?  Was it approved by the State?

10  Was that payment sort of, you know, consistent with -- and it's

11  all irrelevant because the jury -- all the jury is determining

12  in this case is what is the reasonable value of the service.

13      And we don't want to get the jury sidetracked on whether

14  Blue Shield's payment was a reasonable or appropriate payment

15  or not because this is not the -- the jury is not determining

16  damages.

17      The jury is coming up -- at the end of the day, they are

18  writing one thing on a verdict form, which is the reasonable

19  value of NorthBay's services is X.  And whether Blue Shield

20  paid 2X or a half X is completely irrelevant.

21      So the question is, do we now need to hear evidence from

22  NorthBay, for the jury, on what Blue Shield actually paid even

23  though it's irrelevant?

24      And now do we have to -- which we haven't done in this

25  case.  We don't have a witness on that right now.  We don't

have a witness to explain to the jury why Blue Shield paid what it did, and why that rate was a reasonable rate, and it was a regulatory rate; it was nonbinding, they could reject it, as they did; that it was submitted to the regulator.  All that.

**THE COURT:**  Mr. Tooch.

**MR. TOOCH:**  Yes, Your Honor.  We're not going to go into the factors of why Blue Shield paid what it did.

Mr. Pimstone's opening dealt completely with what the hospital actually gets for payment.  And this is the amount that it actually got from Blue Shield.  We think that this is fair game.

We're not going to get into the issue of their factors of how they came into that.  We're not going to get into that. We're just going to say, after the contract terminated here are some examples of what Blue Shield paid for the services and explains why we're here.  And it gives a context to the jury as to why we're in court here today.

**MR. PIMSTONE:**  Just very briefly, Your Honor.

I think the jury knows why we're here.  The jury knows we're here because, as Your Honor explained in the stipulated facts in the jury instructions, the jury was told we're here because Blue Shield made payments, and NorthBay disputes the reasonableness of those payments.

Now, hearing specific evidence as to on that particular claim they paid 5 cents on the dollar and this particular claim

1    they paid 8 cents on the dollar, now that requires us to

2    explain to the jury why it was that on that particular claim,

3    using the methodology that was approved, why that was a

4    reasonable payment.

5         I mean, the only relevance of going into a claim specific

6    actual payment is to leave the jury with the impression that

7    Blue Shield's payment was grossly insufficient.  The jury

8    already knows that there's a dispute between the parties over

9    payment.  The jury is going to come in with what its value is.

10        And so we just think that going into, sort of,

11   cherrypicking particular claims, presumably they're going to

12   find claims where the percentage of billed charges was as low

13   as they can find them, and then that's just going to require us

14   to rebut that.

15        **THE COURT:**  This is all about the reasonable value.

16   It's not about the reasons why -- how you got here.  It is

17   about what the jury now has to do with respect to it.

18        So I do think it's more prejudicial than probative to get

19   into there and also a time waster.  So I would exclude that

20   information.

21        **MR. TOOCH:**  Your Honor, one of the issues in this case

22   is the data that Mr. Deal relies upon and the accuracy of that

23   data.

24        In order to challenge the accuracy of that data, we need

25   to get into a claims analysis to show exactly what NorthBay

1    gets paid on particular claims.

2        And there's a big difference here because Blue Shield's

3    position is this is what the hospital gets.  There's a

4    difference.  There's the billed charges; there's the rate in

5    the contract; and then there's the rate that it gets.  And the

6    rate that it gets isn't the rate in the contract.  And we need

7    to be able to show that, that what it gets isn't often the

8    right amount from Blue Shield and from other payors.

9        So we need to be able to challenge that data.

10        **THE COURT:**  So if this is going to be part of a

11    cross-examination of the -- of Mr. Deal, then I'll look at it

12    as it comes up with Mr. Deal.

13        **MR. TOOCH:**  This is going to be part of

14    Ms. Eichenberger because she needs to lay the foundation for

15    these types of claims for what -- so, for example, Mr. Deal is

16    saying United Healthcare pays NorthBay 35 percent of its

17    charges.  We need to be able to bring in claims, for example,

18    which shows, no, the contract rate is 70 percent of charges,

19    but they're paying 35 percent.  And the reason why they're

20    paying 35 percent is because it's the medical necessity issues

21    with respect to this claim.

22        **THE COURT:**  So if that's the point, then you can bring

23    it up on rebuttal, if that's where you get to with Mr. Deal.

24    And then we'll look at -- when I say you can bring it up on

25    rebuttal, I will look at it as a potential rebuttal issue.

1    **MR. TOOCH:**  And then with respect to the payments that

2    Blue Shield has paid, we think it's important also because

3    Mr. Deal is taking the position that about 12 percent of

4    charges is the reasonable value.

5       And we want to show that there are payments by Blue Shield

6    for many claims at a hundred percent of charges.  And so we

7    want to be able to show that Blue Shield's expert doesn't even

8    match up with what Blue Shield has done in this case with

9    respect to the payment of claims.

10      And so we want to be able to show that Mr. Deal is so far

11   off based upon the history of the payments in this case.

12      **THE COURT:**  Well, that may be.  You may have some

13   cross-examination to do of him on this topic.  I don't know

14   whether it will end up being germane or what his response will

15   be to that.  But -- but that's okay for cross-examination.

16      **MR. TOOCH:**  I want to be clear in my own mind as to

17   what I can introduce, so that there's no issue.

18      Is it appropriate for my witness to say on the stand that

19   after the contract was terminated Blue Shield started paying

20   amounts below the contract rates?

21      **THE COURT:**  Below the rates that had been contracted

22   before?

23      **MR. TOOCH:**  Yes.

24      **THE COURT:**  Yes.  That's absolutely the case.

25      **MR. TOOCH:**  Okay.  I just wanted to make sure that

1    that's fine.  Thank you.

2         **MR. PIMSTONE:**  Thank you.

3         **THE COURT:**  Thank you.

4    I will see you -- is there a reason why we should get

5    together at 7:30?  Do you think there's going to be something

6    that comes up?  Or do you think we have now exhausted the 7:30

7    meeting?

8         **MS. BRIGGS:**  Your Honor, from my perspective, given

9    what the Court has just indicated about what comes in and what

10   doesn't, Ms. Eichenberger's testimony has been severely limited

11   and curtailed.

12   So I want to make sure that we are on the same page about

13   that because if there are differences you will have a brief

14   from us on those differences.  But if we're in agreement --

15        **THE COURT:**  See you at 7:30.

16        **MS. BRIGGS:**  Thank you.

17

18                              -  -  -  -

19

20

21

22

23

24

25

1

2                        CERTIFICATE OF REPORTERS

3            We certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:   Monday, February 4, 2019

7

8

9    _____
                     Vicki Eastvold, RMR, CRR
10                   Official Court Reporter

11

12

13

14   _____
                Katherine Powell Sullivan, CSR #5812, RMR, CRR
15                   Official Court Reporter

16

17

18

19

20

21

22

23

24

25