**Volume 2**

**Pages 161 - 333**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

```
NorthBay Healthcare Group -    )
Hospital Division, dba NorthBay)
Medical Center and VacaValley  )
Hospital,                      )
                               )   NO.  C 17-2929 WHO
          Plaintiff,           )
                               )
  VS.                          )   Day:    Tuesday,
                               )   Month:  February 5, 2019
Blue Shield of California Life )
& Health Insurance Company;    )
California Physicians' Service,)
dba Blue Shield of California; )
and Does 1-50, inclusive,      )
                               )
                               )   San Francisco, California
          Defendants.          )
_____)
```

**JURY TRIAL - VOLUME 2**

<u>**APPEARANCES**</u>:

For Plaintiff:          King & Spalding, LLP
                        633 West 5th Street, Suite 1700
                        Los Angeles, CA  90071
                **BY:   DARON L TOOCH, ESQ.
                        DAVID J. TASSA, ESQ.**

For Defendants:         Manatt, Phelps & Phillips, LLP
                        11355 West Olympic Boulevard
                        Los Angeles, CA  90064
                **BY:   GREGORY N. PIMSTONE, ESQ.
                        JEFFREY J. MAURER, ESQ.**

                        Manatt, Phelps & Phillips, LLP
                        One Embarcadero Center, 30th Floor
                        San Francisco, CA   94111
                **BY:   AMY B. BRIGGS, ESQ.**

Reported By:            Vicki Eastvold, RMR, CRR
                        Katherine Sullivan, CSR, RMR, CRR

# I N D E X

Tuesday, February 4, 2019 - Volume 2

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **EICHENBERGER, LORI** | | |
| (SWORN) | 172 | 2 |
| Direct Examination by Mr. Tooch | 174 | 2 |
| Cross-Examination by Ms. Briggs | 230 | 2 |
| Redirect Examination by Mr. Tooch | 251 | 2 |
| Recross-Examination by Ms. Briggs | 255 | 2 |
| | | |
| **ZUSMAN, EDIE** | | |
| (SWORN) | 256 | 2 |
| Direct Examination by Mr. Tooch | 256 | 2 |
| Cross-Examination by Mr. Maurer | 274 | 2 |
| Redirect Examination by Mr. Tooch | 286 | 2 |
| Recross-Examination by Mr. Maurer | 289 | 2 |
| | | |
| **VENEZIO, HEATHER** | | |
| (SWORN) | 295 | 2 |
| Direct Examination by Mr. Tooch | 295 | 2 |
| Cross-Examination by Ms. Briggs | 318 | 2 |
| Redirect Examination by Mr. Tooch | 331 | 2 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1 | | 200 | 2 |
| 2 | | 204 | 2 |
| 3 | | 211 | 2 |
| 5 | | 205 | 2 |
| 6 | | 209 | 2 |
| 7 | | 210 | 2 |
| 8 | | 213 | 2 |
| 9 | | 214 | 2 |
| 10 | | 192 | 2 |

# <u>I N D E X</u>

## <u>E X H I B I T S</u>

| <u>TRIAL EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 11 | | 193 | 2 |
| 12 | | 196 | 2 |
| 17 | | 189 | 2 |
| 19 | | 187 | 2 |
| 21 | | 191 | 2 |
| 54 | | 217 | 2 |
| 57 | | 220 | 2 |
| 118 | | 176 | 2 |
| 155 | | 309 | 2 |
| 172 | | 216 | 2 |

<u>**Tuesday - February 5, 2019**</u>                    <u>**7:31 a.m.**</u>

**P R O C E E D I N G S**

---o0o---

        **THE COURT:**  All right.  Overnight there was a motion
in limine filed on Exhibits 151 and 152.

        Mr. Tooch, do you have a response?

        **MR. TOOCH:**  I do, Your Honor.

        Exhibit 151 and 152 are emails between the parties about
negotiations of rates after termination of the contract.

        With respect to -- so this was in both parties'
possession.  At the time, both parties should have produced it.
We found it later and we produced it.  They never produced it.

        This will not be coming in through Ms. Eichenberger.  It
will be coming in through cross-examination of Mr. Barnes.

        **THE COURT:**  That would make sense.

        Okay.  Anything else?

        **MS. BRIGGS:**  No, Your Honor.

        **THE COURT:**  Okay.  Mr. Tooch.

        **MR. TOOCH:**  A couple of things.

        We received an email from Blue Shield's counsel last
night, essentially saying that, based upon your rulings
yesterday, essentially all of the sample claims come out as
exhibits in this case.  And I wanted to get clarity on that so
that I don't run afoul of the Court's ruling.

        First of all, I would like the Court to reconsider its

1   rulings with respect to that issue because I think it is --

2       **THE COURT:** So I did not rule specifically on the

3   sample claims. And you all set up the sample claims as

4   something that was going to be a part of this case. And as far

5   as I'm concerned, sample claims are in for whatever value they

6   have. Nobody's presented that specific issue to me.

7       **MR. TOOCH:** Okay.

8       **THE COURT:** So if somebody wants to brief it for me or

9   make a pitch, that's fine.

10      **MR. TOOCH:** So, well, with respect to that, Your

11   Honor, I was planning on entering some of the sample order

12   example claims to show that there are claims in this case, what

13   the charges are, what the payments were, and then, with respect

14   to some of my clinical witnesses, what are some of the examples

15   of the clinical services provided.

16      **THE COURT:** Okay. Ms. Briggs.

17      **MS. BRIGGS:** Yes. So I think we just heard Mr. Tooch

18   say that he is going to be putting in the sample claims to show

19   the charges and Blue Shield's payments, which was addressed

20   yesterday by the Court.

21      So to the extent that Ms. Eichenberger is going to stand

22   up and go through these sample claims and say, look how -- look

23   what NorthBay charged and look how little Blue Shield paid, we

24   think that's improper, and we think the Court already ruled on

25   it yesterday.

1    So that's the sample claims with respect to

2  Ms. Eichenberger.

3        **THE COURT:**  Okay.  I did not rule on that yesterday.

4  And I think it's important that you not stretch what I do to

5  try to fit your arguments.

6    The argument that you were making yesterday, which I think

7  is right, is that the parties can't just pick and choose

8  willy-nilly claims out of the options data to show -- you know,

9  to show the disparity in payments.

10   But you've had the sample claims all along.  That was part

11 of the parties' agreement about how this case was going to be

12 tried, and I'm not going to preclude their use now.

13   If there is an instruction that we need to make at some

14 point about costs being irrelevant to the determination of

15 reasonable value of services, that's something that we can

16 consider.

17   But I'm not going to rule without hearing testimony about

18 what the -- what the testimony is going to be about the claims.

19       **MS. BRIGGS:**  Understood, Your Honor.  And this is not

20 about costs, at least not from my perspective.

21   This is -- and this is not about not knowing the evidence.

22 We certainly knew the sample claims, and I'm not here making

23 that argument to you.

24   The argument that I am making really has to do with the

25 relevance and the relevance of Blue Shield's payments on any

1    one particular claim.

2        The argument, obviously to the jury, which is not going to

3    be calculating damages, is, you know, that they should be

4    drawing an inference that Blue Shield paid, you know, low and

5    that that should somehow be held against Blue Shield.

6        I don't --

7            **THE COURT:**  I understand what your argument is.

8            **MS. BRIGGS:**  Yeah.

9            **THE COURT:**  But I'm not, at the moment, going to

10   preclude evidence with respect to the sample claims.

11           **MS. BRIGGS:**  That's fine.

12       Secondly, with respect to Mr. Tooch presenting clinical

13   witnesses to talk about the sample claims, those were rebuttal

14   witnesses.  They were rebutting Dr. Schriger's opinion.  They

15   were not disclosed for any other purpose.  So I would ask that

16   they be part of the rebuttal case.

17           **THE COURT:**  Mr. Tooch.

18           **MR. TOOCH:**  Yes, Your Honor.  It's easier to get some

19   of those clinical witnesses here than others just because of

20   the nature of the work that they do.  So if we need to call

21   them as rebuttal witnesses, we can.

22       Dr. Zusman may be a little bit harder to call as a

23   rebuttal witness, but, if necessary, we can call the nurses as

24   rebuttal witnesses.  I mean, they are emergency care providers.

25           **THE COURT:**  So there's some claims where -- some

issues where I think it really matters to have the evidence come in in order on the -- as far as rebuttal is concerned.

With respect to these claims, explain to me why it matters.

**MS. BRIGGS:** Because what these witnesses were responding to -- so, first off, I think Your Honor is right to draw a distinction between a clinical witness simply walking through the facts of a particular claim -- this person was brought in, they'd been in a motorcycle accident, here's what we did to treat them -- without rendering any kind of opinion about the quality of care or anything like that.

These are not witnesses who were involved in the care of the patient. They were specifically asked to review these files for this litigation. Okay? So if they want to recite the facts of a claim as they were able to discern them from the file, I suppose that's one thing.

But what these witnesses were disclosed for is more than that. They were disclosed as rebuttal expert witnesses to our expert, Dr. Schriger. They're going to be opining on the quality of care that was provided, why NorthBay's care was superior to that of other hospitals.

In other words, this is squarely expert rebuttal opinion. That is the purpose for which they were disclosed. And I don't think it makes a lot of logical sense for them to be responding to an expert, our expert, Dr. Schriger, who has not yet put on

his testimony.

        **THE COURT:**  And I think that that's right.  So to the

extent that you're calling them to comment on and rebut

Dr. Schriger's opinions, I would save that until he's provided

his opinions.

        **MR. TOOCH:**  Fair enough.

    One last issue, Your Honor.  There are a number of claims

which -- and I think we spoke about this prior to trial --

showing there were a number of claims Blue Shield paid NorthBay

at a hundred percent of charges.

    In Blue Shield's opening, it said that both experts agree

a hospital's billed charges do not reflect what hospitals

actually get paid in an accepted market.

    We think that this evidence is relevant and goes directly

to an issue, which Blue Shield's counsel raised in opening

statement and is part of their case, that billed charges are

not reasonable.

        **THE COURT:**  So what are you -- what are you

suggesting?

        **MR. TOOCH:**  That it's to -- that in many instances

health plans, including Blue Shield, have paid for full billed

charges.

    And that the statement of counsel in opening, and to the

extent that they put in evidence that -- full billed charges

are not -- cannot be a reasonable value, we want to be able to

1 introduce evidence to rebut that. And we can do that on

2 rebuttal, but I just want to get clarity with respect to that

3 issue.

4       **THE COURT:** Okay.

5       **MR. PIMSTONE:** I think it is a rebuttal point. And

6 the -- I did not ever say, and neither of the reasonable value

7 experts will say, that billed charges are reasonable value.

8       Both experts say the same thing, which is that what the

9 hospitals actually get for their services is reasonable value.

10 Now, that could, in a few cases, be billed charges by some

11 payors, but in most situations it's less.

12       So if you're looking at the market rate, it could range

13 from a hundred percent to, theoretically, 2 percent depending

14 on what the payors actually pay. So both experts agree that

15 billed charges are not reasonable value. And that's all that I

16 said.

17       But, certainly, to the extent that our expert gets up and

18 says something different, that opens the door to Mr. Tooch

19 trying to make the argument that occasionally billed charges

20 might be paid by some payors. Then, to me, that's a rebuttal

21 point.

22       But I didn't suggest, and I don't think either expert will

23 suggest when they testify, that billed charges are the

24 definition of reasonable value. And that's the point that I

25 was making.

1    THE COURT:  Well, let's see what the evidence is as it

2    comes in.  If you would like me to go and reread the opening,

3    if you want to make some sort of a pitch related to that, at

4    some point, I'm happy to take a look at it.

5    I didn't under- -- I have to say I had the same

6    understanding that Mr. Pimstone just described as I was

7    listening to him.  But if there was something more that was

8    there, that you think I ought to take a look at, I'm happy to

9    do that.  But I think --

10   MR. TOOCH:  There is, and I will.

11   THE COURT:  Okay.  I think what's important is going

12   to be what's said in here.  People -- there's a lot of --

13   there's a fair amount of argument that came in through the

14   opening statement and came in in the opening statements, and

15   juries tend to hold it against people if they can't prove it

16   up.  So we'll see what happens in the case.

17   MR. TOOCH:  Fair enough.  Thank you.

18   THE COURT:  All right.  I'll be back at 8 o'clock.

19                (Recess taken at 7:42 a.m.)

20             (Proceedings resumed at 8:04 a.m.)

21   THE COURT:  All right.  Are we ready for the jury?

22   MR. TOOCH:  Yes, Your Honor.

23   MS. BRIGGS:  Yes, Your Honor.

24   THE COURT:  The witnesses are being sequestered;

25   correct?

1    **MR. TOOCH:** Yes, Your Honor. Nobody else in the

2 courtroom is going to be a witness other than Ms. Eichenberger,

3 who's going to be first.

4    **THE COURT:** I just wanted to make sure.

5    (Jury enters at 8:07 a.m.)

6    **THE COURT:** Why don't you all sit a little closer

7 together.

8    (Laughter)

9    **THE COURT:** Even a little closer. Good. It's just

10 easier for the witnesses.

11    Please be seated, everybody.

12    Good morning, ladies and gentlemen. Thank you for being

13 prompt. So yesterday you heard the opening statements and my

14 instructions, and now the trial is going to begin.

15    So, Mr. Tooch, please call your first witness.

16    **MR. TOOCH:** Thank you, Your Honor.

17    Plaintiff calls Lori Eichenberger.

18    **THE CLERK:** If you'll step up to the witness stand, I

19 will take your photograph, and then I'll swear you in.

20    **THE WITNESS:** Okay.

21                    **<u>LORI EICHENBERGER</u>**,

22 called as a witness for the Plaintiff, having been duly sworn,

23 testified as follows:

24    **THE CLERK:** Be seated. Adjust that as you may need

25 to.

1    If you would, please, state your full name for the record

2    and spell it for the court reporter.

3        THE WITNESS:  Lori Eichenberger.  It's L-o-r-i, last

4    name is E-i-c-h-e-n-b-e-r-g-e-r.

5        THE COURT:  Please proceed.

6        MR. TOOCH:  Thank you, Your Honor.

7    I have some witness binders for the witness.

8        THE COURT:  Great.

9        MR. TOOCH:  And for the Court.

10       THE WITNESS:  Thank you.

11       MS. BRIGGS:  Excuse me, Your Honor.  Are we entitled

12   to a witness binder as well?

13       THE COURT:  Absolutely.

14       MS. BRIGGS:  That's traditional.

15       THE COURT:  All right.  I will give you my --

16       MS. BRIGGS:  No.

17       THE COURT:  I think you need it more than I do.

18       MS. BRIGGS:  Absolutely not, Your Honor.  I have the

19   exhibits.  I can flip through binders back there.  You keep

20   yours, Your Honor.

21       THE COURT:  All right.  So anything that I get,

22   everybody gets.

23       MR. TOOCH:  Sorry.  I thought there was another copy,

24   so I apologize.

25       THE COURT:  All right.  Go ahead.

1    <u>DIRECT EXAMINATION</u>

2    BY MR. TOOCH:

3    Q.    Good morning, Ms. Eichenberger.

4    A.    Good morning.

5    Q.    Where do you currently work?

6    A.    I work for NorthBay Healthcare.

7    Q.    And what is your position at NorthBay?

8    A.    I'm the senior director of revenue cycle management.

9    Q.    And what does it mean, revenue cycle management?

10   A.    Revenue cycle is kind of an industry buzzword, I suppose,

11   but it's the process of ensuring that the revenues -- both

12   charges and, you know, what a hospital is paid -- are recorded

13   and accounted for correctly.

14        So from the time a charge is created to how it's used, to

15   the billing of those charges to insurance companies, and then

16   to the collection of them, all the way through the billing

17   cycle.

18   Q.    So are you in charge of billing and collections at the

19   hospital?

20   A.    Yes, I am.

21   Q.    And is that billing to all different types of payors?

22   A.    Yes, it is.

23   Q.    And what are the different types of payors that hospitals

24   bill to?

25   A.    We can bill to commercial insurance plans like

1    Blue Shield.  We could bill to government plans like Medicare

2    and Medi-Cal.  We can bill to workers' comp.  We can bill to

3    prisons, in our case, or to a jail, or we could bill to a

4    patient.

5    **Q.**    And what is involved with respect to the collections

6    department?

7    **A.**    The business office of the collections department is

8    responsible for billing either the insurance companies or the

9    patients, or both, for healthcare services that are rendered in

10   either of our two hospitals.

11   **Q.**    Okay.  And how long have you worked at NorthBay?

12   **A.**    This is my 22nd year.

13   **Q.**    And how long have you worked in revenue cycle at NorthBay?

14   **A.**    Twenty-two years.

15   **Q.**    Okay.  Thank you.

16        I'd like to go to Exhibit 118, the first page.

17        **THE COURT:**  So before anything goes up on the screen,

18   for the jury, anyway, exhibits have to be admitted.

19        **MR. TOOCH:**  Right.  I understand.

20   **BY MR. TOOCH:**

21   **Q.**    Do you recognize Exhibit 118?

22   **A.**    I do.

23   **Q.**    And what is it?

24   **A.**    It's the NorthBay Healthcare website.

25   **Q.**    And is this an accurate reflection of the NorthBay

1  website?

2  **A.**   Yes, it is.

3        **MR. TOOCH:**   Move to publish it, Your Honor.

4        **THE COURT:**   Would you like it admitted into evidence?

5        **MR. TOOCH:**   I would like to admit it into evidence,

6  yes.

7        **THE COURT:**   Is there any objection?

8        **MS. BRIGGS:**   No, Your Honor.

9        **THE COURT:**   All right.  It's admitted.

10       (Trial Exhibit 118 received in evidence.)

11       (Document displayed.)

12  **BY MR. TOOCH:**

13  **Q.**   Okay.  Looking at the first page "About Us," it says that

14  the roots of NorthBay run deep in Solano County.  Is that where

15  NorthBay is located?

16  **A.**   Yes, it is.

17  **Q.**   And where is Solano County?

18  **A.**   Solano County is -- I like to explain it as kind of being

19  smack dab in the middle of San Francisco and Sacramento.

20  **Q.**   And what is the mission of NorthBay?

21  **A.**   Compassionate care, advanced medicine close to home.

22  **Q.**   What does that mean?

23       What does compassionate care mean?

24  **A.**   Compassionate care is the way we treat the members of our

25  community and our patients.  Everyone is treated with the

1  utmost respect regardless of whether they're poor or rich,

2  whether they have insurance or whether they don't.  It's the

3  core of our mission.

4  **Q.**   What does "advanced medicine differentiates us" mean?

5  **A.**   As part of our strategic plan and our mission, NorthBay

6  has, as long as it's existed, really strived to develop

7  services that will enable us to treat the members of our

8  community within our healthcare system.

9  **Q.**   And why does NorthBay do that?

10  **A.**   Because it's important to us that everyone that lives in

11  Solano County, in our part of Solano County, has access to the

12  services that they need; basic services and very complicated

13  services.  You know, open heart surgery and trauma, you know,

14  neonatal intensive care, we want everyone to have access to

15  those services.

16  **Q.**   Don't they have access to those services in other

17  counties?

18  **A.**   Solano County and in our part of Solano County --

19  Fairfield and Vacaville are the towns that are our primary

20  service area -- we have a significant number of elderly

21  patients or members of the community as well as low income and

22  uninsured.

23      Many of those people are not able to travel outside of our

24  service area, so our fear would be if we don't have a cancer

25  program and a patient has cancer and they can't see and they

1  can't drive or they don't have the money to do that, that they

2  won't get the care that they need.

3  **Q.**  Okay.  If you can go to page 118-2.

4      What's reflected on this page?

5  **A.**  This page is our services page.  So this page outlines the

6  different kind of services that we offer to our patients.

7      And it's really hard to read.

8  **Q.**  Okay.  So how many hospitals does NorthBay have?

9  **A.**  We are a single hospital with two campuses.

10  **Q.**  What do you mean by that?

11  **A.**  We have a hospital in Fairfield, and then we have a

12  hospital in Vacaville, but we have a single license to operate

13  those hospitals.  And we're recognized by the federal

14  government, Medicare -- Center for Medicare & Medicaid Services

15  as a single facility.

16  **Q.**  Is there common management between both hospitals?

17      In other words, is there a CEO and CFO for both hospitals?

18  **A.**  Yes.

19  **Q.**  And the chief financial officer, is he the chief financial

20  officer for both hospitals?

21  **A.**  Yes.

22  **Q.**  And the other managers -- like, for example, do you do

23  billing and collections for both hospitals?

24  **A.**  Yes, we all do.

25  **Q.**  And are there other clinical and nonclinical individuals

1   who work at both hospitals?

2   **A.**   Yes.

3   **Q.**   Give us some examples.

4   **A.**   We could have a nurse that primarily works in the

5   emergency room at NorthBay Medical Center, and we could have

6   staff, you know, nurses that are scheduled at VacaValley

7   Hospital that call in sick, for example.  And so we may need to

8   pull from one hospital to another in order to cover shifts.

9        I know one of my departments is our patient access

10  department or our admitting department, and I frequently will

11  have staff that are generally located at Vacaville, you know,

12  float to NorthBay or vice versa, very common.

13  **Q.**   Now, does NorthBay have a trauma center?

14  **A.**   We do.

15  **Q.**   And what is a trauma center?

16  **A.**   A trauma center, we are a Level III trauma center as

17  designated by the County of Solano.  And then we are a Level II

18  trauma center as verified by the American College of Surgeons.

19       So a trauma center is specifically equipped to treat

20  patients who are in accidents and who are hurt; so car

21  accidents.  We are in not so great of an area in Fairfield.

22  Some gang activity.  So we have lots of gunshot wounds and we

23  have lots of stab wounds.

24       And we have teams of surgeons that are there and

25  available.  Our trauma surgeons can be there within minutes

1    when a trauma code is called.

2    **Q.**    Does NorthBay have a certain accreditation for chest pain?

3    **A.**    We do.  We're an accredited chest pain center.

4    **Q.**    And what does that mean?

5    **A.**    Like trauma, it means that we have teams of people that

6    are on site and that are skilled in -- licensed in the area of

7    cardiac medicine in that case.

8         So, as with a stroke, if you're having a heart attack,

9    every second counts.  And so, because we have specialized teams

10   and specialized staff, when patients present complaining of

11   chest pain, or maybe not even chest pain but something that

12   ends up being cardiac related, we're there immediately to

13   administer the medications that they need, to do the tests that

14   they need, to determine whether they are or are not having a

15   heart attack.  And if they are, we can have them in one of our

16   cardiac catheterization labs within minutes.

17   **Q.**    Is NorthBay certified as a primary stroke center?

18   **A.**    Yes, we are.

19   **Q.**    And what does that mean?

20   **A.**    Similar to trauma and to the cardiac piece, we have a

21   stroke team.  And if a patient comes in exhibiting signs of a

22   stroke, like the cardiac example, every second counts in

23   determining, you know, what the long-term effects of that

24   stroke will be.

25        So we have a team there.  We have a neurosurgeon.  We

1  have, you know, every specialist that you can think of on site.

2  **Q.**  Does NorthBay have a neonatal intensive care unit?

3  **A.**  Yes, we have a Level III.

4  **Q.**  And what is that?

5  **A.**  It's the -- it's a unit that treats very sick babies.  So,

6  for example, if a mom delivers a baby early and the baby is

7  premature, or if there are some kind of other, you know,

8  complications with the baby, it's an intensive care unit for

9  babies, essentially.

10 **Q.**  Does NorthBay have a cancer center?

11 **A.**  We do.

12 **Q.**  And what is the cancer center?

13 **A.**  Our cancer center, we actually have chemotherapy.  So,

14 medical oncology, and we also do radiation therapy on site.

15     So we can essentially treat a patient from the time that

16 they're diagnosed with cancer.  Take breast cancer as an

17 example.  We can do the surgery.  We have an onco-plastic

18 surgeon who specializes in breasts.  And he can do the surgery

19 and do the mastectomy and then, you know, right there on site

20 we can start the chemotherapy and/or radiation all the way

21 through.

22 **Q.**  Including reconstructive surgery?

23 **A.**  Yes.

24 **Q.**  Now, is NorthBay required to have all of these types of

25 services?

1    **A.**    No.

2    **Q.**    Can NorthBay be a hospital that doesn't have a trauma

3    center and a NICU and a chest pain center, et cetera?

4    **A.**    We could be.

5    **Q.**    So why does NorthBay provide all these services?

6    **A.**    Because our patients need them.

7    **Q.**    Are there other hospitals in Solano County?

8    **A.**    Yes.

9    **Q.**    What other hospitals are there in Solano County?

10   **A.**    Sutter has a hospital, Sutter Solano Medical Center, in

11   Vallejo.  And Kaiser has two hospitals, Kaiser Vallejo and then

12   Kaiser Vacaville.

13   **Q.**    How is NorthBay different to Sutter and to Kaiser?

14   **A.**    NorthBay Healthcare is an independent nonprofit healthcare

15   system.  So if you look at Sutter, Sutter is huge.  Sutter is,

16   you know, all over the state of California, and they have, you

17   know, big governing bodies.

