**Volume 3**

**Pages 334 - 499**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

NorthBay Healthcare Group -     )
Hospital Division, dba NorthBay)
Medical Center and VacaValley  )
Hospital,                       )
                                )  **NO.  C 17-2929 WHO**
            Plaintiff,          )
                                )
  VS.                           )  Day:  Wednesday
                                )  Date: February 6, 2019
Blue Shield of California Life  )
& Health Insurance Company;     )
California Physicians' Service, )
dba Blue Shield of California;  )
and Does 1-50, inclusive,       )
                                )
                                )  San Francisco, California
            Defendants.         )
_____ )

**JURY TRIAL - VOLUME 3**

**APPEARANCES**:

For Plaintiff:          King & Spalding, LLP
                        633 West 5th Street, Suite 1700
                        Los Angeles, CA  90071
                **BY:  DARON L TOOCH, ESQ.**
                      **DAVID J. TASSA, ESQ.**

For Defendants:         Manatt, Phelps & Phillips, LLP
                        11355 West Olympic Boulevard
                        Los Angeles, CA  90064
                **BY:  GREGORY N. PIMSTONE, ESQ.**
                      **JEFFREY J. MAURER, ESQ.**

                        Manatt, Phelps & Phillips, LLP
                        One Embarcadero Center, 30th Floor
                        San Francisco, CA    94111
                **BY:  AMY B. BRIGGS, ESQ.**

Reported By:            Vicki Eastvold, RMR, CRR
                        Katherine Sullivan, CSR, RMR, CRR

# I N D E X

Wednesday, February 6, 2019 - Volume 3

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| | | |
| **HEIL, MICHAEL** | | |
| (SWORN) | 341 | 3 |
| Direct Examination by Mr. Tooch | 341 | 3 |
| Cross-Examination by Mr. Pimstone | 409 | 3 |
| Redirect Examination by Mr. Tooch | 464 | 3 |
| Recross-Examination by Mr. Pimstone | 475 | 3 |
| Further Redirect Examination by Mr. Tooch | 480 | 3 |
| Further Recross-Examination by Mr. Pimstone | 481 | 3 |

| **DEFENDANTS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| | | |
| **PUGH, MICHAEL** | | |
| (SWORN) | 483 | 3 |
| Direct Examination by Mr. Maurer | 483 | 3 |

# E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 300 | | 441 | 3 |

P R O C E E D I N G S

---000---

(The following proceedings were held in open court, outside the presence of the jury:)

        **THE COURT:**  I do need to be here?

        **MR. PIMSTONE:**  Yes.

        **MR. TASSA:**  There is one thing I'd like to address if I may.

        **THE COURT:**  Please come ahead.

        **MR. TASSA:**  From yesterdays testimony.  During the cross of Ms. Eichenberger there was a question asked to the effect of:  Do you know if this had -- this contract that -- NorthBay-Blue Shield contract had effect on Blue Shield's ability to offer affordable care to its members.

    And I think that would be covered by the Court's ruling on costs coming in to a *quantum meruit* action.  To the extent that the Court's ruling affected NorthBay's ability to offer evidence on the affect that any given rate might have on its ability to continue to do business as it does, continue to offer advanced care, to its members of his community, continue to offer uncompensated care, that's a relevant aspect of NorthBay's practice that I understand is excluded from this trial.

    So I think the flip side of that coin is Blue Shield's

1  ability to do business in the manner that it feels that it

2  wants to should be excluded for the same reasons. That's a

3  cost to Blue Shield. And to the extent costs are excluded, I'm

4  not sure why costs to a buyer would be relevant, whereas costs

5  to a seller wouldn't be relevant in a *quantum meruit* case.

6       **THE COURT:** All right. Does anybody want to speak to

7  that.

8       **MR. PIMSTONE:** I'm just struggling to understand the

9  argument. It's not in any way comparable. The market analysis

10  that the jury is doing is a market analysis as to what the

11  products are sold for.

12       And the -- we heard testimony from Ms. Eichenberger and

13  others yesterday that they clearly described NorthBay's

14  mission. They talked about NorthBay's being a nonprofit. They

15  talked about NorthBay's mission to provide care to the local

16  community. There was a lot of discussion yesterday about

17  NorthBay's mission to provide care to the local community

18  including, and I think there was discussion in the testimony,

19  about NorthBay's serving the entire community, including the

20  under-served populations.

21       We didn't objected to that at the time. There wasn't a

22  direct discussion of NorthBay's costs. But in terms of

23  NorthBay's mission to provide -- to provide coverage and care

24  to the local community, that was absolutely discussed

25  yesterday.

**PROCEEDINGS**

1    I think the reference to Blue Shield's mission to provide

2  affordable health care relates to premiums.  It relates to --

3  it relates to Blue Shield not entering into arrangements that

4  preclude Blue Shield from being able to offer appropriate care.

5    And the issue might come up because there will be a

6  discussion probably in testimony tomorrow that relates to why

7  the contract no longer made sense for Blue Shield in 2016, what

8  had changed in the market as to why the contract was no longer

9  appropriate.

10    But it doesn't have to do with -- the *Children's Hospital*

11  case deals with the fact that the costs to produce a product,

12  the cost to the seller, is not relevant in determining the

13  sales price -- in determining the market price for that

14  product.

15    That's not to say that business considerations may not be

16  relevant in other ways to describe why a contract either made

17  sense or no longer made sense after a particular point in time.

18    That doesn't go to issue of market pricing.  That doesn't

19  go -- in terms of market pricing of a product.  It's like

20  apples and oranges.  And there was testimony yesterday about

21  NorthBay's mission.  They took great pains to disclose the fact

22  that NorthBay is a nonprofit, just as Blue Shield is a

23  nonprofit.  And there was a lot of discussion about NorthBay's

24  mission to the community, to serve the community.

25    So if they're going to talk about NorthBay's mission to

1    serve the community and to serve the under-served populations,

2    then talking about Blue Shield's mission, as well, to not price

3    itself out of the ability to offer affordable health coverage

4    is certainly relevant.

5         The law we discussed before talks about the seller's

6    costs.  That the seller's costs are irrelevant in terms of

7    efficiency of the sellers.  Some sellers are more efficient,

8    some sellers are less efficient.

9         So the discussion that we had in terms of *Children's*

10   *Hospital* relates to the seller's costs.  And also the

11   discussion we had previously, in addition to the seller's cost,

12   related to discovery positions that were taken in the case when

13   Blue Shield sought to inquire about the seller's costs.

14        So it was the combination of factors.  But it has nothing

15   to do with either NorthBay's general business strategy or Blue

16   Shield general business strategy.  And we heard yesterday about

17   NorthBay's general business strategy extensively.

18        **THE COURT:**  Here's the thing.  I didn't hear anything

19   yesterday that I thought was inappropriate.  It is up to the

20   lawyers to make objections when you think that there's a

21   problem in the case.  So don't sit on your hands and think

22   that, Oh, I'm going to -- the jury's not like to like me if I

23   make objections.  If you think something's coming in that's

24   improper, make the objection.  So I didn't hear that.

25        I'm not persuaded by the argument that you're making right

1   now, but I'll keep my ears open to it.  But I didn't hear

2   specific -- Blue Shield raising specific cost concerns other

3   than the kind of obvious disagreements that people are going to

4   have about trying to pay as little -- you know, pay as

5   efficiently as possible and get as big a return as possible

6   given the different perspectives that a buyer and a seller has

7   in a market.

8       So I hear you, but if you have a more -- a deeper concern

9   about the way that the evidence comes in, in addition to making

10   an objection if you want to file a brief and lay out what the

11   problems are I'm happy to look at it.

12       **MR. TASSA:**  Thank you, Your Honor.

13       **MR. PIMSTONE:**  Thank you, Your Honor.

14       **THE COURT:**  All right.  All right.  I'll see you at 8.

15       **MR. TOOCH:**  Thank you.

16       (Recess taken at 7:37 a.m.)

17       (Proceedings resumed at 8:05 a.m.)

18       **THE COURT:**  All right.  Please be seated, everybody.

19   Good morning, ladies and gentlemen.  Welcome back.

20       You may wonder why it is that everybody stands for you as

21   you come in for your jury service.  And it is in honor of --

22   and recognition -- of the service that you're providing to the

23   system of justice.  So thank you for that.  Thank you for being

24   prompt.

25       And Mr. Tooch, who's the next witness?

1    **MR. TOOCH:**  Thank you, Your Honor.  Plaintiff calls

2  Michael Heil.

3                    **MICHAEL HEIL**,

4  called as a witness for the Plaintiff, having been duly sworn,

5  testified as follows:

6    **THE CLERK:**  Be seated.  Adjust the mic as you may need

7  to.

8      If you would, please, state your full name for the record

9  and spell it for the court reporter.

10    **THE WITNESS:**  It is Michael Stuart Heil.  H-E-I-L is

11  the last name.

12                    **DIRECT EXAMINATION**

13  BY MR. TOOCH:

14  **Q.**   Good morning, Mr. Heil.

15  **A.**   Good morning.

16  **Q.**   Tell us where you currently work.

17  **A.**   I work at HealthWorks.

18  **Q.**   And what is HealthWorks?

19  **A.**   HealthWorks is a management consulting firm that works in

20  the field of health care.  Our clients are hospitals, hospital

21  systems, physicians and payors, insurance companies and health

22  system payors.

23  **Q.**   And what does it mean to do consulting work?  Give us an

24  example of the types of projects that you work on.

25  **A.**   One category of our work is planning and operations

1   improvement.  Helping health care organization think about the

2   future and improve the way it functions in terms of quality or

3   cost effectiveness.

4        Another part of our work is helping hospitals and

5   physicians come closer together.  We call that physician

6   integration.

7        Another part is valuation.  That is the process of

8   applying standards and principles to determine the value of

9   something.

10       Thirdly -- fourthly -- we provide litigation support

11  services working on matters like this.  And I would add that

12  across all of those, one of our areas of specialization is

13  emergency services and trauma center services.

14  **Q.**   Okay.  Where did you go to college?

15  **A.**   Lehigh University in Pennsylvania.

16  **Q.**   And what degree did you get?

17  **A.**   Industrial engineering.  That's the applying of

18  mathematical approaches to help organizations become more

19  efficient and solve management problems.

20  **Q.**   And did you get any degrees after that?

21  **A.**   Yes.  I got a master's degree in hospital and health

22  services administration from Cornell University, part of the

23  MBA program, in New York.

24  **Q.**   And have you worked at any hospitals?

25  **A.**   Yes.

1  **Q.**   What hospitals?

2  **A.**   My first hospital work was in Vermont.  It was at a

3  hospital called Southwest Vermont Medical Center.  Town called

4  Bennington.

5  **Q.**   And what position did you have?

6  **A.**   I started as a management engineer, industrial engineer,

7  and then was promoted to assistant administrator.

8  **Q.**   And what was your -- what were your responsibilities as

9  assistant administrator?

10 **A.**   I was given responsibility for a subset of the departments

11 of the hospital.  They tended to be in the area of laboratory,

12 support services, X-ray.  Services like that.  And then I

13 continued in my role of trying to work throughout the hospital

14 to help it become more efficient even for the departments that

15 I wasn't necessarily directly responsible for.

16 **Q.**   And how long were you -- did you work at Southwest in

17 Vermont?

18 **A.**   I was there for two and-a-half years.

19 **Q.**   And describe the hospital.  How many beds did it have?

20 **A.**   It's about 150-bed hospital in a relatively small

21 community in a sector in the southwest corner of Vermont.

22 **Q.**   Would you call it a community hospital?

23 **A.**   Yes.  Very much so.

24 **Q.**   Is it a similar community hospital to NorthBay?

25 **A.**   No, it's not.  Its size is similar, but it did not and

1  does not offer the wide range of specialized services that

2  NorthBay does.

3  **Q.**   Are all community hospitals the same?

4  **A.**   No.  There's quite a significant variation, one hospital

5  to the next, even within the same size type.

6  **Q.**   Where did you work after Southwest Vermont?

7  **A.**   Well, I became very interested in hospital management and

8  decided that I wanted to get advanced training.  And that's

9  when I went to Cornell.  While I was at Cornell, I went to work

10 at a teaching hospital in Boston where I did what's called an

11 administrative residency.  And then when I left Cornell I had

12 an opportunity to come to California, and came to work at a

13 hospital in San Jose called San Jose Medical Center.

14 **Q.**   What was your position at San Jose Medical Center?

15 **A.**   Initially, I was director of planning, then I was

16 vice-president for planning, then I was vice-president for

17 professional services.  And in that role I was responsible for

18 the emergency department, the trauma center, the laboratory,

19 the family practice residency training program, lab, X-ray; a

20 lot of the departments that had a lot of physician involvement.

21 **Q.**   And how long were you at San Jose Medical Center?

22 **A.**   17 years.

23 **Q.**   Where did you work after San Jose?

24 **A.**   After San Jose Medical Center, I started the consulting

25 practice, which is HealthWorks.  I started as a solo practice.

1  In -- early in that work, I took an assignment from HealthWorks

2  to be the interim chief operating officer at Sutter Roseville

3  Medical Center during a period of management change there.  And

4  then returned full time to my consulting work at HealthWorks

5  with other clients.

6  **Q.**   What is a chief operating officer?

7  **A.**   It's the individual who reports to the chief executive

8  officer.  It's sort of the second-ranking seniority position in

9  the management side.  Most of the vice-presidents and other

10  senior executives and management people report to that

11  position.  And I was there during the period of quality

12  re-engineering of the hospital, and the hospital moving to a

13  new facility, and the hospital becoming a designated trauma

14  center.

15  **Q.**   And so were you involved in the process of the hospital

16  applying to become a trauma center?

17  **A.**   Yes.  That was the case first when I was just a consultant

18  and before I became interim chief operating officer, and I

19  helped to do the feasibility studies and the planning work for

20  them to do that.  And then I got involved in the leadership

21  role there for that transition time as they became a trauma

22  center, helped them meet all the standards that are required in

23  California to become a designated trauma center.

24  **Q.**   In any of your positions, did you get involved in

25  negotiating contracts with insurance companies?

1   **A.**   Yes.  It's a regular part of my work, particularly at San

2   Jose Medical Center and at Sutter Roseville.

3   **Q.**   And as part of your consulting work, have you been

4   involved in negotiating contracts?

5   **A.**   Yes.

6   **Q.**   How many contracts?

7   **A.**   I would say I've been directly involved as an executive in

8   maybe 40 managed care type contracts negotiations.  In my

9   consulting work I've been occasionally representing the

10  hospital with the payor, but usually providing advisory

11  services to someone at the hospital, or physician group, that

12  would conduct the negotiations across the table.

13  **Q.**   And how many times have you been in that support role?

14  **A.**   I would say probably another 40 or 50 times.

15  **Q.**   Have you held any teaching positions?

16  **A.**   Yes.  When I was at Cornell I was a graduate teaching

17  assistant because I'd had the background of work at the

18  hospital, the one in Vermont.  That was a brief assignment as a

19  teaching assistant.

20      Then when -- here in California I taught health care

21  economics to graduate students in health care at St. Mary's

22  College of California over in Moraga.

23      And more recently I've been a guest lecturer at the School

24  of Public Health, UC Berkeley, teaching health management and

25  policy, teaching health economics, and teaching health care

1   finance.

2   **Q.**   I'd like to talk about your experience with trauma and

3   emergency services.

4        In California, have you had any roles in any organizations

5   with respect to trauma or emergency services?

6   **A.**   Yes.  My roles there began when I was at San Jose Medical

7   Center when it became clear that the quality of patient care

8   would be improved if there were trauma centers.  This was at a

9   time when there weren't very many.

10       And I first served on a county planning committee to try

11  to figure out if there should be one or more trauma centers;

12  and if so, what they should look like and where they should be?

13       Then the hospital I was at, San Jose Medical Center, did

14  go on and become one of three trauma centers.  The others were

15  County Hospital, Valley Medical Center, and Stanford.

16       And as I continued at San Jose Medical Center, my interest

17  led me to be appointed as the founding chairperson of a

18  committee that the California Hospital Association set up

19  called the Committee on Trauma and Emergency Services.

20  **Q.**   What is the California Hospital Association?

21  **A.**   It is the association of all -- virtually all of the

22  hospitals in the state of California.  They work on things like

23  quality improvement, nursing staffing challenges.  They work on

24  legislative advocacy.  They have a lot of roles on behalf of

25  the hospital sector.

1  Q.   And what did the committee that you sit on do with respect

2  to trauma and emergency services?

3  A.   It was primarily focused on improving the quality --

4  giving advice to member hospitals to improve quality at their

5  hospitals if they already were trauma centers; or to help bring

6  about the job of filling in the blanks, if you will, in

7  California where there were gaps in the geography where trauma

8  centers would be beneficial.

9  Q.   What is Cal-STAR?

10 A.   It stands for California Shock Trauma Air Rescue.

11 Q.   And did you have any involvement with Cal-STAR?

12 A.   Yes.  It is a not-for-profit organization that I helped to

13 found.  I was the founding chairperson of it.  And what we

14 undertook to do was to set up a network of medical helicopters

15 around northern California and to do it in a way that was

16 efficient.  So that instead of each hospital having maybe its

17 own helicopter program, the idea was to have a shared approach

18 and to have a network of them that would focus on the patient

19 and get the patient to the right closest trauma center, or for

20 other advanced care like cardiac services or neurosurgery

21 services.

22 Q.   Have you helped any states with respect to their trauma

23 program?

24 A.   Yes.  In a couple of ways.  I helped -- I was the

25 consultant hired by the state of Alaska to set up its first

1   statewide trauma system.  That means how many trauma centers,

2   where should they be, what kind of trauma centers should they

3   be?  How should patients be triaged to get to the right place.

4   As you can imagine, Alaska would present an enormous challenge

5   in that, given the tremendous distances and weather.

6       So I helped them prepare that.  I also served as an expert

7   in several administrative law proceedings in Florida where they

8   had an existing trauma system, but there was considerable

9   controversy about how the system might change over time.  So I

10  gave expert testimony to an administrative law judge to make

11  decisions about changing the Florida trauma system.

12      I also wrote a position paper that helped the state of

13  Colorado do the same thing; figure out how to improve its

14  trauma system.

15  **Q.**   Now go over your qualifications with respect to valuation.

16  Are you a certified valuation analyst?

17  **A.**   Yes.

18  **Q.**   What does that mean?

19  **A.**   There's an organization called in that case NACVA.  Stands

20  for the National Association of Certified Valuators and

21  Analysts.  It's the leading professional organization that

22  certifies -- that educates and certifies people who may know

23  about and do some valuation work but that want to raise their

24  standard of education and knowledge of the profession.  So it

25  certifies individuals after certain education and testing and

1    case study work.

2        I think I did that about eleven years ago.  I wanted to

3    upgrade my capability.

4    **Q.**   Do you have any other certifications as an analyst?

5    **A.**   Yeah.  There's another mouthful that organization has.

6    It's called Master Analyst in Financial Forensics.  What that

7    really means is that valuation people are given guidance about

8    how to participate in dispute resolution processes and

9    understand how the process of arbitration hearings and trials

10   and depositions works.

11   **Q.**   Let's get back to the valuation work you've done at

12   HealthWorks.  Describe the different types of valuation work

13   you've done at HealthWorks.

14   **A.**   So as I said, valuation is the process of establishing the

15   value of something.  It can be a business or it can be a

16   service.  So a business might be, in the health care field, the

17   value of an ambulatory surgery center.  We do that kind of

18   work.  I've done that kind of work.

19       Another would be valuing -- a situation like this --

20   valuing a service relationship between a hospital and an

21   insurance company to establish the fair market value of it.

22   That would be -- that's called compensation valuation.

23       Another example of that is establishing an opinion about

24   what the fair market value would be for a hospital to contract

25   with a neurosurgeon to be on call -- or, a group of

1   neurosurgeons to be on call 24 hours a day to cover an

2   emergency department and/or a trauma center.

3   So those are the three major types of valuation work that

4   I do.

5   **Q.**   And how many times have you been an expert in a case

6   similar to this?

7   **A.**   Probably been 90 engagements.  I would estimate that

8   roughly 50 of them have advanced to the point of an expert

9   report being prepared and/or giving testimony in a deposition

10   and/or giving testimony in a hearing.

11   **Q.**   Hearing is both arbitrations and court?

12   **A.**   They've been both.  State court, federal court,

13   administrative law hearings, and then arbitrations.

14   **Q.**   What were you hired to do in this case?

15   **A.**   Establish the reasonable value of services at NorthBay

16   with a payor that doesn't have a contract.

17   **Q.**   I'd like to show you slide number 2.

18   **THE COURT:**  So you're just going to use these as

19   demonstratives?

20   **MR. TOOCH:**  Demonstratives, yes.

21   **THE COURT:**  You can proceed.

22   **MR. TOOCH:**  Will you publish it?

23   **THE WITNESS:**  Will it pop up here?

24   **THE COURT:**  It will.

25   **THE WITNESS:**  It did.

**BY MR. TOOCH:**

**Q.**   This is a jury instruction that was given to the jury beforehand.  It says:  NorthBay is entitled to be paid the reasonable value of the services that were provided to Blue Shield members.  The reasonable value of the services is the going rate for the services, or the reasonable market value at current market prices.  Reasonable market value or fair market value is the price that a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell and both having full knowledge of all pertinent facts.

As a valuation expert, do you look at willing buyer/willing seller determining your valuation expertise?

**A.**   Yes.

**Q.**   Tell us what a willing buyer/willing seller is?

**A.**   A willing buyer/willing seller situation is where each comes to the table and reaches an agreement about price for a given service, in this case.  The understanding behind it is that the buyer is not compelled to be in the contract, neither is the seller compelled to be in the contract.  So it's a meeting of the minds about a service and a price.

**Q.**   And then have you heard of the term "comparability"?

**A.**   I know that word well.

**Q.**   What is come comparability?

**A.**   Comparability is a term that's used in the valuation profession.  The best place to see it used is in a book, like

1    by Mark Kantor, which is about evidence in arbitrations.

2    Happens to be about arbitrations.  But arbitrations.  And he

3    writes that comparability is at the heart of market-based

4    methods of valuation.

5        So that very succinct phrase is something that is seen

6    there in that text book, but it's built into the thinking and

7    the processes of that valuation experts use.  They have in

8    front of them potentially a very, very large amount of data,

9    and the job is to understand what's the thing that's being

10   valued and how do I sift through all of that data and find the

11   portion of that data that's the most comparable to what it is

12   I'm valuing?  In shorthand, we all talk about, in everybody day

13   life, about apples and apples comparability.

14   **Q.**   Let's take, for example, a hypothetical.  If you are

15   looking for a three-bedroom apartment in a particular part of

16   the city, how would you go about determining whether the price

17   that's offered -- the rent that's offered at one apartment is a

18   fair price?

19   **A.**   I would look to find market rates for other three-bedroom

20   apartments in that area.

21   **Q.**   How would the issue of comparability play out in that?

22   **A.**   Well, I would ask deeper questions about what kind of

23   apartment.  I'd be interested in knowing more about the

24   characteristics of the apartment.  I'd want to be looking at

25   rates that were -- rents, if you will, that were not only for

1  three bedrooms, but where the type of apartments were similar.

2  Might have to do with their size, or their location, or their

3  -- whether they had a washer/dryer in them or not.  Things like

4  that.

5  **Q.**  Does that apply in the medical field as well?

6  **A.**  Yes.

7  **Q.**  Let's say I found out that I had a brain tumor.  It's not

8  an emergency, I don't have to go right away, but I need to have

9  brain surgery and I want to look for a doctor.

10  Tell us how you would go about valuing the services of a

11  brain surgeon in that context?

12  **A.**  I would look -- I would probably ask the question what

13  kind of a brain surgeon do you want?  And you would probably

14  tell me you want a very good one.  And so I would do some

15  searching to identify some indicators of very high quality

16  neurosurgeons and inquire and learn about their fees.

17  **Q.**  And would you compare the fees of a high quality

18  neurosurgeon to every other neurosurgeon?  Or would you -- how

19  would idea of comparability play into your valuation of a

20  particular brain surgeon's prices?

21  **A.**  I would look to try to get as close to apples and apples

22  as I could.  I would look to try to find -- if you told me you

23  wanted a very high quality one, I would look only for high

24  quality ones, and I'd look at the charges they had for their

25  services.

