**Volume 4**

**Pages 500 - 697**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

NorthBay Healthcare Group -    )
Hospital Division, dba NorthBay)
Medical Center and VacaValley  )
Hospital,                      )
                               )    **NO.  C 17-2929 WHO**
          Plaintiff,           )
                               )
  VS.                          )    Day:    Thursday
                               )    Date:   February 6, 2019
Blue Shield of California Life )
& Health Insurance Company;    )
California Physicians' Service,)
dba Blue Shield of California; )
and Does 1-50, inclusive,      )
                               )
                               )    San Francisco, California
          Defendants.          )
_____)

**JURY TRIAL - VOLUME 4**

<u>**APPEARANCES**</u>:

For Plaintiff:          King & Spalding, LLP
                        633 West 5th Street, Suite 1700
                        Los Angeles, CA  90071
                **BY:  DARON L TOOCH, ESQ.**
                      **DAVID J. TASSA, ESQ.**

For Defendants:         Manatt, Phelps & Phillips, LLP
                        11355 West Olympic Boulevard
                        Los Angeles, CA  90064
                **BY:  GREGORY N. PIMSTONE, ESQ.**
                      **JEFFREY J. MAURER, ESQ.**

                        Manatt, Phelps & Phillips, LLP
                        One Embarcadero Center, 30th Floor
                        San Francisco, CA    94111
                **BY:  AMY B. BRIGGS, ESQ.**

Reported By:            Vicki Eastvold, RMR, CRR
                        Katherine Sullivan, CSR, RMR, CRR

# I N D E X

Thursday, February 7, 2019 - Volume 4

| DEFENDANTS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **PUGH, MICHAEL** | | |
| (RECALLED) | 520 | 4 |
| Direct Examination resumed by Mr. Maurer | 520 | 4 |
| Cross-Examination by Mr. Tooch | 546 | 4 |
| Redirect Examination by Mr. Maurer | 602 | 4 |
| | | |
| **BARNES, TRACY** | | |
| (SWORN) | 607 | 4 |
| Direct Examination by Ms. Barnes | 607 | 4 |
| Cross-Examination by Mr. Tooch | 627 | 4 |
| Redirect Examination by Ms. Briggs | 674 | 4 |
| Recross-Examination by Mr. Tooch | 681 | 4 |
| Further Redirect Examination by Ms. Briggs | 683 | 4 |
| | | |
| **DEAL, BRUCE** | | |
| (SWORN) | 685 | 4 |
| Direct Examination by Mr. Pimstone | 685 | 4 |

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 152 | | 666 | 4 |
| 173-A | | 556 | 4 |
| 173-B | | 557 | 4 |
| 173-C | | 558 | 4 |
| 173-D | | 559 | 4 |
| 173-E | | 559 | 4 |
| 173-F | | 560 | 4 |
| 173-G | | 561 | 4 |
| 173-H | | 561 | 4 |
| 173-I | | 562 | 4 |

## **I N D E X**

### **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 173-J | | 562 | 4 |
| 174 | | 548 | 4 |
| 176-A | | 597 | 4 |
| 176-B | | 598 | 4 |
| 176-C | | 598 | 4 |
| 176-D | | 599 | 4 |
| 176-E | | 599 | 4 |
| 176-F | | 599 | 4 |
| 176-G | | 600 | 4 |
| 176-H | | 600 | 4 |
| 176-I | | 601 | 4 |

<u>**Thursday - February 7, 2019**</u>                    <u>**7:34 a.m.**</u>

P R O C E E D I N G S

---oOo---

(The following proceedings were held in open court, outside the presence of the jury:)

**THE COURT:**  Good morning, everybody.

**MR. PIMSTONE:**  Good morning.

**MR. TOOCH:**  Good morning.

**THE COURT:**  All right.  Let's take up the motion in limine.

Mr. Pimstone, do you have a response?

**MR. PIMSTONE:**  Yeah.  I just got a copy ten minutes ago.

**THE COURT:**  Well, it was on ECF.  This is not my problem.

**MR. PIMSTONE:**  I understand.  What I'm telling you is that it got filed at 10:15 last night, and I saw it for the first time ten minutes ago.  We will respond to it, but I'm just saying I haven't read it.

This is the third time this issue has come up.  This was the subject of their motion in limine before trial, which the Court denied.  They then raised the issue again the first day of trial, and the Court denied it again.  And so this is basically the third effort to raise the identical issue.

We also submitted -- we also submitted and exchanged trial

1   demonstratives, including demonstratives from Mr. Deal.  Those

2   demonstratives included specifically a discussion of the -- of

3   the market survey that he had conducted with Blue Cross and so

4   forth.  They did not object to that demonstrative.

5        So we've had two discussions with the Court already.  The

6   Court has ruled twice on this issue, and they failed to object

7   to his trial demonstratives that went into this.  We didn't get

8   any courtesy notice yesterday that they were planning on

9   raising this or else we would have been prophylactically

10  preparing yet a third opposition to this.

11       So we think, at this point, Your Honor, after two rulings

12  by the Court and after they failed to object to his

13  demonstrative which specifically -- I can show you the

14  demonstrative, itself, which they did not object to.  We had no

15  notice this issue was going to come up.  Mr. Deal is testifying

16  today.  I could have prepared an opposition yesterday, which we

17  didn't have an opportunity to do.

18       Substantively, let me --

19       **THE COURT:**  This is about the third time that your

20  team or you has tried to stretch what the Court has done and

21  the issues that have been presented.

22       So the last time that this issue came up you said, I'm

23  withdrawing --

24       **MR. PIMSTONE:**  Opening statement.

25       **THE COURT:**  -- the demonstrative from the opening

1    statement.

2         **MR. PIMSTONE:**  Understand.

3         **THE COURT:**  And there's been -- we have this survey,

4    we have all of this evidence.

5         **MR. PIMSTONE:**  I understand.

6         **THE COURT:**  So this is the first time that all of the

7    evidence is being presented to the Court.  So let's not

8    overstate where things are.

9         Okay.  And so, further, what I'm interested in --

10        **MR. PIMSTONE:**  Right.

11        **THE COURT:**  -- is how this particular survey could be

12   validated.

13        **MR. PIMSTONE:**  Sure.  The -- I think it's important,

14   Your Honor, before I get into the substance, for me to respond

15   to Your Honor's statement.  I'm not stretching anything.

16        The issue as to Mr. Deal's discussions with Blue Cross,

17   Cigna, Aetna, and so forth, was raised in the original motion

18   in limine.

19        Yes, the first day of trial Your Honor said because we

20   withdrew the opening statement demonstrative the issue was

21   again not ripe.  But the arguments that are being raised here

22   were raised in the motion in limine that was filed, and all

23   those arguments were heard at that point in time.

24        So respectfully, Your Honor, we're not stretching

25   anything.  I remember exactly what you said.  You said that in

1    the last -- in the last hearing you said that to the extent

2    that Mr. Deal was just going to testify as to conversations he

3    had with Mr. Barnes at Blue Shield, that you may have an issue

4    with that.  And -- but we did discuss -- we did discuss these

5    conversations with other contracting representatives, and so we

6    had those discussions.

7        So respectfully, Your Honor, I believe the issue has had

8    full hearing.  I'm not attempting to stretch any ruling the

9    Court made before.  What the Court did before was, after

10   Mr. Deal's deposition the issue was fully raised in the earlier

11   motion in limine and the Court ruled on it.

12       Let me get to the substance.

13           **THE COURT:**  That would be good.

14           **MR. PIMSTONE:**  I will.

15       The substance is that the first time that Blue Shield

16   learned that NorthBay and Mr. Heil specifically was going to

17   rely on the full network contracts that NorthBay had in place

18   with Blue Cross, Aetna, Cigna, and so forth, was in his -- was

19   in his report.  That was the first time we learned what their

20   method was going to be.

21       Mr. Deal, in response to seeing that, he -- he and his

22   team then went out to look to see were there market

23   circumstances that -- that related to those particular rates

24   being negotiated.  What were the circumstances.

25       And Mr. Heil yesterday acknowledged in his deposition

1  testimony that it's relevant to know -- if you're looking at

2  comps, that it's relevant to know what these circumstances are

3  of the market that underlay those comps.

4       So Mr. Deal did exactly that.  He saw that these were

5  outlier rates, these rates that were not reflected in the wider

6  geographic area.  And he went out and did what any expert would

7  do, if one is looking to see what -- the market forces that are

8  acting on the contract, he went out and spoke to those

9  contracting representatives.

10       And that's exactly the kind of evidence, if an expert is

11  looking to see what is the market doing.  And -- and is -- are

12  there features of the market that make it anomalous and that

13  make it nonrepetative of the larger geographic region, what are

14  those issues.  The best and only way, really, to do that is to

15  speak to the market representatives, which he did.

16       And he spoke to the market representatives, got a sense

17  for what the market was, the forces that were acting upon them

18  that created these outlier rates in their negotiations and

19  their deals with NorthBay, and that formed the basis of his

20  opinion.

21       Which, his opinion is both empirically, I observed, he

22  says, that these are outlier rates; that these contracts don't

23  reflect regional market prices.  So empirically he observes

24  that.

25       And then he says, And I conducted my analysis of actually

 1  seeking to get behind the market to determine what was it about

 2  the market dynamic that led to these outlier rates.  Because

 3  Mr. Heil, you know, his testimony is that these are rates that

 4  should be relied on and that the circumstances, you know, are

 5  appropriate, that there's nothing different or unusual about

 6  NorthBay vis-a-vis regional market pricing.  And so Mr. Deal

 7  did what any expert would do.  He got beneath the market.

 8      Mr. Heil yesterday said that that kind of information --

 9  generally, that understanding as much as you can about the

10  market would be appropriate.

11      Mr. Deal was deposed.  And in his deposition he described

12  conversations that -- that he had with representatives.  He

13  specifically mentioned Mr. Picket by name, from Blue Cross, who

14  he spoke to.  And he had detailed notes of those conversations.

15      He was asked specifically, Well, tell me, you know, about

16  what so-and-so said to you.  Mr. Deal said, May I take out my

17  notes so that I can testify from that?

18      He was told by Mr. Tooch, No, I don't want you to take out

19  your notes.  Do it from memory.  So Mr. Deal did from memory

20  what he could remember from the conversations.

21      He testified generally that he spoke to representatives

22  and that the themes were all the same from all those

23  representatives as to the forces that were acting upon them

24  that caused them to reach the rates that they did.  He did

25  remember Mr. Picket's name specifically, but he spoke in

1   general as to what he learned from the market representatives.

2   He several times offered to take out his notes, asked to

3   take out his notes. And counsel said, no, I want to you do it

4   from memory. That's the issue.

5   **THE COURT:** So were those notes provided to the

6   plaintiffs?

7   **MR. PIMSTONE:** He had the notes, and he would have

8   provided them to the plaintiffs. He had them right there with

9   him. And he asked to testify and he would absolutely provide

10  them to plaintiffs if plaintiffs had asked for them. He

11  referenced several times in his deposition, I have notes with

12  me specifically of those conversations.

13  But even without the notes he testified generally about

14  what he learned in his discussions with the contract

15  representatives about the NorthBay market and what it was about

16  the Fairfield market that caused those plans to agree to the

17  rates that they did.

18  So he testified generally. Testified specifically

19  remembering Mr. Picket's name. He couldn't remember the names

20  of the other particular contract representatives. Had the

21  notes. Counsel didn't want the notes. Counsel didn't want to

22  look at the notes.

23  **THE COURT:** Mr. Tassa.

24  **MR. TASSA:** So I'll take up the point about the

25  deposition first. We weren't provided any notice of who he

1  spoke to before the deposition.  There was no way for us to

2  prepare for those kinds of questions.

3      And our position on the disclosure issue would be, to the

4  extent he had to rely on those notes to testify about this

5  survey he did, those had to be provided along with his rebuttal

6  report.  It's material that he needed to use in order to get to

7  his opinion, apparently, and was not provided with the report.

8      **THE COURT:**  I can't remember who took the deposition,

9  but that question was asked.  They offered.  The guy said, I

10  want to look at my notes.  And I guess it was Mr. Tooch said

11  no.

12      So why?

13      **MR. TASSA:**  I understand that.  And the point is we --

14  we were entitled to get his recollection using his report and

15  anything attached to his report.  Anything that's disclosed

16  later, we have absolutely no notice of, can't prepare to depose

17  him on.  And that's why things are required to be disclosed in

18  the report.  That's as far as the disclosure issue goes.

19      I would also add that given the -- the deposition was, I

20  believe, December 5th.  There was absolutely no way for us to

21  have subpoenas out to any of these people in time, even had we

22  known the names.  These are people we couldn't depose

23  ourselves, we couldn't request documents from.  We just have no

24  way to test any of this, regardless of whether we got the notes

25  in the deposition or at some later point.

1    As far as the substantive issue, setting aside the

2  disclosure, this is not a survey, Your Honor.  He called up

3  some people.  In fact, if you read the deposition excerpts

4  attached to Mr. Tooch's declaration, sometimes his staff called

5  up some people we still don't know.  They spoke to some people

6  at other payors.  There's no transcript of what was said.  We

7  don't know what was asked.  We don't know what was answered.

8  We have Mr. Deal's characterizations of those conversations.

9  And that's pretty much all we have.

10    It's the proponent's obligation to provide some foundation

11  that this is in any way a reliable survey conducted according

12  to acceptable methods.  And the only evidence we have on that

13  suggests that this is not a survey; this is a guy calling up a

14  few selected people.  It's unclear why he selected some and not

15  others.

16    It's also unclear what firsthand knowledge the declarants

17  have of the issues that were discussed with Mr. Deal.  You

18  know, the only one of these declarants that we were able to

19  depose, Mr. Barnes, I think that revealed some pretty big

20  problems with what he told Mr. Deal as far as hearsay issues of

21  his own.  And we couldn't depose the others to find out if

22  that's the case with their statements to Mr. Deal, to

23  Mr. Deal's associates as may be the case.

24    **THE COURT:**  All right.  So here's what we're going to

25  do with this:  I disagree with you, Mr. Pimstone, on what

1   you -- you really shouldn't show your disapproval when you're

2   standing up here.  But I disagree with you on what has been

3   ruled on.

4        The first time this came up, the issue was can an expert

5   rely on hearsay primarily and didn't go into details.  The

6   second time the issue came up was with respect to the opening

7   statement.  This is the first time that all of the facts have

8   been laid out, I think.

9        And my problem with what the testimony is, is that there's

10  no way of validating it.  I think it is a problem to shoehorn

11  the specifics.  This isn't like a survey itself.  It's not the

12  typical kind of thing that an expert can rely on.

13       I do think that if Mr. Deal has the expertise he can

14  testify about the types of reasons why NorthBay's -- why an

15  insurer would want NorthBay in-network, which I think include

16  the things that are on the screen, perhaps without the

17  aggressive marketing.

18       But at a high level, I don't think he can then go and say,

19  I talked with -- I think he mentioned two people in the

20  deposition that he had talked to.

21            **MR. PIMSTONE:**  He did.

22            **THE COURT:**  I don't think he can say, I talked to this

23  person and they said this about the negotiation, or that

24  person, because among other things, I do think there's a

25  disclosure problem, that it's too late.  But I also think that

1    it's not the kind of survey information that an expert can rely

2    on.  You just can't validate it.

3         So that's how I would revise the testimony.

4         **MR. PIMSTONE:**  I understand, Your Honor.  And I'm not

5    intending to express disapproval, and my apologies to the

6    extent that Your Honor gets that impression.

7         I think the difficulty I'm having is that while the Court

8    did invite this issue to be raised at some later point, we

9    didn't receive any notice yesterday or the day before that the

10   brief was actually being written.

11        To give it to us at 10:10 last night -- I haven't prepared

12   my written response to give to the Court -- I think is unfair.

13   I think it's inappropriate.  It would have been very easy for

14   counsel to say, Look, we're going to raise the issue again,

15   just as an FYI, and if you guys want to prepare another

16   submission.

17        The witness is going on today, and they had the

18   opportunity to object to his demonstrative, and they didn't do

19   it.  They did not.

20        The only objection they had to any of the demonstratives

21   after Your Honor's prior rulings, at least on the motions

22   before, whatever they were, the only objection that they raised

23   was one objection to an opening statement characterization that

24   didn't relate to Mr. Deal; it related to Mr. Barnes.  And they

25   didn't object to any of Mr. Deal's demonstratives, including

1  the demonstrative where he discusses what he learned about

2  those particular contracts.

3      So I think that the issue has been unfairly joined today.

4  I really do think so.

5      **THE COURT:**  I appreciate that.  And I can appreciate

6  why you feel that way.  And I think that the plaintiffs -- it

7  is unimpressive when lawyers are not cooperative in the

8  presentation of a case.

9      You can have zealous advocacy, but to -- but game playing

10  just is -- I always remember.

11     **MR. PIMSTONE:**  But the --

12     **THE COURT:**  Mr. Pimstone.  Mr. Pimstone.  The problem

13  is right now --

14     **MR. PIMSTONE:**  Right.

15     **THE COURT:**  -- we have a witness who's going to be

16  going on.  I am more concerned about the jury --

17     **MR. PIMSTONE:**  I understand.

18     **THE COURT:**  -- and the evidence that they hear as

19  opposed to any particular problem that you have.

20     **MR. PIMSTONE:**  Sure.  I get it.

21     **THE COURT:**  With respect to that problem, if you need

22  a couple of extra minutes at a break, just to let your witness

23  know how to recalibrate those questions, that's okay by me.

24     **MR. PIMSTONE:**  I understand.

25      If I can make one more run at Your Honor, just very

1  briefly.

2          **THE COURT:**  Okay.

3          **MR. PIMSTONE:**  Because I didn't address the substance

4  too much here.

5      In his report, in his rebuttal report, he did -- he did

6  talk about what he had done, that in the rebuttal report he

7  does say in response to the -- in response to Mr. Heil's report

8  we -- we examined -- we examined the market by speaking to

9  representatives.

10     It is true that in his rebuttal report he doesn't say, We

11  spoke to A, we spoke to B, we spoke to C.  But he does say, in

12  response to NorthBay's reliance on these particular contracts,

13  We went out to take a look at whether those rates were the

14  product of any unusual market forces.  And so he does disclose

15  that.

16     And then in deposition, as I said before, he then further

17  explained the details, and would have explained the details

18  even more.

19     By the time the rebuttal reports were delivered by both

20  sides, there was no opportunity, at that point, to have taken

21  further discovery.  So it's not -- the prejudice issue is not a

22  real issue here.

23     In deposition he would have explained every single

24  conversation in detail, with names, dates, and so forth, had

25  Mr. Tooch permitted him to take out his notes.

1    The second part of Your Honor's leaning or ruling relates

2  to whether this is the kind of evidence that an expert would

3  typically rely on.

4    And I think the issue there is what you have -- what

5  NorthBay is doing is, NorthBay is putting out a series of

6  rates.  And they're putting out a series of contract rates.

7  They spent a long time with the jury on those contract rates.

8  And they have absolutely said to the jury these were willing

9  seller-willing buyer transactions, sophisticated entities on

10  the other sides, you should trust that these rates are market

11  rates.

12    And I think it's important, if one is -- if the jury is

13  understanding and putting those rates into context, it is

14  important to have context as to, from an expert perspective,

15  was there something anomalous about the market.

16    **THE COURT:**  And I think he can talk about -- that's

17  what I was saying, that he can talk about the factors, like you

18  need marketing for elective surgery, or the geographic

19  location --

20    **MR. PIMSTONE:**  Right.

21    **THE COURT:**  -- of NorthBay, or the fact that they've

22  got half the specialists.  He can talk about those specific

23  things.  He just can't say -- he can't go down to the next

24  level to say, and Anthem told me this.

25    So if you want to show me -- I was just looking for the

1    rebuttal, which I didn't have in this binder.

2           MR. PIMSTONE:  Okay.

3           THE COURT:  Show me the rebuttal report.  I'll look at

4    it while I'm listening to the evidence from Mr. Pugh.

5           MR. PIMSTONE:  Sure.

6           THE COURT:  And we can take this up again at the next

7    break.

8           MR. PIMSTONE:  Okay.  Thank you, Your Honor.  Will do.

9           THE COURT:  So pass the rebuttal -- maybe I have it

10   here, but show me where it is that you're talking about.

11          MR. PIMSTONE:  Will do.  Thank you.

12          THE COURT:  We'll be back at 8:00.

13                  (Recess taken at 7:54 a.m.)

14                (Proceedings resumed at 8:09 a.m.)

15       (The following proceedings were held in open court,

16   outside the presence of the jury:)

17          THE COURT:  Be seated, everybody.

18       All right.  So taking a look at the rebuttal report, which

19   I did not have, and again at the slide that Blue Shield wants

20   to use, if you revise the slide to take out the "some payors

21   report," the obvious hearsay issues there, and the bottom,

22   "these issues were discussed with," so that it is a cleaner

23   demonstrative, he can testify to his understanding of the

24   services that are provided and the reasons why insurers would

25   be interested in paying higher rates.  But you should not draw

1  out who he talked to, what they said specifically.

2       If NorthBay goes into -- you know, wants to test those

3  points on cross-examination, then they will.

4       The line "Payors report that NorthBay negotiates very

5  aggressively," I would take that out.  But the geographic

6  location is something that is relevant.

7       So that's what you can do with that.

8       Is that clear enough, Mr. Pimstone, for you?

9            **MR. PIMSTONE:**  It is clear.

10           **THE COURT:**  All right.  Clear, Mr. Tooch?

11           **MR. TOOCH:**  Yes, Your Honor.

12           **MR. PIMSTONE:**  The only issue -- I'm just trying to

13  think through mechanically how it's going to work up there.

14       The only issue that I'm having is he can testify, based on

15  his knowledge as an expert, that based on where NorthBay is

16  located, the unavailability of other options, that it is the

17  case that there are market anomalies that produce these rates.

18       Part of his knowledge also comes into play not only sort

19  of knowing the geographic area but part of his knowledge also

20  comes into play by the fact that what he learned when he did

21  speak with industry representatives was that while there may be

22  other areas in the state or Northern California, where you have

23  hospitals that are favorably geographically located, that the

24  difference is that those hospitals don't exploit that location

25  to aggressively negotiate as high rates, and that it is -- what

1  he learned when he spoke to all the payors was that it is a

2  market strategy of NorthBay to take these favorable aspects,

3  the geographic location, et cetera, and to use that in order to

4  get higher rates than market average.  It is a different

5  contract strategy that results in those rates.

6       And so his knowledge as to why the rates are higher, it's

7  not just a function of knowing, well, there's 12 miles from

8  this hospital to this hospital.  It's his -- in his discussions

9  with the people who are actually negotiating those rates, he

10  learned more about the actual market dynamic.

11       **THE COURT:**  That I want you to exclude from his

12  testimony.  I think if you were trying to get into negotiate --

13  comparing negotiating strategies, you'd have to do it in a much

14  more comprehensive way.  And I don't think that just talking to

15  a couple of people who are -- who are negotiating contracts

16  would do it for expert testimony.

17       **MR. PIMSTONE:**  Thank you.

18       **THE COURT:**  All right.

19  Okay.  Let's get the jury.

20       Is Mr. Pugh here?  Mr. Pugh, why don't you come on back

21  up.

22       **MR. TOOCH:**  Your Honor, we have Mr. Heil here.  I

23  believe that experts are permitted to --

24       **THE COURT:**  Yes, absolutely.

25       **MR. TOOCH:**  Okay.  Thank you.

1      (Jury enters at 8:15 a.m.)

2      **THE COURT:**  Please be seated, everybody.

3      Good morning, ladies and gentlemen.  Welcome back.

4      So we are still in the examination of Mr. Pugh in the

5  defense case.

6      Mr. Maurer, please go ahead.

7                        **MICHAEL PUGH**,

8  called as a witness for the Defendant, having been previously

9  duly sworn, testified as follows:

10                **DIRECT EXAMINATION (Resumed)**

11  BY MR. MAURER:

12  **Q.**   Good morning, Mr. Pugh.

13  **A.**   Good morning.

14      **MR. MAURER:**  Your Honor, if I could please publish the

15  demonstratives.

16      **THE COURT:**  Please go ahead.  Which will require Tracy

17  to figure out what's going on with the demonstratives from

18  there.

19      Can you turn it on for everybody?  There you go.  Great.

20      **MR. MAURER:**  Thank you.

21      **THE COURT:**  Please go ahead, Mr. Maurer.

22  BY MR. MAURER:

23  **Q.**   So, Mr. Pugh, where we left off yesterday, we were

24  discussing your qualifications as an expert on hospital

25  quality.  Let's round out our discussion of your qualifications

1    with just a few more questions.

2         So looking back at the summary of your qualifications, on

3    the screen there is a third bullet there that says "Mount Sinai

4    School of Medicine New York, instructor."

5         Are you an instructor at the Mount Sinai School of

6    Medicine?

7    **A.**   Yes, I am.  I have an appointment there, and I teach

8    healthcare quality and strategy courses in their masters

9    programs.

10   **Q.**   Okay.  And what kind of courses do you teach?

11   **A.**   I teach a healthcare strategy course.  And I teach

12   seminars on quality and leadership.

13   **Q.**   Okay.  Is there anything else you wanted to cover about

14   your background in hospital quality before we move on to your

15   opinion?

16   **A.**   Yeah, just two quick things.

17        One is, you asked me yesterday about publications.  I also

18   have authored a textbook chapter which is used in health

19   administration programs across universities.  It's getting

20   ready to be in it's fourth edition.  But my chart is on quality

21   metrics and score cards and dashboards and how leaders use

22   those.

23        And the other is when I -- which I think is germane to my

24   testimony today, is that when I teach my semester-long course

25   at University of Colorado, that what we do is we explore what

1   is quality, and then we look at the public rating and ranking

2   systems which I'm going to talk about in my testimony.  And we

3   talk about patient harm and safety, patient experience.

4       And then we also then go into, over the course of the

5   semester, about how to improve and their responsibility as

6   leaders to take responsibility for the outcomes of the

7   organizations and make it better.

8   Q.   So Blue Shield has agreed to compensate you for the time

9   you spend working on this case; is that right?

10  A.   Yes, they have.

11  Q.   And what's your compensation rate?

12  A.   $550 per hour.

13  Q.   Are you being paid to express any particular opinion?

14  A.   No, I am not.

15  Q.   So have you ever testified at trial as an expert before?

16  A.   Just once.

17  Q.   And what were the circumstances of that case?

18  A.   It was in Virginia.  And I was testifying on behalf of the

19  taxpayers in this country, in a case brought by Blue Cross

20  Blue Shield of Virginia, a tax case.

21  Q.   So were you testifying for the government against

22  Blue Cross?

23  A.   Correct.

24  Q.   All right.  So let's talk about your opinions.

25       MR. MAURER:  If we could move to the next slide.

1          (Document displayed.)

2    **BY MR. MAURER:**

3    **Q.**    To set the framework here, Mr. Pugh, what was your

4    assignment?

5    **A.**    My assignment was to evaluate the relative quality and

6    performance of NorthBay against a group of hospitals that --

7    the Deal benchmark hospitals.

8    **Q.**    Let's look at those really quickly.  If we can look at

9    those just a minute.

10          Looking up at the screen, is that the list of the

11    hospitals you compared to NorthBay in your analysis?

12    **A.**    Yes, it is.

13    **Q.**    And to your understanding, is this the same group of peer

14    hospitals that Blue Shield's expert, economics expert, Bruce

15    Deal, is going to testify about?

16    **A.**    That is my understanding.

17    **Q.**    So let's go back to slide 3.

18          (Document displayed.)

19    **Q.**    So what were your overall conclusions with respect to

20    NorthBay's quality and safety performance in comparison to the

21    peer hospital group?

22    **A.**    Well, my overall conclusion was that NorthBay delivers

23    care at the same levels of quality patient experience as the

24    average, you know, of the group.  Very similar to the other

25    hospitals.  Very comparable to the other hospitals in the

1    analysis.

2    **Q.**    Okay.  And what did you do to reach that conclusion?

3    **A.**    Well, I did three different analysis.  I used the public

4    ranking and rating sites.  We use ten different sites.

5    They're -- hospital rating and ranking has been evolving over

6    the last decade, so you can go online and find that.  So I used

7    those sites.

8         And then I did a second analysis, which was really a check

9    analysis to -- where I used something Donabedian framework for

10   looking at quality.  And I'll talk more about that in a little

11   bit.

12        Finally, I was asked to look specifically at different

13   services and how does the quality of care at NorthBay match up

14   with the other hospitals in the market analysis.

15        **MR. MAURER:**  So let's go to the next slide, please,

16   and one more.  Thank you.

17        (Document displayed.)