18        And if, for example, you know, if there's a particular

19   hospital that's not doing well financially, you can float funds

20   from one to another.  They're just big.

21        And then Kaiser, Kaiser is its own health plan in a

22   hospital.  Again, they're -- you know, they're enormous.  And

23   we are just us.

24   **Q.**    So are there some Kaiser hospitals that have NICUs and

25   have chest pain centers and have primary stroke centers?

1    A.    Yes.

2    Q.    Does Kaiser have to have all of those services in every

3    hospital?

4    A.    No.  That would be, I suppose you could say, a benefit to

5    them in having so many different hospitals is they could

6    have -- you know, Kaiser Vacaville is a trauma center.  They

7    could have trauma at one, but if a patient needed, you know,

8    the cardiovascular operating room or a complex neurosurgery,

9    they may have to go to Sacramento.  That's an example, to a

10   different Kaiser facility.

11        MS. BRIGGS:  I'm going to object, Your Honor.  I'm not

12   sure what the foundation is for this witness to be testifying

13   as to what Kaiser has.  Sounds like there's a fair amount of

14   speculation in her testimony.

15        THE COURT:  Do you want to lay a foundation?

16        MR. TOOCH:  Yes.

17   BY MR. TOOCH:

18   Q.    Ms. Eichenberger, are you, as part of your job, familiar

19   with the other hospitals in Solano County?

20   A.    Yes, I am.

21   Q.    And are you familiar, as part of your 22 years on the job,

22   with the other hospitals in Northern California?

23   A.    Yes.

24   Q.    And as part of your job, are you aware of the numbers of

25   hospitals at Kaiser?

1   A.   I don't know the specific number of Kaiser hospitals, no.

2   Q.   Generally, do you know that it has many hospitals?

3   A.   Oh, yes.

4   Q.   And the same question with respect to Sutter Hospital.  Do

5   you know generally that Sutter has many hospitals?

6   A.   Yes, I do.

7   Q.   Okay.  Do you know whether or not Kaiser Vacaville has a

8   trauma center?

9        MS. BRIGGS:  Objection, Your Honor, to the form of

10  these questions.

11       THE COURT:  Overruled.

12  BY MR. TOOCH:

13  Q.   Do you know whether or not Kaiser Vacaville has a trauma

14  center?

15  A.   Yes, Kaiser Vacaville does have a trauma center.

16  Q.   Do you know whether or not Kaiser Solano has a trauma

17  center?

18  A.   I know they do not.

19  Q.   So are there some Kaiser hospitals that are trauma centers

20  and some Kaiser hospitals that are not trauma centers?

21  A.   Yes, that's correct.

22  Q.   How is NorthBay different to hospitals like Stanford and

23  UC Davis and UC San Francisco?

24  A.   Those larger systems, teaching systems, you know, often

25  they have large endowments, they have funding that is outside

1  of what is available to us as a small community hospital.

2  **Q.**   Okay.  Now, are you familiar with the contracts that

3  NorthBay has with various health plans and payors?

4  **A.**   Yes, I am.

5  **Q.**   And why are you familiar with those contracts?

6  **A.**   My departments -- the departments that report to me, that

7  I'm responsible for, are -- we are responsible for implementing

8  contracts, once they're negotiated, play a part on the

9  negotiating team in helping contracts come to be.

10       But once they've been signed, they're fully executed, we

11 have to put them in to operation, essentially.  We have to, you

12 know, program our information system so we know what we're

13 expecting as payment in those contracts, or any other terms

14 that might affect how we operate under that contract.

15 **Q.**   So are you familiar with the rates and terms in the

16 contracts that NorthBay has with health plans and other payors?

17 **A.**   Yes, I am.

18 **Q.**   Are you directly involved in the negotiations of contracts

19 with other payors?

20 **A.**   I don't do the negotiating.  We have a managed care team

21 that does the negotiating.  But I'm on a team of folks that

22 works to get a contract.  And I'm asked about reimbursement

23 terms as things are being negotiated, and other terms, to make

24 sure, because we wouldn't want to enter into an agreement that

25 I couldn't carry out.

1  Q.  Okay.  So during the negotiations, if a health plan offers

2  a certain rate, are you kind of part of the team that decides

3  whether or not that's a rate that's appropriate?

4  A.  It -- sometimes I am.  Sometimes I'm not.

5  Q.  And what about with respect to the terms of the contract,

6  do the negotiating team consult with you with respect to the

7  terms of the contract?

8  A.  They would consult with me on terms that apply to or that

9  relate to my areas of operation.

10 Q.  Okay.  How long do the negotiations of these contracts

11 usually take?

12 A.  They can take three months, six months, two years.  It

13 just depends.

14 Q.  And why do they take so long?

15 A.  Because both -- you know, the health plan or the insurance

16 company and the hospitals can have, you know, very different

17 ideas about what they want in a contract.

18     If you think about the rates, the reimbursement terms,

19 sometimes they could be kind of on the same playing field, and

20 other times they may need to go back and forth many, many times

21 in order to come to agreement.

22 Q.  Do the health plans try to get the lowest rate they can

23 get?

24 A.  Yes.

25 Q.  And does NorthBay try to get the highest rate it can get?

1    **A.**    Of course.

2    **Q.**    And so is there bargaining backwards and forth as to

3    what's a fair rate?

4    **A.**    Yes.

5           **MR. TOOCH:**  All right.  I'd like to move to

6    Exhibit 19.  And I don't believe, Your Honor, there's any

7    objection to the foundation for this exhibit.

8        Correct?

9           **THE COURT:**  Are you offering Exhibit 19?

10          **MR. TOOCH:**  I am, Your Honor.

11          **THE COURT:**  Is there any objection?

12          **MS. BRIGGS:**  Oh, sorry.  Let me just look at it.

13       Is it one of the contracts?

14          **MR. TOOCH:**  It is.

15          **MS. BRIGGS:**  No objection, Your Honor.

16          **THE COURT:**  All right.  It's admitted.

17       (Trial Exhibit 19 received in evidence.)

18       (Document displayed.)

19   **BY MR. TOOCH:**

20   **Q.**    Okay.  Ms. Eichenberger, do you recognize Exhibit 19?

21   **A.**    Yes, I do.

22   **Q.**    And what is Exhibit 19?

23   **A.**    It's the front page of our contract with Cigna.

24   **Q.**    Okay.  And when was this contract entered into?

25   **A.**    Looks like January 1st, 1991.

1    Q.   And is this contract still in effect today?

2    A.   It is.

3    Q.   Okay.  And if you can turn to page 15 of Exhibit 19, and

4    tell us what is reflected on this page.

5    A.   This is essentially the rate, what we call the rate page.

6    And it lays out the reimbursement terms in the Cigna contract.

7         So in this contract, Cigna pays us -- or gives -- receives

8    a discount off of our prices, of 22 percent.

9    Q.   So is the flip side of 22 percent, 78 percent of charges?

10   A.   Yes, that's what they pay, 78 cents on the dollar.

11   Q.   Okay.  So if you charged them a dollar, would they pay you

12   78 cents?

13   A.   Yes.

14        MR. TOOCH:  I'm writing "Cigna 78 percent."

15   BY MR. TOOCH:

16   Q.   Did Cigna force NorthBay to sign this contract?

17   A.   No.

18   Q.   Did NorthBay force Cigna to sign this contract?

19   A.   No.

20   Q.   Is Cigna free to terminate this contract?

21   A.   At any time.

22   Q.   Is NorthBay free to terminate this contract?

23   A.   We are.

24   Q.   Okay.

25        MR. TOOCH:  I'd like to offer and now move to

1    Exhibit 17 and offer this in evidence.

2           THE COURT:  Is there any objection?

3           MS. BRIGGS:  No, Your Honor.

4           THE COURT:  All right.  It's admitted.

5       (Trial Exhibit 17 received in evidence.)

6       (Document displayed.)

7    BY MR. TOOCH:

8    Q.   Do you recognize Exhibit 17?

9    A.   I do.

10   Q.   What is it?

11   A.   It's our contract with Aetna.

12   Q.   Okay.  And when was this entered into?

13   A.   May 11th, 2011.

14   Q.   And is this contract still in effect today?

15   A.   It is.

16   Q.   Okay.  If you could turn to page 2 of this document, what

17   is reflected on this page?

18   A.   This, again, is the rate page, this time for Aetna --

19   or -- yeah, for Aetna.  And it reflects that they pay us

20   67 percent of billed charges, or 67 cents on the dollar.

21   Q.   Okay.  Is that for inpatient services and outpatient

22   services?

23   A.   Yes.

24   Q.   And what are inpatient services?

25   A.   Inpatient services are when there is -- when a patient

1    stays in the hospital.  So they're admitted.

2        You can be admitted for observation status.  So if we

3    think your stay is not going to be long and we will be able to

4    figure out, you know, and resolve any issues, you can be in

5    observation status or be inpatient on our regular units at

6    hospitals.

7    **Q.**    And is emergency care considered inpatient or outpatient?

8    **A.**    Emergency care would be outpatient.

9        **MR. TOOCH:**  I'm writing 67 percent -- "Aetna

10   67 percent."

11   **BY MR. TOOCH**

12   **Q.**    Did Aetna force NorthBay to sign this contract?

13   **A.**    No.

14   **Q.**    Did NorthBay force Aetna to sign this contract?

15   **A.**    No.

16   **Q.**    Is Aetna free to terminate this contract at any time?

17   **A.**    They are.

18   **Q.**    And is NorthBay free to terminate this contract at any

19   time?

20   **A.**    We are.

21       **MR. TOOCH:**  I'd like to move to Exhibit 21.  And I'd

22   like to move it into evidence.  It is the United contract.

23       **THE COURT:**  Are you offering Exhibit 21?

24       **MR. TOOCH:**  Yes.

25       **THE COURT:**  Any objection?

1          MS. BRIGGS:  No.

2          THE COURT:  It's admitted.

3      (Trial Exhibit 21 received in evidence.)

4      (Document displayed.)

5  BY MR. TOOCH:

6  Q.   Ms. Eichenberger, do you recognize Exhibit 21?

7  A.   I do.

8  Q.   What is it?

9  A.   It's our contract with United Healthcare.

10 Q.   And what was the date that this contract was entered into?

11 A.   This is an amendment that was entered into on January 1st,

12 2015.

13 Q.   Okay.  And is this contract still in effect today?

14 A.   Yes, it is.

15 Q.   Okay.  If you could go to page 3.  Are there rates

16 reflected on this page?

17 A.   Yes, there are.

18 Q.   Okay.  And what are the rates that United pays under its

19 contracts?

20 A.   76 percent of billed charges, or 76 cents on the dollar.

21          MR. TOOCH:  I'm writing "United 76 percent."

22 BY MR. TOOCH:

23 Q.   Is United free to terminate this contract?

24 A.   Yes, they are.

25 Q.   Is NorthBay free to terminate this contract?

1    A.    Yes, we are.

2          MR. TOOCH:  I'd like to go to Exhibit 10 and offer

3    this in evidence.

4          THE COURT:  Is there any objection?

5          MS. BRIGGS:  No.

6          THE COURT:  It's admitted.

7        (Trial Exhibit 10 received in evidence.)

8        (Document displayed.)

9    BY MR. TOOCH:

10   Q.    Do you recognize Exhibit 10?

11   A.    I do.

12   Q.    And what is it?

13   A.    It was our contract with Kaiser.

14   Q.    Okay.  And if you can go to exhibit page 11, does that

15   page contain any rates on it?

16   A.    Yes, it does.

17   Q.    And what was the rate that Kaiser agreed to pay NorthBay

18   in this contract?

19   A.    They paid us 80 percent of billed charges, or 80 cents on

20   the dollar.

21         MR. TOOCH:  I'm writing "Kaiser 80 percent."

22   BY MR. TOOCH:

23   Q.    Now, is this contract still in effect?

24   A.    No, it's not.

25   Q.    And why isn't it?

1    A.    Kaiser terminated the contract.

2    Q.    Okay.  And do you have a dispute with Kaiser as to the

3    rates it is now paying?

4    A.    Yes, we do.

5          MR. TOOCH:  Okay.  I'd like to go to Exhibit 11 and

6    offer it in evidence.

7          THE COURT:  Is there any objection to Exhibit 11?

8          MS. BRIGGS:  No.

9          THE COURT:  It's admitted.

10   (Trial Exhibit 11 received in evidence.)

11   (Document displayed.)

12   BY MR. TOOCH:

13   Q.    Ms. Eichenberger, do you recognize Exhibit 11?

14   A.    I do.

15   Q.    And what is it?

16   A.    It's our contract with Community Healthcare Alliance, or

17   commonly referred to as CCN.

18   Q.    Is CCN Community Care Network?

19   A.    Yes.

20   Q.    And what is Community Care Network?

21   A.    It's a network umbrella of sorts.  So we contract with

22   CCN, and then individual payors buy into that network to gain

23   access to the agreed-upon rate when they pay us.

24   Q.    Explain how it works.

25   A.    So let's just make up an insurance name.  We'll call it

1    Joe's Insurance.  NorthBay Healthcare has a contract with CCN.

2    So that's the direct contract.  But then Joe's Insurance

3    contracts separately with CCN so that when patients with Joe's

4    Insurance come to NorthBay they get the benefit of that CCN

5    discount.

6    Q.   Are those usually elective services or emergency services?

7    A.   Emergency services.

8    Q.   And what is an elective service?

9    A.   An elective service, let's give an example of a shoulder

10   injury.  You hurt your shoulder playing basketball, and the

11   doctor decides that you need some arthroscopic surgery on that

12   shoulder.  That would be -- deciding to have that surgery would

13   be an elective surgery.

14       You know, your shoulder hurts, but you could live without

15   your shoulder surgery, ideally.  So that would be an elective

16   case.

17   Q.   Okay.  And how does that differ from an emergency

18   situation?

19   A.   In an emergency situation, a patient's life can be in

20   danger, and so those are services that come through our

21   emergency room.

22   Q.   And why do you say that the CCN contract typically

23   involves emergency services?

24   A.   Because there's no directed business.  So in a full

25   network contract like, for example, our contract with

Blue Cross, Blue Cross encourages patients to go to network hospitals of which, you know, NorthBay is one. And so they advertise our name. They offer, you know, lower out-of-pocket amounts to patients who -- if they go to NorthBay or VacaValley or any other network provider.

But the CCN contract doesn't operate that way. They don't drive volume into our facilities.

**Q.** Okay. If you can go to page 16 of this exhibit.

Are the rates reflected on that page?

**A.** Yes.

**Q.** And what are the rates reflected on that page?

**A.** Do you want me to read them all?

Hold on. I can't see the page number in the exhibit book.

**Q.** If you look at the yellow tab on the top, do you see 11-16?

**A.** Oh. Yes.

**Q.** Okay. And the first paragraph, does that have rates in it?

**A.** Yes, it does.

**Q.** And what is the rate for -- it says, "Acute inpatient per diem rate exclusive of acute psychiatric care, rehabilitation unit, and care of newborn after mother is discharged." And then it says "15% discount from billed charges."

What does that all mean?

1    **A.**    That means that if a patient that has Joe's Insurance,

2    that accesses us through that CCN network so that they can get

3    a discount -- because if they didn't access CCN to get the

4    discount, and I don't have a contract, then they would get no

5    discount.

6    If they have a patient that is an inpatient, they would

7    get a 15 percent discount for billed charges, or pay 85 cents

8    on the dollar.

9    **Q.**    Okay.  And is that the same rate for outpatient services?

10    **A.**    Yes, it is.

11    **MR. TOOCH:**  I'm writing down "CCN 85 percent."

12    I'd like to go to Exhibit 12 and offer that in evidence.

13    **THE COURT:**  Is there any objection?

14    **MS. BRIGGS:**  No.

15    **THE COURT:**  It's admitted.

16    (Trial Exhibit 12 received in evidence.)

17    (Document displayed.)

18    **BY MR. TOOCH:**

19    **Q.**    Ms. Eichenberger, do you recognize Exhibit 12?

20    **A.**    I don't have anything behind the 12 in the binder.

21    **MR. TOOCH:**  May I approach, Your Honor?

22    **THE COURT:**  You may.

23    **THE WITNESS:**  It looks like it's under 13.

24    **MR. TOOCH:**  Oh, yes.  Okay.

25

1   BY MR. TOOCH:

2   **Q.**   Do you recognize Exhibit 12?

3   **A.**   I do.

4   **Q.**   What is Exhibit 12?

5   **A.**   It's a contract with PHCS.

6   **Q.**   And what is PHCS?

7   **A.**   PHCS is like CCN.  It's a network that payors -- insurance

8   companies buy into in order to get a discount when patients are

9   seen at our hospitals.

10  **Q.**   Is this contract still in effect today?

11  **A.**   Yes, it is.

12  **Q.**   Is the CCN contract still in effect today?

13  **A.**   Yes, it is.

14  **Q.**   Okay.  And if you go to page 37 of Exhibit 12, are there

15  rates reflected on this page?

16  **A.**   Yes.

17  **Q.**   Okay.  Let's look at the top box.  It says "Reimbursement

18  rates for policyholders using the PHCS network product."  What

19  does that mean?

20  **A.**   So, as I explained with Joe's Insurance, Joe's Insurance,

21  in addition to buying into the CCN network, could buy into the

22  PHCS network.

23       And so if they did, and if the patients with Joe's

24  Insurance were seen at our hospitals and they had access to

25  PHCS contracts, they would get these -- they would pay these

1  rates.

2  **Q.**   Okay.  In the box it says, "Service category inpatient OB

3  normal delivery."  And then it says, "Reimbursement rate 1450

4  per diem, paren, includes well baby."

5       What does that mean?

6  **A.**   That if a mom with Joe's Insurance delivers a baby in our

7  hospitals and, Joe's Insurance accesses us through the PHCS

8  network, that they are going to pay 1,450 per day for that

9  delivery.

10  **Q.**   And the next line, "Inpatient OB C-section, 1,650 per

11  diem."  What does that mean?

12  **A.**   Same patient, same scenario, but mom has a C-section and

13  doesn't deliver vaginally, they would pay $1,650 per day.

14  **Q.**   Okay.  And then it says, "All other inpatient covered

15  services, 15 percent discount off hospital's billed charges."

16  What does that mean?

17  **A.**   So for services that are not a normal delivery or not a

18  cesarean section but are inpatient, they get 15 percent

19  discount or pay 85 percent of billed charges.

20  **Q.**   And then the last line says, "Outpatient covered services,

21  15 percent discount off hospital's billed charges."  What does

22  that mean?

23  **A.**   That for outpatient services, same scenario with Joe's

24  Insurance, this time accessing us through PHCS, they would pay

25  us 85 percent of billed charges for outpatient services.

1   Q.   And so if somebody with PHCS part of the network had

2   emergency services, what would be the percentage charges that

3   would be paid to NorthBay?

4   A.   It would be 85 percent of billed charges that would fall

5   under the outpatient covered services.

6       MR. TOOCH:   I'm writing "85 percent outpatient

7   charges."

8   BY MR. TOOCH:

9   Q.   Okay.  In the box underneath that, it says "Reimbursement

10  rates for policyholders using the MultiPlan Network Product."

11  What does that mean?

12  A.   MultiPlan is yet another umbrella like CCN, like PHCS,

13  that insurance companies can buy into to access rates.

14  Q.   And if somebody had -- is part of the MultiPlan Network

15  and they came in for services, either inpatient or outpatient,

16  at NorthBay, how much would NorthBay be paid on its bill?

17  A.   They would get a 10 percent discount or pay 90 percent of

18  billed charges.

19      MR. TOOCH:   I'm writing down, "MultiPlan 90 percent."

20  BY MR. TOOCH:

21  Q.   Is this contract still in effect today?

22  A.   Yes, it is.

23      MR. TOOCH:   Okay.  Now, I'm going to move to

24  Exhibit 1.  I'd like to offer that into evidence.

25      THE COURT:   Is there any objection to Exhibit 1?

1          MS. BRIGGS:  No.

2          THE COURT:  It's admitted.

3      (Trial Exhibit 1 received in evidence.)

4      (Document displayed.)

5  BY MR. TOOCH:

6  Q.    Do you recognize Exhibit 1?

7  A.    I do.

8  Q.    And what is it?

9  A.    It was our letter of agreement with Blue Shield.

10 Q.    What is a letter of agreement?

11 A.    It's a contract.

12 Q.    When was this contract signed by the parties?

13 A.    Trying to find a date.

14 Q.    Page 7.

15 A.    I still don't see a date.

16     Our hospital president signed it on September 19, 2008.

17 Q.    Okay.  And when did Blue Shield sign it?

18 A.    September 22nd, 2008.

19 Q.    Okay.  And if you go to the next page, what is reflected

20 on this page?

21 A.    It's the rate page under that agreement.

22 Q.    Okay.  Okay.  Ms. Eichenberger, can you explain to us what

23 is on this rate page?

24     On the left-hand column, it says, "Reimbursement rate,

25 paren, tiers, inpatient and outpatient hospital services."Then

1   in the right column, it says, "When effective volume

2   thresholds."

3       Explain how the contract worked.

4   **A.**   So the way the Blue Shield arrangement was negotiated, it

5   had these tiers.  And so, simply stated, the more volume that

6   Blue Shield sent to us or referred to us in the way of

7   inpatient cases, the less they would pay.

8       So as -- if over a regular period of time the number of

9   patients increased, then they got a greater discount.

10  **Q.**   Okay.  So let's look at the contract for a moment.

11      So if -- looking at the top line, it says, "80% of total

12  billed charges," then it says "55% inpatient/6MO period."  What

13  does that mean?

14  **A.**   So for that tier, in order for -- in order for the

15  reimbursement rate to be 80 percent of billed charges, we would

16  need to see 55 inpatient cases within a six-month period.

17  **Q.**   Okay.  And below that, what is the number of inpatient

18  services reflected on this contract?

19  **A.**   The second tier is 90 inpatient.

20  **Q.**   Okay.  And what was the percentage of billed charges under

21  that contract?

22  **A.**   For which tier?

23  **Q.**   The 90.

24  **A.**   Oh, 77 percent of billed charges.

25          **MR. TOOCH:**  I just realized this is a later contract

1   amendment, so it's a little confusing to the jury.  That's why.

2   Okay.

3   BY MR. TOOCH:

4   Q.   Okay.  So if Blue Shield was able to get 90 members within

5   a six-month period to become inpatient at NorthBay, did the

6   rate that Blue Shield have to pay come down from 80 percent to

7   77 percent?

8   A.   Yes, that's correct.

9   Q.   And how does Blue Shield increase the number of its

10  members at NorthBay?

11  A.   Ideally, they would insure more people in the community

12  with NorthBay.  So, you know, whether they were able to become

13  a plan that local employer groups offered to its employees,

14  through other advertising...

15  Q.   Now, if Blue Shield was able to get 125 inpatient admits

16  within a six-month period, what was the rate that it got?

17  A.   Then it would go down to 74 percent of billed charges.

18  Q.   And if it was able to get 160 inpatients, what was the

19  rate?

20  A.   71 percent.

21  Q.   And 195 inpatient, what was the rate?

22  A.   68 percent.

23  Q.   And then 230 inpatient within a six-month period, what was

24  the rate?

25  A.   65 percent.

1   Q.   So under this contract, was Blue Shield able to get its

2   payment as low as 65 percent of charges if it was successful in

3   getting NorthBay more members?

4   A.   Yes.

5   Q.   Now, why was NorthBay willing to reduce its rate down to

6   65 percent of billed charges based upon these volume

7   thresholds?

8   A.   Because generally hospitals, you know, in their

9   negotiations, are willing to give a discount where there's --

10  you know, where there's volume.  So the more volume you send,

11  the greater discount.

12      Same thing would apply to buying toilet paper at Costco as

13  opposed to buying it at Safeway.  You buy a smaller package of

14  it at Safeway, it's going to be more expensive than if you buy

15  400 rolls at Costco.

16  Q.   And do hospitals have a lot of inpatient beds?

17  A.   Yes.

18  Q.   And so are those inpatient beds filled up all the time?

19  A.   No.

20  Q.   And does the hospital want to fill up its inpatient beds?

21  A.   Absolutely.

22  Q.   So is the hospital willing to grant discounts in order to

23  fill up those inpatient beds?

24  A.   Yes.

25  Q.   Now, the rates that were in this contract with

1    Blue Shield, did these apply to all types of services?

2    **A.**    Yes, they did.

3    **Q.**    Did they apply to elective services?

4    **A.**    Yes.

5    **Q.**    And to emergency services?

6    **A.**    Yes.

7    **Q.**    Inpatient services?

8    **A.**    Yes.

9    **Q.**    Outpatient services?

10   **A.**    Yes.

11          **MR. TOOCH:**  I'd like to move to Exhibit 2.

12          **THE COURT:**  Is there any objection?

13          **MS. BRIGGS:**  No.

14          **THE COURT:**  It's admitted.

15       (Trial Exhibit 2 received in evidence.)

16          **MR. TOOCH:**  Thank you.

17       (Document displayed.)