1      **MR. TOOCH:**   Okay.   Now, I'd like to go to slide number

2   3.

3         **MR. PIMSTONE:**   No objection.

4         **MR. TOOCH:**   We have a board.

5   BY MR. TOOCH:

6   **Q.**   Mr. Heil, could you explain what this slide shows?

7   **A.**   This slide shows, first of all at the top, my conclusion.

8   The results of my work in this case where I've established that

9   88 percent of NorthBay's charges is fair market value, is

10  reasonable value, for its services.   And it shows that I came

11  to that number by taking three different approaches.

12       By the way, that process of using two or more approaches

13  to come to a number in an important matter like this is very

14  common in the valuation profession.   Valuators know that if

15  they use two or more methods and come to values from each one

16  of those that tend to point in the same basic direction, that

17  gives them increased confidence that they've got the right

18  answer.   And that, in general, is what has happened here.

19       But what I've done here is to identify three approaches to

20  come to what I believe is the right answer.

21  **Q.**   If you can explain.   It says:   Course of dealing between

22  NorthBay and Blue Shield.   What do you mean by "course of

23  dealing"?

24  **A.**   Course of dealing is a way of describing how the two

25  parties have worked together in the past.

1  **Q.**   Why is that important?

2  **A.**   It's important for two reasons.  One is that back to the

3  concept of comparability, there's nothing closer to a perfect

4  apples and apples match than the relationship that has existed

5  between the exact parties in the dispute.  It's exactly the

6  right hospital, it's exactly the right payor.

7      So it is very, very strong and helpful on the

8  comparability principle.

9      The other reason that it's significant in this case is

10 that it was in a relationship that existed for quite a long

11 time.  I think it was eight years.

12 **Q.**   You said there's no better match.  When you talk about

13 comparability, are we talking about the exact same services

14 before the contract versus after the contract?

15 **A.**   Yes and no.  It's, basically, very, very close.  It is

16 NorthBay.  It is -- in the previous arrangement, NorthBay was

17 having nonemergency volumes steered to it because Blue Shield

18 had included it in their network.  So in the previous

19 arrangement, there was a lot of services that would come that

20 way.  Things like outpatient physical therapy, lab, X-ray,

21 maternity care, elective surgery and so forth.

22     However, in this -- after the cancellation of the

23 contract, the only services that are coming are the emergencies

24 that happened to occur and come to NorthBay.  So there's been

25 some shift in the services.  But, the pricing arrangement has

1    remained constant for all of the services.

2    **Q.**    What do you mean by that?

3    **A.**    Well, NorthBay's charges remain the same as they were, for

4    example.  The services -- the charges for their different

5    services remain unchanged.  They charge the same amount to

6    everybody.

7    **Q.**    And did the types of emergency services that they provided

8    and the types of trauma services that they provide remain the

9    same?

10   **A.**    Those are identical.  So in the previous eight years -- or

11   prior to the cancellation, NorthBay was providing emergency

12   trauma, cardiac, various kinds of emergency services to Blue

13   Shield members.  And those remain exactly the same.

14   **Q.**    I'd like to take you to another hypothetical, if I may,

15   about a guy goes to a hamburger place, orders $12 hamburger off

16   the menu, eats the hamburger, then says:  I don't think its

17   worth $12, I think it's worth $4.

18        Is the fact that that guy went to that restaurant for

19   eight years and ordered the same hamburger and paid $12

20   relevant?

21   **A.**    Yes.

22   **Q.**    Why?

23   **A.**    Well, it is exactly the same hamburger and the same

24   customer.  And the fact that that was a workable arrangement

25   between them for a long time is very powerful to understanding

1  value.

2  **Q.**  And if somebody for eight years buys a hamburger and eats

3  it for -- pays $12, does that show a willing buyer at that

4  price?

5  **A.**  Yes.

6  **Q.**  What is the second method that you used on -- in your

7  analysis?

8  **A.**  So the second part of my analysis is to look at contracts

9  between NorthBay and other commercial payors.

10  **Q.**  And what do you mean by "other commercial payors"?

11  **A.**  Well, NorthBay contracts with a wide-range of types of

12  payors.  I could break them into two major groups.  And I've

13  carefully done that and thought about what that means and what

14  it tells me about this case.  But I looked at all of those

15  contracts because they represent a willing buyer/willing seller

16  having come to an agreement about value.

17  **Q.**  And so did you look at contracts like with Aetna, Cigna,

18  United?

19  **A.**  I did.  I looked at where the payors were in one sense

20  very similar to Blue Shield.  United, Aetna, Cigna, Blue Cross,

21  Health Net.  Those happen to be arrangements where those payors

22  are steering business of a nonemergency type to NorthBay.  So

23  that's a notable fact.  But they're similar type of business

24  entities in the sense that they're commercial insurance

25  companies.

1   **Q.**   Did you look at other types of commercial contracts?

2   **A.**   Yes, I did.  I looked also at a group of arrangements that

3   are virtually emergency only.  So NorthBay has contracts with

4   several types of payors where there is none of that steering of

5   nonemergency business.  And those are written contracts.  And I

6   can see what those rates that were agreed to by those two

7   parties.

8   **Q.**   And what was the third method that you used in your

9   analysis?

10  **A.**   It was to analyze charges.  It was to compare NorthBay's

11  charges with, in this particular case, two peer groups.

12  **Q.**   What do you mean by a peer hospital?

13  **A.**   I do charge analysis, analyses, in these kind of cases.

14  And one has to decide, if you're going to look at NorthBay's

15  charges and compare them to others, you want to find one or

16  more groups that are very similar or that have similar

17  characteristics.

18      In this case I thought it was best to actually pick two

19  peer groups to see whether the findings might be significantly

20  different.

21  **Q.**   And in your other projects that you've done valuation in

22  cases similar to this, have you done charge analyses?

23  **A.**   I've always done charge analysis, yes.  And other

24  valuators that I know who work on the provider side of things

25  on a case, or on the payor side, do charge analysis quite

1  routinely.

2  **Q.**   I'd like to go to slide number 4.  Mr. Heil, explain what

3  is shown on this slide.

4  **A.**   So I refer to this as the managed care bargain.  And other

5  people in this field often use this same terminology.  Whether

6  that term is used or not, it represents the same basic

7  principle, which is that in the managed care field hospitals

8  are willing to grant discounts from their charges to people

9  they contract with.

10  **Q.**   What do you mean by the "managed care field"?

11  **A.**   Managed care is the term that best describes the

12  commercial insurance world and how it works with hospitals and

13  physicians.

14  **Q.**   The situation that's here.

15  **A.**   Situation just like this.  HMO's, PPO's, health insurance

16  products of this type, rental products and the like, are

17  contracts with -- in this case -- a hospital, possibly could be

18  a physician.

19  **Q.**   Okay.  This slide has a scale, correct?

20  **A.**   Correct.

21  **Q.**   Let's look at the left side of the scale.  At the bottom

22  it says:  Type 2:  Value of volume.  Then it has steered

23  volume.  Explain what you mean by that.

24  **A.**   One of the things that hospitals would like to have in a

25  relationship with a commercial payor is steered volume.  They

1   would like to have that payor tell its members that the

2   hospital is on a list of approved network hospitals.  They

3   would like to know the insurance company has arranged financial

4   incentives for members to get their elective care, nonemergency

5   care, at that hospital.

6        This is the kind of volume that hospitals find very

7   financially beneficial.  That's what they want a lot of.  As I

8   said before, it's things like obstetrical services, maternity

9   services, outpatient lab and X-ray, and physical therapy, and

10  inpatient elective surgery.  Things like that.  That's the --

11  one of the things that hospitals mostly want in a arrangement

12  with a commercial plan.

13  Q.   And when you said "financial incentives," do you mean

14  lower copays and co-insurance?

15  A.   Yes.  It can be -- it usually doesn't affect

16  deductibilities, but copays and co-insurance.  The plan says:

17  We'll lower the copays and the co-insurance if you go to one of

18  our network hospitals for your elective care.  If you go to

19  another one, it's going to cost you more money out-of-pocket.

20  Q.   And what do you mean by "elective"?  What's an example of

21  elective surgery?

22  A.   It would be, back to your example of if you had a brain

23  tumor and you needed to have it removed on a planned basis

24  where you had time to think about it and select a doctor and

25  select a hospital.  You're going to go and you're going to

1   have -- on Monday morning you're going to have your procedure.

2   It's not an emergency.

3   **Q.**   By "elective," do you mean elect or you choose where

4   you're going to have that?

5   **A.**   You choose where and you also have some control, at least,

6   over when.  It's going to depend on maybe the physician's

7   schedule.  But same thing with maternity services.  Even though

8   you can't particularly be absolutely certain when you're going

9   to go into labor, you pick the hospital in advance and you've

10  planned to go to a particular hospital to have your baby.

11  **Q.**   And that would apply to knee surgeries and back surgeries

12  and shoulder surgeries?

13  **A.**   Correct.  It also applies to outpatient lab tests,

14  outpatient physical therapy treatments.  I've got a bad back.

15  I need to go for 15 physical therapy treatments.  I'd like to

16  go to the hospital's outpatient physical therapy department and

17  have that, but I don't want to go there if they're not in

18  network and if I'm going to have to pay more money

19  out-of-pocket to go.

20  **Q.**   Underneath "steered volume" is "emergency volume."  What

21  do you mean by that?

22  **A.**   This might sound a little bit counterintuitive.  But it

23  does turn out that when hospitals are in a network, the members

24  come to know that.  And when they're faced with a medical

25  problem that might be an emergency and might not be -- it's a

1  kind of close call -- they're going to maybe be a little

2  concerned about going to the wrong place.  They might say:  I

3  will travel further for this problem.  I think it's probably an

4  emergency, but I don't want to run the risk of not getting full

5  coverage.

6      So it has been determined -- or found -- that when

7  hospitals become in network, they actually get more emergency

8  volume, not just the most clear-cut severe emergency cases like

9  a big accident or a heart attack.

10 **Q.**  And then you have "Physician Practice Patterns" -- it's a

11 typo.  It has "patters" but it should say "patterns."

12 **A.**  Yes.

13 **Q.**  What is a physician practice pattern?

14 **A.**  So what hospitals would like is they would like to know

15 that the physicians connected to any particular plan cannot

16 only come there to that hospital when it's that plan's

17 patients; but they'd like to be seen as being in the network

18 that a lot of physicians might have so that they would bring

19 all of their patients there.

20     So being in network, being in this kind of a relationship

21 that's shown on this scale, has that additional benefit.

22 That's why hospitals are willing to discount their charges

23 significantly to get these benefits.

24 **Q.**  Are there contracts between health plans and physicians?

25 **A.**  Yes.

1  Q.   And do those contracts between health plans and physicians

2  sometimes determine where the physician is going to admit his

3  or her patients?

4  A.   It can, yes.  That relationship is more complex.  But

5  absolutely.  There's a connection, yes.

6  Q.   Okay.  So are these -- the bottom of the box, the Type 2,

7  that's sort of the volume, the number of patients from a

8  particular health plan like Blue Shield, right?

9  A.   Correct.

10  Q.   What are the Type 1 value of contract?  First of all, what

11  does "rate" mean?

12  A.   Rate means the amount that will be paid per patient or per

13  visit or per type of service.

14  Q.   And does it mean a certain rate?

15  A.   It's a specified rate.  Managed care contracts spell out

16  sometimes in simple terms, sometimes in very complex terms, but

17  they spell out exactly what will be paid for everything.

18  Q.   Now, on the left side of the scale you say "the hospital

19  gets," right?  So the hospital gets the volume and it gets a

20  specified rate.  Why is that important to the hospital?

21  A.   Because it wants to know in advance how much it will get

22  paid to provide the service.  The payment always comes later,

23  so it wants to know in advance that there's been an agreement

24  with a plan so that there isn't a dispute.

25  Q.   Isn't that also beneficial to the health plan to have a

1   specified rate?

2   **A.**   Yes.

3   **Q.**   Who's it more beneficial to?

4   **A.**   It's significantly more beneficial to the hospital.

5   **Q.**   Explain.

6   **A.**   I would use this example:  Certainty is good for both

7   sides, but the insurance company holds the money and makes a

8   payment after the care is delivered.

9        So I could use the analogy of an employee.  I'd like to

10  know what my salary is in advance because I have to do the work

11  first before I'm going to get paid and my boss might change his

12  mind.  We might have had an understanding or have some general

13  concept, but my boss has the money.  I'd like to know we've

14  spelled out how much I'm going to get so he won't change his

15  mind.

16  **Q.**   And if he changes his mind, might it be a situation where

17  you'd have to sue to get the money that you thought you were

18  going to get?

19  **A.**   Yes.

20  **Q.**   The next item on the value of the contract is "minimized

21  disputes."  What do you mean by that?

22  **A.**   Most managed care contracts have provisions that are

23  designed to avoid complex and expensive lawsuits.  They

24  sometimes have clauses called meet and confer where it just

25  says if there's a disagreement, the parties agree to get in a

room and each have a conversation and see if they can put their

differences behind them and come to an agreement.

Setting up those processes has been found to be a good way

to avoid lawsuits.  They sometimes might call for a mediation

or arbitration as a method to resolve, which might be an

easier, faster, less costly than an actual lawsuit.

**Q.**   Is that beneficial to both sides?

**A.**   Yes, it is.

**Q.**   And tell us why you think it's more beneficial to the

hospital than the payor?

**A.**   Yeah.  I think it is beneficial to both sides.  It's -- in

the same way that rate is more important to the hospital, it's

the same thing really.  That if there's likely to be a dispute,

it's most likely to be about payment.  And it will be the

health plan that holds the money and has determined how much,

if anything, they would pay.

So it's more valuable to the hospital to get to the

resolution through whatever dispute resolution process there is

quicker because they would like to be fairly paid promptly.

**Q.**   Are there some situations -- say there's a claim and the

health plan underpays the hospital by $1,000.  May the hospital

decide, well, it's not worth it to file a lawsuit over that

$1,000?

**A.**   Yes.  That happens a lot in health insurance, it happens a

lot in insurance in general.  The insurance companies, of any

1  type, have the money.  The person who thinks they're entitled

2  to payment for whatever it is is wanting to be paid.  And if

3  the dollar amount is relatively small, it is oftentimes just

4  not practical to file a lawsuit.

5      So sometimes -- in this case, hospitals -- are forced to

6  not file a lawsuit.  That doesn't mean they've accepted the

7  amount as fair, it just means they weren't willing to undertake

8  a lawsuit for the relatively small amount of money.

9  **Q.**  Also had "prompt pay" in there.  What does prompt pay

10  mean?

11  **A.**  Most managed care contracts spell out when the payment

12  should be made.  They usually say 30 days, 60 days, 45 days

13  after the patient's had their care and the bill has been

14  presented.

15  **Q.**  And is that important to a hospital?

16  **A.**  Yes.

17  **Q.**  Why?

18  **A.**  Hospitals, like all organizations, want to get the money

19  they're entitled to promptly.  They don't want to be

20  essentially making a loan to the -- in this case -- insurance

21  company.

22  **Q.**  Okay.  So the left side of the scale is what the hospital

23  gets out of these contracts.  What's the right side of the

24  scale?

25  **A.**  That's the discount that the hospital offers, and that's

1  the discount that is negotiated about in any negotiations that

2  lead to a managed care bargain.

3  **Q.**  So in exchange for all these things that the hospital gets

4  under the contract, is it willing to give a discount when

5  there's a contract?

6  **A.**  Yes.

7  **Q.**  The volume box is bigger than the value of the contract

8  box.  Is that intentional on this slide?

9  **A.**  Yes.

10  **Q.**  Why?

11  **A.**  Almost always the value of the volume, in economic terms

12  to the hospital, is greater than the Type 1 benefits.  They're

13  both valuable.  There's no doubt about that.  But the first

14  thing that hospitals tend to say when they're talking to a

15  health plan is:  We'd like to be in-network.

16      We're kind of assuming we're going to get the piece of

17  paper that spells out the Type 1 benefits, but what we really

18  want is this volume.  We want to get that steered volume, as

19  I've discussed.

20  **Q.**  Is the steered volume a situation like Costco?

21  **A.**  Yes.

22  **Q.**  Buying in bulk?

23  **A.**  Yes.  The Costco parallel's pretty good because it -- in

24  Costco there's a couple things happening there.  They tend to

25  sell in very large quantities, and they require a relationship.

1   You have to become a member.  You're making a commitment.

2   There's been a relationship that's presumed to go on for a year

3   or -- I'm not sure how long memberships are.  But there's a

4   relationship that's developed, and the understanding is that

5   these lower prices are going to be available because the volume

6   is going to be high and because there's going to be this

7   relationship.  Partnership.

8   **Q.**   Now tell us about what negotiations between a hospital and

9   a contract are like?

10  **A.**   They typically are lengthy.  Typically take many months.

11  They typically involve many people on -- in both organizations.

12  They typically involve back and forth proposals and counter

13  proposals.  They typically involve the drafting of lots of

14  language that speaks to the Type 1 categories.  They tend to

15  get more complex if the formulas, the methods of payment, are

16  more complex.

17      So they go on quite a long time.  Each party tends to --

18  they have a negotiation session, they've made proposals to each

19  other, they maybe have some back and forth, and they go back to

20  their other people in their organization and do some analysis

21  and some thinking and might come back to the table again with a

22  -- another counter proposal.

23      So it goes back and forth, and hopefully comes to a good

24  conclusion at the end.  Then the lawyers get involved.  Or

25  maybe they get involved in the beginning and help draft the

1  agreement.  And you end up with usually a very extensive

2  document.

3  **Q.**  Now, you said both sides do their analysis.  What type of

4  analysis is done at the health plan or hospital side?

5  **A.**  Well, each side wants to get the best deal.  The hospital

6  wants to get as much volume as they can and they want to have

7  favorable Type 1 benefits.  And when we get to the dollars and

8  cents of it, they're going to tend -- the hospital's going to

9  look at what would be the amount of volume, what type of volume

10  would it be, what sorts of rates might be being discussed for

11  different types of services.

12  So there's a lot of number crunching that has to happen on

13  the hospital side to figure out what is this -- what is the

14  actual benefit of this proposed contract going to be for us?

15  **Q.**  Have you heard of the term "contract modeling"?

16  **A.**  Yes.  Contract modeling is the process of doing those

17  calculations to determine what is the likely revenue that would

18  come out of that contract related to the various volume

19  forecasts that could be made.

20  **Q.**  So when a hospital gets a particular offer from a health

21  plan and it says, Okay, we'll pay you X amount -- let's say

22  it's not a percentage of charges contract, but it's a per diem

23  contract, case rate contract.  Says, We're going to give you X

24  amount for elective surgeries, Y amount for births, and Z

25  amount for emergency services.

1        Does the hospital say, Okay, if we go in network, how many

2   elective surgeries are we going to get?  How many additional

3   births are we going to get?  And what's our emergency volume

4   going to get from that payor?

5   **A.**   Yes.  Yes.  The hospital -- if they get a proposal,

6   they're going to go back to their offices and they're going to

7   do some calculations and try to figure out what's the volume of

8   different levels of service.  And at certain proposed rates,

9   what's the revenue likely to be?  And how's that going to fit

10  into their overall financial viability and length?

11  **Q.**   And then on the health plan's side, do the health plans

12  have analysts to do the same on their side?

13  **A.**   Right.  They do exactly the same thing.  They have a goal.

14  They would like the best deal they can have, which is going to

15  be they're going to want the lowest rates they can have.

16       So if the hospital makes a proposal to them, they're going

17  to go back and do a lot of calculations to figure out what's

18  that going to mean for them in their business realities.

19  **Q.**   And do the health plans have information on what they pay

20  other hospitals in the region?

21  **A.**   Yes.  They have tremendous amount of information.  Health

22  plans -- most of the ones that I've studied here are very large

23  companies.  They're national companies.  Statewide companies,

24  at the very least -- most of them -- if not national.  So

25  they're very large.  And they have enormous databases from

1   across the country and from throughout the region.  They also

2   know, unless the hospital didn't exist before, they also know

3   exactly what the hospital services are and charges are and so

4   forth because they have history.  So they've seen lots of

5   bills.

6       Finally, there's a large public data system in California

7   that is loaded with more information than one can imagine on

8   every hospital about all of their patients and all of their

9   charges and all kinds of information.

10      So the plans have a wealth of information available to

11  them to inform their internal thinking when they're getting

12  ready to come back to the table.

13  **Q.**  So is it fair to say that both hospitals and health plans

14  do a lot of analysis before they agree upon a number -- a rate

15  in a contract?

16  **A.**  Typically, they do.

17  **Q.**  Okay.  Let's go to slide number 5.  And we have a board

18  for this.

19      Mr. Heil, what does this slide reflect?

20  **A.**  This is an excerpt from the NorthBay-Blue Shield contract.

21  It's a sheet that sometimes gets referred to as the rate sheet.

22  **Q.**  Is this an example of the managed care bargain?

23  **A.**  Yes.  This illustrates the managed care bargain in a

24  number of significant ways.  When you read this, along with the

25  rest of the contract, which said -- in which Blue Shield agreed

1  to make NorthBay one of its network hospitals and do that

2  steering of non-emergency volume; so it reflects the managed

3  care bargain in that sense that on the left side of that scale

4  is the steered volume part, the Type 2 benefits.  And this is

5  also read along with the rest of the contract which would have

6  had information about prompt payment and dispute resolution

7  clauses and administrative processes, who sends what kind of

8  paperwork to who, how does that entire process work.

9       So it's an illustration of the managed care bargain in

10  that sense.  It's also an illustration in that part of the

11  managed care bargain is that in exchange for more volume,

12  steered volume, comes greater discounts.  And this rate sheet

13  spells that out in very clear terms.

14  **Q.**  At the bottom in the notes it says:  The above rate

15  structure is developed based upon the precept that as Blue

16  Shield increases inpatient business, it shall derive an

17  increased financial benefit for all services by virtue of

18  improved (lower) reimbursement rates (the converse is also

19  true.)

20       What is your understanding of what that means?

21  **A.**  Well, that is an expression in this contract of the

22  managed care bargain and the link between steered volume and

23  price.  It literally illustrates what you can see in the

24  literature about how the managed care field works, which is

25  loaded with discussions of this very same relationship.  So it

1  spells it out in very clear terms in that paragraph -- or, that

2  note at the bottom.

3  **Q.**   Then if you look at the rates at the top in the left-hand

4  column, and the volume numbers in the right-hand column, what

5  was the rate of payment at the highest volume?  148 inpatient

6  admits?

7  **A.**   80 percent of NorthBay's charges.

8  **Q.**   If you look at the bottom, the 148, the last line.

9  **A.**   Oh, I'm sorry.  I misunderstood.

10  **Q.**   148 inpatient admits.

11  **A.**   It was 65 percent of Blue Shield's charges.

12  **Q.**   And if the volume went down to 55 percent, what was the

13  rate?

14  **A.**   If the volume went down to 55 inpatients every six

15  months -- that's the way they were measuring it -- the rate

16  would go up to 80 percent of charges.

17  **Q.**   And the converse was true.  In other words, if Blue Shield

18  was successful in getting its members to go to NorthBay, then

19  it would pay less.

20  **A.**   Correct.

21  **Q.**   Let's go to -- is the course of dealing between Blue

22  Shield and NorthBay important in this case?  Is this contract

23  important piece of information that you as an expert valuation

24  person would look at?

25  **A.**   Yes.

1  Q.    Why?

2  A.    Because it is virtually the perfect fit to the

3  comparability apples to apples principle that valuators rely

4  upon.

5  Q.    Same insurance company, same hospital?

6  A.    Same insurance company, same hospital, same types of

7  services, with the exception of the fact that now in this case

8  the steered elective volume has gone away.  But, basically,

9  it's the same.  It's the same parties who have already had a

10 relationship for a long time.

11 Q.    I'd like to go to slide number 6.

12       Explain what is on this slide.

13 A.    This shows a period of time from January 2013 to January

14 of '18.  The gray line is a track of Blue Shield's volume of

15 inpatients.  You'll recall that that was the main measure that

16 was used in the contract.  And it shows how that was changing

17 over time.

18 Q.    So the contract ended at the end of 2016.  What are the

19 volume -- what happened to the volume after 2016?