18   **BY MR. MAURER:**

19   **Q.**    So before we get into those three analyses, let's just

20   talk briefly about a little background here about, what is

21   healthcare?  What is hospital quality generally?

22   **A.**    Okay.  So this is, as I mentioned about what I teach in my

23   course.  And we spend quite a bit of time at the beginning of

24   the course really talking about quality, because people have

25   different perceptions about what hospital quality is really

1    about.

2         So I like to think about it in terms of the old story, the

3    blind man and the elephant.  People have different

4    perspectives, where they're coming from and how they describe

5    it.  So patients have a perspective about their own experience.

6    Physicians have a perspective, which is different, about the

7    clinical experience.  Then there's issues of safety, patient

8    harm, access.  So there are a variety of dimensions.

9         So we talk about quality in healthcare being

10   multidimensional.  No single measure -- okay, meaning like

11   mortality, or no single measure like infection rate -- tells

12   the whole story.  So you need -- so you actually create, sort

13   of, multiple measures to be able to tell the story.

14        And the data sources vary, and the different rating

15   agencies use different data sources to come up with different

16   opinions -- different conclusions sometimes about hospital

17   quality.

18   **Q.**   And why are hospitals collecting quality data?  What's the

19   purpose of all this?

20   **A.**   Well, hospitals collect thousands of measures, all right,

21   across the organization.  It's just part of their daily

22   operation.

23        Some of it they have to report to the government through

24   Medicare, CMS, Medicare and Medicaid.  Some of it they report

25   to different regulatory agencies.  Some of it they just use

1    internally in order to manage, you know, the process.  So

2    knowing the accuracy of your lab test, knowing the number of

3    retakes in your radiology, those are all quality measures that

4    are sort of internal to an organization.

5         (Document displayed.)

6    **Q.**   So let's go to the next slide.

7         So let's talk about that first analysis that you used to

8    compare NorthBay with the peer hospital group.

9         How did you use a composite hospital score to compare

10   NorthBay to the group?

11   **A.**   Okay.  So I mentioned earlier that the transparency around

12   hospital performance has been evolving over the last decade.

13   And so there are multiple online sites where you can go, and

14   they will rate hospitals.

15        And so my composite rating was to look at all those sites

16   where NorthBay was rated and look at all those sites that the

17   other hospitals were rated and then create, sort of, an

18   analysis that says, well, how -- you know, how does NorthBay

19   compare across all these sites.

20   **Q.**   Okay.  And what kind of sites did you look at?  Could you

21   give us some examples, briefly.

22   **A.**   Well, the sites were listed on my slide, but the main one,

23   to start with, was the Centers for Medicare and Medicaid

24   Services, CMS.

25        So, as you know, Medicare and Medicaid is the largest

1    payor of healthcare claims in this country.  They also -- CMS

2    administers the Medicare program.  And as a public policy

3    issue, they've begun publishing hospital performance.  And they

4    require hospitals to send in their data to CMS, and then they

5    have some algorithms that they use and they create a star

6    system to perform.

7         So the other ones that are on here, the other one you

8    might recognize, is *U.S. New & World Report*.  And they have

9    very popular rating of hospitals.  Comes out every year.  They

10   do it, also, for universities and other kinds of things.  So I

11   use that one.

12        Then there's Healthgrades, Leapfrog, California Hospital

13   Compare, some others which I'll talk about as I go through the

14   analysis.

15   **Q.**   Okay.  So I'm understanding correctly, you have the

16   hospital submitting the data up into CMS; and it's making its

17   way up to the rating system.  Is that about right?

18   **A.**   That's correct.  So the hospitals send -- these rating

19   agencies, most of them use some of the CMS data.  So when the

20   hospitals send their data to CMS, then that data is put into

21   public databases.  And then some of these other rating agencies

22   use that data.

23        But they come up with different answers because each one

24   of these rating agencies has a different purpose, right.  They

25   have a different sort of slant on why they're doing the rating.

Q.   Okay.  Briefly -- and we'll come back to it in a minute --
what were the results of your composite score analysis?

A.   Well, when I did the composite analysis my conclusion was
that the quality of care and services that NorthBay provides is
comparable to all the others in the market.  It's really like
the average.  And so I did that by looking at creating an
average of the composite scores.

Q.   Okay.  Let's look at some of the specific rating systems
and sources that you looked at.

So we have the CMS Star Ratings 2018 up on the screen
there.  What is the CMS Star Ratings System?

A.   Well, the CMS Star Ratings System that I talked about a
moment ago, hospitals send their data into CMS.  There are 57
required metrics or measures that they send in.

And then the average hospital -- you know, not every
hospital provides every service, has every measure.  So the
average hospital rating uses like 39, like 39 measures built
in.

And what CMS does, is that they say, okay, let's take and
create, sort of, an apples-to-apples comparison -- you know,
beyond just the size of the hospital and location, et cetera,
the types of patients, you know, the risk of the patients they
have -- and let's group them.  But instead of having everybody
try to go through and sift through 57 potential measures, let's
make it consumer friendly and let's -- so they created this

1    star system.

2         So the star system like, you know, the rating systems for,

3    you know, restaurants or hotels, whatever, it's the same idea.

4    And so what they've done is, the highest performing, those

5    hospitals that had the best scores, you know, get the 5-star

6    rating, that grouping of hospital.  Then 4, 3, and 2.  And then

7    there's a 1-star rating also.

8    **Q.**   Okay.  So this is the government's rating of the hospitals

9    in the peer group.  Is that one way of saying?

10   **A.**   That is absolutely correct it is the government's ratings

11   at the hospitals.

12   **Q.**   Just to step back into the data, you mentioned 57

13   different, you know, inputs.  What are the kinds of data that's

14   involved there?  Can you just give us some examples?

15   **A.**   Yeah.  The 57 data points, they span seven, sort of,

16   dimensions, what I call dimensions.  Things like mortality.

17   And then they look at mortality for specific procedures.

18   Infection rates.  They look at events that should never have

19   occurred.  They look at -- there's some process, like the data

20   around waiting times and throughput.  They look at whether or

21   not -- how certain procedures are performed, whether they are

22   bundled together or separate.

23        So there's a variety of different measures, and these are

24   all things that the hospitals collect and send in.

25   **Q.**   So how does NorthBay fair in the CMS Star Ratings System?

1    **A.**   Well, when I looked at it in 2018, at the time of my

2    report, NorthBay had a 2-star rating.  And we can see that

3    there was one 5-star rating in this market; there are six

4    4-star ratings; and four 3-star ratings.

5    **Q.**   That doesn't mean NorthBay is a bad hospital; right?

6    **A.**   No, it does not.

7    **Q.**   That's not what you're saying here?

8    **A.**   No, it does not.

9    **Q.**   Well, you could have stopped right there at the CMS

10   ratings, but, you know, you went further than that.  So why did

11   you want to look at more rating systems than CMS Star Ratings?

12   **A.**   Well, because I think that it's, again, this idea of

13   quality being multidimensional, even though this is a -- it's a

14   home composite rating.  There are other systems out there, and

15   they may tell you different things, and so we ought to look

16   across all the possible rating systems and not simply use one

17   rating system to make a conclusion about the relative quality

18   of performance.

19   **Q.**   Let's look at some other rating systems.

20         **MR. MAURER:**  Next slide.  Thank you.

21      (Document displayed.)

22   **BY MR. MAURER:**

23   **Q.**   So what's the HealthCare6 rating system?

24   **A.**   HealthCare6 rating, their purpose is to look at, you know,

25   hospitals and rate them based upon the patient experience, all

1  right, only.  There's no clinical measures in here.

2      So it's just -- and what they do is they take -- they take

3  the patient satisfaction scores that are also part of the

4  Medicare CMS Star Ratings, they take those, and then they just

5  take a subset of those questions that they think are the most

6  important questions and then rate the hospitals on a star

7  system from 1 to 5.

8      And as you can see, NorthBay, you know, is a 4.  And there

9  are five hospitals which are 3.  So everybody is either 3 or 4

10  in the market using that methodology.

11  **Q.**  Okay.  And so did this -- the results from this rating

12  system, did that make it into your composite score?

13  **A.**  Yes, it did.

14  **Q.**  So NorthBay did fairly well on this score, and that's

15  something you accounted for in your report; right?

16  **A.**  Yes, it did.

17  **Q.**  Let's look at another one of the rating systems,

18  HealthInsight.

19      So what is the HealthInsight rating system?

20  **A.**  Well, HealthInsight is an entity that publishes hospital

21  ratings.  But instead of -- they take the CMS data, but instead

22  of doing the star system they actually create rankings of

23  all -- 1 through 5,000 something hospitals, right, and then

24  assign -- you know, basically report on how that hospital

25  compares to all the others, the percentile.

1  **Q.**   All right.  And how did NorthBay fair in this rating

2  system?

3  **A.**   So in this rating system NorthBay is on the far left of

4  the first one.  And you can see that there are three -- three

5  things that HealthInsight does.  They look at -- they have an

6  overall national ranking.  They have a ranking for patient

7  experience.  And then they have a ranking for

8  hospital-associated infections.  You know, so basically

9  infections that patients got in the hospital.

10     And you can see that NorthBay, on their overall national

11  percentile, they're about 9, 10 percent, which really means

12  that they scored lower than 90 percent of the hospitals in the

13  country.  They did better on patient experience, closer to

14  32 percent.  And then on infections, they're about 15 -- you

15  know, about the 15th percentile.

16  **Q.**   Okay.  Generally, how did NorthBay compare to the peer

17  group here?

18  **A.**   Well, NorthBay's performance of the peer group is very

19  similar as you look at.  We have some that are higher.  You can

20  look and see that there's variation, all right, you know,

21  between the different providers and even variation within how

22  NorthBay does on some things.

23     And the most extreme example of that is you look at Sutter

24  Davis, they are very high on patient experiences but they're

25  one of the worst in the country on hospital-acquired

1    infections.  So you can get that sort of rating in these rating

2    systems.

3    **Q.**    Okay.  So the rating system results here made it into your

4    composite score?

5    **A.**    Yes, they did.

6    **Q.**    Okay.  So let's move on.  We'll just do a couple more.

7          Let's -- can you explain to me what's the Leapfrog

8    Hospital Safety Grade System?

9    **A.**    Okay.  So Leapfrog is another rating system.  And it's

10   specifically aimed at looking at and trying to help hospitals

11   and push them to be safer places, less harm to patients.

12         And so they use an overall letter grade, you know, A

13   through F.  And their letter grade is based upon some of the

14   CMS data around patient harm, infections, things that happen in

15   the hospital, process data.

16         And then some of their letter grade is based on, sort of,

17   the hospital structure and whether or not they have electronic

18   medical records and physicians interfacing directly, et cetera.

19         And so as you can see -- this is a shot of the

20   screenshot -- that, you know, currently NorthBay has a B.  But

21   historically, in 2015 they were a B, 2016, 2017 they were rated

22   a C.  And then back to 2018, spring, they're a B.

23         And one of the things that Leapfrog does is they update

24   that score roughly every six months.

25   **Q.**    Okay.  And so as we've discussed already, the results from

1  this rating system made it into your composite score; is that
2  right?
3  **A.**    That's true.  But I only used the current year.  I thought
4  it was more fair to everybody, NorthBay and all the other
5  hospitals, to use the current year rather than try to create
6  the complexity of adding what happened in prior years.
7  **Q.**    All right.  So let's look at one more.  What is the
8  Healthgrades rating system?
9  **A.**    It's actually healthgrades.com, and they are a dot-com
10  company that decided to get into the hospital and physician
11  rating and ranking business.  And so they have algorithms that
12  they also use to rate hospitals.
13       And so this example, Healthgrades looks at clinical
14  performance, they look at patient experience, and they look at
15  safety.  And the one I'm showing you here is safety.
16       And they essentially use a star system, which if you --
17  and they have a list of -- a list of -- in the safety one here
18  there are 12 characteristics of safe hospitals, all right.
19       And they -- they use a predictive model to say, based upon
20  the types of patients and risk adjusted, that whether or not
21  the performance of the hospital is as expected, below expected,
22  or better than expected.  All right.  So they're predicting.
23       And so in this example, this is Healthgrades, and they --
24  these 12 indicators on safety, they had none that they were
25  better than expected, they had ten that were as expected, and

1  there were two of the indicators which were worse than

2  expected.

3  **Q.**  Okay.  And you said "they" you're referring to NorthBay?

4  **A.**  I am referring to NorthBay.

5  **Q.**  All right.  So now we've looked at a number of the rating

6  systems.  So how did you put together a composite score for all

7  the hospitals that you analyzed here?

8  **A.**  Okay.  So as I've shown you the different, you know, ways

9  that these -- these ratings agencies are doing this, that, you

10  know, their letter grades, some are color coded, some are

11  stars.

12  So what I had to do is convert all those into a common,

13  you know, number and then weight them based -- so weight them

14  so that CMS and Hospital Compare and Leapfrog, each of these

15  were weighted equally across all ten, and, you know, created a

16  number, added it up, divided by 10, and came out with an

17  average score for each hospital.

18  **Q.**  So can you tell us --

19     **MR. MAURER:**  Let's move to the next slide.

20  (Document displayed.)

21  **BY MR. MAURER:**

22  **Q.**  Can you tell us what the results of your composite score

23  analysis were?

24  **A.**  Sure.  This is a distribution of my scores.  And the

25  Sutter Solano had the lowest score.  Its average across all of

1    these rating systems -- you know, making an apples-to-apples

2    comparison -- is a 1.57.  The highest score was John Muir

3    Medical Center Walnut Creek, at 3.37.  And NorthBay is roughly

4    in the middle, at 2.1.

5    **Q.**    Okay.  So, and apart from giving each hospital a composite

6    score, is there anything else you did with your results?

7    **A.**    Yes.

8          **MR. MAURER:**  Move to the next slide, please.

9          (Document displayed.)

10         **THE WITNESS:**  Yes, there is.  The best way to do this,

11   I believe, is that instead of relying upon, sort of, the

12   ordinal ranking, is to look and say, what is the similarity?

13         Because small differences in, you know, in the data, you

14   know, could drive, you know, moving one hospital ahead of

15   another, back and forth, because the numbers are very close.

16   We're talking about small numbers, and so small changes

17   potentially could move one or the other.

18         And so the better way to do it -- and it's one of the

19   reasons why CMS uses a star system -- they don't tell you in a

20   star system that if you're a 3-star hospital that you're in the

21   middle or the bottom.  They just say you're a 3-star hospital.

22         So what I did was I essentially created three groups.  And

23   I used the statistical methods of standard deviation to say,

24   okay, which of these hospitals are more than one standard

25   deviation from the mean; their scores are better than one?

1    And so, you know, you have three hospitals that came up

2  above market average, and you have three that came up below

3  market average.  And in the average group, NorthBay is in the

4  average group.

5    So it's a way, if I was to use a star system in this, that

6  would be a 1, 3, 5, just like, you know, Healthgrades did.

7  **BY MR. MAURER:**

8  **Q.**  Okay.  So we'll move on to the second analysis here in a

9  second.  Just a couple more questions.

10    So are there any other rating systems or industry sources

11  that use the composite score methodology that you've done here?

12  **A.**  Yes.  The -- to a certain extent the way CMS actually does

13  their star system, it's a composite approach of all these

14  different measures.

15    Becker's Healthcare Review, which is an online news, daily

16  news thing, and they publish other -- they do other sort of

17  publishing, recently did a Top 100 Hospitals in the Country.

18    And they used essentially the same methodology I used,

19  where they took all the rating agencies and came up with an

20  average of the rating agencies to get an apples to apples and

21  say this is the group of the top 100 hospitals in the country.

22  **Q.**  And this case is about the reasonable value of emergency

23  services.  Are emergency services taken into account in this

24  analysis?

25  **A.**  Yes.  And they are in the sense that emergency rooms for

1    most hospitals have become the front door.  The majority of

2    patients are coming in through, you know, the emergency room.

3         And so their care as patients in the hospital are

4    reflected in the -- you know, in these ratings from CMS data,

5    et cetera.

6         So those patients, you know, in terms of the infections

7    that they got in the hospital, in terms of safety events, are

8    timeliness.  So emergency room patients are included in the

9    overall, you know, rating systems.

10   **Q.**   So let's move on to the next slide and your second

11   analysis.

12        So what was the objective of your second analysis?

13   **A.**   Well, I think it's important to do a check on your first

14   analysis.  And so this was essentially my check system.

15        And what I did was I took data from a variety of sources,

16   you know, from the underlying data not the high -- not using

17   the 5 stars in CMS but looking at some of the underlying data

18   there, looking at the underlying data that was in Leapfrog, and

19   created an analysis using this Donabedian framework of

20   structure process and outcome.

21   **Q.**   Okay.  So we'll talk about a Donabedian framework in just

22   a second.

23        But, briefly, what were the results of your second

24   analysis here?

25   **A.**   My second analysis was virtually the same as my first.

1    There was some very minor movement between the hospitals and

2    between the group, but essentially the same.  NorthBay's, you

3    know, quality and performance compared to the average of the

4    group.

5    **Q.**   Can you explain, what is the Donabedian framework?

6    **A.**   Well, Donabedian was a researcher at University of

7    Michigan, and roughly 40 years ago came up with the idea that

8    if you're going to talk about quality in hospitals, that, you

9    know, really you have to talk about a structure, process and

10   outcomes.

11   **Q.**   Okay.  Why don't you describe the structure component.

12   **A.**   Okay.  So structure, structure is traditionally the way

13   we've looked at it.  We say they must be good quality because

14   we have good doctors and good nurses, and have these

15   certifications, and we have these good facilities, and we have

16   these good equipment.

17        And that's important.  No question about it.  But it's how

18   the -- what Donabedian pointed out is how those -- structure is

19   used to produce the care.  And so that's where the process

20   comes in place.  So how you use that structure, and then

21   actually to deliver care.  So how you do the diagnostic

22   processes, how nursing is organized, how the cleaning system

23   works, how the food service works, the accuracy of the

24   laboratory, all those are processes.  And so there are lots of

25   measures around processes just like there's measures around

1  structure.

2      And then the two of them together, that then leads to the

3  outcome.  When we think of outcomes, we think from a patient

4  perspective what was their experience, or we think about the

5  overall clinical mortality, the in-hospital mortality, or

6  30-day mortality, or did they get the right care, or what the

7  cost was.

8      So Donabedian said you just can't look at structure; you

9  need to look at all three of these components.

10 **Q.**  Okay.  So let's go to the next slide.  So how did you use

11 the Donabedian framework to compare NorthBay with the peer

12 group of hospitals?

13 **A.**  Well, what I did was I took data from each of the -- you

14 know, I took data from the different sources, you know,

15 Leapfrog, CMS, et cetera, and I funneled the data, you know,

16 the metrics into the right bucket structure, process or

17 outcome.

18      And then what I did was I said, okay, let's -- you know,

19 we'll score all the hospitals on structure and we'll rank 'em,

20 all right.  And I ranked 'em.  And I scored them all on process

21 and ranked 'em.  And I scored 'em all on outcomes and ranked

22 them.  And I took that ranking and, you know, put it together

23 and scored them, you know, one overall sort of -- one overall

24 sort of ranking.

25 **Q.**  Okay.  And before we get to your results, just one quick

1  question.  You mentioned certifications and designations that

2  hospitals may have.

3      Do they fit into this equation at all?

4  **A.**   Absolutely.  They are counted in the structure component.

5  **Q.**   Okay.  And those are things like a trauma designation, a

6  magnet status.  Are those things accounted for in the analysis?

7  **A.**   Magnet status I accounted for.  Trauma designations I

8  accounted for.  Certifications, stroke centers, you know, et

9  cetera, I accounted for.  The Joint Commission accreditations.

10 So all those sort of -- those are all structural elements.

11     And there are other structural elements I took from

12 Leapfrog and put into this -- into the analysis.

13 **Q.**   All right.  So what were the results of your analysis

14 using the Donabedian framework?

15 **A.**   Well, virtually the same as the -- as my composite

16 analysis.

17     And so you see that we have -- we still have eight

18 hospitals in the middle.  We have now Woodland Memorial dropped

19 into the lower group.  We have two hospitals above market

20 average.  And there was a switch, and one of the hospitals had

21 dropped down.

22     So essentially they're the same.  I used the same sort of

23 distribution analysis to put them in the groupings.

24 **Q.**   All right.  So you were going to use this as a check and

25 essentially it check out?

1  **A.**   Right.  This was a check on my composite analysis.

2  **Q.**   All right.  Before we move on to the third analysis, are

3  there any other rating systems or resources that used the

4  Donabedian framework analysis?

5  **A.**   Well, the Donabedian framework is the underlying framework

6  that is used by *U.S. News & World Report* to do their analysis.

7  It's the same framework used by Leapfrog to come up with their

8  letter grade.  It's the same, you know, theoretical framework

9  used by Healthgrades.  To a certain extent, it's also used by

10  CMS and all the others.  So it is the basic way that academics

11  and others look at quality in healthcare.

12  **Q.**   All right.  Let's move on to the third analysis.  This is

13  the analysis for specific clinical services.

14      What was the purpose of this third analysis?

15  **A.**   Well, this was to look at a more granular level.  So now

16  we looked at the care at an overall level, how about by

17  specific service.

18      So I did an analysis, you know, in each one of these

19  services.

20  **Q.**   Okay.  What specific services did you look at?

21  **A.**   Well, we looked at general surgery, cardiology, neurology,

22  oncology, mother and child, and trauma.

23  **Q.**   And briefly what were the results of your analysis?

24  **A.**   The results were that NorthBay's quality and performance

25  in each one of these services is roughly average.  It's very

1    similar to the average of the group.

2    **Q.**   So why don't we -- why don't we look at each clinical

3    specialty briefly.  Let's start at the bottom.  Actually, let's

4    start with trauma.

5        What did you do to compare NorthBay's trauma programs to

6    the rest of the peer group?

7    **A.**   There's no public data on trauma.  NorthBay collects data

8    internally with the American College of Surgeons.  There's no

9    public source of trauma data.

10       So the trauma patients again are -- you know, basically

11   they're accounted for in the overall sort of hospital rank.

12   There's no breakout.  Because there was no breakout data, and I

13   knew that NorthBay was a trauma center, so what I did was

14   simply look and say, are there any other trauma centers in this

15   market?

16       And there are three others.  And so my conclusion was if

17   there are three others, then NorthBay is not unique in its

18   trauma-based services.

19   **Q.**   All right.  So let's move on to the next specialty, the

20   general surgery specialty.  So what did you do to compare

21   NorthBay with its peer group hospitals in that specialty?

22   **A.**   Okay.  So I went back again to Healthgrades, to *U.S.*

23   *News & World Report*, to CMS, and pulled out specific data

24   around general surgery.  And so types of general surgeries.

25       *U.S. News & World Reports* ranks hospitals based upon --

1  for gastroenterology.  You can see the rankings.  Colorectal

2  surgery, there's a 30-day mortality rate.  Esophageal -- you

3  know, stomach surgery, there's a mortality rate, in-hospital

4  30-day mortality rate.  And gall bladder removal surgery.

5      So I looked at that data and then -- you know, for all the

6  hospitals, you know, that provided those services.

7  **Q.**  Okay.  So you're looking at the metrics that are relevant

8  to the specific specialty; right?  That's how we're doing it

9  here?

10  **A.**  I'm sorry, could you repeat.

11  **Q.**  So just so I understand the specific metrics, for example,

12  for general surgery those are the metrics that are most

13  applicable to that specific specialty?

14  **A.**  Yes, that's exactly what it is.  I took those data points

15  I could find publicly and create a profile what it looks like.

16  **Q.**  Okay.  And then with respect to general surgery, how did

17  NorthBay fair?

18  **A.**  NorthBay essentially was in the middle.  I mean, you can

19  look that they're average.  They got a little higher than the

20  average on the *U.S. News & World Report* score, but, you know,

21  they're a little bit below average on, you know, the other

22  scores at the bottom.  So you have the averages across the very

23  bottom there.

24  **Q.**  Okay.  Let's move on to the cardiology specialty.  So what

25  did you do to compare NorthBay's cardiology services to those

1  of the peer group?

2  **A.**   I pulled out publicly available data on heart attack and

3  heart failure.  Same sort of thing.  30-day mortality rates and

4  unplanned readmission rates and unplanned readmissions is one

5  of the things that people look at across the country in terms

6  of hospital quality.

7       And, again, NorthBay's performance is average.

8  **Q.**   Let's look at the neurology specialty.

9  **A.**   Neurology, primarily looking at stroke, and how patients

10  that come in with a stroke and how well they're treated.  And,

11  again, there were two sources.  There's the -- the *U.S.*

12  *News & World Report*, which is that first column, and then

13  Healthgrades.com, and their 1 to 5 star ratings.  And, again,

14  NorthBay is essentially -- they're average.

15  **Q.**   Let's look at the oncology specialty.  What did you do to

16  compare NorthBay to the comparison peer group in oncology?

17  **A.**   Oncology, somewhat similar to trauma.  They're not

18  specific metrics that are reported to CMS.  But *U.S.*

19  *News & World Report*, using their structure process and outcome

20  approach, come up with a ranking of oncology programs.

21       So I used the *U.S. News & World Report* rankings.  And they

22  identify in this group that there were three hospitals which

23  were high performing.  There are three hospitals that are not

24  rated.  And then NorthBay is rated average along with, I

25  guess -- one, two, three, four, five, six -- seven other

1   hospitals.

2   **Q.**   Let's look at our last slide, the mother and child

3   specialty.  What were the results of that analysis?

4   **A.**   Again, this is data that was reported by the hospitals to

5   California Hospital Comparer.  And that is, again NorthBay is

6   essentially in the middle average compared to the rest of the

7   hospitals in the group.

8           **MR. MAURER:**  Thank you, Mr. Pugh.  No further

9   questions at this time.

10          **THE COURT:**  All right.

11      Mr. Tooch.

12          **MR. TOOCH:**  Thank you, Your Honor.  If I may take a

13  moment to just put up the podium -- the easel.

14      Thank you.

15                      **CROSS-EXAMINATION**

16  **BY MR. TOOCH:**

17  **Q.**   Good morning, Mr. Pugh.

18  **A.**   Good morning.

19  **Q.**   What are the rating systems that you used?  Except for

20  Yelp, you used CMS data; right?

21  **A.**   I believe -- yes, all of the rating systems, with the

22  exception of Yelp, used some form of CMS data.

23  **Q.**   And CMS is the Center for Medicare and Medicaid Services?

24  **A.**   That is correct.

25  **Q.**   It's the program which runs the Medicare and Medicaid

1  program; right?

2  **A.**   Correct.  They administer the Medicare and Medicaid

3  program.

4  **Q.**   And all that information, as you said, is publicly

5  available?

6  **A.**   Yes, it is.

7  **Q.**   It's on the Medicare.gov website; right?

8  **A.**   Yes.  They do the star ranking through hospital

9  comparatives, some extension of Medicare.gov.

10  **Q.**   Okay.  And you said in direct -- you said in direct

11  examination that it's important to use current data; right?

12  **A.**   I'm sorry, could you repeat.  You fell off at the end.

13  **Q.**   You said on direct exam that it's important to use current

14  data?

15  **A.**   It's important to use -- it's important to use all the

16  data that you can find out there.

17  **Q.**   Okay.  You prepared a report in this case in

18  November 2018; correct?

19  **A.**   Correct.

20  **Q.**   And in connection with that report, you used old data,

21  didn't you?

22  **A.**   I used the data that was currently available in 2018, that

23  was published on on the CMS sites and others.

24  **Q.**   Okay.  If you can go to Exhibit 174, please.

25       You were shown this document in your deposition; right?

1   **A.**   Correct.

2   **Q.**   And this document reflects what data was in the

3   Medicare.gov website as of November 30th, 2018, doesn't it?

4   **A.**   Correct.

5        **MR. TOOCH:**   Permission to publish.

6        **THE COURT:**   Is there any objection?

7        **MR. MAURER:**   No.

8        **THE COURT:**   All right.  It's admitted.

9        (Trial Exhibit 174 received in evidence.)

10       (Document displayed.)

11  **BY MR. TOOCH:**

12  **Q.**   Okay. So as of November 30, 2018 -- it says "Data

13  Collection Period."  And it says from July 1, 2013 through

14  June 30th, 2016.  Do you see that?

15  **A.**   I do.

16  **Q.**   So when did you your report in 2018, you were using data

17  from 2013 to 2016; correct?

18  **A.**   I was using CMS-published star ratings from -- you know,

19  which is based upon some of this data and other data which may

20  be more current.

21  **Q.**   And when was the contract in this case terminated?

22  **A.**   I'm sorry?

23  **Q.**   When was the contract in this case terminated?

24  **A.**   When was the --

25  **Q.**   Contract between NorthBay and Blue Shield terminated.

1    **A.**    I have no -- not part of my testimony.  I have no idea.