18   **BY MR. TOOCH:**

19   **Q.**   By the way, with respect to the Exhibit 1, did NorthBay

20   force Blue Shield to sign that contract?

21   **A.**   No.

22   **Q.**   Did Blue Shield force NorthBay to sign that contract?

23   **A.**   No.

24   **Q.**   Okay.  Let's go to Exhibit 2.  And what is Exhibit 2?

25   **A.**   Exhibit 2 is an amendment to that letter of agreement with

1    Blue Shield.

2    **Q.**    Okay.  Before we get there, I wanted to go to Exhibit 5.

3         **MS. BRIGGS:**  It's not up yet.

4    No objection.

5         **THE COURT:**  All right.  It's admitted.

6    (Trial Exhibit 5 received in evidence.)

7    (Document displayed.)

8    **BY MR. TOOCH:**

9    **Q.**    Okay.  What is Exhibit 5?

10   **A.**    Exhibit 5 is a letter that NorthBay wrote and sent to

11   Blue Shield, notifying them that the volumes had increased and

12   so the reimbursement rate was going down from 80 percent to

13   77 percent.

14   **Q.**    Okay.  So the second sentence in the first paragraph, it

15   says, "As noted in Exhibit A, item 3 of the LOA."

16       What does "LOA" mean?

17   **A.**    Letter of agreement.

18   **Q.**    "The rate tiers have been reassessed and shall be adjusted

19   due to increased volumes of Blue Shield business."

20       What does that mean?

21   **A.**    That means that, as prescribed in the tier and in the

22   agreement, Blue Shield increased -- or the number of inpatients

23   that had Blue Shield increased in a given -- in the six-month

24   period of time, and so we were notifying Blue Shield that their

25   reimbursement rate was changing from 80 percent to 77.

1    Q.   So prior to this letter, between the time the contract was

2    signed and this August 31, 2009, letter, was Blue Shield paying

3    80 percent of charges?

4    A.   Yes, they were.

5    Q.   And then did Blue Shield agree to what NorthBay had

6    written in this letter?

7    A.   Of course.

8    Q.   And so after this letter was written, what was the rate

9    that Blue Shield paid?

10   A.   77 percent of billed charges.

11   Q.   Okay.  So did NorthBay live up to its deal in sending this

12   letter?

13   A.   Yes, we did.

14   Q.   Okay.  I'd now like to go to Exhibit 2.

15        And tell us, what is Exhibit 2.

16   A.   Exhibit 2 is an amendment to the original letter of

17   agreement with Blue Shield.

18   Q.   And when was this amendment entered into?

19   A.   October 1st, 2009.

20   Q.   Under the recitals -- there's a section of this which says

21   "Recitals."  It says, paragraph B, "Whereas, Blue Shield and

22   Hospital wish to revise the volume thresholds of Exhibit A in

23   the LOA."

24        What does that mean?

25   A.   The tiers that we looked at that were in the original

1    agreement, this amendment changed the volumes that we required

2    in order to change the reimbursement amounts.

3    **Q.**   Was this something that Blue Shield wanted?

4    **A.**   Yes.

5    **Q.**   Okay.  Let's go to page 3.  Does this reflect the

6    different volume thresholds and percentage of charges?

7    **A.**   Yes, it does.

8    **Q.**   Okay.  Now, I want to flip back between Exhibit 1 and

9    Exhibit 2, to see how the -- they changed.

10        So in Exhibit 2, what was the -- at 80 percent of charges,

11   what was the volume threshold?

12   **A.**   55 inpatients.

13   **Q.**   And was that the same as it was in the prior contract?

14   **A.**   Yes, it is.

15   **Q.**   In -- at 77 percent of charges, what was the new

16   threshold?

17   **A.**   79 inpatients.

18   **Q.**   And what was the old threshold?

19   **A.**   90.

20   **Q.**   So did that work to Blue Shield's benefit?

21   **A.**   Yes.

22   **Q.**   Why?

23   **A.**   Because they got the greater discount with requiring fewer

24   inpatient stays.

25   **Q.**   Okay.  At 74 percent of charges, what was the inpatient

1    admits?

2    **A.**    103.

3    **Q.**    And what was in the original contract?

4    **A.**    125.

5    **Q.**    At 71 percent of charges, what was the volume threshold?

6    **A.**    127.

7    **Q.**    And what was the old threshold?

8    **A.**    160.

9    **Q.**    And at 68 percent of charges, what was the threshold?

10   **A.**    151.

11   **Q.**    And what was it in the original contract?

12   **A.**    195.

13   **Q.**    And then, finally, at 65 percent of charges, what was the
14   new threshold?

15   **A.**    175.

16   **Q.**    And what was the old threshold?

17   **A.**    230.

18   **Q.**    So why did NorthBay agree to these different thresholds?

19   **A.**    Wanted to continue arrangement with Blue Shield.

20   **Q.**    Did Blue Shield force NorthBay to enter into this
21   contract?

22   **A.**    No.

23   **Q.**    Did NorthBay force Blue Shield to enter into this
24   contract?

25   **A.**    No.

1          MR. TOOCH:  I'd like to go to Exhibit 6 and offer it

2    in evidence.

3          THE COURT:  Any objection?

4          MS. BRIGGS:  No.

5          THE COURT:  It's admitted.

6      (Trial Exhibit 6 received in evidence.)

7      (Document displayed.)

8    BY MR. TOOCH:

9    Q.   Ms. Eichenberger, do you recognize Exhibit 6?

10   A.   I do.

11   Q.   And what is it?

12   A.   It's another letter from NorthBay Healthcare to

13   Blue Shield, notifying Blue Shield that the volumes had

14   increased and that, subsequently, their reimbursement rate was

15   going down again.

16   Q.   Okay.  And what did the -- how did the percentage of

17   charges change for Blue Shield?

18   A.   It changed from 77 percent of billed charges to

19   74 percent.

20   Q.   And was NorthBay willing to -- was this under the new

21   contract amendment?

22   A.   Yes.

23   Q.   Okay.  And was NorthBay willing to live up to its deal in

24   the new contract amendment?

25   A.   Yes, we did.

1  Q.   And was Blue Shield okay with what NorthBay had set forth

2  in this letter?

3  A.   Yes, they were.

4  Q.   Did NorthBay force Blue Shield to enter into this letter?

5  A.   No.

6  Q.   And did Blue Shield force NorthBay to enter into this

7  letter?

8  A.   No.

9  Q.   Okay.

10      MR. TOOCH:  Okay.  I'd like to go to Exhibit 7 and

11  offer it in evidence.

12      THE COURT:  Any objection?

13      MS. BRIGGS:  No.

14      THE COURT:  It's admitted.

15  (Trial Exhibit 7 received in evidence.)

16  (Document displayed.)

17 BY MR. TOOCH:

18  Q.   Ms. Eichenberger, do you recognize Exhibit 7?

19  A.   I do.

20  Q.   And what is it?

21  A.   It's another letter from NorthBay to Blue Shield,

22  notifying them that the reimbursement rate was again going down

23  because they had met the volume threshold.

24  Q.   So was Blue Shield successful in getting more and more of

25  its members to go to NorthBay?

1   A.   Yes.

2   Q.   And because there were more and more inpatients, was

3   NorthBay willing to reduce the amount that it got paid by

4   Blue Shield?

5   A.   Yes, we were.

6   Q.   And what was going to be the new rate under this

7   August 11th, 2010, letter?

8   A.   71 percent of billed charges.

9   Q.   And did both parties agree?

10  A.   Yes, they did.

11  Q.   And did NorthBay force Blue Shield to sign this letter?

12  A.   No.

13  Q.   And did Blue Shield force NorthBay to sign this letter?

14  A.   No.

15        MR. TOOCH:  I'd like to go to Exhibit 3.

16        THE COURT:  Is there an objection to Exhibit 3?

17        MS. BRIGGS:  No objection.

18        THE COURT:  All right.  Admitted.

19        MR. TOOCH:  Thank you.

20      (Trial Exhibit 3 received in evidence.)

21      (Document displayed.)

22  BY MR. TOOCH:

23  Q.   Do you recognize Exhibit 3?

24  A.   I do.

25  Q.   What is it?

1  **A.**   It's another amendment to the original letter of agreement

2  with Blue Shield.

3  **Q.**   And if you can go to page 4 of this exhibit, do those have

4  the thresholds amounts and the rates on it?

5  **A.**   Okay.  Yes.

6  **Q.**   Okay.  And did these threshold amounts change from

7  Exhibit 2?

8  **A.**   Yes, they did.

9  **Q.**   Okay.  And if you can go to Exhibit 2 and look at

10  Exhibit 3 and compare the threshold amounts.

11        At 80 percent of charges, were the threshold amounts the

12  same?

13  **A.**   Yes, 55 inpatients.

14  **Q.**   And then at 77 percent of charges, was there a change?

15  **A.**   Yes.  It changed from 79 inpatients to 74.

16  **Q.**   And was that to Blue Shield's benefit?

17  **A.**   Yes.

18  **Q.**   And then for 74 percent of billed charges, was there again

19  a change?

20  **A.**   Yes.  The volume changed from 103 inpatients to 92.

21  **Q.**   And then for each one of the others, were there reductions

22  in the volume thresholds for all of the other rows?

23  **A.**   Yes, they were all reduced.

24  **Q.**   Okay.  And so why was NorthBay willing to enter into a new

25  contract amendment that benefited Blue Shield as opposed to

1    staying with the old contract?

2    **A.**    We wanted to have a good relationship and wanted to, you

3    know, be able to see Blue Shield patients and treat Blue Shield

4    patients electively, and so we agreed to it.

5    **Q.**    Okay.  And did NorthBay force Blue Shield to enter into

6    this contract?

7    **A.**    No.

8    **Q.**    And did Blue Shield force NorthBay?

9    **A.**    No.

10            **MR. TOOCH:**  Okay.  I'd like to go to Exhibit 8 and

11   offer that in evidence.

12            **THE COURT:**  Is there any objection?

13            **MS. BRIGGS:**  This screen is taking just a second to

14   come up.

15        No objection.

16            **THE COURT:**  It's admitted.

17        (Trial Exhibit 8 received in evidence.)

18        (Document displayed.)

19   **BY MR. TOOCH:**

20   **Q.**    Ms. Eichenberger, what is Exhibit 8?

21   **A.**    It is another letter from NorthBay to Blue Shield,

22   notifying them that the reimbursement was going down because

23   they had met the volume threshold.

24   **Q.**    And was this letter after the contract amendment that we

25   just looked at?

1    **A.**    Yes, it was.

2    **Q.**    Okay.  And so what are the rates that Blue Shield had to

3    pay after this letter was signed?

4    **A.**    It decreased from 71 percent to 68 percent of billed

5    charges.

6    **Q.**    So was that to Blue Shield's benefit?

7    **A.**    Yes.

8    **Q.**    And was NorthBay willing to live up to its agreement under

9    the new contract rates?

10   **A.**    Yes.

11   **Q.**    And did NorthBay force Blue Shield to sign this?

12   **A.**    No, we didn't.

13   **Q.**    And did Blue Shield force NorthBay to sign this?

14   **A.**    No.

15          **MR. TOOCH:**  Okay.  I'd like to move to Exhibit 9 and

16   offer it in evidence.

17          **MS. BRIGGS:**  No objection.

18          **THE COURT:**  It's admitted.

19       (Trial Exhibit 9 received in evidence.)

20       (Document displayed.)

21   **BY MR. TOOCH:**

22   **Q.**    Ms. Eichenberger, do you recognize Exhibit 9?

23   **A.**    I do.

24   **Q.**    What is Exhibit 9?

25   **A.**    It is another letter from NorthBay Healthcare to

1    Blue Shield, this time notifying them that they did not meet

2    volume thresholds and that, as a result, the reimbursement was

3    changing from 68 percent of billed charges to 77 percent of

4    billed charges.

5    **Q.**   Okay.  So under this situation, had the number of

6    Blue Shield members at NorthBay decreased?

7    **A.**   Yes.

8    **Q.**   And so under the contract did the amount that Blue Shield

9    have to pay increase?

10   **A.**   Yes.

11   **Q.**   Okay.  Now, did Blue Shield agree to this letter?

12   **A.**   Yes.

13   **Q.**   Okay.  Did it sign this letter agreeing to pay the

14   77 percent of billed charges?

15   **A.**   Yes.

16   **Q.**   Did NorthBay force Blue Shield to sign this letter?

17   **A.**   No.

18   **Q.**   And did Blue Shield force NorthBay to sign this letter?

19   **A.**   No.

20   **Q.**   What was the date of this letter?

21   **A.**   April 20th, 2016.

22          **MR. TOOCH:**  Okay.  I'd like to now go to Exhibit 172

23   and offer that in evidence.

24          **MS. BRIGGS:**  No objection.

25          **THE COURT:**  All right.  It's admitted.

1     (Trial Exhibit 172 received in evidence.)

2     (Document displayed.)

3  BY MR. TOOCH:

4  Q.   Ms. Eichenberger, can you tell us, what is Exhibit 172?

5  A.   Exhibit 172 is a letter from Blue Shield to NorthBay,

6  notifying us that they were terminating the contract.

7  Q.   And what was the date of this letter?

8  A.   August 30th, 2016.

9  Q.   And so was the last letter we looked at April 20, 2016?

10 A.   Yes.

11 Q.   Okay.  So, and did Blue Shield, in fact, terminate the

12 contract?

13 A.   Yes, they did.

14 Q.   Now, after Blue Shield terminated the contract, what

15 happened to the volume of patients of Blue Shield members at

16 NorthBay?

17 A.   It decreased significantly.

18 Q.   Under the second amendment, which was the last contract,

19 you took 80 percent of total billed charges at 55 inpatients

20 for a six-month period.

21     What did the volume go down to after the contract was

22 terminated?

23 A.   It's less than the 55 patients -- inpatients in a

24 six-month period.

25 Q.   How much less?

1    A.    Significantly less.

2    Q.    And after the contract was terminated, did Blue Shield pay

3    the 80 percent of charges?

4    A.    No.

5    Q.    How did Blue Shield's payments -- what were Blue Shield's

6    payments like after the contract terminated?

7    A.    They were less than half of that.

8    Q.    Were they less than 65 percent of charges?

9          MS. BRIGGS:  Objection, Your Honor.  It's been

10   established that they were less, and that's why we're here.  I

11   don't think the details are relevant.

12         THE COURT:  Sustained.

13         MR. TOOCH:  I'd like to move to Exhibit 54 and offer

14   this exhibit in evidence.

15         THE COURT:  Is there any objection to 54?

16         MS. BRIGGS:  No, Your Honor.

17         THE COURT:  Okay.  It's admitted.

18      (Trial Exhibit 54 received in evidence.)

19      (Document displayed.)

20   BY MR. TOOCH:

21   Q.    Ms. Eichenberger, looking at the first page of Exhibit 54,

22   what is this document?

23   A.    It is a bill for services provided to a patient at

24   NorthBay Medical Center, that we were billing to Blue Shield.

25   Q.    Okay.  And there are black lines which say "Redacted."

1    Why are those lines redacted?

2    **A.**    To protect patient confidentiality.

3    **Q.**    Okay.  And then on -- there's a column which says

4    "Description."  What's listed in that column?

5    **A.**    It's a general description of the service --

6    **Q.**    Okay.

7    **A.**    -- that's being charged.

8    **Q.**    And then are there codes which are associated with each

9    service?

10   **A.**    Yes.

11   **Q.**    So if you look at the -- looks like row 14, there's a

12   code 450, and then is says "emerg room."

13         What does that mean?

14   **A.**    That's the charge for -- it's the facility fee for the

15   emergency room visit.

16   **Q.**    Okay.  So was this patient an emergency room patient at

17   NorthBay?

18   **A.**    Yes.

19   **Q.**    And above emergency room, it says "C.T. scan/bodies."

20   What does that mean?

21   **A.**    It's a C.T. scan.  The patient had a C.T. scan of the

22   body.

23   **Q.**    And above it, it says "lab chemistry" and "lab hematology"

24   and "lab urology."  What is that?

25   **A.**    Those are various types of lab services.

1  **Q.**   Okay.  So does this bill generally describe the services

2  and medications provided to the patient?

3  **A.**   Yes, it does.

4  **Q.**   And if you look at the second to the last column, it says

5  "Total charges."  What's reflected in that column?

6  **A.**   The total charges for each service and then the sum of all

7  of the charges.

8  **Q.**   And what were the total charges on this claim?

9  **A.**   $20,441.98.

10  **Q.**   And what was the date of service of this?

11  **A.**   October 10, 2017.

12  **Q.**   And was that after the contract was terminated?

13  **A.**   Yes, it was.

14  **Q.**   Okay.  And in the left-hand column, under the description

15  of services, it says "Payor Name."  What's reflected in that

16  column?

17  **A.**   The insurance company that we're billing for that

18  particular case.

19  **Q.**   Okay.  Can you turn to page 2 of these documents.

20      Can you tell us what this document is?

21  **A.**   When we -- after we submit the bills, like we just looked

22  at, then the insurance companies send us detail back about, you

23  know, what they're paying and what they're not paying.  And so

24  this is one of those documents.

25      It's called an Explanation of Benefits.

1  **Q.**   Or an EOB?

2  **A.**   Or an EOB.

3  **Q.**   Okay.  There's a column which says, "Submitted charges,

4  $20,441.98."  What is that?

5  **A.**   That is that same total charge figure that we looked at on

6  the claim form.

7  **Q.**   And then it has a column which is "Allowed Amounts."  What

8  is reflected in that?

9  **A.**   That's the amount that Blue Shield was allowing or was

10  going to pay on this claim.

11  **Q.**   And the paid amount, what is reflected on that?

12  **A.**   The money that we were actually paid.

13  **Q.**   Okay.  So was this -- is this an example claim where --

14  that Blue Shield paid to NorthBay after the contract was

15  terminated?

16  **A.**   Yes, it is.

17  **Q.**   Okay.  Just going to go to one more of these.

18       **MR. TOOCH:**  I'd like to go to 57 and move that in

19  evidence.

20       **MS. BRIGGS:**  No objection.

21       **THE COURT:**  All right.  57 is admitted.

22    (Trial Exhibit 57 received in evidence.)

23    (Document displayed.)

24  BY MR. TOOCH:

25  **Q.**   Okay.  Ms. Eichenberger, if you can go to Exhibit 57, and

1   tell us, what is the first page?

2   **A.**    It is a bill for another emergency room visit.  If you

3   look at line 9, you see the same code 0450, which is the

4   emergency room facility fee for another Blue Shield patient,

5   this time at VacaValley Hospital.

6       If you look up at the top of the claim form, over to the

7   left, you can see the location where the services were

8   provided.  That's where you can see that this was a VacaValley

9   patient.

10  **Q.**    In the top right-hand corner, does it say what the date of

11  service of this patient was?

12  **A.**    Yes, it's July 22nd, 2017.

13  **Q.**    And was this after the contract terminated?

14  **A.**    Yes.

15  **Q.**    And what were the total charges for this patient?

16  **A.**    $35,217.45.

17  **Q.**    And if we can go to page 2 of this document.

18          **MS. BRIGGS:**  Objection, Your Honor, to the particular

19  page.  It's irrelevant.  It's the appeals correspondence

20  between Blue Shield and NorthBay.

21          **THE COURT:**  The second page of Exhibit 57?

22          **MS. BRIGGS:**  Yes, Your Honor.

23          **MR. TOOCH:**  Oh, I'm sorry.

24  BY MR. TOOCH

25  **Q.**    Go to page 5.

1    **A.**    Okay.

2    **Q.**    What is this document?

3    **A.**    This is the explanation of benefits for this particular

4    patient.

5    **Q.**    And what were the submitted charges?

6    **A.**    $35,217.45.

7    **Q.**    And what was the allowed amount?

8    **A.**    $12,361.32.

9    **Q.**    What was the paid amount?

10   **A.**    $12,361.32.

11   **Q.**    Was NorthBay in agreement that it could get paid at these

12   rates by Blue Shield after termination of the contract?

13   **A.**    No.

14   **Q.**    Was it a willing seller of its services to Blue Shield at

15   these rates?

16   **A.**    No, we were not.

17   **Q.**    Did NorthBay appeal these payments?

18         **MS. BRIGGS:**  Objection, Your Honor.  Relevance.

19         **THE COURT:**  What is the relevance of the appeal?  Just

20   to show that NorthBay was unhappy with the result?

21         **MR. TOOCH:**  That's right.

22         **THE COURT:**  I think you've established that.

23         **MR. TOOCH:**  Okay.  I'd like to go to Exhibit 45 and

24   ask the -- before I seek to admit it, ask the witness if she

25   recognizes this document.

1    THE WITNESS:  Yes, I do.

2    BY MR. TOOCH

3    Q.   And what is this document?

4    A.   It's a spreadsheet of disputed claims.

5    Q.   And who prepared this document?

6    A.   I did.

7    Q.   Okay.

8         MS. BRIGGS:  Objection, Your Honor.  Counsel and I had

9    an agreement that this document would not be shown with these

10   figures on it.  It's up on the screen.

11        MR. TOOCH:  Oh, I said not to --

12        THE CLERK:  The jury did not see that.

13        MR. TOOCH:  Okay.

14        THE COURT:  This was not shown to the jury.

15        MS. BRIGGS:  Thank you.

16        MR. TOOCH:  Okay.  So I'm going to move to admit this,

17   Your Honor, but we have an agreement with counsel as to a

18   modified version of it to be looked at.  That's why I don't

19   want to show it to the jury.  That agreement was reached just

20   before court today.

21        THE COURT:  So are you moving to admit it or not?

22        MR. TOOCH:  I'm moving to admit it with the agreement

23   that we made with counsel.

24        MS. BRIGGS:  So what I would say is I'm objecting to

25   its admission at this time, but I will allow counsel to admit

1    it in the form that we agreed on.  I have no objection to that.

2         THE COURT:  All right.  Well, I'm not admitting it

3    until you've submitted something that is consistent with what

4    your agreement is.

5         MR. TOOCH:  Okay.

6         THE COURT:  While we're talking about that, it's not

7    clear to me whether, when you've been offering exhibits, you've

8    been offering the entire exhibits or just the portions of the

9    exhibits that are in the binder, which makes it difficult for

10   the defendants if the defendant doesn't have the binder.

11        So what are you offering, Mr. Tooch?

12        MR. TOOCH:  I'm offering the entirety of the exhibit,

13   Your Honor, but I'm just pointing out particular pages from the

14   exhibit that are what I think are relevant to this testimony.

15        THE COURT:  All right.  So what I'd like you to do is

16   give the defendant a copy of this binder.  And then if there

17   were pages, as there has been an objection already, that was

18   not in the binder, to the exhibit, we'll work on that outside

19   the presence of the jury.

20        MR. TOOCH:  Fair enough.

21   BY MR. TOOCH:

22   Q.   Okay.  Ms. Eichenberger, the -- going back to the

23   different types of contracts that NorthBay has with the other

24   payors of health plans -- we've got Cigna, Aetna, and United --

25   are those different from the contracts and payors that are

1    Kaiser, CCN, PHCS, and MultiPlan?

2    A.    Yes, they are.

3    Q.    And how are they different?

4    A.    The Cigna, Aetna, and United arrangements are full network

5    arrangements, and so there's volume being driven to us.  You

6    know, we're -- the health plan will list us as an in-network

7    facility, encouraging patients, you know, to use our

8    facilities.

9         The others on the list, from Kaiser down, there is no

10   directed business under those arrangements.  It's all patients

11   who land in our emergency room.

12   Q.    And are the rates for the nondirected business, the

13   emergency-type contracts, generally higher than the rates in

14   the directed business contracts?

15   A.    Yes.

16   Q.    And why is that?

17   A.    You would expect that, because there is less volume, that

18   you would get a smaller discount.

19   Q.    Now, the situation that you're in with Blue Shield today,

20   is there directed volume by Blue Shield?

21        Is Blue Shield encouraging its members to go to NorthBay?

22   A.    No.

23   Q.    Is it discouraging its members from going to NorthBay?

24   A.    I am sure.

25   Q.    And so are the patients that are Blue Shield members at

1    NorthBay, are those emergency room patients?

2    **A.**    Yes, they are.

3    **Q.**    So are those patients more like the Kaiser, CCN, PHCS, and

4    MultiPlan patients?

5    **A.**    Yes, they are.

6    **Q.**    And does NorthBay expect to get paid more along the lines

7    of what its agreements with those ER payors -- emergency room

8    payors are?

9    **A.**    Yes, we would expect that.

10   **Q.**    Okay.  Now, does NorthBay provide services to Medicare

11   patients?

12   **A.**    Yes, we do.

13   **Q.**    If a Medicare patient shows up at NorthBay's emergency

14   room with a heart attack, does NorthBay have to provide that

15   care to the Medicare patient?

16   **A.**    Yes.

17   **Q.**    Can NorthBay say, sorry, we don't provide services to

18   Medicare patients?

19   **A.**    No, you can't say that.

20   **Q.**    Does NorthBay get to negotiate the rates that it gets paid

21   by the Medicare program?

22   **A.**    No, we do not.

23   **Q.**    Does NorthBay just have to take whatever rate the

24   government pays?