20 A.    It went down sharply.

21 Q.    What is the orange line?

22 A.    The orange line is the rate that had been agreed to in the

23 Blue Shield-NorthBay contract.  We simply looked up where the

24 volume was at every point along the track, and looked back at

25 that rate sheet and said:  What would that be saying the rate

1  should have been when the volume was at any volume point along

2  the timeline?

3  **Q.**   And what was the rate that the parties agreed to?

4  **A.**   That was the agreed-to rate in the rate sheet.

5  **Q.**   Okay.  And so at these lower volume thresholds, what -- if

6  the old contract were still in effect, what would Blue Shield

7  be paying?

8  **A.**   80 percent of NorthBay's charges.

9  **Q.**   Let's go to slide number 7.  And what is reflected on this

10  slide?

11  **A.**   This slide is the same as the prior slide, with the

12  addition of the rate that Blue Shield paid.  Technically

13  allowed, but paid.  And you'll notice that it says "target

14  rate."  Because they didn't always pay consistently.  So we

15  tried to figure out what were they trying to pay most of the

16  time.

17       **MR. PIMSTONE:**  If I may, Your Honor.  I have an

18  objection to this testimony.  And it's based on the prior

19  discussions we've had about the payment rate not being relevant

20  generally.

21       **THE COURT:**  This is not an objection about this being

22  outside the scope of his expert report.

23       **MR. PIMSTONE:**  It was in the expert report --

24       **THE COURT:**  All right.  It's overruled.

25       **MR. PIMSTONE:**  Thank you.

**BY MR. TOOCH:**

**Q.** Explain again what the blue line is.

**A.** That's the rate that Blue Shield was generally paying.

**Q.** After the contract terminated.  Or, before and after.

**A.** Before and after.  Right.  The sharp drop is at the time of cancellation.

**Q.** So this line that goes vertically down, that's December 2016.

**A.** Correct.

**Q.** So if old contract was in effect, at those volumes they would have been paying 80 percent, but now they're paying well below that.

**A.** Correct.

**Q.** Okay.  Let's go to -- so was that the course of dealings analysis that you did?

**A.** That was the foundation of the course of dealings analysis that I did, yes.

**Q.** Okay.  Let's go to slide number 8.  I think we have a board for this.

Okay, Mr. Heil, can you explain what is reflected on this chart?

**A.** This is a list of five commercial insurance companies that had -- have -- had and have -- managed care network contracts with NorthBay.

**Q.** And are these the five main insurance companies in the

1  country?

2  **A.**   These are -- these are many of the big guys, yes.

3  **Q.**   Is United Healthcare a large company?

4  **A.**   Yes.  It's -- it may be the largest in the country.

5  **Q.**   Is it a Fortune 100 company?

6  **A.**   I don't know their rank.  It's a very large company.

7  **Q.**   Okay.  So in the left column we have "payor."  Let's go

8  with Blue Cross.  And then under "contract rate" it says "IP

9  per diem."  What does IP per diem mean?

10  **A.**   That's shorthand for inpatient per diem with stoploss.

11  **Q.**   Okay.  We'll get to the stoploss in a second.  What does

12  inpatient per diem mean?

13  **A.**   "Per diem" means per day.  Some rates are structured as

14  there will be a dollar amount of $1,000 per patient day.  So

15  each and every day that a patient is in the hospital where

16  they're staying overnight one or more days, the rate agreed to

17  would be called the per diem rate.

18  **Q.**   So some contracts based upon a percentage of charges, and

19  some are on a -- based upon a per diem rate.

20  **A.**   Yes.

21  **Q.**   Okay.  And so, for example, could there be one per diem

22  rate for all inpatient services.

23  **A.**   Yes.

24  **Q.**   No matter what you're in the hospital for, the health plan

25  would pay a particular day per day.

1  **A.**   Yes.

2  **Q.**   Particular rate per day.

3      And then are there different per diem -- could there be

4  different per diem payments based upon the type of service?

5  For example, there's a per diem rate for normal OB deliveries

6  versus C sections?

7  **A.**   Yes, there is.  There can be different levels of care.

8  Sometimes the agreements are designed to be more fine-tuned

9  than just a single number.

10  **Q.**   Okay.  What is "stoploss"?

11  **A.**   Stoploss is a term that involves patients who have very,

12  very long and/or expensive services.  And it is a method of

13  payment that says something like this:  When charges accumulate

14  to more than X, instead of paying the per diem rate we will pay

15  a certain percentage of charges.

16  **Q.**   Are those provisions generally to protect hospitals from

17  suffering loss in case there's a patient who's in the hospital

18  for many months, for example?

19  **A.**   That's right.  If you use a single rate, you're looking at

20  averaging.  And there's a risk, a high side -- there's a big

21  risk for a hospital that could have a catastrophically ill or

22  injured patient that might not be properly or fairly covered by

23  a fixed rate.

24  **Q.**   Okay.  Then you say "OP percentage of charges."  What does

25  that mean?

1   A.   "OP" is shorthand for outpatient.  And that's saying that

2   outpatient services would be -- and this could be a lab test,

3   could be a physical therapy series of treatments.

4   Q.   Emergency?  Outpatient emergency?

5   A.   Could be outpatient emergency.  Could be outpatient

6   non-emergency.  But it's paid for as a percentage of the

7   charges.

8   Q.   And so under "source" you say "average paid."  Why do you

9   say average paid?

10   A.   The way I calculated this table was to apply the claims

11   for these payors -- particular patients and their situations --

12   to the terms of payment.  So this is my way of just recording

13   that I'm -- what -- the 57 percent is telling me that the

14   effect of these various ways of paying, of Blue Cross paying

15   NorthBay, work out to be an average of 57 percent of NorthBay's

16   charges.

17   Q.   And so did you have to do that because the contract just

18   didn't have one line which says all services 57 percent of

19   charges?

20   A.   That's right.  Sometimes there might have been a stoploss

21   on one of the patients.  So we don't know what per diem to use

22   because it's not going to be applicable.  So for that patient,

23   I calculated what the stoploss payment would have been.  And

24   that built in to the formula, added up to the total, and then

25   divide -- then calculated the overall average, which is

1  57 percent.

2  **Q.**  So that's essentially the rate at which Blue Cross and

3  NorthBay agreed to get paid, on average, for the services.

4  **A.**  Correct.

5  **Q.**  Okay.  Then you have Aetna.  You have "HMO 60 percent,

6  PPO/etc 67 percent."  Tell us why you have different rates for

7  HMO, PPO?

8  **A.**  Well, the Aetna contract with NorthBay says that Aetna has

9  two kinds of insurance products.  One's an HMO, one's a PPO.

10  That stands for health maintenance organization; and the PPO

11  stands for preferred provider organization.

12  And the parties decided to negotiate two different rates

13  depending on what product a patient was covered by.

14  **Q.**  And then you have "contract modeled, 67 percent."  What

15  does "contract modeled" mean?

16  **A.**  It means that I calculated -- I considered how many of the

17  patients were HMO and how many were PPO.  And I did the math

18  and figured out that turns out that most of the patients were

19  PPO.  The actual calculated value there is something like 66.9,

20  or something.  So I modeled how much was PPO and how much was

21  HMO and found out that when you round it off to the whole

22  number you get 67 percent as the agreed upon rate.

23  **Q.**  Cigna it says 78 percent.  And then you have "contract

24  rate."  What does contract rate mean?

25  **A.**  Well, that's the simplest of all structures for any kind

1    of a contract percent of charges.  And that's the way the Cigna

2    contract was negotiated.  78 percent of charges.  No worries

3    about inpatient/outpatient.  No worries about emergency,

4    non-emergency, no worries about stoploss, no worries about HMO

5    or PPO.  It's just if it's Cigna, it's 78 percent.

6    **Q.**  United Healthcare it says "72 percent in 2016-17, and

7    65 percent in 2018."  What does that mean?

8    **A.**  Means that during those different time periods there were

9    different rates that had been negotiated.

10   **Q.**  Then you say "contract modeled 70 percent."  What does

11   that mean?

12   **A.**  Again, I took a look at all the patients that had been

13   United patients at NorthBay and ran them through the formula

14   that is shown here, the 72 percent, the 65 percent.  And it

15   works out that over the time period I was studying, the rate --

16   the average rate is 70 percent of charges.

17   **Q.**  Now, this contract modeling you're doing here, this is

18   what hospitals and health plans do before they enter into

19   contracts, too, right?

20   **A.**  Yes.  Leads up to --

21   **Q.**  Same type of modeling.

22   **A.**  Same thing.

23   **Q.**  Then you have Health Net.  You have IP per diems with

24   stoploss.  That's the same as the Blue Cross contract, right?

25   Same structure?

1   **A.**   Same structure.

2   **Q.**   "Several OP percentages of charges," and then "carve

3   outs."  Tell us what that means?

4   **A.**   So this is -- this is the most complex of the five because

5   there's that inpatient per diem for some patients, then there's

6   the stoploss thing to take care of the catastrophically ill or

7   injured person.  Then instead of one outpatient rate where Blue

8   Cross had a single number, there's several.  I don't recall

9   right now what they were.  And then --

10  **Q.**   Maybe an outpatient rate of X percentage for lab services,

11  and then an outpatient -- different outpatient rate, say, if

12  you needed to go for X-rays.

13  **A.**   Just that kind of thing.  And then the term "carve out" is

14  sometimes hospitals, particularly those that have specialized

15  services like NorthBay does, will identify that when the

16  patient is in a particular service, let's say they're in the

17  advanced cardiac service, the rate of payment might be unique.

18  So, again, I don't recall off the top of my head.  But I

19  modeled -- I did the calculations again here based on the

20  experience of the Health Net patients at NorthBay and found out

21  what it worked out to be on the overall, which was 38 percent.

22  **Q.**   Okay.  Now, did you ignore that contract because it's a

23  lot lower than the other contracts?

24  **A.**    No.  I included it because it falls into this same class

25  of contracts which are important for me to know about in this

1    case.  Now, I didn't cherry-pick this in any way.  Those are

2    the rates.  I looked at them all together because they're of

3    the same type.  And I treated them all equally and averaged

4    them to 62 percent.

5    **Q.**   So tell us what the number 62 percent represents?

6    **A.**   It is the best representation of what these five major

7    health plans determined was the value of NorthBay's services in

8    a situation where they were steering non-emergency volume to

9    NorthBay, and where they had a written contract that gave them

10   the Type 1 benefits of a certain rate, and dispute resolution

11   clauses and prompt payment.

12   **Q.**   Were Blue Cross, Aetna, Cigna, United and Health Net

13   willing buyers of NorthBay's services at these rates?

14   **A.**   Yes.

15   **Q.**   And was NorthBay a willing seller of its services to these

16   health plans at these rates?

17   **A.**   Yes.

18   **Q.**   Now, at the top it says "Noncomparable Primary Network

19   Contracts."  Why do you use the term "noncomparable"?

20   **A.**   As I said before, a valuator is often going to be aware of

21   a very large amount of data.  And the comparability, apples and

22   apples principle that I've said is at the heart of the

23   valuation profession, is the job of looking at all of that data

24   and culling it down.  Looking for the data that is most

25   representative of whatever it is that the valuator is given as

1  the assignment.  In this case, valuing NorthBay's services in a

2  situation where there's not a contract steering non-emergency

3  volume.

4      So I'm aware of these -- it's very important to know these

5  rates and to understand them.  They validate the managed care

6  bargain.  Very important for me to know them.  But I consider

7  them noncomparable because they are not like the subject of

8  this case.

9  **Q.**  Why not?

10 **A.**  This case is about a relationship that now exists between

11 NorthBay and Blue Shield where there is no contract at all.

12 NorthBay no longer has the benefit of being in Blue Shield's

13 network and getting that steered non-emergency volume.  And it

14 doesn't have the piece of paper that spells out any rate or

15 prompt payment.

16     So I wouldn't want to base my calculations of reasonable

17 value in this case on a data set that was so dramatically

18 different than the subject of this case.

19 **Q.**  So, for example, if you're looking for three-bedroom

20 apartments, would you also kind of look at what they're

21 charging for two bedroom apartments in this same building?

22 **A.**  Yes.  A good quality valuation would include being aware

23 of the entire market.  All aspects of it.  The valuator is --

24 in fact, one of the standards of the association that certifies

25 me is that you need to describe the industry in which you're

1   working and understand everything about it.  So I want to look

2   at things like this.  I want to be aware of it.  But I want to

3   be very careful about what I use to drive my opinion.

4        So in your example about the apartments, yeah, I would

5   like to know what the two bedrooms are, and the one bedrooms,

6   because it's part of my understanding of the apartment market.

7   All aspects of it.  But if I'm asked to look at the value of a

8   three-bedroom apartment, I don't want to do calculations that

9   blend in the rentals, the rental rates, of one-bedroom

10  apartments.

11  **Q.**   Okay.  I'd like to go to slide number 9.  We have a board

12  for that, as well.

13       Could you explain to us what is reflected on this slide?

14  **A.**   This is a list of six payors.  Actually, in the case of

15  that last line it says "one-time agreements."  It's actually

16  many payors, but I lump them into one because they have a

17  common theme.  And I can discuss that.

18       But this is six payors, basically, that -- where -- they

19  have contracts, written contracts, with NorthBay.  And these

20  are contracts where the relationship is the most like the

21  subject of this case.  Namely, the volume is all, or virtually

22  all, emergency only.

23  **Q.**   Let's look at the first line for Kaiser.  That says 2001

24  to 2015.  What does that mean?

25  **A.**   During that period of time there was a written contract

1  between Kaiser and NorthBay for that 13 or 14 year period in

2  which the agreed upon rate of payment was 80 percent of

3  NorthBay's charges.

4  **Q.**   So for 14 years was there a rate at which Kaiser agreed to

5  pay NorthBay, and NorthBay agreed to accept the rate from

6  Kaiser?

7  **A.**   Yes.  And I know that Kaiser was not steering

8  non-emergency volume to NorthBay.  They had their own hospitals

9  in -- close by.  So they steer all of that non-emergency volume

10  to those hospitals and other facilities.

11       So they were only using, if you will, their members were

12  only using NorthBay for emergency care just as in this case.

13  **Q.**   If you're a Kaiser member and you want to have shoulder

14  surgery, you need to have it at a Kaiser hospital.

15  **A.**   Right.

16  **Q.**   But if you're a Kaiser member and you're in a car

17  accident, and you happen to be a mile from NorthBay's emergency

18  room, you may very well be taken by an ambulance to NorthBay's

19  emergency room.

20  **A.**   Correct.

21  **Q.**   And was this the rate that Kaiser agreed to pay NorthBay

22  for those emergency services.

23  **A.**   Yes.

24  **Q.**   Now, are you aware that that contract is terminated?

25  **A.**   I am.

**Q.** Is it still an important piece of information or data in your analysis?

**A.** Yes.

**Q.** What is MultiPlan?

**A.** MultiPlan is a large nationwide company. It is a type of a plan that sometimes referred to as a rental network. Leaving aside the terminology, what it is is a company that acts as an intermediary between the payor, the end result payor, and a hospital in this case. And it goes out to hospitals and says: We want to enter into a contract with you at a discount. And what they do is then they tell payors about that discount that they've negotiated. And the payors like that because they've done the job of negotiating a discount. And these are payors that would like to benefit from that discount. And they -- when a patient is priced through this arrangement, MultiPlan makes a fee. That's how they make their money.

**Q.** Is MultiPlan a large company?

**A.** It's a very large company.

**Q.** Do many hospitals contract with MultiPlan?

**A.** Yes.

**Q.** Do many insurance companies contract with MultiPlan?

**A.** Yes.

**Q.** And is it nationwide?

**A.** Nationwide. Many insurance companies, many other types of payors. They will take all comers because they want to make

1  that fee.

2  **Q.**   Okay.  And so if an insurance company is contracted with

3  MultiPlan, then it can get a 10 percent discount if one of its

4  members happens to be in an emergency at NorthBay, right?

5  **A.**   Right.  Without ever having to bother having a negotiation

6  with NorthBay.

7  **Q.**   Okay.  And if there's no negotiation, then is the rate

8  100 percent of charges?

9  **A.**   Yes.

10  **Q.**   What is Interplan?

11  **A.**   It's a similar type organization.

12  **Q.**   Does it have -- what is the 70 percent outpatient.  OP,

13  70 percent IP after low stoploss?

14  **A.**   Right.  It's a somewhat more complex rate structure than

15  the other one, than the first two we looked at.  The Kaiser and

16  the MultiPlan.  So it pays 70 percent if it's an outpatient

17  service, emergency service or lab.  It pays 70 percent of

18  inpatient.  But there's a low threshold for stoploss.

19  **Q.**   What is First Health?

20  **A.**   Another one of those rental networks.

21  **Q.**   What was the rate under the First Health contract?

22  **A.**   Well, it worked out to be 73 percent overall after we

23  modeled it.  It also comes from some slightly different terms,

24  as you can see there.

25  **Q.**   PHCS.  What is that?

1    **A.**    Another rental network.

2    **Q.**    Was there a rate in that contract?

3    **A.**    Yes.

4    **Q.**    What was the rate?

5    **A.**    That, like the MultiPlan and Kaiser, was a simple rate.

6    Very simple to calculate.  85 percent of charges.

7    **Q.**    What do you mean by one-time agreements?

8    **A.**    When a payor has a patient who shows up at a hospital,

9    let's say NorthBay, there wasn't a contract, and they didn't

10   have a contract with MultiPlan or Interplan or anybody else.

11   They show up, let's say, for an emergency typically, the

12   parties may have a conversation after the service is provided

13   and they may negotiate a rate.

14       We don't have a contract.  Can we come up with an

15   agreement about a rate that would be fair so we don't have to

16   have a lawsuit?  And there were dozens of them that we found,

17   different kinds of payors, one-time arrangements.  Just one

18   patient at a time.  So there's no steered volume -- because

19   there can't be -- because it just comes up after one patient.

20       But it indicates quite a bit about what those payors, how

21   they value NorthBay's services.

22   **Q.**    And then there's -- it says "average 81 percent."  What is

23   reflected on that line?

24   **A.**    So that's the straight arithmetic average of the numbers

25   listed above.  Take those numbers, add them up, divide by 6.

1  **Q.**   Okay.  Now, you say rate adjusted for value of contract,

2  15 points, capped at 100 percent.  What do you mean by that?

3  **A.**   You were asking me earlier about the type 1 benefits.

4  **Q.**   Okay.  You're talking about the managed care bargain;

5  right?

6  **A.**   About the managed care bargain.  The discount is granted

7  in exchange for benefits.  On the chart we're looking at here,

8  we don't have any steered volume, so there's nothing on the

9  Type 2 large sector on the left-hand side.

10      So, as we would expect, the amount of the discount will be

11  lower.  It will be a lesser discount.  And, in fact, that's

12  what it is in this group of payors that we just looked at.

13  Because there's --

14  **Q.**   If you look at the scale, the Type 2 is not there;

15  correct?

16  **A.**   That's zero.

17  **Q.**   That's zero.  Okay.

18      So if there's an emergency for one of these patients for

19  an insurance companies that contracted with MultiPlan, for

20  example, NorthBay could say, well, we want 100 percent of its

21  charges; correct?

22  **A.**   Correct.

23  **Q.**   Why would will NorthBay give a discount to that insurance

24  company?

25  **A.**   It would give them a discount, it would give them a

1  smaller discount, as we can see from the data.  It's not

2  getting any of the Type 2 benefits, but it's getting the Type 1

3  benefits.  It has a written piece of paper that says the rate

4  and says "prompt payment" and has a dispute resolution clause.

5      So that's giving us an insight into what that piece of

6  paper is worth.

7  **Q.**  So let's go back to slide 9 for a moment.  What was the

8  average of all of these types of contracts?

9  **A.**  It was 81 percent.

10  **Q.**  And if you subtract 81 from 100, what is that?

11  **A.**  That's 19 percentage points.

12  **Q.**  So why didn't you say that the value of the contract is

13  19 percent, or 19 points, rather than 15 points?

14  **A.**  Right.  I could have done that.  I try to base -- when I'm

15  estimating something that has some subjectivity in it, I try to

16  draw on my broadest experience.

17      My broadest experience here involves dozens of rental

18  network and emergency and other emergency-only type contracts.

19  And I've generally found the middle of the pack of all of those

20  is 15 percent.  Not 19.

21  **Q.**  If you had used 19, would it have been to NorthBay's

22  benefit?

23  **A.**  Yes, it would have been.

24  **Q.**  Okay.  So you said a rate adjusted for value of contract,

25  15 points capped at 100 percent.  Then you say 96 percent.

1  What is the 96 percent?

2  **A.**   That's taking the 81 and adding 15.  And I'm doing that

3  because the subject of this case doesn't have any Type 1

4  benefits in it.  There is no contract with a rate, there's no

5  dispute resolution clause.  We're here in this proceeding.

6      So to properly value something where there is no Type 1

7  benefits, I want to take arrangements that have Type 1 benefits

8  in them and make my adjustment of 15 points so that I've now

9  gotten to apples and apples comparability.

10  **Q.**   So if we look at the big insurance company, like Blue

11  Cross, Aetna that has both parts of the Type 1 and Type 2

12  benefits, right?

13  **A.**   Correct.

14  **Q.**   And if we look at the MultiPlan type contract, that's just

15  the Type 1 benefits, right?

16  **A.**   Correct.

17  **Q.**   This case doesn't have Type 1 or Type 2 benefits?

18  **A.**   Correct.

19  **Q.**   And so, therefore, that's why you add the 15 points.

20  **A.**   Correct.

21      **THE COURT:**  All right.  Ladies and gentlemen why don't

22  we take our first break in the morning for 15 minutes, and

23  we'll be back a little bit before 10:00.  Please remember the

24  admonitions.

25              (Recess taken at 9:42 a.m.)

1              (Proceedings resumed at 9:57 a.m.)

2         (The following proceedings were held in open court,

3    outside the presence of the jury:)

4              THE COURT:  Are you ready to proceed?

5              MR. PIMSTONE:  Your Honor, I wanted one point of

6    clarification.

7              THE COURT:  Let's go on the record.

8              MR. PIMSTONE:  Thank you.

9              THE COURT:  Please be seated everybody.

10             MR. PIMSTONE:  Thank you.

11        I just want to get something clear in my own mind so I

12   know what is appropriate on cross.  We had -- we had a

13   discussion here in connection with motions in limine and,

14   subsequent to motions in limine, about what would be fair game

15   in terms of plaintiffs putting in regarding the rate that

16   Blue Shield paid.

17        And the Court ruled that a lengthy discussion and argument

18   that what Blue Shield paid was irrelevant.  And the Court did

19   allow, in a limited sense, on the claims-specific evidence that

20   came in, the Court did allow discussion because the Court

21   indicated that the parties had agreed to look at exemplar

22   claims to indicate sort of what happened on that claim.

23        But the Court's general ruling was that evidence coming in

24   about what Blue Shield paid --

25             THE COURT:  Let's get to the point, Mr. Pimstone.

1    **MR. PIMSTONE:**  Yes, Your Honor.

2        The point is, is that Mr. Heil -- the one objection I

3    made -- and I've given counsel wide latitude here.  The one

4    objection I've made is when he introduced a slide that had

5    Blue Shield's payment rate.

6        And so what I wanted to know is, is that Blue Shield's

7    payment rate now relevant?  And how does that relate to the

8    Court's prior ruling where I thought that issue was off the

9    table, because --

10       **THE COURT:**  How does this relate to your

11   cross-examination question, Mr. Pimstone?

12       **MR. PIMSTONE:**  Well, it relates to cross-examination

13   in that what we had previously discussed was that if they get

14   into the payment rate, then evidence becomes relevant relating

15   to how is that payment rate developed, you know, what were the

16   legal obligations, who was involved in that payment rate?

17       Those are considerations that I thought were not going to

18   be discussed.

19       **THE COURT:**  Well, if you want to dig into the -- given

20   the limited testimony that there was --

21       **MR. PIMSTONE:**  Understood.

22       **THE COURT:**  -- with respect to that, if you want to

23   dig into it, we'll deal with it on a question-by-question

24   basis.  How's that?

25       Let's get the jury.

1      (Jury enters at 9:59 a.m.)

2          **THE COURT:**  All right.  Please be seated, everybody.

3      Mr. Tooch.

4          **MR. TOOCH:**  Thank you.

5  **BY MR. TOOCH:**

6  **Q.**  Mr. Heil, have we completed the first two types of

7  analyses that you performed in your reasonable value analysis?

8  **A.**  Yes.