2    **Q.**    Did Blue Shield's lawyers ever tell you when it was

3    terminated?

4            **MR. MAURER:**  Objection.  Sorry, proceed.

5            **THE WITNESS:**  No.

6    **BY MR. TOOCH:**

7    **Q.**    There was more current available data at the time that you

8    did your report, wasn't there?

9    **A.**    Not that I'm aware of.

10   **Q.**    If you can go to Exhibit 175.

11           Exhibit 175 is a Hospital Compare Preview Report, dated

12   May 21, 2018.  And it has a Bates stamp NBBS-069976.

13           Have you ever seen this document before?

14   **A.**    I have not.

15   **Q.**    This document was produced to Blue Shield's counsel.  Did

16   Blue Shield's counsel ever send you this document?

17   **A.**    I have not seen this document before.

18   **Q.**    Did you ask Blue Shield's counsel whether or not it

19   received any information about quality from NorthBay?

20   **A.**    I did ask for documents that related to quality.

21   **Q.**    And did you get any?

22   **A.**    I did get some documents.

23   **Q.**    Did you get this document?

24   **A.**    I did not get this document.

25           **MR. TOOCH:**  Permission to publish, Your Honor.

1    **THE COURT:**  You haven't laid a foundation yet,

2  Mr. Tooch.

3  **BY MR. TOOCH:**

4  **Q.**  Are you aware that as of May 21, 2018, NorthBay had an

5  overall star rating of 3, and not 2?

6  **A.**  Actually, that's not correct.  The overall star rating is

7  the publicly published rating.  This is not published.

8  **Q.**  I understand it wasn't published yet, but according to the

9  Hospital Compare Preview Report, using data from the fourth

10  quarter 2016 through the third quarter 2017 discharges, CMS had

11  increased NorthBay's star rating from 2 to 3?

12    **MR. MAURER:**  Objection, Your Honor.  There's no

13  foundation for the document he's reading from.

14    **THE COURT:**  Sustained.

15  **BY MR. TOOCH:**

16  **Q.**  Have you ever seen documents like this before?

17  **A.**  I have not.

18  **Q.**  So you have never seen a Hospital Compare document in this

19  format?

20  **A.**  I have never seen -- that's correct.  I've never seen an

21  internal Hospital Compare document in this format.

22  **Q.**  Have you ever seen the documents that Medicare requires

23  the hospitals to provide?

24    **MR. MAURER:**  Objection.  Vague.

25    **THE COURT:**  Overruled.

1      You can answer, if you can.

2          **THE WITNESS:**  I'm sorry, would you repeat that

3   question?  I'm not sure.

4   **BY MR. TOOCH:**

5   **Q.**   Have you ever seen any documents that Medicare requires

6   the hospitals to provide to it for the data?

7   **A.**   Yes.

8   **Q.**   Okay.  And have you ever seen the documents that Medicare

9   sends to the hospitals about that data before it publishes the

10  data?

11  **A.**   No.

12  **Q.**   Did you make any attempt to determine whether or not there

13  was more current data than 2013 to 2016 data?

14  **A.**   I made a very thorough attempt to look and see what data

15  and ranking systems were published in November of this last --

16  you know, November of 2018, whenever I wrote my report.  I

17  looked at a variety of rating systems that did not include

18  NorthBay, and these other hospitals, and eliminated those.

19      So I looked broadly across to see what was publicly

20  available.

21  **Q.**   And, again, you didn't make any attempt to find out from

22  Blue Shield's lawyer whether it received more current data than

23  the data you relied on with respect to NorthBay?

24  **A.**   I'm not sure the way that you characterize that question

25  is correct.

1       I asked Blue Shield, I asked counsel to send me data -- I

2  mean, to do a search of -- excuse me, to do a search of

3  documents that had been produced in this case that I could

4  look -- that might have some relation to quality.  They sent me

5  a variety of documents.  I looked at 'em and did not use any of

6  them in my -- preparing my report.

7  **Q.**  So they didn't send you this document, and you didn't use

8  it?

9  **A.**  That is correct.

10 **Q.**  Now, you said that small -- you said small changes make a

11 difference, words to that effect, in your direct examination;

12 right?

13 **A.**  Correct.

14 **Q.**  So if NorthBay is a Level III as opposed to a Level II,

15 that would make a difference; right?

16 **A.**  Maybe.

17 **Q.**  Well, how many --

18 **A.**  No, not -- it might make a difference.

19 **Q.**  There are 5 stars in the CMS system; right?

20 **A.**  Correct.

21 **Q.**  And so each star is a 20 percent difference between the

22 others, isn't it?

23 **A.**  No.

24 **Q.**  So you say -- what's the --

25 **A.**  Their star rating system is not based upon a normal

1    distribution.

2    **Q.**  So what's the percentage difference between a 1 and a 2?

3    **A.**  I'd have to go back to look at my notes.  I don't recall

4    it off the top of my head, but I do know it is not an even,

5    normal distribution.

6    **Q.**  And now I think you said in your report that there are 57

7    different metrics underlying the CMS data; right?

8    **A.**  Correct.

9    **Q.**  And not all hospitals have the same number of metrics;

10   correct?

11   **A.**  That's correct.

12   **Q.**  You said on average there are 39 metrics that a hospital

13   has?

14   **A.**  Correct.

15   **Q.**  How many metrics did NorthBay have?

16   **A.**  I don't know.

17   **Q.**  How many -- what metrics did Sutter Delta have?

18   **A.**  I'm sorry?

19   **Q.**  How many metrics did Sutter Delta have?

20   **A.**  I don't know.  I didn't look and count the number of

21   metrics that are -- that each hospital in the market used that

22   were used in the CMS data.

23   **Q.**  So if one hospital has two metrics and another hospital

24   has 57 metrics that makes a difference, doesn't it?

25   **A.**  Actually, that's not possible.  There's a minimum number

1    of metrics.  And, actually, that's not right either because

2    part of the CMS grouping formula is to level that out.

3        I mean, so they use this complex algorithm so that they

4    can compare smaller hospitals with less services and give them

5    a 3 star, as well as a large hospital with more extensive

6    service give a 3 star.  So that's built into the way that they

7    do their star system.

8    **Q.**   You said that this case involves -- you know that this

9    case involves emergency room services; right?

10   **A.**   I do.

11   **Q.**   You said something like that's the front door to the

12   hospital; correct?

13   **A.**   I'm sorry, please repeat the second question.

14   **Q.**   Did you use the term that that's like the front door to

15   the hospital?

16   **A.**   I did say that the emergency room has become the front

17   door of the hospital for many hospitals.

18   **Q.**   Okay.  Did you look at the metrics for NorthBay on the CMS

19   website for emergency services compared to the other hospitals?

20   **A.**   The metrics that I remember from, yes.  And the metrics I

21   remember have to do with waiting time.

22   **Q.**   Okay.  Did you compare NorthBay's emergency room to other

23   emergency rooms?  In other words, how busy they are?

24   **A.**   No, I did not make that comparison.

25   **Q.**   Does it make a difference if an emergency room has 150

1  patients a day versus another emergency room that has 12

2  patients a day?

3  **A.**   I'd have to ask a question to you.  A difference in what?

4  **Q.**   Difference when you're comparing hospitals to hospitals.

5       For example, waiting times, does that make a difference,

6  if there are 150 people in one waiting room and there are 12 in

7  another waiting room?

8  **A.**   Actually, in my experience, I've seen some very busy

9  hospitals with virtually no waiting time, and I've seen some

10 small hospitals with very large waiting time.  And so that --

11 it is not a function of the number of people coming in the

12 door; it's a function of the way they're organized.

13 **Q.**   Exactly.  If you have a hospital with a busy waiting room

14 with short waiting times, that's a lot better than a hospital

15 with a small waiting room number and large times; correct?

16 **A.**   And the inverse is also true.

17 **Q.**   Okay.  Let's go to Exhibit 173.

18 **A.**   173.

19 **Q.**   Yes.  173-A.

20 **A.**   I have nothing -- I have nothing in 173.

21       **MR. TOOCH:**  May I approach, Your Honor?

22       **THE COURT:**  Yes.

23       **THE WITNESS:**  I still have nothing in 173.

24    Thank you.

25

1   BY MR. TOOCH:

2   Q.   Okay.  Looking at Exhibit 173-A, do you recognize this

3   document?

4   A.   I know what this document is, but I'm not sure I recognize

5   it.

6   Q.   What is it?

7   A.   This is from Hospital Compare, looking at timely emergency

8   care.

9   Q.   And this is a publicly available on the Medicare.gov

10  website?

11  A.   Some of the data, yes, is publicly available.

12  Q.   This is the underlying metrics that you talked about;

13  right?

14  A.   Some -- one set of underlying metrics, yes.

15          MR. TOOCH:  Permission to publish, Your Honor.

16          THE COURT:  You're moving to admit?

17          MR. TOOCH:  Yes.

18          THE COURT:  Any objection?

19          MR. MAURER:  Objection.  Lacks foundation with respect

20  to these specific documents that he's showing.

21          THE COURT:  Overruled.  It's admitted.

22      (Trial Exhibit 173-A received in evidence.)

23      (Document displayed.)

24  BY MR. TOOCH:

25  Q.   Okay.  The first document, can you see it says "NorthBay

1    Medical Center."  Do you see that?

2    **A.**    I do.

3    **Q.**    And then at the top it says, Timely and effective care:

4    Emergency care details.  Do you see that?

5    **A.**    I do.

6    **Q.**    Now, if you turn to the second page.

7          On the top it says "Emergency Department Volume - Very

8    High."  Do you see that?

9    **A.**    I do.

10   **Q.**    So according to the federal government, NorthBay's

11   emergency room department is very high.  Do you see that?

12   **A.**    I see that.

13   **Q.**    Let's go to Exhibit B in this exhibit.  There's a tab B.

14   **A.**    Tab B.  Okay.

15   **Q.**    Behind tab B do you see there's another Medicare.gov

16   Hospital Compare page for Kaiser Foundation Vacaville?  Do you

17   see that?

18   **A.**    I do see that.

19         **MR. TOOCH:**  Move to admit, Your Honor.

20         **THE COURT:**  Any objection?

21         **MR. MAURER:**  No objection.

22         **THE COURT:**  All right.  It's admitted.

23      (Trial Exhibit 173-B received in evidence.)

24      (Document displayed.)

25

1  **BY MR. TOOCH:**

2  **Q.**   Now, do you see on the second page for emergency

3  department volume, "Not Available"?  Do you know what that

4  means?

5  **A.**   Do I know what "not available" means?

6  **Q.**   Yes.

7  **A.**   It means it's not been reported.

8  **Q.**   Do you know why Kaiser Vacaville does not report its data

9  to the federal government?

10  **A.**   I have no idea.

11  **Q.**   Let's go to Exhibit C under 173.  This is a Medicare.gov

12  Hospital Compare report for Kaiser Foundation Walnut Creek;

13  correct?

14  **A.**   That's what it says.

15       **MR. TOOCH:**  Move to admit, Your Honor.

16       **MR. MAURER:**  No objection.

17       **THE COURT:**  It's admitted.

18       (Trial Exhibit 173-C received in evidence.)

19       (Document displayed.)

20  **BY MR. TOOCH:**

21  **Q.**   If you go to this document, on the second page it says

22  "Emergency Department Volume - Not Available," doesn't it?

23  **A.**   I see that.

24  **Q.**   If you can go to Exhibit D.  This is another Medicare.gov

25  for Kaiser Foundation Hospital and Rehab Center.

1    MR. TOOCH:  Move to admit this document, Your Honor.

2    THE COURT:  Any objection?

3    MR. MAURER:  No objection.

4    THE COURT:  It's admitted.

5    (Trial Exhibit 173-D received in evidence.)

6    (Document displayed.)

7    BY MR. TOOCH:

8    Q.   If you go to the second page, the emergency department

9    volume is also not available, is it?

10   A.   It says it's not available.

11   Q.   Okay.  Let's go to Exhibit E.  And this is a Hospital

12   Compare report for emergency department for Queen of the Valley

13   Medical Center; correct?

14   A.   That's correct.

15   Q.   And that's one of the hospitals you looked at; right?

16   A.   Correct.

17       MR. TOOCH:  Move to admit.

18       THE COURT:  Any objection?

19       MR. MAURER:  No objection.

20       THE COURT:  It's admitted.

21   (Trial Exhibit 173-E received in evidence.)

22   (Document displayed.)

23   BY MR. TOOCH:

24   Q.   If you go to the second page, under Emergency Department

25   Volume, according to the federal government they have a medium

1    number of people in their emergency department; right?

2    **A.**    It says "Medium."

3    **Q.**    Let's go to Exhibit F.  This is a Hospital Compare report

4    for the emergency department for John Muir Medical Center

5    Concord campus; correct?

6    **A.**    That is correct.

7    **Q.**    And that is one of the hospitals you reviewed; right?

8    **A.**    Yes, it is.

9         **MR. TOOCH:**  Move to admit.

10        **THE COURT:**  Any objection?

11        **MR. MAURER:**  No objection.

12        **THE COURT:**  Admitted.

13    (Trial Exhibit 173-F received in evidence.)

14    (Document displayed.)

15   BY MR. TOOCH:

16   **Q.**    And if you go to the second page of this document, it has

17   a high volume; correct?

18   **A.**    Correct.

19   **Q.**    If you can go to Exhibit G.  This is a Hospital Compare

20   for the emergency department at John Muir Medical Center Walnut

21   Creek; correct?

22   **A.**    That is correct.

23        **MR. TOOCH:**  Move to admit.

24        **THE COURT:**  Any objection?

25        **MR. MAURER:**  No objection.

1      **THE COURT:**  Admitted.

2      (Trial Exhibit 173-G received in evidence.)

3      (Document displayed.)

4  **BY MR. TOOCH:**

5  **Q.**   If you go to the second page, they have a volume that is

6  high; correct?

7  **A.**   That's what it says.

8  **Q.**   If you go to Exhibit H, this is the Hospital Compare

9  emergency department report for Kaiser Foundation Hospital

10  Antioch.  Do you see that?

11  **A.**   I do.

12      **MR. TOOCH:**  Move to admit.

13      **THE COURT:**  Any objection?

14      **MR. MAURER:**  No objection.

15      **THE COURT:**  It's admitted.

16      (Trial Exhibit 173-H received in evidence.)

17      (Document displayed.)

18  **BY MR. TOOCH:**

19  **Q.**   If you see on the second page, there's no data reported

20  for the volume of this hospital?

21  **A.**   It says "Not Available."

22  **Q.**   And two more.  Exhibit I is the Hospital Compare report

23  for the emergency department at Sutter Davis; correct?

24  **A.**   That is correct.

25  **Q.**   And that is one of the hospitals that you reviewed in your

1  analysis?

2  **A.**    Yes, it is.

3        **MR. TOOCH:**  Move to admit.

4        **THE COURT:**  Any objection?

5        **MR. MAURER:**  No objection.

6        **THE COURT:**  Admitted.

7     (Trial Exhibit 173-I received in evidence.)

8     (Document displayed.)

9  **BY MR. TOOCH:**

10  **Q.**    And if you look at the second page, the emergency

11  department volume is medium; correct?

12  **A.**    That is correct.

13  **Q.**    Finally, if you look at Exhibit J, this is the Hospital

14  Compare report for the emergency department at Woodland

15  Memorial Hospital.  Do you see that?

16  **A.**    Yes, that is correct.

17        **MR. TOOCH:**  Move to admit.

18        **THE COURT:**  Any objection?

19        **MR. MAURER:**  No objection.

20        **THE COURT:**  Admitted.

21     (Trial Exhibit 173-J received in evidence.)

22     (Document displayed.)

23  **BY MR. TOOCH:**

24  **Q.**    If you see on the second page of that they have a medium

25  volume; correct?

1   **A.**   That is correct.

2   **Q.**   So of all of these hospitals, NorthBay has the highest

3   volume in its emergency department; right?

4   **A.**   I don't know that.  I know that it says that they're very

5   high.

6   **Q.**   Are you saying that the Medicare data is incorrect?

7   **A.**   I'm saying that I don't know the operational definitions

8   of very high, medium, you know, so -- and the fact that not

9   available doesn't necessarily -- it means the data hasn't been

10   reported.  It doesn't actually say whether -- you know, that --

11   I can't say that NorthBay has the highest volume of any of

12   these based upon what you've shown me.

13   **Q.**   Did you do any study of that?

14   **A.**   No.  I was not asked to do that.

15   **Q.**   Did you look at what the CMS definition of "very high" is?

16   **A.**   I did not look at the definition of "very high."

17   **Q.**   Go to Exhibit A in this report, second page.

18       If you look at the top, you see there "Measures."  Do you

19   see the measures at the top of the page?

20   **A.**   I see that at the top of the page, yes.

21   **Q.**   Okay.  A hospital with a low volume is patients below

22   20,000; right?

23   **A.**   The top of the page gives definitions of measures.  But

24   this is the first time I have seen this.

25   **Q.**   I understand it's the first time you've seen it.  But

1  according to the Medicare document --

2  A.   Right.

3  Q.   -- that we're looking at, a low volume is zero to 19,999

4  patients?

5  A.   That's correct.

6  Q.   And according to the Medicare document we're looking at, a

7  medium volume is 20,000 to 39,999 patients; right?

8  A.   That is correct.

9  Q.   And a high volume is 40,000 to 59,999 patients; correct?

10  A.   That is correct.

11  Q.   And a very high volume is over 60,000 patients a year;

12  correct?

13  A.   That's correct.

14  Q.   Okay.  So of these hospitals, NorthBay is the only one

15  that sees over 60,000 patients a year; correct?

16  A.   I don't know that.

17  Q.   All right.  Let's look at the first page of Exhibit 173-A.

18      Now, if you look at the -- some of the metrics, let's see

19  the -- let's go to the bottom of that, percentage of patients

20  who came to the emergency department with stroke symptoms who

21  received brain scan results within 45 minutes of arrival.

22  Higher percentages are better.

23      You would agree that it's important to have a brain scan

24  for a stroke patient as soon as possible; right?

25  A.   I would agree with that.

1  **Q.**  According to the Medicare Hospital Compare data, in

2  84 percent of 44 patients, NorthBay was able to give a brain

3  scan within 45 minutes, according to this; right?

4  **A.**  That's correct.

5  **Q.**  Okay.  If we can go to Exhibit B, for Kaiser the data is

6  not available; correct?

7  **A.**  Yes, Kaiser Hospital Foundation Vacaville, yes.

8  **Q.**  Exhibit C for the Kaiser Foundation Walnut Creek, it's not

9  available; right?

10  **A.**  That is correct.

11  **Q.**  And for the next Kaiser hospital, D, it's also not

12  available; right?

13  **A.**  That is correct.

14  **Q.**  If you go to Exhibit E, and we look at Queen of the

15  Valley, they were successful in providing a brain scan within

16  45 minutes 75 percent of the time; correct?

17  **A.**  That's correct.

18  **Q.**  For 16 patients; right?

19  **A.**  That's correct.

20  **Q.**  So NorthBay was 84 percent of the time for 44 patients;

21  correct?

22  **A.**  Correct.

23  **Q.**  That's better than 75 percent of 16 patients; isn't it?

24  **A.**  That's correct.

25  **Q.**  If we can go to Exhibit F, this is for John Muir Concord;

1  right?

2  **A.**    Yes, it is.

3  **Q.**    According to this data, they were successful in giving a

4  brain scan 72 percent of the time for 32 patients; right?

5  **A.**    That is correct.

6  **Q.**    And so NorthBay's 84 percent for 44 patients is better

7  than that; right?

8  **A.**    That's correct.

9  **Q.**    If you can go to John Muir Walnut Creek, which you said

10  was the highest quality, the percentage of patients who got a

11  brain scan when they came in with a stroke was 55 percent for

12  11 patients; right?

13  **A.**    That's correct.

14  **Q.**    And that's much lower than 84 percent for 44 patients;

15  right?

16  **A.**    That is correct.

17  **Q.**    The next one is for Kaiser.  That's not available.

18      Under I, if we look at Sutter Davis, they got a score of

19  85 percent for 26 patients; right?

20  **A.**    That's correct.

21  **Q.**    And that's -- the percentage is close to the 84 percent

22  for NorthBay, but NorthBay had 44 patients compared to the 26

23  patients; right?

24  **A.**    I think you changed that from what you said before, but

25  85 percent is better than 84 percent.

1  **Q.**   Yes.  85 percent is better than 84 percent, yes?

2  **A.**   Correct.

3  **Q.**   But that's 85 percent on 26 patients versus 44 patients?

4  **A.**   Correct.

5  **Q.**   And then if you look at Woodland Memorial, they use

6  89 percent, but they only have 19 patients; right?

7  **A.**   That's correct.

8  **Q.**   Okay.  Let's go to number A again.

9      Now, they -- at the bottom of Exhibit A, the second page

10  is the average time, the median, that patients spend in the

11  emergency department before they are seen by a healthcare

12  professional.  A lower number of minutes is better.  You would

13  agree that that's important --

14  **A.**   Yes, I would.

15  **Q.**   -- when you get to an emergency department, it's important

16  you see a doctor right away; right?

17  **A.**   Well, see a doctor.  But this actually says "healthcare

18  professional."  So that could be a nurse, that could be

19  somebody else.

20  **Q.**   Okay.  A nurse or a doctor?

21  **A.**   Pardon?

22  **Q.**   A nurse or a doctor?

23  **A.**   A nurse or a doctor.

24  **Q.**   Okay.  So according to this, NorthBay has a nurse or a

25  doctor see the patients in the emergency room within 16

1    minutes.

2        Have you ever been to a busy emergency room and been seen

3    within 16 minutes?

4    **A.**   I'm sorry, could you ask --

5    **Q.**   Have you ever been to a busy emergency room and been seen

6    by a doctor or nurse within 16 minutes?

7    **A.**   Have I ever seen that before?  Yes.

8    **Q.**   Let's look at the comparisons that you have.

9        Kaiser it's not available, so we can skip the Kaiser ones.

10       If you can go to Exhibit E, for Queen of the Valley,

11   second page, with the medium volume it's 31 minutes, according

12   to this report; right?

13   **A.**   That's correct.

14   **Q.**   If you go to Exhibit F, for John Muir Concord, it's 29

15   minutes; correct?

16   **A.**   That's correct.

17   **Q.**   And John Muir Walnut Creek, it's 15 minutes; correct?

18   **A.**   That's correct.

19   **Q.**   The next one is Kaiser data.

20       Next one is Sutter Davis.  That's 22 minutes; correct?

21   Exhibit I.

22   **A.**   Excuse me, you said -- oh, I'm sorry, that's Kaiser.  Got

23   to get to -- Sutter Davis is 22 minutes, yes, correct.

24   **Q.**   Okay.  And Woodland Memorial, they're very good, at 6

25   minutes?

1    A.    Six minutes, yes, that's correct.

2    Q.    So would you agree, Mr. Pugh, that you can't just look at

3    overall scores, but you have to dig down below the metrics to

4    see what each hospital is like; right?

5    A.    Is that a question?

6    Q.    Yes.

7    A.    Would you repeat that question.

8    Q.    Okay.  I'll rephrase it.

9         It's important to know, when you're looking at metrics for

10   emergency departments, whether it's a high-volume place versus

11   a low-volume place; correct?

12   A.    Correct for what?

13   Q.    When you're doing a quality analysis.

14   A.    Not necessarily.

15        So using -- the approach I used was to look at the overall

16   quality as reported in these websites.  That -- the emergency

17   room data is part of that overall how they came up with the

18   overall star ratings for CMS.  It's part of how HealthInsight

19   comes up.  It's all baked in, right.

20        I was not asked to do a separate analysis of emergency

21   rooms, all right.  And so, instead, I was asked to do a

22   separate analysis of general surgery, OB, as service lines.

23        Nor did I do an analysis of how well the radiology

24   department works or how well the food service department works.

25   I mean, you could go down to that level, but the data that's

1   out there, right -- and this is part of the data, but it was

2   not a matter of trying to compare all these hospitals at

3   this -- at this one departmental level, right.

4       If I had been asked to do that, I could have done that,

5   but I didn't do that, right.

6   **Q.**   Blue Shield's lawyers never asked you to do a report on

7   the emergency services at NorthBay?

8   **A.**   I was not asked -- I was asked to review the general

9   surgery, the neurology, I mean the list that I testified to

10  earlier in my report, and to look at trauma services.

11      Trauma services, emergency room services are not the same.

12  **Q.**   I agree with that.  But let me get -- let me understand

13  what you're saying.

14      So the list of services you were asked to review was

15  provided to you by Blue Shield's lawyers?

16  **A.**   Correct.

17  **Q.**   You didn't come up with that list on your own?

18  **A.**   No, I did not.

19  **Q.**   Okay.  Did you ask them why they chose that list and not

20  another list like emergency room services?

21  **A.**   Uhm, my understanding was is that these were services that

22  NorthBay was going to testify to about the quality of their

23  services.

24  **Q.**   You could have looked at this data if you wanted to,

25  right, about emergency services?

1    **A.**   I have to go back to what I was asked to do in my report.

2    I was asked to do an overall valuation of the quality of care

3    provided by NorthBay compared to these other hospitals.

4        So asked to do it at an aggregate level, which I did.  And

5    again these metrics, as are other metrics we could pull out and

6    start looking at the comparison of, say, hospital-based

7    infection rates between -- you could do it at that -- you know,

8    that level.  We didn't.  You know, we looked at the high level,

9    right.  And then I was asked to look at specific services,

10   which I gave that analysis earlier.

11   **Q.**   What is this case about?

12   **A.**   What's the what?

13   **Q.**   What is this case about?

14   **A.**   This case is -- my understanding of this case?

15   **Q.**   Yes.

16   **A.**   This case is a dispute about payment.

17   **Q.**   Payment for what?

18   **A.**   Services, you know, provided to -- by NorthBay to --

19   excuse me, to Blue Shield patients.

20   **Q.**   What type of services?

21   **A.**   I'm assuming that services around general surgery,

22   oncology, mother and child, trauma, all those services that,

23   you know, were listed.

24       But I did not -- I've not seen a breakout of the specific

25   claims or the types of services, you know, that were -- you

1    know, that are being, you know, argued about in this case.

2    Q.    In fact, you didn't do a service-by-service comparison of

3    the hospitals in this report; correct?

4    A.    No, I did do a service-by-service comparison.  I looked at

5    neurology services, I looked at general surgery services, I

6    looked at the outcomes of those services as publicly reported;

7    so the listed.  That wasn't service by service.

8    Q.    Okay.  And we'll get to those in a moment.

9          How many of the 13 hospitals that you looked at have a

10   cath lab?

11   A.    How many of these hospitals have a cath lab?

12   Q.    Yeah.

13   A.    I don't know.

14   Q.    What is done in a cath lab?

15   A.    I'm sorry?

16   Q.    What types of services are done in a cath lab?

17   A.    The cardiology, invasive cardiology procedures are done in

18   a cath lab.  And there may be some interventional radiology

19   procedures that can also be done in a cath lab.

20   Q.    How many of these hospitals do neurosurgery?

21   A.    I don't know.

22   Q.    How many of these hospitals do cardiovascular surgery?

23   A.    I don't know.

24   Q.    How many of these hospitals have NICU units?

25   A.    How many of the hospitals have ICU units?

1  **Q.**   NICU.

2  **A.**   Oh, NICU.  Neonatal or neurology ICU?

3  **Q.**   Neonatal.

4  **A.**   I don't know.

5  **Q.**   What's the difference between a Level II and Level III

6  NICU?

7  **A.**   Level II and Level III NICU, the main difference is the

8  staffing, the in-house staffing and availability of

9  professionals between the different -- to provide care to the

10  babies.

11  **Q.**   And why is there a difference in the staffing?

12  **A.**   Why is there a difference in the staffing between the II

13  and a III?

14  **Q.**   (Nods head.)

15  **A.**   It's the hospital's commitment to providing that level of

16  service.  So, you know, they have to contract with physicians

17  to provide, you know, in-house coverage for certain things and

18  response times for other things.

19  **Q.**   Are you saying that the staffing levels are physician

20  staffing levels?

21  **A.**   I'm sorry?

22  **Q.**   Are you saying that the staffing levels on the NICU are

23  physician staffing levels?

24  **A.**   The difference in my -- I didn't study the NICUs in these

25  organizations.

1        Based on my experience working in other hospitals -- and

2   you asked me the question, the difference between a Level II

3   and Level III NICU, which was not part of my report, but based

4   on my experience it has to do with the standards of care, the

5   available technology and the availability of physician

6   staffing.

7   **Q.**   Not nursing staffing?

8   **A.**   Nursing staffing is always part of the equation.

9        But the real differences, the real differences in the NICU

10  have to do with the physician staffing and the -- and the

11  ability of that unit to take care of certain types of patients.