25   **A.**    That's exactly what we have to take.

1  **Q.**   And are the Medicare rates market rates?

2  **A.**   No, they're not.

3  **Q.**   Why not?

4  **A.**   They're not negotiated.

5  **Q.**   Does NorthBay have to provide services to Medi-Cal

6  patients?

7  **A.**   We do.

8  **Q.**   And what type of patients are covered by the Medi-Cal

9  program?

10  **A.**   Those would be low income patients.

11  **Q.**   If a Medi-Cal patient shows up at NorthBay's ER having a

12  stroke, does NorthBay have to provide care to that patient?

13  **A.**   We absolutely do.

14  **Q.**   Does NorthBay say, sorry, we don't provide services to

15  Medi-Cal patients?

16  **A.**   No.

17  **Q.**   Does NorthBay get to negotiate the rates that it receives

18  from Medi-Cal?

19  **A.**   No, we don't.

20  **Q.**   Does it just have to accept whatever Medi-Cal pays?

21  **A.**   We do.

22  **Q.**   Are Medi-Cal rates market rates?

23  **A.**   No, they are not.

24  **Q.**   Now, if NorthBay has to provide emergency room care to

25  Medicare and Medi-Cal patients, why doesn't NorthBay just close

1   its emergency room?

2   **A.**    Because we need -- it's our mission to treat all of the

3   patients that live in our community and we have Medicare and

4   Medi-Cal patients.

5   **Q.**    Do you have a full ER?

6   **A.**    Yes, we do.

7   **Q.**    Why doesn't NorthBay just say, well, we're going to be a

8   hospital that provides cosmetic plastic surgery to rich people,

9   forget about Medicare and Medi-Cal?  Theoretically, could

10  NorthBay do that?

11  **A.**    Theoretically, we could, but we would not be taking care

12  of our patients in our community.

13  **Q.**    Are there some patients that NorthBay provides free care

14  to?

15  **A.**    Yes.

16          **MS. BRIGGS:**  Objection, Your Honor.

17          **THE COURT:**  Overruled.  You can answer.

18          **THE WITNESS:**  Yes, there are.

19  BY MR. TOOCH:

20  **Q.**    Give us an example.

21  **A.**    Had a patient a few years back that -- she had called.  I

22  was working in the business office then, and she had called to

23  talk about an emergency room bill for a visit that she had had.

24          And during the course of our discussion, she told me that

25  she had just been diagnosed with advanced-stage breast cancer

1   And I -- so I asked her, you know, wanting to make sure she was

2   connected to our surgeons and the people that she needed to be

3   connected to, and she said, Oh, no, you don't understand.

4         And I said, Understand what?

5         And she said, I'm not -- I'm not going to have care.  I'm

6   not getting care.  I'm not doing anything about this.

7         And I said, Why?

8         And she said that her husband of many years had left and

9   taken his insurance with him so she didn't have insurance

10  coverage, so she was not going to pursue treatment.

11        And I said, Yes, you are.

12        And we did the mastectomy.  I'm sorry, it's a hard story.

13  We did the mastectomy, we did the chemo and we did the

14  radiation, and it was free.

15  **Q.**   If NorthBay gives away its services for free, is zero

16  dollars the market rate for its services?

17  **A.**   No.

18        **MR. TOOCH:**  No further questions.

19        **THE COURT:**  All right.  Why don't we take a 15-minute

20  break for the first break for the morning and we'll be back at

21  about 20 of.

22        Please remember the admonitions, which are don't talk

23  about the case while you're outside.  Don't do any research.

24  And we'll pick up again in 15 minutes.

25        (Jury out at 9:25 a.m.)

1      THE COURT:  All right.  We'll be in recess.

2              (Recess taken at 9:25 a.m.)

3          (Proceedings resumed at 9:42 a.m.)

4      THE COURT:  All right.  Please be seated, everybody.

5    Ms. Briggs, go ahead.

6      MS. BRIGGS:  Thank you.

7                  CROSS-EXAMINATION

8  BY MS. BRIGGS:

9  Q.   Good morning Ms. Eichenberger.

10  A.   Good morning.

11  Q.   We met the other day, but my name is Amy Briggs and I

12  represent Blue Shield of California in this proceeding.

13      You've covered a lot of topics so we're going to jump

14  around a little bit.  With the Court's and counsel's

15  permission, I'm going to try to signpost that for both you and

16  the jury so it's easier to follow along in my questioning.

17      First I'd like to turn to the commercial contracts you

18  testified to.  I believe those are the ones that are written up

19  over on that white board.

20  A.   Yes.

21  Q.   I wanted to ask you about the United contract which is

22  written up there at 76 percent.  NorthBay recently renegotiated

23  a contract with United, didn't it?

24  A.   Yes.  There's an amended rate.

25  Q.   Okay.  You didn't show the amended rate, did you?

1  **A.**   It wasn't the exhibit I was looking at.

2  **Q.**   But my question, Ms. Eichenberger, was you didn't tell the

3  jury what that amended rate was, did you?

4  **A.**   No.

5  **Q.**   Do you know what --

6  **A.**   I actually don't know it off the top of my head.  I would

7  need to look at the binders at work.

8  **Q.**   Do you have any basis to disagree with the fact that

9  NorthBay renegotiated the rate to 60 percent?

10 **A.**   I don't believe that's the rate.

11 **Q.**   I thought you just said you didn't know what the rate was.

12 **A.**   But I don't think -- it's seventy-something, I believe.

13 But I don't think it's 60.

14 **Q.**   Okay.

15 **A.**   I would have to look to be certain.

16 **Q.**   Okay.  And are you familiar with the work of NorthBay's

17 expert in this case, Mr. Michael Heil?

18 **A.**   Yes.  I've read his report.

19 **Q.**   You have.  Okay.

20     Could we put up the slide from Mr. Heil's report?  And in

21 particular, Ken, if you could --

22     **THE CLERK:**  You won't see it here if it's not

23 published to the jury, but it is showing.

24 **BY MS. BRIGGS:**

25 **Q.**   Ms. Eichenberger, this is a page from Mr. Heil's report.

1  Do you recognize it?

2  **A.**   I've seen it, yes.

3  **Q.**   Okay.  And there's a line in there for United.  Do you see

4  that?

5  **A.**   I do.

6  **Q.**   And the line indicates that the rate went to 65 percent in

7  2018.  Do you see that?

8  **A.**   I do see that.

9  **Q.**   Okay.  Do you have any basis to disagree with Mr. Heil

10  that NorthBay, in fact, renegotiated its United contract rate

11  to the 65 percent just last year?

12  **A.**   Again, I would need to look at documents other than what's

13  been presented to me.

14  **Q.**   Understood.  As you sit here today, Ms. Eichenberger, do

15  you have any reason to disagree?

16  **A.**   I have no reason to agree or disagree.

17  **Q.**   Okay.  Now, on the same topic of the commercial contracts,

18  there's a contract that isn't listed on that board at all that

19  I believe NorthBay has.  Are you familiar with NorthBay's

20  contract with Health Net?

21  **A.**   I am.

22  **Q.**   What's Health Net?

23  **A.**   Health Net is an insurance company just like Blue Shield

24  or any of the others.

25  **Q.**   And what is the rate that NorthBay has agreed to with

1   Health Net?

2   **A.**   I would need to look at the contract.

3   **Q.**   Do you know whether it's 50 percent?

4   **A.**   I would need to look at the contract.

5   **Q.**   Again, you're familiar with Mr. Heil's report, NorthBay's

6   own expert, correct?

7   **A.**   Yes.

8   **Q.**   So if we could put that same slide back up, Mr. Kotarski,

9   and go to the bottom line.

10      Ms. Eichenberger, can I direct your attention to the rate

11  that Mr. Heil, NorthBay's expert, says it's paid under the

12  Health Net contract?

13  **A.**   Yes.

14  **Q.**   And that says 38 percent, right?

15  **A.**   It does.

16  **Q.**   Do you have any basis, sitting here today, NorthBay has

17  entered into a contract with Health Net for 38 percent?

18  **A.**   I don't have the contract in front of me.  If you look at

19  the contract rate, the column with some sort of descriptions in

20  it, I do know that that contract has different reimbursement

21  terms throughout.  If it in the aggregate is 38 percent of

22  billed charges, then it is.

23  **Q.**   So again, you have no reason to disagree, correct?

24  **A.**   Or agree.

25  **Q.**   So would it be fair to say that there are two contracts.

1   One is Health Net.  And that wasn't mentioned at all in your

2   testimony, correct?

3   **A.**   Correct.

4   **Q.**   Okay.  And the other is that NorthBay has renegotiated its

5   United contract.  So United is now at 65 percent, not 76.

6   Right?

7              **THE COURT:**  That misstates her testimony.

8              **MS. BRIGGS:**  Excuse me?

9              **THE COURT:**  That misstates her testimony.  She said

10  she didn't know.

11  **BY MS. BRIGGS:**

12  **Q.**   You don't know, right?

13  **A.**   I don't know without looking at the contracts.

14  **Q.**   Do you know whether or not Mr. Heil, when he reviewed

15  NorthBay's contracts, even factored in the rates that NorthBay

16  was receiving into his calculation of reasonable value, one way

17  or the other?  Do you know?

18  **A.**   No.  You would need to ask Mr. Heil.

19  **Q.**   We will.

20       But it's true, Ms. Eichenberger, isn't it, that these

21  contracts, and specifically Health Net, United, Cigna and

22  Aetna, include both emergency services and elective services,

23  correct?

24  **A.**   Yes.  Emergency services, elective services, and referred

25  volumes, yes.

**Q.**   So, for example, you testified earlier about NorthBay's cancer center and the treatment that that provides patients. Correct?

**A.**   I did.

**Q.**   Okay.  So under these commercial contracts it's true, isn't it, that the members of those plans would have access to those -- to the cancer services.

**A.**   Absolutely.

**Q.**   And it's true, isn't it, that a Blue Shield member where Blue Shield is no longer contracted with NorthBay would not have access to those elective services, correct?

**A.**   Not without a specific authorization or agreement, no.

**Q.**   Let me step back for a minute and talk about the claims that are in dispute here in this litigation.

First of all, the doctors' fees are not in dispute here, correct?

**A.**   No, they are not.

**Q.**   Okay.  So these are only the hospital's fees.  Like the facility -- what we call the facility fees.  Are you familiar with that term?

**A.**   Yes, I am.

**Q.**   So that refers to things like NorthBay's charges for room and board, for example.

**A.**   Yes.

**Q.**   Or, for in some of the specific claims, we saw tests that

1    NorthBay runs.  Correct?

2    **A.**    Or the emergency room charges that we looked at.

3    **Q.**    Okay.  Or the emergency room charges.  That's what's in

4    dispute here.  Correct?

5    **A.**    Correct.

6         **THE COURT:**  Ms. Briggs, I'm sorry.  Would you just

7    tear off that piece of paper that you've written on because

8    it's not an accurate reflection of what has been testified to.

9         Thank you.

10        (Pause.)

11        **MS. BRIGGS:**  Really loud.

12   **BY MS. BRIGGS:**

13   **Q.**    Let's move to more specifically the nature of the claims

14   in dispute.

15        You spoke to the jury about two specific claims, correct?

16   **A.**    Correct.

17   **Q.**    Okay.  Now, it's true that those two claims were picked

18   from more than 1,600 claims in dispute.  Correct?

19   **A.**    That's correct.

20   **Q.**    Okay.  And you're not a clinical person yourself, are you,

21   Ms. Eichenberger?

22   **A.**    No, I'm not.

23   **Q.**    And you have not undertaken the gargantuan task of

24   reviewing the nature of all the services that were rendered in

25   those 1,600 claims, correct?

1    A.    Not individually, no.

2            **MS. BRIGGS:**  Can we put up Exhibit 118, Mr. Kotarski?

3    And if you could go to page 2.

4         This is an exhibit that's quite hard to read.

5            **THE COURT:**  This is in, yeah.

6            **MS. BRIGGS:**  Yes.  It is already in.  What I was

7    hoping -- let me grab that.

8         NorthBay, could I ask to borrow your binder?  I didn't get

9    a binder of exhibits.  Thank you.  It's just that I can't read

10   that second page.

11        It's actually hard to read on your copy.

12   **BY MS. BRIGGS:**

13   **Q.**    So, Ms. Eichenberger, you mentioned a number of services

14   that NorthBay provides.  And just wanted to confirm that you're

15   not aware personally of whether or not any cardiac cath

16   services, for example, were rendered to Blue Shield patients in

17   the claims in dispute, are you?

18   **A.**    I don't recall specifically.

19   **Q.**    That's because you really haven't looked at, beyond the

20   two exemplar claims we looked at -- that Mr. Tooch looked at --

21   you really don't know the services at issue.  Correct?

22   **A.**    We've looked at -- through the course of this process of

23   getting ready for trial and depositions and things, there have

24   been cases that we have looked at.  I just can't recall whether

25   any was specifically a cardiac cath.

1   **Q.**   You talked about the neonatal intensive care unit that

2   NorthBay runs.

3   **A.**   Correct.

4   **Q.**   Are there any claims in dispute where Blue Shield members

5   had a baby admitted to NorthBay's -- what we call the NIC-U

6   unit?

7   **A.**   There are none.

8   **Q.**   Let's turn to the Blue Shield contract itself that you

9   talked about earlier.

10      Blue Shield was entitled to terminate its contract,

11  correct?

12  **A.**   Yes.

13  **Q.**   And it gave notice to NorthBay properly under the terms of

14  that contract, didn't it?

15  **A.**   Yes.

16  **Q.**   And NorthBay is not here today suggesting that there was

17  anything improper about the termination of that contract,

18  right?

19  **A.**   No, we are not.

20  **Q.**   Okay.  And the effective date of termination of that

21  contract was December 1 of 2016, correct?

22  **A.**   That was the first non-contracted day, yes.

23  **Q.**   And, Ms. Eichenberger, you don't know the reason that Blue

24  Shield terminated that contract, do you?

25  **A.**   No, I don't.

1  **Q.**   So you don't know if Blue Shield thought that the contract

2  had become too expensive for it, do you?

3  **A.**   No.  That would seem odd, though, since the rates had

4  continued to go down year over year.

5  **Q.**   Again, Ms. Eichenberger, you don't know the reasons Blue

6  Shield terminated the contract and whether or not it thought it

7  was too expensive.  Correct?

8  **A.**   Blue Shield never told me, no.

9  **Q.**   So you don't know whether or not it was impacting Blue

10  Shield's ability to offer affordable coverage to residents in

11  Solano County, correct?

12       **MR. TOOCH:**  Objection.  Assumes a fact not in

13  evidence.

14       **THE COURT:**  Well, it's -- it's argumentative in light

15  of her prior answer that she doesn't know.

16       **MS. BRIGGS:**  I'll withdraw the question.

17  BY MS. BRIGGS:

18  **Q.**   You do know, however, Ms. Eichenberger, that the 1,600,

19  about, claims that are in dispute in this litigation, those

20  claims arose after the contract was terminated.  Correct?

21  **A.**   That's correct.

22  **Q.**   And I believe you've given some testimony that Blue Shield

23  was no longer -- has no longer been paying the rates under the

24  contract.  Correct?

25  **A.**   That's also correct.

1  **Q.**   In fact, the rates its been paying are significantly --

2  are lower, aren't they?

3  **A.**   Yes, they're low.

4  **Q.**   So has Blue Shield -- is Blue Shield a willing buyer of

5  NorthBay's services at the rates in the contract during the

6  period of the claims in dispute?

7  **A.**   It still has insured members that live in our service

8  area, so --

9  **Q.**   Ms. Eichenberger, my question --

10       **THE COURT:**  Let her finish, please.

11       **THE WITNESS:**  I believe that it is.

12  BY MS. BRIGGS:

13  **Q.**   It's a willing buyer?

14  **A.**   It still has -- sells insurance to people who live -- or,

15  to employers of people who live in our service area.  It would

16  seem that it would have a responsibility to have facilities

17  that those patients could go to.

18  **Q.**   Do you know whether or not Blue Shield has entered into

19  contracts with facilities that charge a fraction of the price

20  NorthBay does?

21       **MR. TOOCH:**  Objection.  Assumes a fact not in

22  evidence.

23       **THE COURT:**  Overruled.

24       **THE WITNESS:**  I have no idea.

25

1   **BY MS. BRIGGS:**

2   **Q.**   I'd like to direct your attention, Ms. Eichenberger, to

3   the series of contracts that are at the bottom of that board.

4   And just so we're all on the same page, it's the CCN, PHCS, and

5   multi-plan contracts?

6   **A.**   Yes.

7   **Q.**   So let's just start with multi-plan as an example.

8   Because would you agree with me that those contracts operated

9   similar ways?

10  **A.**   I would agree.

11  **Q.**   Okay.  Now the multi-plan contract, that's not a contract

12  directly with a payor, is it?

13  **A.**   No.

14  **Q.**   And, in fact, this is a -- I find the multi-plan

15  arrangement a little confusing.  I have a demonstrative that --

16          **MS. BRIGGS:**  -- you've seen.  You've already seen it.

17          **MR. TOOCH:**  I don't know which one --

18          **MS. BRIGGS:**  Ken, it was part of Mr. Deal's deck, but

19  I've removed any text.

20       Would you pull up -- and let counsel see it first.  I

21  don't want it to go to the jury.  Just let counsel look at it.

22          **MR. TOOCH:**  I have no problem with the demonstrative

23  that she --

24          **MS. BRIGGS:**  Okay.

25          **THE COURT:**  Go ahead.

1   **BY MS. BRIGGS:**

2   **Q.**   So, Ms. Eichenberger, can you see it on your screen?

3   **A.**   Yes.

4   **Q.**   Okay.  So in this diagram -- and this is really just to

5   help everybody's testimony and understanding.  The gray circle

6   in the middle that says "Rental Networks."  That's multi-plan,

7   right?

8   **A.**   Yes.

9   **Q.**   Or CCN?

10  **A.**   Or PHCS, yes.

11  **Q.**   And then here's a light blue circle on the right-hand side

12  that says "Payors," right?

13  **A.**   Correct.

14  **Q.**   And on the left-hand side is a peach-colored circle for

15  "Providers," right?

16  **A.**   Correct.

17  **Q.**   So the provider in this instance would be NorthBay, for

18  example, correct?

19  **A.**   Yes.

20  **Q.**   And the rental network is one of the three entities that

21  we've just mentioned.

22  **A.**   Yes.

23  **Q.**   Let's focus on the payors.  The payors, you would agree,

24  are largely smaller -- smaller health plans, sometimes out of

25  state.  Is that right?

1    A.    Yes.  Based upon what I've seen, that's correct.

2    Q.    In other words, they're not the Cignas or the Aetnas of

3    the world, correct?

4    A.    Generally, no.

5    Q.    You would also agree that the payors in that case aren't

6    negotiating a contract directly with NorthBay, correct?

7    A.    That's correct.

8    Q.    So it's really a series of two separate contracts,

9    correct?

10   A.    Correct.

11   Q.    And you would also agree with me that the payors, the

12   CCNs, the multi-plans of the world, don't pay the claims

13   themselves, correct?

14   A.    That's correct.

15   Q.    So the money really comes from the payors through the

16   rental network and on to NorthBay, correct?

17   A.    Yes.

18   Q.    Okay.  So whatever discount the payor is receiving under

19   this arrangement, it's not one that it has negotiated directly

20   with NorthBay, correct?

21   A.    That's correct.

22   Q.    Do payors -- if one of their members is treated at

23   NorthBay, do payors have to use that multi-plan contract?

24   A.    No, they don't.

25   Q.    And do you know the volume of NorthBay's overall business

1  that is actually paid through these types of arrangements?

2  **A.**   It's not overly significant.   As -- especially as a

3  percentage.   I would have to look at some data.

4  **Q.**   Can you give any kind of estimate as to how much of

5  NorthBay's business actually gets paid through these rental

6  networks?

7  **A.**   I wouldn't feel comfortable guessing.   I would need to

8  look at data.

9  **Q.**   But I think you said it's nothing significant, right?

10  **A.**   Not overly significant, no.

11  **Q.**   I wanted to ask you about payments made through Medicare

12  that you also talked about.   And the jury may know this, but

13  Medicare is a government health insurance, right?

14  **A.**   Yes.

15  **Q.**   And it's generally speaking, although there are some

16  exceptions, for people who are 65 and over.   Correct?

17  **A.**   Or disabled, yes.

18  **Q.**   Correct.   That was the exception I was thinking of.   Does

19  NorthBay have to be a participating provider in the Medicare

20  program?

21  **A.**   In order to see Medicare patients, yes.

22  **Q.**   I understand.   But does it have to participate in the

23  Medicare program?

24  **A.**   I don't know of any hospital that doesn't participate in

25  the Medicare program.

1  Q.   Ms. Eichenberger, does NorthBay have to participate in the

2  Medicare program?

3  A.   Believe that we do, given that we have an emergency room.

4  We couldn't -- the hospital couldn't have an emergency room

5  that requires you to see anyone who presents and not be a

6  provider with Medicare.

7       MS. BRIGGS:  Mr. Kotarsky, could you please play the

8  video of Ms. Eichenberger's testimony?  But before you do --

9  BY MS. BRIGGS:

10 Q.   Ms. Eichenberger, you do recall that you --

11      MR. TOOCH:  I'm going to object to the video.  I don't

12 think it's --

13      Sidebar, Your Honor?

14      THE COURT:  No sidebars.  But I would like to -- I'd

15 like to have the deposition transcript.

16      MS. BRIGGS:  You don't have the transcript?

17      THE COURT:  I think I need the transcript.

18      MS. BRIGGS:  Do you mind if I open it to the page?

19 Page 158, lines 18 to 22.

20      THE COURT:  Would you say that again?

21      MS. BRIGGS:  Page 158, lines 18 to 22.

22      MR. TOOCH:  Sorry.  I didn't hear what Ms. Briggs

23 said.

24      MS. BRIGGS:  Page 158.

25      THE COURT:  Go to page 158, lines 18 to 22.

1    MS. BRIGGS:  That's for you.

2    May I proceed, Your Honor?

3         THE COURT:  You may.  Just a second.

4    Is there any objection?

5    (Pause.)

6         MR. TOOCH:  Your Honor, no.  No problem.

7         THE COURT:  Okay.  Please go ahead.

8    BY MS. BRIGGS:

9    Q.   Before you play that Mr. Kotarsky, I just want to ask.

10        Ms. Eichenberger, you remember you gave a deposition on

11   December 7 of 2018?

12   A.   I do.

13   Q.   Okay.  And you were under oath during that deposition the

14   same as you are here today?

15   A.   Yes.

16        MS. BRIGGS:  Okay.  Go ahead.

17             (Video was played but not reported.)

18   BY MS. BRIGGS:

19   Q.   Let's move on to the nature of the services that the

20   patients at NorthBay receive when they come to the hospital.

21        It's true, isn't it, Ms. Eichenberger, that the services

22   that patients get at NorthBay are the same regardless of

23   whether the patient has a contracted health insurer, health

24   plan, or a non-contracted health plan, correct?

25   A.   Absolutely.

1   Q.   So they get seen by the name doctors, correct?

2   A.   Yes.

3   Q.   And they receive the same medications, correct?

4   A.   They do.

5   Q.   And they receive the same treatments, correct?

6   A.   Yes.

7   Q.   And when the Blue Shield member, or really anybody else

8   presents to NorthBay for emergency services, you would agree

9   that the hospital has an obligation to treat them, correct?

10  A.   Yes.

11  Q.   And you would also agree, wouldn't you, that health

12  insurers, or health plans like my client, have to pay the

13  hospital, correct?

14  A.   Yes.

15  Q.   And you would also agree that the health plans or health

16  insurers, such as Blue Shield, can't tell their members where

17  to go for emergency services.  Correct?

18  A.   No, they can't.

19  Q.   In other words, they're going to go to -- the members are

20  going to go to a hospital that's nearby regardless whether or

21  not that hospital is contracted or not contracted.  Right?

22  A.   Yes.

23  Q.   I want to direct your attention back to the last contract

24  on the board there.  And that is the Kaiser contract.

25       That Kaiser contract is terminated just like the Blue

1  Shield contract, isn't it?

2  **A.**    It is.

3  **Q.**    And when did Kaiser terminate that?

4  **A.**    September 18, 2016.

5  **Q.**    So just about two and-a-half months before the Blue Shield

6  contract terminated.  Correct?

7  **A.**    Right.

8  **Q.**    And it's true, isn't it, that Kaiser is now paying

9  NorthBay about half of what it used to pay under the contract?

10  **A.**    That's correct.

11  **Q.**    And NorthBay has sued Kaiser, hasn't it?

12  **A.**    Yes, we are.

13  **Q.**    Let's talk about the two Blue Shield claims that you

14  testified to earlier.  And the first is Exhibit 54.

15       So Ms. Eichenberger, on Exhibit 54 we have a patient who

16  didn't spend the night at NorthBay to receive treatment,

17  correct?

18  **A.**    They were there across midnight, but it was not an

19  inpatient case.

20  **Q.**    Is that what NorthBay calls a treat and release case?