9  **Q.**  The course of dealings and then the comparison to the

10  other contracts?

11  **A.**  Yes.

12  **Q.**  And then I believe you said that the last comparison was a

13  charge comparison.

14      What is a charge comparison?

15  **A.**  A charge comparison is something that I do all the time in

16  these cases.  It is designed to learn how the subject

17  hospital's charges compare to others.

18  **Q.**  The subject hospital, you mean NorthBay's charge?

19  **A.**  In this case, NorthBay's charges.

20  **Q.**  And let's go to -- is there any issue of comparability

21  when you're looking at comparing charges of one hospital to

22  charges at another hospital?

23  **A.**  Yes.  You had asked me earlier, when reviewing my

24  background, whether all hospitals are the same.  So hospitals

25  do vary quite considerably.

1    And true to the concept of comparability and apples to

2  apples, when one does a charge analysis, one wants to try to

3  compare NorthBay to appropriate similar group of hospitals, a

4  large enough number to be statistically valid and sufficiently

5  similar in one way or another that the comparison is helpful

6  and meaningful.

7  **Q.** Okay. If you go to slide number 11, please. I'm sorry.

8  Yes, 11. Thank you.

9    (Document displayed.)

10  **Q.** Mr. Heil, what is reflected on this slide?

11  **A.** This is a list of hospitals in what I'm calling peer

12  group 1, because I've studied two peer groups. I mentioned

13  that briefly before.

14    This is a shorthand list by name, to keep it on the same

15  line, of 33 hospitals that I studied to see how NorthBay

16  compared.

17  **Q.** And you say similar hospitals in geographic area. What do

18  you mean by the geographic area?

19  **A.** This is a group that's, relatively speaking, close in.

20  It's a robust group. 33 is a nice sample size, so we have

21  statistical validity.

22    If you think about the geography of Northern California,

23  this is kind of East Bay, Central Valley, Sacramento area and

24  in between, generally speaking.

25  **Q.** And if you can go to slide number 12, what is reflected on

1   this slide?

2   **A.**   This is a list of a second peer group, peer group 2.   And

3   as you can see, it's a smaller list of hospitals.

4       If you look at where those are, you'll notice that they're

5   also covering a broader radius.   And I did that because I'm

6   aware that NorthBay has -- is unusual in that it has,

7   especially for a smaller hospital a very broad array of

8   specialized services.

9       So rather than just look at a group that was fairly close

10  in, East Bay to Sacramento and so forth, I wanted to look

11  more -- I need to go more broadly to find hospitals that have a

12  similar array of specialized services.

13  **Q.**   And --

14  **A.**   Back in that prior list, if I may, just that prior list,

15  many of the hospitals there don't have such a broad array of

16  specialized services on peer group 1, so that's why I wanted to

17  have this larger group.

18  **Q.**   So did you want to find hospitals that were similar to

19  NorthBay to compare the charges to?

20  **A.**   Similar in terms of their array of services, yes.

21  **Q.**   Okay.   So let's look at the array of services.

22      What's the first -- well, in the second column, what was

23  the first type of service that you looked at?

24  **A.**   First was whether they're a trauma center; and, if so,

25  what level.

1  Q.  What is the difference between a -- do you know what the

2  difference between the level trauma centers are?

3  A.  Yes.

4  Q.  Okay.  If you could describe what a Level I is.

5  A.  So Level Is and Level IIs actually have very, very similar

6  capability.  The big difference is Level Is are generally

7  teaching hospitals, so that doctors taking care of the patients

8  are often residents and fellows in addition to the fully

9  professor level.  In Level IIs, all the doctors are fully board

10  certified, more senior physicians.

11  So Is and IIs are very similar, but one happens in a

12  teaching setting with research and one happens in a hospital

13  more like NorthBay.  That's the big difference between I and

14  II.

15  Q.  And between II and III?

16  A.  II and III, III would not have -- for example, the biggest

17  differentiation is neurosurgery.  IIIs generally do not have

18  neurosurgery.  So if the patient has a brain injury or a spinal

19  injury, they typically need to be transferred to a place that

20  does.

21  Q.  Does NorthBay do neurosurgery?

22  A.  NorthBay does do neurosurgery.

23  Q.  And next to NorthBay, you have III CA and II ACS.  Tell us

24  what those mean.

25  A.  There are two schemes of categorization.  The one that

1   says CA is California.  And the way that California has chosen

2   to categorize NorthBay is as a III, even though it has

3   neurosurgery and many of the other specialized services.

4       The American College of Surgeons is ACS, and that's the

5   national group that is really the gold standard.  They wrote

6   the book on trauma center standards and quality, and they're

7   the ones that go around and do the certifying.

8       So NorthBay is classified as a Level II by the American

9   College of Surgeons.

10  **Q.**   And does NorthBay provide Level II trauma centers?

11  **A.**   They do, yes.

12  **Q.**   Okay.  And then do you have the list of -- if there's

13  blank -- for example, California Pacific and El Camino -- does

14  that mean they provide trauma centers?

15  **A.**   That means they're not a trauma center at all.

16  **Q.**   And then the ones below, you have the rank if they do have

17  a trauma center?

18  **A.**   Right.  The blanks mean they don't have trauma at all, and

19  if there's a Roman numeral, it's what level they are.

20  **Q.**   Okay.  The next column says STEMI, I think it's receiving

21  center.  Is that correct?

22  **A.**   Yes.

23  **Q.**   What is STEMI?

24  **A.**   STEMI is one dimension of heart attack.  It has to do with

25  the type of heart attack that it is.  It is generally thought

1  to be one of the deadliest types of heart attack.  It's one

2  whose treatment requires very, very rapid intervention to try

3  to unblock the clot that's causing the heart attack.

4  **Q.**  And out of the larger group of peer 1 hospitals, did you

5  choose hospitals that provide -- are STEMI receiving centers?

6  **A.**  I'm not sure I understand that question.

7  Out of peer group 1 are you asking about?

8  **Q.**  To get to this peer group 2, did you list only those that

9  have STEMI receiving centers?

10  **A.**  Right.  What I did was I -- my peer group 1 was 33

11  hospitals.  Many of those didn't have all or most of these

12  specialized services, so I wanted to go get a bigger group.

13  There's some overlap in these.

14  But what I've done here is to get only the ones who are --

15  who have all or mostly all of these services that NorthBay has.

16  And to do that and get a fairly good sample size, I needed to

17  go out to a bigger geography.

18  **Q.**  And what does it mean to be a STEMI receiving center?

19  **A.**  It means that the county and I believe it's the American

20  Heart Association has come in and certified that the hospital

21  has the capability, the doctors, the nurses, the equipment to

22  do that very rapid clot-busting maneuver that can oftentimes

23  save someone from a life-threatening heart attack.

24  And then the paramedics know to take patients who might

25  have that to those hospitals.

1   **Q.**   Stroke center, what does that mean?

2   **A.**   That is similar to STEMI center in that it's now

3   understood that if strokes are treated rapidly and

4   aggressively, it can make a huge difference in outcome.

5       And there are -- by the American Heart Association and the

6   Joint Commission, I believe it is, they do that on an

7   overlapping basis.  That is a -- there are levels of stroke

8   center and there's codes here that indicate what the different

9   levels are.

10  **Q.**   Okay.  And so did you include those hospitals that have --

11  are certified stroke centers?

12  **A.**   Yes.

13  **Q.**   Okay.  NICU level, what is NICU?

14  **A.**   Stands for neonatal intensive care unit.  It's a special

15  nursery for sick babies.

16  **Q.**   Okay.  And are there different levels of NICU?

17  **A.**   They have Levels I through IV.  And for reasons nobody

18  understands, they read in the opposite direction in trauma.

19  Level IV is higher, the most advanced; whereas, in trauma it's

20  Is and IIs that are the highest.

21      But the highest is IV.  You can see that most of these are

22  IIIs, like NorthBay is.  And one or two of them are IIs.  And

23  it looks like there's a few IVs.

24  **Q.**   Okay.  What does cancer center mean?

25  **A.**   Cancer centers are certified by the American College of

1  Surgeons, and NorthBay is called a community cancer center.

2  That's very similar to the highest level, which is called

3  comprehensive cancer center.

4      They're very similar except the level -- the comprehensive

5  has more new cancer patients per year coming into their system.

6  So it's kind of a volume relationship.

7      But they have largely the same capability.  They have to

8  have medical oncologists, surgical oncologists, they have to

9  have special diagnostic and treatment facilities.

10     They have to participate in research and data systems to

11  report in how well they do in taking care of cancer patients.

12  **Q.**  And what is neurosurgery?

13  **A.**  Neurosurgery is brain surgery and spinal surgery, although

14  some spinal surgery can be done by orthopedic surgeons.  But

15  for these purposes, it's brain surgery and it can be brain

16  tumor surgery, let's say, something like that, or it can be

17  brain surgery for injury such as happens in a trauma center.

18     In this case you'll notice that some of the hospitals that

19  were not trauma centers, like California Pacific, have

20  neurosurgery.  But they aren't a trauma center, so they're

21  doing more like the brain tumor kinds of work, whereas NorthBay

22  is doing both.

23  **Q.**  And, finally, cardiac surgery, what's that?

24  **A.**  Cardiac surgery is mostly a major surgery on the chest to

25  repair valve problems and vessel problems in the heart, and

1  requires cardiologists, cardiac cath lab, surgeons, special

2  nurses, special anesthesiologists.

3  **Q.**  Okay.  Let's go to slide number 17.

4      (Document displayed.)

5  **Q.**  What is reflected on this slide?

6  **A.**  This is the result of my charge analysis.

7  **Q.**  And did you look at the charges from both peer groups?

8  **A.**  I did.

9  **Q.**  And so when you look at the charges from both peer groups,

10  did you -- did you kind of average out the charges between the

11  two peer groups?

12  **A.**  Right.  The bottom line there is the average finding of

13  the two.  And I did the analysis for inpatients and for

14  outpatients, because they can work differently, and then I

15  combined them across the two peer groups and came to what I

16  think is the most accurate picture.

17      There's no perfect choice between peer group 1 and peer

18  group 2.  But, again, the idea of a valuator using two or more

19  methods and combining them is a method that is known to

20  increase accuracy.

21  **Q.**  So in peer group 1, which was more of the geographic

22  analysis; correct?

23  **A.**  Correct.

24  **Q.**  What was the -- to make an adjustment to NorthBay's

25  charges to meet that peer group, what was the percentage?

1  A.  Right.  I needed to bring NorthBay's charges down by 30

2  percentage points if I was looking at peer group 1, in the

3  overall, to have it be consistent with fair market value.

4      And in peer group 2, I needed to bring it down by 25

5  percentage points.

6  Q.  And then did you average those two?

7  A.  Yes.

8  Q.  Okay.  Now, someone may ask you, well, can hospitals set

9  their charges at any rate that they want to?

10  A.  Not really.  It is the case that there's not regulation by

11  government of charges.  But many managed care contracts that

12  hospitals enter into, such as, I think, three or four of the

13  ones that I looked at here, have caps on charges that have been

14  negotiated.

15      So, typically, those caps are around 10 percent per year.

16  You can't increase your charges by more than 10 percent per

17  year or we won't pay you anymore.

18      So the payor community is influencing -- negotiating

19  control over hospital charges.  And, in fact, NorthBay keeps

20  its charge -- charge changes from year to year underneath the

21  caps that they have negotiated because there's very little

22  impact for them.  They're honoring the spirit of those

23  agreements.

24  Q.  Let's go to slide 18 right now.

25      (Document displayed.)

1  Q.  What is reflected on this slide?

2  A.  This is where I bring together my three basic methods, my

3  three prongs, and combine them to get to a single number, which

4  is my opinion in this case.

5  Q.  So the course of dealings, 95 percent is based upon the

6  old contract; correct?

7  A.  That's based upon the canceled contract, which is a good

8  indicator of value because it's between the exact same parties

9  and was in place for eight years.

10      I've made that adjustment for the lack of the -- I made

11  that 15-percentage-point adjustment for the lack of the value

12  of the piece of paper and the certainty and so forth.

13  Q.  Okay.  Let's stop there.

14      So under the contract, the -- at the lowest volume

15  threshold, 55 patients, what was the highest rate?

16  A.  The agreed-upon rate there was 80 percent.

17  Q.  And has the volume gone down even more after the contract

18  was terminated?

19  A.  I think it's dropped below that threshold even, yes.

20  Q.  And so the highest rate of the contract was 80 percent,

21  but here you have 95 percent.  Explain why.

22  A.  So what I'm reflecting there is basically the fact that

23  NorthBay had to bring this lawsuit in order to get what it

24  thinks is a fair payment.

25      It didn't have the benefit of type 1 benefits.  It didn't

1    have a written agreement.  It didn't have an agreed-upon rate.

2    It didn't have a dispute resolution clause.  It didn't have

3    prompt payment.

4        So it would not be right for -- if we were going to honor

5    that 80 percent number, it wouldn't be right to honor it now

6    because NorthBay has to be here to get it.  And so since we

7    know that 15 percentage points is a pretty darn good indicator

8    of what that value is in the marketplace, those type 1

9    benefits, I'm adding that back.

10   **Q.**  And did you add that back again to the most comparable

11   contracts as well?

12   **A.**  Yes.

13   **Q.**  Okay.  And then does the charge analysis that you did

14   actually lower your reasonable value calculation?

15   **A.**  Yes.

16   **Q.**  So could you have chosen not to do a charge analysis?

17   **A.**  I wouldn't have chosen not to do it.

18   **Q.**  Why not?

19   **A.**  Because I always do it.  And I think it's the right way to

20   do it.  Charges are important.  They're valuable.  They're

21   often recognized.  They're often paid.

22       And what I'm doing here is discounting -- in this

23   methodology, I'm discounting NorthBay's charges to bring them

24   down to this level.

25   **Q.**  I'm going to show you a slide from Blue Shield's counsel's

1  opening statement.  And over there it says, "Both experts

2  agree:  Hospital 'billed charges' do not reflect what hospitals

3  are actually paid and accept in the market."

4      Do you agree with that statement?

5  **A.**   No.

6  **Q.**   Why not?

7  **A.**   Because hospitals do expect to be paid and are often paid

8  their charges.

9  **Q.**   Have you seen hospitals being paid their full billed

10  charges many times?

11  **A.**   Yes.

12  **Q.**   So getting back to your reasonable value --

13  **A.**   If I can just add, not only are they often paid in

14  out-of-network situations when there isn't a contract, but

15  they're sometimes paid in-network contracts.

16      There's a case that's available in the public domain

17  between Community Hospital Monterey Peninsula and Aetna where

18  Aetna's expert showed Community Hospital contracts to the

19  court.  And there were network contracts from Cigna and another

20  payor, whose name I'm forgetting, that paid 100 percent

21  in-network.  And the Court in that case ruled that the

22  out-of-network reasonable value was 100 percent.

23  **Q.**   So let's get back to slide number 18.

24      Did you give equal weight to your three different types of

25  analyses?

1   **A.**   Yes.

2   **Q.**   And what is your opinion as to the reasonable value of

3   NorthBay's services?

4   **A.**   I believe the reasonable value of NorthBay's services is

5   88 percent of its charges.

6          **MR. TOOCH:**   Thank you.

7       I have no further questions at this time.

8          **THE COURT:**   All right.   Mr. Pimstone.

9                     <u>CROSS-EXAMINATION</u>

10  **BY MR. PIMSTONE:**

11  **Q.**   Good morning, Mr. Heil.

12  **A.**   Good morning.

13  **Q.**   As I think you know, my name is Greg Pimstone.   I

14  represent Blue Shield in this case.   And I wanted to start by

15  asking you a few questions relating to your background, which

16  was the beginning of your testimony today.

17      You testified, I believe, that you have been involved in

18  about 43 California cases; is that correct?

19  **A.**   I don't recall.   I think you asked me about that in my

20  deposition.

21  **Q.**   Well, if we look at -- let's pull up your slide number 1.

22  That's from NorthBay's demonstrative, slide number 1.   And if

23  we look under the first bullet under litigation support, you

24  say in your CV here that you've been involved in 61 cases with

25  43 in California.   Do you see that?

1    **A.**    Yes.

2    **Q.**    And that's accurate?

3    **A.**    I think that's a pretty good estimate, yes.  A good count.

4    **Q.**    And is it the case that you -- in those 43 cases you've

5    represented providers, meaning hospitals, providers of medical

6    care, hospitals or physicians, in all but about four of those

7    cases?

8    **A.**    All but four, yes.

9    **Q.**    And so the significant predominance of your practice, at

10    least in terms of litigation support, is in terms of

11    representing providers instead of payors?

12    **A.**    That is correct, yes.

13          **MS. BRIGGS:**  Excuse me for interrupting.  The monitors

14    have not been turned on.

15          **THE COURT:**  Thank you.

16          **THE CLERK:**  The jury's is on.  Sorry.

17          **MR. PIMSTONE:**  Thank you.

18    **BY MR. PIMSTONE:**

19    **Q.**    And, in fact, the most recent case, if we take a look at

20    the four cases that you say that you represented payors, the

21    most recent of those was your representation of Palo Alto

22    Medical Foundation about six years ago; is that correct?

23    **A.**    Yes, that's Palo Alto Medical Foundation acting as a

24    payor.

25    **Q.**    Correct.  Now, Palo Alto Medical Foundation is a medical

1  group, a group of doctors, part of the Sutter Hospital System;

2  is that right?

3  **A.**   Yes, that's correct.

4  **Q.**   So in that case, even though you say that you represented

5  a payor, the client were a group of providers, but you believe

6  that in that case they were acting as a payor?

7  **A.**   The clients were providers; correct.

8  **Q.**   No, the clients were doctors?

9  **A.**   Well, it's a client organization that takes -- that acts

10 in every respect like a payor.  It pays the bills for patients

11 for medical care.

12 **Q.**   I understand.  But when you say that you represented

13 payors in four cases, I understand that those doctors were

14 seeking payment from -- I think in that case it was a medical

15 group, an ER group?

16 **A.**   That's correct.

17 **Q.**   Okay.  But in three out of the four cases that you say you

18 represented payors, you were representing doctor groups who

19 were part of a hospital system when they were seeking to get

20 money from another provider; correct?

21 **A.**   Well, not quite.  I think it's important to note that --

22 let's use the analogy of Kaiser.

23     Kaiser is an integrated system that is a health plan that

24 acts as an insurance company that has a group of doctors and it

25 has hospitals.  That's just what my client was in that case.

1      They do all three things.  They're an integrated

2   healthcare delivery system.  They act very much as an insurance

3   company.  They act very much as doctors.  They act very much as

4   hospitals.  They are just like Kaiser in that regard.

5   **Q.**   Understood.

6      My point was a little bit more limited, which is, in three

7   out of four cases where you're representing payors, the entity

8   that you were representing was a medical group, just simply

9   that?

10  **A.**   Yes.

11  **Q.**   Thank you.

12     Is it fair to say, Mr. Heil, that within the last six

13  years you've represented exclusively hospitals in connection

14  with disputes between hospitals and payors over reasonable

15  value?

16  **A.**   And medical groups.

17  **Q.**   Hospitals and medical groups?

18  **A.**   Correct.

19  **Q.**   Okay.  You mentioned also that you, in your background,

20  that you've taught at St. Mary's?

21  **A.**   Yes.

22  **Q.**   And is it correct that you taught there for one semester

23  about 20 years ago?

24  **A.**   That's correct.

25  **Q.**   And you mentioned also that you have taught at Berkeley?

1   **A.**   Yes.

2   **Q.**   And is it fair to say that -- I think you said that you

3   were a guest lecturer for certain instructors at Berkeley?

4   **A.**   Yes, three times.

5   **Q.**   Okay.  You also mentioned in your background that you were

6   on the Committee on Trauma and Emergencies Services?

7        **MR. PIMSTONE:**  If we may publish again slide number 1.

8        (Document displayed.)

9   **BY MR. PIMSTONE**

10  **Q.**   And if we go to -- there's a bullet there where you talk

11  about the fact that you were a founding chair on the Committee

12  on Trauma and Emergency Services for the California Hospital

13  Association.

14  **A.**   Yes.

15  **Q.**   And the last time were you on that committee, I believe,

16  was in 1991; is that correct?

17  **A.**   Yes.  One needs to be an executive in a hospital --

18  **Q.**   Right.

19  **A.**   -- to be on that committee.

20  **Q.**   Just asking the last time you were on the committee was

21  1991?

22  **A.**   That's correct.

23  **Q.**   Now, you -- in formulating your opinion in this case, you

24  were assisted by a team of individuals?

25  **A.**   Yes.

1    Q.   And you and your team are being paid by NorthBay for your

2    services in this case; correct?

3    A.   Correct.

4    Q.   And can you tell us what your billing rate is in this

5    case, to NorthBay?

6    A.   $650 per hour.

7    Q.   Per hour.

8         Now, if we can go to slide number 3.  Mr. Heil, slide

9    number 3 is your mathematical computation -- well, it doesn't

10   include the math here, but these are the three factors that you

11   used to compute reasonable value in this case; correct?

12   A.   The three approaches.

13   Q.   And your opinion is that reasonable value would be

14   88 percent of NorthBay's charges?

15   A.   Yes.

16   Q.   Okay.  And you get that by equally weighting these three

17   factors:  Factor 1 is you look at the former Blue Shield

18   NorthBay contract; correct?

19   A.   Correct.

20   Q.   Factor 2, you look at some transactions that you have

21   called comparable transactions?

22   A.   Some contracts.

23   Q.   Contracts that you call comparable?

24   A.   Yes.

25   Q.   And factor 3 is that you look at the 75th percentile of

1  billed charges of certain hospitals in a geographic area;

2  correct?

3  A.   Correct.

4  Q.   And you get a value for each of those three factors and

5  you just average them together?

6  A.   That is correct.

7  Q.   Okay.  Mr. Heil, let's just talk a little bit about what

8  you did and didn't do in connection with coming up with your

9  opinion.

10     You did not make any determination that any particular

11  patient who is in the disputed claims set here in this case

12  provided -- was provided any unique service by NorthBay that

13  could not have been provided at one of your peer hospitals;

14  correct?  You didn't make that determination?

15  A.   I didn't consider that at all.

16  Q.   Okay.  You also didn't make any determination that any

17  particular patient claim that's involved in this case, that the

18  particular patient was taken to NorthBay based on some offering

19  or service that NorthBay had that a peer hospital did not have.

20  You didn't make that determination either?

21  A.   I didn't do any case-by-case analysis of patient flow in

22  this.

23  Q.   Okay.  All right.  Let's take a look at your factor

24  number 1, which is the Blue Shield contract.

25     Now, that contract that you looked at, the old Blue Shield

1  contract, was for all hospital services, not just emergency;

2  correct?  It was a full network contract?

3  **A.**  The former contract --

4  **Q.**  Yes.

5  **A.**  -- the cancelled contract did not differentiate between

6  any subcategories of services.

7  **Q.**  Right.  So it was a full network contract.  It was not a

8  contract just for emergency services?

9  **A.**  That's correct.

10  **Q.**  Okay.  It included elective services as well?

11  **A.**  Yes, indeed.

12  **Q.**  Okay.  Now, Blue Shield terminated that contract as of

13  December 2016?

14  **A.**  I'll take your word for it.  I don't remember the exact

15  date.  Something like that.

16  **Q.**  And so this contract, the terminated contract, was not in

17  place, obviously, with respect to the time period at issue in

18  this case, the claims in this case, right, by definition?

19  **A.**  That is correct.

20  **Q.**  Okay.  And you would agree, Mr. Heil, would you not, that

21  one does not have a willing buyer-willing seller transaction

22  once the contract ends and there's no agreement as to price?

23  **A.**  That's correct.

24  **Q.**  Okay.  Now, you -- it is your opinion, Mr. Heil, that

25  under this particular factor that Blue Shield should pay

1    95 percent of NorthBay's billed charges, which is -- I think

2    you get there by taking the highest rate under the terminated

3    contract and you add another 15 percent; is that right?

4    **A.**    Yeah.  I didn't pick it because it was the highest rate.

5    I picked it because it was the rate associated with the volume

6    that is in this dispute.

7    **Q.**    I understand.  So -- but that's the highest rate that was

8    applicable under the old contract; correct?

9    **A.**    Correct.

10   **Q.**    Now, Mr. Heil, you have no idea what percentage of

11   NorthBay's customers actually paid 95 percent or above for

12   NorthBay's services; right?

13   **A.**    I haven't done that analysis, no.