12  **Q.**   What types of patients are provided care in a NICU II?

13  **A.**   I don't know.  I'd have to go back and look.  I would be

14  speculating based upon past experience.

15  **Q.**   What types of patients are provided care in a NICU III?

16  **A.**   Same answer.

17  **Q.**   You looked at mortality rates; right?

18  **A.**   I did.

19  **Q.**   One hospital provides care to severely sick babies, very

20  premature babies, born at 15 weeks, and another hospital

21  provides only care to full-term babies.  The mortality rate

22  makes a difference depending on whether the hospital provides

23  care to severely sick babies compared to babies that go to full

24  term, doesn't it?

25  **A.**   Not necessarily.

1          **MR. MAURER:**  Objection.  The hypothetical assumes

2     facts not in evidence.

3          **THE COURT:**  I think the objection would be an

4     incomplete hypothetical.  But if you can answer the question

5     based on what you've been asked, go ahead.  If you need more

6     information, you can ask for that.

7          **THE WITNESS:**  I think I'm going to have to ask you to

8     repeat or read back the question because --

9     **BY MR. TOOCH:**

10    **Q.**   Okay.  Let's add some more facts to the hypothetical.

11         NorthBay has a NICU unit that provides care to severely

12    sick and premature babies.

13         Sutter Delta doesn't.  It only provides care to healthy

14    babies.  If it's a severely sick baby, it's transferred to

15    NorthBay.  That baby, that very sick baby.

16         When you're looking at mortality rates, how many babies

17    die in the hospital, isn't it important to know what type of

18    care is being provided to those babies, what type of patients

19    each hospital is providing care to?

20    **A.**   Isn't it important to know for what?

21    **Q.**   When you're comparing mortality rates, say it's 40 percent

22    in one place and 14 percent in the other place, it makes a

23    difference what you're talking about when you're talking about

24    the 14 percent; right?

25         It makes a difference whether or not you're talking about

1    14 percent for babies who are hanging on to their lives by a

2    thin thread versus full-term babies who come out happy -- well,

3    they cried first and then they're happy.  It makes a

4    difference, doesn't it?

5              **MR. MAURER:**  Objection, Your Honor.  Argumentative.

6              **THE COURT:**  Tone it down.  But you can answer the

7    question.

8              **THE WITNESS:**  So when you look at -- when you look at

9    the CMS measures and other measures of mortality, in my report

10   I had two different levels.  There's the overall measure of

11   hospital mortality, and that is risk adjusted, all right.  And

12   it is adjusted for the types of patients, et cetera.

13        So in answer to your question, it is baked in.  I mean,

14   the risk adjustment, the types of patients are taken care of.

15        And then when we looked at the service-by-service, all

16   right, those mortality numbers are specific for cardiology.

17   They're specific for stroke.  They're specific.  They do not

18   include the types -- you know, the hypothetical that you've --

19   that you've introduced.

20   **BY MR. TOOCH:**

21   **Q.**   We'll get there, too, in a moment.

22        Now, in your deposition you said readmission rates may be

23   influenced by a patient's income; right?  Income level.

24   **A.**   I said that readmission rates -- yes, I did.  In my

25   deposition I did talk about readmission rates as possibly being

1   impacted by the socioeconomic factors.

2   **Q.**   And the readmission rate of a patient -- a readmission is

3   the patient is in the hospital, gets discharged, and when they

4   come back into the hospital for the same condition; right?

5   **A.**   That's -- that's a general sort of description what a

6   readmission is.

7   **Q.**   And one of the factors that you looked at was the

8   readmission rates; right?

9   **A.**   It was one of the measures I used in the -- that was for

10  the Hospital Compare, and Hospital Compare with the value-based

11  purchasing.  So I did use the readmissions rate from that, and

12  I used that in my structure -- you know, my Donabedian

13  analysis, my second-level analysis.

14  **Q.**   Okay.  So when a patient is discharged from the hospital,

15  the hospital doesn't have any control over what the patient

16  does, does it?

17  **A.**   That's not true.

18  **Q.**   Well, does the hospital have control over whether or not

19  the patient eats well?

20  **A.**   There are hospitals that are working in the area of

21  population health that on readmissions they're trying to

22  prevent readmissions that are intervening on nutrition, they're

23  intervening on pharmacy, they're doing many things to make sure

24  patients don't come back in that are not traditional hospital

25  functions.

1  **Q.**   That are not traditional hospital functions?

2  **A.**   Right.

3  **Q.**   So whether a patient goes for follow-up care can depend

4  upon whether or not they had adequate access to transportation;

5  right?

6  **A.**   It could.

7  **Q.**   If you're --

8  **A.**   It may not, but it could.

9  **Q.**   If you're an old person or a poor -- who does not drive,

10  or a poor person who can't afford a car or a bus, it might make

11  a difference as to whether or not that patient goes to the

12  doctor for follow-up care after discharge?

13  **A.**   Transportation can be an issue for patients after they're

14  discharged, whether they are poor or not.

15  **Q.**   Housing can make a difference too; right?

16  **A.**   I'm sorry?

17  **Q.**   Housing can make a difference too?

18  **A.**   Housing can make a difference.

19  **Q.**   Two patients in the hospital for the same condition may

20  get discharged.  One goes home to a nice house and the other

21  one goes home to his -- he's homeless.  It may make a

22  difference as to whether or not there's a reinfection; right?

23  **A.**   There are many factors that can make a difference whether

24  a patient -- what happens to a patient when they leave could

25  impact whether they come back or not.

1  **Q.**  So it's important, when you're looking at readmission

2  rates, you also have to look at the socioeconomic community in

3  which that hospital operates?

4  **A.**  Well, it is.  And the -- one thing to point out is that

5  the readmission rates that I used from the hospital value-based

6  purchasing are based upon readmission of Medicare patients.

7  **Q.**  Ah, not Medi-Cal patients?

8  **A.**  Not to my understanding.  It's primarily Medicare

9  patients.

10  **Q.**  One of the things you looked at was mother baby; right?

11  **A.**  That's correct.

12  **Q.**  How many 65-year-olds are delivering babies?

13  **A.**  That's a different data source.  I actually testified to

14  that earlier.  That's data submitted by the hospitals in

15  California on the -- the maternity -- the -- that's part of a

16  statewide collaborative.  They submit that data directly to

17  California Hospital Compare.

18  **Q.**  For Medicare patients?

19  **A.**  There are no Medicare patients in that group.

20  **Q.**  Ah, so Medicare data does include nonMedicare patients?

21  Or is this only Medicare patients?

22  **A.**  I'm sorry, the re- -- I'd have to put my slide back up,

23  but the readmission -- I don't think readmission rates is on

24  the mother and child grouping.

25  **Q.**  We're not talking about readmission rates.  We've moved on

1    to mother baby.

2        You said the data was for Medicare patients in the CMS --

3    **A.**   No, I said the readmissions data --

4    **Q.**   Ah.

5    **A.**   -- I used in my structure process outcome data was from

6    the Medicare value-based payment system, all right, and their

7    readmissions.  And I used that.  Those are Medicare patients.

8    That's what I said.

9    **Q.**   What is the value-based payment system?

10   **A.**   I'm sorry?

11   **Q.**   What is the value-based payment system?

12   **A.**   Value-based payment system is a -- it's a program that

13   Medicare has put in place that says that hospitals are at risk

14   for their quality performance.  So using a subset of those

15   quality metrics, they're paid by Medicare basically based --

16   they get a flat amount based upon what's wrong with the

17   patient.  It's called DRG.

18       So depending upon how the hospital ranks, they're going

19   to -- they're going to either get a little bonus on their

20   Medicare payment or they're going to get money taken away from

21   their Medicare base payment.

22       And in my analysis, if I recall, NorthBay was in the

23   bottom percentile.  So they were actually the lower end, that

24   they had their Medicare payments reduced because their quality

25   outcomes weren't what they needed to be.

1        THE COURT:  Mr. Tooch, is this a good time to take the

2   first break in the morning?

3        MR. TOOCH:  Yes.

4        THE COURT:  All right.  Ladies and gentlemen, we'll

5   take a break for 15 minutes.  Please remember the admonitions.

6        (Jury out at 9:41 a.m.)

7   (The following proceedings were held in open court, outside the

8   presence of the jury:)

9        THE COURT:  Just for clarity's sake, when a witness is

10  on cross and from then on, there's no substantive conversation

11  between the lawyers and the witness.  So don't -- no

12  preparation during this recess period.

13       MS. BRIGGS:  Your Honor, I need to raise something

14  with you, please, and it will be quick.

15       THE COURT:  Mr. Pugh, you may step down.

16       MS. BRIGGS:  There was a series of questioning by

17  Mr. Tooch with respect to Exhibit 175, and the questioning

18  suggested that Blue Shield's counsel had withheld information

19  from Mr. Pugh in the preparation of his report.

20       I wanted to make clear that Mr. Pugh's report was

21  completed and exchanged on November 9 of 2018.  That document

22  was produced to us by NorthBay after the close of fact

23  discovery and after Mr. Pugh's report was done on December 21

24  of 2018.

25       So I think it's inappropriate for Mr. Tooch to stand up

1  and, you know, suggest in front of the jury that we withheld

2  information from Mr. Pugh based on the chronology of the events

3  surrounding that document.

4      **MR. TOOCH:**  Your Honor, we received Mr. Pugh's report.

5  We saw that Mr. Pugh gave the hospital a ranking of 2.  Upon

6  seeing that, that they had a ranking of 2, we produced

7  information to Blue Shield's counsel to show that the ranking

8  is now 3.  And that's why we produced the -- that's why we

9  produced the data to correct what was in Mr. Pugh's report.

10     Mr. Pugh could have changed his report, could have put a

11  footnote in there, he could have -- they could have provided

12  him the information.  It was in response to what we thought was

13  incorrect in his report.  If they had put a level 3, we would

14  have not provided the data to correct what we thought was an

15  incorrect reading of the Medicare data.  The current Medicare

16  data.

17     **THE COURT:**  Well, you did leave the impression, I

18  think, with the jury that the defense had information that they

19  didn't provide to their expert at the time the report was

20  prepared.

21     **MR. TOOCH:**  Well, Your Honor, there's been no

22  testimony about -- well, they didn't provide this to him,

23  according to the expert.  So he could have modified his slides

24  or modified his report based upon this information.  So we

25  didn't know that he was going to give them a level 2 rather

1    than a level 3.  That's why we provided the information.  He

2    could have at any point after his report or in preparation of

3    the slides taken into that account that factor had they

4    provided him this data.

5           THE COURT:  All right.  So I'm going to go back during

6    this break, I'm going to see precisely what you said, and I'll

7    probably correct the misimpression that your examination raised

8    with respect to the lawyers.

9           MS. BRIGGS:  Thank you, Your Honor.

10          THE COURT:  Thank you.

11                    (Recess taken at 9:45 a.m.)

12                    (Proceedings resumed at 9:58 a.m.)

13          THE COURT:  All right.  Please be seated, everybody.

14       Ladies and gentlemen, during the cross-examination there

15    was -- there's some questions about Exhibit 175.  And you

16    should not take any implication that Blue Shield's lawyers

17    withheld any documents or didn't produce any documents that

18    they were obligated to produce.  That wasn't -- that wasn't the

19    purpose of the questions and you shouldn't take anything from

20    that.

21       All right.  Mr.  Tooch, are you finished or do you have

22    more?

23          MR. TOOCH:  I have more, Your Honor.

24          THE COURT:  All right.

25    BY MR. TOOCH:

1  **Q.** If you go to slide 21. These are the particular areas

2  that you looked at the categories that were provided to you by

3  Blue Shield's counsel, correct?

4  **A.** That is correct.

5  **Q.** And under general surgery you looked at, in particular I

6  believe there were metrics in your slide, for gastroenterology.

7  Correct?

8  **A.** That's correct.

9  **Q.** And colorectal surgeries, correct?

10  **A.** Yes.

11  **Q.** And esophageal surgeries, correct?

12  **A.** Yes.

13  **Q.** And gallbladder surgery, correct?

14  **A.** Which surgeries?

15  **Q.** Gallbladder.

16  **A.** Yeah. Cholecystectomies, yes. I think -- I'd have to

17  look at the other slide, but I think that's what it was.

18  **Q.** I don't have that slide with me.

19  Are any of the claims in this case -- do they involve

20  gastroenterology?

21  **A.** I'm sorry. I didn't hear --

22  **Q.** Are any of the claims at dispute in this case, do they

23  involve gastroenterology services?

24  **A.** Is anybody -- I'm sorry. I didn't quite understand what

25  you said. My apologies.

1    **Q.**    Do any of the patient claims that are at issue in this

2    lawsuit involve gastroenterology?

3    **A.**    I have no -- I have no idea.

4    **Q.**    And the same question with respect to the other surgeries,

5    colorectal surgeries and esophageal surgeries and gallbladder?

6    **A.**    I do not know.  I did not review the claims that are in

7    this case.

8    **Q.**    You can go to slide 22.  Now, you looked at whether or not

9    some of the hospitals were trauma centers, correct?

10   **A.**    That is correct.

11   **Q.**    And out of the list of 14 hospitals, ten of them did not

12   have trauma services.

13   **A.**    That's correct.

14   **Q.**    These are the four that do have trauma services.

15   **A.**    That's correct.

16   **Q.**    What is the difference between level 2 and a level 3

17   trauma center?

18   **A.**    Difference between level 2 and level 3 trauma center is

19   essentially the level of in-house staffing and response times

20   for certain specialties.

21   **Q.**    What specialties?

22   **A.**    The trauma surgeon himself, I believe in a level 2 needs

23   to be in-house.  There may be -- I think there's some

24   requirements about anesthesiologist being in-house 24 by 7.

25        On level 3, there are response times that are required

1   that the anesthesiologist or other specialist may not be

2   in-house, but they have to respond within a certain amount of

3   time.

4        That's the primary difference.  The standards of care, the

5   approach to care, is supposed to be the same.

6   **Q.**   What's the response time for a level 2?

7   **A.**   I'm sorry?

8   **Q.**   What's the response time for a trauma level 2?

9   **A.**   I don't know off the top of my head what the response time

10  for a level 2 is.

11  **Q.**   Or a level 3?

12  **A.**   I don't know off the top of my head.

13  **Q.**   Let's go to the next slide.  Cardiology.  What is

14  cardiology?

15  **A.**   Cardiology is the specialty, service line of treatment, of

16  the heart.

17  **Q.**   Is it treatment of the heart or is it diagnostic in

18  nature?

19  **A.**   Well, it's both.  I mean, you have heart attack, the

20  treatment of heart attacks and treatment of heart failure on

21  this slide.

22  **Q.**   Somebody has a blockage in an artery.  Is that done by a

23  cardiologist or cardiovascular surgeon?

24  **A.**   If somebody has a blockage of an artery, is that handled

25  by a cardiologist or a cardiovascular surgeon?  Is that your

1    question?

2    **Q.**    That is my question.

3    **A.**    It depends.

4    **Q.**    Depends on what?

5    **A.**    Well, if patient has a blockage, that's my understanding,

6    you know, the general definition of a heart attack.  And they

7    may be taken to a cath lab where the cardiologist then performs

8    a procedure to try to open up the vessel.

9    **Q.**    You say a cardiologist opens up the vessel?  Or --

10   **A.**    A cardiologist goes to the cath lab to open up the vessel.

11        (A phone rinking.)

12        **THE JUROR:**  My apologies.

13        **THE COURT:**  Jurors always get a pass.  If the lawyers

14   had done that, that would be an entire different thing.

15        Please go ahead, Mr. Tooch.

16   **BY MR. TOOCH:**

17   **Q.**    And I think you said before you don't know which of these

18   hospitals have cath labs, right?

19   **A.**    That's correct.

20   **Q.**    So you don't know, for example, if a patient goes to

21   Sutter Solano, whether or not that patient -- and is having a

22   heart attack -- whether or not they can provide that care at

23   Sutter Solano, or that patient then has to be transferred over

24   to a different hospital.

25   **A.**    Well, actually, I don't know what the transfer protocol

1   is.  But the assumption the patient cannot be cared for with a

2   heart attack at some place that does not have a cath lab is

3   incorrect.

4   **Q.**   Do you have any clinical background?

5   **A.**   I'm sorry?

6   **Q.**   Do you have any clinical background?

7   **A.**   No.  I'm an administrative person.

8   **Q.**   If you were having a heart attack, would you want to go to

9   other hospital that can actually do heart surgery?  Or one that

10  cannot do heart surgery?

11  **A.**   If I'm going to the hospital, I want to go to the closest

12  -- and having a heart attack -- I want to go to the closest

13  hospital I can find.

14  **Q.**   Even if they can't treat you for your surgery -- for your

15  heart attack?

16  **A.**   They can treat you for your heart attack.  You said

17  earlier, you made the assumption that if you go to the hospital

18  that doesn't have a cath lab or cardiac surgery they can't

19  treat you for heart attack.  That's not true.

20  **Q.**   Are you saying that the hospital can -- that does not have

21  a cath lab can do the services that a hospital that a cath lab

22  has?

23  **A.**   No.  They can treat you for heart attack, and they can

24  stabilize you, and they can use thrombolytic clot-dissolving

25  drugs in order to dissolve that clot.  Which is what is done,

1    you know -- which is the standard of care for if you don't have

2    a cath lab.

3    **Q.**    So they can give you a drug.  So you're saying it's not

4    necessary to actually do the surgery to put in the stent, that

5    can all be done by giving medication.  Or clots can be resolved

6    by medication.  Is that your testimony?

7    **A.**    I don't think that's what I said.

8    **Q.**    So a lot of clots cannot be dissolved by medication.

9    **A.**    That's true.

10   **Q.**    So if you're having a heart attack where there's a clot in

11   an artery that cannot be resolved through medication, you have

12   to have a stent, correct?

13   **A.**    If you have a heart attack and it's not being dissolved by

14   medication, then if you could get to a cath lab and have a

15   stent put in, that would be a normal course of treatment.

16   **Q.**    So you'd have to go to a hospital that has a cath lab.

17   **A.**    Be moved to a hospital that has a cath lab.

18   **Q.**    What's cardiopulmonary bypass surgery?

19   **A.**    That is when you have -- I'm not a clinician, but my

20   understanding of this is that when you -- there's an artery in

21   the heart has a blockage in it, what they do is they basically

22   take another artery or vein from your leg and then bypass it.

23   Bypass the clot.  And they create a new pathway for blood flow

24   to get to the muscles of the heart.

25   **Q.**    Are you aware that the patient at that point in time is on

1  an artificial or mechanical heart?

2  **A.**   During the surgery?

3  **Q.**   Yes.

4  **A.**   I'm aware that you have to have a -- you have -- in order

5  to do this surgery, yes, you have to have a heart-lung machine

6  that basically does the -- does the purpose of your lungs and

7  putting oxygen in the blood while you're doing surgery.  Yes,

8  I'm aware of that.

9  **Q.**   Are you aware NorthBay does that surgery?

10  **A.**   Pardon?

11  **Q.**   Are you aware NorthBay does that surgery?

12  **A.**   Only from -- I think from the testimony, yes.

13  **Q.**   Have you heard the testimony?

14  **A.**   From the questions and -- yeah.  I mean, I did not study

15  the service by service line.  I am aware that NorthBay does --

16  I am aware NorthBay does the open heart -- does open heart

17  surgery.

18  **Q.**   You're aware other hospitals do not do that?

19  **A.**   I'm aware that some of the other hospitals do not do that.

20  **Q.**   Okay.  And that would affect mortality rate, too?  If one

21  hospital's doing that type of surgery and other hospitals are

22  not, that has an impact on whether or not the mortality rate

23  for cardiac surgery is a good number or a bad number.  Right?

24  **A.**   But in my report I didn't report specific mortality rates

25  for cardiac surgery.  I haven't seen any specific -- I haven't

1  seen any reports on specific mortality rates for cardiac

2  surgery.

3  **Q.**  You can go to the next slide.  25, please.

4      What is neurology?

5  **A.**  Neurology is the specialty treatment of neurological

6  conditions.  It's a medical specialty, not a surgical

7  specialty.  Neurosurgery would be the surgical specialty where

8  they're actually doing intervention with -- doing surgery.  But

9  neurologists treat a variety of chronic conditions involving

10  the nervous system and they also treat strokes.

11  **Q.**  What's a chronic system -- what's a chronic disease?

12  **A.**  What is a chronic disease?  It's a disease that may

13  persist over a long period of time that you manage but may not

14  be able to cure.

15  **Q.**  That's not an emergency, is it?

16  **A.**  Well, I mean, patients with chronic diseases can have

17  emergencies, but --

18  **Q.**  If a patient has an intracranial hemorrhage, a brain

19  bleed, can all hospitals treat that condition the same?

20  **A.**  Do all hospitals -- can all hospitals treat a brain bleed

21  the same?  Well, there's standard protocols for how to treat a

22  stroke -- is what you're referring to? -- that cross all

23  hospitals and emergency rooms.  They should seek to try to use

24  those standard protocols.

25  **Q.**  What are they?

1    **A.**    The standard protocols?  It's evaluation and ensuring that

2    -- in general it's my understanding, evaluation of the, you

3    know, of whether patient's having a stroke or not.  And then

4    use of thrombolytics, again, to try to dissolve the stroke clot

5    if it's within a certain time period.

6         Then the general sort -- I understand the general sort of

7    management of the patient in terms of if it's affected their

8    breathing or heart rates, et cetera.  You've got -- you take

9    care of the person, but you also try and deal with treating the

10   stroke.

11   **Q.**    Did you look at which of your 14 hospitals do

12   neurosurgery?

13   **A.**    No, I do not.

14   **Q.**    What's a primary stroke center?

15   **A.**    Primary stroke center is a certification by the American

16   Hospital Association, I believe, that says that, you know, they

17   have put in place and have prioritized the way they will take

18   care of stroke patients when they come in.  So they have the

19   protocols.  They trained to that.  So essentially said:  We

20   think strokes are really serious, we've organized ourselves to

21   take care of these patients when they hit the door.

22   **Q.**    What's a chest pain center with PCI?

23   **A.**    Chest pain center is similar.  Patients that come in to

24   the hospital and have -- you know, complaining of chest pain.

25   Then they put them in -- the classical way of doing it was to

1    actually create another space within the emergency department.

2    And you put the patient with chest pain in and rule out whether

3    or not they're having a heart attack.  So you're -- it's a

4    special place for people that might be having a heart attack.

5    **Q.**    Let's go back to the previous slide, if you could, please,

6    on cardiology.

7         Now, you see this has mortality rates in it.  You see the

8    30-day mortality rate?

9    **A.**    That's correct.

10   **Q.**    And what is the number 14 percent -- let's take John Muir,

11   11 percent.  What does that number represent?

12   **A.**    11 percent represents that 11 percent of the patients that

13   presented in this data sample with a heart attack died within

14   30 days.

15   **Q.**    And so -- and that's -- would be the -- true with respect

16   to the other percentages in that column, correct?

17   **A.**    That's correct.

18   **Q.**    And so if you look at -- let's take Methodist Hospital of

19   Sacramento.  They have 14 percent and NorthBay has 14 percent.

20   Do you see that?

21   **A.**    I see that.

22   **Q.**    And you -- does Methodist Hospital of Sacramento have a

23   cath lab?

24   **A.**    I don't know.

25   **Q.**    Do they do cardiac surgery?

1   **A.**   I don't know.

2   **Q.**   Do they do cardiopulmonary surgery?

3   **A.**   I don't know.

4   **Q.**   Now, if they don't do any of those surgeries, but NorthBay

5   does those surgeries, NorthBay would be seeing sicker cardiac

6   patients than Methodist Hospital of Sacramento.

7   **A.**   I think you're conflating cardiology and cardiac surgery

8   here.  Because not all patients with a heart attack go for

9   cardiac surgery.

10   **Q.**   I understand.  But in order to compare hospitals -- you

11   chose cardiology, not -- or, you or Blue Shield's lawyers chose

12   cardiology not cardiovascular surgery.  Correct?

13   **A.**   That's correct.  I did not do a separate study of

14   cardiovascular surgery.

15   **Q.**   NorthBay is a trauma center, right?

16   **A.**   That's correct.

17   **Q.**   Methodist Hospital of Sacramento is not a trauma center,

18   right?

19   **A.**   That's correct.

20   **Q.**   So if somebody's having a massive heart attack, the

21   ambulance -- and they consider it a trauma, they're going to

22   take the patient to NorthBay and not to Methodist Hospital of

23   Sacramento.

24         **MR. MAURER:**  Objection.  Improper hypothetical.

25         **THE COURT:**  You can answer the question if you can.

1          THE WITNESS:  Actually, no.  And the reason is a heart

2     attack -- that's not trauma.  Trauma's an accident.  It's

3     injury associated with automobile accidents, you know.  That's

4     why it takes a trauma surgeon.

5          Heart attack -- it's a heart attack.  That's a different

6     -- it's a medical condition.

7     BY MR. TOOCH:

8     Q.   Fair enough.  Let's go to the next slide.  Neurology.

9     Neurology is a -- somebody gets a massive blow to the brain

10    during a car accident.  That would be a trauma, right?

11    A.   That would be trauma.

12    Q.   And so if you look at comparing Sutter Medical Center

13    Sacramento, which is at 14 percent mortality rate, and NorthBay

14    which is 14 percent mortality rate, those 14 percents don't

15    mean the same thing if NorthBay is treating people with massive

16    head injuries and Sutter Sacramento is not.

17    A.   Actually, you're conflating neurosurgery and neurology.

18    This is neurology.  This is stroke.  This is not -- you know,

19    these mortality figures are reported for people that had

20    strokes, all right?  Blood clot that comes up to the brain.

21    This is not mortality for trauma patients from a blow to the

22    head.

23    Q.   But you didn't include that data in your report, right?

24    A.   Was that a question?  I'm sorry.

25    Q.   Yes, it was a question.

1    **A.**   Could you repeat that question?

2    **Q.**   You didn't include the neurosurgery data in your report,

3    right?

4    **A.**   I did not do -- I did not do an analysis of -- comparing

5    neurosurgery outcomes at NorthBay to the rest of the market.  I

6    did not do that.

7    **Q.**   Okay.  If you look at slide 27, please.  This is one of

8    the other categories you were asked to look at.  Correct?

9    **A.**   Yes, it is.

10   **Q.**   And the mother-baby metrics you looked at were C-sections.

11   Correct?

12   **A.**   Correct.

13   **Q.**   Breast feeding rates.  Correct?

14   **A.**   Correct.

15   **Q.**   Episiotomy rates?

16   **A.**   Correct.

17   **Q.**   And VBAC rates, right?

18   **A.**   Correct.

19   **Q.**   VBAC is a vaginal birth after C-section, right?

20   **A.**   Correct.

21   **Q.**   You did not look at NIC-U services, did you?

22   **A.**   I did not look at NIC-U services.

23   **Q.**   Let's go back to slide 13.  This is the Leapfrog score,

24   right?

25   **A.**   That's correct.

1  **Q.**  You see the current Leapfrog score is a B for NorthBay,

2  right?

3  **A.**  That's correct.

4  **Q.**  And there are Leapfrog scores for other hospitals that you

5  looked at, right?

6  **A.**  I looked at the Leapfrog score for all hospitals in the

7  market, yes.

8  **Q.**  If you could go to Exhibit 176 in your blinder under

9  tab A, is the Leapfrog score for NorthBay Medical Center,

10  correct?  Fall of 2018.

11  **A.**  That's correct.

12         **MR. TOOCH:**  Move to admit, Your Honor.

13         **THE COURT:**  Do you have any objection?

14         **MR. MAURER:**  No objection.

15         **THE COURT:**  It's admitted.

16      (Trial Exhibit 176-A received in evidence)

17  BY MR. TOOCH:

18  **Q.**  And this is for the hospital in Fairfield, right?

19  **A.**  That's what it says, yes.

20  **Q.**  If you go to Exhibit B in this, this is the Leapfrog score

21  for NorthBay VacaValley Hospital, right?

22  **A.**  That's correct.

23         **MR. TOOCH:**  Move to admit.

24         **THE COURT:**  Any objection?

25         **MR. MAURER:**  No objection.

1      **THE COURT:** It's admitted.

2      (Trial Exhibit 176-B received in evidence)

3  **BY MR. TOOCH:**

4  **Q.** And they also got a B in the fall of 2018, right?

5  **A.** That's correct.

6  **Q.** If you go to Exhibit C, this is the Leapfrog score for

7  John Muir Medical Center in Walnut Creek, correct?

8  **A.** That's correct.

9      **MR. TOOCH:** Move to admit.

10     **THE COURT:** Any objection?

11     **MR. MAURER:** No objection.

12     **THE COURT:** It's admitted.