21  **A.**    Yes.  Yes.

22  **Q.**    So in other words, this is otherwise known as an

23  outpatient claim, right?

24  **A.**    It is an outpatient claim, yes.

25  **Q.**    And what outpatient claims means is that the patient

1  presents to the emergency room, receives their treatment, and

2  is released without ever being admitted to the hospital.

3  Correct?

4  **A.**   Correct.

5  **Q.**   And NorthBay's charges for seeing this outpatient, or this

6  treat and release, were over $20,000.  Weren't they?

7  **A.**   Yes, they were.

8  **Q.**   Now, Blue Shield paid a little over $7,000 on this claim.

9  Right?

10  **A.**   Can we refer back to the --

11  **Q.**   Yes.  Absolutely.  Absolutely.  On the very next page of

12  the exhibit I will show you -- does that refresh your

13  recollection?

14  **A.**   Yes.  They paid $7,175.14.

15  **Q.**   So if NorthBay's charges were twice what surrounding

16  hospitals were charging --

17       **MR. TOOCH:**  Objection, speculative.

18       **THE COURT:**  Overruled.  You can answer.

19  **BY MS. BRIGGS:**

20  **Q.**   If NorthBay's charges were double what hospitals in the

21  surrounding area were charging for these same services, then in

22  other hospitals Blue Shield would have received a bill for

23  about $10,000, give or take, correct?

24  **A.**   Did you say if they were double?

25  **Q.**   If NorthBay's charges were double.  Correct?

1    **A.**    Yes.  It would be half of this amount.

2    **Q.**    In other words, the bill would have been for about half.

3    And under that scenario, Blue Shield's reimbursement would have

4    been around 70 percent, correct?

5    **A.**    For this -- yes.  If the services were the same.

6    **Q.**    Do you know did Blue Shield -- excuse me -- did NorthBay

7    render any treatment here that other hospitals couldn't have?

8         **MR. TOOCH:**  Objection, speculation.

9         **THE COURT:**  If you know you can answer the question.

10        **THE WITNESS:**  Can we go back to the bill, please?

11   **BY MS. BRIGGS:**

12   **Q.**    Sure.  Would you turn to the front page?

13   **A.**    Those are probably services that other area hospitals

14   have, yes.

15   **Q.**    My last question -- famous last words -- you testified

16   earlier that you were sure Blue Shield was discouraging members

17   from being treated at NorthBay now.  Correct?

18   **A.**    Yes.

19   **Q.**    And what was the basis of that response?

20   **A.**    That we're not an in-network facility anymore, so the

21   services that would have been rendered as an in-network

22   facility could not be rendered at NorthBay.

23   **Q.**    In other words, Blue Shield is discouraging its members

24   because as a non-in-network facility it would be more expensive

25   for the patient, wouldn't it?

1   **A.**   Absolutely.

2           **MS. BRIGGS:**  Thank you.  No further questions.

3           **THE COURT:**  All right.  Redirect, Mr. Tooch.

4           **MR. TOOCH:**  Thank you, Your Honor.

5                      <u>**REDIRECT EXAMINATION**</u>

6   BY MR. TOOCH:

7   **Q.**   Ms. Eichenberger, on direct exam do you recall being asked

8   questions about whether or not Blue Shield members now have

9   access to NorthBay's cancer care center?

10  **A.**   No, I don't believe you asked me that question.

11  **Q.**   Do you recall whether or not -- do you recall on direct

12  exam that you were asked questions that Blue Shield members

13  don't have access to all of the elective services now that are

14  being provided by NorthBay?

15  **A.**   No.

16  **Q.**   Okay.  Assuming -- if Blue Shield didn't terminate the

17  contract, would Blue Shield members have access to NorthBay's

18  cancer care center?

19  **A.**   Yes, they would.

20  **Q.**   Would they have access to all of the elective services at

21  NorthBay?

22  **A.**   Yes, they would.

23  **Q.**   If the contract is in place, do health plans generally

24  authorize the services at the hospital?

25  **A.**   Yes.  If there's a contract, yes.

**Q.** So if somebody wanted elective cancer care -- not that anybody wants to elective to have cancer care -- but if they were to have chemotherapy would it be likely now that Blue Shield would not authorize that care at NorthBay?

**A.** It would be unlikely that they would authorize the care at NorthBay.

**Q.** So is the reason why Blue Shield's members can't get cancer care at NorthBay now is because Blue Shield terminated the contract?

**A.** Yes. That's exactly why.

**Q.** Do you recall being asked questions on cross-examination whether any of the cardiac cath services were being provided to Blue Shield members?

**A.** I do recall.

**Q.** And the same questions with respect to NIC-U services. Do you recall that?

**A.** Yes.

**Q.** If a Blue Shield member showed up in the emergency room with a life-threatening situation, they've got a blockage of the artery, would they be given treatment in NorthBay's cardiac cath lab?

**MS. BRIGGS:** I think that's an improper hypothetical. It's not a claim in dispute.

**THE COURT:** Overruled.

1  BY MR. TOOCH:

2  **Q.** You may answer.

3  **A.** Yes, they would.

4  **Q.** If a mother, who's a Blue Shield member, went into labor

5  very prematurely and had a very sick baby, would that care --

6  baby be provided care in NorthBay's NIC-U unit?

7  **A.** Yes, it would be.

8  **Q.** If a Blue Shield member was suffering a stroke, would that

9  member be treated just the same way as other members of other

10  health plans like Blue Cross and Cigna, Aetna?

11  **A.** Yes.

12  **Q.** Same for chest pain?

13  **A.** Any of our services they would have access to.

14  **Q.** Do you recall on cross-examination being shown a chart

15  with the rental networks, and then on one side was the payor,

16  and the other side was the hospital.

17  **A.** I do remember.

18  **Q.** If the payors do not access the rental network contracts,

19  multi-plan, CCN, et cetera, would you expect to be paid

20  100 percent of your charges for those claims?

21  **A.** Yes, I would.

22  **Q.** And so by accessing the multi-plan and the CCN contracts

23  do they get a discount?

24  **A.** Yes. That's why they access them.

25  **Q.** In your deposition do you recall the section being played

1    where you said that NorthBay doesn't necessarily have to be a

2    participating provider.  Do you recall that?

3    A.    Yes.

4    Q.    Okay.  So theoretically can NorthBay choose not to take

5    Medicare patients?

6    A.    I believe that we could.  I just -- it's hard to fathom

7    because we never would.  And I've never worked in a facility

8    that didn't have -- that wasn't a participating provider with

9    Medicare.

10   Q.    Now, finally, you were showed a claim where there was --

11   Exhibit 54.

12         If we could pull that up, please.

13         Did this patient have emergency services?

14   A.    Yes, they did.

15   Q.    And what is the definition of "emergency services"?

16         MS. BRIGGS:  Objection, Your Honor.  Lacks foundation.

17   And legal question.

18         THE COURT:  Overruled.  You can answer to the extent

19   of your personal knowledge.

20         THE WITNESS:  If a person believes that their life is

21   in danger based upon a condition, then they need to access an

22   emergency room.  It's a laymen's interpretation of emergency.

23   BY MR. TOOCH:

24   Q.    Are there different levels of emergency care that are

25   provided in the emergency room?

1  **A.**    Yes.

2  **Q.**    How many levels are there?

3  **A.**    Technically, six.

4  **Q.**    Okay.  And if you see next to the emergency room code

5  there's a 99284.  Do you know what that means?

6  **A.**    That's the fourth level.  So the levels start at a 1.  So

7  a 99281.  And then 99282, 283, 284, 285.  And then critical

8  care, which is a different code.

9  **Q.**    So are they five codes and then the critical code?

10 **A.**    Yes exactly.

11 **Q.**    Was this the second highest emergency code?

12 **A.**    Yes, it is.

13 **Q.**    And do you think that $20,000 is reasonable to save

14 somebody's life?

15        **MS. BRIGGS:**  Objection, Your Honor.

16        **THE COURT:**   Sustained.

17        **MR. TOOCH:**  No further questions.

18        **THE COURT:**  Anything further?

19        **MS. BRIGGS:**  Yes, Your Honor.  Just briefly.

20                        **RECROSS-EXAMINATION**

21 BY MS. BRIGGS:

22 **Q.**  Ms. Eichenberger, Mr. Tooch asked you a series of

23 hypothetical questions about whether or not if a Blue Shield

24 member presented at NorthBay it would receive certain types of

25 treatment.  Do you remember those questions?

1    A.    I do.

2    Q.    NorthBay is not here in this lawsuit asking Blue Shield to

3    pay on hypothetical claims, correct?

4    A.    That's correct.

5              MS. BRIGGS:  Okay.  Thank you.  No further questions.

6              THE COURT:  All right.  Thank you, Ms. Eichenberger.

7    You can step down.

8         (Witness excused.)

9              THE COURT:  Mr. Tooch, who's next?

10             MR. TOOCH:  Is plaintiffs call Dr. Edie Zusman.

11                          **EDIE ZUSMAN**,

12   called as a witness for the Plaintiff, having been duly sworn,

13   testified as follows:

14             THE CLERK:  Adjust the mic, then if you would please

15   state your full name for the record and spell it for the court

16   reporter.

17             THE WITNESS:  Edie E. Zusman.  Z-U-S-M-A-N.

18                        **DIRECT EXAMINATION**

19   BY MR. TOOCH:

20   Q.    Good morning, Dr. Zusman.  Tell us what type of doctor are

21   you?

22   A.    I'm a neurosurgeon.

23   Q.    What is a neurosurgeon?

24   A.    A neurosurgeon is a surgeon who specializes in the care of

25   the brain, the spine and the peripheral nerves.

1   Q.   And what types of surgery do neurosurgeons do?

2   A.   Oh, we do brain surgeries for diseases such as stroke and

3   hemorrhage.  For brain tumors, for trauma.  We do spine

4   surgeries, and we do peripheral nerve surgery.

5   Q.   What is a hemorrhage?

6   A.   Hemorrhage is a bleed.

7   Q.   A brain bleed?

8   A.   Hemorrhage can be a bleed in any area.  It would then

9   secondarily be identified based on location.

10  Q.   Okay.  What was the last thing that you said?  I didn't

11  quite catch it.  Of the types of surgeries that you do.

12  A.   Peripheral nerve.

13  Q.   What's peripheral nerve?

14  A.   Like carpal tunnel.  Wherever nerves are in the body

15  neurosurgeons can operate.  Operate in the brain, the spine and

16  in the extremities.

17  Q.   Where did you go to medical school?

18  A.   I attended Northwestern University in Chicago.

19  Q.   And how old were you when you started medical school?

20  A.   I started medical school at the age of 19.

21  Q.   And why did you start so young?

22  A.   I applied to medical school out of high school, and I got

23  an acceptance that required me to do two years of undergrad

24  before matriculating to medical school.

25  Q.   Where did you go your internship and residency?

1  A.   At University California Davis.  I did general surgery

2  internship, followed by neurosurgical residency and chief

3  residency.

4  Q.   Where did you do your fellowship?

5  A.   I did my fellowship with Dr. Charles Wilson at University

6  of California San Francisco.

7  Q.   Why did you mention Dr. Wilson's name?

8  A.   In his day he was one of the leading neurosurgeons for

9  brain tumors and aneurysms, vascular neurosurgery.  And I was

10  very blessed to be mentored by him.

11  Q.   What is a fellowship?

12  A.   A fellowship is additional years.  So after you're fully

13  certified and ready to go out and practice, some of us choose

14  to do some deeper training and education.

15  Q.   And did you specialize in any particular areas in your

16  fellowship?

17  A.   Yes.  My fellowship is in epilepsy, awake craniotomies,

18  computer-guided neurosurgery, and tumors.

19  Q.   What is an awake craniotomy?

20  A.   So the brain itself doesn't feel pain.  So if you numb up

21  the skin, you can do the full craniotomy and talk to patients

22  through that procedure.  For some patients it makes the

23  procedure safer.  So that you can resect the greatest amount of

24  tumor, or treat their epilepsy, with a decreased risk of side

25  effects.

1  Q.   There's some surgeons where you're talking to the patient

2  while you're operating on their brain?

3  A.   Yes, sir.

4  Q.   And what types of questions are you asking those patients?

5  A.   So depending upon where the lesion is located, where the

6  abnormality is located.  If it's in a speech area, we might

7  have them talk or answer questions.  We might have them read or

8  look at pictures.  And that can be customized depending on

9  where it is in the brain.

10  Q.   So if there's a tumor or lesion in certain parts of the

11  brain, does it affect certain speech patterns?

12  A.   Yes.

13  Q.   After your fellowship, what was your first professional

14  appointment?

15  A.   I worked at Kaiser Sacramento.

16  Q.   And what were you doing at Kaiser Sacramento?

17  A.   I did general neurosurgery there, and I did some of the

18  first epilepsy cases, some of the first awake craniotomies, at

19  Kaiser in Sacramento.

20  Q.   When you say general neurosurgery, what do you mean?

21  A.   Referring back to brain, spine, and the more simple

22  peripheral nerve cases.

23  Q.   And where did you work after Kaiser Sacramento?

24  A.   Then I was recruited to UC Davis to become assistant

25  professor.  I ran an epilepsy laboratory and launched a

1    comprehensive epilepsy program and brain tumor program for UC

2    Davis.

3    Q.   What's epilepsy?

4    A.   Seizures.  Epilepsy as disorder of the brain where there's

5    recurrent electrical activity that disrupts normal function.

6    Q.   And what is a tumor?

7    A.   A tumor is a type of cell that has altered DNA and it

8    doesn't respect the normal growth patterns.  Tumors vary from

9    benign to malignant.  Benign tend to be well demarcated, or

10   separated from the surrounding structures.  And malignant

11   tumors, as many people would be familiar with, would be

12   considered cancer and that's where it travels through the

13   normal structures, through the bone, through the muscle, or

14   even throughout the body.

15   Q.   And so do you work on tumors in the brain only or in other

16   parts of the body?

17   A.   Again, using that same template, it would be the brain,

18   the spine, and the peripheral nerves.

19   Q.   Okay.  How long were you an assistant professor at UC

20   Davis?

21   A.   I was on the full-time faculty for three years.  And then

22   I remained on the volunteer clinical faculty for a number of

23   years afterwards.

24   Q.   And what did you teach?

25   A.   I taught neurosurgery.  I taught residents.  And even some

1  of my residents are now working in systems throughout northern

2  California.

3  **Q.**   After UC Davis where did you work?

4  **A.**   I was recruited from UC Davis to the Sutter system.  And

5  in the Sutter system in Sacramento I helped to organize the

6  neuroscience care.

7  **Q.**   What was your position at Sutter?

8  **A.**   I was the director of adult neurosurgery.

9  **Q.**   And how long did you have that position?

10  **A.**   Approximately 12 years.

11  **Q.**   And you used the term "neuroscience."  What does that

12  generally --

13  **A.**   So neuroscience is a broader term that would include other

14  specialties.  For example, neurology.  In some programs it

15  would include psychiatry, physical medicine and rehabilitation,

16  pain management.  So essentially it would be kind of all of the

17  different doctors working together for diseases of the nervous

18  system.

19  **Q.**   And after -- that was Sutter Sacramento?

20  **A.**   Yes.

21  **Q.**   And after working there, where did you go?

22  **A.**   After working in Sutter Sacramento I pursued my MBA, my

23  business degree.  And with that, I moved in the Sutter system

24  to the East Bay hub for neuroscience.  And there I directed

25  neuroscience program development.  And again, it was the

1    transition from working just in a single area of neuroscience,

2    the neurosurgical area, then to start building systems of care

3    that would create a better patient experience.

4    Q.   And why did you get your MBA?

5    A.   I got my MBA because I felt like when I was talking to the

6    administrative staff at my hospital, at the Sutter Hospital in

7    Sacramento, that it was like we were speaking different

8    languages.  And I felt that as a passionate physician who

9    wanted to build great programs for my patients, if I could

10   learn their language, their business language and their

11   administrative language, that maybe I could help move some of

12   these care programs forward.  So I actually looked to see where

13   the CEO of Sutter got their MBA, and that's where I went.

14   Q.   And a MBA is a master of business administration.

15   A.   Correct.

16   Q.   Where did you work after Sutter?

17   A.   So after -- I think it was five years additional at Sutter

18   in the East Bay -- I was recruited to NorthBay where I'm

19   currently working.

20   Q.   Have you ever worked -- before we get to NorthBay, have

21   you ever worked outside of the country?

22   A.   Yes.

23   Q.   And where?

24   A.   I've traveled twice to Nigeria.  The first time was five

25   years ago.  And in Nigeria, the disease of epilepsy, one of my

1   areas of expertise, it's thought to be like a curse.  So people

2   with epilepsy in Nigeria, they can't work, nobody can marry

3   into their family, they're isolated, they have to live on the

4   outside of the community.

5       And we studied this aspect, and we found that for $23 a

6   year, 70 percent of people with epilepsy in Nigeria could be

7   seizure-free if they stayed on those medicines.  So we brought

8   that really transformative and innovative program to southern

9   Nigeria.

10      Then five years later we went back with a similar type of

11  model building on that experience.  And we looked at stroke.

12  And what was fascinating about stroke is it comes from the root

13  "stroke of God."  And so in these more under-developed,

14  under-resourced countries there was this, like a shamanism

15  associated that something bad had happened.  It was really an

16  incredible and transformative opportunity.  Thank you for

17  asking.

18  Q.   When did you start working at NorthBay?

19  A.   Three years ago.

20  Q.   And what is your position at NorthBay?

21  A.   I'm the director of the NorthBay center for neuroscience.

22  Q.   And what type of care does the neuroscience center at

23  NorthBay provide?

24  A.   NorthBay provides comprehensive care.  We use a Mayo

25  Clinic model of one-stop shop trying to make it so that

1  patients who have different diseases, like brain tumors and

2  spine problems, can come on one day and see all of their

3  specialists together.

4  Q.    Stop you right there.  What is the Mayo center?

5  A.    The -- NorthBay's been identified as part of the Mayo

6  Clinic network in northern California, so we've been able to

7  begin thinking about aspirational goals of modeling our health

8  care based on physician-led patient-centered care.  Making a

9  destination for comprehensive and complex care at NorthBay.

10  Q.    Is the Mayo Clinic a small little clinic in northern

11  California?

12  A.    So Mayo Clinic is Mayo Clinic.

13  Q.    I don't know what that means.  Tell us what Mayo Clinic

14  means.

15  A.    Sure.  So Mayo Clinic is one of the stalwart and leading

16  institutions in the world for complex and comprehensive care.

17  And our hospital, NorthBay in Solano County, was selected to be

18  part of the network for Mayo Clinic.  And with that we get to

19  have exchanges and feedback.  And we've traveled to Mayo Clinic

20  to see what it is that makes people drive through corn fields

21  in the winter to Rochester, to see whether we can provide that

22  type of care here in northern California.

23  Q.    Okay.  Then you used the term "one-stop shop."

24  A.    Yes.

25  Q.    What could you mean by that?

**A.**   Well, one of the things we know is that right now if a family member has an injury or a medical condition, a lot of times another family member, a caregiver, has to stop work, they have to put their life on pause, to go see maybe three or four different doctors and take three or four days.

Our goal at NorthBay is to try to combine those appointments so it's more like a single visit where you see the doctors together.  And that's the comprehensive approach.  And then secondarily, for patients who are traveling from outside of our immediate region, we like to set up essentially an itinerary, which is what we learned from Mayo Clinic.

**Q.**   And what different types of doctors would a patient see all on the same day?

**A.**   So in my area of the center for neuroscience, one of the programs we have is traumatic brain injury and concussion.  And in that program we have psychiatry, neurology, neurosurgery. We have access to trauma doctors, access to the cognitive therapists, we have neuropathology.  And we built this program based on one of the best sports concussion clinics in the country at Vanderbilt.  So we have an advisor from Vanderbilt.

And every patient who comes with traumatic brain injury and concussion, we assess metrics.  We do baseline assessment of their cognition, their clinical symptoms, and then we track to see how effective our care is.  Essentially, the patient comes to one clinic on one visit and sees all of those

1  providers.

2      We have clinics set up like that for spine, and we also

3  have a clinic like that set up for brain tumors.

4  **Q.**  What is a traumatic brain injury?

5  **A.**  Essentially, it's if you hit your head really hard, you

6  would call that a traumatic brain injury.  Under that category,

7  there are a lot of different degrees of injury.

8  **Q.**  Give us some examples.

9  **A.**  So for traumatic brain injury, there could be a concussion

10 which is better within 24 hours.  There could be skull

11 fractures.  And then there can be blood clots sometimes within

12 the brain, or outside the brain but under the skull.  And then

13 the continuum goes on to patients who come in in coma and the

14 care that they receive through our trauma program.

15 **Q.**  Does NorthBay have a concussion clinic?

16 **A.**  Yes, sir.

17 **Q.**  Is there anything special about its concussion clinic?

18 **A.**  As we were speaking, it's based on the best clinic in the

19 country, currently identified in Vanderbilt.  And one of the

20 things we're quite excited about this year is we're going to

21 have one of the first in the nation clinical trials of

22 medications.  One of the doctors, Dr. Bennett Omalu, who helped

23 identify a disease called chronic traumatic encephalopathy.

24 They made the movie *Concussion* about his experience in the NFL.

25 He's on our staff and is advising us.  And so we're incredibly

1  excited to launch this, one of the first in the country

2  clinical trials to try to help people who have had the type of

3  traumatic brain injury that continues to progress with multiple

4  concussions.

5  **Q.**    Tell us what's involved at NorthBay's spine program.

6  **A.**    So when we came to NorthBay, as you know, Solano County is

7  a very under-served community.  There's a burden of disease,

8  including drug addiction and narcotic addiction.  And when I

9  got to NorthBay three years ago, we stratified the patients who

10  currently were being cared for with back problems.  And

11  normally the definition of "chronic pain" is six months in

12  spine.  And at NorthBay we had to set that threshold at two

13  years because there were so many patients who were using

14  narcotics on a daily basis.

15       And it turned out that actually 50 percent of the patients

16  with spine problems at NorthBay had chronic pain defined as

17  over two years and were already using narcotics.  And so when

18  we set up our program it wasn't just about taking care of any,

19  you know, just one individual patient and providing the best

20  care for them; it was how do we become part of the solution and

21  how do we create a program where no additional patients will

22  move from a treatable disease to chronic pain and narcotic

23  addiction.

24       So what we did is we pulled together the primary care

25  doctors, the first line of providers.  We pulled together our

1    entire pain management team.  The neurosurgeons, the

2    neurologists who do the nerve studies, people with expertise in

3    imaging.  And we looked to see what was the right pathway at

4    NorthBay.

5         And so one of the things that we're able to leverage

6    that's really special about our area is the commitment to

7    health and prevention.  NorthBay's invested in a 50,000 square

8    foot wellness center.  It's three stories, with four swimming

9    pools.  And nothing makes me more joyful than on Tuesdays at

10   about 11:00 to walk on the track where I can overlook the

11   swimming pools and I see about 18 of my patients, who look like

12   they've never been in a gym before, doing their water therapy

13   and connecting with each other and starting to find that path

14   forward.

15        And we, again, track metrics.  We use data to see, are we

16   making a difference?  We look at narcotic use; we look at how

17   many times these patients need to seek a doctor for help for

18   their spine; we track their disability scores.  Are they able

19   to return to work?  And we track depression scores.  And we

20   just got wonderful results with this comprehensive approach

21   that includes both state-of-the-art operative care, minimally

22   invasive outpatient surgeries.  We have intraoperative CT

23   scanners, we have computer guidance.  We can do some adult

24   scoliosis surgery.

25        So we can do the nonoperative all the way through the

1    continuum of care to provide the operative solutions.  And to

2    date, I think we've really begun to move the metric where we

3    are not adding to that very heavy burden of substance abuse in

4    Solano County.

5            THE COURT:  Mr. Tooch, can we move to the services

6    that are at issue in the case, please.

7    BY MR. TOOCH:

8    Q.    Then I'd like to move to patient example number 63.

9            THE COURT:  Are you shy a witness monitor?

10       (Pause.)

11           THE COURT:  I've got an exhibit here.  Let's go,

12   Mr. Tooch.

13          MR. MAURER:  Your Honor, we have an objection to

14   Dr. Zusman's testimony at this time.

15          THE COURT:  Why don't you stand up.

16       Thank you.  And what's the problem?

17          MR. MAURER:  In the plaintiff's joint trial report,

18   supplemental report, she was -- Ms. -- Dr. Zusman was

19   potentially identified as someone who's going to testify in

20   rebuttal to Dr. Schriger.  And my understanding this is the

21   only patient claim she's going to be talking about.

22          THE COURT:  Is that right?

23          MR. TOOCH:  That's right, Your Honor.  So I can either

24   do it in rebuttal or now.  I was just responding to your

25   question could we go to the claims at issue in this case.

1    That's why I went here.

2           THE COURT:  No.  What I was trying to do is get you to

3    focus on what -- her testimony about services that are directly

4    involved in the case.  What we've heard is very interesting

5    testimony, but I want to know -- it needs to get tied in to

6    what we're doing here.