14   **Q.**    Okay.  And that wouldn't matter to your analysis even if

15   we looked at all of the payments that NorthBay got for its

16   services during the disputed period, even if we found that no

17   one paid 99 -- 95 percent of billed charges, that would not

18   matter to your analysis; correct?

19   **A.**    It would not.  And I'd like to be clear about why.

20   **Q.**    Well --

21   **A.**    May I?

22   **Q.**    -- I'm just trying to sort of understand what was a factor

23   in your analysis and what wasn't.  And Mr. Tooch can certainly

24   give you an opportunity to explain these matters.

25        But my only curiosity was whether, even if not a single

1  payor ever paid NorthBay during the time period 95 percent of

2  billed charges, my simple question is that that was not a

3  relevant factor to your analysis; correct?

4  **A.**   It was not a relevant factor.

5  **Q.**   Okay.  Thank you, Mr. Heil.

6      Now, you agree, Mr. Heil, that Blue Shield received

7  certain benefits from that contract, that network contract that

8  was terminated?

9  **A.**   Yes.

10  **Q.**   Okay.

11      **MR. PIMSTONE:**  And if we could pull up slide 4 of

12  Mr. Heil's presentation.

13      (Document displayed.)

14  **BY MR. PIMSTONE**

15  **Q.**   And so you talk about, in slide 4, the fact of rate

16  certainty and minimizing disputes or having no disputes over

17  rate.

18      And I think you actually even said in your opinion that

19  rate certainty and not being here in a lawsuit over rates,

20  that's a benefit that accrues both to the plan and the provider

21  when they have a contract, obviously; correct?

22  **A.**   What I testified earlier on direct, that it's much more

23  beneficial to the hospital.

24  **Q.**   Well, we'll get to that in second.  I'm just asking you a

25  very simple question.

1    I'm trying to just tease out a little bit here, for us and

2  the court, the fact that when there is a network contract in

3  effect between a plan and a provider, that network contract has

4  benefits to the plan as well, to the payor?

5  **A.**   It does.

6  **Q.**   Okay.  You also mentioned in your type 1 benefits the idea

7  of collaboration, sort of partnering between the plan and the

8  provider.

9    And that's a benefit to the plan as well, to engage in a

10  full network arrangement with a provider that involves

11  collaboration; correct?

12  **A.**   Yes.

13  **Q.**   Okay.  And, of course, the benefit to Blue Shield from

14  that old contract was that it got to add NorthBay to its

15  contracted network?

16  **A.**   I guess that would be one of their benefits, yes.

17  **Q.**   Right.  I mean, isn't that the main benefit, the main

18  advantage, Mr. Heil, to Blue Shield, the fact --

19  **A.**   It would be my general impression that that would be a

20  major benefit.

21  **Q.**   Okay.

22  **A.**   I don't try to get inside of their head.

23  **Q.**   I understand.  But when -- when a plan -- when Blue Shield

24  had NorthBay in its network, and it wanted to sell its health

25  coverage products in Solano County, it got to advertise to

1    buyers to purchasers, to employer groups, to calipers, to

2    individuals who were purchasing insurance, it got to say if you

3    lived in Fairfield and Vacaville, you get to go to NorthBay for

4    your elective services and pay the in-network rates and so the

5    costs are lower for you.  It got to do that; right?

6    **A.**    I think they would, yes.

7    **Q.**    Okay.  And Blue Shield does not get to do that anymore.

8    Blue Shield, when it's selling its products right now in Solano

9    County, Blue Shield doesn't get to go to employer groups or to

10   individuals and say you get to go to NorthBay in Fairfield or

11   NorthBay in Vacaville and you get to go there for your elective

12   services and pay less.

13        Blue Shield can't do that anymore; right?

14   **A.**    That's correct.

15   **Q.**    It doesn't have that benefit anymore?

16   **A.**    It does not.

17   **Q.**    Now, Mr. Heil, in coming up with your opinion, you didn't

18   study the importance to Blue Shield or to other entities who

19   actually contract with NorthBay, like Blue Cross, Aetna, Cigna,

20   United, of having NorthBay in their networks for purposes of

21   selling their insurance products in Solano County in that

22   particular region?  You didn't study that, did you?

23   **A.**    I did not study that.

24   **Q.**    Okay.  And focusing on Blue Shield in particular, when

25   coming up with your analyses you didn't study the particular

1    value to Blue Shield of having NorthBay in its network for

2    elective services in order to sell its products in Solano

3    County.  You didn't study that either, did you?

4    **A.**    Well, actually, I think I did.  I think, by observing the

5    eight-year contract, I was able to quantitatively observe the

6    value of NorthBay's services to Blue Shield.

7    **Q.**    Okay.

8            **MR. PIMSTONE:**  Your Honor, I would like to publish

9    Mr. Heil's deposition testimony at page 264, lines 15 to 21.

10           **THE COURT:**  Can you give me those pages numbers again?

11           **MR. PIMSTONE:**  I'm sorry, Your Honor.  Page 64, line

12   15 to 21.

13           **THE COURT:**  That cuts into the index for me, I think.

14       You're cross-examining an expert.  Why don't you just go

15   ahead.

16           **MR. PIMSTONE:**  That's fine.  What I had just a minute

17   ago, I had Volumes 1 and 2.

18       There we go.  Thank you.

19           **MR. TOOCH:**  If I may, Your Honor, for completeness,

20   can we go to page 265, to the end of the witness's answer on

21   line 11?

22           **MR. PIMSTONE:**  May I, Your Honor?

23           **THE COURT:**  Yes.  And how far do you want to go,

24   Mr. Tooch?

25           **MR. TOOCH:**  To line 11.

1    THE COURT:  265, line 11?

2    MR. TOOCH:  Yes.

3    MR. PIMSTONE:  I believe, Your Honor, 264, 15 through

4    21 would be sufficient.

5    THE COURT:  I think that's fine.

6        And, Mr. Tooch, you can do the rest of it on redirect.

7    MR. PIMSTONE:  Thank you.

8    THE COURT:  Jean.

9    (Video played, not reported.)

10   BY MR. PIMSTONE:

11   Q.  Mr. Heil, you -- in coming up with your analysis, while

12   we're on the subject of value to the payor, you did not talk

13   with the customer base in Solano County, employers, self-funded

14   groups, patients, to determine how important it was for them to

15   select a plan that had NorthBay in-network?

16   A.  That is correct.

17   Q.  Now, the terminated contract, the old contract rate, I

18   think you indicated was based on a percentage of NorthBay's

19   billed charges?

20   A.  Yes.

21   Q.  Now, that particular letter of agreement did not limit

22   itself how much NorthBay could increase its billed charges;

23   correct?

24   A.  It did not.

25   Q.  Okay.  And that former contract rate was tied to

1  in-network volume; is that correct?

2  **A.**  Yes.

3  **Q.**  Now, the fact that NorthBay could not -- could increase

4  its charges under that contract, and Blue Shield -- there was

5  no limit in that contract, I think you indicated in your other

6  testimony that you feel that there were other contracts that

7  NorthBay had that limited, I think you said, how much NorthBay

8  could increase its charges; is that right?

9  **A.**  I believe so.  Limited -- as I recall, it was what's

10  called a deflator clause where, if an increase was greater than

11  a certain amount, then there would be an offset, so there would

12  be no net benefit in that contract.

13  **Q.**  I see.  So those other contracts that you indicated

14  limited NorthBay's increase of billed charges, those didn't

15  actually limit NorthBay's ability to increase its billed

16  charges; right?

17  Those other contracts just said, well, NorthBay, if you

18  increase your billed charges above a certain percent, you can

19  only pass through a certain portion of that increase to us.

20  That's right, isn't it?

21  **A.**  That is correct.

22  **Q.**  Okay.  So those contracts, those other contracts, I think

23  you said with United or others, that had limitation clauses,

24  those did not say to NorthBay, NorthBay, you cannot increase

25  your billed charges, period.

1    It just specified how much of the increase they could pass

2  through to those particular payors; right?

3  **A.**   That is correct.

4  **Q.**   Okay.  And so the Blue Shield contract, I think we've

5  established, didn't have any such limiter.  So if NorthBay

6  raised its charges by a certain percent, Blue Shield, under

7  that old contract, didn't get to come back to NorthBay and say,

8  well, you can only pass through a certain portion of that

9  increase to us.

10    Under that old contract, Blue Shield was obligated to pay

11  a percentage of whatever NorthBay's revised charges were;

12  correct?

13  **A.**   That is correct.

14  **Q.**   Did you consider, Mr. Heil, in evaluating the old contract

15  and the charges and the fact that the charges -- the old

16  contract did not contain any sort of limiter, did you consider

17  that by 2013, five years after the parties had entered into the

18  contract, NorthBay's billed charges had become the third

19  highest in the country?  Did you know that?

20         **MR. TOOCH:**  Objection.  Assumes facts not in evidence.

21         **THE COURT:**  Overruled.  This is cross-examination.

22  Whatever you know.

23         **THE WITNESS:**  I studied NorthBay's charges compared to

24  my peer groups.

25

1  BY MR. PIMSTONE:

2  **Q.**   Right.

3  **A.**   So I know how they compared to the peer groups.  I did not

4  study them compared to other parts of the country.

5  **Q.**   And in comparison to your peer group, you found that

6  NorthBay had high charges?

7  **A.**   They did, yes.

8  **Q.**   Yes.  And -- but you didn't -- as far as your analysis

9  went on the old Blue Shield contract, you didn't look at any

10  studies showing that NorthBay's charges were not only high but

11  were some of the highest charges in the country?  You didn't

12  look at that?

13  **A.**   I did not look nationally.  I did conclude that NorthBay's

14  charges were among the highest in my peer group.

15  **Q.**   Were you familiar, Mr. Heil, with a 2013 *New York Times*

16  study showing that NorthBay had the third highest charges in

17  the country?  Were you familiar with that study?

18  **A.**   No.

19  **Q.**   Okay.

20      **MR. PIMSTONE:**  Your Honor, for cross-examination

21  purposes, I'd like to publish a copy of an article in

22  *The New York Times* about that study.

23      **MR. TOOCH:**  I'm going to object, Your Honor.  That's

24  hearsay.

25      **THE COURT:**  It's not admissible.

1          **MR. PIMSTONE:**  All right.  Thank you, Your Honor.

2    **BY MR. PIMSTONE:**

3    **Q.**   Now, Mr. Heil, when were you talking about the Blue Shield

4    contract rate -- let's actually take a look at slide number 5.

5    This is NorthBay's slide 5.

6          (Document displayed.)

7    **Q.**   And if we look at the right-hand column, the old contract

8    rate was tied to inpatient volume; is that right?

9    **A.**   That's correct.

10   **Q.**   Okay.  And so to the extent that Blue Shield sent more

11   inpatient business to NorthBay and that volume went up, the

12   rates would go down; right?

13   **A.**   That's correct.

14   **Q.**   Okay.  And so to the extent that Blue Shield was sending

15   more outpatient volume to NorthBay under that old contract,

16   that would have no impact on the rate.

17         Blue Shield could send twice, three times, four times, it

18   could increase the volume of outpatient services and, under the

19   contract, that wouldn't lower the rate to Blue Shield; right?

20   **A.**   Right.  The parties had agreed that the inpatient volume

21   was the best and simplest proxy for utilization --

22   **Q.**   I'm just asking a question about how the contract worked.

23         So under that old contract, to the extent that Blue Shield

24   sent outpatient volume and increased that outpatient volume to

25   NorthBay, my simple question is:  That didn't impact the rate;

1    correct?

2    **A.**    That's correct.

3    **Q.**    Okay.  Mr. Heil --

4         **MR. PIMSTONE:**  Thank you.  I'm done with this slide.

5    **BY MR. PIMSTONE:**

6    **Q.**    Mr. Heil, you would agree that there's been a trend that

7    medical procedures that used to be addressed in the inpatient

8    setting now can be addressed as outpatient; correct?

9    **A.**    Yes.

10   **Q.**    Okay.  And so to the extent that -- over the course of

11   time, volume that used to be inpatient volume, to the extent

12   that -- based on this trend, some of those patients were now

13   treated by NorthBay as outpatients, as I think we've

14   established, that wouldn't count or didn't count towards volume

15   to Blue Shield, right, under the old contract?

16   **A.**    It would not.

17   **Q.**    Now, in deciding, Mr. Heil, to use this old contract rate

18   in your analysis, Blue Shield's reasons for terminating the

19   contract did not factor mathematically into your analysis;

20   correct?

21   **A.**    That is correct.

22   **Q.**    Mr. Heil, I wanted to move on now to the second --

23   actually, let me ask you a few more questions about the

24   Blue Shield contract.

25        So, Mr. Heil, I think we've established that one-third of

1  your mathematical computation of reasonable value was

2  associated with this old -- this terminated contract; correct?

3  **A.**  Correct.

4  **Q.**  And that contract was just between Blue Shield and

5  NorthBay, so that's not a value that would apply to some other

6  health plan.

7       That factor, factor 1, is sort of specific to Blue Shield

8  and NorthBay; correct?

9  **A.**  Yes, indeed.  That's one of the reasons I think it's very

10  important and why I gave it as much weight as I did.

11  **Q.**  So, Mr. Heil, if you were doing a reasonable value

12  analysis and, instead of it being Blue Shield, who was the

13  payor, it was a different carrier with a different course of

14  dealing, and if you were doing that identical analysis, you

15  would come out with a different value for reasonable value;

16  correct?

17  **A.**  If everything else in the case were the same?

18  **Q.**  Yeah.

19  **A.**  Exactly as this and the course of dealings existed, but

20  was a different number, are you asking would it change --

21  **Q.**  Yes.

22  **A.**  -- the answer.

23  **Q.**  Yes.

24  **A.**  Yes, it would.

25  **Q.**  Okay.  And assuming that the other carrier had a different

1  course of dealing, that would change your opinion as to the

2  reasonable value of the services; right?

3  **A.**  Yes, indeed.

4  **Q.**  So, in other words, this factor 1, this prior course of

5  dealing, that could fluctuate based on who the carrier is who

6  happens to be insuring the patient who comes to the emergency

7  room; right?

8  **A.**  It could.

9  **Q.**  Okay.  Mr. Heil, let's tease this out a little bit more.

10  Let's imagine, Mr. Heil, that there were three patients getting

11  an emergency procedure at NorthBay.  A stent, MRI.

12  One of those patients were covered by Blue Shield.  One of

13  those patients was covered by a non-contracted carrier with a

14  different prior course of dealing.  And one of those was

15  insured by a carrier with no course of dealing, prior course of

16  dealing with NorthBay.

17  Under your reasonable value analysis, the reasonable value

18  of that exact same procedure, that stent, that MRI, would be

19  different for each of those patients; correct?

20  **A.**  It would be.

21  **Q.**  Okay.  So if, for example, Mr. Heil, if HealthNet -- I

22  think you indicated that NorthBay's HealthNet contract was at

23  38 percent of NorthBay's billed charges in your modeling?

24  **A.**  Yes.

25  **Q.**  Okay.  And so, for example, if HealthNet and NorthBay

1  terminated the contract, and HealthNet -- a patient insured by

2  HealthNet came into NorthBay's emergency room and you were

3  doing same course of dealing analysis, instead of using the

4  Blue Shield 80 percent plus another 15, you would take

5  38 percent and add another 15 and factor that into your

6  reasonable value analysis; correct?

7  **A.**  If all other things were exactly equal, then, yes.

8  **Q.**  Okay.  Mr. Heil, it's also your position, I believe, that

9  the reasonable value of that same emergency procedure, that

10 stent, that MRI, could vary depending on which hospital that

11 procedure was done in as between, for example, NorthBay and a

12 hospital ten miles down the road; right?

13 **A.**  Yes.  My task in this engagement was to say what's the

14 reasonable value of services at NorthBay in this dispute with

15 Blue Shield.

16 **Q.**  I understand.  And so my question is, Mr. Heil, I think

17 you answered yes, but let me just make it very clear for the

18 jury:  It's also your position that if that emergency stent or

19 MRI was handled at a hospital other than NorthBay, in the

20 geographic area, that that would also influence or could

21 influence the reasonable value of the services?

22 **A.**  Yes, it could.

23 **Q.**  Okay.  So to you, Mr. Heil, the reasonable value of a

24 particular emergency service, like a stent or an MRI, can be

25 different depending on who happens to be insuring the patient

1  who walks in the door and which emergency facility they're

2  taken to; correct?

3  **A.**  Yes.  The reasonable value at hospital A, if that were the

4  case, could be different than at hospital B, if that were the

5  case.

6  **Q.**  Understood.  So under your model, Mr. Heil, there's no one

7  number for the reasonable value of particular services in a

8  geographic area for purposes of these emergency services;

9  right?

10  It depends on the hospital and depends on who's insuring

11  the patient who walks into the emergency room?

12  **A.**  That's right.

13  **Q.**  Okay.  Now, this first factor of yours, Mr. Heil, the

14  Blue Shield terminated contract, it doesn't in any way measure

15  the rates paid to or accepted by any other hospital in the

16  geographic area; correct?

17  **A.**  That is correct.

18  **Q.**  Okay.  Mr. Heil, let's move on to your factor 2.  And just

19  so that we can remind ourselves, factor 2 was the comparable

20  agreements between NorthBay and other commercial payors.

21  **MR. PIMSTONE:**  And if we can go to slide 9,

22  Mr. Kotarski, please.

23  (Document displayed.)

24  **MR. PIMSTONE:**  Thank you.

25

1  **BY MR. PIMSTONE:**

2  **Q.**   So slide 9, this is the slide where you compute the

3  portion of your reasonable value estimate that relates to

4  factor 2; correct?

5  **A.**   Correct.

6  **Q.**   Okay.  And just so that we can all be clear on what you

7  did, you took a series of these contracts and you came up with

8  an effective contract rate, and you took the simple average,

9  you just took all those numbers and added them together and

10  divided by the total.

11       You took a simple average and then you added 15 percent;

12  right?

13  **A.**   That's correct.

14  **Q.**   Okay.  Let's --

15  **A.**   15 percentage points, yes.

16  **Q.**   15 percentage points.  Thank you.

17       You will probably correct me a few times in this analysis.

18  Math was never my strong suit.

19       Mr. Heil, you know, let's take a look at the first of

20  these transactions.  This is the terminated Kaiser contract?

21  **A.**   Correct.

22  **Q.**   Just a small point, you indicate that the old Kaiser

23  contract was in effect from 2001 through 2015.

24       Did you look at that contract?  Are you sure about that

25  2001 date?

1   **A.**   I'm not certain.

2   **Q.**   Okay.  Where did you get that number from?

3   **A.**   That's my best recollection of what I saw.

4   **Q.**   Okay.  All right.  Now, you know, Mr. Heil, that Kaiser

5   terminated that agreement and is now paying NorthBay at a

6   fraction of that old rate?

7   **A.**   Yes.

8   **Q.**   Okay.  And you understand --

9   **A.**   I am aware of that.

10   **Q.**   You are aware of that.

11   And you understand NorthBay is suing Kaiser for the

12   reasonable value of its services as well?

13   **A.**   Yes, I'm aware of that.

14   **Q.**   Okay.  You didn't seek to establish, Mr. Heil, as part of

15   your opinion, why that contract was terminated, whether it was

16   viewed by Kaiser as outdated or was too expensive under today's

17   market conditions?

18   You didn't look at the reasons why Kaiser terminated that

19   contract; right?

20   **A.**   That is correct.  I did not.

21   **Q.**   Okay.  But do you agree, Mr. Heil, that one does not have

22   a willing buyer/willing seller transaction once the contract

23   ends and there's no agreement as to price?

24   **A.**   Not anymore.

25   **Q.**   Not anymore.  Right.

1    So for the time period at issue in this case, which is,

2  what, 2017 and 2018, that Kaiser contract did not -- for the

3  disputed time period, 2016 and '17, didn't reflect a willing

4  buyer/willing seller transaction for that time period; right?

5    It was for an earlier time period?

6  **A.**    Right.  It's what the parties had agreed to in a previous

7  significant period as a willing buyer, willing seller

8  agreement.

9  **Q.**    At a previous point in time?

10  **A.**    At a believe point in time.

11  **Q.**    Okay.  So if we move on past the Kaiser contract, we see a

12  few other contracts; MultiPlan, InterPlan, First Health, and

13  PHCS.  And I think you testified that all of those arrangements

14  were what you call rental network or at lease networks?

15  **A.**    That's one of the terms that's used, yes.

16  **Q.**    Those terms are used pretty interchangeably in rental

17  network and lease network; right?

18  **A.**    Generally, yes.

19  **Q.**    All right.  So let's discuss briefly -- you went into

20  this, but just for clarification for the jury, let's discuss

21  briefly what a lease network is, all right?

22    And to do that, I'm going to do some drawing and test my

23  art skills.  Be right back.

24    Let's see if we can arrange this in a way you can see and

25  the jury can see.

1      THE COURT:  Can you move it back so Mr. Tooch can also

2  see?

3      MR. PIMSTONE:  How's that?

4      MR. TOOCH:  That's good.

5  BY MR. PIMSTONE:

6  Q.  Let's start off with MultiPlan, but I think your testimony

7  will be that they all worked the same way.

8      So there's a contract between the providers, like NorthBay

9  and MultiPlan; correct?

10     So supervisors at NorthBay will contract with MultiPlan;

11  is that right?

12  A.  Yes.

13  Q.  Okay.  And then MultiPlan will then enter into a separate

14  set of contracts with payors, with health plans, or insurers;

15  correct?

16  A.  With many different kinds of payors, yes.

17  Q.  Sure.  All different kinds of payors.

18     And so MultiPlan in that sense is acting as an

19  intermediary.  MultiPlan negotiates a rate discount with

20  providers, the providers will say, we'll discount our rates by

21  a certain percentage, and then MultiPlan goes out and contracts

22  with payors to have access to that discount if the payors

23  choose to; correct?

24  A.  That's one of the ways the relationship goes, yes.

25  Q.  All right.  And there are various different rental

1　networks out there.  I think you've listed a few here.

2　　MultiPlan, InterPlan, First Health, those are all

3　different rental networks that exist, different arrangements

4　that pretty much operate like this; right?

5　**A.**　Correct.

6　**Q.**　And a plan like Blue Shield or Aetna or Cigna, they can

7　contract with multiple rental networks, it's not an exclusive

8　situation where they can only contract with one; right?

9　**A.**　That's my general impression, yes.

10　**Q.**　Right.  So Blue Shield or anyone could have simultaneous

11　contracts with MultiPlan, InterPlan, First Health, which all

12　may have different discounts negotiated with the same provider,

13　with NorthBay; right?

14　**A.**　Correct.

15　**Q.**　Because MultiPlan, its discount would just be for using

16　MultiPlan.  So NorthBay -- so Blue Shield had a relationship

17　with various different rental networks, and it wanted to look

18　to see what discount those rental networks had with NorthBay,

19　Blue Shield could ask the various rental networks to reprice

20　the plan to see what the discount is; correct?

21　**A.**　I think they could.

22　**Q.**　Absolutely.  Okay.  And providers could contract with

23　multiple rental networks as well.

24　　So NorthBay could contract with multiple rental networks

25　as well, with MultiPlan, InterPlan, First Health.  They're not

1    limited to just one?

2    **A.**    That's correct.

3    **Q.**    And the way that MultiPlan gets paid here, for example,

4    would be that if a particular patient comes in to NorthBay and

5    Blue Shield wanted to see, well, what's the discount that

6    NorthBay has offered to MultiPlan, Blue Shield could ask

7    MultiPlan to reprice the claim to see what the discount would

8    be; right?

9    **A.**    I mean, they could.

10   **Q.**    They could.

11   **A.**    They could.

12   **Q.**    Right.  And the way MultiPlan gets paid is that if

13   Blue Shield decides to use the discount, MultiPlan takes a fee;

14   right?  You know that?

15   **A.**    That's the way they can earn their income, yes.

16   **Q.**    So if MultiPlan decides, once it sees the discount, we're

17   going to use that discount -- I'll slow down, I'm sorry.

18        So if the plan then decides to use the discount, MultiPlan

19   will take its fee.  If the plan decides not to use the

20   discount, MultiPlan doesn't take a fee.

21        You understand that's how the process works; right?

22   **A.**    That's how I understand it works.