13     (Trial Exhibit 176-C received in evidence)

14 **BY MR. TOOCH:**

15 **Q.** And they also received a B in the fall of 2018, right?

16 **A.** I'm sorry?

17 **Q.** They also received a B in the fall of 2018.

18 **A.** Yes, it did.

19 **Q.** If you go to Exhibit D. This is the Leapfrog score for

20 Sutter Solano Medical Center, correct?

21 **A.** That is correct.

22     **MR. TOOCH:** Move to admit.

23     **THE COURT:** Any objection?

24     **MR. MAURER:** No objection.

25     **THE COURT:** It's admitted.

1          (Trial Exhibit 176-D received in evidence)

2     BY MR. TOOCH:

3     Q.    And Sutter Solano received a D in 2018, correct?

4     A.    That's correct.

5     Q.    Go to Exhibit E.  This is the Leapfrog score for Methodist

6     Hospital of Sacramento for the fall of 2018.  Correct?

7     A.    That's correct.

8              MR. TOOCH:  Move to admit.

9              THE COURT:  Any objection?

10             MR. MAURER:  No objection.

11             THE COURT:  It's admitted.

12         (Trial Exhibit 176-E received in evidence)

13    BY MR. TOOCH:

14    Q.    And they received a level C, correct?

15    A.    That's correct.

16    Q.    Go to Exhibit F.  This is the Leapfrog score for Sutter

17    Davis, correct?

18    A.    Yes, that's correct.

19    Q.    And for fall of 2018, correct?

20    A.    That's correct.

21             MR. TOOCH:  Move to admit.

22             THE COURT:  Any objection?

23             MR. MAURER:  No objection.

24             THE COURT:  Admitted.

25         (Trial Exhibit 176-F received in evidence)

1  BY MR. TOOCH:

2  Q.    They received a level C, correct?

3       If you go to Exhibit G, this is the Leapfrog score for

4  Sutter Delta Medical Center, correct?

5  A.    That is correct.

6           MR. TOOCH:  Move to admit.

7           MR. MAURER:  No objection.

8           THE COURT:  It's admitted.

9       (Trial Exhibit 176-G received in evidence)

10 BY MR. TOOCH:

11 Q.    And this is the Leapfrog score of -- they received a C,

12 right?

13 A.    That's correct.

14 Q.    And then H is the Leapfrog score for Sutter Medical Center

15 of Sacramento, correct?

16 A.    That's correct.

17          MR. TOOCH:  Move to admit.

18          THE COURT:  Any objection?

19          MR. MAURER:  No objection.

20          THE COURT:  It's admitted.

21      (Trial Exhibit 176-H received in evidence)

22 BY MR. TOOCH:

23 Q.    They received a letter grade of C, right?

24 A.    It is a C, yes.  That's correct.

25 Q.    And I is the Leapfrog score for Woodland Memorial

1  Hospital, correct?

2  **A.**    Yes.

3          **MR. TOOCH:**  Move to admit.

4          **MR. MAURER:**  No objection.

5          **THE COURT:**  It's admitted.

6      (Trial Exhibit 176-I received in evidence)

7  **BY MR. TOOCH:**

8  **Q.**    They received a letter C, right?

9  **A.**    That's correct.

10          **MR. TOOCH:**  Going to be using the white board.  Sorry

11  to block your view.

12  **BY MR. TOOCH:**

13  **Q.**    I'm going to ask you a hypothetical.  Student 1, and

14  underneath I'm writing Student 2.  Student 1 has an average

15  grade in all his classes of a B, and student 2 has an average

16  grade in all of his classes as a B.

17      Are these students the same quality students?

18  **A.**    Based upon the scoring system of the grades, yes.

19  **Q.**    What if I told you that Student B in math is taking basic

20  math, in English he's taking basic English, in history he's

21  taking basic, in science classes, biology, chemistry, physics,

22  he's taking basic.

23      Student B, he's taking AP math, he's taking AP English,

24  he's taking AP history, he's taking AP biology, chemistry,

25  physics, and taking Spanish as well, AP.

1    Quality of the students the same?

2   **A.**   Quality of the students the same?  One could answer that

3   question and say "yes" that both students are applying

4   themselves within the limits of their ability as students and

5   producing similar results.

6        **MR. TOOCH:**  No further questions.

7                    <u>**REDIRECT EXAMINATION**</u>

8   **BY MR. MAURER:**

9   **Q.**   Hello, Mr. Pugh.

10    So Mr. Tooch has just cross-examined you and essentially

11   implied NorthBay treats a sicker patient population.  In

12   connection with preparing your report, did you take a look at

13   the case mix index for the hospitals -- some of the hospitals

14   in the comparison group?

15  **A.**   Yes, I did.

16  **Q.**   What is a case mix index, if you could explain it.

17  **A.**   A case mix index is a measure that, basically, puts into

18   one metric the types of patients.  So if you have very sick

19   patients, very complex patients, you know, it balances out.  So

20   every type of patient when they code the medical records is

21   assigned a weight.  And so this is a weighting system to say,

22   Are your patients sicker or more complex at this hospital than

23   this hospital?

24  **Q.**   Okay.  And as you sit here today, do you recall all the

25   case mix indexes for the hospitals in the comparison group?

1    A.    No.   I had a chart in my report that I filed, but I don't

2    remember the -- I don't remember the specific case mix indexes.

3          MR. MAURER:   So, Your Honor, I'd like to refresh the

4    witness's recollection with an excerpt of his report that I

5    don't want to publish to the jury but I want him to be able to

6    testify to some of the numbers.

7          THE COURT:   That's fine.

8          MR. TOOCH:   What page is this?

9          MR. MAURER:   It is page 23 of the November -- do you

10   have the November 9 report?   Which page is it, Ken, do you have

11   it?

12   BY MR. MAURER:

13   Q.   And you can look on your screen and see if --

14         THE COURT:   Not published.

15         MR. MAURER:   Not published.   Go ahead.

16   BY MR. MAURER:

17   Q.   So Mr. Pugh, can you see the chart that was in your

18   report?

19   A.   I can now, yes.

20   Q.   So what was NorthBay's case mix index in fiscal year 2017?

21   A.   In July of 2017 -- fiscal year 2017 it was 1.44.

22   Q.   And what was -- there are three hospitals above NorthBay

23   in the case mix index.   Can you tell me what those hospitals

24   are and what their case mix indexes were?

25   A.   John Muir Medical Center Concord, 1.89.   John Muir Medical

1  Center Walnut Creek Campus, 1.53.  Kaiser Foundation Hospital

2  Vacaville, 1.5.

3  **Q.**   Can you show the CMS star ratings slide for Mr. Pugh's

4  demonstratives?

5          **MR. MAURER:**  Like to publish that, Your Honor.

6          **THE COURT:**  Yes.

7  BY MR. MAURER:

8  **Q.**   Do you understand that the case mix index for -- John Muir

9  Medical Center, the Concord campus, John Muir Medical Center

10  Walnut Creek Campus, Kaiser Foundation Hospital Vacaville, they

11  have higher case mix indexes than NorthBay.  That is right?

12  **A.**   That's my understanding.

13  **Q.**   Does that mean, based on your understanding of case

14  indexes, that they're treating sicker patients than NorthBay?

15  **A.**   They have a sicker, more complex, mix of patients than

16  NorthBay, yes.

17  **Q.**   So on your demonstratives, I see the CMS star ratings

18  there.  Where do John Muir Medical Center Concord Campus, John

19  Muir Medical Center Walnut Creek, and Kaiser Foundation

20  Hospital Vacaville, where do they appear?

21  **A.**   John Muir Medical Center Concord is five star.  And then

22  John Muir Medical Center Walnut Creek, and Kaiser Foundation

23  Hospital Vacaville are both four star.

24  **Q.**   That's above NorthBay right?  On the CMS star ratings?

25  **A.**   Yes.  NorthBay's a two star.

**Q.** So even if -- well, so separate and apart from that, if NorthBay were treating sicker patients, would that already be accounted for in your analysis that you performed on the composite hospital scores?

**A.** Yes. The types of patients taken care of, you know, all of the rating systems have some form of risk adjustment, a leveling in order to take account for differences in patient mix.

**Q.** Okay. So let's move on. Mr. Tooch cross-examined you about a number of different metrics relating to the ER room. I think waiting times was sort of the key -- the one he talked about a lot.

Would any of that information change the analysis that you did in your report and the conclusions you reached?

**A.** I don't think so. I mean, you have to remember my analysis looks at ten different systems. So you could throw out one system, all right, and I don't think it will materially change the results across the other nine.

I think the point is that NorthBay performs pretty much at the average level. In the middle, you know, compared to all the others. They're better than some hospitals in some things, they're not as good as some hospitals in other things. But overall, they're average.

**Q.** And I think Mr. Tooch was also discussing about some services that NorthBay provided that maybe some other hospitals

1    provided.  You don't know whether some of the other hospitals

2    in your comparison group had services that NorthBay doesn't

3    have, is that right?

4    **A.**    That's correct.

5    **Q.**    Well, so, you didn't do a service-by-service comparison in

6    your report in connection with looking at NorthBay and the

7    comparison hospital group, is that right?

8    **A.**    Well, I did do a service-by-service comparison -- general

9    surgery as service, cardiology as service.  So I did do that

10   comparison with the available data.  But I did not do a

11   structural sort of checklist to say this hospital has this,

12   this and this.

13   **Q.**    Why didn't you do that?

14   **A.**    Well, because the -- as I've already demonstrated earlier,

15   the structure is part of the story.  And so that's -- some of

16   that is taken into account already in *U.S. News and World*

17   *Report* ratings, the Leapfrog ratings, and to a certain extent

18   healthgrades.com.

19        And CMS in their desire to move away from the idea that

20   more is better -- and the way that they do their star system,

21   that you could be a small -- fairly -- you know, a fairly -- a

22   good -- a small, but good, not as complex hospital, and you

23   could be a five star hospital.  Just as John Muir Concord is,

24   which is a much more sophisticated place because based on the

25   care you're able to render.

1    And so that's really -- that's -- underlying idea within

2  CMS was that we want to be able to compare.  And you can't just

3  say just because you have a lot of stuff, you're better.  And

4  that's the -- you also have to look at the processes and the

5  other metrics that are underneath.

6         **MR. MAURER:**  Okay.  No further questions, Your Honor.

7         **THE COURT:**  All right.  Mr. Tooch, anything further?

8         **MR. TOOCH:**  No, Your Honor.

9         **THE COURT:**  All right.  Thank you, Mr. Pugh.  You can

10  step down.

11     (Witness excused.)

12         **THE COURT:**  Ms. Briggs, who's next?

13        **MS. BRIGGS:**  Tracy Barnes from Blue Shield.

14                       **TRACY BARNES**,

15  called as a witness for the Defendants, having been duly sworn,

16  testified as follows:

17       **THE CLERK:**  And if you would please state your full

18  name and spell it for the court reporter.

19       **THE WITNESS:**  Tracy Lealand Barnes.  T-R-A-C-Y.

20  L-E-A-L-A-N-D.  Barnes, B-A-R-N-E-S.

21                  **DIRECT EXAMINATION**

22  BY MS. BRIGGS:

23  **Q.**  Good morning, Mr. Barnes.

24  **A.**  Good morning.

25  **Q.**  Could you tell the jury what your current position at Blue

1   Shield is?

2   **A.**    I'm the director of provider contracting for northern

3   California.

4   **Q.**    Okay.  And how long have you worked at Blue Shield?

5   **A.**    In September it will be 33 years okay.

6   **Q.**    Could you give the jury a brief review of your employment

7   history with Blue Shield?  Let's bring you up to about 2008.

8   And again, high level.

9   **A.**    Since 2008 I was a director of contracting for the --

10  **Q.**    I'm sorry.  I might have misspoken.  Can you go back 35

11  years up to 2008?

12  **A.**    Oh, okay.  Sorry.  Sorry.  Early in my career I started

13  out in the claims operations area.  I started out as a claims

14  processor.  I advanced to be a supervisor over a team of claims

15  processors.  Eventually, managing a claims department.  That

16  was all my first five years.

17        Then moved forward to the early '90s.  I took a role in

18  provider relations.  And in that role I worked with physicians,

19  chiropractors, labs, to become contracted with Blue Shield and

20  as the liaison as they had issues or concerns with their

21  contractor, their relationship with Blue Shield.

22        That role took place to about the mid '90s, at which time

23  I started managing contracts and contracting with hospitals,

24  integrated medical groups, under what we call a capitation

25  arrangement, a prepaid arrangement.  And then surgery centers,

1    skilled nursing facilities.  Did that in the Sacramento and

2    central valley.  Trying to think.  Oh, through early 2000s.

3    And then in 2008 I became the director of provider contracting

4    for Sacramento and the central valley.

5    **Q.**   Thank you.  And could you describe what that means, the

6    director of provider contracting for Sacramento and the central

7    valley?

8    **A.**   I have a team of negotiators who report to me.  They're

9    assigned individual providers, generally in a region.  I have

10    someone who handles the central valley, so they're responsible

11    from Stanislaus County down to Kern.  Someone else has sort of

12    the bay area, someone has the Sacramento, someone has the east

13    bay.  And they're just assigned providers, and they negotiate

14    those agreements as they come up for renewal with Blue Shield.

15        They'll approach new providers we want in a network.  They

16    will sometimes, as we expand product lines, reach out to

17    providers.  They also are the front face.  And while we have a

18    service team, they will also get a lot of direct interactions

19    on things that aren't working with the providers and then try

20    and coordinate that through the organization to address those

21    concerns.

22    **Q.**   And when you say "providers," Mr. Barnes, what type of

23    providers are you talking about?

24    **A.**   My team today handles facility-type providers, hospitals,

25    behavioral health, ambulatory surgery centers, skilled nursing

1  facilities, and then those capitated arrangements we typically

2  see in the HMO space.

3  **Q.**  In 2008 when you became the director of provider

4  contracting for Sacramento and central valley, did that include

5  Solano County where NorthBay's located?

6  **A.**  So -- yes and no.  I did not have direct responsibility

7  for Solano County, but I had statewide responsibility for

8  Sutter Health who has a facility in that county.  So while I

9  did not have the county itself, I had the Sutter relationship

10  so I'd interact with the director who had the bay area that had

11  Solano County.

12  **Q.**  So by virtue of the fact that you were responsible for

13  Sutter, and Sutter had a hospital in Solano County, did you

14  come to have an understanding about the nature of the Solano

15  County market for providers generally?

16  **A.**  Yes, I did.

17  **Q.**  And I believe in 2012, four years after you first became

18  the director of provider contracting, at least your title

19  changed and I think your responsibilities grew?  Is that right?

20  **A.**  Yeah.  At that point we changed the structure and I

21  assumed responsibility for both the bay area contracting team

22  and the Sacramento contracting team.  Basically, handling all

23  the negotiations from Kern County northward for Blue Shield.

24  **Q.**  So at that point in time, were your -- did you become

25  responsible for Solano County?

1    **A.**    Yes, I did.

2    **Q.**    And that included, obviously, NorthBay's two hospitals in

3    Solano County.

4    **A.**    Correct.

5    **Q.**    And is it fair to say you have a general familiarity as a

6    result of becoming responsible for Blue Shield's relationship

7    with NorthBay that you have a general familiarity with that now

8    terminated letter of agreement with NorthBay and Blue Shield?

9    Or as we've been calling it, the contract?

10   **A.**    Yes, I do.

11   **Q.**    And we'll come back to that.

12        Now, do you have -- as you sit here today, do you remember

13   when that contract was signed?

14   **A.**    I remembered it was in 2008.  I think in October time

15   frame.

16   **Q.**    Okay.  So at that time you were not actually directly

17   responsible for the NorthBay contract, right?

18   **A.**    Correct.

19   **Q.**    Because this was back in 2008 when you were responsible

20   for Sutter but not Solano County per se.

21   **A.**    Correct.

22   **Q.**    But by -- did you come to have an understanding as to why

23   Blue Shield originally entered in to that letter of agreement

24   with NorthBay back in October of 2008?

25        **MR. TOOCH:**  Objection, calls for hearsay.

1    THE COURT:  Overruled.  Lay the foundation, if you

2   will.

3         MS. BRIGGS:  I'm about to.

4   BY MS. BRIGGS:

5   Q.   So let me -- sorry.  Let me ask you some pointed questions

6   to satisfy that you have personal knowledge of that.

7        Do you have personal knowledge of the reasons why Blue

8   Shield originally entered into the contract with NorthBay?

9   A.   Yes, I do.

10  Q.   Okay.  And what is the basis for that knowledge?

11  A.   My experience at Blue Shield and my negotiating contracts

12  in that market with other providers and what was going on with

13  Blue Shield in the network in general at that time frame.

14  Q.   Now, you just mentioned what was going on at Blue Shield

15  at that time.  Could you provide a little more detail, again,

16  to establish that -- your personal knowledge?

17  A.   Okay.  At that time, CalPERS, the California State

18  Employees System for Retirees, was switching the manner in

19  which they contracted with health plans in the HMO space for

20  non-Kaiser plans.  At that time they had many competing HMO's

21  that were offered to their membership, and they were

22  consolidating that into a single plan.  And Blue Shield ended

23  up winning that bid and made commitments to pursue provider

24  contracts that weren't in our network but previously were in

25  other networks when we took over the consolidated relationship.

1  **Q.**  And were you part of the process of Blue Shield, for lack

2  of a better word, vying for the CalPERS business?

3  **A.**  I was involved with a team on the network side that had to

4  implement -- I guess I call it fill in the gaps.  Where someone

5  was with a prior network we did not have and we made those

6  commitments on filling those gaps for CalPERS.

7  **Q.**  So let me make sure I understand what you're saying.

8  Around 2008, CalPERS was changing its health care offerings to

9  --

10  　　　　**MR. TOOCH:**  Objection, leading.

11  **BY MS. BRIGGS:**

12  **Q.**  -- to its employees, correct?

13  　　　　**THE COURT:**  Sustained.  That's leading.

14  　　　　**MS. BRIGGS:**  Okay.

15  　　　　**THE COURT:**  So don't answer the question.  We'll start

16  again.

17  **BY MS. BRIGGS:**

18  **Q.**  So you referenced some HMO offerings and non-Kaiser.

19  Could you just explain what you meant by that statement?

20  **A.**  So at the time CalPERS, to their employees, offered

21  competing HMO plans, same benefits but just different networks.

22  It could have been a Blue Shield, it could have been a Health

23  Net.  It could have been United, Anthem.  Whomever.  And they

24  had decided that they were going to consolidate that to get

25  purchasing power to a single network model HMO, non-Kaiser, and

1  Blue Shield ended up winning that bid.

2  **Q.**  Now, what was the relationship between Blue Shield winning

3  that bid for that CalPERS work and Blue Shield entering a

4  contract with NorthBay?

5  **A.**  At the time, Blue Shield did not have a contract with

6  NorthBay, and NorthBay was contracted with at least one of the

7  other plans that no longer were going to be offered.  So Blue

8  Shield made a commitment to try and address that network gap

9  for NorthBay to CalPERS, along with other providers throughout

10  the state.

11  **Q.**  So -- and could you just say a few more words about

12  CalPERS?  You mentioned that Blue Shield actually got the

13  CalPERS business.  Can you describe what that meant to Blue

14  Shield?  What was the size of that business?

15  **A.**  Very large employer group.  I would say the largest for

16  Blue Shield at the time.  At its high point, it had over

17  425,000 members, so very big important employer group to Blue

18  Shield.

19  **Q.**  Now, I would like to fast forward with you to the time

20  when Blue Shield ultimately made the decision to terminate the

21  letter of agreement, or contract, with NorthBay.  Were you

22  involved in that decision?

23  **A.**  Yes, I was.

24  **Q.**  Can you tell us about your involvement?  I'm not actually

25  asking about the substantive decision yet, but just laying a

1  foundation for your personal involvement.

2  **A.**   At that time I, obviously, was managing the network.

3  There were many things going on in the marketplace.  A year or

4  so prior, CalPERS had made a decision to move away from that

5  consolidated model to now opening it back up to competing HMO

6  health plans.

7       And at the same time -- or, a little bit before that --

8  the Affordable Care Act came into play with coverage through

9  Covered California.  And so there was a lot of changes going on

10 in the marketplace and we were evaluating provider contracts in

11 relationship to all those market changes.

12 **Q.**   Okay.  We're going to come back to the Affordable Care Act

13 and CalPERS in just a minute.

14      But the decision-making process leading up to the

15 termination of the contract you were -- were you personally

16 involved in that?

17 **A.**   Yes, I was.

18 **Q.**   Okay.  Let's dig a little more into two things that you

19 just mentioned.  You mentioned two things.  The Affordable Care

20 Act and the loss of at least some of the CalPERS business.

21 **A.**   Correct.

22 **Q.**   Let's take those one at a time.  Let's start with the

23 Affordable Care Act.  Your reference.  What did you mean by --

24 why did you reference the Affordable Care Act?

25 **A.**   Under the Affordable Care Act, Blue Shield is a

1    not-for-profit health plan with a mission to ensure all

2    Californians have access to quality affordable health care.

3         The Affordable Care Act really set out as a way to try to

4    get individuals without insurance coverage into the marketplace

5    to ensure people had coverage.  And that fit -- very much

6    aligned with Blue Shield's strategy.  We very much wanted to be

7    involved.

8         Providers also wanted to be involved because it was, you

9    know, a new set of people to come and access their facilities,

10   access their doctors.  And for that, we had to build a network

11   for this new influx of membership.

12        And so there's a lot of unknowns at the time, but there's

13   a lot of work to create a network to support this influx of new

14   people into the insurance marketplace.

15   **Q.**   Okay.  How did the new influx of people into the

16   marketplace, how did that relate to Blue Shield's decision that

17   it may need to terminate the contract with NorthBay?

18        **MR. TOOCH:**  Objection, relevance.

19        **THE COURT:**  Overruled.  You can answer.

20        **THE WITNESS:**  So at the time you're trying to build

21   networks to offer these new influx of people.  It's consumers

22   buying those policies themselves.  So they're people that don't

23   have access through work, anywhere else.  So they, within their

24   budget, are purchasing.  And with that, we knew that consumers

25   were really going to be cost conscious, so they really were

1  going to be looking at how the networks stack up versus price.

2  So we had to try to structure products and networks to meet the

3  price point we thought the market would take.

4      **MR. TOOCH:**  Objection, relevance.  And particularly in

5  light of with respect to cost issues, Your Honor.

6      **THE COURT:**  This seems to be a different -- related to

7  something different.  And the objection's overruled.

8  **BY MS. BRIGGS:**

9  **Q.**   I'm sorry.  Had you finished your answer?

10 **A.**   Yeah.  So we were working on building those.  But as it's

11 an influx and it's a new product offering, there's a lot of

12 assumptions.  And over time, you end up getting data and

13 information.  So by the mid part of 2015, we had over a full

14 year's worth of claims, we had run out of those claims.  And

15 you started to merge sort of cost of the product implications,

16 and we were looking, in partnership with our sales marketing

17 team, what did we need to do from a network and product design,

18 also, to sort of make sure that these people that are new to

19 the marketplace, paying out of their own pocket, are not going

20 to get hit with huge price increases based upon just how the

21 networks were structured.

22 **Q.**   You keep referring to networks and the price of networks.

23 What do you mean there?  Just in the most basic terms that even

24 I can understand.

25 **A.**   In the most basic terms is -- is we created a new network

1  for this exchange product.  We had a full PPO network.  We were

2  offering the PPO product statewide, but it was a narrowed

3  network.  There were providers that agreed to come in at

4  decrement.  Some providers didn't.  So you're trying to take

5  all those different price points from providers, create a

6  network that then you can sell and market that people can

7  afford paying out of their pocket.

8  Q.  So you're talking about the price of your contracts with

9  hospitals in your network?

10  A.  And then how that rolls up to the premium that the member

11  ultimately pays.

12  Q.  When -- do you have a recollection as to when the

13  Affordable Care Act policies that Blue Shield wanted to sell,

14  when those actually started being sold on the market?

15  A.  They were effective 1-1-2014.  The sales happened a little

16  bit prior to that, the end of 2013.

17  Q.  So January 14, the Affordable Care Act policies go into --

18  go into effect.  And that brought about changes in the

19  marketplace for Blue Shield.  Okay.

20      You also mentioned a second issue.  You mentioned CalPERS

21  and something happening with that relationship.  Let's just set

22  the stage.  When did this change with Blue Shield's

23  relationship with CalPERS occur?

24  A.  That happened also on 1-1-14.

25  Q.  What happened?

1   **A.**   So CalPERS moved away from their consolidated non-Kaiser

2   HMO model, and brought in new networks for the CalPERS

3   population like it had existed in 2007 and before.  They went

4   away from that consolidated model to an unconsolidated model

5   and brought in competing HMO health plans.

6   **Q.**   When you say competing HMO's, are you referring to the

7   Aetnas and the Cignas of the world?

8   **A.**   It's probably more the HMO model, which would be the

9   Health Net, United, Anthems.

10  **Q.**   What happened when CalPERS decided to essentially go back

11  to a more competitive bidding process?  What happened at Blue

12  Shield?

13  **A.**   What happened at Blue Shield; that we dramatically lost a

14  significant amount of our CalPERS membership over time.  That

15  cost, and cost competitive, was really an issue as that many of

16  the HMO's that CalPERS brought in were narrow networks.  They

17  excluded certain providers.  And so they had significantly

18  different price point than the Blue Shield broad network.

19  **Q.**   Do you have any sense, as you sit here today, what the

20  overall change in Blue Shield's CalPERS membership has been

21  from kind of the height of that relationship to where it is

22  now?

23  **A.**   As I stated earlier, at the high we had a little over

24  425,000 members.  As we sit here today, it's under 130,000

25  members.

**Q.** And how did CalPERS rank in terms of the size of Blue Shield's clients over all?

**A.** At their height, they were the largest.

**Q.** So we've talked about two things that happened in 2014 that were disruptive in Blue Shield. But we're really trying to talk about the termination of the NorthBay contract.

So were there other things that were happening either internally at Blue Shield, or externally, that led to Blue Shield's decision to terminate the contract with NorthBay?

**A.** When you overlay sort of the marketplace changes that we were going from a contract that CalPERS was a highlight and a key point, to now exchange members trying to hit a price point that they will pay out of their pocket for those, the dynamics just changed dramatically and the membership shifted from one product line to another.

Along with that, the contract hadn't been renegotiated in many years. It still was under this LOA that from a, you know, compliance standards, probably met it, but there were -- routine we would get audits from accreditation agencies and others. And there's just terms that I expected to be in there that you can't line out. That was an issue.

The contract was a percentage of charges basis. And there wasn't any limitation to what happens to those charges. And most other contracts by the 2015-16 time frame that are charged-based have limitations around that.

**Q.** Could I stop you right there and get you to explain a little more.

When you say that that contract did not have a limitation on chargemaster increases, what does that mean?

**A.** A hospital provides a whole lot of services. Everything that they provide has a charge attached, whether it's a lab test, or radiology, or you go into the OR, or you stay overnight, there's a charge associated with that.

All those charges reside in what the hospital calls a chargemaster. It's a big list of codes, and associated on what they charge for that service.

When a contract is percent of charges, how much they charge is an important factor. Because as those charges go up, the rates go up. And so whenever you have a charge based contract and you negotiate with a provider, you want to understand how that piece of the contract moves so that then you can bake it into your pricing.

In other words, I would negotiate a contract and tell someone I'll pay them X amount of charges, but I have no idea how that contract's going to change over time without the language because they can raise their rates however they see fit. With the language, it provides protection that we all know for the term of this deal how those charges can change. And if they exceed, that we can adjust the reimbursement to neutralize back to what we agreed to the increases to be.

1    **Q.**   So you've explained that the percentage of -- that the

2    percentage is a percentage of bill charges, and that the bill

3    charges are in NorthBay's control.

4         But that percentage of charges and the contract,

5    Mr. Barnes, that changed, didn't it?  Or it could change?  It

6    could move up and down?

7    **A.**   Under the NorthBay's contract structure at the time, it

8    was structured where you had a threshold driven by inpatient

9    days and some criteria what counted for an inpatient day.  And

10   depending on your inpatient day volume, either party could

11   invoke changes to those rates.

12   **Q.**   Okay.  So it was tied to inpatient volume.

13        Could you tell us, what does that mean.  What's an

14   inpatient?

15   **A.**   So an inpatient is someone that the physician writes

16   orders for them to stay overnight to receive inpatient care.

17   So the physicians actively taking an action to say person X

18   needs to stay overnight, and writes orders for them to be

19   admitted to the hospital.

20   **Q.**   Okay.  And so the more inpatients that Blue Shield drove

21   to NorthBay, the lower the rate it would have to pay under the

22   contract generally.  Right?