7           And if 63 is rebuttal to Dr. Schriger, then she should be

8    testifying in rebuttal to Dr. Schriger and not right now.

9           MR. TOOCH:  All right.

10   BY MR. TOOCH:

11   Q.   Well, let me ask you in general, Ms. -- Dr. Zusman.  Did

12   you review any of the claims at issue in this case?

13   A.   I did.

14   Q.   And did some of those claims involve the neuroscience

15   services that are being provided at NorthBay?

16   A.   Yes.

17   Q.   When somebody comes in to the, say, emergency room and

18   they're suffering from a brain bleed, a hemorrhage, do you know

19   when they come in through the door what the degree -- where

20   they're going to fall on the continuum?

21   A.   Not when --

22           MR. MAURER:  Objection, hypothetical.

23           THE COURT:  Overruled.

24           THE WITNESS:  Not when they first come in the door.

25   Sometimes that's -- they come in with warning symptoms.  And

1    imaging studies help us understand what the cause of those

2    symptoms are.  And if there's blood, if there's a hemorrhage in

3    the brain, then those patients are the ones that are managed by

4    the neurosurgical service.  Almost a third of those patients

5    will progress, and we need to be standing by in case there is a

6    neurosurgical intervention required.

7    BY MR. TOOCH:

8    Q.   And so if a Blue Shield member were to show up at NorthBay

9    with a serious brain bleed, are NorthBay's neurosurgeons

10   available to provide care to that Blue Shield member?

11   A.   Yes.  NorthBay has 24-7, 365, neurosurgical coverage with

12   a dedicated neurosurgery operating team and the availability of

13   the latest technology, including computer guidance, minimally

14   invasive brain surgery, and microscopes.

15   Q.   Now, if somebody were to look at the medical records years

16   after the fact and say:  Well, that person came in with a head

17   injury, but it was just a minor concussion.  Any hospital can

18   treat a minor concussion.

19        What would be your response?

20   A.   Just that you --

21        MR. MAURER:  Objection, Your Honor.  This is rebuttal

22   testimony of Dr. Schriger.

23        THE COURT:  Overruled.

24        THE WITNESS:  Just that you don't know at that moment

25   in time what the story's going to be for that patient.  And I

1    always think about, like, what kind of care would I want for my

2    loved one?  If, you know, somebody had a small bleed, you want

3    them to be at the place that can take care of the big bleed.

4    BY MR. TOOCH:

5    Q.   Okay.  Now, you've worked at both Kaiser and Sutter

6    Hospitals, correct?

7    A.   Correct.

8    Q.   And how does the care at NorthBay differ from those

9    hospitals?

10    A.   Well, the Kaiser model is a model that we call capitated.

11    It means you pay one fee.  And it's a membership fee.  And any

12    provision of care, like, for example, having a neurosurgery, is

13    an expense.  So Kaiser makes less money overall the more

14    neurosurgery that's done, the more overall care that's provided

15    in that capitated model.

16         What that does, like, for one of my girlfriends she was

17    healthy for 30 years and then now she's started -- she's had

18    cancer, she's had heart disease and now her back is out.  And

19    so that's all being managed by the primary care doctor with

20    difficulty getting access to the specialists.  And that makes

21    sense, because that would be more expensive care.  So driving

22    the cost down a lot of times in the Kaiser system slows the

23    process by which folks are offered surgery or get access to

24    specialist.  And that's based on my experience working at

25    Kaiser.

1        Then on the flip side, in the Sutter system -- and I was

2    in that system I think all told somewhere around 15 years --

3    that was a real interesting system because it's very heavy on

4    the fee for service side which means that they make their money

5    by doing more and more procedures.

6        And I had a -- kind of a personal experience with that

7    where I was developing a comprehensive spine program after the

8    MBA to try to prevent spine surgery and help people stay fit

9    and healthy.  And after about 18 months of working with the

10   Sutter system to try to get that healthy spine program

11   approved, it really fell on deaf ears; because preventing

12   disease isn't aligned with the profitability model of a

13   fee-for-service program where they actually want the procedures

14   and they want the surgeries.

15       So when I came to NorthBay with this concept of a healthy

16   spine program, they already had a commitment to the wellness

17   center.  They'd already invested in health.  And what's really

18   unique about NorthBay above almost any other hospital in

19   northern California is a blended model.  So NorthBay has

20   capitated patients like Kaiser, they are partnered with an

21   insurance company called Western Health Advantage.  In

22   addition, they have commercial payors like Sutter.  And so what

23   happens is as an individual doctor we're incentivized to do

24   what's right.  We don't go after the ones where doing less like

25   Kaiser makes money; we don't change our practice to the doing

1   more and more procedures like Sutter makes money.  We get to

2   talk amongst ourselves and build these programs based on

3   evidence and based on what's best for patients.  And so to me

4   that's what brought me to NorthBay after 15 years with Sutter.

5           **MR. TOOCH:**  No further questions.

6           **THE COURT:**  All right.

7                           <u>**CROSS-EXAMINATION**</u>

8   **BY MR. MAURER:**

9   **Q.**   Good morning, Dr. Zusman.  I know you know this, but I'm

10  Jeff Maurer.  I represent Blue Shield of California.

11  **A.**   Good morning.

12  **Q.**   Dr. Zusman, you are a well-qualified neurosurgeon.  I

13  assume you'd agree with me on that.

14  **A.**   Do I say "yes"?  Or, "correct"?

15  **Q.**   Correct.

16  **A.**   What do I say.

17  **Q.**   You bill -- for your services -- separately than what the

18  hospital bills for its services.  Is that correct?

19  **A.**   So there is billing that's done for my services, but my

20  own financial arrangement with NorthBay is a set fee regardless

21  of what NorthBay bills.  So it's uncoupled from billing.

22  **Q.**   Right.  So in other words, there's a bill for your

23  services, the physician's services, then the hospital has its

24  own bill as well.  Correct?

25  **A.**   There is a bill, but I do not submit that bill.

1    Q.   Right.  But there's also a separate hospital bill from

2    your bill.  They're not one and the same, correct?

3    A.   I am joyfully, gleefully, focused on patient care, and we

4    have people at NorthBay who do the billing and that aspect.

5    Q.   Right.  So none of the payment for your particular

6    services, the physician's services, are at issue in this

7    lawsuit.  Correct?

8            MR. TOOCH:  Objection, speculation.

9            THE COURT:  Overruled.  If you know you can answer.

10           THE WITNESS:  I don't know the answer.

11   BY MR. MAURER:

12   Q.   So let's talk about the claims that are at issue in this

13   case briefly.

14       Now, you're aware there's somewhere between 1,600 and

15   1,700 patient claims at issue in this case.  Is that right?

16   A.   I don't have any firsthand knowledge of the number of

17   claims.

18   Q.   Okay.  And Dr. Zusman, you don't know whether you

19   personally provided any of the care that's at issue in this

20   lawsuit.  Is that correct?

21   A.   I have not reviewed the number of claims that you've

22   expressed.

23   Q.   And Dr. Zusman, out of all of the patient claims at issue

24   in this dispute, how many of those claims involve neurosciences

25   services, do you know?

1  **A.**   I do not know.

2  **Q.**   Do you know if it's more than one?

3  **A.**   I know that it's at least one.

4  **Q.**   Do you have any knowledge if it's more than one?

5  **A.**   I do not.

6  **Q.**   So you know of only one neuroscience case that's at issue

7  in this case as you sit here today.

8  **A.**   I've been asked to personally review one case that was

9  selected.

10 **Q.**   Okay.  But you don't know of any other cases, correct?

11 **A.**   I also don't know that there aren't any other cases.  So I

12 would say you're correct.  I do not know.

13 **Q.**   So let's talk briefly about some of the other hospitals in

14 the area near NorthBay and some of the care they provide.

15     In Solano County there are two Kaiser facilities, is that

16 right?  Kaiser Vacaville and Kaiser Vallejo?

17 **A.**   That's correct.

18 **Q.**   You've told me in some prior testimony there are five

19 different programs that make up the bundle of NorthBay's

20 neuroscience services.

21 **A.**   Yes.  At this time.

22 **Q.**   There's TBI, concussions, right?

23 **A.**   Yes.

24 **Q.**   Spine care is another one, correct?

25 **A.**   Yes.

1   **Q.**   Neurovascular and stroke services, is that right?

2   **A.**   Yes.

3   **Q.**   Neuro-oncology?

4   **A.**   Yes.

5   **Q.**   And neurology.

6   **A.**   Yes.

7   **Q.**   So let's start with the TBI and concussions.  So you have

8   no independent knowledge of the two Kaiser facilities' TBI

9   concussion program capabilities, is that right?

10  **A.**   I would just say that we all know each other.  A lot of

11  the neurosurgeons, you know, talk.  We go to meetings together,

12  we share information about our programs.  I know things about

13  their programs and they know about my program.

14  **Q.**   But you have no personal knowledge of the two Kaiser

15  facilities' TBI and concussion programs, is that correct?

16  **A.**   I have not worked at Kaiser Vallejo and I have not worked

17  at Kaiser Vacaville.

18  **Q.**   So the answer to that question is "no"?

19  **A.**   I would say that I know what gets transferred to us from

20  different hospitals in the area, so the answer to that would

21  be, no, I have no personal direct experience working at those

22  facilities caring for TBI and concussion patients.

23  **Q.**   Let's move on to spine care.  With respect to spine care,

24  you have no reason to believe the two Kaiser facilities cannot

25  provide competent medical care with regard to treatment of

1    spinal injuries, is that correct?

2    **A.**    I do not know the extent of care that's available for

3    spine at Kaiser Vallejo, but I do not believe they do surgery

4    there.  And Kaiser Vacaville does have a spine surgery program.

5    You know, the challenge for me, though, is that my patients --

6    the patients who come to NorthBay -- don't have access to those

7    programs as Kaiser's a different system.

8    **Q.**    So in the context of an emergency situation, those

9    patients, Kaiser patients, wouldn't have access to NorthBay's

10   services?

11   **A.**    I think that's a different question.  But Kaiser patients

12   would have access to NorthBay's services in an emergency.  I

13   would say you're correct.

14   **Q.**    So let's move on to the neurovascular and stroke program.

15   With respect those programs, Dr. Zusman, the neurovascular and

16   stroke program services, you do not know whether there are any

17   neurovascular stroke services that NorthBay provides but that

18   aren't available at the Kaiser Vacaville or Kaiser Vallejo

19   facilities.  Is that correct?

20   **A.**    Let me extend that.  So there are two types of stroke.

21   There's ischemic stroke, which is where a blood vessel's

22   blocked.  We call those bland strokes where there's not enough

23   blood going to the brain.  And then there's hemorrhagic stroke.

24   And that's where there's a hole and the vessel bleeds.

25       I do have knowledge that hemorrhagic stroke cannot be

1    cared for at Kaiser Vallejo, and it cannot be cared for at

2    Sutter Solano because they call us when we're on call to take

3    care of those emergency patients.

4    **Q.**   Do you know whether -- strike that.

5         And you don't know whether NorthBay has any special

6    equipment for its neurovascular and stroke program that the two

7    Kaiser facilities in Solano County don't have?  Is that right?

8    **A.**   My understanding is NorthBay's the only facility with 24-7

9    availability of computer guidance and minimally invasive brain

10   surgery, which is the latest treatment for intracranial

11   hemorrhage from strokes.  That's the bleeding type of stroke.

12   And I do believe that is unique in Solano County.

13        **MR. MAURER:**  Your Honor, I'd like to play the video of

14   Ms. -- Dr. Zusman's deposition.  It's lines 115, 2 through 5,

15   and then 115, through 13 and 14.  (sic)

16        **MR. TOOCH:**  Just a second.  What?

17        **MR. MAURER:**  Page 115, lines 2 through 5, and page

18   115, lines 13 through 14.

19        **THE COURT:**  Is there any objection?

20        **MR. TOOCH:**  No, Your Honor.

21        **THE COURT:**  Go ahead.

22             (Video was played but not reported.)

23        **MR. TOOCH:**  Your Honor, I don't think that was -- I'm

24   sorry.  I was looking at a different line, Your Honor.

25        I request that the entire page be read with respect to

1    that.

2            THE COURT:  All right.  For completeness, let's do the

3    entire page.

4                 (Video was played but not reported.)

5            THE WITNESS:  I can speak to that.

6            MR. MAURER:  There's no question pending, Your Honor.

7            THE COURT:  Right.  If there's something to add, I'm

8    pretty sure Mr. Tooch will ask you to add to it.

9            THE WITNESS:  Thank you.

10   BY MR. MAURER:

11   Q.   As you sit here today, you have no knowledge about the

12   quality of neurosciences care that's available at other

13   counties -- let's say Napa County -- is that right?

14   A.   I would say in the same way that we have collegial

15   relationships with other doctors, I would say that I'm

16   indirectly familiar with their care, and I'm directly familiar

17   with the care for the groups that I participated in.

18   Q.   But you don't have any personal knowledge of the quality

19   of care that's provided at any particular hospital in Napa

20   County, is that right?

21   A.   Correct.

22   Q.   And you have no knowledge about the quality of

23   neuroscience care that's available in any of the Contra Costa

24   County facilities, is that right?

25   A.   No personal knowledge.  You're correct.

1   **Q.**   And you're not aware of a patient that's ever been

2   transferred from a Napa County hospital or a Contra Costa

3   County hospital to NorthBay to receive neuroscience services,

4   is that correct?

5   **A.**   I'm not personally aware at this time of a patient.

6   **Q.**   So let's move on. I want to talk a little about comparing

7   quality of neuroscience programs between hospitals. So you've

8   testified about the quality of NorthBay's neuroscience program,

9   right? Here today?

10   **A.**   Correct.

11   **Q.**   You're not aware any reports, evaluations, or data that

12   show patient outcomes for patients who received neurosurgery

13   care at NorthBay are better than the patient outcomes that are

14   had at other hospitals located in Solano County. Is that

15   right?

16   **A.**   Correct.

17   **Q.**   And you're not aware of any reports, evaluation, or data

18   that demonstrate that there's a higher level of patient

19   satisfaction for patients who receive neurosurgical care at

20   NorthBay in comparison to other hospitals in Solano County. Is

21   that right?

22   **A.**   Correct. There was a recent OPA review that emphasized

23   the excellence of NorthBay patient care. So I do think that

24   NorthBay is a community that is moving in a wonderful

25   direction, as evidenced by some of the newer quality metrics.

1   Q.   Okay.  Well, I appreciate that.  But as you sit here today

2   you're not aware of any specific data or report or an

3   evaluation that you can point to that says NorthBay has a

4   higher level of patient satisfaction than any of the other

5   hospitals in Solano County?  Is that right?

6   A.   I would refer you to the OPA report.

7   Q.   So let's talk about a few of the other counties, as well.

8   So you're not aware of any reports, data or evaluations that

9   compare the clinical outcomes for patients who receive

10  neurosurgery services at NorthBay compared to those patients

11  who receive neuro services at hospitals in Napa County or

12  Contra Costa County.  Is that right?

13  A.   I can say that I've written papers on outcomes and

14  outcomes analysis.  And it's very difficult to track outcomes

15  metrics and compare them between organizations.  I do know that

16  at NorthBay we are tracking our internal outcomes, and we're

17  tracking them over time.

18  Q.   Okay.  I understand that.  And I appreciate that.  But my

19  question is, are there -- are you aware of any reports or data

20  that compare the clinical outcomes for patients at NorthBay

21  compared to the clinical outcomes for patients at facilities in

22  Napa County or facilities in Contra Costa County?

23  A.   No, sir.

24  Q.   And those last few questions were about neurosurgical

25  services.  I think when you testified in deposition there's

1  neurosurgical services and there's neurology services.  Right?

2  A.    Correct.

3  Q.    Let's talk about neurology services briefly.  It's true,

4  is it not, you're not aware of any reports or evaluations that

5  compare clinical outcomes for patients who receive neurology

6  services at NorthBay compared to the clinical outcomes for

7  patients receiving neurology services at NAPA or Contra Costa

8  County, is that correct?

9  A.    Correct.  I would just emphasize that in Solano County the

10  underserved community we have has a very difficult time getting

11  to those hospitals.

12  Q.    So -- well, I appreciate that, Dr. Zusman.  Just a couple

13  more questions here.

14        So as far as you know, or as far as you're aware, there is

15  no way to objectively compare patient clinical outcomes for the

16  neuroscience services provided at NorthBay when you compare

17  them to the neurosciences services provided at other hospitals

18  in Solano County, Napa County, Contra Costa or any other

19  county.  Is that right?

20  A.    I would agree the ability to evaluate neurosurgical

21  outcomes is not stat -- it's not correct yet.  We don't know

22  the right metrics yet for outcomes analysis in neurosurgery.

23  Q.    That's true for neurology, as well, correct?

24  A.    I'm less familiar with neurology.

25  Q.    But as far as you know, that's true for neurology, is that

1  right?

2  **A.**   I would not -- I would say that it would be out of my area

3  of expertise to comment on outcomes for neurology.

4  **Q.**   So prior to working for NorthBay -- Well, actually, let me

5  back up.

6       Prior to working for NorthBay you worked at Kaiser some

7  period of time.  Did you mention that earlier?

8  **A.**   Correct.

9  **Q.**   How long ago was that?

10 **A.**   I worked at Kaiser in -- from 1987 to 1989, I believe.

11 **Q.**   Okay.  So it was over 20 years ago?

12 **A.**   No, '94.  It would have been '93 to -- it would have been

13 '97 to '99.  Forgive me.  I was off by a decade.

14 **Q.**   So it's over ten years ago.

15 **A.**   Yes, sir.

16 **Q.**   Actually, closer to 20 years ago.  I missed on math like

17 you.  Okay.  So you spent some time working for the Sutter

18 hospitals after that, is that right?

19 **A.**   I think after Kaiser -- I spent two years at Kaiser.  I

20 know, because I had my daughter during those years.  And then I

21 was recruited to UC Davis, so I was at UC Davis for three

22 years.  And then I was super excited about the idea of breaking

23 down some of the silos of health care.  And moving to Sutter,

24 they were building a neuroscience institute where doctors could

25 work together and I wanted that opportunity.

1  **Q.**  I appreciate that, Dr. Zusman.  And I just wanted to

2  establish the fact that you've worked at Sutter.  So I just

3  have a couple more questions for you.

4      So you mentioned to me at your deposition that at the

5  Sutter Sacramento neurosurgery program while you were there it

6  was recognized as one of the top 50 hospitals for neurology and

7  neurosurgery in the nation by *U.S. News and World Report*, is

8  that right?

9  **A.**  Correct.  That was for two years.  At that point Sutter

10  made some really concerning strategic changes in some very

11  fundamental aspects of the program.  They changed a contract

12  with our radiologists.  And that was actually what prompted me

13  to get the MBA.

14  **Q.**  Thank you.  Is NorthBay currently ranked by the *U.S. News*

15  *and World Report* as one of the top 50 hospitals in the nation?

16  **A.**  They're not.  And neither is Kaiser anymore.  And --

17  forgive me.  And neither is Sutter anymore.

18  **Q.**  Thank you.  So you're generally familiar with the dispute

19  between Blue Shield and NorthBay, right?

20  **A.**  I would say I'm peripherally familiar with the dispute.

21  **Q.**  And you understand that the only issue the jury here is

22  being asked here to decide is the reasonable value of NorthBay

23  services.  Is that correct?

24  **A.**  That is the first time it's been clarified for me.

25  **Q.**  Okay.  And you're not an expert on the reasonable value of

1  NorthBay services.  Right?

2  A.    That would be correct.

3  Q.    But you do know, don't you, that NorthBay has hired its

4  own expert, Michael Heil, to calculate the reasonable value of

5  NorthBay services?

6  A.    I have not met with or discussed this with Mr. Heil.

7  Q.    Are you familiar at all with Mr. Heil's opinion?

8  A.    I am not.

9  Q.    Are you aware that in calculating the reasonable value of

10  NorthBay's services Mr. Heil did not mathematically take into

11  account the quality of the neuroscience services offered at

12  NorthBay?

13        MR. TOOCH:  Objection.

14        THE COURT:  Sustained.

15        MR. MAURER:  I have no further questions at this time,

16  Your Honor.

17        THE COURT:  All right.

18     Redirect?

19        MR. TOOCH:  Yes, Your Honor.

20              **REDIRECT EXAMINATION**

21  BY MR. TOOCH:

22  Q.    Dr. Zusman, does NorthBay ever treat patients for

23  intracranial hemorrhages that come from Kaiser?

24  A.    We treat anybody who rolls in, and a portion of those are

25  folks who are Kaiser members.  They are triaged at the level of

1  the emergency medical response system to the nearest hospital,

2  and oftentimes that's NorthBay.

3  **Q.**   Does NorthBay ever treat patients with brain bleeds

4  because they cannot be treated at other hospitals?

5  **A.**   There are times where we're asked to provide services to

6  patients who did not have insurance.  Is that the direction of

7  the question?

8  **Q.**   No.  I'm just wondering, are there ever situations where

9  the services at another hospital can't be performed?  Say the

10  neurology -- the neurosurgery services can't be provided at

11  another hospital and so the patients are then transferred to --

12  **A.**   There's one Sutter Hospital in Solano County called Sutter

13  Solano, and it does not have neurosurgical services.  So any

14  time there's a bleed in the head, whether as a result of a

15  broken blood vessel, which would be considered a stroke, or

16  whether it's the result of trauma, those patients all come to

17  us.

18  **Q.**   Okay.  Now on cross-examination you were asked questions

19  about special equipment and then your deposition was shown.

20  You were asked does NorthBay have any special equipment.  And

21  they played the deposition testimony, and you said that you

22  could speak to that.

23      Could you tell us what you were going to say?

24  **A.**   Thank you.  The way the question was mapped, it was

25  talking about what we call ischemic stroke.  That's the stroke

1  with the blocked blood vessels.  So neither of those facilities

2  have special equipment to unclog a blocked blood vessel.

3      But the testimony I gave here was about the bleeding

4  stroke.  And NorthBay does have unique and specialized

5  equipment available every day, including Super Bowl Sunday, to

6  evacuate hematomas.  And so that's why both of those answers

7  were correct in their context.

8  **Q.**   Okay.  And what is "minimally invasive surgery"?

9  **A.**   So there's been a huge emphasis on minimally invasive

10  spine surgery.  Some of you may have seen it advertised on TV,

11  the Laser Spine Institute and bandaid spine surgery.

12      And so we've been able to develop smaller and smaller

13  incisions and safer and safer surgeries for the spine.  And I

14  was part of one of the first groups, probably one of the first

15  100, to take that same technology to the brain.

16      And so now using computer guidance we're able to operate

17  deeper in the brain areas that used to be inoperable.

18      And one of the cases that still touches me is a 28 year

19  old young man who came in comatose with blood scattered

20  throughout the ventricular system.  And I talked to the wife.

21  I talked to the family.  I said, I don't know if this is going

22  to work but we're willing to give it a try.  And she said,

23  Look, Doc, whatever you can do, if you can bring him back to

24  me, I'll take him the rest of the way.

25      And by a year later he was walking, returned to work, and

1  driving because of the new technology of minimally invasive

2  computer-guided brain surgery.

3       **MR. TOOCH:**  No further questions.

4       **THE COURT:**  All right.  Mr. Maurer anything?

5       **MR. MAURER:**  A few, Your Honor.

6                      <u>**RECROSS-EXAMINATION**</u>

7  BY MR. MAURER:

8  **Q.**   So Dr. Zusman, you were just talking about special

9  equipment you believe NorthBay has for certain stroke issues

10  that the Kaiser facilities don't have.  Is that right?

11  **A.**   That is my understanding, correct.

12  **Q.**   Is there a name for that special equipment?

13  **A.**   The equipment that I was referencing particularly for

14  these cases it's called Myriad.  The technology is BrainPath,

15  one word.  Brain, P-A-T-H.

16  **Q.**   Do you know if any of the Myriad equipment was used for

17  any of the 1,700 patient claims at issue in this case?

18  **A.**   I have not had the opportunity to review the 1,700 -- or,

19  number of claims.

20  **Q.**   And you were just talking about minimally invasive

21  BrainPath surgery.  Do you know if any of the 1,700 patient

22  claims at issue in this case involved minimally invasive

23  BrainPath surgery?

24  **A.**   Again, I don't know one way or the other.

25  **Q.**   At the beginning of your testimony with Mr. Tooch, you

1  referenced peripheral nerve surgery.  Do you know if any of

2  those cases are involved in this dispute?

3  **A.**   I have not reviewed any cases besides the single case that

4  was identified for my review.

5          **MR. MAURER:**  Thank you, Dr. Zusman.  No further

6  questions.

7              **THE COURT:**  All right.  Thank you.

8          **MR. TOOCH:**  No further questions.

9          **THE COURT:**  Dr. Zusman, thank you.  You can step down.

10      (Witness excused.)

11          **THE COURT:**  All right.  Ladies and gentlemen why don't

12  we take our second break of the morning, and it will be for

13  again about 15 minutes.  We'll come back at about 11:27.  You.

14      (Jury exiting the courtroom.)