23   **Q.**    Okay.  All right.  So these arrangements -- MultiPlan,

24   InterPlan, First Health, PHCS -- just to be really clear, these

25   are not direct negotiations between the health plans and the

1    insurance on the one side and NorthBay on the other.

2        These are two separate sets of contracts where an

3    intermediary has worked with NorthBay and NorthBay has said

4    this is the discount that we're going to give anyone who

5    decides to access your rental network?

6    **A.**    It is an intermediary relationship, yes.

7    **Q.**    Okay.  Now, Mr. Heil, you did look at how frequently

8    rental networks like these -- these rental networks were

9    actually used to pay emergency claims at NorthBay, and you've

10   concluded it was low, low usage; right?

11   **A.**    It is low usage, yes, as a percentage of all the business

12   activity at NorthBay.

13   **Q.**    Okay.  So just to put that in common terms, in terms of

14   NorthBay's -- all NorthBay's business, the percentage of times

15   that these contracts were actually accessed and used to pay

16   NorthBay, that didn't happen very much, right, in the global

17   scheme of things for NorthBay?

18   **A.**    It did not.

19   **Q.**    Okay.  In fact, Mr. Heil, in your backup to your opinion,

20   did you have a file where you actually looked at NorthBay's

21   volume by contract type?

22   **A.**    I did.

23   **Q.**    And did that -- that file list a number of arrangements,

24   including First Health, MultiPlan, and did that indicate sort

25   of the total amount of charges that were attributable to the

1  usage of those particular products?

2  **A.**   It did.   I'm not that familiar with the file because, as I

3  think I told you in the deposition, I didn't use that volume

4  question that you're asking about in my calculations.   I didn't

5  use anything from that file.

6      It's just part of my understanding of the way the whole

7  system works.   I was not looking at volume as a determinant of

8  selecting these plans.

9  **Q.**   Oh, I know you weren't, Mr. Heil.   I know you weren't.

10     But I'd like to give us all a sense, when you say that

11  these rental networks were not used very often, I sort of want

12  to put a little flesh on those bones to see how often they were

13  used.

14     And so what I want to do is show you one of the

15  calculations or one of the sheets, the worksheets, that was

16  produced with your opinion to us.

17        MR. PIMSTONE:   Mr. Kotarski, if you could put in -- if

18  you could please put up Exhibit 6 to Mr. Heil's deposition,

19  just page 2 for the time being.

20        THE COURT:   This is not for publication for the jury.

21        MR. PIMSTONE:   It will be ultimately, Your Honor.

22        THE COURT:   If you want to move it into evidence,

23  then --

24        MR. PIMSTONE:   Absolutely --

25        THE COURT:   Right now, let's not put it up for the

1    jury.

2            **MR. PIMSTONE:**  I didn't mean to publish it.

3        Can we publish it to the witness?

4            **THE COURT:**  Yes.  That would be a good way --

5            **MR. PIMSTONE:**  That would be lovely.

6            **THE COURT:**  -- of getting the foundation laid.

7    **BY MR. PIMSTONE:**

8    **Q.**    All right.  Mr. Heil, this is -- I'll represent to you

9    this is a sheet from your backup analysis.

10        And do you have any reason to believe that this is not

11   part of your backup to your analysis that you produced to

12   Blue Shield in this case?

13   **A.**    No, I think it is part of my backup.

14   **Q.**    Okay.

15           **MR. PIMSTONE:**  And, Your Honor, at this point I'd like

16   to move it into evidence.

17           **THE COURT:**  And as Exhibit what?

18           **THE CLERK:**  What number?

19           **MR. PIMSTONE:**  As -- I don't know what the next in

20   order is at this point in time for us.

21        Defendant's 1?

22           **THE CLERK:**  Did the parties coordinate to number their

23   exhibits jointly?  The highest number you used on the sheet I

24   have is 172.

25           **THE COURT:**  So we'll make this as Exhibit 300.

1      MR. PIMSTONE:  Fantastic.  Thank you, Your Honor.

2      THE COURT:  Is there any objection to Exhibit 300,

3  Mr. Tooch?

4      MR. TOOCH:  Yes, Your Honor, because the witness says

5  he didn't use this in his analysis.

6      THE COURT:  Overruled.  I'll admit it.

7   (Trial Exhibit 300 received in evidence.)

8      MR. PIMSTONE:  All right.  So if we could publish

9  Exhibit 300 for the jury, please.

10   (Document displayed.)

11  BY MR. PIMSTONE:

12  Q.   All right.  So, Mr. Heil, this is the document that I

13  think you indicated was part -- at least part of the backup

14  analysis that you gave to Blue Shield in this case; correct?

15  A.   Yes.

16  Q.   Okay.  And can you tell us, Mr. Heil, you have a column

17  here entitled Total Sum of Charges?

18  A.   Yes.

19  Q.   "Total Sum of Total Charges."  And can you tell us what

20  that represents?

21  A.   That's a summation for each one of those payor categories

22  of the total charges, be they inpatient, outpatient, emergency,

23  non-emergency, at the charge level --

24  Q.   Right.

25  A.   -- for each one of those payor groups.

1  **Q.**   Okay.  And so if one looks, for example, at the first line

2  there, that's Aetna.  Do you see that?

3  **A.**   Yes.

4  **Q.**   And the total sum of total charges is around 56 and a half

5  million dollars.  That indicates that, for the time period that

6  you were looking at, that Aetna represented -- the Aetna

7  business represented 56 and a half million dollars of charges

8  to NorthBay?

9  **A.**   In charges.

10  **Q.**   In charges?

11  **A.**   Yes.

12  **Q.**   Billed charges.

13      And if we skip all the way to the bottom of the list here,

14  there's a grand total.  Do you see that?

15  **A.**   Yes.

16  **Q.**   And the grand total is 581 -- about 581 and a half million

17  dollars?

18  **A.**   Yes.

19  **Q.**   And that would be NorthBay's charges, what it received --

20  not what it received, but NorthBay's charges associated with

21  each of those particular payors added up together?

22  **A.**   Correct.

23  **Q.**   That's the grand total.

24      So if we were to add up what NorthBay charged to Aetna,

25  Blue Cross, Blue Cross Blue Shield, presumably, that's a

1  different state, Blue Shield, Cigna, so forth and so on, you

2  add them all up, it gets to the $581 million number?

3  **A.**  That's my understanding of this data.

4  **Q.**  Okay.  And so, Mr. Heil, if we could look at the first

5  page of this exhibit --

6  　　　　**TECHNICIAN:**  I just have one page of this exhibit.

7  　　　　**MR. PIMSTONE:**  I see.  Mr. Kotarski, I believe that

8  the exhibit that we had moved into evidence, was Mr. Heil's

9  deposition Exhibit 6, which is a 2-page document.

10 　　　　**TECHNICIAN:**  This is what I have, it's just one page.

11 Sorry.

12 　　　　**MR. PIMSTONE:**  All right.  Well, then we'll have to do

13 the math ourselves.

14 **BY MR. PIMSTONE:**

15 **Q.**  All right.  So let's -- I think what we were going to do

16 is let's blow up these so that we can all see the numbers.

17 　　　　So we were looking here for your -- the contracts that you

18 used for purposes of your analysis were these rental networks?

19 　　　　So let's first look at MultiPlan.  And so MultiPlan, if

20 you look down here, you've got it listed as an ED-dominant

21 contract.  Do you see that?

22 **A.**  Yes.

23 **Q.**  And you have here the total amount of charges associated

24 with MultiPlan, with payors who actually used the MultiPlan

25 contract, is a little over a million dollars; right?

1  **A.**  Correct.

2  **Q.**  And so that's a little over a million dollars out of a

3  total of $581,470,000; right?

4  **A.**  That's correct.

5  **Q.**  Mr. Heil, I'm happy to give you a calculator here, but at

6  least according to my math that works out to 0.2 percent of

7  NorthBay's charges volume.

8  **A.**  Two-tenths of a percent.

9  **Q.**  Two-tenths of a percent.

10  **A.**  Okay.  I'll take your word for it.  Let's assume it.

11  **Q.**  Let's not assume it.

12  **A.**  Okay.

13  　　　　**MR. PIMSTONE:**  May I approach the witness, Your Honor?

14  　　　　**THE COURT:**  You may.

15  　　　　**MR. PIMSTONE:**  Thank you.

16  **BY MR. PIMSTONE:**

17  **Q.**  Mr. Heil, can you do the math for us and tell us whether

18  you agree that the MultiPlan arrangement accounted for

19  0.2 percent of NorthBay's charges volume?

20  **A.**  Looks right.

21  **Q.**  And so the -- another contract that you used in your

22  analysis, Mr. Heil, was the First Health contract.

23  　　　　And if we look down at the First Health contract, that

24  accounted for about $3.8 million worth of volume to NorthBay?

25  **A.**  Yes.

1  **Q.**   And if we do the math again, I believe that comes out to

2  0.7 percent of NorthBay's charges volume.  Do you agree?

3  **A.**   Yes.

4  **Q.**   All right.  And let's move on to the next one.  I think

5  you also used InterPlan in your calculation.  And InterPlan

6  here is listed in this document as Health Smart InterPlan.  Do

7  you see that?

8  **A.**   I do.

9  **Q.**   That's the same entity; right?  That's InterPlan?

10 **A.**   I believe so, yes.

11 **Q.**   And if we do the math on that, InterPlan was a little bit

12 over 2 percent of NorthBay's charges volume; right?

13 2.2 percent?

14 **A.**   Yes.

15 **Q.**   And PHCS, which is another entity that you used, PHCS

16 accounted for about $1.9 million of NorthBay's volume, which I

17 believe comes out to 0.3 percent; is that right?

18 **A.**   Yes.

19 **Q.**   So this sort of mathematically validates, I think, your

20 instinct of a few minutes ago that these rental networks that

21 you used here for your calculation were not heavily used by

22 payors in paying NorthBay for their services; right?

23 **A.**   They represented a small percentage of NorthBay's volume.

24 **Q.**   Okay.  Let's tease that out a little bit more, Mr. Heil.

25    Let's say that NorthBay contracted with MultiPlan and

1   literally not a single payor paid a claim using the MultiPlan

2   arrangement.  Not a single one.

3       My question is:  You would still view it as being a

4   comparable emergency services contract for your use in

5   determining reasonable value even if no one used it; right?

6   **A.**   If it was an active live contract that the parties had

7   agreed to, it's representative of a willing seller/willing

8   buyer price, contracts are made in advance.  We don't know what

9   the future holds.  It's what people agreed to pay whether the

10  transaction occurs or not.

11  **Q.**   I understand that.  Let me ask you the question again.

12      If NorthBay contracted with MultiPlan and literally not a

13  single payor decided ever to access that rate for whatever

14  reason, because it was too high, didn't make sense, and

15  NorthBay was not paid under the MultiPlan arrangement by any

16  payor, it would still have made your list; right?

17      Just yes or no, Mr. Heil, would it have made your list?

18  **A.**   If I had reason to believe it was an active live contract

19  that was in force, I would consider it valid, yes.

20  **Q.**   Okay.  And so the reason why --

21      **MR. PIMSTONE:**  Mr. Kotarski, could we go back to

22  Mr. Heil's slide number 9.

23      (Document displayed.)

24  **BY MR. PIMSTONE**

25  **Q.**   The reason why MultiPlan and InterPlan and First Health

1    and PHCS are on that list is that, regardless of whether

2    0.2 percent of payors actually used those agreements or

3    0.0 percent of payors actually used those agreements, the

4    reason why you have it on your list is the simple fact that

5    NorthBay had contracted with these entities to provide a

6    discount?

7    **A.**    No, that's not correct.  The reason they're on this list

8    is that they are the most similar to the situation at hand

9    here; and that is, that Blue Shield is steering no

10   non-emergency volume to NorthBay.

11       So I'm looking for what are agreed-upon rates that

12   sophisticated buyers have agreed to when they will not be

13   steering significant or any non-emergency volume to NorthBay.

14       That's -- I'm on a search for apples and apples, most

15   comparable to the business relationship.  That's what puts them

16   on the list, not their volume.

17   **Q.**    I understand.  And so what I think you've said is that

18   these transactions -- when NorthBay entered into an agreement

19   with MultiPlan or with First Health or with InterPlan, I think

20   you said that these transactions would have been part of your

21   mathematical calculation of reasonable value even if every

22   single insurer or plan, once they accessed those rates, looked

23   at them and said, heck, no, we're not going to pay those rates,

24   they're way too high, those transactions still would have been

25   used by you even if every single insurer, once they accessed

1    those rates, say they're way too high, we're not going to pay

2    them, they still would have made your list; yes?

3    **A.**    I'm looking at the relationship.

4    **Q.**    Mr. Heil, they still would have made your list?

5              **THE COURT:**  Let him answer the question.

6              **MR. PIMSTONE:**  Thank you, Your Honor.  Absolutely.  Of

7    course.

8              **THE COURT:**  You asked a complicated question.  He's

9    entitled to answer.

10             **THE WITNESS:**  I'm looking at the business relationship

11   between the MultiPlan, who's the contracting party, and

12   NorthBay.  The fact that they might have another relationship

13   with a payor behind them is a unique characteristic in this

14   situation.

15        But the question on the table is, when a sophisticated

16   company like MultiPlan comes to NorthBay and wants to establish

17   its value of its contract, what does it think NorthBay's

18   services are worth?

19   **BY MR. PIMSTONE:**

20   **Q.**    What does --

21   **A.**    What does MultiPlan think they're worth?

22   **Q.**    Okay.

23   **A.**    So it's the contracting party that is known by the payors

24   to be a very sophisticated, potent, large, well-informed

25   organization.  So the reason that payors contract with them is

1   they think they're good.  They think they do good work.

2   **Q.**   All right.  I'm going to ask the question again, that

3   these various transactions -- MultiPlan, InterPlan, First

4   Health and PHCS -- they would have been part of your

5   mathematical calculation of reasonable value even if every

6   insurer, every plan who decided to access those rates to see

7   what MultiPlan had negotiated with NorthBay, looked at the

8   discount and said, heck, no, we're not going to pay it, those

9   are way too high, they still would have made your list?

10  **A.**   You've given me a hypothetical.  And, of course, it's not

11  applicable here.  I can see that payors are using these

12  contracts.  I can see they're using them.

13         **THE COURT:**  If you can answer yes or no, please do

14  that.

15         **THE WITNESS:**  Okay.  The answer is yes.

16         **MR. PIMSTONE:**  Thank you.

17         **THE COURT:**  Mr. Pimstone, is this a good time for a

18  break?

19         **MR. PIMSTONE:**  Absolutely, Your Honor.

20         **THE COURT:**  All right.

21      Ladies and gentlemen, we'll take our second break for the

22  morning.  Be back in 15 minutes.

23      (Jury out at 11:23 a.m.)

24         **THE COURT:**  All right.  We'll be in recess.

25         **MR. PIMSTONE:**  Thank you.

1     (Recess taken at 11:23 a.m.)

2    (Proceedings resumed at 11:39 a.m.)

3    **THE COURT:** All right. Please be seated, everybody.

4  Mr. Pimstone, when you're ready.

5 **BY MR. PIMSTONE:**

6 **Q.** So Mr. Heil, just to review briefly what we've done to

7 date in connection with your factor 2, what you have deemed the

8 emergency services type contracts that you used as your second

9 part to your analysis. What we've looked at so far --

10  And Mr. Kotarsky, if we could put on Mr. Heil's slide

11 number 9.

12  So we've looked at Kaiser. The Kaiser contract with

13 NorthBay?

14 **A.** Yes.

15 **Q.** And. And I believe you said in 2015.

16  We have looked at the rental network contracts. To remind

17 ourselves what those are, those are the next four down on your

18 list, right? So that's MultiPlan, Interplan, First Health,

19 PHCS. And I apologize to everyone for my handwriting.

20  We've looked at those. Those are the rental network

21 agreements. And we've talked about the volumes under those

22 particular agreements to NorthBay, correct?

23 **A.** Correct.

24 **Q.** Okay. And specifically we talked about the MultiPlan

25 volume is 0.2 percent of the charges. The Interplan was

1   2.2 percent.  The First Health was 0.7 percent.  And PHCS is

2   0.3 percent.  Correct?

3   **A.**  I think that's correct.

4   **Q.**  Okay.  And then before we get to your last -- the last

5   factor that you looked at, these one-time agreements, just a

6   couple more questions on these rental networks.

7       Now, these kinds of rental networks, to the extent that

8   they're accessed by payors -- by payors looking to use the

9   MultiPlan arrangement or the First Health arrangement and

10   actually deciding to go ahead and use those rates -- those are

11   typically out-of-state payors right?

12   **A.**  They can be.  They can be in-state, out-of-state.  There's

13   quite a variety.

14   **Q.**  But your general experience has been that rental networks

15   are working with out-of-state payors.

16   **A.**  I wouldn't say I've done enough of a study to say that.

17   **Q.**  The kinds of entities that typically access those

18   arrangements are small union trust funds, typically out of

19   state, right?

20   **A.**  You're asking me to provide a market analysis of rental

21   networks.  I haven't done it quantitatively.  What I can tell

22   you is I've seen a wide variety.  They range from self-employed

23   -- self funded plans.  They are sometimes large health plans,

24   health insurers, national health insurers.  There's so much

25   variety there that I did not and have not studied them as to

1  their composition.

2  **Q.**   But your general experience that is these rental networks

3  are largely working with the out-of-state payors.

4  **A.**   (No response.)

5  **Q.**   If the answer is no, that's fine.

6  **A.**   In general -- I'm trying to be very precise.  Have I ever

7  done a study?  No.  I think I have a general impression that a

8  lot of times it's out of state.

9  **Q.**   In fact, your general experience, Mr. Heil, is that rental

10 networks are working with out-of-state payors.  Right?  That's

11 your general experience?

12 **A.**   I think in general -- I think in general, yes.

13 **Q.**   Okay.  Thank you.

14     Now, this factor 2 analysis, you also have as the last

15 piece here one-time agreements?

16 **A.**   Yes.

17 **Q.**   Did you measure the volume of those one-time agreements?

18 **A.**   I think I found 50 or more.

19 **Q.**   All right.  I'm talking about as a percentage of all the

20 business that NorthBay has when NorthBay's selling its

21 services.  Did you attempt to quantify --

22 **A.**   I did not.

23 **Q.**   You would agree that would be pretty low, right?

24 **A.**   I would expect it would be quite low.

25 **Q.**   Okay.  And these are agreements, I think you've testified,

1  that typically are negotiated in situations where the patient's

2  already at NorthBay.  And the plan, or the insured, ends up

3  negotiating just a one-off agreement with NorthBay for that

4  patient that's already there.

5  **A.**   That's what they are.  They are one-offs.  They are

6  negotiated resolutions to billing questions one at a time.

7  **Q.**   Where NorthBay's typically got the patient already.

8  Patient's already there.  Usually it's after the services have

9  been rendered.

10 **A.**   Typically, in my experience, it's after the service has

11 been rendered.

12 **Q.**   I understand.  So I think we've covered now the waterfront

13 of your factor 2 analysis.  So this is one-third of your

14 analysis related to these rates.  Right?  Plus 15 percent.

15 **A.**   Correct.

16 **Q.**   Now, this factor 2 analysis, Mr. Heil, it does not measure

17 in any way the rates that were paid to or accepted by any other

18 hospitals in each geographic area.  Right?

19 **A.**   That's correct.  It's NorthBay only.

20 **Q.**   I understand.  Now, you also testified earlier this

21 morning about a series of other network contracts.  Blue Cross,

22 Aetna, Cigna.  You didn't factor those contracts mathematically

23 into your reasonable value analysis, correct?

24 **A.**   Correct.

25 **Q.**   In fact, Mr. Heil, I think you have stated at least in

1   your report that you believe that it would not be proper to

2   conduct a reasonable value analysis factoring in those

3   particular full network rates, right?

4   **A.**   Right.  In a case like this --

5   **Q.**   In a case like this --

6   **A.**   -- where it's a non-contracted, out of network, no steered

7   business, it would not be appropriate to compare to those.

8   **Q.**   So that cuts out a whole series of questions.  If your

9   analysis is that it wouldn't be appropriate to consider those

10  rates, we don't have to talk about them.

11  **A.**   Excuse me.  I didn't say "consider."

12  **Q.**   To use them in your calculation.

13  **A.**   I did not use them in my calculation.

14  **Q.**   Thank you very much.  All right.

15      You did say something this morning that piqued my

16  curiosity.  You said that some of those full network rates you

17  modeled using data, right?  Because some of them were clean.

18  They were just X percent of bill charges.  And others of them

19  had per diems and were more complicated.  And I think you said

20  that you came up with a contract modeled rate?

21  **A.**   Correct.

22  **Q.**   How did you do that?  Did you use NorthBay's data to do

23  that?

24  **A.**   I used NorthBay's data showing the experience of the

25  patients under those contracts.

1  **Q.** And so what did you do? You looked at how much that

2  particular payor had paid NorthBay for the patients?

3  **A.** No. I looked at how much they had agreed to pay NorthBay.

4  **Q.** How much they agreed to pay NorthBay. But then in terms

5  of modeling, sort of the effective rate, how did you do that?

6  **A.** Well, if I could just use a simple example.

7  **Q.** Sure.

8  **A.** If there were three patients, and two were inpatients and

9  one was an outpatient. I looked at those three specific

10 patients. And if there was a separate rate for inpatients and

11 outpatients, I would have taken those three patients and said:

12 Let's apply those two patients and their charges and their

13 length of stay, if you will, to that rate; and let's take the

14 outpatient and apply that. So I computed what the effective

15 rate was that had been agreed to in those rates, in those

16 contracts.

17 **Q.** Okay.

18   Mr. Kotarsky, if you could put back on the screen Exhibit

19 300. That's the -- thank you. And if you could blow that up

20 just a little bit here.

21   So we talked about the various utilization of the rental

22 networks. There is a category here for Blue Shield, is that

23 correct, Mr. Heil?

24 **A.** Yes.

25 **Q.** And it looks like during this -- and this was the disputed

1  time period, right?

2  **A.**   This is the disputed time period.

3  **Q.**   This is 2017 and '18?

4  **A.**   I believe so.  It's the disputed time period.

5  **Q.**   Disputed time period.  In the disputed time period, it

6  looks like, as we've said, MultiPlan payors who ended up using

7  the MultiPlan arrangement gave NorthBay about $1.4 million

8  worth of charges volume?  Is that right?

9      I'm sorry.  1.1.  $1.1 million worth of charges volume.

10 **A.**   Correct.

11 **Q.**   And during that time period during the disputed period,

12 Blue Shield -- Blue Shield paid NorthBay -- not paid NorthBay.

13 That's wrong.  But the charges associated with the Blue Shield

14 patients who were at NorthBay was about almost 48 million.  Is

15 that right?

16 **A.**   That's correct.

17 **Q.**   And if we do the math as to sort of what percentage that

18 is of the total charges that NorthBay had over the disputed

19 time period, 581 million.  I think that turns out roughly to a

20 little over 8 percent.  8.2 percent of NorthBay's charge of

21 business was Blue Shield?

22 **A.**   What is the math you'd like me to do?

23 **Q.**   Well, it's from your sheet here.

24 **A.**   I'm just asking you --

25 **Q.**   Sure.

1   **A.**   -- repeat your question, please.

2   **Q.**   Absolutely, Mr. Heil.  It's the fraction of 47,855,000 as

3   a percentage of 581,470,000.

4   **A.**   I got 8 percent.

5   **Q.**   Okay.  All right.  I've rounded a little bit.  I think it

6   comes out to about 8.2 percent.  But about 8 percent.

7         **MR. TOOCH:**  That misstates the calculation.

8   8 percent.  8.2.

9         **MR. PIMSTONE:**  All right.

10         **THE COURT:**  The evidence is what comes out of the

11   mouth of the witness.  What lawyers say, as I told you earlier,

12   is not evidence.

13   **BY MR. PIMSTONE:**

14   **Q.**   And is especially not evidence given what I've already

15   disclosed about my math skills.

16         All right.  Mr. Heil, let's move onto your third factor

17   here.

18         We've discussed the old terminated Blue Shield contract.

19   We've discussed these various rental networks and the old

20   Kaiser agreement.  And I think the only other factor that you

21   looked at in calculating reasonable value in terms of your

22   mathematical computation was a bill charge analysis.  Correct?

23   **A.**   That's correct.