23   **A.**   Correct.  Correct.

24   **Q.**   Now, did you have an understanding as to whether there was

25   any kind of overall change in the marketplace with respect to

1    inpatients going on during this time frame?

2    **A.**    Well, generally in this time frame, the marketplace has

3    moved from one that historically was very inpatient driven.

4    There was a lot of service done in the inpatient to one that

5    it's better outcomes quality to get people moved to outpatient

6    settings and do as much as you can in the outpatient setting

7    and people ambulatory.  So it's just been a change in the

8    marketplace.

9         You know, technologies, other things are driving that.

10   The event of freestanding surgery centers you did not have as

11   much 20 years ago as you do today.  All those advanced.

12   Freestanding imaging.  Many years ago you could only get an MRI

13   a hospital.  Now they have freestanding locations.  Just the

14   industry has changed.

15   **Q.**    So under the contract as these kind of former inpatients

16   now became outpatients, was Blue Shield getting, you know,

17   credit for those outpatients in terms of getting a better rate

18   under this contract?

19   **A.**    Not hitting the thresholds in changing the percentages,

20   no.

21   **Q.**    So I think we left off with two specific events in 2014

22   along with some more general changes in the marketplace leading

23   up to the decision to terminate.

24        Can you tell us a little bit about the timing of the

25   decision to terminate.  In other words, when did Blue Shield

1  start thinking about terminating this contract?

2  **A.**   It's one of those things that termination of a contract is

3  not something we take lightly.  It's something we don't relish.

4  We want people to have access.  We want them to have care

5  locally.

6      But it really was in the end of 2015 leading up to how we

7  were going to be pricing for Covered California in 2016, for

8  2017, that we realized we had issues with our NorthBay contract

9  and we were going to have to address it or suddenly we would be

10  faced with decisions that, you know, Blue Shield based on our

11  mission, just felt like we needed to be in that space.  And we

12  didn't like the alternatives.

13      And so it really began that work there.  But it's one you

14  cannot take lightly to terminate a hospital.  You also have to

15  look at the corresponding physician relationships.  Can you

16  meet regulatory access requirements?  It takes a lot of work

17  before you decide I'm going to pull that trigger; or you kind

18  of lose credibility if it ended up that you couldn't work it

19  out for regulatory reasons.

20  **Q.**   So one thing you just mentioned, you mentioned you were

21  trying to get ready I think for the 2016 year of Covered

22  California.  Covered California, you mentioned it before, what

23  is that?

24  **A.**   Covered California is the ACA.  In California, the

25  exchange that was created to fulfill the requirements of the

1    ACA is called Covered California or California Exchange.

2    **Q.**   Is that where Blue Shield sells its Affordable Care Act

3    policies to California residents?

4    **A.**   Correct.

5    **Q.**   So the decision you didn't take lightly, but you started

6    talking about it towards the ends of 2015.  What happened?

7    What happened after those discussions?

8    **A.**   So we worked together to try and develop how we were going

9    to approach this.  And then not long -- you know, we were still

10   working internally.  We received the notice from NorthBay

11   saying, Hey, we're calling in a trigger.  You're not meeting

12   the threshold.  The rates are going to raise.

13   **Q.**   Now, one of the reasons why Blue Shield takes terminating

14   a contract with a hospital like NorthBay seriously, is that

15   Blue Shield gets some benefit --

16          **MR. TOOCH:**  Objection.

17   **BY MS. BRIGGS:**

18   **Q.**   -- from that contract.  Right?

19          **THE COURT:**  Sustained.

20   **BY THE COURT:**

21   **Q.**   Does Blue Shield get any benefit from its contract with

22   NorthBay?

23   **A.**   Both parties get benefits.  The benefit is there's a

24   relationship.  We refer business, steer business.  They're

25   listed in our directories.  They're marketed as being part of

1   the Blue Shield network and members have access.  They get paid

2   based upon contractual rates and contractual provisions.

3   There's dispute provisions if we can't agree on how something

4   should be handled.  I mean, there's benefits for both parties

5   on how we're going to interact and work.

6   **Q.**   You sent the notice of termination.  And do you have a

7   recollection as to when that termination became effective?

8   **A.**   The date of the termination?  Or effective date of the

9   term?

10  **Q.**   The effective date of the term.

11  **A.**   I want to think it's December 1 of 2016, if I remember

12  correctly.

13  **Q.**   I think you do.  So as of December 1, Mr. Barnes, was Blue

14  Shield a willing buyer of NorthBay's emergency services at

15  80 percent of NorthBay's billed charges?

16  **A.**   No, we were not.

17  **Q.**   As of December 1, 2016, was Blue Shield a willing buyer of

18  NorthBay's services at 88 percent of NorthBay's full billed

19  charges?

20  **A.**   Definitely not.

21  **Q.**   As of December 1, 2016, was Blue Shield a willing buyer of

22  NorthBay's services at 95 percent of NorthBay's full billed

23  charges?

24  **A.**   Absolutely not.

25       **MS. BRIGGS:**  Thank you.  No further questions.

1      THE COURT:  Mr. Tooch.

2                **CROSS-EXAMINATION**

3  **BY MR. TOOCH:**

4  **Q.**   Good morning, Mr. Barnes.

5  **A.**   Good morning.

6  **Q.**   You're the network manager at Blue Shield that was

7  responsible for the NorthBay contract up until the time it

8  terminated.  Correct?

9  **A.**   I'm not the network manager.  I was the director.  I had a

10  network manager assigned to NorthBay contract.

11  **Q.**   That's right.  His name was Mr. Little, right?

12  **A.**   Michael Little, correct.

13  **Q.**   Now, your deposition was taken in the case on January 4,

14  2009.  Correct?

15  **A.**   Correct.

16  **Q.**   And prior to your deposition you spoke with Mr. Little

17  about the case, right?

18  **A.**   Correct.

19  **Q.**   And you had this deposition with Mr. Little around the

20  time when you first became aware of the lawsuit, correct? (sic)

21      **THE COURT:**  Could you rephrase that question,

22  Mr. Tooch?

23  **Q.**   You had a conversation with Mr. Little around the time

24  when you first became aware of this lawsuit, right?

25  **A.**   Correct.

1  BY MR. TOOCH:

2  **Q.**   And that conversation with Mr. Little was sometime in

3  2018.  Correct?

4  **A.**   I think.  That's my best recollection.

5  **Q.**   Now, the complaint in this case was filed in May of --

6  May 22, 2017.  Correct?

7  **A.**   I do not know when it was filed.

8  **Q.**   If you could bring up the --

9       **THE COURT:**  Jean, got to switch.  Okay.  Don't put

10  this on the jury -- okay.

11  BY MR. TOOCH:

12  **Q.**   You see the date at the top of this document, May 27,

13  2017?

14  **A.**   The filed date.  Yes, I see that.

15  **Q.**   So you were not aware of this case in 2017.

16  **A.**   I don't remember when I first became aware.  I was

17  thinking it's '18, but I do not know for sure.

18  **Q.**   And so the contract terminated in 2016, right?

19  **A.**   Correct.  The end of 2016.

20  **Q.**   Then in May of 2017 this case was filed, but you didn't

21  know about it in 2018.  Correct?

22       **MS. BRIGGS:**  Objection.  Misstates his testimony.

23       **THE COURT:**  Overruled.  You can answer the question.

24       **THE WITNESS:**  I don't recall specifically knowing in

25  '17.  I remember knowing about it in '18.  I'm not sure the

1  exact date I became aware.

2  **BY MR. TOOCH:**

3  **Q.**  Okay.  Now, you've worked continuously with -- at Blue

4  Shield for 32 years -- or, 33 years, rather.

5  **A.**  Well, it will be 33 this year.

6  **Q.**  You've never worked at Cigna, United, Aetna, Blue Cross or

7  Health Net, correct?

8  **A.**  Correct.

9  **Q.**  You started out as a claims processor, right?

10  **A.**  Correct.

11  **Q.**  Then you became claims analyst, and then a general

12  supervisor.  Right?

13  **A.**  A supervisor, then a general supervisor.

14  **Q.**  And around the '90s you became a contract manager, right?

15  **A.**  Provider relationships, then go into contract managing.

16  **Q.**  As a contract manager you would negotiate contracts with

17  hospitals and IPA's and medical groups, right?

18  **A.**  Correct.

19  **Q.**  You were responsible for the greater Sacramento area,

20  right?

21  **A.**  Correct.

22  **Q.**  And Solano County was not included in the greater

23  Sacramento area, right?

24  **A.**  Solano not, but my relationship with Sutter was.

25  **Q.**  We'll get to that in a bit.  And then you said in the late

1  '90s you became a contract supervisor, right?

2  **A.**   Yes.   Somewhere in that late '90s, early 2000, I started

3  supervising a team of contract managers.

4  **Q.**   And that included Sacramento, the central valley, and all

5  the way up to the Oregon border, right?

6  **A.**   Correct.

7  **Q.**   Not Solano County.

8  **A.**   Not Solano County.

9  **Q.**   And you were a contract supervisor for four years, right?

10  **A.**   Probably.

11  **Q.**   Not going to hold you to the exact date, you understand.

12  **A.**   Yes.

13  **Q.**   And then you -- so you've either negotiated a lot of

14  contracts with hospitals, or you have supervised others that

15  have negotiated a lot of contracts with hospitals.   Right?

16  **A.**   Correct.

17  **Q.**   Now, as a contract manager, you do not do your own

18  analytics, correct?

19  **A.**   Correct.

20  **Q.**   You work internally at Blue Shield with your analytical

21  team, right?

22  **A.**   We have a team of analytical folks that are assigned to

23  us.

24  **Q.**   And they use data that Blue Shield has internally, right?

25  **A.**   Historically they use claims data, correct.

1  **Q.**   What is claims data?

2  **A.**   Information submitted to us by providers who render care.

3  **Q.**   And that has the types of services, and the charges.

4  Right?

5  **A.**   Yes.  It has date of service, types of services, diagnosis

6  codes, charges, all that information.

7  **Q.**   And that's whether the patient is inpatient or outpatient,

8  right?

9  **A.**   That would be on a hospital claim, yes.

10 **Q.**   And whether the patient is an ER patient or not an ER

11 patient?

12 **A.**   There's identifiers around ER services.

13 **Q.**   Okay.  Whether the patient -- whether it's elective

14 services or not elective services?

15 **A.**   I think there might be an elective indicator, but it's

16 been so long since I did claims, so --

17 **Q.**   Say whether or not they're C-sections or normal

18 deliveries?

19 **A.**   That would come through either by types of procedures or

20 diagnosis codes.

21 **Q.**   And they create a model of the contract, right?

22 **A.**   They create a modeling tool, correct.

23 **Q.**   And they share that model with you, the negotiator, right?

24 **A.**   Correct.

25 **Q.**   How many hospitals does Blue Shield contract with in the

1  state of California?

2  **A.**    Over 330, I think.

3  **Q.**    So Blue Shield has data on 330 hospitals in California,

4  right?

5  **A.**    Approximately, I think.

6  **Q.**    It has data on the volumes at those hospitals, right?

7  **A.**    I would assume so.

8  **Q.**    It has data on the rates that it pays those hospitals,

9  right?

10  **A.**    For those that are contracted, yes.

11  **Q.**    And it has data on what those hospitals charge, right?

12  **A.**    At a high level, yes.

13  **Q.**    Okay.  The analytical team at Blue Shield not only looks

14  at the data from the hospital that they're negotiating with,

15  but they look at data from competitor hospitals in the same

16  market, right?

17  **A.**    I think those are two different things that within the

18  model they'll model a hospital, but we also will look at

19  information from a competing hospital, get an idea of

20  relativity to one another.

21  **Q.**    How much you're paying one hospital versus what you're

22  paying another hospital.  Right?

23  **A.**    Correct.

24  **Q.**    And that is to let you know whether the contract that

25  you're negotiating with the particular hospital is on par with

1    the other hospitals, or is more expensive or less expensive.

2    Right?

3    **A.**    That's part of what we get out of it, yes.

4    **Q.**    And if the hospital's already in network with Blue Shield,

5    the analytical team gives you information on what type of

6    increase is proposed under the contract.  Right?

7    **A.**    It gives us increase and what's happening in different

8    service lines.

9    **Q.**    And service lines are what?

10   **A.**    Service lines would be, you'll get a split between

11   inpatient and outpatient.  Within the inpatient bucket, you'll

12   see things about what's happening med-surg verses ICU verses

13   coronary versus if they've got a stoploss provision.  So

14   there's just kind of different buckets.  So you'll see that

15   granular level, and then it will get rolled up.

16        On the outpatient side you'll see what's happening for

17   emergency, radiology, lab, outpatient surgery.  And then

18   there's generally an "other" bucket.

19   **Q.**    And when hospitals and Blue Shield negotiate, they

20   negotiate rate -- generally increases, but sometimes decreases

21   for all those different service lines.  Right?

22   **A.**    You negotiate rates, and they can get impacted

23   differently, is how I would say.

24   **Q.**    What do you mean by that?

25   **A.**    That how you negotiate a contract, the impact to different

1    service lines can be different.  Something could go up 2,

2    something else goes down 3, something else goes up 5.  There

3    could be differences based on what's going on and what each

4    party's trying to address as part of the negotiation.

5    **Q.**    And so, theoretically, say Blue Shield may want to say:

6    We want to reduce the prices for ER services, but we'll give

7    you more under inpatient services.  Right?

8    **A.**    That could happen.

9    **Q.**    And you say:  Well, we'll reduce the charges for radiology

10   services like X-rays and CAT scans, but we'll increase your

11   charges on medications.  Theoretically.

12   **A.**    Theoretically, yes.

13   **Q.**    And so what the analytical team at Blue Shield does is it

14   takes the increases and decreases in all these different

15   service lines and puts it into a model contract.  Right?

16   **A.**    Not a model contract, but a modeling of the contract.

17   **Q.**    A modeling of the contract.  Okay.  And that modeling of

18   the contract tells you exactly how much based upon the volumes

19   that were at the hospital in the past year, right?

20   **A.**    Well -- well, it depends on what time frame you're using

21   because you're got to have complete data.  But you'll use a

22   baseline time period, it will take that utilization, and make

23   an assumption that if all that utilization stays the same this

24   would be the output under the changes proposed.

25   **Q.**    So say, for example, if you're looking at X-rays you look

1   at what's the number of X-rays under the old contract, what's

2   the increase, and how's that going to be affected under the new

3   proposed contract.  Right?

4   **A.**   I'd say how it flows through.

5   **Q.**   So for each service line, you have a model of how much, as

6   best as Blue Shield can do, expect to pay the hospital over the

7   -- in the new contract, right?

8   **A.**   Correct.

9        **THE COURT:**  This seems like a good time to take a

10   break.  Why don't we take our second break for the morning for

11   about 15 minutes.

12      Please remember the admonitions.

13               (Recess taken at 11:20 a.m.)

14            (Proceedings resumed at 11:32 a.m.)

15     (The following proceedings were held in open court,

16   outside the presence of the jury:)

17        **THE COURT:**  Are you ready to proceed, Mr. Tooch?

18        **MR. TOOCH:**  Yes, Your Honor.  If I may, before the

19   jury comes back.

20        **THE COURT:**  Okay.

21        **MR. TOOCH:**  I would like to have the opportunity to

22   again raise the objection that I had to --

23        **THE COURT:**  Everybody be seated, please.

24        **MR. TOOCH:**  -- to Mr. Barnes' testimony with respect

25   to premiums.

1    I understand Your Honor has made a ruling with respect to

2  the hospital's costs and that they are not relevant.  And we're

3  living with your ruling on that.  And you say that what's a

4  fair market value has nothing to do with what the costs are.

5    The same reason applies to Blue Shield's costs.  What is

6  the reasonable value for the services has nothing to do with

7  Blue Shield's costs.  If Blue Shield is inefficient and can't

8  compete with the other members and they, therefore, can't

9  compete with the other hospitals, those costs are irrelevant.

10    And what it can sell premiums for is irrelevant because

11  that's like saying, okay, you know, it's going to cost us a lot

12  more to provide the services, and so the reasonable value of

13  services in the abstract is affected.

14    And so it's very unfair to the hospital to be able to say,

15  well, we can't talk about our costs, we can't talk about the

16  reasons why we need high prices in our contracts, but

17  Blue Shield is given the opportunity to argue why it can have

18  low -- why it needs low prices in its contracts.

19    And so that's an unfair playing field with respect to

20  this.  Both sides can say what their reasons are why they need

21  high prices or low prices, or neither side should be able to

22  say that.

23    **THE COURT:**  So as I understood Mr. Barnes' testimony,

24  they're setting up what this -- how did this happen?  He did

25  not go into any specific details about the premiums or anything

1    else.  But he was explaining how they came to this -- how we

2    all come to this place.

3        And I thought that that was perfectly fine background,

4    foundational information in the same way that I've allowed you

5    to describe how wonderful NorthBay's services were.

6        So your objection is noted and overruled.

7            **MR. TOOCH:**  If I may just one -- and I don't mean to

8    try the Court's patience.

9            **THE COURT:**  You are.

10           **MR. TOOCH:**  I understand that, Your Honor, and I

11   understand that I'm doing that, but I understand that it's

12   important for my client too.

13       I studiously stayed away from asking questions of my

14   client, "Why did you need these high prices in your contracts?"

15   because I know they would have brought an objection.

16       And Mr. Barnes is being asked, Why did you need low prices

17   in your contracts?  And am I able now, based upon Mr. Barnes'

18   testimony, to ask that question?

19           **THE COURT:**  To ask what question?

20           **MR. TOOCH:**  Why did -- NorthBay's witness on rebuttal,

21   why do you need -- why did you need to have prices at certain

22   levels?

23           **THE COURT:**  Okay.

24           **MR. TOOCH:**  I understand I can't ask that question

25   based on the last ruling.  But what Mr. Barnes has been saying

1   is why they needed low prices in the contract.  And I need --

2   you know, I respectfully request that the Court reconsider

3   this, because I think it's a key issue.  And I don't think

4   what -- the reasons why Blue Shield needs low prices in the

5   contract goes to reasonable value.

6          **THE COURT:**  Okay.  Thank you for your objection.  It's

7   overruled.

8       Let's get the jury.

9       (Jury enters at 11:36 a.m.)

10         **THE COURT:**  All right.  Please be seated, everybody.

11      Mr. Tooch.

12         **MR. TOOCH:**  Thank you, Your Honor.

13  **BY MR. TOOCH:**

14  **Q.**   Now, Mr. Barnes, in 2007 you became director of provider

15  contracting for Sacramento and the Central Valley; right?

16  **A.**   Correct.

17  **Q.**   And, again, you're not responsible for Solano County?

18  **A.**   Correct.

19  **Q.**   That was handled at the Bay Area negotiating team at

20  Blue Shield?

21  **A.**   Correct.

22  **Q.**   And who was in charge of that Bay Area negotiating team?

23  **A.**   The later part of 2007, Kristen Miranda.

24  **Q.**   Kristen Miranda?

25  **A.**   Correct.

1  Q.   And who after that?

2  A.   The structure changed somewhat, and there was a senior

3  manager.  And I'm drawing a blank of her name.  She had

4  responsibility for leading that team.  And then Kristen sort of

5  took it back over before I took over in 2012.

6  Q.   And who was in charge of the NorthBay Medical Center

7  contract in 2008?

8  A.   Uhm, 2008, I know Michael Little and Juan Davila

9  negotiated that contract.  But I think Michael Little was still

10  the assigned network manager.

11  Q.   And did Mr. Little work underneath Mr. Davila, or the

12  other way around?

13  A.   Juan was all of our bosses, so, yeah, Michael, there was a

14  layer between him and Juan.  Juan was the vice president at the

15  time.

16  Q.   And Juan is your boss; correct?

17  A.   He was our boss at that time.

18  Q.   Now, you mentioned on direct exam that you were involved

19  in the Sutter negotiations; right?

20  A.   Correct.

21  Q.   And unlike some of the other hospitals where you managed

22  other people who did the direct hospital-to-Blue Shield

23  negotiations, with Sutter you were personally involved; right?

24  A.   Correct.

25  Q.   And Sutter is a big system; right?

1   **A.**   Correct.

2   **Q.**   It has over 20 hospitals; right?

3   **A.**   Correct.

4   **Q.**   And what are some of the hospitals in Sutter's system in

5   Northern California?

6   **A.**   Sutter Medical Center Sacramento.  Sutter Davis.  Sutter

7   Solano.  Auburn Faith.  CPMC in San Francisco.  Alta Bates

8   Summit Medical Center.  Sutter Santa Rosa.  Sutter Maternity

9   Center.

10  **Q.**   In 2013, you also took over responsibility for the Dignity

11  hospitals; right?

12  **A.**   Correct.

13  **Q.**   And Dignity also has a lot of hospitals; right?

14  **A.**   Correct.

15  **Q.**   What are some of Dignity's hospital in Northern

16  California?

17  **A.**   Mercy Medical Center Sacramento.  Mercy Folsom.

18  Methodist.  Saint Frances.  St. Mary's here in the City.

19  Dominican Santa Cruz.  They have Mercy Mount Shasta.  They have

20  one in Red Bluff, but I'm drawing a blank in its name.  Mercy

21  Redding.  Mercy Merced.  A couple of facilities in Bakersfield,

22  and then quite a few through Southern California.

23  **Q.**   Now, generally what's the value of a contract for a

24  hospital the size of NorthBay?

25  **A.**   Generally, what's the value --

1  **Q.**   In other words, what's the total payments?

2  **A.**   We call it "spend."  And I don't remember looking at

3  NorthBay's -- as I sit here today, I can't tell you the exact

4  number.  I don't remember what it was prior to termination.

5  **Q.**   I'm not asking for exact.  I'm just saying in general,

6  based upon your experience generally for a hospital its size.

7  **A.**   They can vary.  NorthBay has two campuses.  It's all over

8  the board.  Some there's a million dollars.  Some it's

9  50 million.  There's some up over a hundred million.

10 **Q.**   And the Sutter contract, does that go into the billions?

11 **A.**   For all the services, yes, because there's more than just

12 the hospitals.

13 **Q.**   And do the Dignity hospitals go into the billions as well?

14 **A.**   Dignity is just under.

15 **Q.**   Now, when you're negotiating with a hospital like Sutter,

16 you look -- you do modeling in those contract negotiations, as

17 well; right?

18 **A.**   Correct.

19 **Q.**   And you model not only at the hospital level but also at

20 the system level; right?

21 **A.**   Correct.

22 **Q.**   And so you may be looking at a particular hospital like

23 Sutter Solano, and you can say, okay, if we change the rates

24 for this particular hospital then we'll pay more for this,

25 x-rays, and these -- less for ERs and of inpatient, et cetera,

1   et cetera; right?

2   **A.**   You negotiate all the various providers.  And there are

3   tradeoffs between the negotiations.  And they can vary between

4   the facilities.

5   **Q.**   So not only do you negotiate the different rates within a

6   facility but also between the facilities as well?

7   **A.**   Correct.

8   **Q.**   Now I'm going to read off a list of hospitals, and let me

9   know if Blue Shield has contracts with them.  Okay?

10  **A.**   Okay.

11  **Q.**   Sutter Davis.

12  **A.**   Yes.

13  **Q.**   Sutter Delta.

14  **A.**   Yes.

15  **Q.**   Sutter Sacramento.

16  **A.**   Yes.

17  **Q.**   Sutter Solano.

18  **A.**   Yes.

19  **Q.**   John Muir Walnut Creek.

20  **A.**   Yes.

21  **Q.**   John Muir Concord?

22  **A.**   Yes.

23  **Q.**   Queen of the valley?

24  **A.**   Queen of the valley yes.

25  **Q.**   Woodland?

1    A.    Yes.

2    Q.    Now, in 2012, you took over responsibility for the entire

3    northern part of the state?

4    A.    Correct.

5    Q.    And that included Solano County?

6    A.    Correct.

7    Q.    Now, I'd like to go to Exhibit 1.

8          (Document displayed.)

9    Q.    Exhibit 1 was the contract that Blue Shield and NorthBay

10   entered into in 2008; right?

11   A.    Correct.

12          **THE COURT:**  Jean, can you put it on the screen.

13   **BY MR. TOOCH:**

14   Q.    And if you can go to page 1-7.  This was signed by your

15   boss, Juan Davila; right?

16   A.    Correct.

17   Q.    And did I say his name correctly?

18   A.    Davila.

19   Q.    Davila.  And he's still at Blue Shield; right?

20   A.    No.

21   Q.    Oh.  Where is he now?

22   A.    Uhm, I don't know where he's at.

23   Q.    Okay.  Now, before he left Blue Shield he was the

24   executive vice president of network management?

25   A.    He was executive vice president, but I'm not sure over

1  network management.  I think it was healthcare quality and

2  affordability.

3  **Q.**   When did he leave?

4  **A.**   I don't know the exact date.

5  **Q.**   Okay.  I was going off LinkedIn, so my information may not

6  be correct.

7       Approximately when did he leave?

8  **A.**   I don't know.  I would be guessing at this point.  I don't

9  know if it was 2016, 2017.  I don't know.

10  **Q.**   Okay.  Now, Mr. Davila was an experienced negotiator of

11  contracts; right?

12  **A.**   Correct.

13  **Q.**   And he would not have signed this contract without getting

14  information about volumes and rates; right?

15  **A.**   I would assume he would have had this agreement modeled.

16  **Q.**   And not only would he have this agreement modeled, but he

17  would have Blue Shield's contract rates with its other

18  hospitals in the region; right?

19       **MS. BRIGGS:**  Objection.  Lack of foundation.  This

20  witness already testified he was not involved in the contract

21  negotiations with NorthBay.

22       **THE COURT:**  He can talk about the practice and

23  procedure if he knows.

24     If you know.

25       **THE WITNESS:**  I would assume so, but I don't know for

1  sure.

2  **BY MR. TOOCH:**

3  **Q.**  Okay.  So it's the practice of contractors like yourself,

4  at Blue Shield, that before they enter into a particular

5  contract with a hospital they compare that contract to

6  Blue Shield's contracts with other hospitals; right?

7  **A.**  That we haven't modeled and understand the implications.

8  **Q.**  So either Mr. Davila did that analysis or he didn't do

9  that analysis; right?

10  **A.**  Correct.

11  **Q.**  Okay.  Would you suspect that he did do that analysis?

12  **A.**  I'd expect someone did it for him and shared it with him.

13  **Q.**  The analytical department?

14  **A.**  Correct.

15  **Q.**  Okay.  Now, if you can go to page 1-8.

16  (Document displayed.)

17  **Q.**  You've seen this page of the contract before; right?

18  **A.**  Correct.

19  **Q.**  And if you can go to the notes section at the bottom, the

20  first -- and when you took over Solano County, you familiarized

21  yourself with this contract; right?

22  **A.**  At some point I did.  I can't tell you when exactly, but

23  at some point I did.

24  **Q.**  And the notes, the first sentence says, "The above rate

25  structure is developed based upon the precept that as

1  Blue Shield increases inpatient business, it shall derive an

2  increased financial benefit for all services by virtue of

3  improved, paren, lower reimbursement rates, paren, the converse

4  is also true."

5      You understood what they meant; right?

6  **A.**  I understood the concept they entered into at that time.

7  **Q.**  What was your understanding?

8  **A.**  That the rates were based upon some volume thresholds, and

9  rates changed as that volume changed.

10 **Q.**  Now, before Blue Shield agreed to these rates and volumes,

11 it had information about rates and volumes at a number of

12 different hospitals in the area; right?

13 **A.**  Most likely.

14 **Q.**  And so Blue Shield went into this contract with a lot of

15 information; right?

16 **A.**  I would assume Blue Shield entered into this knowing what

17 was going on in the market at the time.

18 **Q.**  Okay.  And Blue Shield agreed that if the number of

19 patients that -- the in-patients in the six-month period was

20 230, that it would get a discount down to 65 percent of total

21 billed charges; right?

22 **A.**  Correct.

23 **Q.**  But if Blue Shield was unsuccessful in increasing its

24 volume, it would pay 80 percent of total charges; right?

25 **A.**  Correct.

**Q.** And, generally, that's how contracts in the managed care field work; right? A lot of them are tied to volume; that the more a hospital -- volume a hospital gets, the lower its rates will be?

**A.** I disagree.

**Q.** So are you saying that hospitals that get greater volume don't get greater discounts?

**A.** No. I disagree because this is one of the few contracts that has some volume threshold tied to the rates. Most of our other contracts don't have such stipulations.

**Q.** I see. Most of the other contracts are just maybe a percent of charges or per diems and --

**A.** They have a rate structure that's not tied to any volume thresholds.

**Q.** Okay. Now, Blue Shield entered into this contract willingly; right?

**A.** I assume so at the time.

**Q.** Okay. How does -- now, this contract was tied to volume threshold. How does Blue Shield increase its volumes at a particular hospital?