15  (The following proceedings were held in open court, outside the

16  presence of the jury:)

17          **MR. PIMSTONE:**  Your Honor, I did just want to bring

18  something to the Court's attention.

19          **THE COURT:**  You can be seated.

20          **MR. PIMSTONE:**  I'm not going to be seated.

21      I think this witness was an example.  We all intentionally

22  had motions *in limine* so that we could sort of sculpt and guide

23  what would be appropriate and what wouldn't be appropriate once

24  the witness gets on the stand.

25      And what we saw with this witness was a witness who

1  testified regarding the swimming pools, regarding the wellness

2  centers, regarding all sorts of services, as the Court

3  recognized, completely untethered to emergency services.

4       And we specifically had that discussion before and Your

5  Honor specifically asked NorthBay to make sure that its

6  questions were guided to issues related to emergency.

7       Once the witness is speaking in long paragraphs, we can't

8  object at that point.  We would look terrible in front of the

9  jury.  We don't want to interrupt the witness.  But then once

10  that testimony's out, it's out.  And so -- there was also an

11  attempt to question the witness on what is clearly rebuttal

12  even though we had had that discussion before with the Court.

13       And so I would like to see if we can all be clear that

14  where the Court has ruled and given the parties' guidance as to

15  what's legitimate and not legitimate.  I feel that we are being

16  prejudiced by witnesses who are being asked questions that are

17  not guided to what the Court's previous rulings were.

18            **THE COURT:**  Okay.  Mr. Tooch.

19       **MR. TOOCH:**  Yes, Your Honor.  I didn't know that the

20  witness was going to talk about the nonsurgical care that they

21  give for the swimming pool.  But be that as it may, it is the

22  range of services that are provided and are available to Blue

23  Shield's members.  And so any Blue Shield member that shows up

24  at NorthBay can get these services and will get these services.

25       It's -- on the one hand, Blue Shield says, well, you need

1   to tie the testimony to the claims at issue; and then on the

2   next side they say, whenever I try to bring up a claim, they

3   say that's rebuttal testimony.

4       So I'm kind of put in a catch 22 over here where either I

5   tie it to the claims or I don't tie it to the claims.  So it's

6   -- in that sense it's very difficult for me to say, Okay, are

7   these relevant to the claims at issue, and let me show you why.

8   But then on the flip side he's saying it's rebuttal testimony.

9       **MR. PIMSTONE:**  The --

10       **MR. TOOCH:**  If I may --

11       **MR. PIMSTONE:**  Of course.

12       **MR. TOOCH:**  And as we said with the respect to the

13   motions *in limine*, the nature of the services that are provided

14   are a relevant factor with respect to the reasonable value.

15       **MR. PIMSTONE:**  I just have two comments to that.

16   First, we had this exact same debate a few days ago and the

17   Court very clearly ruled that the range of services that would

18   be relevant for the jury to hear are services that could be

19   tied to emergency.  So we had that discussion.

20       What Mr. Tooch is doing now is rearguing after the fact,

21   after he elicited testimony that was well in excess of what the

22   Court said he could, he's now attempting to, *post hoc*, re-argue

23   that issue.

24       Secondly, the questions that were being asked were clearly

25   not tied to emergency.  One question was:  Tell me how your

1    care differs from Kaiser?  How your care differs from Sutter?

2    And we got a long answer regarding how they're a one-stop shop,

3    how they've got fee for service versus capitation.  And none of

4    that relates to emergency care.

5        Whether a patient comes into the emergency clinic who is

6    an HMO member who has capitated care, or there's a fee for

7    service issue, that is unrelated to emergency services.  So

8    what we got, because the question was -- the questions were

9    being asked:  How does your care differ from Sutter?  How does

10   your care differ from --

11       **THE COURT:**  I don't need to hear more.  Thank you,

12   Mr. Pimstone.

13       So with this witness, obviously I thought that you went

14   way far afield, which is why I corrected you in front of the

15   jury.  That usually doesn't work out very well for the side

16   that's doing it.  And I think it's important that you have a

17   clear idea of how the testimony you're eliciting ties to the

18   claims.

19       I've allowed NorthBay to put on evidence about how

20   wonderful it is because I think every client gets to do a

21   little bit of that.  And, but, other than that, the testimony

22   really needs to be about why -- it's something that matters.

23   There's a broad scope of relevant evidence that can come in on

24   the question of reasonable services; and Dr. Zusman went well

25   beyond that.

1    I have to believe that you're preparing your witnesses,

2  Mr. Tooch, so don't go far afield from what the case is about.

3       **MR. TOOCH:**  I understand, Your Honor.  And I will take

4  that to heart.

5    With respect to the issue of the one-stop shop, that

6  actually is for emergency services.  It's directly relevant.

7  So when a patient comes in for emergency services, it's a

8  one-stop shop and they have all of the -- they have relevant

9  doctors right there.  So it actually does apply to emergency

10 services.

11      **THE COURT:**  I can see some potential relevance to some

12 of the testimony, but you really need to make sure that it is

13 relevant to what the claims are that you're fighting about.

14 And the pool was one of those things that I specifically

15 referenced when we were doing the argument.

16      **MR. TOOCH:**  I understand that, Your Honor.

17      **THE COURT:**  And I understand that Dr. Zusman is, I'm

18 sure, justly proud of the services.  That's part of what the

19 case is about, but it's -- she went -- or, you went far beyond

20 with her.

21      **MR. TOOCH:**  I understand.

22      **THE COURT:**  So please keep that in mind.

23      **MR. TOOCH:**  I will thank you.

24      **MR. PIMSTONE:**  Thank you.

25            (Recess taken at 11:20 a.m.)

1    (Proceedings resumed at 11:31 a.m.)

2    THE COURT:  All right.  Are we all ready for the next

3  witness?

4    MR. TOOCH:  Yes.

5    THE COURT:  Get the jury.  All right.

6    (Jury enters at 11:32 a.m.)

7    THE COURT:  All right.  Please be seated everybody.

8  Mr. Tooch, who is our next witness?

9    MR. TOOCH:  Thank you, Your Honor.

10  Plaintiff calls Heather Venezio.

11    THE CLERK:  Step up, remain standing.  And I'm going

12  to take your photograph, and then I'll swear you in.

13  If you'll raise your right hand, please.

14    **HEATHER VENEZIO**,

15  called as a witness for the Plaintiff, having been duly sworn,

16  testified as follows:

17    THE CLERK:  Be seated.

18  Adjust the microphone as you need.  State your full name

19  and spell it for the court reporter.

20    THE WITNESS:  My full name is Heather Theaux Venezio.

21  H-e-a-t-h-e-r, T-h-e-a-u-x, Venezio, V-e-n-e-z-i-o.

22    **DIRECT EXAMINATION**

23  BY MR. TOOCH:

24  Q.    Good morning, Ms. Venezio.

25  A.    Good morning.

1  **Q.**   Where do you currently work?

2  **A.**   I work at NorthBay Medical Center and VacaValley, both

3  hospitals.

4  **Q.**   And what is your current position at NorthBay?

5  **A.**   My current position is director of emergency and trauma

6  services.

7  **Q.**   Are you a registered nurse?

8  **A.**   Yes, I am.

9  **Q.**   And when did you get your nursing degree?

10 **A.**   I got my nursing degree in January of 2011 -- I'm sorry,

11 2001.  My apologies.

12 **Q.**   And where did you started working after you received your

13 nursing degree?

14 **A.**   I started working at Lafayette General Medical Center in

15 Lafayette, Louisiana.

16 **Q.**   Where did you work after that?

17 **A.**   After that, I became a travel nurse for about 18 months.

18 Took 18-months' back-to-back assignments at the VacaValley

19 emergency department.

20 **Q.**   When you were working in Lafayette, what type of nurse

21 were you?

22 **A.**   Emergency department.  I started in the emergency

23 department.

24 **Q.**   Okay.  And then when you came to VacaValley, what type of

25 nurse were you?

1    **A.**    Emergency nursing.

2    **Q.**    Okay.  How long did you hold that position?

3    **A.**    Approximately seven to eight years.

4    **Q.**    And then after that, what was your position?

5    **A.**    Trauma program director.

6    **Q.**    And when did you become the trauma program director?

7    **A.**    About 2011.

8    **Q.**    Okay.  And in your current position are you in charge of

9    the trauma program at NorthBay?

10   **A.**    Yes.

11   **Q.**    And are you in charge of the emergency departments at

12   NorthBay?

13   **A.**    Yes.

14   **Q.**    Okay.  And are there emergency rooms at both campuses?

15   **A.**    Yes, there is.

16   **Q.**    And are you responsible for both of them?

17   **A.**    Yes, I am.

18   **Q.**    Okay.  And which facility is the trauma unit at?

19   **A.**    NorthBay Medical Center.

20   **Q.**    Okay.  Are there emergency room managers that work under

21   you?

22   **A.**    I have a single emergency department manager.

23   **Q.**    And what is the responsibility of the emergency manager?

24   **A.**    Responsibility of the emergency department manager is to

25   manage the staff.  It's the operational, making sure the unit

1   is staffed with nurses, qualified nurses, and that the clinical

2   care is in the direction that we need it to be to meet all of

3   our programmatic needs around all of our patient populations.

4   **Q.**   Underneath the manager, are there a particular type of

5   nurses?

6   **A.**   Underneath the manager, we have lead nurses.  Other

7   organizations call them charge nurses.

8   **Q.**   What is the responsibility of a lead nurse?

9   **A.**   The lead nurse is, for lack of a better term, boots on the

10  street.  So they are managing the unit, managing the flow,

11  making sure that patients are assigned to the right level of

12  nurse, the nurse -- matching the patient's needs with the nurse

13  who's competent to care for them, and making sure that they're

14  all doing what they need to do around all our different patient

15  populations.

16  **Q.**   Are the emergency departments at the two NorthBay

17  facilities open 24/7, 365 days?

18  **A.**   Yes, sir.

19  **Q.**   And are there different shifts that nurses work?

20  **A.**   Yes, there are.

21  **Q.**   And what are the shifts?

22  **A.**   At NorthBay Medical Center, the emergency department

23  nurses work 12-hour shifts.  So we have -- the majority of our

24  nurses show up at 7:00 a.m. and go home at 7:00 p.m.  So as the

25  day progresses, our volume increases, so we add more nurses to

1    account for that volume.

2         We have nurses that show up at 11:00 a.m., that work until

3    11:00 p.m.  And then we have nurses at 3:00 p.m., who go home

4    at 3:00 a.m.  And then our other nurses show up 7:00 p.m. to

5    7:00 a.m.

6    **Q.**   And on average, how many emergency room patients are seen

7    in the Fairfield facility?

8    **A.**   Daily, we see between 120 and 130 patients a day.  It

9    works out to about 45,000 -- about 45,000 a year.

10   **Q.**   And at the VacaValley facility?

11   **A.**   They see somewhere between 60 and 70 patients a day.  And

12   so that works out to about 25,000 patients a year.

13   **Q.**   Okay.  Now, tell us, what is the definition of a trauma?

14   **A.**   Do you mean trauma patient?

15   **Q.**   Yes.

16   **A.**   A trauma patient -- well, "trauma," by definition, means

17   an injury.  So it's kind of redundant when we say a traumatic

18   injury.

19        But a trauma patient in the trauma world is not someone

20   who stubs their toe but someone who sustains an injury that

21   requires a surgeon.  Trauma is a surgical specialty within the

22   surgical world, so we have trauma surgeons who are specially

23   trained to take care of patients who have multisystem traumatic

24   injuries.

25        So there are a set of criteria that are set forth by the

1    CDC, that we follow, that says certain types of patients need a

2    trauma surgeon faster than others.  One of those types of

3    patients would be if you have a gunshot wound to your core,

4    your abdomen, your chest, your head or your neck, you probably

5    need a trauma surgeon now.

6         And then there are patients, who, let's say, are involved

7    in a motor vehicle crash, and not by the speed of the accident

8    or if the car rolled over, but if there's intrusion or damage

9    that's into the car a certain amount, then there are data that

10   suggest that that patient will probably need a trauma surgeon.

11        So we're trying to match the patient with the trauma

12   surgeon in the right amount of time.  But not everybody who's

13   in a car accident is a trauma patient.

14   **Q.**   Is it important for patients who have suffered severe

15   traumas to get care right away?

16   **A.**   Yes.  There's a vernacular, as well as a good bit of

17   research in the literature, about the "golden hour" of trauma,

18   that our ability to decrease someone's morbidity, mortality,

19   basically improve their chances of survival and walking out of

20   the hospital the same way -- at their previous level of

21   functioning, is enhanced by getting a multi-injured trauma

22   patient to a trauma center within an hour.

23        There's also a lot of literature around a "platinum half

24   hour," as it were.

25        So the goal nationally, for the American College of

1    Surgeons Committee on Trauma, is to try to put a trauma center

2    within an hour of everyone nationwide.

3         And that's a big push California-wide also.  The

4    California emergency -- EMS -- Emergency Medical Services

5    Administration for California is actually working on trying to

6    assist facilities in, let's say, rural parts of our state so

7    that all patients -- all residents of California have access to

8    trauma care within an hour.

9    **Q.**   Now, does the County of Solano decide which hospital is

10   going to be a designated trauma center?

11   **A.**   Yes.  In the State of California, the designating body is

12   going to be a local EMS authority or emergency medical services

13   authority.  So depending on where you live determines -- in the

14   state, determines which LEMSA, is what it's called, makes those

15   decisions.

16        Like up north, it's -- it's a big conglomeration, and

17   they're all under one LEMSA.  Certain counties are just single

18   county; some are double counties.  So the county holds that --

19   that ability.

20   **Q.**   Was there a process whereby the hospitals in Solano County

21   could vie to become the designated trauma center?

22   **A.**   Correct, yes.  Initially, they allowed two facilities in

23   Solano County to be designated as Level III trauma centers.

24   And then when we moved to Level II -- after a feasibility study

25   was done in our county about whether or not we actually needed

1  a Level II trauma center, a higher-level trauma, they decided

2  they would move forward but only needed one, per California

3  guidelines.

4      You can only have one Level I or Level II per 350,000.

5  And in Solano County, we're close but not quite.  So they

6  decided to create a competitive process for a Level II

7  designation.

8  **Q.**  And so tell us the difference between the different levels

9  of trauma.  Give us some patient examples of Level IV through

10  Level I.

11  **A.**  So we'll start at Level I.  Level I trauma centers are

12  typically but not always academic centers such as U.C. Davis,

13  U.C. San Diego, UCSF, just to name a few.  I believe Highland

14  Hospital has recently become a Level I trauma center also.  And

15  they have the full accompaniment of surgical services available

16  immediately to the patient.

17      A few of the other highlights that a Level I would have is

18  they have a -- you have to be fellowship-trained in surgical

19  critical care to be the co-director of the ICU.

20      And other than that, they have to have cardiopulmonary

21  bypass.  They have to have it.  They have to have screening for

22  PTSD, or Post Traumatic Stress Disorder.  And they have to

23  publish.  So that's the big thing.

24      A Level I trauma center has to publish -- I believe it's

25  30 scholarly articles each time they are verified.  So they're

1  producing a lot of new knowledge where they're training most of

2  the new surgeons.

3     A Level II is just under that, where we have most of the

4  requirements of a Level I, but we do not have the requirements

5  of cardiopulmonary bypass, let's say.  You don't have to have

6  that.  But you do have to have thoracic surgeons available

7  24/7.

8     We have to have anesthesiologists in-house.  We have to

9  have interventional radiology immediately available.  We have

10 to have a trauma surgeon on call and a backup trauma surgeon.

11 We have to have orthopedists and a backup orthopedist.  We have

12 to have the ability to treat complex pelvic fractures.  You

13 have to have ophthalmology on call 24/7.  You need to have

14 oral-maxillofacial surgery 24/7; gastroenterology on staff and

15 available; urology.

16    Intensivists, we have to have ICU physicians available

17 within 15 minutes to the patient, which basically means they're

18 in-house.

19    So there's quite a few services that a Level I would have

20 that we have.  We just are not required to have the research

21 component.

22    Level IIIs are typically -- typically community

23 facilities, and they are not required to have a backup trauma

24 surgeon.  And their surgeon has to respond to the patient

25 within 30 minutes.  Level II is maximum 15 minutes.

1    Anesthesia can be 30 minutes away at a Level III.
2  Interventional radiology is not required at a Level III.  All
3  the surgical specialties that I just named off are not required
4  at a Level III.
5    And at a Level IV -- there are a few of those in the state
6  of California, none of them in Solano County.  Those are
7  basically -- the best way to think of it is they are stop --
8  like a hub and spoke model where you have a close
9  association -- like U.C. Davis has a close association with
10 Ukiah.
11   Ukiah is a Level IV trauma center.  What they basically do
12 is they have training to recognize who is severely injured and
13 do the necessary treatments just immediately to get them from
14 the ED to a helicopter to U.C. Davis.
15   So they do not have the surgeon requirements than any
16 other facilities.  They just have to have an emergency
17 department physician available and staffed within 30 minutes, I
18 believe.  But it's a way of ensuring that all patients are
19 trying to get access into higher-level tertiary services.
20   So that's kind of brief but not exhaustive.
21 **Q.**  So what is an interventional radiologist?
22 **A.**  An interventional radiologist is a specialized radiologist
23 who can intervene in pelvic fractures, for traumas anyway.
24 It's for pelvic fractures, so they don't have to open the
25 patient up and pack the pelvis and go in and find the little

1    bleeding artery or vein and cauterize it.  So the patient is

2    able to survive very quickly and leave the hospital very

3    quickly.

4        The same can be of a spleen -- a spleen laceration.  They

5    can go in and cauterize that, or they can do a liver laceration

6    and cauterize that.  So interventional radiology is a

7    complement to what we do in the OR instead of doing a big, open

8    procedure.

9    **Q.**   Now, when the process -- when the County sent out this

10   request for a hospital to want to be the county-designated

11   trauma center, was a particular hospital chosen?

12   **A.**   Yes.  For the Level II competitive process, Kaiser

13   Vacaville, in our county, was chosen as the designated

14   Level II.

15   **Q.**   And when Kaiser VacaValley -- Vacaville was chosen as the

16   county-designated trauma center, could NorthBay have chosen not

17   to provide trauma services?

18   **A.**   Correct.  We were, at that point, designated as a

19   Level III.  And we could have remained at that as a county,

20   basically, community Level III.

21       But we chose -- upon the advice of the American College of

22   Surgeons Committee on Trauma, when they did our surveys, that

23   we provided the quality care and had the infrastructure in

24   order to provide more services to our community and could meet

25   that, so we decided to pursue it.

Q.    So why did NorthBay go through the hassle of becoming a Level II trauma center?

A.    For a few reasons, one of them being that we owe it to our community.  For a very long time in Solano County, having specialists and having our community have access to specialists -- remember, I worked in the emergency department for many years prior to trauma, and getting patients to high-level specialists was close to impossible.

       As we started bringing on the trauma services, we were able to allow patients to get access to those services in a different way.  So now a jaw fracture, for example, which was extremely difficult for someone to get care for in the county, now we can do that because we have those services available. And the community was really begging to not have to drive, you know, further down the road to see a loved one who was seriously harmed.

       And so -- and then the other part of it is we had asked a good number of physicians to join us in this competitive process to Level II, and once it was -- we were no longer designated, those physicians could have just left and said, We're out of here; you're not the designated facility.

       So part of our commitment from NorthBay to our physician colleagues was to say, yes, we are committed to this, and we want you, and you're bringing something to the community that is really needed.

1      MR. TOOCH:  Okay.  I'd like to turn to Exhibit 155.

2  First ask if there is any objection.

3      THE WITNESS:  What exhibit?

4      MR. TOOCH:  155.

5      THE WITNESS:  Okay.

6      MS. BRIGGS:  I don't know that there's any proper

7  foundation for this exhibit.

8      THE COURT:  All right.  Why don't you lay a

9  foundation, Mr. Tooch.

10      MR. TOOCH:  Okay.

11  BY MR. TOOCH:

12  Q.  Ms. Venezio, do you recognize Exhibit 155?

13  A.  Yes, sir.

14  Q.  And what is it?

15  A.  It is data that is presented at the county level for

16  trauma data we are required to submit to our county.

17  Q.  Do you have any involvement in the submission of this

18  document?

19  A.  Yes, I do.

20  Q.  And what involvement do you have?

21  A.  I am the validater and analyst for the data.

22  Q.  And as part of being a trauma center, is NorthBay required

23  to provide this kind of data to the County?

24  A.  Yes.  And the County is supposed to submit it to the

25  State.

1  **Q.**   Was this document prepared at or about the time reflected

2  on the front page, 2017?

3  **A.**   It was prepared after 2017, in 2018, because it took us a

4  minute to get all the data in for the entire year.

5  **Q.**   And is this document maintained in the business records or

6  the records of NorthBay?

7  **A.**   Yes, and Solano County.

8  **Q.**   And is it one of the business records of the hospital?

9  **A.**   Yes.

10         **MR. TOOCH:**  I move to admit it, Your Honor.

11         **THE COURT:**  Any objection?

12         **MS. BRIGGS:**  Yes, Your Honor.  It was not clear to me

13  which data Ms. Venezio actually verified.  Was it just

14  NorthBay's data or all of the data?

15     And if it's all of the data, then I have no objection.  If

16  it was only NorthBay's data, then I object to the extent it

17  seeks to introduce data submitted by other hospitals without

18  the witness's personal knowledge.

19         **THE COURT:**  Why don't you ask questions with respect

20  to Kaiser Vacaville.

21         **MR. TOOCH:**  All right.

22  **BY MR. TOOCH:**

23  **Q.**   Did you verify all the data in this document?

24  **A.**   I verified the NorthBay data.  But as part of the process,

25  the data is sent to both hospitals for them to validate both of

1    their data before it is brought to this public forum.

2    **Q.**    So is the data that NorthBay submits in this document and

3    the data Kaiser Vacaville submits in this document?

4    **A.**    I'm sorry, can you repeat that?

5    **Q.**    So this document has data from NorthBay; right?

6    **A.**    Correct.

7    **Q.**    And it also has data from Kaiser; right?

8    **A.**    Correct.

9    **Q.**    Does NorthBay submit the NorthBay data and Kaiser submit

10    the Kaiser data?

11    **A.**    Correct.

12    **Q.**    And is that submitted to the County --

13    **A.**    Yes, to the local EMS authority.

14         **THE COURT:**    And then the local EMS authority publishes

15    it?

16         **THE WITNESS:**    Correct.  They have their own data

17    person there that we submit our data to.

18         **THE COURT:**    I'll admit it.

19         (Trial Exhibit 155 received in evidence.)

20         (Document displayed.)

21    **BY MR. TOOCH:**

22    **Q.**    Okay.  If you can go to the page 155-3 and tell us what is

23    reflected on this page.

24    **A.**    This is mostly just demographic data.  So it's the number

25    of patients that both trauma centers had seen in 2017.

1  Q.   And what was the number for NorthBay?

2  A.   641.

3  Q.   And the number for Kaiser Vacaville?

4  A.   433.

5  Q.   Do you have any knowledge as to why the number of trauma

6  patients at NorthBay is higher than Kaiser Vacaville?

7  A.   We are -- by pure location, we are centrally located in

8  the county.  And -- yeah.

9  Q.   What is reflected under the row "Age"?

10 A.   Row H?

11 Q.   "Age."

12 A.   "Age."  Oh, that's the average age of the trauma patients

13 with the low interval and the high interval, 27 and 65, and

14 then 29 to 74.  So those are our average age of patients.  We

15 both have bimodal distributions; 27 and 67 are mine, and 29 and

16 74 are Kaiser's.

17 Q.   And what is reflected by "Ground"?

18 A.   Ground is the manner in which the trauma patient arrived

19 to the trauma center.

20 Q.   Okay.  By ambulance?

21 A.   Correct.

22 Q.   Okay.  Let's turn to the next page, 155-4.  What is

23 reflected on this page?

24 A.   Again, demographics on the level of trauma activation and

25 who admits the patient.

1  Q.   What does it mean, the level of trauma activation?

2  A.   So the level of trauma activation is the services that we

3  bring to bear for the patient when they're in our emergency

4  department.

5       So if it's a full activation, we bring the most resources

6  we can at one time to the patient.  So if you are a full

7  activation, you get a trauma surgeon, you get an ER nurse, you

8  get an ICU nurse, you get an OR nurse, an anesthesiologist, an

9  ED physician, another ER nurse, a tech, lab, radiology, the AC,

10 blood bank.

11      Trying to think if I missed anyone.

12      So all of those people arrive to the patient's bedside

13 immediately to care for the patient because they are in high

14 danger of needing OR right now.  They are somebody we suspect

15 is going to need OR intervention now.

16      A limited activation would be --

17 Q.   Before you start --

18 A.   Yes.

19 Q.   -- OR means operating room?

20 A.   Yes.  I'm sorry.  Operating room.

21      Limited activations are where we bring less of the staff

22 in.  We're suspicious that the patient is going to need an

23 operating room, but nothing about their physiology lets us know

24 that they're unstable.