24   **Q.**   So let's go to that.  Let's --

25         Mr. Kotarsky, if you could pull up slide 10.  NorthBay

slide 10.  And so that's the charge comparison analysis.  All right.

Mr. Kotarsky, I think we're done with that.

Is it fair to say that, Mr. Heil, that this is the only one of your three factors that you used that includes data relating to other hospitals in the geographic area, correct?

A.   Correct.

Q.   And so, Mr. Heil, I think you testified that you assembled two peer groups.  The peer -- what you called Peer Group 1 and Peer Group 2 for purposes of this third factor.  Correct?

A.   That's correct.

Q.   And you were looking here at NorthBay's, and the peer hospitals', bill charges.  Not the rates that were paid to or accepted by those hospitals, correct?  You were just looking at bill charges.

A.   These are bill charges.

Q.   Bill charges only.  Okay.  Now Mr. Heil, if all we knew were the hospital's bill charges -- that's all we knew -- would that tell us anything about what that hospital actually accepted from payors in the market?

It wouldn't, would it?

A.   Do you mean if we didn't have access to their contracts?

Q.   I'm telling you if all we knew were the hospital bill charges, that wouldn't tell us anything about what that hospital actually accepted from payors in the market.  You

1 would need to look further to look at what they, in fact, did

2 accept in willing buyer/willing seller transactions.  Right?

3 **A.**   Except to the extent that payors pay their charges.

4 **Q.**   But what I'm saying is if we knew that NorthBay had $581

5 million worth of bill charges, that wouldn't tell us anything

6 -- that data alone, that fact alone, wouldn't tell us anything

7 about what NorthBay was actually accepting from payors in the

8 market, right?

9 **A.**   Well, that total of 581 is made up of a lot of different

10 claims from a lot of different payors.  And some payors pay

11 full bill charges.

12 **Q.**   And many others don't, right?

13 **A.**   Some payors pay full bill charges.  And many payors don't.

14 **Q.**   So let me ask the question again.  If all we knew was one

15 number, if all we knew was what the hospital's bill charges

16 were, would -- that wouldn't tell us anything about what that

17 hospital actually accepted from payors in the market.  From all

18 payors in the market.

19 **A.**   It wouldn't tell me about the average overall, but I would

20 know what each payor paid for each claim.  And I would know

21 that some of those are equal to full bill charges.

22 **Q.**   All right.

23     **MR. PIMSTONE:**  Your Honor, I'd like to -- I'd like to

24 publish, if I could, Mr. Heil's deposition testimony.  And this

25 would be page 217, lines 7 through 19.

1    MR. KOTARSKY:  That's actually page 276.

2    MR. PIMSTONE:  There we go.  276.

3    THE COURT:  So it's the second day.

4    MR. PIMSTONE:  276.  Second day.

5  Thank you, Mr. Kotarsky.

6  Lines 7 through 19.

7    THE COURT:  Mr. Tooch.

8    MR. TOOCH:  No objection.

9    THE COURT:  Please go ahead.

10        (Video was played but not reported.)

11  BY MR. PIMSTONE:

12  Q.  It is true, is it not, hospital's bill charges, if not

13  paid by payors, don't reflect willing buyer/willing seller

14  transactions, right?

15  A.  That's correct.

16  Q.  Mr. Heil, you, in coming up with your analysis, you didn't

17  think that rates that were agreed to between payors and other

18  hospitals, other than NorthBay, in each geographic area, should

19  be used in the calculation of reasonable value in this case,

20  correct?

21  A.  Correct.

22  Q.  So Mr. Heil, to be very clear, what payors are paying

23  other hospitals in the geographic area was not used in your

24  mathematical value in this case, is that right?

25  A.  That's correct.

1   **Q.**   What other hospitals -- what the other hospitals in the

2   geographic area are accepting for their services was not used

3   in the calculation of reasonable value in this case?

4   **A.**   That's correct.

5   **Q.**   Mr. Heil, your analysis does not seek to measure the

6   reasonable market value of the emergency services in each

7   geographic area, does it?

8   **A.**   It seeks to evaluate the reasonable value of the services

9   in dispute here at NorthBay.

10  **Q.**   Let me ask the question again.  Mr. Heil, your analysis

11  does not seek to measure the reasonable market value of the

12  services in the geographic area.  Correct?

13  **A.**   Just at NorthBay.

14  **Q.**   So the answer to that is my statement is correct.  Your

15  analysis does not seek to measure the reasonable market value

16  of the services in the geographic area.  Correct?

17  **A.**   That's correct.

18  **Q.**   Thank you.  Mr. Heil, you would also agree that reasonable

19  value should not be mathematically altered one way or the other

20  based on hospital quality, correct?

21  **A.**   I have not modified my opinion based on quality.

22  **Q.**   Thank you.

23  **A.**   Except to the extent that I've measured the services that

24  NorthBay offers.  And as I've testified, or said in deposition

25  and in my report, the services that NorthBay offers are

1  intrinsic to its quality.

2      And I can elaborate on why it is true clinically.  But the

3  fact of the matter is, yeah, I am considering quality because

4  I'm focused on the hospital in question here which is NorthBay,

5  and it has a particular set of services that support its --

6  that drive its quality.  So I am considering quality.

7      I'm not making a separate independent assessment of

8  quality, but I'm very definitely considering quality.

9  **Q.**  And let me ask the question again because I don't think

10  you answered the question I asked you.

11      You didn't adjust your reasonable value calculation one

12  way or the other in terms of doing -- based on a quality

13  analysis between NorthBay and peer hospitals, correct?  There

14  was no mathematical adjustment in any of your work based on a

15  comparison of NorthBay's quality to any other hospital.

16  **A.**  I'm trying to answer this question very, very precisely.

17  I didn't mathematically change my values based on quality.

18  However, built into my work is the way that willing buyers in

19  the market value NorthBay services.

20      So I'm very much keeping an eye on how buyers value their

21  services by my methodology.

22  **Q.**  Mr. Heil, the people who are the reasonable value experts

23  in this case, don't you all come to the same conclusion?  Which

24  is that reasonable value should not be directly mathematically

25  altered one way or the other based on quality?  Isn't that

1  right?

2  **A.**   Not in the sense that I would come to an answer through my

3  three methods and then make an adjustment factor.  But what I'm

4  trying to clarify, and I don't know that we discussed this in

5  my deposition, but I am considering the very quality of

6  NorthBay and the way that's judged, not by me, but by payors.

7  Because payors are signing agreements with NorthBay in which

8  they are indicating how they value NorthBay's services.

9  **Q.**   I understand.

10      **MR. PIMSTONE:**  At this point, Your Honor, I'd like to

11  publish Mr. Heil's deposition testimony, page 315, lines 5

12  through 14.  And then, secondly -- there's a second one after

13  that, Your Honor.

14      **THE COURT:**  I think you can't start him in the middle

15  of his answer.  I think you have to go back to a question.

16      **MR. PIMSTONE:**  Let's do this, then.  That's a little

17  messy, that one.  Let's go to page 68, Your Honor, in the first

18  deposition, lines 11 to.

19      **MR. TOOCH:**  I have no objections, Your Honor.

20      **THE COURT:**  All right.  You can proceed.

21          (Video was played but not reported.)

22      **MR. PIMSTONE:**  I have no further questions.  Thank

23  you, Your Honor.

24      **THE COURT:**  All right.  Mr. Tooch, any redirect?

25      **MR. TOOCH:**  Yes, Your Honor.

1    Okay.  Great.

2    Your Honor, I want to use the whiteboard.  I don't want to

3    block Mr. Pimstone, and I don't want to be away from the

4    podium.

5         THE COURT:  Mr. Pimstone, if you have any concerns

6    about what is being written you can move around and take a

7    look.

8         MR. PIMSTONE:  I trust Mr. Tooch implicitly.  I have

9    no concerns whatsoever.

10                    **REDIRECT EXAMINATION**

11   BY MR. TOOCH:

12   Q.   If you would look to Exhibit 300.  All right.

13        Mr. Heil, at the -- in the left-hand column of this

14   exhibit there are ED-Dominant -- there's the words ED-Dominant.

15        MR. TASSA:  One second.  The exhibit has not been

16   published to the jury.

17        THE COURT:  Exhibit 30 has --

18        So it should go onto the screen I think is what they're

19   saying, Ms. Davis.

20        THE CLERK:  Yes.

21   BY MR. TOOCH:

22   Q.   And do those ED-Dominant mean the -- what does ED-Dominant

23   mean?

24   A.   It means contracts that are all emergency care, or

25   virtually all emergency care.

1   Q.   And I think Mr. Pimstone did some of the math for you.   If

2   you look at the -- if you add up all the ED-Dominant contracts,

3   there's a total at the bottom of 20,807,630, correct?

4   A.   Correct.

5   Q.   And that is four percent of the grand total, isn't it?

6   A.   Yes.

7   Q.   And if you look at Health Net, what is Health Net's total?

8   A.   10,800,000.

9   Q.   I'm writing ED-Dominant, ED contract, is 4 percent.   And

10  Health Net?

11  A.   Health Net is 10.8.   That's 1.8 percent.

12  Q.   So the MultiPlan, Interplan, PHCS, and Sutter contract was

13  about volume much than the Health Net contract.

14  A.   Yes.   And charges across all services it was more than --

15  slightly more than double.

16  Q.   I want to look at the -- I think, Mr. Stovall, slide 9.

17       No, that's not it.   Sorry.

18       Let's just look at the -- it's a -- the one before this.

19  Slide 8.   There we go.

20       Now, you included Health Net in your analysis, correct?

21  A.   Yes.

22  Q.   And the Health Net contract was the lowest of the insured

23  -- insurance company contracts.   Correct?

24  A.   Of the network managed care, steered business contracts,

25  yes.

1  **Q.**   Did you exclude Health Net because it was a low rate

2  compared to the other rates in the other contracts?

3  **A.**   No.

4  **Q.**   If you exclude contracts at 4 percent or below, and you

5  exclude the Health Net contract, can you do the math and tell

6  me what your reasonable value calculation would be for the Blue

7  Cross, Aetna, Cigna and United contracts?

8         **MR. PIMSTONE:**   Your Honor, I would object.   This is

9  outside the scope of the cross.   This is not appropriate

10  redirect testimony.

11         **THE COURT:**   Overruled.

12         **THE WITNESS:**   It would have been 68 percent.

13  **BY MR. TOOCH:**

14  **Q.**   So if you're going to exclude the ED-Dominant contracts

15  from your analysis, and you were to exclude the Health Net

16  contract over here, for the -- for those types of contracts

17  (indicating) your analysis would have been a lot higher,

18  wouldn't it have been?

19  **A.**   Yes.

20  **Q.**   On cross-examination you were asked -- you were asked

21  questions about the fact that the Blue Shield contract was

22  terminated and the Kaiser contract was terminated, so why are

23  you looking at terminated contracts?   Do you recall those

24  questions?

25  **A.**   Yes.

1   Q.   If you could show slide number 2.

2       This is the jury instruction that we have.  It says -- the

3   second paragraph, second sentence:  Reasonable market value or

4   fair market value is the price that a willing buyer would pay

5   to a willer seller, neither under compulsion to buy or sell,

6   and both having full knowledge of all pertinent facts.

7       With that instruction in mind, why did you look at the

8   Kaiser contract?

9   A.   Because it is a directly observable agreed-upon rate by a

10  willing buyer and a willing seller.

11  Q.   Neither under a compulsion --

12  A.   Neither under compulsion.

13  Q.   So in order to determine the reasonable value in a

14  non-contracted situation, do you have to look at what parties

15  agreed to in a contracted situation?

16  A.   Yes.

17  Q.   Is that the same reason why you looked at the Blue Shield

18  contract?

19  A.   Yes.

20  Q.   So, for example, let's go back to your hamburger example.

21  If the guy's been eating a hamburger in the same restaurant and

22  paying $12, and he wasn't forced to eat that hamburger, and he

23  willingly ordered that hamburger and paid the $12, is that

24  relevant to when he decides the day afterwards it's not worth

25  $12?

1          **MR. PIMSTONE:**  Objection, Your Honor.  Leading.

2   Object to form.

3          **THE COURT:**  Sustained.

4   **BY MR. TOOCH:**

5   **Q.**   I'm going to read some testimony that is at 10:33 in the

6   transcript.

7          And just to refresh your memory of what we're talking

8   about.  It says, Question:  You have no idea of what percentage

9   of NorthBay's customers actually paid 95 percent or above for

10  NorthBay's services.

11         Answer:  I haven't done that analysis.

12         Question:  Okay.  And that wouldn't matter to your

13  analysis even if we looked at all of the payments that NorthBay

14  got for its services during the disputed period even if we

15  found no one paid 99 percent debt to 95 percent of bill charges

16  that would not matter to your analysis.

17         Correct.

18         Mr. Pimstone said:  I'm just trying to sort of understand

19  what was a factor in your analysis and what wasn't.  And

20  Mr. Tooch can certainly give you the opportunity to explain

21  these matters.

22         Do you recall that testimony?

23  **A.**   I generally recall that.

24  **Q.**   Do payors pay NorthBay 100 percent of its charges?

25  **A.**   They do.

1  Q.   Does Blue Shield pay NorthBay 100 percent of its charges

2  after the contract was terminated?

3       MR. PIMSTONE:  Objection, Your Honor.  Beyond the

4  scope.

5       THE COURT:  Sustained.

6  BY MR. TOOCH:

7  Q.   In your analysis did you look at any claims Blue Shield

8  paid to NorthBay after the contract was terminated?

9  A.   Yes.  Yes, I did.

10      MR. TOOCH:  If I may be heard on this, Your Honor.

11      THE COURT:  I think this is a matter that we've

12 already dealt with prior, Mr. Tooch.

13      MR. TOOCH:  I think that opened up the door, Your

14 Honor, by those questions.  If I may.

15      THE COURT:  No.  Just continue with your examination.

16 BY MR. TOOCH:

17 Q.   Mr. Heil, do you recall questions in your

18 cross-examination as to -- did you try to find out why Blue

19 Shield entered into the contract or did not enter -- or,

20 terminated the contract?

21 A.   Yes.

22 Q.   And do you recall questions about:  Did you ask any of the

23 other payors why they're contracting with NorthBay?

24 A.   Right.  I remember being asked.

25 Q.   When you're doing a market analysis, the type that you're

1  doing, is it important why somebody buys a product at a

2  particular price or not?

3  **A.**    No.  The valuation process, profession, the way it works

4  is that the valuator is an observer of agreements, of rates, of

5  prices; not kind of a psychologist to try to climb in the heads

6  of either party and understand what was going on.  We're being

7  scientists, observers, of the reality, and taking that at face

8  value.  And then, of course, determining which of the whole set

9  of data is the most relevant to the case at hand.  But in all

10 cases, we're not trying to understand motives, thinking, within

11 the two parties' organizations.

12 **Q.**    Let's say, for example, I asked you to do an analysis of

13 what's the market rate for an iPhone.  And you come back and

14 you said:  It's $900.  Does it make a difference why my

15 daughter convinced me to buy an iPhone for her for $900?

16 **A.**    No.

17 **Q.**    Does it make a difference that she wants the iPhone

18 because it's cool, because her friends have it?

19 **A.**    No.

20 **Q.**    Does it make a difference that she -- you know, or that I

21 buy an iPhone because everybody else in my family has iPhones?

22 **A.**    No.

23 **Q.**    Is the only important factor is that I paid $900 for that

24 iPhone?

25 **A.**    Yes.

**Q.** Going back to that chart over there (indicating). Blue Cross currently has a contract with NorthBay, correct?

**A.** Yes.

**Q.** And their rates in the chart -- their rates in the contract with NorthBay.

**A.** Yes.

**Q.** Does it make any difference why Blue Cross has that contract with NorthBay?

**A.** No.

**Q.** Is the only factor that it's willing to pay whatever the rates it agreed to pay in the contract?

**A.** That's it.

**Q.** And is that the same that's true for Aetna and Cigna and United, as well as MultiPlan, PHCS, Interplan, and the one-time agreements?

**A.** Correct.

**Q.** Do you recall questions on cross-examination that some of the contracts had chargemaster deflators in them. Do you recall that?

**A.** Yes.

**Q.** And some -- is it true that some of the health plans have negotiated chargemaster deflators in their contracts?

**A.** Some have built-in caps that affect their contract, yes.

**Q.** Could Blue Shield have raised that as a term that it wanted in its contract?

1    **A.**    Certainly.

2    **Q.**    Could it have raised that when the contract was first

3    negotiated?

4    **A.**    Yes.

5    **Q.**    And in 2009 when the contract was amended, could they have

6    asked for a chargemaster deflator?

7    **A.**    Yes.  Any time along the way.

8    **Q.**    2010, 2011, 2012, 2013, '14, '15 and '16.  At any point

9    along those years, could Blue Shield have asked NorthBay to

10   say, Hey, we want a chargemaster deflator in our contract?

11          **MR. PIMSTONE:**  Object, Your Honor.  Lacks foundation.

12   Calls for speculation as to negotiations.

13          **THE COURT:**  Overruled.  You can answer.

14          **THE WITNESS:**  Yes.  Blue Shield could have asked for

15   an amendment like that.

16   **BY MR. TOOCH:**

17   **Q.**    Now, do you recall questions on cross-examination where

18   you were asked about that your reasonable value calculation

19   would be different if a stent was provided at different

20   hospitals.  Correct?

21   **A.**    Yes.

22   **Q.**    Now, are there different rates in different contracts for

23   the same services at NorthBay?

24   **A.**    Are there different rates for the same services at

25   NorthBay?  In different -- between contracts?

1  **Q.**   Yes.

2  **A.**   The rates vary between contract, yes.

3  **Q.**   So let's say there's a Health Net member and a Cigna

4  member and they both have the exact same stent surgery at

5  NorthBay.  Will the amounts that they pay under the contract be

6  different?

7  **A.**   Yes.

8  **Q.**   So the same stent surgery can have different rates,

9  correct?

10  **A.**   Yes.

11  **Q.**   And that is -- is that true at other hospitals?  That

12  different health plans have different contract rates than each

13  other at the same hospital?

14  **A.**   Yes.  I've never seen a hospital that didn't have many,

15  many different rates with many different payors.

16  **Q.**   So, for example, when you worked at San Jose, did you have

17  contracts with Aetna, Cigna, United, et cetera?

18  **A.**   Yes.

19  **Q.**   Were there different rates in those contracts?

20  **A.**   Yes.  Well, almost always, yes.

21  **Q.**   So if the same stent surgery was done at a different

22  hospital, would they be different rates for the same services?

23  **A.**   Yes.

24  **Q.**   Do you recall on cross-examination questions that was read

25  from your deposition.  And I'd be reading from page 276, which

1   was the section that was read into the record.

2       Question by Mr. Pimstone:  Just that alone, if all we knew

3   were the hospital's bill charges, would that tell us anything

4   about what that hospital actually accepted from payors of the

5   market?

6       Answer:  No.  You would need to look further to look at

7   what they did accept in willing buyer/willing seller

8   transactions.

9       What did you mean by "you would have to look at willing

10  buyer/willing seller transactions"?

11  **A.**   You have to go down beneath the charges and look at

12  individual claims.  And you'd have to look within individual

13  claims and identify which ones were at rates that reflected

14  willing buyer/willing seller.  They couldn't be rates that were

15  unilaterally underpaid.  They must be rates that -- where

16  there's evidence that both parties have agreed to the rate.

17  **Q.**   So in order to do that, do you have to look at the

18  contract rates?

19  **A.**   Yes.  The contract rates are the best evidence about what

20  willing buyers and willing sellers have agreed to.

21  **Q.**   And if the health plan agrees to pay 80 percent of

22  charges, but pays 40 percent of the charges, is the hospital a

23  willing seller of its services at 40 percent of charges to that

24  health plan?

25  **A.**   No.  No.

1           **MR. TOOCH:** I have no further questions at this time.

2           **THE COURT:** All right. Re-cross?

3           **MR. PIMSTONE:** Just a little bit, Your Honor.

4                 **RECROSS-EXAMINATION**

5 **BY MR. PIMSTONE:**

6 **Q.** Mr. Heil, if we could put back on, Mr. Kotarsky, slide 2.

7 That's the jury instruction.

8     And I think you just testified a few minutes ago on the

9 second paragraph of that jury instruction in connection with

10 why you looked at the Kaiser and Blue Shield contracts. Do you

11 recall that?

12 **A.** Yes.

13 **Q.** Okay. And you testified, I think, previously that the

14 rates that were agreed to in those terminated contracts were

15 not rates that were current for the time period in dispute.

16 Correct?

17 **A.** They are not now current.

18 **Q.** They are not now current. Okay.

19     And so you would agree that those rates do not constitute

20 current market prices, correct? "Current" meaning during the

21 period in dispute.

22 **A.** Well, it turns out that those rates are very similar to

23 other rates that are current, so --

24 **Q.** I was just asking very specific question. Those

25 particular rates --

1    THE COURT:  No.  I think he was answering your

2    question.  Let him finish.

3    BY MR. PIMSTONE:

4    Q.   Please, Mr. Heil.  Go ahead.

5    A.   So you posed a term which was "current market rates."  It

6    is absolutely correct that they do not reflect what's currently

7    agreed to between, let's say, Blue Shield and NorthBay, because

8    there is no agreement.

9         But I think you asked me the question:  Do they represent

10   current market rates?  Well, I know from my analysis that the

11   80 percent rate and the other rates that are in canceled

12   contract line right up with a whole series of contract rates

13   that are current and agreed to.

14        So I considered those to be the active current market

15   rates.  And it turns out that the canceled contract, the course

16   of dealings contract, lines up with that.  So it gives me all

17   the more reason to know that it's an appropriate thing for me

18   to be considering.  It fits -- the pieces of the puzzle fit

19   together.

20   Q.   I understand.  My question was more simple.  Which is,

21   those particular contract transactions, I think you've already

22   testified those themselves don't involve current market

23   pricing.  Very simple.

24   A.   That's not correct.  I don't -- I don't want to be

25   difficult, but --

1  **Q.**   I understand you disagree.  You disagree.  I understand.

2  So the answer is no.  Your answer is no it does not --

3  **A.**   My answer is no.

4  **Q.**   All right.

5       Mr. Heil, you I think indicated earlier on that you are a

6  valuation expert.

7  **A.**   Yes.

8  **Q.**   Okay.  And you were asked some questions about whether you

9  think it's relevant to understand -- or, was relevant to

10  understand Kaiser's intent or Blue Shield's intent in

11  originally agreeing to the contracts that it did or why it

12  ended up -- or, those parties ended up terminating those

13  contracts.  And you testified that would not be relevant?

14  **A.**   The why.

15  **Q.**   The whys are irrelevant --

16  **A.**   Is irrelevant.

17  **Q.**   -- under your view.  And as a valuation expert, it's

18  important, is it not, Mr. Heil, to understand in deciding

19  whether to use transactions as comparable or appropriate, it's

20  important to understand whether the market conditions that led

21  to the old agreements are still relevant or applicable today so

22  you know whether you're comparing apples to apples.  Do you

23  agree with that?

24  **A.**   Could you just do that one more time slowly?

25  **Q.**   I'll do it slowly.

1  You would agree that it's important to know in evaluating

2  the applicability of an old contract rate whether the market

3  conditions that were -- that led to that old agreement are

4  still relevant or applicable today, right?  Wouldn't be that

5  important for you to know?

6  **A.**  Yes.

7  **Q.**  Okay.  All right.  So since Mr. Tooch brought up his

8  daughter in a hypothetical, I'm going to sort of follow on with

9  that here.  And that is to say that if we were, Mr. Heil, doing

10  an analysis of the reasonable market value of a Camry, right?

11  And we knew that Mr. Tooch's daughter bought a Camry five years

12  ago for a particular price.

13  Just knowing that, first of all, that doesn't tell you

14  anything about what all sellers are selling comparable Camrys

15  to to all buyers.  Right?  Just knowing what Mr. Tooch's

16  daughter bought a Camry for five years earlier, that doesn't

17  tell you anything about what all sellers are selling that same

18  car for to all buyers.  Correct?

19  **A.**  That's one data point.  It's just one data point.

20  **Q.**  I understand.  But knowing what one buyer bought the car

21  for five years earlier wouldn't tell you anything about the

22  fair market value of that car in the geographic area as sold to

23  all buyers, correct?