**A.** Generally, it's by growing membership.

**Q.** And how does it grow membership?

**A.** It grows the membership by attracting new employer groups, new clients to Blue Shield, that buy our coverage and are in a given marketplace.

1  **Q.**   By "employer groups," in other words, it goes to employers

2  and says, you know, buy your health insurance for your

3  employees through Blue Shield not through Blue Cross,

4  essentially?

5  **A.**   Yeah.  I mean there's a broker community, but there's a

6  conduit for how those businesses come and decide who they're

7  going to select.

8  **Q.**   What do you mean "a broker"?

9  **A.**   So very few employer groups come directly knocking on

10 Blue Shield's door.  Usually they have an agent, you know,

11 what's called a broker.

12     Similar to car insurance, where you have an agent that

13 represents you, and maybe they represent multiple lines or a

14 single line, a similar-type thing happens in the healthcare

15 space.  There's people that they specialize on matching

16 employers to health plans.

17 **Q.**   Okay.  If you could go to Exhibit 5.

18     Have you seen this document before?

19 **A.**   Yes.

20 **Q.**   And this is a letter that NorthBay sent to Blue Shield in

21 August of 2009; right?

22 **A.**   Correct.

23 **Q.**   And if you look at the second sentence of the first

24 paragraph, it says, "As noted in Exhibit A, item 3 of the LOA,

25 the rate tiers have been reassessed and shall be adjusted due

1  to increased volumes of Blue Shield business"; right?

2  **A.**  Correct.

3  **Q.**  So Blue Shield was able to increase its volumes at that

4  time?

5  **A.**  Correct.

6  **Q.**  And NorthBay agreed to reduce its rates from 80 percent of

7  charges to 77 percent of charges?

8  **A.**  Yeah, most likely to the CalPERS.

9  **Q.**  And this was signed by Kristen Miranda, who was the woman

10  you mentioned before; right?

11  **A.**  Correct.

12  **Q.**  And she reported to Mr. Davila; right?

13  **A.**  Correct.

14  **Q.**  And before she signed this, she would have had information

15  about the volumes herself; right?

16  **A.**  I would assume so, that she verified the volumes.  But

17  since the rates were going down, I don't know if she did or

18  just took NorthBay's word.  I don't know.

19  **Q.**  All right.  If you can go to Exhibit 2.

20      (Document displayed.)

21  **Q.**  This is the contract that NorthBay entered into with

22  Blue Shield as of October 1, 2009; right?

23  **A.**  Uhm, I can't tell what date this was, based upon what I'm

24  seeing.

25  **Q.**  If you see --

1  A.    I think that's correct, but I can't see --

2  Q.    If you look under "Agreement," paragraph 2.

3  A.    Yeah.  That wasn't shown originally.  Correct.

4  Q.    And so if you look under "Recitals," paragraph B, it says,

5  "Whereas, Blue Shield and Hospital wish to revise the volume

6  thresholds of Exhibit A in the LOA."  Do you see that?

7  A.    Correct.

8  Q.    And LOA means letter of agreement?

9  A.    The original letter of agreement, correct.

10  Q.    And so -- and if you look at -- and this was signed -- if

11  you go to page 2 -- by Mr. Davila; right?

12  A.    Correct.

13  Q.    And on page 3 they're the revised volume thresholds;

14  right?

15  A.    Correct.

16  Q.    So Blue Shield wanted to reduce the volume thresholds in

17  its contract; right?

18  A.    I don't think that's correct.  I think the original LOA

19  had some provisions in the notes about doing a reconciliation

20  of what happened, because there was a baseline contract.  But I

21  don't know, I wasn't involved.  But as I read the contracts,

22  that's what I would have assumed happened.  But I wasn't

23  involved, so I can't say directly.

24  Q.    If you look at Exhibit 1, page 8, you can see that the

25  volume threshold -- let's just go to the bottom -- 65 percent

1   of charges was based upon 230 inpatient admits.  Do you see

2   that?

3   **A.**   Correct.

4   **Q.**   And if you go to Exhibit 2, page 3, for 65 percent of

5   charges, it was 175 inpatient admits.  Do you see that?

6   **A.**   Yes, I see that it changed.

7   **Q.**   And so the volume thresholds went down under this

8   amendment; right?

9   **A.**   The volume thresholds went down.  But I think it's

10  paragraph 1, note 1, under the original LOA, that drove that.

11  Because they talked about a benchmark payor and a

12  reconciliation process that I think that's what drove it versus

13  a negotiation.

14  **Q.**   Okay.  Let's go to paragraph 2 under notes -- paragraph 1

15  under the notes.

16      The second sentence says, "If Blue Shield can achieve

17  volumes equivalent to hospital's highest volume payor, paren,

18  the, quote, benchmark payor, Blue Shield will receive a

19  discount equivalent to that payor."

20      Do you understand what that means?

21  **A.**   Correct.

22  **Q.**   And who is the benchmark payor?

23  **A.**   I do not know.

24  **Q.**   Do you know whether or not it was Blue Cross?

25  **A.**   I don't know.  I don't know if Blue Shield even knew.

Q.    And it says that Blue Shield can achieve volumes
equivalent to the hospital's highest volume payor.  What did
you understand that to mean?

A.    I would say it this way, that NorthBay was saying if you
can meet the volumes of our highest payor, we will give you
similar discounts.

Q.    You can compete on an equal basis to whoever that payor
is?

A.    If you can achieve those same levels, correct.

Q.    So let's assume, for example, it's Blue Cross, just
theoretically.  I know you don't know.  So if it's Blue Cross
that had the highest volumes, Blue Shield will get the same
discount that Blue Cross was getting; right?

A.    For the same volume.

Q.    For the same volume, yes.  In other words, if Blue Shield
can encourage enough of its members or sell its product as well
as Blue Cross did in the marketplace to employers, and get the
volume that Blue Cross has at NorthBay, then NorthBay will give
them the same deal that it's giving Blue Cross?

A.    That's how this was structured.

Q.    Now, before Mr. Davila signed this contract, he would have
had a year's worth of volume thresholds -- volume information
from NorthBay; right?

A.    Uhm, contract would have been in place for a year.  You
know, you don't necessarily have a year's worth of data at the

1　end of the year, but you're going to have at least six months,

2　maybe nine months.  But you have a fair amount of data.

3　**Q.**　Okay.  And he would also have the information from the

4　hospitals that Blue Shield contracts with; Sutter Delta, Sutter

5　Davis, Sutter Sac, Sutter Solano, John Muir Walnut Creek, John

6　Muir Concord, Queen of the Valley, Woodland.  He would also

7　have all of those data; right?

8　**A.**　Correct.

9　**Q.**　And in this contract amendment a year after entering into

10　the contract, Blue Shield didn't attempt to reduce the rates in

11　this contract; right?

12　**A.**　I'm not following you.  There was an agreement in place

13　that called how the agreement would change.  So Blue Shield

14　would intend to honor that versus renegotiating.  I'm not

15　following.

16　**Q.**　Blue Shield could have tried to renegotiate the contract

17　in total in 2009, couldn't it?

18　**A.**　Uhm, I guess that's debatable that you have a binding

19　agreement.  You could always try, but the other party could

20　say, no, we've got a binding agreement.

21　　　And, you know, so normally once we enter into an agreement

22　we don't open it up until the renewal unless something new

23　happens, like a new product offering, something that wasn't

24　contemplated, then you might.  But outside of that, you tend to

25　honor the provisions you agreed to.

1  **Q.**   So there was no provision in this contract which said that

2  Blue Shield couldn't terminate the contract at any point in

3  time, was there?

4  **A.**   Uhm, I'm not familiar without looking at the initial term.

5  I don't know if it locked in for the full three years or not.

6  I think it might have, but I'm not sure.

7  **Q.**   All right.  So do you know whether or not -- so but when

8  it negotiated the volume differences, Blue Shield could have

9  negotiated the percentage of billed charges differences,

10 couldn't it?

11 **A.**   Uhm, the whole premise of the agreement is you are getting

12 the same deals as the benchmark payor.  So if that's the deal

13 NorthBay was offering and we agreed to, anything we were

14 getting was sort of based upon that benchmark payor.

15 **Q.**   Well, not really, because this agreement doesn't say that

16 this amendment was being entered into because Blue Shield met

17 what the benchmark payor was doing, does it?

18 **A.**   No.  It says the rate structure is developed based upon

19 the precept of that, and that it's going to be driven by what

20 happens with the benchmark payor.  I mean, there's a whole

21 connection there.

22 **Q.**   So are you saying that Blue Shield could compete on equal

23 basis to whoever that benchmark payor was when this agreement

24 was signed?

25 **A.**   Uhm, they could compete if they got the same volume.

1  **Q.**   Okay.  So let's go to -- now to -- now, you mentioned on

2  direct exam that there are chargemaster deflater provisions;

3  right?

4  **A.**   Correct.

5  **Q.**   And that's a typical provision in Blue Shield's contracts

6  with its other hospitals; right?

7  **A.**   Today, yes.

8  **Q.**   And when Mr. Davila entered into the contract in 2008, he

9  could have insisted upon a chargemaster provision?

10 **A.**   Potentially.  I wasn't involved in that negotiation, so I

11 don't know how it was -- you know, it's tied to that benchmark

12 payor.  And I don't know how literally they went, and so I

13 don't know what was up to negotiation and what wasn't.

14 **Q.**   When you negotiate the contracts with the hospitals you

15 deal with, you request a chargemaster limitation provision?

16 **A.**   I do today, correct.

17 **Q.**   And you did in the past as well; right?

18 **A.**   In the past, you know, 2008 is probably about the time

19 that became very common.  Not quite sure it was in agreements

20 that much before then.

21 **Q.**   Now let's go to Exhibit 6.

22      (Document displayed.)

23 **Q.**   You've seen this letter before.  It's a March 22nd, 2010

24 letter; right?

25 **A.**   Correct.

1    **Q.**   And the first paragraph says that, essentially, the rate

2    tiers will be reassessed and adjusted due to increased volumes

3    of Blue Shield's business.  Do you see that?

4    **A.**   Correct.

5    **Q.**   So instead of paying 77 percent, it now went down to

6    74 percent; right?

7    **A.**   Correct.

8    **Q.**   And at this point in time, Blue Shield had almost two

9    years of data; right?

10   **A.**   Uhm, well, your October -- got a year and a half, I would

11   say.

12   **Q.**   So it had a year and a half of the volume data; right?

13   **A.**   Correct.

14   **Q.**   And it again had information about contract rates it paid

15   with other hospitals; right?

16   **A.**   Correct.

17   **Q.**   And it -- Blue Shield never attempted to change the rates

18   in the contract at this point in time, did it?

19   **A.**   At this point, under the terms we agreed to back in '08.

20   **Q.**   Sorry?

21   **A.**   We agreed to honor the terms we agreed to back in '08.

22   **Q.**   Okay.  And so did NorthBay?

23   **A.**   Correct.

24   **Q.**   And this was to Blue Shield's benefit because the rate it

25   was paying was being reduced; right?

1   **A.**   As -- as inpatient volume went up, the rate went down.

2   **Q.**   Okay.  And if you can go to Exhibit 7.

3        (Document displayed.)

4   **Q.**   You've seen this August 11th, 2010 letter; right?

5   **A.**   Correct.

6   **Q.**   And, again, this one time Blue Shield is increasing its

7   volume, and NorthBay is agreeing that it can be paid less;

8   right?

9   **A.**   Consistent with the terms of the original LOA, yes.

10  **Q.**   And if you can go to Exhibit number 3.

11       (Document displayed.)

12  **Q.**   You've seen this document before; right?

13  **A.**   Yes.  I think we talked about it earlier.

14  **Q.**   And if you go to page 1 -- 3.3.  Again, this is signed by

15  Mr. Davila; right?

16  **A.**   Correct.

17  **Q.**   And this is an amendment to the contract; right?

18  **A.**   Correct.

19  **Q.**   And in this amendment, Mr. Davila did not attempt to

20  include a chargemaster deflater provision, did he?

21  **A.**   I'm aware one was never added.  Whether he attempted to, I

22  don't know.

23  **Q.**   And in this contract amendment Mr. Davila never attempted

24  to change the rates in the contract?

25  **A.**   I don't know what he attempted to.  All I know is what's

1   on the document.

2   **Q.**   And Blue Shield never attempted to terminate the contract

3   because the rates were too high, did it?

4   **A.**   Not at this point in time.

5   **Q.**   Let's go to Exhibit number 8.

6        (Document displayed.)

7   **Q.**   You've seen this document before?

8   **A.**   Yes.

9   **Q.**   And there's a May 24, 2011, letter from NorthBay to

10  Blue Shield; correct?

11  **A.**   Correct.

12  **Q.**   And, again, Blue Shield's increasing its business; right?

13  **A.**   Correct.

14  **Q.**   And, again, NorthBay is agreeing that Blue Shield can pay

15  less based upon the increased business?

16  **A.**   Correct.

17  **Q.**   Now, in 2012, you took over the Solano County region;

18  right?

19  **A.**   Correct.

20  **Q.**   And that included the contract for NorthBay; right?

21  **A.**   Correct.

22  **Q.**   And when you took over responsibility for Solano County in

23  2012, you reviewed all the contracts that you were responsible

24  for; right?

25  **A.**   Not immediately.

1  Q.   At some point in time did you?

2  A.   Over time I did.

3  Q.   Okay.  And did you review the NorthBay contract?

4  A.   At some point in time, as I stated earlier, I'm not sure

5  when.

6  Q.   And if you wanted to you could have got the volume data at

7  NorthBay; right?

8  A.   Uhm, I could have asked for it internally.  I guess I

9  could have pinged them.  Normally, we would look at our own

10  data and raise an issue.  Same on their side.

11  Q.   And you could have looked at the rates in the contract at

12  that point in time; right?

13  A.   Correct.

14  Q.   And you could have compared the rates in that contract to

15  the rates in the other contracts that Blue Shield had at the

16  time; right?

17  A.   I could compare contract provisions.

18  Q.   And rates?

19  A.   Well, I guess it's your definition of rates.  If you're

20  talking rates on how a percent of charges compares to a per

21  diem, there's a lit bit of analytics that would have to be

22  done.  So it's not always an apples-to-apples comparison.

23       So I could look at two contracts and see what the rate

24  structures are, but understanding how they really compare would

25  probably take some analytics.

Q.   So you could have asked the analytics team to do that?

A.   Correct.

Q.   And you could have attempted to include a chargemaster

provision in the NorthBay contract when you became responsible

for it; right?

A.   Consistent with the terms of the agreement and when we

could have opened it up, we could have.

Q.   And you could have sought to change the rates when you

took over in 2012; right?

A.   Correct.

Q.   But you never did, did you?

A.   We did not address the rates or try to renegotiate until

2016.

Q.   Now, in 2013 you could have done the same thing; right?

A.   As I stated, we could have anytime after that initial term

renegotiated.  We lived under the terms of those agreements

based on the market conditions, and in 2016 we addressed it.

Q.   The initial term of the contract would not have been more

than three years; right?

A.   Well, this one wasn't.  Sometimes they are; this one was

not.

Q.   Was not.

     So anytime after 2011, Blue Shield could have terminated

the contract?

A.   Yes, we could have.

1    **Q.**   Anytime after 2011, Blue Shield could have attempted to

2    negotiate different rates in the contract; right?

3    **A.**   Well, after the end of that three years, so after that

4    October 2011, correct.

5    **Q.**   And Blue Shield could have attempted to move the contract

6    to the a per diem-type contract; right?

7    **A.**   We could have attempted.

8    **Q.**   But you never did.

9    **A.**   We did in 2016, tried to renegotiate, but not per diems.

10   **Q.**   We'll get to 2016.

11         In 2013, when you were responsible for the contract, you

12   never attempted to do any of those things; right?

13   **A.**   Not until, as I stated, 2016.

14   **Q.**   Now, on direct examination you said that the ACA came in

15   on January 1st, 2014; right?

16   **A.**   Correct.

17   **Q.**   And CalPERS made these changes in the marketplace on

18   January 1st, 2014; right?

19   **A.**   Correct.

20   **Q.**   In 2014, you never sought to amend the contract, did you?

21   **A.**   No, we did not.

22   **Q.**   You didn't seek to change the rates in the contract;

23   right?

24   **A.**   We were living under the terms of that agreement.

25   **Q.**   That was your choice; right?

1  **A.**   That was our choice.

2  **Q.**   The same is true in 2015?

3  **A.**   Correct.

4  **Q.**   It was your choice to live under the terms of the

5  contract; right?

6  **A.**   Correct.

7  **Q.**   Never attempted to change the rates?

8  **A.**   Correct.

9  **Q.**   Now, in 2016 you sent a -- Blue Shield sent a termination

10 letter; right?

11 **A.**   Correct.

12 **Q.**   Let's go to Exhibit 9, please.

13      (Document displayed.)

14 **Q.**   Oh, before the termination letter there was a rate

15 adjustment; right?

16 **A.**   Correct.

17 **Q.**   And the -- this is a letter that NorthBay sent to

18 Blue Shield in April of 2016; right?

19 **A.**   Correct.

20 **Q.**   And it says that there has been a decrease in the volume

21 of Blue Shield's business; right?

22 **A.**   Correct.

23 **Q.**   And so the rate changed from 68 percent to 77 percent?

24 **A.**   Correct.

25 **Q.**   And so -- and Blue Shield agreed with that; right?

1   **A.**   We were honoring the terms of the agreement, correct.

2   **Q.**   Again, you didn't at this point in time -- at this point

3   in time say, no, we're not going to allow the terms of the

4   agreement; right?

5   **A.**   That's not who we are as an organization.  We had a

6   binding agreement.  We honored it, and then we exercised our

7   right to terminate.

8   **Q.**   Okay.  So if you go to 172.

9        (Document displayed.)

10  **Q.**   This is the termination that Blue Shield sent to NorthBay;

11  right?

12  **A.**   Correct.

13  **Q.**   And you said sending termination letters is not who you

14  are; you honor the terms of the agreement?  Is that what you

15  just said?

16  **A.**   I'm not sure exactly what I said, but what I'm saying is

17  we received a notice.  That notice required contract terms to

18  change.  We changed them.  And then subsequently we did provide

19  a termination notice.

20       But that termination notice, we didn't just stop, saying,

21  oh, we don't have an agreement with NorthBay.  We had a binding

22  agreement.  But based upon all the market changes and dynamics,

23  the rates we were paying, even at 68, was not something we

24  wanted to live under any further.

25  **Q.**   In this termination letter you don't mention anything

1    about the ACA, do you?

2    **A.**    No, but that doesn't mean it wasn't in play.

3    **Q.**    In this letter you don't say anything about CalPERS;

4    right?

5    **A.**    No, we do not.

6    **Q.**    Okay.  And in the second paragraph you say, "It is our

7    intent to negotiate the rates and terms of the agreement on our

8    fee schedule."  So you were terminating it, but you wanted to

9    renegotiate; right?

10   **A.**    Well, it says "our fee for service hospital agreement," so

11   we wanted to get it on a hospital agreement versus the LOA, the

12   previous structure.

13   **Q.**    So you wanted to -- you were willing to renegotiate rates

14   after the termination; right?

15   **A.**    Well, prior to the termination.

16   **Q.**    Okay.  If you can go to Exhibit 151.

17        At the bottom of Exhibit 151 there is an email dated

18   September 21, 2016, from Michael Little to Jaye Lynn Ravenstad

19   and Aldora Cameron.  Do you see that?

20   **A.**    Yes.

21   **Q.**    And Mr. Little worked for you at the time; right?

22   **A.**    Correct.

23   **Q.**    And says, "Hi" --

24        **MS. BRIGGS:**  Hold on.  Objection.

25        **THE COURT:**  Sustained.

1      **MR. TOOCH:**  Okay.

2      **THE COURT:**  So this is not in evidence yet, so lay a

3  foundation.

4      **MR. TOOCH:**  Okay.

5  **BY MR. TOOCH:**

6  **Q.**  Did you see this email before it went out?

7  **A.**  The one from Michael to Jaye Lynn, I don't recall.  I'm

8  not copied on that one, so I don't recall specifically if I saw

9  that before he sent it.

10 **Q.**  Did you discuss with Mr. Little a proposal that

11 Blue Shield was sending out to NorthBay?

12 **A.**  Yes, we would have discussed the NorthBay proposal.

13 **Q.**  And would Mr. Little have sent out a proposal to NorthBay

14 without discussing it with you?

15 **A.**  Most likely we would have discussed it before it went out.

16     **MR. TOOCH:**  I move to admit the --

17     **THE COURT:**  No.  It's not admitted.  That's not a

18 foundation.

19     **MR. TOOCH:**  Okay.

20 **BY MR. TOOCH:**

21 **Q.**  Let's go to Exhibit number 152.

22     If you go to page 2 of 152, at the bottom there's an email

23 from Mr. Little, sent on September 27th, to Jaye Lynn

24 Ravenstad; right?

25 **A.**  Correct.

1  **Q.**   And you were copied on this email; right?

2  **A.**   Correct.

3  **Q.**   And if you look at the third page, there's the email chain

4  which refers to the email that Mr. Little sent to Ms. Ravenstad

5  on September 21st; right?

6  **A.**   I see the chain, correct.

7  **Q.**   So if you didn't see the email on September 21st, you

8  would have seen it on the 27th; right?

9  **A.**   Yes, minus the attachment.

10  **Q.**   I -- did you ever look at the proposal that Mr. Little

11  sent to --

12  **A.**   It's --

13  **Q.**   -- to NorthBay?

14  **A.**   It's been so long, I don't remember for sure.

15        **MR. TOOCH:**  Your Honor, I move to admit Exhibit 152.

16        **THE COURT:**  Any objection?

17        **MS. BRIGGS:**  No.

18        **THE COURT:**  It's admitted.

19     (Trial Exhibit 152 received in evidence.)

20     (Document displayed.)

21  **BY MR. TOOCH:**

22  **Q.**   Okay.  So let's go to page 3 of 152, at the bottom.

23     This is the September 21st email from Michael Little to

24  Jaye Lynn Ravenstad?

25  **A.**   Yes.

1  **Q.**   And who is she?

2  **A.**   She's the -- Michael's equivalent at NorthBay.  She's the

3  contract manager.  I'm not sure Jaye Lynn's correct title, but

4  she's the one that represents NorthBay in contract

5  negotiations.

6  **Q.**   Okay.  And he says in his email, "Hi, Jaye Lynn.  As

7  promised, attached is proposal for NorthBay Medical Center and

8  VacaValley Hospital."

9      So at this point in time Blue Shield sent a proposal to

10  NorthBay; correct?

11  **A.**   Correct.

12  **Q.**   And then if you look at the top of that page, two days

13  later, on September 23rd, Ms. Ravenstad responds to Mr. Little;

14  right?

15  **A.**   Correct.

16  **Q.**   And in the second paragraph she says, "Attached is a red

17  line of the exhibits to the hospital agreement."

18      And so NorthBay made some proposed edits to the agreement

19  that Blue Shield proposed; right?

20  **A.**   Correct.

21  **Q.**   Did you see those red lines?

22  **A.**   Uhm, I wasn't originally copied on this, but I think

23  subsequently I did at some point in time.

24  **Q.**   Okay.  Let's go to the second page.

25      At the bottom of the page is the email from Mr. Little to

1  Ms. Ravenstad on September 27th, that you were copied on;

2  right?

3  A.   Correct.

4  Q.   And he says, "Hi, Jaye Lynn.  I'm following up on my

5  voice mail message to you with our response.  As I mentioned in

6  my voice mail, we are countering back at our initial offer."

7       What does that mean?

8  A.   That means that NorthBay asked him to counter, and he came

9  back and said our original offer was -- we were sticking with

10  that, because that's what we felt we needed to be market

11  competitive.

12  Q.   Okay.  And then if you look at that, above that there's

13  the email from Ms. Ravenstad to Mr. Little, on September 28th,

14  in which she says in the second paragraph -- and by the way you

15  were copied on that; right?

16  A.   Correct.

17  Q.   She said, "We interpret your communication to mean that

18  Blue Shield is unwilling to negotiate any offer other than

19  50.5% of charges with a 4 percent CDM limitations and AWP - 15%

20  for certain pharmacy drugs, paren, that were listed in your

21  original offer."

22       Now, the CDM is the chargemaster description limiter;

23  right?

24  A.   Correct.

25  Q.   So it wants to limit the amount of charges that can be

1    increased under the contract to 4 percent?

2    **A.**    Correct.

3    **Q.**    And on the first page of Exhibit 152, at the bottom,

4    there's an email the next day from Mr. Little to Ms. Ravenstad,

5    in which he says, "I never represented Blue Shield's proposal

6    as being Blue Shield's best and final proposal."

7        And if you could read through this email and tell me if

8    anywhere he disagrees with Ms. Ravenstad's statement that

9    NorthBay calculated the offer to be at 50.5 percent of charges.

10   **A.**    He did not propose another rate.  He just restated that he

11   expected to see material changes that we were looking for.

12   **Q.**    And this was almost two years after the ACA went into

13   effect; right?

14   **A.**    Correct.

15   **Q.**    And this was almost two years after CalPERS made its

16   change; right?

17   **A.**    Correct.

18   **Q.**    And then just to complete the story, on the first page

19   there's an email from Ms. Ravenstad, responding on the same

20   day, September 29th.  Again, you were copied on that email.

21       And in the fourth paragraph she says, "Please know, we do

22   hear you that Blue Shield is not satisfied with the current

23   reimbursement, despite the continued decline in patient volume.

24   Your proposal of 50.5% of charges was valued at just under a

25   $20 million reduction."

1          You understand what that means; right?

2     **A.**    I understand that that's how they viewed it.

3     **Q.**    And they viewed it as they were going to -- their

4     reimbursement was going to be reduced by $20 million; right?

5     **A.**    Correct.

6     **Q.**    And you never sent any email to correct that, did you?

7     **A.**    No, because I don't tend to get into with providers on how

8     they view it versus us.

9     **Q.**    So two years after the ACA was in effect, almost two

10    years, two years after CalPERS was in effect, Blue Shield was

11    offering a rate of 50.5 percent of charges; right?

12    **A.**    Correct.

13    **Q.**    Now, you're saying that you terminated the contract

14    because you can't compete with the other health plans; right?

15    **A.**    Correct.

16    **Q.**    So there's other health plans that are better than you?

17    **A.**    I'm not saying that.

18    **Q.**    They are more efficient than Blue Shield?

19    **A.**    Not necessarily.

20    **Q.**    They know how to sell to employer groups a lot better than

21    Blue Shield?

22    **A.**    No, I wouldn't say that.  I would say that our goal is to

23    try and stay in the exchanges.  Other health plans left.  We

24    stayed in.  And so we try to find a way to make it work versus

25    just abandoning the membership.

1    So it's one of those things that it's tough -- as I said

2  earlier, it's tough to terminate a hospital.  But at the end of

3  the day you've got to look and say, if I've got other providers

4  that can provide the same care at a lower price point, and I am

5  forced with either steering member that way or keeping someone

6  in and raising premiums where they're not affordable, you've

7  got to make a decision.

8    And by 2016, Blue Shield was at that price point, trying

9  to figure out how to make it work.  And we made that decision.

10 **Q.**  In 2016, Anthem Blue Cross was selling ACA products in the

11 marketplace; right?

12 **A.**  Yeah.  And subsequently they pulled out of a number of

13 markets.

14 **Q.**  And Aetna and United Healthcare and Cigna, do you know if

15 any of them have -- do business with CalPERS?

16 **A.**  Uhm, I know HealthNet does.  I don't know about -- so

17 United does.  HealthNet.  And who else did you say?

18 **Q.**  Cigna?

19 **A.**  Cigna, I'm not aware of Cigna.

20 **Q.**  Aetna?

21 **A.**  I'm not aware of Aetna.

22 **Q.**  Are you just not aware one way or the other?

23 **A.**  Uhm, you know, I don't have a perfect memory on things,

24 but CalPERS has a lot of product offerings.  And those aren't

25 sticking out as one that I recall.

1  **Q.**  So the business went from -- the CalPERS business went

2  from Blue Shield to some other health insurer; right?

3  **A.**  Correct.

4  **Q.**  Who?

5  **A.**  There are numerous that United was offered.  Anthem was.

6  In some markets HealthNet was.  And eventually Western Health

7  Advantage was also brought in.

8  **Q.**  And do you know what NorthBay's contract rates are with

9  those health plans?

10  **A.**  No, I do not.

11  **Q.**  And do you know whether or not -- how those health plans

12  are able to offer those products to CalPERS at those rates?

13  **A.**  Uhm, all I know is we get access to State-reported data.