25      So you will get ED physician, an ER nurse one to one, you

1    get lab, you get radiology, the AC.  So all of those five
2    people.
3        And then the ER physician discusses with the trauma
4    surgeon what the mechanism was, and then the trauma surgeon
5    will then arrive.
6        And a consult -- a consultation is a patient who does not
7    meet activation criteria.  So I talked a little bit about
8    criteria by which we decide who needs a surgeon faster than
9    others.
10       This is a patient, let's say, who fell and has a femur
11   fracture.  We wouldn't tell the ambulance come in now, because
12   maybe the patient has a femur fracture because they just fell
13   from standing.
14   **Q.**   Femur is in the leg?
15   **A.**   In the leg.  The big bone in the leg.
16       And so those are patients that need a trauma surgeon, but
17   we didn't have any data to suggest they need a trauma surgeon
18   now.  They're going to be admitted, but they don't need someone
19   to intervene now with a chest tube or surgery or some sort of
20   impressive intervention.
21   **Q.**   So why is there a trauma consultation?
22   **A.**   Consultation is to account for all the patients who have
23   injuries that we didn't -- that were not able to be identified
24   prior to arrival to the hospital.
25       The prime example would be an older person who falls and

1  hits their head, and then when you look, they're clear, they

2  look good, everything sounds good, and then you put them in the

3  C.T. scanner and they have a head bleed.  Now we definitely

4  need the trauma surgeon involved, we need the neurosurgeon

5  involved, and we're going to take care of that patient, but the

6  patient is, for lack of a better word, stable, but they still

7  need care.

8  Q.   So are there some patients that go to the E.R., and then

9  only after some tests are done then it's decided we need a

10 trauma team to respond?

11 A.   Yes.  And the trauma team looks different, right.  So we

12 don't have a whole bunch of people running in to the emergency

13 department, one-to-one nursing care.  But it is, have a trauma

14 surgeon who admits the patient and oversees the care of the

15 patient.

16      It has been proven that when the trauma surgeon is

17 involved, outcomes improve.  And so we have trauma surgeons

18 admitting many things that aren't necessarily activated on a

19 full or a limited.

20 Q.   Let's go to the next page, 155-5.

21      What's reflected on this page?

22 A.   These are the triage criteria.  So what they've attempted

23 to do is to take a look at over and under triage.  So are there

24 criteria that we are seeing a lot of that perhaps aren't

25 getting other services or are -- so what's really going on in

1    our community as far as what's the activation criteria.

2        So what you're going to see here is a significant number

3    of patients activate because of age.  The CDC recommends

4    greater than 55.  That feels a little young, especially to our

5    surgeons, so 65 is the age that we decided to do.

6        If you've been amputated or an animal -- if you have

7    trauma from an animal, if you have anticoagulants, auto versus

8    bike, crush injury, if you've had to be -- a prolonged

9    extrication, these are all criteria under which we determine

10   who's a trauma patient and who isn't.

11   **Q.**   Now, does the -- having a trauma certification at a

12   hospital raise the level of care in other departments at the

13   hospital?

14   **A.**   Yes.

15   **Q.**   How so?

16   **A.**   There's a term called halo effect -- I'm sorry, halo

17   effect.  Well published in the literature also that when you

18   bring in a trauma service or a program into a hospital, the

19   level of care or the quality of care that's provided to all the

20   patients goes up because what is required to have a trauma

21   center is not just a trauma surgeon.  You could put a surgeon

22   with a patient and they may not have awesome outcomes.  It's

23   the fact that we train everyone on what to look for, what to

24   do, the fact that I have a performance improvement nurse.  So

25   there's a few pieces of that.

1          And so it's someone who looks at every single chart.  And

2     when we identify, hey, it seems to be like our patients are

3     having a problem with catheter-associated urinary tract

4     infections, if we're identifying it in trauma patients, chances

5     are it's a systemwide issue.

6          And when we change the process for trauma patients, we

7     change it for all the patients.  So all the patients benefit

8     from us really diving deep into all these patients and what --

9     how the care could be improved, because our object is to work

10    ourselves out of a job.  You know, we don't want patients to be

11    injured and come in and need complex care.  And we want to be

12    able to provide perfect care every time.  And that takes, you

13    know, a relatively high amount of self-scrutiny about what we

14    can do to improve, and most of it is systematic.

15    Q.   And are there certain types of, say, neuroscience or

16    plastic surgery that benefit from having a trauma unit?

17    A.   Yes.  Without having trauma surgery -- like I referenced

18    before, without having a trauma program in place that required

19    an oral-maxillofacial surgeon, then you would not get a plastic

20    surgeon to come in and see a patient who needed it who was not

21    a trauma patient.

22    Q.   You used the term "oral-maxillo" --

23    A.   Facial surgery.

24    Q.   What does that mean?

25    A.   It's a surgeon who's going to work on the face and the

1   mouth, and they do plastics.  A good number of them do

2   plastics.

3   **Q.**   Because they have to rebuild the face?

4   **A.**   Correct.

5   **Q.**   Okay.  And let's take, for example, OB deliveries.

6       Does the fact that you have a trauma center help with

7   respect to deliveries in the emergency room?

8   **A.**   Yes.  It significantly impacts the labor and delivery

9   department and not just pregnant women who are in traumas.  The

10  biggest impact is in blood, blood utilization.

11      The two departments in the hospital that use blood the

12  most are going to be the emergency department and the labor and

13  delivery department.  They have a lot of women who bleed up

14  there.

15      And as a result of bringing in trauma, we scrutinize our

16  massive transfusion protocol.  So it's not just enough to give

17  somebody who's bleeding red blood cells, you have to give them

18  all the parts of the blood.

19      You may have heard, like, in wartime they talk about whole

20  blood and having your dog tag with your blood type, and if

21  you're in Iraq or Afghanistan and they could say, we need O-pos

22  today and everybody lines up.  But in the civilian world we

23  can't do that, so we break it down into its parts.

24      And so coming up with a protocol and a system of delivery

25  of care where we can get the patient all the units and the

1    types they need to help them to stop bleeding or to form their

2    own clots is -- works not only in the trauma patient, now we've

3    transferred that to labor and delivery.  So now labor and

4    delivery patients are getting the benefit of that.

5        And we also have a surgeon who can stand by now with the

6    OB surgeon, if they're having a bleeding woman, and they take

7    care of other things that may come up during that surgery.  So

8    they have more backup than they had before.

9    **Q.**    Now, are all of these ER services and trauma services

10   available to whoever shows up at NorthBay's door?

11   **A.**    Yes.

12   **Q.**    And does that include Blue Shield members that show up

13   either on their own or through an ambulance or a helicopter?

14   **A.**    Yes.  We don't check insurance before patients show up.

15   **Q.**    And has NorthBay provided emergency care to Blue Shield

16   members?

17   **A.**    Yes.

18   **Q.**    And has it provided trauma care to Blue Shield members?

19   **A.**    Yes.

20       **MR. TOOCH:**  No further questions, Your Honor.

21       **THE COURT:**  All right.

22       Can we set up the board so everybody can see it as opposed

23   to blocking the tables?

24       **MS. BRIGGS:**  I was going to ask, Your Honor, do you

25   have a suggestion for this?

1    THE COURT:  One way you can do it is to go back there.

2  Another one would be to put a little on the side of Mr. Tooch.

3    MS. BRIGGS:  I think, also, these will be up on the

4  screen as well.  So I'm going to move them over there.

5    THE COURT:  All right.  Go ahead.

6              **CROSS-EXAMINATION**

7  BY MS. BRIGGS:

8  Q.   Good afternoon, Ms. Venezio.

9  A.   Good afternoon.

10  Q.   We met earlier.  My name is Amy Briggs, and I represent

11  Blue Shield.

12    You're familiar, aren't you, with the nature of the

13  dispute between Blue Shield and NorthBay?

14  A.   Yes.

15  Q.   And you understand that the issue in this particular trial

16  is the reasonable value of NorthBay's services; right?

17  A.   Yes.

18  Q.   And you're not here as an expert on the reasonable value

19  of NorthBay's services, are you?

20  A.   No.

21  Q.   But you know, don't you, that NorthBay hired its own

22  expert, Mr. Michael Heil, to calculate the reasonable value of

23  NorthBay's services?

24  A.   No.

25  Q.   You're not familiar with that?

1   **A.**   No.

2   **Q.**   So you would not know one way or the other, would you,

3   whether or not Mr. Heil took into account, mathematically, the

4   fact that NorthBay provides trauma services?

5   **A.**   No.

6   **Q.**   Okay.  Now, with respect to the claims in dispute here,

7   you didn't review the nature of all the services that were

8   provided to -- provided in the 1600-plus claims in dispute, did

9   you?

10  **A.**   Can you clarify that for me?  I'm sorry.

11  **Q.**   Sure.

12          **MR. TOOCH:**   Objection, Your Honor, if I may.

13          **THE COURT:**   Okay.  What's the basis of your objection?

14          **MR. TOOCH:**   The parties agreed to select a sample of

15  claims in this case and not have every member review all the

16  16- or 1700 claims in this case.

17      So it's unfair to the witness to say, well, did you review

18  everything which the parties have agreed the claims weren't

19  going to be used as examples.

20          **THE COURT:**   I understand what your objection is.

21  Thank you.

22      The question is fine.  You can proceed.

23  **BY MS. BRIGGS:**

24  **Q.**   So you didn't personally go through the large volume of

25  medical charts related to the patients whose claims are in

1    dispute, did you?

2    **A.**    I did not go through all the claims, no.

3    **Q.**    And I do know that you went through about 38 of them, and

4    we're going to get to that probably later in the week.

5         So aside from those 38, the remaining 1600 and some-odd

6    claims, you don't have any personal familiarity with, correct?

7    **A.**    Not correct.  I review every single trauma chart that

8    comes through NorthBay, so if those charts are in this group,

9    then I would have reviewed them in the past.

10   **Q.**    I see.  Okay.

11        And as you sit here today, you can't tell me -- you can't

12   tell me beyond the claims that -- the 38 claims that you

13   reviewed, you can't tell me, oh, yeah, I remember, I reviewed

14   this trauma chart of the Blue Shield patient; right?

15   **A.**    No.

16   **Q.**    You don't have that kind of recollection?

17   **A.**    No.  Absolutely not.

18   **Q.**    Okay.  And did you personally provide any medical care to

19   any of the Blue Shield patients whose claims are in dispute in

20   this litigation?

21   **A.**    No.

22   **Q.**    And I know you looked at three trauma claims because they

23   were part of the 38 that the parties chose to discuss.

24        And three of those claims involved trauma services, did

25   they not?

1  **A.**   Yes.

2  **Q.**   So beyond that, with respect to the 1,600 and some-odd

3  remaining claims, do you know whether or not trauma services

4  were provided to Blue Shield members?

5          **MR. TOOCH:**  Same objection, Your Honor.

6          **THE COURT:**  Overruled.

7          **THE WITNESS:**  Can you repeat?

8          **MS. BRIGGS:**  Sure.  I can try.

9  **BY MS. BRIGGS:**

10 **Q.**   Putting aside the three trauma claims that the parties

11 agreed to pick as their sample claims in this litigation, do

12 you have any personal knowledge as to whether the remaining

13 1600 some-odd claims in dispute involved NorthBay providing

14 trauma services to Blue Shield members?

15 **A.**   I have no knowledge of that.

16 **Q.**   Before we -- before we go on, I just wanted to actually

17 try to visually orient everybody to, I think, NorthBay and the

18 surrounding hospitals.

19         **MS. BRIGGS:**  Mr. Kotarski, could you pull up the

20 demonstrative?

21         **MR. KOTARSKI:**  I can't hear you.

22         **MS. BRIGGS:**  And you can't read my mind.

23     It is the one from Mark Gustofson.

24         **MR. KOTARSKI:**  I have one for NorthBay and one for

25 NorthBay VacaValley.

1      **MS. BRIGGS:**  Right.  Would you pull up the NorthBay

2  one.

3      **MR. KOTARSKI:**  Thank you.

4      **MS. BRIGGS:**  Thank you.

5      (Document displayed.)

6  **BY MS. BRIGGS:**

7  **Q.**   Ms. Venezio, you're familiar with the area -- the

8  geographic area that surrounds NorthBay; right?

9  **A.**   Yes.

10  **Q.**   And just to back up, I think there's been some testimony

11  that NorthBay actually consists of two hospitals; correct?

12  **A.**   Yes.

13  **Q.**   And there's NorthBay Medical Center, on the one hand, in

14  Fairfield; correct?

15  **A.**   Yes.

16  **Q.**   And then there's the VacaValley facility in Vacaville;

17  correct?

18  **A.**   Yes.

19  **Q.**   Okay.  Let's focus just for a minute on this slide which

20  shows NorthBay Medical Center.  And is that the approximate

21  location of NorthBay Medical Center?

22  **A.**   Yes.

23      **THE COURT:**  This has not been shown to the jury yet.

24      Is there an objection, Mr. Tooch, to the publication of

25  this document as a demonstrative?

1          MR. TOOCH:  I have no objection, Your Honor.

2          THE COURT:  All right.  So it's published.

3          MS. BRIGGS:  Sorry.  I may have inadvertently

4   published it when I put up the board.

5          THE COURT:  Go ahead.

6   BY MS. BRIGGS

7   Q.    So, to orient everybody, the bright orange circle with the

8   cross in it is the approximate location of NorthBay Medical

9   Center; correct?

10  A.    Yes.

11  Q.    Okay.  And up towards the top of the page we see Kaiser

12  Foundation Hospital-Vacaville; right?

13  A.    It's actually where the cross is, not the label?

14  Q.    Yes, that's right.

15  A.    Okay.

16  Q.    And that's the approximate location of Kaiser's Vacaville

17  hospital; correct?

18  A.    Yes.

19  Q.    And then over on the left-hand side of the page, with the

20  green circle labeled "Queen of the Valley," is that the

21  approximate location of Queen of the Valley Medical Center?

22  A.    Yes.

23  Q.    And that's another trauma facility, isn't it?

24  A.    Yes.

25  Q.    And then down at the bottom of the page, there's another

1    green circle that you'll see, and that references John Muir

2    Medical Center.  Do you see that, Ms. Venezio?

3    **A.**    Yes.

4    **Q.**    Is that the approximate location of John Muir?

5    **A.**    I believe so.

6    **Q.**    And John Muir is another trauma facility; correct?

7    **A.**    Yes.

8    **Q.**    So is it fair to say that surrounding -- as shown on this

9    map, there are three other trauma facilities that surround

10   NorthBay Medical Center?  One is a Level III and the other are

11   Level IIs?

12   **A.**    Yes.

13   **Q.**    Okay.  And we'll get to those designations in just a

14   minute.

15          **MS. BRIGGS:**  Now, Mr. Kotarski, would you pull up the

16   other slide so that opposing counsel can take a look and let me

17   know if he has objections.

18          **MR. TOOCH:**  Your Honor, I'm not sure that this is --

19   whether this is accurate.  It includes other hospitals in the

20   area, so I have an objection.

21          **THE COURT:**  I'm sorry, what did you say?  Did you say

22   you have an objection?

23          **MR. TOOCH:**  I do have an objection.  I'm not sure

24   whether this is accurate, whether it accurately reflects other

25   hospitals in the area.

1        **MS. BRIGGS:**  It does not purport to reflect all other

2    hospitals in the area.

3        **THE COURT:**  This is a demonstrative, so it's not going

4    into evidence.

5        Is there any question about the accuracy of what is shown?

6        **MR. TOOCH:**  I don't believe so, Your Honor.

7        **THE COURT:**  All right.  So I'll allow it as a

8    demonstrative.

9        **MS. BRIGGS:**  Thank you.

10       (Document displayed.)

11   **BY MS. BRIGGS:**

12   **Q.**  Ms. Venezio, does -- in the middle of this particular

13   slide is an orange cross.  Does that show the approximate

14   location of NorthBay's VacaValley Hospital in Vacaville?

15   **A.**  Yes.

16   **Q.**  Okay.  Now, VacaValley Hospital is not a trauma center;

17   correct?

18   **A.**  Correct.

19   **Q.**  Okay.  And it's not a STEMI receiving center; correct?

20   **A.**  No.

21   **Q.**  Not a stroke center?

22   **A.**  Yes, it is.

23   **Q.**  Oh, it is a stroke center.  Okay.

24       Is that a NICU?

25   **A.**  A what?

1  **Q.**   A neonatal intensive care unit?

2  **A.**   No, it is not.

3       **MS. BRIGGS:**  Mr. Kotarski, could you go back to the

4  NorthBay slide.

5       (Document displayed.)

6  **BY MS. BRIGGS:**

7  **Q.**   Ms. Venezio, you gave a lot of testimony about the trauma

8  services that NorthBay provides.

9       And so my question to you is whether or not -- in the

10 testimony that you described to the jury, were there any

11 services that NorthBay -- that you referenced that NorthBay

12 provides that aren't available at Kaiser Vacaville, another

13 Level II trauma center?

14 **A.**   Yes.  We have cardiothoracic bypass at NorthBay.  They do

15 not have that at Kaiser Vacaville.

16 **Q.**   And cardio -- could you say it again?

17 **A.**   Cardiopulmonary bypass.

18 **Q.**   Cardiopulmonary bypass.

19      Do you know whether or not the claims in dispute involve

20 cardiopulmonary bypass?

21 **A.**   I have no idea.

22 **Q.**   And I guess I would ask you the same question about John

23 Muir.  Are there any services that NorthBay provides that John

24 Muir does not provide?

25 **A.**   The same, cardiopulmonary bypass.

1    Q.    But, again, you don't know whether or not that particular

2    service was rendered to any of the Blue Shield members whose

3    claims are in dispute in this litigation; right?

4    A.    Correct.

5    Q.    In fact, you would agree with me, wouldn't you, that a

6    significant volume of the emergency patients -- of emergency

7    patients could be treated and released from NorthBay's

8    emergency department without needing any of NorthBay's

9    specialty services; right?

10   A.    You're asking me if I would agree with you?

11   Q.    Yeah.

12   A.    It depends.  I don't -- I would have to look at the data

13   to come up with a valuation of what percentage to be the

14   majority.

15        MS. BRIGGS:  Your Honor, I would direct your attention

16   to page 226, line 18, to page 227, line 1.

17        THE COURT:  All right.

18        MR. TOOCH:  226, line what?

19        MS. BRIGGS:  18.

20        MR. TOOCH:  If I can request that the -- it be read

21   from line 5.

22        THE COURT:  Fair enough.  Rule of completeness.

23        MS. BRIGGS:  Line 5, please.

24        (Video played, not reported.)

25

1   BY MS. BRIGGS:

2   Q.   So with respect to that significant volume of patients

3   that don't need the higher level of services that NorthBay

4   provides, your testimony, right, is that they could walk into,

5   really, any of the hospitals shown on the demonstrative and

6   walk out and be just fine; right, Ms. Venezio?

7   A.   Can you repeat the first part of the question?  I'm sorry.

8   Q.   Sure.

9        With respect to the significant volume of patients that we

10  just heard about in that deposition clip, I mean, what you're

11  really saying is that that significant volume of emergency

12  patients could walk into any of the hospitals that are shown on

13  this map, regardless of whether they offer the specialty

14  services that NorthBay offers, and walk back out and be just

15  fine; right?

16  A.   I would say that there is a fair volume.  But I think it's

17  also fair to say that walking into any emergency department and

18  the care that you receive is dependent upon the ancillary

19  services and other departments that you have in place there.

20  Q.   Now, I want to talk for a moment about NorthBay's trauma

21  designation and how that came to be.

22       And I want to make clear, you would agree that there are

23  two different trauma certifications, for lack of a better word.

24  There is a verification and there's a designation; correct?

25  A.   Correct.

1   **Q.**   And NorthBay is a verified Level II trauma center;

2   correct?

3   **A.**   Correct.

4   **Q.**   And the designated Level II trauma center of Solano County

5   is Kaiser Vacaville; correct?

6   **A.**   Correct.

7   **Q.**   And that designation means that Solano County, itself,

8   evaluated the two facilities, Kaiser Vacaville and NorthBay,

9   and chose Kaiser Vacaville to be the designated Level II

10  facility to serve Solano County; correct?

11  **A.**   Yes.

12  **Q.**   And NorthBay Medical Center competed for that designation,

13  didn't it?

14  **A.**   Yes.

15  **Q.**   Okay.  And it lost; right?

16  **A.**   Yes.

17  **Q.**   Now, there was some testimony from you earlier that

18  NorthBay -- oh, and just to close out that line of questioning,

19  Solano County chose NorthBay Medical Center to be the

20  designated Level III trauma center; correct?

21  **A.**   Not correct.  They chose both hospitals to be designated

22  Level IIIs.

23  **Q.**   Okay.  So both Kaiser and NorthBay are designated

24  Level IIIs?

25  **A.**   Their Level II superseded the Level III.

1  **Q.**   Is NorthBay a designated Level III trauma center for

2  Solano County?

3  **A.**   Yes.

4  **Q.**   And Level II trauma centers see a higher-acuity patient;

5  correct?

6      Let me ask a better question.  Let me withdraw that.

7      A Level II designation means that, generally, there are

8  more resources available to treat -- to treat patients; right?

9  **A.**   According to the American College of Surgeons, as I

10  described in my previous answer about the difference between

11  the different levels.

12  **Q.**   So you had mentioned that NorthBay treats more trauma

13  patients than Kaiser Vacaville; right?

14  **A.**   Yes.

15  **Q.**   And I think you said that's purely by location; right?

16  **A.**   Yes.

17  **Q.**   In other words, trauma patients aren't saying, oh, take me

18  to NorthBay versus anywhere else; correct?

19  **A.**   No.

20  **Q.**   Okay.  It's by virtue of the fact that NorthBay Medical

21  Center is located kind of, I think we heard earlier, smack dab

22  in the middle in between the Bay Area and Sacramento; right?

23  **A.**   Yes.

24          **MS. BRIGGS:**  That's all I have.  Thank you.

25          **THE COURT:**  Mr. Tooch, go ahead.

**REDIRECT EXAMINATION**

BY MR. TOOCH:

Q.   You mentioned on cross-examination that NorthBay provides cardiopulmonary bypass surgery that is not provided at the Kaiser facility.

What is that?

A.   I'm sorry?

Q.   What is cardiopulmonary bypass surgery?

A.   It's what happens when you have open heart surgery.  They basically give you an external heart and lung while they repair the heart or put a stent in or do a bypass around -- scratch that -- not stent, but they put another way for blood flow to be happening in the heart.

And so they have to put you on this complex system with specialists, specialty surgeons and perfusionists, in order to accomplish that safely.

          MR. TOOCH:  No further questions.

          THE COURT:  All right.  Anything else?

          MS. BRIGGS:  Nothing further.

          THE COURT:  Ms. Venezio, thank you.

     (Witness steps down.)

          THE COURT:  Mr. Tooch, who's next?

          MR. TOOCH:  If I can just have a sidebar with Your Honor before the next witness.

          (The following proceedings were heard at the sidebar:)

1    **MR. TOOCH:**  We have our next witness available.  She's

2   from the chest pain center.  She's not a nurse.  I heard what

3   you said.  I don't want to overdo the bragging part.  So we

4   don't need to call her, but -- and then our expert is available

5   tomorrow morning at 8 o'clock.

6        So, if necessary, because you say call your next witness,

7   I can put her on.  Again, I want to have that balance.

8        **MR. PIMSTONE:**  Are you saying that you don't need to

9   call her as a witness in this case?

10       **MR. TOOCH:**  I don't need to call her, but I would be

11  at a bit of disadvantage of saying my next --

12       **MR. PIMSTONE:**  As far as Blue Shield is concerned, we

13  are fine adjourning now and starting tomorrow.

14       **THE COURT:**  And your expert will be ready first thing

15  in the morning?

16       **MR. TOOCH:**  Yes.

17       **THE COURT:**  Okay.

18       **MR. TOOCH:**  Thank you.

19      (Sidebar concluded.)

20       **THE COURT:**  Ladies and gentlemen, I have good news for

21  you.  The case is moving along at a very efficient clip, and

22  we're going to take a break for today, right now, and pick back

23  up first thing tomorrow morning at 8 o'clock.

24       So please come promptly.  Come early.  Hopefully, the

25  coffee was there and other things.  But whether it was or it

wasn't, I look forward to seeing you first thing in the
morning, at 8:00.

     Please remember the admonitions.  Don't do any research.
This case has just begun, it's going to go quickly, but you
need to hear everything before you start making up your mind
about things.

     So keep an open mind.  Don't do any research.  And I look
forward to seeing you in the morning.

     (Jury out at 12:30 p.m.)

          **THE COURT:**  All right.  I'll see everybody at 7:30.

          **MS. BRIGGS:**  Thank you.

          **MR. TOOCH:**  Thank you.

     (Proceedings to resume on Wednesday, February 5, 2019, at
7:30 a.m.)

                         -  -  -  -

                    CERTIFICATE OF REPORTERS

          We certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, February 5, 2019


          _____
                Vicki Eastvold, RMR, CRR
                Official Court Reporter


          _____
          Katherine Powell Sullivan, CSR #5812, RMR, CRR
                Official Court Reporter