24  **A.**  I understand your question.  That's correct.  It is not.

25  **Q.**  Isn't it also the case that if you were looking -- even if

1    you wanted to look at what one seller sold to one buyer a few

2    years earlier, even if you wanted to look at that, you know, in

3    a fair market value analysis, you would also, wouldn't you,

4    want to know whether there were factors relating to that one

5    sale that were applicable then that aren't applicable now?

6        So, for example, let's say Mr. Tooch's daughter needed a

7    car that afternoon to drive off to college.  She didn't have

8    time to negotiate, she didn't have time to comparison shop, so

9    she overpaid for that car based on particular circumstances

10   that were relevant five years ago.

11       That's a fact you would want to know in determining

12   whether that one transaction should be used or how heavily it

13   should be weighted in looking at the fair market value of

14   Camrys.  Right?  You'd want to know that?

15   **A.**  I would want to know as much as I could about the market

16   now and then.  And in this case, I think you're asking me about

17   the relevance of the canceled contract --

18   **Q.**  No, no, no.  I'm asking you about the relevance of

19   Mr. Tooch's daughter having bought a Camry five years earlier

20   based on particular market condition that's related at this

21   time to her.  That's all I'm asking you.

22   **A.**  Yeah.

23   **Q.**  I'm saying if you were doing a fair market value analysis

24   of Camrys in a geographic area, and even assuming that what one

25   buyer bought a Camry for even matters, alone, you certainly

1  would want to know whether that particular price was the result

2  of a particular market force that was either unique to that

3  buyer or that was applicable back then that doesn't apply now.

4  You'd want to know that, right?

5  **A.**   I'd want to know as much as I could.

6       **MR. PIMSTONE:**  Thank you very much.  No further

7  questions.

8       **MR. TOOCH:**  Just briefly.

9       **THE COURT:**  Go ahead, Mr. Tooch.

10       **FURTHER REDIRECT EXAMINATION**

11  BY MR. TOOCH:

12  **Q.**   If you buy a Camry five years ago, the Camry depreciates,

13  right?

14  **A.**   Yes.

15  **Q.**   Does hospital services depreciate?  In other words, are

16  they fresh every time you provide the services?

17  **A.**   They're fresh.

18  **Q.**   So the hospital services provided today at NorthBay are as

19  good, if not better, than the hospital services that were

20  provided at NorthBay when the contract was in effect, which was

21  not that long ago.  Correct?

22  **A.**   Yes.  In fact, there's a lot of evidence in this case

23  about constant improvement through more certifications and the

24  magnet status of the hospital.  So, yes, it's been getting

25  better.

1    Q.    Now, Mr. Pimstone keeps on referring to the old contract.

2    Was the contract that old?

3    A.    No.  It's actually, for this purpose, it's quite fresh.

4    It's -- I call this modern history.  This is very current.

5    Q.    On the day after the contract terminated -- so terminated

6    November 30, 2016.  On December 1, did Blue Shield start paying

7    a different rate than the contract rate?

8    A.    Yes.

9    Q.    And on the day after the contract terminated was the

10   contract that old?

11   A.    No.

12   Q.    And were some of the claims that you looked at from

13   December 2016?

14   A.    Yes.

15   Q.    And the contract that you looked at for those claims was

16   just a month prior to that.  Correct?

17   A.    Yes.

18        MR. TOOCH:  No further questions.

19        THE COURT:  Okay.  Go ahead Mr. Pimstone.

20            **FURTHER RECROSS-EXAMINATION**

21   BY MR. PIMSTONE:

22   Q.    Mr. Heil, I promise I'm going to be very short.

23        If you were doing that same fair market value of Camrys.

24   Instead of it being five years ago, if you were doing the value

25   of a current Camry.  And you knew that just recently just a few

1    months ago one particular buyer bought a Camry and paid well

2    more than other buyers were buying -- were paying for Camrys;

3    you would want to know, in doing a valuation, assuming that

4    that one data point was even relevant to the fair market value,

5    you would want to know whether there were any market forces

6    applicable to that one buyer that were unique to that buyer or

7    that -- that did not -- did not reflect willing buyer/willing

8    seller transactions generally, right?

9    **A.**   Yeah.  I would always be wanting to look for anomalies.

10   What I'm particularly -- or, odd outliers.  What I'm looking at

11   in my work here is a large pool of data, of a large number of

12   willing buyers and willing sellers, network contracts and

13   emergency-only contracts, that give me high confidence that

14   that represents not only willing buyer/willing seller but it

15   represents current market reality as of this moment.

16          **MR. PIMSTONE:**  Thank you, Mr. Heil.

17          **THE COURT:**  All right.  Mr. Heil, thank you.

18       (Witness excused.)

19          **THE COURT:**  Mr. Tooch.

20          **MR. TOOCH:**  Yes, Your Honor.  Other than the rebuttal

21   witnesses we would be calling, plaintiff rests its case in

22   chief.

23          **THE COURT:**  Okay.  So who's the first witness for the

24   defense?

25          **MS. BRIGGS:**  The first witness is going to be Michael

 1    Pugh.  And I will go retrieve him.

 2         THE COURT:  Great.

 3       (Pause.)

 4                        **MICHAEL PUGH**,

 5    called as a witness for the Defendants, having been duly sworn,

 6    testified as follows:

 7         THE CLERK:  Be seated.  If you would please state your

 8    full name and spell it for the court reporter.

 9         THE WITNESS:  Michael Duane Pugh.  P-U-G-H.  Duane

10    D-U-A-N-E.

11         THE COURT:  Mr. Maurer, go ahead.

12         MR. MAURER:  Thank you, Your Honor.

13                        **DIRECT EXAMINATION**

14    BY MR. MAURER:

15    **Q.**   Good afternoon, Mr. Pugh.  Mr. Pugh, what is your current

16    profession?

17    **A.**   I'm a management consultant.

18    **Q.**   And what company do you work for?

19    **A.**   I work for my own company, which is MdP Associates.

20    **Q.**   We'll go over your specific qualifications here in a

21    minute.  But how long have you been working in the health care

22    field?

23    **A.**   I think 41 years.  I graduated with my master's degree in

24    health care administration in 1978.

25    **Q.**   And you've been retained by Blue Shield to testify as an

1  expert in this lawsuit concerning quality of care and

2  performance measures for hospitals, is that right?

3  **A.**   Yes, I have.

4  **Q.**   What specifically were you asked to render an opinion

5  about?

6  **A.**   I specifically was asked to look at the performance of

7  NorthBay relative to quality and safety with approximately 14

8  other -- 13 other hospitals in the geographic market.

9  **Q.**   Did you prepare a slide that summarizes your

10 qualifications?

11 **A.**   I did.

12 **Q.**   Okay.

13         **MR. MAURER:**  Your Honor, may I publish that slide to

14 the jury?

15         **THE COURT:**  Certainly.

16         **MR. MAURER:**  And, Your Honor, just as we go forward,

17 my understanding is that the plaintiffs have not objected to

18 any of the demonstratives we're going to use with Mr. Pugh.

19 Can I just move from slide to slide?

20         **THE COURT:**  If that's the case, Mr. Tooch?

21         **MR. TOOCH:**  That's correct, Your Honor.

22         **THE COURT:**  Go ahead.

23         **MR. MAURER:**   Thank you.

24 BY MR. MAURER:

25 **Q.**   So Mr. Pugh, do you see there is a summary of

1   qualifications up on the screen?

2   **A.**   I do.

3   **Q.**   And there's a heading on the list that says Education.  Do

4   you see that?

5   **A.**   I do.

6   **Q.**   Can you briefly describe your education for the jury,

7   please?

8   **A.**   Sure.  I have a bachelor of science in biology from Tulane

9   University.  And then I followed with a master of public health

10  and health care administration, also from Tulane, which is in

11  New Orleans.

12  **Q.**   And the list of your qualifications also includes a

13  heading for Employment.  Looking at -- let's go one at a time.

14  Looking at the fourth bullet under Employment.  Have you

15  previously worked for a number of hospitals?

16  **A.**   Yes, I have.  In fact, I started my career in health care

17  as an interim administrator.  I worked for a company that

18  managed hospitals across the west.  And so first 18 months I

19  was interim CEO in half a dozen different hospitals.  And then

20  that progressed.

21      I was actually in the first one -- United General Hospital

22  was the first hospital where I -- permanent -- named a

23  permanent CEO.  I spent five years there.  And then moved to

24  Pueblo, to Colorado, Parkview Health System.  Spent 11 years

25  there.  And then moved to Medical City Dallas, which was one of

1  HCA -- I think at the time was their largest hospital in the

2  Dallas area.  Spent a year there.  And then was recruited back

3  from the hospitals.  Actually moved to the other side of the

4  world, other side of the tracks, and into the managed care

5  insurance side.  So I spent several years running health plans,

6  primarily in the west.

7  **Q.**  And you mentioned that you were an administrator, CEO, at

8  United General Hospital, is that right?

9  **A.**  Yes, that's true.

10 **Q.**  How big was that hospital?

11 **A.**  It was 100-bed hospital.  It's located about 60 miles

12 north of Seattle.  And I was sent up there as the interim

13 administrator.  After about four months, the medical staff went

14 to the board and said, Hire this guy.  And so I got my first

15 hospital CEO job permanently at age 26.

16 **Q.**  And did your work at United General Hospital include

17 evaluation of quality and performance measures for hospitals?

18 **A.**  Absolutely.  It was really -- it was a very competitive

19 situation.  There were a couple other hospitals around.  So we

20 were constantly working to improve the patient experience,

21 improve the quality, and make sure the flow of patients as they

22 moved through the hospitals.  So very much so.

23 **Q.**  How long did you work at United General Hospital?

24 **A.**  I was there five years.

25 **Q.**  And then you moved to Parkview Health System?

**A.**    Yes.

**Q.**    What was the state of that facility when you took that over?

**A.**    Well, in 1984 when I moved and took the job at Parkview -- that was also a managed hospital, and it was in pretty tough situation.  We had less than 60 days cash on hand, and we were up against a deadline on getting a certificate need for a new hospital.  Actually, expansion of the hospital.  Excuse me.

So it was really a turn-around situation.  But it was about 350-bed hospital at the time.  Licensed hospital.  And there were two hospitals in Pueblo, Colorado.

**Q.**    Did your work at Parkview Health System include the evaluation of quality and performance measures for hospitals?

**A.**    Oh, absolutely.  In fact, our strategy, once I essentially got the hospital stabilized, our strategy was really about improving the quality.  Improving -- from the patient's perspective, from the provider's perspective, the physicians.

And it was our -- really, our core strategy.  And that -- we were one of the early starters in the whole quality improvement effort across the country.

In the late '80s there was a wave about how could we do this quality improvement "Deming" stuff that was going on in industry, could not apply to health care?

And I just happened to -- one of my mentors, one of the really thought leaders, a guy named Dr. Paul Batalden, and went

1  to a course I said, I can do this.  And so for the next seven

2  years I led a transformation of that organization using the

3  principles of quality improvement.  So we're really one of the

4  very first hospitals in the country to do that.

5      And that led to the joint commission, which is the

6  accreditation body for health care.  They wrote first book

7  about quality improvement.  Our story at Parkview is Chapter 1

8  of how one leads and uses quality as a strategy to move

9  forward.

10     So at Parkview, it was not just part of the mix of what I

11 did on a daily basis, but the quality -- you know, the patient

12 experience, the clinical quality, you know, the provider's

13 experience, was really core to our strategy.

14     And when I got there, we were perhaps -- we had market

15 share in the community of about 28 percent.  And when I left

16 eleven years later, after pursuing this quality strategy, our

17 market share was about 53, 54 percent.  So it was how I turned

18 around the organization.

19 **Q.**   And you spent some time after Parkview Health System at

20 Columbia HCA Medical City Dallas Hospital, is that right?

21 **A.**   I was recruited to go to Dallas and run which at the time

22 was -- I think was HCA's largest hospital.

23 **Q.**   What was the size of the hospital in the number of beds?

24 **A.**   It was 555 beds hospital.  Very complex, you know, full --

25 in terms of the types of services and things.  Again, Dallas is

1    very competitive market and it was really about how do we -- to

2    really use our -- the quality of our services, the quality of

3    our patient interactions, as a business strategy.

4    Q.   So I see that -- Why don't we move on.  Actually, I missed

5    one item on the fourth bullet point, the last item.  There's a

6    reference to Western Division of Foundation Health Systems.

7    Did you work at Foundation Health Systems?

8    A.   Yeah.  So when I left Dallas, I was actually recruited to

9    come back to Colorado to be the president of managed care

10   company, which was known as QualMed at the time.  It's a

11   division of Health Systems International, which became

12   Foundation Health Systems, which today is known as Health Net.

13   So I ran all of the operations outside of California for Health

14   Net for a couple years.

15       So I have experience both on the hospital side as CEO, but

16   also experience then on the managed care insurance side of

17   running insurance plans.

18   Q.   Let's move on to the fifth bullet.  It refers to principal

19   at Pugh Ettinger McCarthy and Associates.  Do you see that?

20   A.   That was the first consulting firm I had, and I formed

21   that in 1998.  Left the managed care world and decided to hang

22   my shingle out.  And it was really my ability to create a firm.

23   And our primary purpose of the firm was around how do you help

24   other organizations improve quality and safety in health care?

25       And because of the experience that I'd had at Parkview,

1    and sort of the national notoriety that we had developed in

2    terms of what we had done there -- we had over 2,000 people

3    visit us in a three-year period to come learn from us, come to

4    Pueblo, Colorado, and learn how we were actually driving

5    quality.

6         So that gave me something, you know, that I could take,

7    and I thought I could take back to the field.  And so we formed

8    -- with two friends of mine, formed this company.  And our

9    primary focus was on quality.

10        So things that we did, we actually worked with hospitals

11   to help them apply for and -- you know, the Baldridge National

12   Quality Award.  And helped -- you know, we actually had a

13   couple hospitals, including Poudre Valley in Fort Collins,

14   ultimately win that award, which is the highest award for

15   quality in the country given -- it was given by the Commerce

16   Department.

17   Q.   What was the name of that award again?

18   A.   It's the Baldridge -- it's the Malcolm Baldridge National

19   Quality Award.  It's not just health care.  It's multiple

20   ministries.  They have a division just for health care and for

21   hospitals.

22   Q.   So how long did you work for the Pugh Ettinger consulting

23   firm?

24   A.   We kept that firm together for about five years.  And so

25   we did the Baldridge work, and the other -- actually, my very

1  favorite consulting work of all time was I was asked by -- I

2  actually won an award to evaluate the health care system and

3  the quality of care provided our Peace Corps volunteers around

4  the world.  And so that gave us the chance to go to Africa and

5  eastern Europe and Central America and look at -- and really do

6  an evaluation of the system that the Peace Corps used to ensure

7  that our volunteers get good care when they get sick.  And so

8  we did that for about five years.

9      And our firm broke up primarily because one of my partners

10  Joel Ettinger, wanted his son to come into the firm.  And then

11  I, at the same time, starting a new company called Verisma

12  Systems, Inc.

13  **Q.**  So -- and you've actually covered my next question.  So

14  what did you do at -- let me ask it this way.  What does

15  Verisma Systems, Inc., do?

16  **A.**  Well, Verisma Systems Inc., was a health care technology

17  company, and we specialized and created software and a system

18  for working with hospitals to make copies of medical records

19  and move those to other requesters, like attorneys.  Like

20  insurance companies.  Other places -- people that needed copies

21  of medical records.

22      So we had -- it's a technology company that did that.  And

23  so I started that company.  At the same time, I continued my

24  consulting.  All right?

25      And at some point, I think in 2007 or '8, finally

1  transitioned away from the Pugh Ettinger McCarthy name and then

2  started the MdP Associates as a way of continuing the

3  consulting.  But I did both at the same time.  So I was a CEO

4  and the starter of this company, and then also kept consulting

5  primarily in the areas of quality around the country.

6  **Q.**  Okay.  And so we're back to -- I think up to your current

7  employment, which is MdP Associates.

8      So what kind of work does MdP Associates do?

9  **A.**  Well, we primarily work in the space of helping hospitals,

10  primarily, and health care organizations, improve their quality

11  and performance.  All right?  And we do that in a couple

12  different ways.

13      We do quality assessments where we'll go in on-site and

14  look at the way that their system internally works for, you

15  know, for producing quality.  We look at their performance in

16  terms of their quality metrics and the governance, and work

17  with the board of directors and senior leaders to come up with

18  a strategy to drive forward.

19      As an example, I worked with Orlando health in Orlando,

20  which is a five or six hospital system.  And I was brought in

21  because the board was dissatisfied with the level of

22  performance in the organization.

23      And so what we did, I looked, you know, at how they were

24  organized, I looked at what they were measuring, I looked at

25  what the board was looking at in terms of quality measures, and

1   then proposed some strategy and some new targets.

2      And they adopted those.  And one of the things they did --

3   even though they didn't look poorly compared to other hospitals

4   when we started on mortality.  So mortality is one of the major

5   sort of measures in health care.  How well does the hospital do

6   in terms of in-hospital mortality?

7      And they looked okay.  They looked average when we

8   started.  They adopted a target that they would reduce their

9   in-hospital mortality by 50 percent over five years.  And they

10  didn't quite make it.  They make it to 48 percent.  They did it

11  by systematically improving all the systems and processes

12  inside.  And I helped them on that journey over those years to

13  achieve those sort of levels of performance.

14  **Q.**   Okay.  We'll get into this some more later on.  But can

15  you explain to the jury what a quality metric is or give them

16  some examples?

17  **A.**   Yeah.  So the quality measures -- I mean, when I work with

18  organizations, I mean, we look at how they're performing in

19  terms of quality measures.  I help the senior leadership

20  identify and organize the way that they look and think about

21  quality and performance inside the organization.  We integrate

22  that with a strategic plan.

23     I work with -- for example, one of my clients is the

24  Native American health care organization in Alaska called the

25  Yukon-Kuskokwim Health Care Corporation.  And they take care of

1  roughly 30,000 Yupik people in an area roughly the size of the

2  state of Oregon in western Alaska with no roads.

3      And so, you know, I work with that board, help them

4  understand, you know, how to measure their quality.  How to

5  pursue those things that will actually benefit the people of

6  western Alaska.

7      And so -- one example, I also worked with the community.

8  The Federally Qualified Community Health Center System in

9  Austin, Texas.  And they have about 15 sites across Austin

10  where they're providing care to patients that don't have

11  access, uninsured, in Texas.  And part of my work with them and

12  their board is to help develop sort of the quality metrics sort

13  of score card they're going to use to judge their performance

14  going forward.

15  **Q.**  Thank you for that.  So let's move on to the second and

16  third bullets under the Employment heading there.

17      Are you an instructor in health care?

18  **A.**  Yes, I am.

19  **Q.**  Can you explain to me how it is you teach courses in

20  health care?

21  **A.**  So when we began getting notoriety at Parkview for what we

22  were doing around quality improvement, the director of the

23  health administration program, masters degree, MBA in health

24  administration program, University of Colorado, asked me to

25  come up and start -- and do a seminar every spring.  So in the

1    early '90s I would come in and do a quality seminar for --

2    about the principles of quality for these graduate students.

3    And it was part of the required course work.

4         In 2013 he asked me if I would be willing to teach a

5    full-time course -- excuse me -- teach a full semester course

6    around quality.  And so I began in 2013 teaching a course

7    called health care quality and outcomes.  And I will teach -- I

8    guess this will be the seventh year this fall when I teach it

9    again.

10   **Q.**   Okay.  And have you also served as an adjunct professor at

11   University of Colorado at Denver?

12   **A.**   That's what -- that's what I was just describing was

13   Colorado at Denver.

14   **Q.**   Okay.  And I assume you're still teaching health care

15   courses today, is that right?

16   **A.**   That's true.  I will teach this course again this fall.

17   **Q.**   Okay.  Do you also, you know, participate in seminars

18   where you speak on quality of care and performance measures?

19   **A.**   Yeah I do.  I do those frequently.  I'm speaker at

20   different national meetings.  And I think -- one of them is the

21   Institute for Health Care Improvement, which is out of Boston,

22   is really one of the thought leaders about improving quality in

23   health care.  They have a big national forum every year with --

24   usually have five, six thousand people show up.  And I think

25   I've presented at that national forum every year for the last

1    12, 13 years on some subject around quality and performance and

2    improvement.

3    **Q.**   And have you authored any articles or papers or textbooks

4    on health care quality?

5    **A.**   Yes, I have.  The -- I am -- they call -- my relationship

6    with IHI is that they are a client of mine.  But it's -- they

7    call us faculty.  So I am the vice chairman of the leadership

8    faculty for IHI.  And as part of that, I help write a couple of

9    papers that they published about how to lead -- what leaders

10   need to do, and executives in hospitals and health care, to

11   drive quality and make a strategy.

12        So a couple of papers that were published.  One was called

13   "7 Leadership Leverage Points for Improving Quality," which we

14   talk about those specific things that leaders need to do around

15   working with their board, working with medical staff, others,

16   to improve quality.

17        And then the -- another paper is -- that they published

18   was -- it's called "High Impact Leadership, Achieving Triple

19   Aim Results for Patients."  And that paper is also about the

20   best practices in health care around improving quality and

21   performance.

22        And that really -- and so we use that paper to provide,

23   and IHI provides a lot of workshops, and I do many of those

24   workshops for them with leaders and teams from health care.

25   Not just in this country, but around the world.

1    For instance, I guess later this month I'm headed to

2    Ethiopia to do a leadership seminar to help the ministry of

3    health officials in Ethiopia implement their strategy for

4    improving quality in that country.

5    **Q.**   Have you held any leadership positions in industry

6    organizations that, you know, delve into hospital quality

7    performance measures, things of that nature?

8    **A.**   I have.  A couple things that I've done.

9    I've been on -- when I was at Parkview, I was on the board

10   of -- I was actually the chairman of the Colorado Hospital

11   Association.  And part of that role of chairman was to

12   interface with the legislature around regulations in terms of

13   quality reporting, financial reporting, putting together a

14   database that was published.

15   And then I was also on the board of the American Hospital

16   Association and spent three years as a board member

17   representing hospitals in the west.

18   And then I've also spent time as a commissioner or board

19   member for the joint commission, which is an accreditation

20   organization that does the accreditation, which is sort of a

21   right to operate.  Sort of you meet the minimum quality

22   standards, all right?  And so spent time as a board member/

23   commissioner there.

24   And then I've also served for a couple times in national

25   positions on something called the AHA Health Forum which has a

1  theme around the American Hospital Association of running

2  leadership programs and providing data, making sure that

3  there's transparency around what happens in health care.

4  **Q.**  Okay.  And I want to stop on the joint commission for just

5  a second.

6     So that's an organization that a credits hospitals, right?

7  **A.**  Correct.

8  **Q.**  Okay.  How do they do that?

9  **A.**  Well, the joint commission, they -- just in a simple way

10  of explaining it, all right?  Is that if you're joint

11  commission accredited, the Medicare that pays for -- the

12  Medicare and Medicaid, which is the biggest payor of health

13  care, basically, says, Okay, if you're accredited by joint

14  commission then we don't have to come in and do a separate

15  governmental regulatory survey, all right?  So that's sort of

16  at the core.

17     The accreditation, then, is a whole series of standards

18  around which the hospital has to adhere to.  And then has --

19  and then they apply, and a survey team comes out and looks and

20  says whether or not you meet the standards for being

21  accredited.

22     So accreditation, like accreditation for education, you

23  know, other -- it's -- it says you've reached a certain

24  standard of care.

25     **THE COURT:**  All right.  I think we'll break for today.

1    Ladies and gentlemen, please remember the admonitions that

2 I've given you.  The case is -- as you saw, the plaintiffs have

3 rested.  They will come back with some rebuttal case after the

4 defense case.  But the case is moving along.  So please, as you

5 attention.  And we'll see you in the morning.

6              (Court adjourned at 1:02 p.m.)

7

8                        -   -   -   -

9

10              CERTIFICATE OF REPORTERS

11    We certify that the foregoing is a correct transcript

12 from the record of proceedings in the above-entitled matter.

13

14 DATE:  Wednesday, February 6, 2019

15

16          _____

17               Vicki Eastvold, RMR, CRR
                 Official Court Reporter

18

19          _____

20     Katherine Powell Sullivan, CSR #5812, RMR, CRR
                 Official Court Reporter

21

22

23

24

25