14  Hospitals report data to the State.  And from that we can see

15  overall what type of discounts the hospital reports for

16  third-party managed care business.

17       And in the NorthBay data we saw that overall their

18  third-party managed care discounts were much greater than we

19  were getting.  So someone was getting a better deal.  So

20  someone was able to compete.  We weren't.  And someone was

21  getting a better deal and able to compete on that basis.  We

22  wanted to be equal to that.

23  **Q.**  Are you saying that somebody is getting lower contract

24  rates than Blue Shield?

25  **A.**  Blue Shield based upon their self-reported data.

1    **MR. TOOCH:**  Okay.  And if you go to Exhibit 3, please.

2    Page 3-4.  The notes section please.

3        (Document displayed.)

4    **BY MR. TOOCH:**

5    **Q.**   At the time that Blue Shield terminated the contract, this

6    provision was still in the contract; right?

7    **A.**   Uhm, what's "this"?

8    **Q.**   The notes section paragraph.

9    **A.**   The notes section in general, yes.

10   **Q.**   And that section said that if Blue Shield can achieve

11   volumes equivalent to Hospital's highest volume payor, the

12   benchmark payor, Blue Shield will receive a discount equivalent

13   to that payor; right?

14   **A.**   Correct.

15   **Q.**   So if Blue Shield was able to meet the volumes of another

16   payor, whether it's Aetna or Cigna or United or Blue Cross,

17   Blue Shield could have gotten the same discount as those

18   payors?

19   **A.**   We could have got the same discount of whoever the

20   benchmark was.  But the State-reported data showed a discount

21   much greater than this.  So there's a discount there somewhere

22   that somewhere something changed in the marketplace, and we

23   wanted to get changes consistent with what changed in the

24   marketplace.

25   **Q.**   Your volumes went to another payor.

1    **A.**    That was part of it.  But we also had a lot of volume

2    increases with -- under the ACA and Cover California.

3         So changes were happening in the marketplace.  This deal

4    did not -- this deal no longer worked for Blue Shield.  We were

5    looking to change it.  We were looking to get on equal footing.

6         And outside of that, we were willing to go through the

7    disruption, even how hard it is, to terminate the agreement.

8    **Q.**    You never asked NorthBay to give you the volume data of

9    its benchmark payor, did you?

10   **A.**    No, we did not.

11        **MR. TOOCH:**  No further questions.

12        **THE COURT:**  All right.  Any redirect?

13                 <u>**REDIRECT EXAMINATION**</u>

14   **BY MS. BRIGGS:**

15   **Q.**    I think we started in the morning, Mr. Barnes, but now

16   it's good afternoon.

17        I'm going to take things a little out of order, and I'm

18   going to start with the negotiations that occurred after

19   Blue Shield terminated the contract or gave notice of the

20   termination of the contract.

21   **A.**    Okay.

22   **Q.**    You mentioned that there was a Blue Shield offer to pay

23   50.5 percent of NorthBay's full-billed charges at that time;

24   correct?

25   **A.**    Correct.

1    Q.    Can you explain what Blue Shield would have gotten as part

2    of that contract?

3    A.    By agreeing to that rate, we felt we would get parity with

4    other payors.  We would get the benefit of having NorthBay in

5    our network for our members; NorthBay would get the benefit of

6    our volume.  We were very competitive in the ACA compared to

7    some of our competitors.  That would give them influx.  And at

8    the end of the day members would have access.  They would have

9    local access.  But we needed to have a rate that was fair and

10   market competitive.

11   Q.    How important is it for Blue Shield to have NorthBay in

12   network for purposes of marketing its policies in Solano

13   County?

14   A.    NorthBay's situated in a very unique situation, that there

15   are not competitors right in their market.  They don't have a

16   competitor a mile away.  Their competitors are quite far away,

17   and there's travel distance.  So members perceive value of

18   having NorthBay.  They like NorthBay.  The problem was it was

19   just too expensive and we couldn't afford it.

20         So, therefore, Blue Shield lost -- by making this tough

21   stand with them, we lost potential to sell clients.  There are

22   clients that have not come to us because we don't have NorthBay

23   in our network.

24         And that's just a result of drawing the line and saying we

25   have to respect, with our mission, that these costs are

1  unsustainable and unaffordable and, therefore, we had to take

2  the hard step of terminating the NorthBay contract.

3  **Q.**   So does NorthBay, from your perspective, take advantage of

4  its geographic location as one of the few hospitals in that

5  area?

6  **A.**   NorthBay -- I would say I have utmost respect with the

7  providers I deal with.  But NorthBay does take advantage that

8  there are not competition.  They pretty much can dictate the

9  terms they're willing to negotiate for.  And then a health plan

10  has to take options of are you going to agree to that or

11  decide.

12      For many, many years Blue Shield agreed to that.  We used

13  a term that, if you look at the data it appears we were

14  subsidizing other health plans' rates; that we were paying more

15  than everybody else.

16      And with us being a not for profit, us really driving for

17  consumers, you can't -- you know, you can't support that.  You

18  cannot look them straight in the face and say, "We're doing the

19  best for you," if we continued to allow that to happen.

20  **Q.**   Let me take you back in time.  There was a series of

21  questions Mr. Tooch asked you about why Blue Shield hadn't

22  terminated the contract or sought to renegotiate it.  So I want

23  to make sure that the record is clear on this point.

24      There was a provision in the contract, wasn't there, for

25  an initial term?

1    **A.**    Correct.

2    **Q.**    Okay.  Now I can refresh your recollection.  We can go to

3    that provision, if it would help you.  But independently do you

4    recall what the initial term was?

5    **A.**    It was for three years.

6    **Q.**    Okay.  And that meant, essentially, that Blue Shield

7    and -- well, let me ask it this way.  That three year initial

8    term, what did that mean for the parties?

9    **A.**    That basically bound the parties to that, the -- the terms

10   in that LOA were to run for three years.  And we were both

11   making a commitment that we agreed to honor those terms for

12   three years.

13   **Q.**    So there wasn't going to be any renegotiation in 2009,

14   which is one of the documents that Mr. Tooch showed you; right?

15   **A.**    Correct.

16   **Q.**    And there wasn't going to be any renegotiation in 2010,

17   which was another document that Mr. Tooch showed you; correct?

18   **A.**    Correct.

19   **Q.**    Mr. Tooch showed you a third document, in May of 2011, and

20   that three year initial term was still in effect; wasn't it?

21   **A.**    Correct.

22   **Q.**    Now, then there was the series of questions about why

23   Blue Shield hadn't thought to renegotiate the contract in 2012,

24   2013, and 2014.

25        I thought, Mr. Barnes, that your testimony earlier had

1  been that market changes really started to occur in 2014.  Did

2  I misunderstand that?

3  **A.**   No, you're correct.

4  **Q.**   Okay.  So, again, what were those market changes that

5  began in 2014?

6  **A.**   The CalPERS contract was no longer what I'll call

7  exclusive on the network model side with Blue Shield.  There

8  was competitors.  And that the ACA or Cover California came

9  into existence.  And it was a very price-conscious marketplace.

10  **Q.**   Okay.  And when did Blue Shield really first start to see

11  the underlying data that identified for Blue Shield the impact

12  that these changes were having?

13  **A.**   Uhm, the membership data you saw a little bit initially in

14  2014.  You saw more in 2015, around CalPERS.

15      Around the ACA you did not have complete claims data

16  until, like, the middle of 2015.  And so you had made some

17  assumptions from '14 going into '15.  You were getting some

18  data, and you realized you were behind the curve and trying to

19  figure out how you're going to catch up, that everything came

20  in the head of the end of '15, rolling into '16, that we had to

21  address the marketplace challenges.

22  **Q.**   Okay.  And when did you and your team first start

23  considering terminating the agreement with NorthBay?

24  **A.**   The end of 2015.

25  **Q.**   Okay.  So Blue Shield didn't sit on its hands, did it?

1    **A.**    No, we didn't.

2          **MR. TOOCH:**  Objection.  Leading.

3          **THE COURT:**  Sustained.

4          **MS. BRIGGS:**  I'll withdraw the question.

5    BY MS. BRIGGS:

6    **Q.**  So in 2015, when you started looking at terminating the

7    contract based on the data that you had received, why didn't

8    you just pull the plug on the contract at the end of 2015?

9    **A.**  These are very complex relationships, and they involve

10   multiple regulatory agencies.  There's HMO members that you

11   have to get approval to move them.

12         If you terminate a hospital, you can't have physicians

13   that admit there, so you have this out-of-network access issue.

14   So you have to address all those pieces.

15         And as a team, Blue Shield would have to say, can we get

16   enough access and meet access requirements without NorthBay?

17   That's some studying we have to do.  Do we have gaps on the

18   physician panel if we terminate providers that have privileges

19   at NorthBay, because they wouldn't have a place to admit.

20   There's a whole lot of work we have to do.  And that takes time

21   to get that all together.

22         I mean, it was one of those things that their notice came

23   in for the increase of rates.  We were in the midst of that.

24   We had to put that aside, implement the new rates, and then

25   pick it back up.

1  **Q.**   And when you talk about network access requirements,

2  that's a term that I think is specific to the industry.   Could

3  you explain a little bit about what that -- what that means for

4  Blue Shield?

5  **A.**   The Blue Shield --

6          **MR. TOOCH:**   Objection.   Beyond the scope of cross.

7          **THE COURT:**   Overruled.   You can answer.

8          **THE WITNESS:**   Okay.   Blue Shield's HMO products are

9  regulated by the Department of Managed Healthcare.   And they

10  set up requirements to ensure consumers have access to care,

11  about how far people drive to a facility; how far -- PCP

12  access, do you have enough specialists.   That's the type of

13  data you have to look at.

14  **Q.**   And PCP is?

15  **A.**   Primary care physician.

16  **Q.**   Thank you.

17  **A.**   And so we have to look at all that data to make sure that

18  if we make network changes we can meet that, because we also,

19  as a licensed health plan in the Department, have to file

20  annual notices, updates.   And those changes all have to be

21  filed also.

22  **Q.**   Okay.   Is that a process that takes at least a couple of

23  months?

24  **A.**   Correct.

25  **Q.**   My last question focuses on the cross-examination by

1    Mr. Tooch as to why Blue Shield couldn't meet the benchmark

2    payor that was identified in the original LOA.

3        Could you explain why Blue Shield was not able to meet the

4    benchmark payor and is paying the same rates that NorthBay was

5    giving to other payors?

6    **A.**   Well, we had the market changes we're talking about with

7    CalPERS so that membership is changing.  And that was a lot of

8    the membership that got our thresholds down.  We met the higher

9    thresholds and got the greater discount.  So that membership

10   changed.

11       Also, there was something underlying happening in the

12   marketplace, based upon the data we had access to, that their

13   discount structure changed somehow.  We didn't know how.  But

14   what was a benchmark payor in 2008 seemed not to be what was

15   going on today.  And we wanted to get consistent with today.

16           **MS. BRIGGS:**  Thank you.  I have no further questions.

17           **THE COURT:**  All right.  Mr. Tooch.

18           **MR. TOOCH:**  Thank you, Your Honor.

19                      <u>**RECROSS-EXAMINATION**</u>

20   **BY MR. TOOCH:**

21   **Q.**   Mr. Barnes, these are all new reasons that Blue Shield is

22   coming up for terminating the contract, isn't it?

23   **A.**   No.

24   **Q.**   In the termination you never mentioned CalPERS other ACA;

25   right?

1    **A.**    No.  But I think in our discussions with NorthBay we

2    shared our concerns the marketplace was changing and what we

3    were seeing in the marketplace was changing.

4    **Q.**    In your emails you don't mention that.  Mr. Little didn't

5    mention that; right?

6    **A.**    He mentioned about the ability to -- the need to fulfill

7    our mission and meet the affordability, which obviously was an

8    issue.

9    **Q.**    Now, you were contacted by Blue Shield's expert in this

10   case; right?

11   **A.**    Yes.

12   **Q.**    And he asked you the reasons for your termination, right,

13   why Blue Shield terminated the contract?

14   **A.**    I think he might have.  At this point I don't specifically

15   recall that.

16   **Q.**    Okay.  I'm going to be referring to pages 71 through 76 of

17   your deposition.

18        And you understood the focus of his phone call was to find

19   out --

20        **MS. BRIGGS:**  Objection, Your Honor.  There was a

21   series of arguments before the Court this morning about how

22   much hearsay Mr. Deal was going to be allowed to testify to,

23   and opposing counsel is now eliciting the same conversations

24   that they moved to exclude.

25        **THE COURT:**  That would be a mistake for him, wouldn't

1  it?

2      I don't have the deposition transcript though, Mr. Tooch,

3  so I can't follow along with what you're trying to do.

4      **MR. TOOCH:**  With that in mind, I will not be going

5  into this line of questioning with this witness.

6      **THE COURT:**  All right.

7      **MR. TOOCH:**  I have no further questions at this time.

8      **THE COURT:**  All right.

9      **MS. BRIGGS:**  Just one more.

10     Mr. Kotarski, could you put up Exhibit 152, at page 2.

11     And there's a sentence four lines down, beginning "As I've

12  stated."  No.  I'm sorry, in the paragraph down below, "Hi,

13  Jaye Lynn," the paragraph "As I've stated" and the sentence "As

14  I've stated."

15     (Document displayed.)

16                 **REDIRECT EXAMINATION (Further)**

17  BY MS. BRIGGS:

18  **Q.**  Mr. Barnes, Mr. Tooch has asked you a series of questions

19  suggesting that because Blue Shield did not give every single

20  reason for the termination in its letter, that somehow

21  Blue Shield is making up the reasons for the termination.

22     Could you address that, please.

23  **A.**  Uhm, this was a very serious issue.  As I said earlier, we

24  don't take termination of contracts lightly.

25     There was many changes happening in the marketplace, and

1  we had to address those changes for our members and what we

2  thought was best for them based upon our stewards of providing

3  quality affordable healthcare.  And that's what we undertook to

4  do.

5  **Q.**  Do you normally list all of your bases for termination in

6  your letters when you terminate a provider contract?

7  **A.**  We do not.  And providers don't to us.

8  **Q.**  Okay.  I want to direct your attention to what has been

9  put up on the screen here.

10      Mr. Tooch suggested that Blue Shield had never referenced

11  its mission to provide affordable care.

12      Do you have an understanding of what that sentence means

13  in that email?

14  **A.**  In Michael's email to Jaye Lynn, in September 27th, he

15  says, "Hey, in our initial meeting with respect to rates we are

16  looking to secure rates in agreement where it makes good

17  business sense and supports our mission of assuring all

18  Californians have access to affordable high-quality

19  healthcare."

20  **Q.**  Does that remain Blue Shield's mission today?

21  **A.**  Yes, it does.

22          **MS. BRIGGS:**  Thank you.  No further questions.

23          **THE COURT:**  Anything further, Mr. Tooch?

24          **MR. TOOCH:**  No, thank you.

25          **THE COURT:**  You can step down, Mr. Barnes.

1    Mr. Pimstone, who is next?

2        **MR. PIMSTONE:**  Yes, Your Honor.  Blue Cross calls

3   Bruce Deal.

4        **THE CLERK:**  If you would step up and remain standing.

5   I'm going to take your photograph and swear you in.

6        Would you raise your right hand, please.

7                          **<u>BRUCE DEAL</u>,**

8   called as a witness for the Defendant, having been duly sworn,

9   testified as follows:

10        **THE CLERK:**  Be seated.  And if you would please state

11   your full name and spell it for the court reporter.

12        **THE WITNESS:**  Sure.  It's Bruce Deal.  B-r-u-c-e, last

13   name D-e-a-l.

14                      **<u>DIRECT EXAMINATION</u>**

15   BY MR. PIMSTONE:

16   **Q.**   Good afternoon, Mr. Deal.

17   **A.**   Good afternoon.

18   **Q.**   Could you tell the Court and the jury what your current

19   position is?

20   **A.**   Certainly.  I'm a managing principal with Analysis Group,

21   which is an economic, financial and strategic consulting firm.

22   **Q.**   What does Analysis Group generally do?

23   **A.**   So a variety of different types of things, generally

24   related to economics and finance.  As I said, some strategic

25   analysis as well.

1        But a lot of what we do is work related to disputes, such

2   as this current dispute, where we provide expert testimony and

3   support for professors, sometimes, from universities who

4   provide expert analysis.  And that can be in a variety of

5   different kinds of settings; arbitrations, federal court, state

6   court, things like that.

7            MR. PIMSTONE:  So Mr. Deal has a set of demonstrative

8   slides that have not been objected to.  May we publish them,

9   Your Honor?

10           THE COURT:  Go ahead.

11           MR. PIMSTONE:  Thank you.  And if we could turn to --

12  BY MR. PIMSTONE:

13  Q.  Mr. Deal, you are in control of your slides.  Let's go to

14  the background.

15  A.  I'm almost in control of my slides.

16           THE CLERK:  There we go.

17           THE WITNESS:  Oops, little too far.

18           MR. TOOCH:  Your Honor, if I may, there was just one

19  caveat based on this morning's ruling.

20           MR. PIMSTONE:  That's been addressed.

21           THE COURT:  Okay.

22  BY MR. PIMSTONE:

23  Q.  And, Mr. Deal, within Analysis Group can you tell us what

24  your position is and what your focus and specialty is.

25  A.  Certainly.  So I'm a managing principal.  That's the

1    senior leadership of the firm.  It's equivalent to a partner in

2    a law firm.  Managing principal is what we call ourselves.

3        I run the Menlo Park office, all the economic analysis in

4    the Menlo Park office.  And in terms of broad strokes, I do a

5    lot of this type of work where I provide expert testimony in

6    various disputes.

7    **Q.**   Mr. Deal, can you tell the jury what your educational

8    history is, please.

9    **A.**   Certainly.  And it's noted on the demonstrative here.

10       So I grew up in Washington State.  I have an undergraduate

11   degree in economics, double major in economics and global

12   studies from Pacific Lutheran University in Tacoma.  Then I did

13   my graduate work at Harvard University.

14       I have a master's degree in public policy, from Harvard,

15   where I studied health policy and also international

16   development.  Then I was accepted in the Ph.D. program and did

17   all the additional course work and passed the exams for the

18   Ph.D. at Harvard.

19   **Q.**   Then, Mr. Deal, could you take us briefly through your

20   employment history?

21   **A.**   Yes.  So following my graduate studies at Harvard, my

22   master's degree there, I was actually an economics instructor.

23   In fact, I did that while I was a master's student at Harvard.

24   So I taught mid career students and also some of the other

25   graduates students economics.  Also some statistical analysis

1    as part of that.

2        Then I joined -- following my gradation, I joined a

3    consulting group that was part of Harvard University.  It was

4    called the Harvard Institute for International Development.

5    And it had projects all over the world.

6        I joined the project that was in Jakarta, Indonesia.  And

7    we were the consultants to the Minister of Finance in

8    Indonesia, covering a wide variety of issues, including trade

9    policy.  Which is, of course, in the news these today, as well.

10    So I did that for a while, a year.

11        And then I came back to the states.  My wife was in

12    graduate school at the time.  And I worked as a consultant and

13    senior consultant with Arthur Andersen, which at the time was

14    the largest accounting and consulting firm in the world.

15        There I mostly worked with hospitals and physician groups

16    on a wide variety of different kinds of issues related to

17    economics and finance of healthcare.

18        I was then back at Harvard working on my Ph.D. when I

19    started working with Analysis Group in our Boston office, which

20    is our biggest office.  And I very quickly began working

21    full-time with Analysis Group, and I've been with Analysis

22    Group now ever since.  So almost 23 years now.

23    **Q.**  In your listing of your professional experience, it says

24    here that in addition to leading all economic analysis in Menlo

25    Park you coordinate the firm's insurance work.  Can you just

1    speak for a minute or two to what that means.

2    **A.**    Certainly.

3        So I've always been interested in at-risk analysis and

4    insurance-type issues.  Studied that in undergraduate and

5    graduate school.

6        And one of my roles across the firm has been to help

7    coordinate our activities.  As you might imagine, insurance

8    companies get involved in lots of different kinds of disputes.

9    So I worked in a number of different lines of insurance.

10   Health insurance being one, which is obviously at issue here,

11   but life insurance, auto insurance, other types of property,

12   casualty insurance.

13       So I have a fairly wide range of experience in insurance.

14   And, again, one of my roles in the firm is to help coordinate

15   across many of our different offices, when we have

16   insurance-type cases, providing expertise or just generally

17   helping to coordinate that.

18   **Q.**    And in the healthcare field have you testified previously

19   in arbitrations and litigations?

20   **A.**    Oh, many times, yes.  Both in healthcare and in

21   nonhealthcare, but certainly many times.

22   **Q.**    And what would you say is your single largest area of

23   focus in terms of work that you do?

24   **A.**    Healthcare is the single biggest area.  I work in a number

25   of different areas and do a lot of evaluation work, some

1    antitrust, what's called commercial damages, which would be any

2    type of a contract where there's a dispute there. Really a

3    variety of different kinds of things.

4        But industry-wise healthcare is the one that I spend the

5    most time on.

6    **Q.**    And specifically, with respect to health insurance, can

7    you briefly tell us what your expertise has been involved in

8    working with disputes in the health insurance and hospital

9    area.

10   **A.**    Certainly. So a variety of different types of projects.

11   Some of them very similar to this project, where I've worked on

12   what are generally referred to as payor/provider disputes, such

13   as this, and in-network emergency situation here. So I've done

14   a number of those types of projects.

15       I've been involved in many other projects that have

16   elements of contract disputes. Sometimes it's class actions

17   that there's a lawsuit on behalf of either policyholders or

18   some other group where the insurance company is being sued.

19   So, really, a variety of different kinds of things.

20       The class actions typically don't involve hospitals as

21   directly. That would more be policyholders or things like

22   that. Sometimes there's hospitals involved. So I also do work

23   separately for hospitals and consulting on litigation basis as

24   well. So I've worked hospitals for many years.

25   **Q.**    Can you just give us an example or two of the work that

1   you've done with hospitals?

2   **A.**   Certainly.  As I said, I started my career with Arthur

3   Andersen, dealing with mostly four hospitals in a variety of

4   different kinds of things, including some work on setting

5   chargemasters, doing things like that.

6       More recently, I've been working for many years with the

7   Washington State Hospital Association, which is the association

8   of all the hospitals in Washington State.  We help run a big

9   Medicaid program for them.  I've worked on a number of projects

10  in addition to that, including things -- repricing different

11  types of contracts, things like that.  So quite a variety of

12  different types of projects for hospitals.

13  **Q.**   And so have you been involved in matters involving

14  hospital pricing?

15  **A.**   I have, yes.

16  **Q.**   Okay.  And so the work that you have done over the course

17  of your career involves work on behalf of the provider

18  community as well as work on behalf of the payor community?

19  **A.**   That's correct, yes.

20  **Q.**   Okay.  Mr. Deal, can you tell us what you were asked to do

21  in this case as part of your opinions.

22  **A.**   Certainly.

23      At a very high level, there's basically two assignments.

24  The first is to provide an affirmative analysis of what

25  reasonable value should be for the claims in dispute in this

1    matter for the emergency services here.

2        In addition to that, I understand Mr. Heil has testified

3    and provided some opinions, and I've been asked to comment on

4    and rebut and analyze those opinions.  And I'm prepared to do

5    both of those things.

6    **Q.**  And can you tell us, before we get into your opinion,

7    generally what type of materials you've looked at and analyzed

8    in coming up with your opinions.

9    **A.**  Certainly.

10       And we can talk about this in more detail, but we've

11   looked at a number of published findings related to questions

12   of how much hospitals are paid in various situations.

13       I've also done a lot of my own analysis involving various

14   data sources, including State data, data from Blue Shield, data

15   from a huge national database, looking at a variety of

16   different types of payors.

17       And then I'm generally familiar with various documents and

18   things in the case, as well, that have provided some relevance

19   for my opinion.

20   **Q.**  Mr. Deal, let's start with talking about your affirmative

21   opinion, not the rebuttal to Mr. Heil.  Let's talk about your

22   opinion of reasonable value.

23       Can you set the stage for us and take us through the

24   components of that opinion.

25   **A.**  Certainly.

1    So I'm showing on the screen right now the various

2    elements I'll be talking about over the next few minutes, and I

3    suspect into tomorrow as well given the time.

4    I'm going to start with some description of the

5    methodology, sort of both setting the broad framework and some

6    of the specific types of tools that we use as economists to

7    determine reasonable value in situations like that.

8    At a very high level, that involves looking at actual

9    payment data for all the providers in the geographic area and

10   looking at it from all the payors.

11   And there's really three main payors which relates to the

12   next few bullets.  There are -- Medicare is the biggest of the

13   payors.  And I think people are pretty familiar with Medicare.

14   We'll talk about it a little bit more.

15   The second item on there notes private payors, which would

16   be like a Blue Shield or an Anthem or a HealthNet.  Things like

17   that.

18   I note on there that I'm going to be talking about them

19   largely as a multiple of Medicare.  And then there's some

20   reasons for doing that, to kind of standardize thing.

21   So I'll be talking about Medicare.  I'll be talking about

22   private payments as a multiple of Medicare.  And I start with

23   the published findings.  So what is it that researchers and

24   others are findings about what do private payors pay relative

25   to Medicare.

1     Then I also, in the third item, I do my own analysis.  And

2  I'll be presenting that to the jury of various data sources,

3  looking at my own calculations of what private payors pay

4  relative to Medicare.  So providing both of those analyses.

5     The fourth bullet or note on here is Medi-Cal, which is

6  the name in California for Medicaid, which always was a pretty

7  big program.  Has recently become quite a big program.  And

8  I'll be talking about my analysis of what Medicaid pays there.

9     And then I'll bring that all together, providing my

10  overall reasonable value calculations where I talk about each

11  payor.  And then I talk about all payors combined in my

12  analysis.

13     And that is essentially what my affirmative analysis will

14  be.

15     **MR. PIMSTONE:**  Thank you.

16     So at this point, Your Honor, I think now that we've set

17  the stage, Mr. Deal is about to launch into his affirmative

18  opinions.  We can start for three or four minutes.

19     **THE COURT:**  If you want to stop here, I'm happy to

20  stop here.

21     **MR. PIMSTONE:**  Probably a good breaking point because

22  we're about to start.

23     **THE COURT:**  All right.  So, ladies and gentlemen, you

24  now just have your teaser for tomorrow morning.

25     (Laughter)

**PROCEEDINGS**

1    **THE COURT:**  And please remember the admonitions.  We

2    are working through the case promptly and -- but there's still

3    more to come.  So it's very important that you keep your --

4    keep your minds open to everything that you're going to be

5    hearing.

6        There's going to be a rebuttal case after this, and then

7    the -- I'm going to instruct you on the law, the lawyers will

8    help you sort out what's -- they think you should have learned,

9    and then you'll be able to make your own determination.

10       But for the moment, just follow the admonitions and be

11   here promptly so we can get going.  And I'll look forward to

12   seeing you in the morning.

13       (Jury out at 12:58 p.m)

14       **THE COURT:**  You can be seated, everybody.

15       Mr. Deal, you can step down.

16       **THE WITNESS:**  Thanks very much.

17       **THE COURT:**  I just wanted to say three things to

18   everybody.  First, be cognizant of the time that you have in

19   this case.

20       Second, you've given me final jury instructions, and I --

21   that you've agreed on, which is great.  If there's going to

22   be -- if anybody thinks there's anything else that needs to be

23   added, I want to talk about that tomorrow, at the end of

24   testimony, at 1:00 o'clock.

25       And if you think something should be added, write it up

1  and exchange it so that we can have a conversation about it.

2  Because I don't know where we'll be as far as the rebuttal --

3  as far as when the case is going to conclude.  So I'd like to

4  be ready for that in the event that it happens Monday as

5  opposed to Tuesday.

6      And then the final thing is -- and I mentioned this

7  before, and I don't know whether you've had conversations about

8  it, but the exhibits that have been in the book have been

9  partial exhibits for many of the documents.

10     For the contract, the initial contract, I think we quite

11  obviously need the full document.  I don't know whether you've

12  talked about the other ones, but you should reach agreement

13  because when the case goes to the jury the exhibits go back to

14  the jury, and I want to make sure that that's all organized.

15  All right.

16        **MR. TOOCH:**  Okay.

17        **THE COURT:**  All right.  See you in the morning.

18     (Proceedings to resume on Friday, February 8, 2019, at

19  7:30 a.m.)

20                     -   -   -   -

21

22

23

24

25

```
1
2                  CERTIFICATE OF REPORTERS

3         We certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6   DATE:    Thursday, February 7, 2019

7

8

9   _____
                Vicki Eastvold, RMR, CRR
10              Official Court Reporter

11

12

13

14  _____
        Katherine Powell Sullivan, CSR #5812, RMR, CRR
15              Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```