**Volume 5**

**Pages 698 - 896**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

NorthBay Healthcare Group -    )
Hospital Division, dba NorthBay)
Medical Center and VacaValley  )
Hospital,                      )
                               )   **NO.  C 17-2929 WHO**
          Plaintiff,           )
                               )
  VS.                          )   Day:    Friday
                               )   Date:   February 8, 2019
Blue Shield of California Life )
& Health Insurance Company;    )
California Physicians' Service,)
dba Blue Shield of California; )
and Does 1-50, inclusive,      )
                               )
                               )   San Francisco, California
          Defendants.          )
_____)

**JURY TRIAL - VOLUME 5**

**<u>APPEARANCES</u>:**
For Plaintiff:          King & Spalding, LLP
                        633 West 5th Street, Suite 1700
                        Los Angeles, CA  90071
                   **BY: DARON L TOOCH, ESQ.**
                        **DAVID J. TASSA, ESQ.**

For Defendants:         Manatt, Phelps & Phillips, LLP
                        11355 West Olympic Boulevard
                        Los Angeles, CA  90064
                   **BY: GREGORY N. PIMSTONE, ESQ.**
                        **JEFFREY J. MAURER, ESQ.**

                        Manatt, Phelps & Phillips, LLP
                        One Embarcadero Center, 30th Floor
                        San Francisco, CA    94111
                   **BY: AMY B. BRIGGS, ESQ.**

Reported By:            Vicki Eastvold, RMR, CRR
                        Katherine Sullivan, CSR, RMR, CRR

# **I N D E X**

Friday, February 8, 2019 - Volume 5

| **DEFENDANTS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **DEAL, BRUCE** | | |
| (RECALLED) | 709 | 5 |
| Direct Examination resumed by Mr. Pimstone | 709 | 5 |
| Cross-Examination by Mr. Tooch | 845 | 5 |
| Redirect Examination by Mr. Pimstone | 890 | 5 |

1    **Friday - February 8, 2019**                    **7:32 a.m.**

2                    **P R O C E E D I N G S**

3                         **---000---**

4        (The following proceedings were held in open court,

5    outside the presence of the jury:)

6        **THE COURT:**  Please be seated, everybody.  Good

7    morning.

8        You have some matters for me?

9        **MR. PIMSTONE:**  Just an item of clarification so I know

10   how far I can go with Mr. Deal --

11       **THE COURT:**  Okay.

12       **MR. PIMSTONE:**  Without running afoul of Your Honor's

13   rulings.

14       So I took a look at the case law.  I didn't have that

15   available yesterday morning.  And I understand judges -- each

16   court is different in terms of the comfort level with respect

17   to hearsay.

18       We have cited the Court to a variety of District Courts in

19   California and the Ninth Circuit case that discusses experts

20   relying on hearsay in forming their opinions and relaying them

21   at trial.

22       I understand Your Honor doesn't want Mr. Deal to relay

23   them at trial, so that's a distinction that we made, and I'm

24   not going to reargue that.

25       **THE COURT:**  Okay.

1    **MR. PIMSTONE:**  I believe Mr. Tooch and I are in

2    agreement that what I can elicit from Mr. Deal is that he has

3    specific knowledge of the Solano market and he can testify

4    specifically that, you know, empirically, you know, he's looked

5    at the data, he looked at sort of the rates that they received

6    and he has knowledge of the market.

7        What I'm not allowed to do is then have him say, "I spoke

8    to John Picket and he told me X about Blue Cross."

9        There's a little gray area in between, and this is what

10   I'm going to inquire about, which is, can I ask Mr. Deal:

11       In forming your opinion and your basis for your knowledge

12   about the Solano market, have you spoken with -- have you

13   spoken with payors to understand the dynamic in that -- the

14   dynamic in that market, without getting into who did you speak

15   to and what did you say?

16       So that's the question.  So I wouldn't be eliciting the

17   actual hearsay communication, but I would be -- the jury would

18   understand that his knowledge of the market comes from not only

19   empirically observing the data but also having communicated

20   with the market without relaying the actual hearsay

21   communication.

22       I believe that's within -- well within the boundaries

23   established by the Ninth Circuit, but I just wanted to get Your

24   Honor's take on that.

25       **THE COURT:**  I mean, the problem is that walks right

1   into the issue that we were talking about yesterday.  And so I

2   think -- I think it really depends on what kind of

3   cross-examination Mr. Tooch --

4          **MR. PIMSTONE:**  Okay.

5          **THE COURT:**  -- pursues with him, because just -- just

6   going back again --

7          **MR. PIMSTONE:**  Sure.

8          **THE COURT:**  -- the kind of payor information that he

9   has is not, in my mind, the kind of survey information that

10  would justify opinions on a -- on a deep level.  And so he

11  would have to pick and choose amongst the couple of

12  conversations that he has.

13      He has -- he can, however, give the broader opinions, as

14  we discussed yesterday --

15         **MR. PIMSTONE:**  Sure.

16         **THE COURT:**  -- with respect to these issues.  And

17  depending on what the cross-examination is, he could certainly

18  say, well, you know --

19         **MR. PIMSTONE:**  Right, okay.

20         **THE COURT:**  So that's the line that I would -- I would

21  stay on that side of the line.

22         **MR. PIMSTONE:**  So I would not be --

23         **THE COURT:**  So don't lay out, among the many bases for

24  his opinion, the one where, "And I also talked with a couple of

25  people from payors."

# PROCEEDINGS

1    **MR. PIMSTONE:**  Understood.

2    **THE COURT:**  Okay.

3    **MR. PIMSTONE:**  Understood.

4    And since this is Mr. Deal's only time before the jury,

5    he'll be testifying both as to his affirmative opinion and his

6    rebuttal to Mr. Heil's opinion as well, obviously.

7    **THE COURT:**  Of course.

8    **MR. PIMSTONE:**  Yeah.  And in that regard, there are --

9    there have been demonstratives that the plaintiffs have put --

10    well, have given us and given the Court, which -- including

11    demonstratives that Mr. Heil would be using in his rebuttal

12    testimony.

13    I'm assuming it's fair game for me to use those with

14    Mr. Deal since he's not going to be able to come back after

15    Mr. Heil uses those.

16    **THE COURT:**  Well, I wouldn't use a rebuttal slide that

17    hasn't been shown to the jury, but you can certainly use the

18    information, the -- his testimony -- Mr. Heil's testimony has,

19    I assume, opened up the areas of inquiry that are on that

20    slide.

21    **MR. PIMSTONE:**  And we've seen Mr. Heil's rebuttal

22    report and -- including Mr. Heil's critique of Mr. Deal.  That

23    rebuttal report contains, for example, graphs.

24    **THE COURT:**  You can use the -- I wouldn't use anything

25    from Mr. Tooch's slide deck directly, but you can use it

1   directly from his rebuttal report.

2       **MR. PIMSTONE:**  If there is a --

3       **THE COURT:**  And if it's the same thing.

4       **MR. PIMSTONE:**  Well, I'll tell you what, it is the

5   same thing.  It's in the -- I can show you.  In the rebuttal

6   report, there are two graphs.  One graph has the -- the

7   in-network contract rates compared to Mr. Deal's analysis.

8   Then, a couple of pages later, there's the -- what they call

9   their ED-dominant rates compared to Mr. Deal's analysis.

10      The demonstrative that he's going to use just combines

11  those two graphs.  And so I would plan to use that.  But it's

12  not anything different than what was in his report.

13      **THE COURT:**  Okay.  Mr. Tooch, do you have a

14  perspective?

15      **MR. TOOCH:**  If it is what he says it is, I'll take a

16  look at it.  It doesn't sound objectionable.

17      **THE COURT:**  Okay.

18      **MR. PIMSTONE:**  We may not use it.  But I wanted to

19  make sure, if it's in Mr. Heil's rebuttal report, it's fair

20  game.

21      **THE COURT:**  Okay.

22      **MR. PIMSTONE:**  Thank you.

23      **MR. TOOCH:**  Just a scheduling issue.

24      **THE COURT:**  Right.

25      **MR. TOOCH:**  First of all, I think we're going to get

1  to the day and probably not get to closing arguments or opening

2  arguments.  Well, that's what we were thinking.  That was the

3  discussion.

4      THE COURT:  Well, I'm confident that you don't --

5  well, you do not have to give your closing arguments today.

6      MR. TOOCH:  Okay.

7      THE COURT:  Is that what you're asking?

8      MR. TOOCH:  That's what we're talking about, yes.

9      THE COURT:  If, perhaps, the evidence finishes today,

10  at any time, then we're going to have a final instruction

11  conference to make sure that everybody's set with that, the

12  jury will go home, and you would argue on Monday.

13      MR. PIMSTONE:  Understood.

14      THE COURT:  Okay.

15      MS. BRIGGS:  Excuse me, Your Honor.

16      THE COURT:  Are you chilly?

17      MS. BRIGGS:  Do you keep the courtroom subzero to keep

18  us all awake?

19      THE COURT:  Sometimes it's really cold, sometimes it's

20  really hot.  And I wish I had the ability and power to

21  manipulate it, but I don't.

22      MS. BRIGGS:  My office is like that too.

23      I understand that the other side may be calling

24  Ms. Eichenberger in rebuttal, but we learned that this morning.

25  Is that --

1    **MR. TOOCH:**  I told Mr. Pimstone yesterday I was going

2  to call, instead, Mr. Heil and then -- after Mrs. Eichenberger.

3    **MS. BRIGGS:**  So Ms. Eichenberger, would she then be

4  going on Monday?

5    My only point is I wasn't prepared for Ms. Eichenberger

6  because I didn't know she -- you were thinking she might come

7  on today.

8    **MR. TOOCH:**  No, she's going to be here today.

9    **MS. BRIGGS:**  We were not given any notice of that.

10    **MR. TOOCH:**  I spoke with Mr. Pimstone yesterday that

11  my rebuttal witnesses were going to be Mr. Heil and

12  Ms. Eichenberger.

13    **MR. PIMSTONE:**  I must have been asleep on that.  So,

14  my apologies, I don't remember that.  But he may have, I don't

15  know.

16    **MR. MAURER:**  May I speak, Your Honor?

17    **THE COURT:**  Yes.

18    **MR. MAURER:**  So I did have a conversation with

19  Mr. Tooch, and I asked him who he was going to call tomorrow

20  and he informed me that it was Mr. Heil.  He didn't say

21  anything about Ms. Eichenberger.

22    **MR. TOOCH:**  Your Honor, that's absolutely not the

23  case.  I said my rebuttal witnesses were Mr. Heil and

24  Ms. Eichenberger.  I can honestly say to the Court under

25  penalty of perjury that that's what I said, Your Honor.

1    **THE COURT:**  I'm confident that that's true.  I'm also

2  confident that you may have been misheard.

3    **MR. TOOCH:**  Fair enough.

4    **THE COURT:**  So I'm not -- I don't think it's worth

5  pointing any fingers one way or another.

6    **MS. BRIGGS:**  Let me see if I can fix this, you know,

7  with Mr. Tooch because it may be that Ms. Eichenberger is

8  coming on for a very limited purpose without a lot of exhibits.

9    I'm not really sure what the scope of her rebuttal is, and

10  so if I can get a sense of it, maybe I can do it on the fly.

11    **THE COURT:**  Why don't you talk about what it is.

12    I would have assumed that you had all the -- you know,

13  that you've deposed her, that you'd be able to deal with the

14  issues that are coming up.

15    But talk -- figure it out, and if there's a -- if there's

16  a problem, then we'll -- then I'll address it.

17    **MS. BRIGGS:**  No problem.

18    **MR. TOOCH:**  I'll make this offer, Your Honor.  We

19  could bring Ms. Eichenberger on Monday if -- if that's what

20  they want.  She's coming on her way in, otherwise --

21    **MS. BRIGGS:**  Why don't you and I talk about it and see

22  if we can figure it out.

23    **THE COURT:**  Figure it out.  I think that would be the

24  best thing.

25    **MS. BRIGGS:**  Thank you.  Thank you, Your Honor.

# PROCEEDINGS

1          THE COURT:  All right.  See you at 8:00.

2              (Recess taken at 7:42 a.m.)

3              (Proceedings resumed at 8:02 a.m.)

4       (The following proceedings were held in open court,

5    outside the presence of the jury:)

6          THE COURT:  All right.  Did you work out the issues

7    with Ms. Eichenberger?

8          MS. BRIGGS:  Yes, Your Honor.

9          MR. TOOCH:  Yes, Your Honor.  We're going to be

10   calling her on Monday.

11         THE COURT:  All right.  So let's get Mr. Deal on the

12   stand, and the jury.

13      (Jury enters at 8:03 a.m.)

14         THE COURT:  All right.  Please be seated, everybody.

15      Good morning, ladies and gentlemen.

16      (Jurors greet the Court.)

17         THE COURT:  Welcome back.

18      So we continue in the defendant's case.  And Mr. Deal was

19   on the stand as you left yesterday, and he gave you an outline

20   of where he was going.  And now you're going to find out what

21   he thinks about it.

22      Go ahead.

23         MR. PIMSTONE:  Thank you.

24

25

1          **BRUCE DEAL**,

2    called as a witness for the Defendant, having been previously

3    duly sworn, testified as follows:

4                        **DIRECT EXAMINATION**

5    **BY MR. PIMSTONE:**

6    **Q.**   Good morning, Mr. Deal.

7    **A.**   Good morning.

8    **Q.**   I think when we left off, you were about to show us your

9    demonstrative regarding the nature of the market for emergency

10   services.

11          **MR. PIMSTONE:**  Can we get to that?

12        (Document displayed.)

13          **THE WITNESS:**  Yes, so this was the overview.  And then

14   I think we were about to launch into a description of the

15   methodology.

16   **BY MR. PIMSTONE:**

17   **Q.**   So, Mr. Deal, can you tell us -- these services that we're

18   valuing here are emergency services.  Can you tell us a little

19   bit about the market for emergency services and any particular

20   characteristics of that market that are relevant to your

21   analysis?

22   **A.**   Yes, I certainly can.

23        So emergency room services are actually kind of

24   interesting from an economic perspective for a couple of

25   reasons.

1    As I've noted on the top of this slide -- and I think this

2 is pretty common knowledge -- emergency rooms can't turn away

3 patients even if that hospital doesn't have a contract with the

4 underlying payor.  So they sort of have to serve the patient.

5    Now, it's a voluntary choice to have an ER and make it

6 open, but assuming you do, you can't turn patients away.

7    Similarly, in the second bullet, payors, or individuals as

8 well, but they can't refuse payment just because the ER is

9 non-contracted.  You don't get to say, well, this hospital is

10 not in my network, but I need to go to that emergency room,

11 and, oh, I'm not going to pay you because you're not in my

12 network.  You can't do that either.

13    So there's kind of an interesting aspect of that.  And

14 patients are, similarly, the third bullet, you're entitled to

15 be taken to the closest ER.  So we don't want patients saying,

16 Oh, I have to go all the way across town with my cut hand or

17 broken wrist or whatever it is.

18    So those are some of the interesting dynamics that feed

19 into the economic analysis, which I will be discussing in more

20 detail.

21    But one way to think about it is these are sort of forced

22 transactions, so there isn't a prior agreement on price.  If

23 it's a contracted situation, there's a prior agreement on price

24 and you can analyze that.  But these are these forced, where

25 the party can't say no and the party can't say we're not going

1    to pay you.

2        What that leads us to is the analysis which I'm going to

3    be addressing, which is to look at what's the regional price,

4    the going rate in the geographic area?  That becomes the

5    reasonable value estimate.

6    **Q.**    Thank you.

7        And, in fact, Mr. Deal, I'm going to sort of -- I'm going

8    to put up -- the jury has been given a jury instruction, and

9    I'm just going to sort of have that available here --

10   **A.**    Sure.

11   **Q.**    -- to ask you a couple of questions.

12   **A.**    Okay.

13   **Q.**    So, Mr. Deal, when you just mentioned that what you --

14   what your task was, was, you believe, to determine what the

15   regional price was for these emergency services in the

16   geographic area, I see that what we have here in the jury

17   instruction is that one is to examine a wide variety of

18   evidence reflective of the market rate for the services in the

19   geographic area.  Is that what you did?

20   **A.**    I did, yes.

21   **Q.**    And so what is it -- actually, before we get to that, you

22   mentioned that these were forced transactions.

23       How is that different from when I would go into a hospital

24   and go see a doctor outside the emergency context, when I'm

25   going in for an elective procedure?

1    If I have a rotator cuff injury on my shoulder and I'm

2   choosing my doctor or choosing my hospital, how is that

3   different?

4   **A.**    Sure.  So in that situation both parties have choice.  So

5   the physician can say, oh, my practice is full or I charge, you

6   know, a thousand dollars, and if you're not willing to pay a

7   thousand dollars, I'm not going to take you as a patient.

8    And vice versa, the patient can say then this doctor over

9   here is 500, this doctor over here is a thousand, but that guy

10  has better credentials or his office is closer, I'll go there.

11   So the issue is choice.  And you can think of that as kind

12  of a willing seller-willing buyer framework, which we'll

13  discuss more.

14   In that kind of an elective-type market, again, that

15  dynamic is different.  Each party can evaluate the opportunity

16  and the costs and decide whether they want to do it.  That's

17  not the situation in an ER.

18   An ER is sort of almost a random element of where you get

19  hurt or need the emergency room you go to the closest ER.  And,

20  therefore, we're not sort of forcing you, from an economic

21  perspective, to sort of pay whatever the rate is for the person

22  who happens to be staffing the ER at that moment.

23  **Q.**    So if I were driving, sort of, in a loop around Solano

24  County and my appendix burst, is that the kind of randomness

25  you're talking about here?

1  **A.**    Yeah.

2  **Q.**    I could be near -- I could be nearer VacaValley, I could

3  be nearer Fairfield, or I could be nearer, sort of, one or the

4  other hospitals which are not the NorthBay hospitals.

5  **A.**    That's exactly right.

6      You think of just a couple miles one way or the other,

7  you're going to go to a different emergency room and you're not

8  subject to whatever their independent elective negotiated rates

9  might be for that procedure.  They decided to have an ER, and

10  you're subject to paying the regional price for that service.

11  **Q.**    Got it.  Okay.

12      And you contrasted that -- this is an important point, so

13  I just want us to dwell on this just for a few minutes.

14      You contrasted that to the situation where -- now I'm not

15  talking about a burst appendix, where I'm taken to the closest

16  emergency room, but you contrasted that with a situation where

17  I now am going into a hospital or seeing a doctor for an

18  elective procedure.  And I -- I just want you just to dwell on

19  that for a minute.

20      Again, can you tell us, why is that different?

21      If I'm going to a particular doctor who is three times the

22  rate of other doctors in the geographic area, the fact that I

23  have choice, how does that impact, sort of, your analysis?

24  **A.**    Again, you're basically -- both parties have full

25  information and have choice, is the simple way of thinking

1    about that.  So, you know, you can decide if you're willing to

2    pay more --

3    **Q.**   Uh-huh.

4    **A.**   -- if it's worth it.

5        The provider can decide whether, if you're offering a

6    certain price, whether they're willing to accept that price or

7    not.

8        So, again, very different dynamics because neither party

9    has to do the transaction.  It's not a forced transaction.

10       Now, maybe you've got to get your shoulder repaired at

11   some point because it's painful, but it's not an emergency

12   situation and you'll have a number of choices.  So quite a

13   different situation there.

14   **Q.**   And your testimony is, in that kind of situation, if I'm

15   choosing to go to a provider that has higher prices than other

16   products in the geographic market, that's a choice I get to

17   make because I'm voluntarily deciding to go to that high-priced

18   provider?

19   **A.**   Yes, that's right.  And, similarly, again from an economic

20   perspective, you don't say, I'm going to choose to go to the

21   thousand-dollar doctor instead of a $500 doctor.

22       You voluntarily go there, they accept it, and then

23   afterwards you say, you know what, I don't feel like paying a

24   thousand dollars, I feel like just paying the average rate,

25   that's not the way, kind of, markets work in that type of a

1  situation.

2  **Q.**  All right.

3  **A.**  So that's not a forced transaction, and you don't get to

4  sort of renege, if you will, on your agreed-on price.  But

5  that's not the situation for these forced transactions.

6  **Q.**  Got it.

7  So you could have a situation then -- so could you have

8  situation then that a particular provider, whether it's a

9  hospital or a doctor, may get a certain price when they are in

10  the elective market, when patients are seeing them and choosing

11  to go there, for higher prices, but if that provider, whether

12  it's a hospital or a doctor, is choosing to participate in the

13  emergency market, then is what you're saying, they're subjected

14  to the -- then they're subjected to what the reasonable rate is

15  for the services in the geographic area, they're subjected to

16  regional market pricing?

17  **A.**  Yes, very much so.  In other words, you could have the

18  same provider who might, in a private practice, whether it's a

19  physician or even a hospital, they get a certain price in that

20  voluntary market.  But once you're opting in to the emergency

21  market and say, I'm going to have an emergency room or, if

22  you're a doctor, I'm going to staff that emergency room, at

23  that point you become subject to the reasonable value situation

24  because it's a forced transaction.

25  The individual doesn't get to say, I want the

1    thousand-dollar guy versus the $500 guy.  You get who's on duty

2    at the ER at that moment.

3    **Q.**   So if -- if we sort of drive this point home with an

4    example -- and I know we're not talking about physician

5    services here, but this might be sort of an easier example to

6    think of.

7        If I am -- if I need a heart procedure done and it's not

8    an emergency, it's an elective procedure, and I decide that I

9    want to go to a particular doctor who's five times more

10   expensive than the other doctors in the geographic area,

11   because I'm choosing her because she happens to be the one who

12   I want to go to, then that's an example of choice; right?

13   **A.**   Exactly.

14   **Q.**   And there's nothing wrong with that doctor, when she's

15   seeing me on an elective basis, charging five times more than

16   other doctors in that geographic area?

17   **A.**   That's correct, yes.

18   **Q.**   Okay.  That's what she's getting in the elective market?

19   **A.**   Right.

20   **Q.**   But if that same doctor were to say, okay, I'm going to

21   choose to also work part of my time in the emergency room, and

22   let's say there were three cardiologists who randomly staffed

23   that emergency room, one cardiologist would charge a thousand

24   dollars for a procedure, whether it's a stent -- let's just

25   call it a stent, one cardiologist would charge a thousand

1  dollars for that stent, the second cardiologist, who staffs the

2  ER, would also charge a thousand dollars for that stent,

3  talking now in the private practice, the elective practice --

4  **A.**   Right.

5  **Q.**   -- and the third cardiologist who was staffing that ER

6  would charge $5,000, five times as much for that stent, when

7  people are choosing that doctor electively, you know,

8  voluntarily.  Okay?

9       Now, if those three doctors are rotating now in the

10  emergency room, so now we're not talking about elective

11  procedures but emergency procedures, and if a person is taken

12  to the emergency room, are they -- I take it they're not

13  choosing whether they get doctor 1 or doctor 2 or doctor 3;

14  right?  That's just whoever happens to be on call?

15  **A.**   That's the nature of emergency services.

16  **Q.**   Exactly.  So the net of this is the patient is not

17  saying --

18       **MR. TOOCH:**  Objection, Your Honor.  These are leading.

19       **MR. PIMSTONE:**  I'll pull back, Your Honor.  I'll pull

20  back.

21       **THE COURT:**  Sustained.

22       **MR. TOOCH:**  If you don't mind --

23       **THE COURT:**  Please don't talk over each other.  The

24  objection has been ruled on.  It's sustained.

25       **MR. PIMSTONE:**  Thank you, Your Honor.

1    **MR. TOOCH:**  May I move this back?

2    **THE COURT:**  Of course.

3    **MR. PIMSTONE:**  I apologize.

4    BY MR. PIMSTONE:

5    **Q.**  Thank you.  Let me see where I was, and I'll see if I can

6    dial it back a little bit.

7         And so, now, if we take that same hypothetical and you've

8    got a patient who's coming in in the emergency context, is that

9    patient choosing one particular doctor over another particular

10   doctor?

11   **A.**  No.  Again, that's a good illustration.  Whether it's the

12   physician at the emergency room or the choice of which

13   emergency room to go to, at that point the choice to staff the

14   ER or have an ER, you're basically subjecting to the regional

15   price --

16   **Q.**  Okay.

17   **A.**  -- across -- you know, similar services across the region.

18   So at that point whatever you are charging kind of in the

19   elective market isn't the price that one would pay at that

20   moment in the ER.

21   **Q.**  Okay.  So is it -- is it your opinion then that, in that

22   instance, if we stay with that hypothetical, that a provider

23   who may get well above market rates in her or its elective

24   practice, if you're talking about a hospital, when they are

25   participating in the emergency market they are subject not to

1   what they get in private practice, but they are subject to the

2   market rate for the services in the geographic region?

3       Is that your opinion?

4   **A.**   That is my opinion.  That's my understanding, yes.

5   **Q.**   And did you understand that your task was to determine --

6   now, NorthBay has chosen to participate in the emergency

7   market; correct?

8   **A.**   That's correct.

9   **Q.**   And NorthBay has certain prices that it gets in the

10  elective market when people choose to go to NorthBay

11  voluntarily?

12  **A.**   That's right.  And we'll talk about those.

13  **Q.**   Okay.  And did you understand what your assignment was,

14  was to determine when NorthBay --

15          **MR. TOOCH:**  Objection.  Leading.

16          **MR. PIMSTONE:**  I'm asking whether his understanding --

17          **THE COURT:**  You're leading.

18          **MR. PIMSTONE:**  Okay.

19          **THE COURT:**  Ask him a direct question.

20          **MR. PIMSTONE:**  Sure.

21  BY MR. PIMSTONE:

22  **Q.**   What did you understand your assignment to be in valuing

23  the services here?

24  **A.**   To determine the regional price in the geographic area for

25  the services at issue.

1  Q.   Okay.  And so before we leave this, just to stay on the

2  same example we talked about, physicians staffing in an

3  emergency room, would the same hold true for hospital services?

4      For example, if we take the price of an MRI that the

5  hospital may get in the elective market versus the emergency

6  market, would the same hold true?

7  A.   Yes, very much so.  So if you're in the emergency room and

8  need an MRI, your -- even if that same hospital might have a

9  different price for elective situations for whatever

10 combination of reasons, at that point the price that's relevant

11 for the emergency service is the regional, the price in the

12 geographic area for the similar service.

13 Q.   And that is what -- in coming up with your opinion, is

14 that what you sought to determine, which is what is the

15 regional price for the hospital services in the geographic

16 area?

17 A.   That's what I did, yes.

18 Q.   All right.  Mr. Deal, can you summarize your general

19 approach that you used in this case to calculate reasonable

20 value?

21 A.   Yes.  So I've got a demonstrative that summarizes that up

22 on the screen now.

23     On the left, I sort of identified what I understand the

24 relevant concepts here, without offering a legal opinion, but

25 the quantum meruit concept, which is a legal concept, but from

1    an economic perspective, it's determining the reasonable value.

2    The way to think about that is the going rate of the services.

3         Now, the next two columns over are a listing of factors

4    that I considered and other ones that I didn't consider in the

5    sense that they're not things that are explicitly factored into

6    the price.

7         So starting with the factors that I do consider, as we've

8    just been talking about for the last few minutes, the actual

9    going rates in the geographic area.

10   Q.   Let's just stop for a second there.

11        When you talk about the actual going rates in the

12   geographic area, did you -- did you attempt to look at the

13   going rates for the services in the geographic area?  That's

14   what you attempted to do?

15   A.   That's what I both attempted and did do, yes.

16   Q.   And you did do that, okay.

17   A.   Yes.  Now, to do that, one thinks about the facts and

18   circumstances of the relevant market.  And I'll be talking

19   about some of the various ways that I've done that analysis.

20   So the -- the data sources, things like that may vary somewhat

21   situation to situation.

22   Q.   Right.

23   A.   Here I've used a number of different data sources to look

24   at it.  And, importantly, at the bottom, one wants to think

25   about the actual claims and services that are at issue here.

1      So there's -- and I'll talk about that in a moment, what

2    those claims are, at least at a high level.  So you think about

3    the relevant claims that you're valuing there.

4    **Q.**    And, Mr. Deal, what were the types of considerations that

5    you did not consider in coming up with your opinion?

6    **A.**    Yeah.  So you can see on that column on the right, there's

7    some things that -- it's not even so much I didn't consider

8    them as they're not factors that play into the specific

9    numbers.

10      So the first thing I would say is billed charges.  So I'll

11    talk about this in more detail, but it's true in other

12    industries as well, it's certainly true in hospitals, that the

13    list price, if you will, the billed charges -- and anybody

14    who's sort of seen, you know, descriptions of their insurance

15    claims comes home, it really is not the price that's paid.

16      On a few occasions, maybe someone pays full billed

17    charges, but, by and large, prices are much different than

18    billed charges, so one can't simply look at billed charges.

19    That's not the right way to do it.

20    **Q.**    Now, just generally, I don't want to get into -- and I'm

21    not asking for your opinion as to the frequency of times that

22    people pay billed charges, and so I don't understand your

23    testifying as to frequency.

24      Is your larger point that, in looking at actual market

25    prices, one needs to look at the prices paid, whether they're

1    billed charges or whether they're less?

2            MR. TOOCH:  Objection.  Leading.

3            THE COURT:  Sustained.

4    BY MR. PIMSTONE:

5    Q.   Are you intending to testify as to the percentage of times

6    that a particular payor pays billed charges?

7    A.   No.  What I'm looking at is the actual prices paid, which

8    will be a range.

9    Q.   Okay.

10   A.   Some people pay -- a few may pay full billed charges.

11   Many -- the vast majority would pay less than that.

12        Again, I'm factoring in, as I'll discuss, all prices paid

13   by all payors, actually, in my analysis.  The key is I'm

14   focusing on actual prices paid, not billed charges.

15   Q.   I understand.

16   A.   Billed charges is not the right thing to look at.

17        Second item I've listed on here is hospital quality.  So

18   at a baseline level, one wants to think about competent

19   services, certainly, but one doesn't adjust in this analysis

20   for nuances of quality in there.  I haven't done that.

21        That's not my understanding of the appropriate way to do

22   an analysis.  And very much like your discussion a moment ago

23   about the cardiologist, you know, you may have some real or

24   perceived variances in quality, the $5,000 doctor versus the

25   $1,000 doctor.  That's actually not relevant for this in terms

1   of we're looking at the overall prices that are paid, kind of

2   keeping quality, essentially, off to the side.

3   **Q.**   So let's just stay on that a little bit, and when we

4   discussed that actually just a few minutes ago.

5       In the elective market, do people make quality

6   distinctions in deciding who to go to if they're choosing to

7   see a doctor?

8       If I'm choosing to see a cardiologist or a brain surgeon,

9   my quality or my perception of quality could be a factor in

10  that?

11  **A.**   Certainly, yeah, that would be the -- technically, you

12  could imagine if you needed a rotator cuff surgery, you might

13  say, oh, I want to go to the doctor for the 49ers.  And maybe

14  that doctor is more expensive, but you perceive, well, if the

15  49ers go there, it must be a good quality.

16  **Q.**   Is there anything wrong, in that instance, with the 49ers'

17  doctor charging more because he or she perceives that they're

18  better quality?

19  **A.**   No.

20  **Q.**   In the elective market?

21  **A.**   In the elective market, that's right.

22  **Q.**   But I think, as you said before, with respect to the

23  emergency market, can you explain again, sort of, why does that

24  consideration not play, you know, when one is valuing -- when

25  one is doing a regional market survey -- not a market survey --

1  when one is looking at regional pricing in a geographic area?

2  **A.**  Again, these are forced transactions.  If the 49ers doctor

3  chooses to staff the ER, the rate for those services will be

4  the going rate in the geographic area.

5      So it's a -- you don't get to say, I'm not going pay you.

6  They don't get to say, I'm going to charge whatever I charge in

7  my elective market.  It's the going rate in the region.  That's

8  the standard.

9  **Q.**  And is that because when a person goes to the emergency

10  room, they're not voluntarily saying --

11      **MR. TOOCH:**  Objection.  Leading.

12      **THE COURT:**  Sustained.  Let the expert testify.

13      **MR. PIMSTONE:**  I understand.  I understand, Your

14  Honor.

15  **BY MR. PIMSTONE:**

16  **Q.**  If a person goes to the emergency room, are they choosing

17  the 49er doctor in that example?

18  **A.**  They're going to get whichever doctor is on duty at that

19  point.

20  **Q.**  All right.

21  **A.**  And then the last couple of items on the factor list are

22  hospital costs.  We're not considering hospital costs, we're

23  really looking at prices.  And we're not looking at the other

24  services and amenities, we're looking at the actual services

25  provided, but not if they have other services out there.

1   **Q.**   Understood.

2       All right.  Mr. Deal, can you tell us, in this case there

3   were claims relating to two NorthBay facilities; is that right?

4   **A.**   That's correct.  So -- and I'm not going to go into a

5   tremendous detail on each of the claims, for sure, but on the

6   visual here -- just got a little bit of an illustration.

7       There are two facilities for NorthBay.  I believe there's

8   been testimony on that.  NorthBay Medical Center in Fairfield,

9   and a little less than half the claims are associated with

10  that, 762 claims.  The left side of my pie chart.

11      The right side of my pie chart is VacaValley Hospital in

12  Vacaville.  And there's, again, 874 claims there.  A little

13  more than half.  So it's pretty close to a split between those

14  two facilities.

15      Below that, I've got a couple of notes too.  Somewhat

16  coincidentally as well, from a total charges perspective --

17  and, again, billed charges aren't what I'm analyzing, but one

18  can just use that to get a sense of the relative split of

19  claims.

20      Approximately half the dollars are associated with

21  inpatient claims and about half the dollars are associated with

22  outpatient claims.

23      Now, in my parens, at the end of that first bullet I've

24  noted, by count of claims -- and this is not a surprise -- I

25  think there's vastly more outpatient claims than inpatient

1    claims.  You know, 94 percent of the claims are outpatient

2    claims, where you go in, get care, leave.  Not overnight in a

3    hospital on that situation.

4         So the average cost of an outpatient claim is clearly

5    lower than the average cost of an inpatient claim, which is

6    why, even though inpatients are only 6 percent of the count of

7    claims, they're almost half the dollars here.  So just sort of

8    note that.

9         And when I do my analysis, I make adjustments for the

10   inpatient-outpatient mix because, as you'll see, there's some

11   differences in terms of pricing for some of those claims.

12        And then the bottom line of the chart, I've noted the time

13   period, which is about a 20-month period from December of

14   2016 -- this is post the termination of the Blue Shield

15   contract -- to July of 2018.

16        So this is just a little bit of a context and description

17   of the claims.

18   Q.   Okay.  We've heard some testimony regarding the fact that

19   NorthBay Medical Center in Fairfield is a trauma facility.

20        Is VacaValley a trauma --

21   A.   It's not, no.

22   Q.   All right.

23        And did -- did the fact that at least one of the two

24   hospitals, you know, treats trauma patients, did that factor

25   into your analysis, Mr. Deal?

1   **A.**    Certainly not in any explicit way of looking at, you know,

2   is there an add-on or something like that.  The only thing it

3   is relevant for is I'm looking at the exact claims at issue.

4       So to the extent there's a particular claim or an

5   inpatient that might have additional services that are used,

6   that would be part of my analysis.

7   **Q.**    So to the extent that a trauma patient uses additional

8   services, are those factored into your analysis?

9   **A.**    Yes.

10  **Q.**    Okay.  Let's talk a little bit about how you determined

11  the market.  You indicated that you did -- that what you did

12  was an analysis to see what the market rate was for the

13  services in the geographic area.

14      How did you bill the market?

15  **A.**    Yes.  So I'll get into a little more detail in a moment,

16  but at a very high level, what I've got on the screen now is --

17  one thinks about all the sellers in a geographic area, and I'm

18  showing a map there.  I'll describe the hospitals in a few more

19  minutes.

20      But, essentially, you want to look at hospitals in the

21  geographic area.  And I've done that for each of the two

22  hospitals at issue, NorthBay and VacaValley, and identified

23  hospitals within a sort of a circle if you will.

24      Then one wants to also think about all the buyers in the

25  market.  And I'll be talking about this throughout my

1  testimony.  There's really three major buyers that I analyze.

2  There's Medicare, a very large program for the -- funded by the

3  federal government.  Medi-Cal, which is a state program,

4  state/federal cost share on that, also a very large program.

5  And private payors, which would be like a Blue Shield or a

6  HealthNet or Anthem, various private payors like that.

7      I look at all three of those, and I'll present data on

8  each of those.  All of those are significant buyers in the

9  market.

10 Q.  So when you generally today are talking about sellers and

11 buyers, when you're talking about sellers, are you referring to

12 hospitals?

13 A.  Yes.  That's sort of, you know, kind of a clinical

14 economic term.  In some sense, a seller could be a seller of

15 hamburgers, could be a seller of cars.  In this case, it's a

16 seller of emergency services for hospitals.

17 Q.  And when you're generally referring to buyers, you're

18 talking about people who are purchasing those emergency

19 services?

20 A.  That's correct.  And particularly we're focusing on the

21 underlying payor.  In this analysis, obviously it's the

22 individual patients getting the care, but the payment is

23 typically the responsibility of the underlying payor with some

24 potential cost share with the patient.

25      But the focus is on Medicare, Medi-Cal, and private

1   markets.

2   **Q.**   In some cases, if the payor has no insurance, the -- could

3   the payor be the individual patient, him or herself?

4   **A.**   Yes.   There are some self-paids.   It's very small.

5   **Q.**   Okay.   All right.

6        And so I think you've talked about the sellers.   And

7   you've talked about valuing the market rate in the geographic

8   area.

9        Can you tell us what steps you took in taking -- to

10  determine the appropriate comparable hospitals that you used in

11  your analysis?

12  **A.**   Certainly.   So the slide that's up right now gives a few

13  of the elements that I used in determining my list of

14  hospitals.   And I'll go over that list in just a moment.

15       But, at a high level, we certainly want to be thinking

16  about what we think of as general acute care hospitals here,

17  with either a basic or a comprehensive emergency department.

18  So it means it's staffed.

19       Most emergency departments are basic level.   Comprehensive

20  has a few more specialists on call and available.

21       But underneath that main heading I have noted some things

22  that I've excluded from that list.   In other words, we're

23  trying to get similar hospitals here.

24       So I've excluded what are called critical access

25  hospitals, which might be very small rural hospitals,

1  typically.  They're teaching hospitals, also other rural

2  hospitals.

3       That's not as much of an issue in this particular case.

4  Where I've done this in other situations in more rural

5  communities, it becomes more of an issue of -- there.

6       But this is a fairly populated area that we're dealing

7  with here so these were not particularly binding issues.

8       I excluded city, county, or what are called district

9  hospitals.  Those are government-funded hospitals or

10  government-owned hospitals.

11       I do include trauma centers for NorthBay because -- and

12  this is where we talked about a moment ago, NorthBay itself is

13  a Level III trauma center.  And so, as we'll see in a moment,

14  some of the other hospitals that I include in that list for

15  NorthBay are also trauma centers.  Not all of them, but I

16  include some trauma centers there.  For VacaValley, which is

17  not a trauma center, I excluded trauma hospitals from

18  VacaValley.

19       So I'm trying to get as close as I can.  One can never do

20  it absolutely perfectly and get exact matches, but I'm trying

21  to get general acute care hospitals in the region.

22       And the bottom part of this is the geographic area.  So

23  what I essentially do is I look at a 25-mile radius around

24  NorthBay.  And this is always a bit of a judgment as to how far

25  of a radius you want to go.

1    The smaller the radius, obviously, the more -- the closer

2  the exact market conditions in terms of wages, things like

3  that.  But you also want enough hospitals to be able to make a

4  reliable analysis of the geographic area.  So it's a bit of a

5  judgment on that.

6    I've used 25 miles for NorthBay.  I had to go a little bit

7  bigger for VacaValley to get enough hospitals for my analysis,

8  so I went 30 miles for VacaValley.  Again, this is sort of this

9  tradeoff that closer is better, all else equal, but you want

10  enough hospitals.  So that was my decision criteria for what to

11  include.

12  **Q.**  And, Mr. Deal, did you take any steps to confirm that

13  these comparable hospitals reflected that they were general

14  acute care hospitals?

15  **A.**  I did, yes.  I used data that made it clear that they were

16  general acute care hospitals.

17  **Q.**  Okay.  And it looks like you've got a slide here that is

18  discussing case mix.

19    Can you tell the jury what case mix is and how it was

20  relevant to your selection?

21  **A.**  Certainly.  So what's on the screen right now -- and I've

22  got a similar slide in a moment for VacaValley -- this is the

23  exact list of hospitals that I'm using for my analysis for

24  NorthBay.

25    So what I've got is the name of the hospital on the left.

1   And many of these people are probably familiar with or you've

2   heard some testimony about during this trial.  John Muir, Queen

3   of the Valley, Sutter, various hospitals.

4       My second column is this trauma center note.  And as I

5   said, I've included NorthBay.  Obviously, they're the bold one

6   there.  That's the at-issue hospital, but I've included others

7   that were also trauma centers.

8       The case mix index that you were just asking about is a

9   way that those of us that do healthcare analysis look at the

10  relative severity of the patients that are cared for at the

11  hospital.

12  **Q.**  By severity, you mean how sick they are?

13  **A.**  Basically, how sick they are, how complex the procedures

14  are.  Every patient -- every inpatient gets a weight, if you

15  will.  So the transplant would be a very high case mix.  A, you

16  know, basic gall bladder, something like that, might have a low

17  case mix.

18      You add those all up and take the average to get the

19  hospital case mix index.  And what I'm showing here is the

20  reported case mix index for each of the hospitals.  And you can

21  see they vary from 1.2 -- I've sorted them low to high.

22      Sutter Delta is at 1.27, to John Muir Medical Center in

23  Concord is 1.86.  I've circled the averages at the bottom, of

24  1.46 there.  And what you see is that NorthBay is kind of right

25  in the middle of that group.  So they see a similar overall

1   level of severity to these other hospitals.

2       You can see, in general, the trauma facilities would be a

3   little bit higher than the other ones.  They're kind of in the

4   higher half of it.  NorthBay is at the low end of the higher

5   half of those.

6       And then my last column is just simply noting the distance

7   from NorthBay on, sort of, a straight-line basis.

8   **Q.**   Understood.

9   **A.**   So there's eight hospitals that I looked at that are

10  comparable.

11  **Q.**   And did you do the same when you built your hospital peer

12  group?

13      For purposes of VacaValley, can you take us through sort

14  of that case mix as well?

15  **A.**   Yeah, a very similar analysis here.  I won't go through

16  every column.  Again, there are nine hospitals for VacaValley.

17  This is my slightly larger geographic area.  But very similar

18  analysis here.  None of them are trauma centers, so I don't

19  have that column here.

20      But on a case-mix basis, NorthBay VacaValley is, again, a

21  little bit above average but essentially in that middle --

22  middle group.  So, similar analysis, eight hospitals for the

23  Fairfield campus, nine hospitals as a comparison for

24  VacaValley.

25  **Q.**   Okay.  Mr. Deal, did you take any steps to confirm that

1    the comparable hospital list that you've created -- how did

2    that reflect the geographic area?

3    **A.**    Yeah, so I've noted the distance and, in general, all of

4    them fall within this direct line radius I've talked about.

5          What's on the screen right now is sort of a map.  I mean,

6    I've lived in the Bay Area for a long time here so it's also

7    interesting just to kind of see visually where these are.

8          So VacaValley and Fairfield are obviously on that I-80

9    corridor, if you will, on your way up towards Sacramento and

10   Davis and that area.  And you can see there's sort of a ring

11   around them, some up towards Sacramento, some down towards, you

12   know, the East Bay, Richmond, and Berkeley and so forth.

13         So this is just a visual to kind of show where those

14   comparable hospitals are located in each situation.

15   **Q.**    So now we've discussed the -- how you built your seller

16   list, the comparable hospitals in the geographic area.

17         Can you talk a little bit about the buyers and what you

18   did in that regard?

19   **A.**    Certainly.  And I'll be talking about each of the buyers

20   kind of separately and presenting my analysis of payment levels

21   separately.  At the end, I bring it all together and look at

22   all the payors on a combined basis.

23         But to go back to my earlier comment, that on Medicare,

24   which is that left pie on here, just to say a word more about

25   that, I think most people are pretty familiar with Medicare,

1    but it's a federal government program.

2        It largely serves people 65 and over.  It was started in

3    the '60s.  It pays for a very large fraction of hospital

4    services these days.  It's typically the largest single payor

5    for a hospital now.  And in some sense that's growing as the

6    population continues to age, given longevity and so forth.

7        It also covers a few non-65 populations, but the majority

8    of it are 65 and over population.  So it's a very large payor

9    out there.

10        The lower right quadrant on this, of the pie, is Medi-Cal.

11    Medi-Cal is just another name for Medicaid in California.

12    California has always added the Cal part of that for as long as

13    I can remember.

14        Certainly, it's a very large program as well.  It's an

15    interesting split in terms of costs between the state and the

16    federal government.  And it's actually become an even larger

17    payor with the Affordable Care Act, sometimes colloquially

18    known as Obama Care.  One of the big parts of that program was

19    to expand Medicaid.

20        Medicaid typically, historically, was covering a lot of

21    children, often pregnant women.  It's really been expanded to

22    cover low-income adults now.  It actually is a very large payor

23    nationally and in California now.

24        So there's been the so-called Medicaid expansion.

25    Sometimes one hears about that, where this state agreed to do,

1    some states don't.  California did expand, and it's become a

2    very large payor.  So that's another payor that I analyzed.

3        And in the upper-right quadrant, the private payors.  So

4    as I briefly mentioned the other day, those would be your

5    HealthNets, your Blue Shields, your Anthem Blue Cross of the

6    world.

7        There's a few others that I'll talk about in a few minutes

8    that sometimes get included in that private payor, but that's

9    what many of us who are employed or maybe you buy your

10   insurance on the Exchange or an individual policy, most of us

11   would -- who are under 65 would fall into that category.

12       And, again, it's a large category, but it's certainly

13   not -- it's by no means the majority of hospital patients.

14   It's -- you know, it can vary depending on the hospital or the

15   region, but it's a significant, but by no means the majority.

16   **Q.**   Now, in coming up with your analysis, Mr. Deal, did you

17   consider what the sellers -- what the hospitals in the

18   geographic area were selling their services to, to all of these

19   buyers?

20   **A.**   Yes, I analyzed each group separately.  And then, again,

21   at the end I'll put it all together to look at, kind of, the

22   overall price that each hospital is receiving for the services.

23       But I -- my understanding in terms of the assignment and

24   the appropriate analysis would be to look at the overall price

25   by all buyers and all sellers.

**Q.** Now, the jury has been instructed that in determining the market value of the geographic area one would look to what they call willing buyer-willing seller transactions?

**A.** Yes.

**Q.** Are all of these sales transactions here -- when these buyers are buying the hospital services, were all of these willing buyer-willing seller transactions that you looked at?

**A.** Essentially, the answer is yes. When we get into some of the data sources, I can describe in a little more detail.

**Q.** Okay.

**A.** There can be disputes over payments like this. That's why we're here. But the resolution of those is -- are typically included in the data.

But at a very high level, they are willing buyer, willing seller, which can take different forms, by the way.

So one aspect of willing buyer, willing seller might be, as a private payor, I'm negotiating a particular contract with a particular hospital. But that's not the only kind of willing buyer, willing seller.

You can also have a situation like Medicare, for instance, or Medicaid, where the hospital chooses to participate or not. So there's a voluntary willing buyer aspect of that, willing seller in that case.

The hospital doesn't go to Washington, D.C., and say I'm going to sit down with the Medicare person and negotiate my

1    particular hospital rates.  That's a -- it's a rate that's set

2    by Medicare.  You know what that rate is and you choose to

3    participate or not.

4        So that's a common thing.  You think about going to a

5    restaurant, you typically don't negotiate the price of a salad.

6    There's a price there.  If you like it, you say, I'm a willing

7    buyer, I'll pay that price for it.  If you don't, you don't.

8        But it's not an individual contract negotiation, but it's

9    still a willing buyer-willing seller transaction.

10   **Q.**  So, Mr. Deal, you're described the -- how you built your

11   seller -- sellers, the geographic area.  You've talked about

12   the buyers.

13       Can you tell us a little bit about, generally, the data

14   sources that you used in developing your analysis?

15   **A.**  Yes.  So what's on the screen right now is a little visual

16   I put together to describe some of the sources of data.  And

17   I'll go into these in a little bit more detail.

18       Many of them focus on the private payor market.  For

19   reasons I'll go into, in terms of how I developed my pricing,

20   there's more variation among the private payors, for example.

21   But I do look at each of the different groups; Medicare,

22   Medicaid, and private payors.

23       What I've got at the top of this analysis is focusing --

24   my starting point, I'm an economist, I have -- I think research

25   is very useful out there.  I want to make sure I'm building on

1    what's been studied already.

2        So I'll present a little information on published

3    findings.  So this is -- as you might imagine, this is an area

4    that gets studied, that gets analyzed; the sort of, hey, how

5    much do private payors pay for hospital services?  That's a

6    topic that's of interest.

7        And I'll be presenting a number and discussing a number of

8    published findings that measure that.  It probably won't be a

9    surprise to anybody that, among the different groups, private

10   payors tend to pay the most of those.

11       And this will kind of give a little context for what range

12   are we typically looking at for how much private payors pay

13   relative to other payors, for example.

14       Then I don't just stop there.  I don't just say, I'm just

15   going to take that study's finding.  I actually do my own

16   analysis.  And I'll be presenting that in a moment.

17       And I used three data sources for that, which is what's at

18   the bottom of my slide here.  And all of these things

19   contribute to my reasonable value estimate.

20       So the first one is this state data source called OSHPD.

21   That's an abbreviation.  I'll discuss that in a moment.  But

22   that's basically state-collected data reported by the

23   hospitals, and they report all charges and payments for all

24   payors.

25       So that's a great data source.  I've used that many times.

1    It gets used in research a lot.  It's an outstanding tool for

2    people like me trying to do this analysis.  So I definitely

3    focus on OSHPD, the acronym there.

4        And that both provides data on private payors, it also

5    provides data on Medicaid, and it can also be used to calibrate

6    a sense of just high how billed charges are.

7        And billed charges are not the relevant analysis here,

8    payments are, but it does have relevance if one thinks about

9    what percentage of billed charges are, things like that.

10       So I look at the OSHPD data.

11       The second data source on the bottom are what I call

12   Blue Shield data.  So what -- here what I'm looking at is I'm

13   looking at what does Blue Shield pay the other comparable

14   hospitals, the other sellers in the region.

15       Again, this is obviously not useful for Medicaid, but

16   these are private payments by Blue Shield.  So these are

17   willing buyer-willing seller transactions.

18       And I specifically look at the particular types of

19   inpatients that are at issue here and the particular levels of

20   emergency care that have been provided.  So I'm matching the

21   specific types of services and saying what does Blue Shield pay

22   others in the region for this.

23       And, again, I'm kind of cross-checking and calibrating

24   these two sources.  I'll talk about each of them.

25       And then I have a third source that is really kind of a

1  reasonableness check on, particularly, Blue Shield data.  It's

2  a source called Optum.  It's a huge national database.  I'll

3  talk about it more in a moment.  And that's specific to

4  outpatient.

5       So I use each of these three sources to do my own analysis

6  of reasonable value for all payors, but specifically the bottom

7  data sources are all used for my private payor analysis.  And

8  OSHPD is also used for my Medicaid analysis.

9  **Q.**   All right.  Let's run through each of these sources that

10  you used.  Let's start with OSHPD.

11       Can you tell us what that acronym stands for?

12  **A.**   Yes.  You can see at the top, it's the Office of Statewide

13  Health Planning and Development Data.  So that's a bit of a

14  mouthful, so OSHPD is what it gets abbreviated to.

15       And as I note in the bullet here, it's really the leader

16  in collecting and disseminating information on California

17  healthcare, what's called the infrastructure, meaning all the

18  hospitals that are out there, other kinds of information.

19       What I care about for my analysis is mostly payment-type

20  data, but it collects information on lots of things; nursing

21  staffing levels, services provided.  It's really a rich trove

22  of data that's reported by every hospital in California.

23       As I say, they collect it, they compile it, they

24  disseminate it, it's publicly available data on hospital

25  financial performance and other things.  What I care about is

1    the financial performance aspects and specifically the payor.

2         And, again, it's submitted by the hospitals, including

3    NorthBay.  I'll show you NorthBay's data as part of that as

4    well.

5         The bottom left box, I talk about the relevant payor types

6    that I use.  And these really map to what I was just describing

7    a moment ago.

8         So Medicare -- and I've noted in parens -- and this is

9    getting a little bit into the data weeds, but as people may be

10   aware, there's sort of often a couple of flavors, if you will,

11   of each type of insurance.

12        So there's traditional Medicare, where you can kind of go

13   anywhere and it pays a standard rate.  There's also managed

14   care, Medicare Advantage-like plans.  So you can say, I want

15   Kaiser Medicare, for instance, or some other Medicare plan.

16        That might have a more limited network, for instance,

17   there.  And what I do is look at both of those.  And Medicare

18   Advantage is becoming a larger part of Medicare as well, but it

19   has those two components and they're reported separately.

20        Medicaid, similar.  Medicaid, there's traditional

21   Medicaid, where each hospital can accept -- if they accept

22   Medicaid, the patient can go to any hospital.  There's also

23   managed care Medicaid.  So I look at both elements of that.

24        And then, similarly, there's what's called third party,

25   which is really the private pay group.  And, again, there's

1    standard traditional and managed care-type plans there.  And

2    that's private insurance companies.  That's the significant

3    majority of this category.

4         And, again, this is reported as a group to Medicaid.  So

5    they don't report each payor individually.  They report as a

6    group to the state.

7         It also includes self-insured companies.  So you've got

8    your private insurance, you've got your self-insured companies.

9         You've also got your private individual coverage.  So if

10   you go to a broker and say, I want to buy insurance for me or

11   just my family, that would also be in there.  So it's all forms

12   of private insurance.

13        And then at the bottom, I've noted there's a small amount

14   of other types of programs that are in this OSHPD data.  Again,

15   this is the way it's reported.  Those would include CHAMPUS, or

16   TRICARE, it's sometimes called, for military and dependents.

17   People may be aware of that.

18        There's also workers' compensation that's reported in this

19   category, and a few other small government programs.

20        In total, those represent less than -- for instance, I

21   looked at NorthBay, less than 4 percent of this entire

22   category.  So there are a few other things.  They're not

23   particularly large, and they're reported consistently by

24   everybody.  But that's just the way that data is reported.

25   Q.   Got it.

1    Now, we know that healthcare payments are sometimes

2  disputed.  Sometimes a plan will pay a certain amount and, like

3  in this case, there's a dispute by the hospital.

4    Does OSHPD -- does the OSHPD data include payments

5  relating to those disputes?

6  **A.**    It does.  So OSHPD is certainly aware of that aspect of

7  health care.  And that can be disputes of various sorts.  It

8  could be an arbitration, it could be a court case like this,

9  other kinds of situations there.

10    Without reading all the details, this is a document

11  from -- from OSHPD that talks about accounting and reporting

12  the data.

13    The essence of this is that if there is some type of a

14  resolution, whether it might be a verdict or a settlement or

15  whatever it is, that's to be included in the payment data.

16    So the idea is to capture all the payments.  Even in

17  disputes, you want to include the ultimate resolution of those

18  disputes in the data.  So OSHPD is trying to capture that in

19  the overall data.

20  **Q.**    And what is the significance of the fact that OSHPD

21  captures additional payments that are made by payors after a

22  hospital has disputed the claims?

23  **A.**    Again, what we're trying to identify here is the going

24  rate for the services, the kind of accepted amount.

25    Now, obviously, if there's a dispute, there might be an

1    initial, I don't accept that, I think I should get paid more

2    or, I guess, less, potentially, but typically it's more that

3    they'll want.  And there's ultimately a resolution of that.

4        That doesn't necessarily mean everyone is happy with the

5    resolution, of course.  You know, there's -- I would be happier

6    if I paid less for a salad, but I pay for it.  And if I were to

7    sue somebody over a situation and there's a resolution, that is

8    the resolution.

9        So that is sort of an accepted -- imposed accepted but

10   accepted ultimately part of that, so I want to include that in

11   my overall payments so I'm not undercounting the payments for

12   instance.

13       So if they say, well, I initially paid $10,000, but

14   ultimately I had to pay 3,000 more, the idea is report the

15   extra 3,000, as well, in there.  So that's the final payment

16   amount.

17   Q.   And that's -- that final payment amount, is that what's

18   captured by the OSHPD database?

19   A.   That's right.  So whenever there's a resolution, they

20   include that in the aggregate data.

21   Q.   Okay.  Now, it's also the case that sometimes when payors

22   are paying, they might -- is it the case that a payor may not

23   pay a portion of the bill because they view a service as not

24   being covered?

25   A.   Sure.  So one can imagine a situation where, you know, a

1   payor, whether it's -- different kinds of payors can do this,

2   certainly, where they might say, well, I'm not paying for that,

3   a private room or something like that.

4       So that would be part of the -- the actual payment for the

5   claim would be part of the overall payment data.  The disputed

6   part would be part of the charges.

7   **Q.**   Okay.  And to the extent that the OSHPD data, that a plan

8   or payor may have paid less due to -- for coverage reasons, did

9   that give you concern in using the OSHPD data at all?

10  **A.**   Certainly didn't give me any concern.  It's sort of a

11  factor that's out there.  I've been doing this a very long time

12  in many, many different settings.  Those denials are -- what we

13  call a denial.

14      So that would be a sort of, hey, we're not paying for that

15  service, or that claim is not legitimate, we're not going to

16  pay that claim.  That's, in my experience, a very small

17  percentage.  Typically, under 5 percent of the total charges

18  fall into that type of a category.  So it's not material in an

19  overall sense.

20      It's also the case that, as I'll describe in a moment,

21  when I'm using OSHPD I'm also looking at -- I'm comparing

22  relative payors.  So I'm doing it as a multiple of Medicare.

23  That's really my analysis.

24      And to the extent there are a effectively denial-type

25  information in both private payors and Medicare, that's going

1    to essentially cancel itself out.  So there's a logical aspect

2    of it, and it's just quantitatively not particularly

3    significant.

4    **Q.**   Okay.  It might be helpful if we draw that point out a

5    little bit more just so that we all understand what you're

6    talking about.  I'm just going to get a piece of paper here.

7    I'll be right back.

8    **A.**   Okay.

9    **Q.**   And we'll get into this in a few minutes, but you talked

10   about the fact that you compare -- you're comparing these OSHPD

11   amounts to, I think you said, to Medicare?

12   **A.**   Yes.  So I use OSHPD data both on private payments and on

13   Medicare, for instance.

14   **Q.**   And so I think you testified that in some cases you said a

15   payor might pay less because of a denial; is that correct?

16   **A.**   Yeah.  They're going to pay what they're going to pay for

17   that particular claim, but if one thinks about relative to

18   charges --

19   **Q.**   Sure.

20   **A.**   -- so if the charge was $50,000 for a case and the payment

21   is $10,000 on the case, part of that differential -- a very

22   small part, but part of that might be, well, we're not going to

23   pay for the private room, and that was 5,000 of the $50,000.

24        So there's a little bit of, we're just not going to pay

25   for that.  The rest of it is, what rate are we going to pay for

1    the remainder?  So we're talking about that small slice of what

2    we call a denial --

3    **Q.**  Okay.

4    **A.**  -- there.  But the important fact, which you're sort of, I

5    think, drawing up there, is I'm comparing the payment as a

6    percent of charges in each case, the private payor and the

7    Medicare, because what I want to do is I want to get a multiple

8    of Medicare.  And Medicare doesn't pay as a percent of charges,

9    they pay on typically a per-case-type basis.  So they've

10   effectively got the equivalent of these denials in there as

11   well.

12       So they're just saying you can charge for a private room,

13   but we're not going to pay for it, we're just going to pay for

14   that.  So you've basically got -- in both cases they may charge

15   $50,000, Medicare is going to pay what it's going to pay.  The

16   private payor will pay what it's going to pay, a combination of

17   some denials and some rate, mostly the rate.  The denial is a

18   small part of that.

19       But in both cases, ultimately, I'm looking at payment to

20   payment on that.  And that's what I'm analyzing is, what do

21   private payors pay as a multiple of Medicare?

22       And it is a multiple of Medicare.  I'll describe that in

23   more detail.  Private payors do pay more than Medicare,

24   typically.

25   **Q.**  And is your point that there would be denials --

1          MR. TOOCH:  Objection.  Leading.

2          THE COURT:  Overruled.  Ask the question.

3          MR. PIMSTONE:  All right.  I gave Mr. Tooch slightly

4    more latitude in his examination.

5          Your Honor, thank you.

6    BY MR. PIMSTONE:

7    Q.   In discussing the fact that there are denials in both

8    sets, I think you noted that when you're comparing one to the

9    other, that there would be denials in both sets.

10         And can you explain one more time, does that -- what

11   effect that has on your analysis?

12   A.   So that basically, in some sense, means that those denials

13   are -- they essentially cancel out from an algebraic

14   perspective on that.

15         The denials are not typically as explicit in Medicare

16   because they're paying a set amount regardless of what you

17   charge, but it's the same concept across payors.

18   Q.   Okay.

19   A.   So bottom line is they effectively cancel out.

20         So this is really -- it's very small to begin with, but

21   it's present in both so they sort of cancel out.

22   Q.   Okay.  And the OSHPD data, sort of the availability of the

23   OSHPD data, how does that compare to the data that's available

24   when you are doing geographic regional comparisons in other

25   industries nonhealthcare?

1   **A.**   Mostly I wish I had data like OSHPD. It's really

2   excellent data to determine relative pricing across different

3   hospitals or across regions, things like that.

4       It would be the equivalent of if I was doing a survey of,

5   you know, tires and there was some government entity that

6   required all tire sellers to report in, you know, the aggregate

7   price of all their tires out there. And if I need to determine

8   the market rate for prices for tires, I could use that data

9   source out there.

10       It's very rare to find that kind of data, so it's

11   really -- it's not perfect, of course. No data source is

12   perfect. But it's very, very good. And it's widely used by

13   researchers.

14       I've used it in many situations for years. Researchers

15   use it all the time. It's really excellent data because each

16   hospital is reporting all of their payments and all of their

17   charges by payment categories. So it's exactly the right kind

18   of data to use.

19   **Q.**   And if one is doing a -- if one is doing a regional

20   analysis of the going rate in a geographic area, is there

21   really any other practical way to be able to compare what

22   hospitals are being paid in the geographic area other than

23   using OSHPD?

24       I mean --

25   **A.**   No is the answer to the question, I think, in the sense

1    that, if one were theoretically -- there was no OSHPD, and I

2    was sort of omniscient, how would I do it?  I would say I need

3    to get actual payment data from all of the regional hospitals

4    in my -- in my group and the hospital at issue, and I need to

5    be able to combine that all together.

6         So you would effectively have to subpoena, I guess, all

7    the other hospitals to get all of their payment data for all of

8    their payors.  And that's just not a practical situation.

9         And, thankfully, it's not necessary because OSHPD has

10   essentially done that for me in an aggregate sense, and they've

11   reported it all.  And that's what I need is the aggregate data.

12        So I don't know what one would do -- I have been involved

13   in cases in other industries where essentially that's what

14   we've had to try to do.  It's really expensive and really

15   time-consuming, and you typically don't get nearly as good a

16   data as you would get here because there are people who object

17   and people who never turn in the data, things like that.

18        You do the best you can, but, again, thankfully, we don't

19   have to do that here because it's already been reported in.

20   Q.   Have you found one way or the other as to whether

21   hospitals would have claimed proprietary information in

22   connection with their data or their contracts?

23   A.   Oh, sure.  The hospitals and payors often -- I mean,

24   they -- they all view their -- their relationships among each

25   other as being very proprietary.

1    So you certainly couldn't -- in my experience, you

2    couldn't just say, hey, voluntarily, I'm real interested in

3    getting your payment data because we're having a dispute over

4    here, would you mind sending me in all your payment data?

5    In my experience, that would never happen.  And they would

6    often object very strongly because the data on their negotiated

7    rates with different payors are proprietary and both parties

8    would typically object, in my experience.

9    **Q.**   Okay.  Let's move past OSHPD and let's look at your other

10   data source.  And I think you said that you also looked at

11   Blue Shield claims data for the region?

12   **A.**   That's right.  So -- and that's what's up on the screen

13   now.

14   So, again, all the other hospitals in the region,

15   including Kaiser, so all the other ones in my analysis are part

16   of Blue Shield's network.  Blue Shield has a very broad

17   network, so all the other hospitals, except for the Kaiser

18   hospitals, are part of that network.

19   So Blue Shield has received claims from all of those

20   hospitals and has processed and paid those claims.  And what we

21   focus on is what's called the allowed amount, which is the

22   total amount the hospital will receive for the claim.

23   There may be some patient cost sharing in there.  We don't

24   count whether or not the patient pays their part.  We see --

25   the allowed amount is the focus of what they should be paid in

1    total on that.

2        And even though Kaiser is not in the network, Blue Shield

3    certainly receives claims from people who go to Kaiser

4    emergency room, and pays those claims.

5        So I've got all that data from the other hospitals, and

6    they process those claims using, again, a consistent approach

7    in terms of the denial-type issues, things we talked about

8    there.  So that's not an issue with the Blue Shield data

9    because it's consistent.

10       And, ultimately, what I receive from Blue Shield, which I

11   have put on the bottom of this, is I have data from 2016 to

12   2018, both inpatients and outpatients, 43,000 total claims.

13       Remember there was about 1600 claims at issue here, so I

14   have a comparison set of 43,000 claims that I'm using to

15   identify the equivalent regional price.

16       So what is it that Blue Shield would pay for the same

17   service in the region there and the same set of comparable

18   hospitals.  And, as I discussed -- and, again, I'm doing it for

19   both NorthBay and VacaValley.

20       So here I'm using the Blue Shield data as another data

21   source to look at, for private payors, how is this priced.

22       I also use this data to develop what's called the multiple

23   of Medicare, again.  So I've separately priced every one of

24   these claims as if Medicare paid it, so I know, for these 1600

25   claims, Medicare would pay X dollars.

1    I use the Blue Shield data and I say, well, Blue Shield

2    would pay more than X.  And I'll be presenting that in a moment

3    what I actually find on that.  But that's the analysis, is I

4    look at what Blue Shield would have paid and then I compare

5    that to what Medicare would have paid, and that's my -- that's

6    my measurement, if you will.

7    **Q.**   All right.  So source number one, you testified to, was

8    the OSHPD?

9    **A.**   Correct.

10   **Q.**   Okay.  And the OSHPD data reflected what the hospitals in

11   the geographic region were selling the services as

12   self-reported?

13   **A.**   Correct.

14   **Q.**   Okay.  And then your second source was Blue Shield, which

15   is to look at those same hospitals in the geographic region to

16   see what they were accepting from Blue Shield?

17   **A.**   Correct, yes.

18   **Q.**   Okay.

19   **A.**   And, again, there, unlike my earlier discussion, because

20   Blue Shield is a party to this litigation, I was able to get

21   that data.  But I -- my experience is you wouldn't be able to

22   get that data for all the other payors for all the other

23   hospitals.

24   **Q.**   All right.  And then did you look at any other sources in

25   determining what hospitals in the geographic area were

1   receiving for these services?

2   **A.**    I did.  Really, this is essentially a reasonableness

3   check, which I'll describe in a few moments.  I don't use this

4   in my final calculations, mostly because it shows that the

5   Blue Shield data, in particular, and really the OSHPD as well,

6   are essentially at even higher levels.

7       So I just want to confirm that Blue Shield wasn't

8   particularly low, for example, in my analysis of it.  And it's

9   not -- the data source is called Optum, which is a very large

10  healthcare company out there.

11      And, ultimately, this data that I'm using is reported by

12  self-insured companies, many of the Fortune 500 companies' data

13  from 1999 to the present.  I use it for the relevant time

14  period here.

15      It's got hundreds of millions of claims in it, so it's

16  very useful data.  It's as close as you can get, in my

17  experience, in the private data market to what we were

18  describing earlier as the kind of perfect data set if you were

19  omniscient or could have perfect subpoena powers, because it

20  disguises the individual hospitals and payors because of

21  proprietary information.

22      But you're able to look by county, for instance, and by

23  particular service.  So I can look and say, well, these

24  services were provided.  What were people charging and what

25  were they getting paid here?

1    So the nice thing is I've got the payment data in here as

2    well from all of these large self-insured plans.  So this data

3    gets used -- I've used it many, many times.  It's used for all

4    kinds of research out there as well.  And I've got complete

5    medical and pharmaceutical claims.  Pharmaceutical sometimes is

6    a particular focus of research.  And Optum is widely used.

7    What I specifically focus on here is Solano County and the

8    surrounding counties; Contra Costa, Napa, Sacramento, Yolo.  As

9    I said, it doesn't give you the individual hospitals.  So my

10   comparable analysis, I've set my set of eight, set of nine

11   hospitals.  Here, I'm not able to do it because I don't have

12   hospital-specific data.

13   It's all data associated with hospital claims, but, again,

14   because of the proprietary nature.  So it's a slightly broader

15   geographic area, but of course it's capturing all these

16   hospitals, including NorthBay --

17   **Q.**   Okay.

18   **A.**   -- in that data.  And, again, I use it as a cross-check.

19   **Q.**   So, Mr. Deal, I'm now moving to what you found in your

20   analysis.  Let's start off with something, actually, I didn't

21   write down, which is, I think the first thing you said was you

22   looked at published studies?

23   **A.**   Correct.

24   **Q.**   Can you describe at a high level the published studies you

25   reviewed and how you used them?

1   **A.**   Yes.   So this is, again, back to my overview here, just to

2   note that we're going to be talking for a moment about the

3   published findings.

4        What I flip to on the screen is sort of my one-page

5   summary of the published findings that are particularly

6   relevant for this analysis here.

7        And, again, what I'm looking for here is to sort of ground

8   my analysis, start my analysis, with what is it that others

9   have found who have researched these questions?   This is not a

10  new question.

11       And, in particular, the question is:   What do private

12  payors pay relative to what Medicare pays?

13       So each of these rows, if you will, on my chart is a

14  different source of published data on that.   One of the

15  interesting ones is the first one that I note, which was a

16  study, it was produced in 2010.

17       They studied a number of markets around the United States.

18  This has been an ongoing study, actually.   And they looked

19  separately -- and this was very useful for my analysis.   They

20  looked separately at inpatient services and outpatient

21  services.

22       And the reason that's important is because, again, the mix

23  that we have here is about 50 percent inpatient and 50 percent

24  outpatient.   That's a little different from the overall mix for

25  hospitals.

1    So, for instance, in OSHPD I need to make a little

2  adjustment for that because I don't have -- I have that payment

3  data but together, inpatient and outpatient.  The studies look

4  at it separately.

5    So you can see the columns I've identified here are

6  inpatient, outpatient, and then in the right-hand side is this

7  what I call 50/50 blend.  So that's what I'm doing, I'm sort of

8  matching that to the claims at issue here.

9    So that's really the relevant multiplier.

10  **Q.**    I'm sorry, can you just elaborate on that point?

11  **A.**    Yeah.

12  **Q.**    Can you explain again to the jury why you did the 50/50

13  blend?

14  **A.**    I will.  Let me take you through that first row, and I

15  think that will help on this.

16    So what the study found is that, for inpatients, private

17  payors typically paid 2.1 times.  Now, that will be somewhat

18  interchangeable.  I'll sometimes say 210 percent.  That's the

19  same as 2.1 times as Medicare.  That's sort of interchangeable.

20    So if Medicare paid a thousand dollars for an inpatient,

21  that would be very low for an inpatient, of course.  So

22  $10,000.  And a private payor would pay -- if it's 10,000, they

23  would pay $21,000, so 210 percent or 2.1 times that.  So that's

24  for my inpatient bucket.  That's my ratio.

25    For outpatient, what you see here and what you'll see in a

1    few moments, is they typically pay a higher multiple of

2    outpatient services.  So those would be the outpatient

3    emergency claims or other outpatient services, physical

4    therapy, things like that.

5        And here, what this study found -- and this is specific to

6    the San Francisco area -- and like many things in the Bay Area,

7    San Francisco tends to be on the high side of national data.

8        So if your only criteria were finding the lowest cost

9    healthcare, you probably wouldn't live in San Francisco.

10   That's true for lots of things.  They find, for outpatient, it

11   would be 3.6 times or 3.7 times, or 366 percent.  So, again,

12   those are -- those percentages and multiples are equivalent

13   there.

14       So what I do is I say, well, the claims here are half

15   inpatient and half outpatient.  So, essentially, what I'm doing

16   is I'm taking the average of the inpatient and the outpatient,

17   and I'm weighting them equally.  And that's where I get my

18   288 percent.

19       So the bottom line for this particular study was private

20   payors would typically pay 2.9 times Medicare, 2.88 times

21   Medicare more precisely, for the equivalent services.  So that

22   was that study:  2.8, 2.9 times.

23       Then I've got a number of other published findings.  The

24   next one I note is a 2014 -- and this is not so much a study as

25   part of the filings of -- from the Department of Insurance,

1   where carriers would identify -- interestingly, not always

2   consistently, but in some cases they identify how much is our

3   payment relative to Medicare.

4        And so this was a filing in 2014 that said inpatient was

5   2.58 times, or 258 percent.  So a little higher than the

6   Ginsberg study, the first one, but in that same kind of

7   ballpark.

8        And really quite a similar number for outpatient.  They

9   found 357 percent, or 3.7 times Medicare.  Again, the blend of

10  those is a little higher.  It's about 3.2 times Medicare.  So

11  the first study, 2.9.  Second published finding, 3.2.

12       Third study was a more general study in the U.S., a 2015

13  analysis here.  So this is not as specific to the Bay Area, but

14  again more of a national study.  But, again, fairly similar

15  findings, a little lower.  Again, as I say, San Francisco tends

16  to be a little bit higher on some of these things.  Again, like

17  lots of things.

18       Inpatient, they found 1.87 times Medicare, 187 percent of

19  Medicare.  So each of these studies is finding either a little

20  bit less than two times Medicare or somewhat more than two

21  times Medicare.  So you can think of it kind of in that range.

22       And on an outpatient basis, again, a fairly similar

23  finding there of 3 to 4 times Medicare.  307 percent to

24  377 percent, so on a blended basis about 2.7 times Medicare.

25       Just to wrap up the studies and then summarize again,

1    there was also a study in 2015 that was specifically looking at

2    inpatients.  And in the U.S. they found 170 percent, or 1.7

3    times Medicare.

4        Other studies that were specifically not looking at

5    California, the bottom ones, again, it was a set of markets

6    across the U.S., but not Medicare -- excuse me, not California,

7    found 1.25 to 2 times Medicare.

8        So, not surprisingly, you're going to find some variation

9    whether you're looking across the country, in just Northern

10   California, you know, the specific time period.  But at a high

11   level, you're finding these inpatient multiples that are,

12   again, kind of just under 2 to just under 3 kind of a range.

13   And similarly for outpatients, we're finding a 3 to 4 times

14   Medicare.

15       So if you blend that together in the right-hand side --

16   and some of the studies I don't have an equivalent outpatient

17   number, so I've only been able to do it for the first three

18   there -- again, you find a 2.7 to 3.2 times Medicare.  Again,

19   expressed as a percentage, 265 percent to 317 percent.

20       So the importance of this is I think it provides kind of a

21   framing of when I then look at private payments in my own

22   analysis, are they reasonably consistent with what other

23   researchers and published sources have found?  Previewing that,

24   the answer is yes.

25       But I think it's important to understand -- and just to

1  put a little perspective on, are we even talking about the

2  right range of numbers here?  And, in particular, I've got some

3  comments on Mr. Heil's analysis, which I don't think is in the

4  right range even, but we'll get to that.

5      But this is where I start, is with the published findings.

6  Q.  And just looking ahead, I know you're going to discuss

7  Mr. Heil's opinion in a while, but looking ahead, as we look at

8  these published studies, what is Mr. Heil's opinion in this

9  case for reasonable value?

10     If you were to convert that to a percentage of Medicare --

11 A.  Yeah.

12 Q.  -- what is he saying the reasonable value is of the

13 services here?

14 A.  Yeah, and I'm now showing that on the same screen, just I

15 put his number on the bottom just to give a little perspective.

16 He's saying it's 1,310, or 13 times Medicare.

17     So, again, just without even getting into the specifics of

18 his opinion, which I will, he's just many multiples away from

19 what any of the research shows what private payors pay, not

20 even to mention all payors, which I'll analyze separately.

21     So that's just a little bit of an initial, just are we

22 even talking about the right kind of range of numbers.  And I

23 certainly don't think that's true for Mr. Heil.

24 Q.  And I think Mr. Heil didn't testify in terms of multiple

25 of Medicare.  He testified that he believed reasonable value

1    was 88 percent of NorthBay's billed charges.  Is that the same

2    thing?

3         Does that translate to 1,310 percent of Medicare?

4    **A.**    That's correct.  For the particular claims at issue, that

5    translates into 13 times Medicare.  So the reason for that is

6    NorthBay's charges are extremely high, so 88 percent of an

7    extremely high number turns out to be many, many multiples of

8    Medicare here.

9         And, conversely, a 2 or 3 times Medicare is going to be a

10   relatively small percentage of NorthBay's charges because

11   NorthBay's charges are really so high, which we'll describe in

12   a few minutes.  And billed charges isn't the right unit of

13   analysis here.

14   **Q.**    Okay.  All right.  So is that all you have to say on the

15   published studies?

16   **A.**    Yes.

17   **Q.**    Okay.  Let's move on to the next aspect of your research.

18   **A.**    Okay.  And this is where I start specifically looking at

19   my own analysis of private payors.

20   **Q.**    Okay.

21   **A.**    So, just to preview, again, I'll spend some time on

22   private payors.  I'll talk about Medi-Cal.  Medicare, I

23   separately priced those.  It's, of course, one times Medicare.

24   It's its own thing.  So the focus of my analysis is going to be

25   on multiples of Medicare using these different sources.

1  **Q.**   Just to orient the jury, you talked earlier about there

2  being different payor categories.

3  **A.**   Correct.

4  **Q.**   You talked about private payors, you talked about

5  Medi-Cal, and you talked about Medicare.

6  **A.**   Correct.

7  **Q.**   Are you turning now to your study of -- not the published

8  studies but the -- your other study as to what the private

9  payor segment of the market pays in the geographic area as

10  compared to Medicare?

11  **A.**   That's correct.  So, you know, I guess, in theory, you

12  could just stop with the published studies and say that gives

13  me a good sense of the range.  And I think that's useful, but I

14  haven't done that.

15       I've actually done my own calculations.  And that's what

16  I'm going to be talking about now, is my own, which I find

17  actually slightly higher numbers even than the published

18  studies.

19  **Q.**   Let's start -- before you show us, Mr. Deal, your

20  analysis, because you are talking today a lot about a multiple

21  of Medicare, I think that has come across clearly, but let's

22  dig a little bit more deeply into that because I do want

23  everyone to understand exactly what you mean when you keep

24  talking about a multiple of Medicare.

25  **A.**   Sure.  So I've got a little graphic to maybe illustrate

1    that point here.

2         What this graphic shows is, on the left-hand side, a

3    Medicare payment that's a thousand dollars.  And Medicare pays

4    a consistent amount across hospitals, kind of regardless of

5    what you pay for similar hospitals.

6         Certain kinds of hospitals, teaching hospitals, things

7    like that might get a little bit more, but the hospitals at

8    issue here are going to get a very similar amount for the same

9    service.  So this is just a hypothetical situation where they

10   paid a thousand dollars.

11   Q.   When you say paid a thousand dollars, that Medicare would

12   pay a thousand dollars for a particular service?

13   A.   Medicare would pay a thousand dollars for a particular

14   service.

15   Q.   All right.

16   A.   What I'm illustrating here, imagine two other hospitals on

17   the right-hand side that actually get paid the same amount by a

18   private payor so the Bruce Deal Insurance Company, for

19   instance, says we're going to pay $2,000 to hospital 1 and

20   we're going to pay $2,000 to hospital 2.

21        So the way to think about that relative to what we've been

22   saying is, well, I'm paying $2,000, Medicare would pay a

23   thousand dollars, I'm paying 2 times Medicare, or 200 percent

24   of Medicare.

25        Equivalent concepts there.  And that's what I've noted on

1    each of these bars.

2         So you'd say, oh, those two hospitals are very similarly

3    situated.  They're both getting paid $2,000 for the same

4    service.

5    **Q.**  So if you know what the Medicare payment is and you know

6    what the private payor is paying at different hospitals, you

7    can compare payments at different hospitals by looking at the

8    multiple of Medicare standard?

9    **A.**  That's right.  And I'll describe in a moment why I think

10   that's a much more sensible way of thinking about relative

11   payments.

12   **Q.**  Okay.

13   **A.**  But that's exactly right.  If you know the payments from

14   both private and Medicare, either through the OSHPD data or

15   Blue Shield data or the other sources, I can compute that as a

16   multiple of Medicare.

17        So what's interesting then from a billed charges

18   perspective, so this is essentially why -- why is a multiple of

19   Medicare the right way to think about this, and the most

20   straightforward way?  Because there really are essentially no

21   limits on hospitals, no effective limits on hospitals as to

22   what they set their billed charges level to.

23        In almost all cases hospitals get nowhere close to their

24   full billed charges.  And if you've ever gotten a bill from

25   your insurance company, it will often show you, well, the

1   charges were, you know, $50,000 for this maybe fairly minor

2   procedure sometimes, and the allowed amount is 10,000 or

3   15,000.  It's that billed charges which the hospital can

4   essentially set at any level they want.

5       So what I'm showing here is what -- what that means from a

6   billed charges perspective and why you can't compare across

7   hospitals as a percent of charges, because both these hospitals

8   are getting paid the same $2,000.

9       But imagine hospital 1, for that same service, sent you a

10  bill for $5,000.  So your payment level there would be

11  40 percent of charges; right?  $2,000 payment, $5,000 charge.

12  So you'd say, oh, okay, that's a big differential, but it's

13  40 percent of charges.

14      Hospital 2 that has, for whatever reason, decided to set

15  its charges even higher.  So here they're going, in this

16  example, $10,000, so twice the level of the others.  Well, that

17  looks like that's only 20 percent of charges.

18      So if you were to just focus on billed charges, you would

19  say, oh, that second hospital is getting paid much less, it's

20  only getting 20 percent of its charges, when, in fact, it's

21  getting paid exactly the same.

22      So this whole concept of billed charges isn't the right

23  way to do analysis like this across hospitals because, again,

24  it's really artificial and hospitals don't get paid billed

25  charges.

1    I mean, occasionally, sure, but in terms of an aggregate,

2    it's typically nowhere close to billed charges.  So this is

3    just an illustration of why one has to be very wary of billed

4    charges.

5         And, similarly, you can end up in a situation like

6    hospital 2 where you'd say, oh, 20 percent of charges or maybe

7    even lower, that looks like nothing, they must be really

8    underpaying that hospital.  No.  They're getting paid twice

9    Medicare, it's just that their charges are so high that it

10   appears to be a small percentage.  But that's, again, not the

11   way to think about it.

12        So that's an illustration of why I do my -- excuse me, why

13   I do my analysis on a multiple of Medicare basis.

14   **Q.**  So with this multiple of Medicare standard in mind, that's

15   going to sort of be the lingo that you talk about today in

16   terms of multiple of Medicare?

17   **A.**  That's the framework, yes.

18   **Q.**  All right.  So with this in mind, what, Mr. Deal, did you

19   find using the OSHPD data for how much private payors --

20   because now we're focusing on the private segment of the payor

21   market for the time being, what did you find for how much

22   private payors pay comparable hospitals in the geographic

23   region?

24   **A.**  Right.  So, as I noted a moment ago from my published

25   findings, I typically found kind of 2 to 3 times Medicare on

1    this blended basis.

2         With OSHPD data, this is total hospital, so this is before

3    I make any adjustments for the inpatient/outpatient mix.  But I

4    basically find that each bar represents an individual hospital.

5         They're a little hard to read on the bottom.  It's not

6    critical to look at any particular hospital.  But this is the

7    multiple of Medicare.  So you can see at the low end 2.1 times

8    Medicare for private payments.  At the high end, John Muir

9    Walnut Creek's 3.9.  But you see an awful lot of them in that

10   similar zone of 2 to 3 times Medicare.

11        And if you do an average across those, kind of a weighted

12   average based on the data, it would be 2.8 times Medicare.

13   **Q.**    And just to be clear, in this particular slide are you

14   including NorthBay?

15   **A.**    Not in this particular slide.

16   **Q.**    All right.

17   **A.**    So I'm starting with kind of a let's look at all the other

18   comparable hospitals.  I'm about to add NorthBay in a moment.

19   I'll show you, because I do include NorthBay in my overall

20   analysis.

21        But I want to get a sense first, before I do that, what is

22   it that we see in the region?  What's the geographic area?

23   What's the going rate for private payors in the region?

24        And, again, 2 to 3 times Medicare is sort of the range;

25   2.8 in particular.  So that's my first finding using the OSHPD

1    data.

2        And then do I add NorthBay, and that's on the second slide

3    here.  And what's interesting, you can just visually see it

4    that NorthBay is quite a bit higher than others.  So they're

5    actually at 5 times Medicare for their all-in private-payor

6    multiple of Medicare, which brings up the average.

7        They're not a huge part of the total because they're one

8    among the various payors, but it brings it up from 2.8 to 3

9    times Medicare.

10       So I observed two things.  One is that, for the overall

11   region, 3 times Medicare.  Again, that's before I make any

12   adjustment for the inpatient/outpatient mix.  I later do that,

13   and that number goes up a bit.  But just looking at the total

14   hospital, it's 3 times Medicare.

15       But that's really -- part of that is driven by the fact

16   that NorthBay itself is actually getting 5 times Medicare from

17   the overall private payor market.

18           **MR. PIMSTONE:**  Okay.  Thank you.

19           **THE COURT:**  Is this a good time for a break?

20           **MR. PIMSTONE:**  It is, Your Honor.  Thank you.

21           **THE COURT:**  Ladies and gentlemen, we'll take a break

22   for 15 minutes.  Please remember the admonitions.

23       (Jury out at 9:32 a.m.)

24           **THE COURT:**  Mr. Pimstone.

25           **MR. PIMSTONE:**  Yes, sir.

1    **THE COURT:**  You are entitled to be as frustrated as

2   you want to be at any time with any ruling that I make.  You

3   are not entitled, at any time, to make any comments.

4    **MR. PIMSTONE:**  I understand.

5    **THE COURT:**  That was --

6    **MR. PIMSTONE:**  I understand.

7    **THE COURT:**  -- as unprofessional as I've seen in my

8   courtroom.

9    (Recess taken at 9:33 a.m.)

10    (Proceedings resumed at 9:49 a.m.)

11    **THE COURT:**  Please be seated, everybody.

12   Mr. Pimstone, go ahead.

13    **MR. PIMSTONE:**  Thank you, Your Honor.

14  BY MR. PIMSTONE:

15  **Q.**  So, Mr. Deal, I think when we left off we were discussing

16  your conclusions about what you found with respect to the

17  market rate in the geographic area relating to the OSHPD data?

18  **A.**  That's correct.

19  **Q.**  Thank you.

20   And so can you briefly just orient the jury again as to,

21  once you added NorthBay into the mix, what -- what did you

22  find?

23   How did that affect the data as it related to the

24  geographic area?

25  **A.**  So, as you can visually see with the bar on the left,

1    NorthBay is higher than the other geographic hospitals that I

2    review in the area.

3        So the average of all the pink bars is the dark red bar,

4    which would be 2.8 times Medicare.  Because NorthBay is 5 times

5    Medicare, so nearly twice as high as some of the others, that

6    brings the overall average, when you include them, to 3.0 times

7    Medicare.

8    Q.   So here, just to be clear, you had discussed before the

9    fact that NorthBay, you believe, has high charges.  Your

10   analysis here is not focused on charges, your analysis here is

11   focused on -- is your analysis focused on what all of these

12   various hospitals were getting in the market from private

13   payors?

14   A.   That's correct.  So NorthBay is getting paid more than

15   other hospitals, well below charges, but more than other

16   hospitals.

17   Q.   Okay.  And we'll get to that in a little bit as to your

18   observation about that market.

19       But can you again tell the jury, what was your object,

20   what was your goal in doing this particular analysis and coming

21   up with the 3 times Medicare final number?

22   A.   Yeah.  So as we said, as I said earlier, there are three

23   main payors.  This is the private payor component.  And I'm

24   trying to do -- I think I am doing -- what I understand the

25   jury instructions will be describing, which is to do a regional

1   analysis of prices paid in the geographic area.

2       So I'm looking at including NorthBay, but looking at all

3   the other comparable hospitals, too, and coming up with an

4   overall regional number, the 3.0.

5   **Q.**  And when we talk about regional number, are you talking

6   about the geographic area, as you previously explained it to

7   the jury, the 25-mile radius around NorthBay and the 30-mile

8   radius around the VacaValley Hospital?

9   **A.**  That's correct.  So if you think of that map I was showing

10  earlier, the various hospitals there, and this is looking at

11  all of those hospitals.

12  **Q.**  And sometimes in your testimony you've used the term

13  "geographic area."  Sometimes you've used the term "regional."

14  Do you mean that to be the same thing?

15  **A.**  I do, yeah.  Those are essentially interchangeable terms,

16  and I'm using them to mean the same thing in my analysis of the

17  relevant hospitals to examine.

18  **Q.**  Understood.  And so your conclusion then, in terms of what

19  the most comparable hospitals in the geographic area were

20  actually being paid by the private payor segment of the payor

21  market, your conclusion is that, including NorthBay, that would

22  be -- that the hospitals in the geographic area are being paid

23  3 times Medicare?

24  **A.**  Yes, that's correct.

25      Now, as I'll do in a few moments, that needs to be

1  adjusted a little bit because of the inpatient-outpatient mix.

2  And I take that number up a little bit, but that is my analysis

3  from the OSHPD data, 3 times Medicare is the private payor rate

4  in the geographic area.

5  **Q.**  Now, I want to come back, before we leave OSHPD, your

6  OSHPD study.

7  **A.**  Yes.

8  **Q.**  We talked a little bit a few minutes ago about what OSHPD

9  includes in its data and what it doesn't include.

10  And do you understand that Mr. Heil has made some

11  critiques of the use of OSHPD as a tool to measure rates?

12  **A.**  I do, yes.

13  **Q.**  Okay.  And do you understand that one of Mr. Heil's

14  critiques relates to whether OSHPD includes denials in its data

15  when plans or insurers deny a service as opposed to a rate

16  payment?

17  **A.**  Yes.

18  **Q.**  And I believe you've already testified to that.

19  **A.**  Right.

20  **Q.**  Anything else you want to add to that testimony?

21  **A.**  Uhm, no.  Again, I think, first of all, it's, in my

22  experience, very small.  And there are denials.  Here I'm

23  comparing the Medicare and the private pay.

24  And there's effectively denials in each set, so to the

25  extent it would be an issue, it would only be, first of all,

1    very small to begin with, because this is small, and only if

2    the relative rate of denials was different.  But it's a very

3    small issue.

4    **Q.**   Mr. Heil -- has Mr. Heil also critiqued your use of OSHPD

5    based on whether there are any data entry errors?

6    **A.**   Yes, I understand that to be a critique.

7    **Q.**   And what is your response to that?

8    **A.**   Certainly, data entry errors can occur.  They can

9    certainly go in both directions.  So to the extent one sort of

10   codes in -- leaves off a code, or codes in a code, or codes in

11   the wrong price, there can be those kinds of things.

12         Again, these things happen in any data set, but we're

13   really talking at the very margins of that.  And this is

14   overall data that I wish I had almost in any industry that I

15   analyze.

16   **Q.**   And did Mr. Heil also critique your use of OSHPD data

17   based on whether it only included, sort of, unilateral payments

18   by payors as opposed to accepted amounts?

19   **A.**   Yes.  I think there were a couple of elements to the

20   critique, as I understood it.

21         One, which we've talked about, is it does include

22   settlements of things.  I think there's potentially a related

23   critique of hospitals may not be happy about some of these

24   payment levels and, you know, maybe it's not worth it for them

25   to sue, but they're kind of grumbling.  He doesn't use those

1    terms, but conceptually.

2         And, obviously, payors may not be happy to pay as much as

3    they're paying either, but these are, in fact, the --

4    basically, the final payments that are made.  And hospitals, if

5    they want to dispute it, they certainly can.  And there's

6    mechanisms to do it.  And if there's a resolution, that gets

7    reported.

8    Q.   And that gets added into the OSHPD data?

9    A.   That's correct.

10   Q.   Okay.  I understand there was also a critique as to

11   whether Medicare pays some hospitals more than others.  I think

12   you touched on that already.  Can you just briefly sort of

13   respond to that critique?

14   A.   Yes.  So for very similar hospitals in similar regions,

15   which is what my analysis is, Medicare pays identical or

16   virtually identical amounts.

17        So where you see some differences, I think he cited a

18   difference between UCLA, for instance, and a community

19   hospital, there are some differences.  Like Kaiser Hospital, if

20   Medicare pays for residents -- you see TV shows, "The

21   Resident" -- things like that.

22        So there can be some differentials by type of hospital,

23   but that's not affecting my analysis, and so that's not really

24   applicable to this situation.

25   Q.   And Mr. Heil has used a different measure.  He's looked at

1    contract rates, whereas, you've looked at the OSHPD payment

2    rates.

3        Do you want to comment as to whether the use of what

4    hospitals are actually being paid, as reported in OSHPD, is an

5    appropriate measure?

6  **A.**    Yes.  So Mr. Heil -- you know, and I'll discuss this in

7    more detail, but he certainly has looked at certain contracts,

8    only from NorthBay.  He hasn't looked at any contracts from any

9    other hospitals there.

10        But one can't, in my experience, come up with a final

11    number just by looking at contracts.  Many of them have

12    provisions like per day kind of rates, things like that.

13        By far, in my experience, the better way to do the

14    analysis is to look at actual payments.  This is at the end of

15    the day, considering all provisions from all contracts, what

16    did they actually get paid.

17  **Q.**    And by looking at payments, are you also looking at -- is

18    it also weighted by volume, as well, so that if one contract

19    accounts for a large --

20            **MR. TOOCH:**  Objection.  Leading.

21            **THE COURT:**  Overruled.

22  **BY MR. PIMSTONE:**

23  **Q.**    If one contract, for example, accounts for a large amount

24    of volume, is that reflected in the OSHPD data?

25  **A.**    That's right.  And previewing one of my critiques, the

1    data that Mr. Heil actually uses represents a very small

2    portion of the payments.

3         And what one wants to do in a regional geographic area

4    analysis is to look at all the payments to all the hospitals

5    there, which is, again, exactly what OSHPD is reporting here.

6  **Q.**   Okay.  Thank you, Mr. Deal.

7         In looking -- so I understand that this slide, as you

8    indicated, measures what hospitals were paid and accepted in

9    the geographic area through your cohort, the group of hospitals

10   you picked.

11        Did you also look at what OSHPD data reflected with

12   respect to other hospitals that were not in your geographic

13   peers that you looked at?

14 **A.**   I did.  Again, not for any analytic purpose of using those

15   totals in my data, but I was interested in particular about the

16   relatively high multiple of NorthBay.

17        So, for instance, I looked here just at the same

18   equivalent measures for some of the premiere teaching hospitals

19   in the state.  Again, I don't think those are the right

20   geographic peers to use, or type of hospitals.

21        It was interesting to me -- and, again, more of an

22   observation -- that you find in Stanford, UC Davis, UCLA, UCSF,

23   those hospitals are actually much more similar to the

24   geographic peers, and all of them are actually below NorthBay.

25        So, effectively, NorthBay is getting paid more than

1    Stanford, for instance, on this, which is interesting to me.

2    Again, I don't use these in my calculations, but it was just

3    sort of an interesting observation.  And, again, a little bit

4    of a context.

5    **Q.**   Did you reach -- sort of looking at the empirical data,

6    did you reach any conclusion as to whether -- in terms of what

7    NorthBay was being paid through its contracts, whether NorthBay

8    was an outlier in the region?

9    **A.**   Statistically, they for sure are.  I think just even

10   commonsense-wise they are as well.

11        If you look on the chart here, I've got each blue kind of

12   cross -- not Blue Cross, the insurer -- but the blue dot here

13   represents the location of one of my geographic peers, and each

14   number next to it represents its corresponding number from my

15   slide a couple of times ago.

16   **Q.**   And when you say "corresponding number," you mean what

17   that hospital is being paid as a percentage -- sorry, as a

18   multiple of Medicare?

19   **A.**   That's correct.  So you can see these numbers range

20   from -- up towards Sacramento there's the 2.1, 2.6, 2.4, so on

21   and so forth, down to 3.9 in Walnut Creek.

22        So just visually you can kind of see that in the region we

23   see, again, quite a consistent 2 to 3 times, a little higher on

24   the high end in Walnut Creek, but 2 to 3 times.

25        And then what I did is I said, well, now, let's impose

1    what -- NorthBay.  And that's my next slide here.  And you can

2    see those two hospitals, which are not -- not surprisingly in

3    the middle of my picture, because I'm specifically looking at

4    hospitals around them, they're at 5 times Medicare.

5         So they are very clearly visually an outlier.

6    Statistically, they're also an outlier.  And so, again, I

7    include them in my overall regional total, but something is

8    different for NorthBay than the other hospitals.  So that was

9    sort of my conclusion from this analysis.

10        And, I guess, final point on this is just to also note

11   that Mr. Heil's opinion of 13.1 times Medicare is well in

12   excess of even what they're getting paid.  So just to kind of

13   set an overall context on this.

14   **Q.**   Okay.  And so you've mentioned a number of times here in

15   your empirical analysis, from what you could see, that NorthBay

16   is getting paid significantly more in its various contracts

17   than the market -- in the rest of the geographic market.

18        Did you do sort of -- do you have any sort of conclusion

19   as to sort of why that's the case?

20   **A.**   I do, yes.

21   **Q.**   Okay.  And can you just tell the jury sort of what you

22   have -- what you have observed and what you have found in

23   connection with, sort of, the dynamics of the market in Solano

24   County?

25   **A.**   Certainly.

1    I mean, there's some specific elements to it, but I think,

2  you know, the sort of overview of this you can actually see

3  from this slide, which is to say they are geographically

4  located some distance from other hospitals.

5    So the closest hospital is about 15 miles away, which

6  happens with other hospitals as well.  I grew up in a small

7  town in Central Washington that was 50 or a hundred miles to

8  the next hospital there.  So that's not unique to NorthBay.

9    But it's obvious, from an economic perspective, that what

10 NorthBay is doing is basically using that geographic location

11 and the lack of immediate nearby competitors to adopt a

12 strategy that results in much higher payments from private

13 payors than other hospitals in the region.

14   So they're essentially using that geographic location and

15 the fact that, without other hospitals within just a few miles,

16 they don't have -- they've got broader competitors across the

17 region, but not local competitors.

18   And for a variety of reasons, which I can describe, that

19 has been the strategy that they have adopted.  As a

20 not-for-profit hospital there, they've gone with a very high --

21 effectively a high-priced strategy.

22 **Q.**  And the fact that NorthBay receives in the market these

23 higher reimbursements, is that related to emergency services?

24 **A.**  So what's interesting about that, the short answer is no

25 to that.  Again, from emergency services, the framework that

1   we've been discussing today is the appropriate framework, which

2   is to say, because individuals don't -- don't face different

3   prices for emergency services, and they've agreed to accept, by

4   having an emergency room, the regional price, it actually isn't

5   what's going on for emergency services.

6       It's really in the elective market that they're able to

7   command these high prices.  And, effectively, by wanting them

8   in the network, to be able to appeal to people for getting the

9   shoulder surgery, to stay with that example, they have used

10  their -- their location and the related elements to that to

11  extract, you know, high prices from payors on that, because if

12  people want to get their elective surgery done locally, meaning

13  Fairfield or Vacaville, there aren't really any other choices.

14  **Q.**   And if those same individuals locally wanted and needed

15  use of an emergency room, would it cost the patient any more to

16  go to NorthBay even if NorthBay were not in the network?

17  **A.**   No.  It's my understanding the economics of emergency care

18  are such that the cost to the individual is similar,

19  essentially the same, whether you go in-network or

20  out-of-network.

21      You want that, effectively.  You don't want people to

22  bleed all over town, going to the only one that's in network,

23  so you have a contract from public policy perspective. So

24  there's not an issue there.

25      Of course, there is for elective.  Any of us that have

1  gone out of network for elective care, much more expensive,

2  typically.

3      And so that's where you see this opportunity is, if you

4  want someone in-network to be able to market to local employers

5  and all of -- and individuals, you know, you need to basically

6  come to an agreement with NorthBay as to what's that going to

7  cost, because, otherwise, your members are going to pay -- if

8  they go to NorthBay, they're going to pay out-of-network rates,

9  which are going to be much more expensive.

10     So the individual being insured, the employees or the

11  individual buying it, is going to face a much different price

12  situation for elective care for in-network versus

13  out-of-network.

14  **Q.**  Understood.

15     I think you have also examined a little bit more the

16  various factors that would sort of come into play in connection

17  with why private payors may be paying NorthBay more.

18     Can we go into those individually?  I think you've touched

19  on some of those already.

20  **A.**  Yes.  I think we can go over these fairly quickly, but,

21  basically, the first two are related to this network access and

22  network coverage question, which is really relevant for

23  elective care of, you know, how broad is the network.

24     There are some regulatory issues associated with that.  I

25  think Mr. Barnes may have touched on that yesterday in his

1    testimony.  It's not essential.  It's not required that

2    NorthBay be in a network.

3         But I think it can be challenging, so it's certainly much

4    easier from a network access perspective if NorthBay is in the

5    network.

6         And, more generally, network coverage, the second item on

7    there, if you want to be able to market your plans to people

8    who live in Vacaville and Fairfield, it's certainly going to be

9    directionally more attractive to them to have NorthBay in their

10   network or not.

11        So from a how complete and broad is my network, it's a

12   desirable thing to have NorthBay in your network.

13   **Q.**   So if you are a plan like Blue Cross or Aetna, or some

14   other plan that was looking to market its services or its

15   products, you know, let's say in Fairfield and Vacaville -- can

16   we go back to the last slide.

17        Yeah.  We can keep it on that slide.

18        And so if we look here, Vacaville, that's the orange dot,

19   that's the higher up orange dot; right?

20   **A.**   Correct.

21   **Q.**   And so if you were a commercial plan like a Blue Cross,

22   Aetna, Cigna, whatever, looking to sell your insurance products

23   to people living in Vacaville, if -- so that for their elective

24   care they could use VacaValley, if VacaValley were not in the

25   network, that individual would have to -- for their elective

1  care, where would they go?

2  **A.**  They'd have to go to one of those other blue dots, which

3  the closest one is 15 miles.  All of us who have been on I-80

4  know sometimes that's not a fun commute.

5  **Q.**  So that one as well.

6  **A.**  So that could be a significant deterrent.

7  **Q.**  That would be Davis, I think?

8  **A.**  Yeah, Davis probably is the closest from Vacaville.  I'd

9  have to look back on my list, but, yes.

10  **Q.**  And same thing if you were a commercial insurer like a

11  Blue Cross or another insurer looking to market your products

12  to people who lived in Fairfield, if NorthBay were not in the

13  network, those people would have to travel a fair distance as

14  well?

15  **A.**  Yeah, probably either over to Napa or down to Vallejo

16  would be the kind of next closest, but certainly at least

17  15 miles, yes.

18  **Q.**  Okay.  And so for any commercial carrier who did not have

19  the NorthBay campuses in-network, they would be selling their

20  products locally to people and basically telling them what?

21  **A.**  If you didn't have an in-network, you'd say, well, you've

22  got coverage, but you're going to end up having to drive at

23  least 15 miles for your elective care, and your family is going

24  to have to drive that same distance to see you if you're in the

25  hospital.  Those kinds of things.

1    So, you know, the margin it's clearly less attractive.

2    **Q.**   So, in your opinion, having studied the market, does that

3    account for why it is that NorthBay --

4         **MR. TOOCH:**  Objection.  Leading.

5         **THE COURT:**  Start again.

6         **MR. PIMSTONE:**   Thank you, Your Honor.

7    **BY MR. PIMSTONE:**

8    **Q.**   To what extent does NorthBay's geography and the geography

9    of any competing hospital or other hospitals, to what extent

10   does that play into, in your analysis, NorthBay's receipt of

11   rates that are higher than the other -- the comparable

12   hospitals?

13   **A.**   So the way I think about it is it's sort of a combination

14   of two things.  And this is related to the other two items on

15   my list on the slide here, the physician coverage and the

16   specialist needs, which I can touch on in a moment.

17       But at a high level, the geographic location of the

18   NorthBay hospitals create the opportunity.  If NorthBay decides

19   to adopt a strategy of, you know, essentially demanding high

20   prices from payors, they're able to get that.  Not a completely

21   unlimited amount, obviously, but almost twice what others are

22   getting.  So it creates the opportunity.

23       And then NorthBay has chosen, as a strategy, to actually

24   adopt that.  I mean, as an example, I grew up, as I said, in a

25   small town in Central Washington that was even more

1    geographically isolated than these hospitals.

2        That hospital had the opportunity for sure to do a very

3    similar kind of thing, but the strategy was not to do that.

4    They were actually the lowest-priced hospital in the state in

5    terms of the actual payments that they received.

6        So it's an opportunity that's created by the geography,

7    and it's a decision and a strategy by the hospital to do this.

8    **Q.**   I think in your slide you also talk about physician

9    coverage.  Can you explain, sort of, how that factors into the

10   market dynamic?

11   **A.**   Sure.  I think the last two are, in some sense, similar.

12   It's the occasional specialist needs.  There's the hospital

13   component, but NorthBay, like many others, has a foundation,

14   has certain doctors who only admit to those hospitals.

15       To the extent they're part of the NorthBay system, it's

16   much more difficult for a payor to put together a network that

17   doesn't include those physicians.  Or if it includes the

18   physicians, but if they only admit to NorthBay, again, it's

19   another element of this.

20       It's not unique to NorthBay, but the fact that they've

21   done it gives it, you know, even a little bit more enhanced

22   opportunity, if you will.

23       And the same thing with the specialist.  If you've got a

24   sick member in one of those towns, and they may need, you know,

25   care from a specialist, there may not be very many specialists

1   who admit other places or aren't part of the foundation.

2       So it's, again, part of this opportunity that's created by

3   the geography.

4   **Q.**   So Mr. Heil criticizes your view of this market, and he

5   does -- he uses data that he finds from HHI.  He does what he

6   calls an HHI analysis.

7       Can you tell the jury what this is?

8   **A.**   Yeah.  So this is getting, kind of, into the weeds of

9   economic analysis.  But, as I understand his point, he says,

10  well, I've done -- and maybe the best way to do it is to go

11  back to this slide here.

12      He says, I've done this analysis, which the technical part

13  of it is you add up the sum of the market shares for the

14  region, and it gives you a quantitative number.  It says it's

15  up to 10,000.  If there's only one hospital in the whole

16  region, it would be a hundred squared of 10,000.

17      What he says is, I've done this analysis, and it doesn't

18  look that concentrated to me, which, all else equal, this is a

19  measure of the opportunity or the ability to raise prices.

20      So, as I understand his point, it's sort of at the border

21  of moderately concentrated and highly concentrated, and he sort

22  of dismisses, oh, this sort of isn't concentrated enough for

23  this to be a real issue.

24      I think he's missing a couple of big-picture points.

25      First of all, what the HHI is measuring is a broad measure

1    of regional concentration.  What it's really intended to do

2    underneath it is to say, in a merger situation, for example, is

3    there an opportunity to raise prices for a year by 5 percent?

4    That's what antitrust authorities are worried about.

5         I've done a lot of antitrust work myself.  I testified in

6    Judge Illston's chambers a couple of years ago on an antitrust

7    case.  But what we're worried about is, if there's a merger,

8    can someone raise the price 5 percent?

9         What Mr. Heil seems to ignore is, we don't have to have a

10   theory here.  We can look at the actual data and see that

11   NorthBay has raised its prices not by 5 percent over everyone

12   else but almost double everyone else.  So, clearly, there is

13   opportunity there, and they've done it.

14        So the HHI isn't a useful tool when you can actually

15   observe what's happening here.

16   **Q.**   And the kind of hospitals that are included in the HHI

17   analysis, those would include hospitals -- would that include

18   hospitals from, sort of, the general region?

19   **A.**   So he's used the exact same hospitals that I've used for

20   this, for his calculation.  So he's sort of used my definition.

21   One could use a different definition if one wanted to.  And not

22   all of these are obviously immediate substitutes.  You know, if

23   you're bleeding, you don't necessarily want to drive 30 miles.

24   But there's an aspect of HHI of what's the region.

25   **Q.**   All right.  Mr. Deal, let's switch to another payment

1    source.

2        Actually, before we do that, so you're -- at least at this

3    point, because I think you're going to do some adjustment a

4    little bit later, but at least at this point your conclusion

5    from using the OSHPD data, as to what hospitals in the

6    geographic area, what's the going market rate for their

7    services was 3 -- about 3 times Medicare?

8    A.    For private payors --

9    Q.    Private payors.

10   A.    -- before adjustment, my opinion is, in the geographic

11   area, 3 times Medicare would be the appropriate price to use

12   for the private payors, yes, based on the OSHPD data.

13   Q.    All right.  Let's look to your next analysis, which I

14   think you used Blue Shield data.

15   A.    That's correct.

16   Q.    All right.  Can you tell the jury a little bit about that

17   analysis and conclusion, please.

18   A.    Yes.  So earlier I described the Blue Shield data, which

19   is to look at what Blue Shield is paying other -- the other

20   hospitals in my comparable set.

21       I, of course, don't use NorthBay for this particular

22   analysis because they're disputing the payments here.  So I'm

23   looking at the payments to other hospitals, and what I find is

24   interesting.

25       And here, because I actually have claim-level data from

1    Blue Shield, I can literally compare similar claim at issue

2    here to similar claim from the comparable hospitals.

3    Inpatients, outpatients, I'm lining it up.

4         So OSHPD is an aggregate analysis.  This is a

5    claim-specific analysis.  And, as a result, I'm able to

6    separate out the inpatient and the outpatient on this.

7         And what you observe on my chart is really the result of

8    my analysis, which is not dissimilar on the inpatient side from

9    the findings of the published studies and published findings,

10   which is I find that Blue Shield on average, for the same set

11   of claims, would pay 1.7 times Medicare.  Again, that's quite

12   consistent with the published findings.

13        What I find on the outpatient side, interestingly, is

14   they're paying even more.  So if you remember, it was more like

15   3 to 4 times Medicare for the outpatient from the studies.

16   Here Blue Shield is paying 6 to 7 times what Medicare is paying

17   for the outpatient claims.

18        And the relevant for my analysis is the final bar, which

19   is by weight, half of them inpatient, half of them outpatient.

20   So I find that Blue Shield's payment levels -- and, again, all

21   these other hospitals are either in networks or accepting

22   payments, or Kaiser, not in network, obviously, it's Kaiser,

23   but no lawsuit between the parties, is 4.1, so somewhat higher

24   than what I find from the OSHPD data, but in the sort of broad,

25   broad same range.

1    Q.   So I just want to make sure everyone is clear exactly what

2    you were doing here.  And that is, you were looking at the

3    hospitals that you had selected, the comparable hospitals in

4    the geographic area.

5    A.   Correct.

6    Q.   So that was the group that you were looking at, the

7    comparable hospitals in the geographic area.  And then you were

8    also looking at sort of the claims that are at issue in this

9    case.

10   A.   Correct.

11   Q.   And is what you were saying, if we took that same claim

12   set and asked ourselves, what did those hospitals -- what would

13   those hospitals in the comparable area have accepted from Blue

14   Shield for that claim set, this is what you're measuring.

15   A.   That's right.  This is the forty-some thousand claims for

16   similar services, both inpatient and outpatient, from the

17   others.  So the mental exercise here is exactly let's take the

18   exact same set of claims, and imagine that Blue Shield had paid

19   those at what it pays all the other hospitals in my geographic

20   area.  And the answer is they would have received 4.1 times

21   Medicare.

22   Q.   Now, I understand that Mr. Heil has critiqued your use of

23   the Blue Shield data in a variety of different respects.

24   A.   Yes.

25   Q.   Okay.  And he -- one critique was use of denials as well.

1  That the data might have reflected denials that Blue Shield

2  had.

3  **A.**   Yes.  As I understand it, he was specifically calling out

4  denials in the context of OSHPD, but he would make the same

5  general concern about any of these types of data sources.

6      That is not actually an issue at all with my Blue Shield

7  data, because Blue Shield's applying consistent policies across

8  all the hospitals.  So if they say I'm not paying for a private

9  room or I don't pay for, you know, extra payment for giving a

10  shot or something like that, they're doing that consistently.

11  So I'm looking at Blue Shield's payments using consistent, what

12  we call, adjudication policies.  How they adjudicate the claim.

13  **Q.**   Okay.  And are there any data entry problems that

14  concerned you in connection to using this data set?

15  **A.**   So here I was able, because I had claims, I was able to

16  exclude any of them that would have a zero allowed, for

17  instance, because they typed in the wrong patient ID or

18  something like that.  So I'm excluding all of those.

19      You know, there can obviously still be some at the

20  margin -- typos, or, you know, mistakes one way or the other.

21  But they go both ways, and they would be very small.  But

22  because I've got claim level data, I can throw out any data

23  that's obviously problematic.

24  **Q.**   And would any data entry issues -- also would you assume

25  one way or the other as to whether they were consistent across

1    the hospital set?

2    **A.**    Every hospital's going to -- again, I've seen this many

3    times.    There's going to be always a few issues.    But they can

4    go both directions.    And they're very small, and they're going

5    to affect all hospitals.    So it's not an issue in terms of the

6    reliability of this data.

7    **Q.**    So if you're comparing hospitals, then that wouldn't

8    concern you.

9    **A.**    No.

10   **Q.**    And the data that you were measuring here, were these

11   payments that the hospitals accepted?

12   **A.**    Yes.    As I've said, almost all of the hospitals, except

13   for Kaiser, were actually in network.    So these were pursuant

14   to willing buyer/willing seller contracts.    And Kaiser is not

15   in network.    Again, it's Kaiser.    But I'm not aware of any

16   litigation between the parties over payment levels.

17   **Q.**    Okay.    And here you were looking at the actual -- what the

18   actual payments would have been, as opposed to contract rates.

19   What was your logic in looking at actual payment rates as

20   opposed to just looking at Blue Shield's contract rates?

21   **A.**    Again, most of these -- in fact, all but Kaiser -- were

22   paid pursuant to a contract.    But I understand the spirit of

23   your question to say I don't literally just look at the four

24   corners of the contract.    What I care about is what they

25   actually got paid.    That's how I understand the assignment; is

1    what's the payment level in the geographic area?

2         So I want to see what's the result of all of these

3    contracts?  What's the actual payment received?  So that's the

4    relevant analysis for me, not trying to analyze all the

5    provisions of a particular contract, which oftentimes can be

6    quite complicated, in my experience, in terms of trying to do

7    that given the different payment methodologies, things like

8    that.

9    Q.   Mr. Heil also notes that your conclusions, from what you

10   saw in the Optum data, differ to some degree from the Blue

11   Shield data.  Any comment on that?

12   A.   Yeah.  I'm going to show that slide in just a couple of

13   moments.  But what I find is that Blue Shield is actually

14   higher than what Optum pays.  And that's not terribly

15   surprising to me.  Payors do pay somewhat differently.  Blue

16   Shield -- the allowed amounts may well be at the somewhat more

17   generous and higher end.

18        These are -- again, these are higher than what I see in

19   the published findings, so I'm sure Blue Shield obviously wants

20   to have competitive prices.  I think Mr. Barnes testified to

21   that.  But it's not necessarily the lowest priced payor out

22   there.

23   Q.   Okay.  So I think the analysis that you just did looked at

24   what the NorthBay claims would be if Blue Shield had paid them

25   and what those rates would be accepted at other geographic

1    hospitals in the geographic area.

2        Did you also look at what Blue Shield's payments would

3    have been for this NorthBay data set if instead of being paid

4    to NorthBay what premiere teaching hospitals would have

5    accepted for those same services?

6    **A.**    Yes.   This is in very much the same spirit as I described

7    a moment ago with the OSHPD data.   I don't think NorthBay is

8    appropriately comparable to the Stanford and UCSF for various

9    reasons.   But I was interested in just getting a little

10   calibration of how much more do those premiere facilities get

11   paid?

12       And I've got a set of bars here on the screen that, again,

13   not my direct opinion in this matter because I don't think

14   these are the geographic area hospitals, but I looked at UC

15   Davis which is obviously closer in Sacramento but still it's a

16   teaching hospital.   I looked at Stanford, UCSF and UCLA.

17   Again, as one might imagine, Blue Shield does pay those

18   hospitals somewhat more than community hospitals.   But you can

19   see, as I've circled on the right, it's 4.7 times Medicare as

20   opposed to 4.1 times Medicare.   So there is a premium that gets

21   paid, but it's not particularly large.

22   **Q.**   So again, just to reformulate.   Was your look here to --

23   just so we all understand the parameters of what you were

24   doing.   You took the disputed claims at issue in this case; and

25   is what you are asking yourself if those same claims were paid

1   by Blue Shield to these premiere teaching hospitals, what would

2   those teaching hospitals have accepted in willing buyer/willing

3   seller transactions?

4   **A.**   Yes.  That's correct.  So it's the same framework, same

5   set of claims, now we're processing them through --

6   conceptually processing them through these teaching hospitals.

7   **Q.**   Understood.

8       Mr. Deal, you mentioned earlier that you could also use

9   Optum data to compare outpatient payments.  Can you tell us

10  what you found in that regard?

11  **A.**   Yes.  So as I noted, first point, which you just noted,

12  was Optum doesn't actually have what are called DRG's.  Without

13  getting into the detail, that's the identifying for the

14  particular type of inpatient.  And I have that with the Blue

15  Shield data, so I can do that.  Optum I don't have that in the

16  Optum data so I can't make sure -- I can't be sure I've got the

17  same set of services.  So I don't look at that on the inpatient

18  side.  Which is really why I used this as a confirmatory

19  analysis, because I can really only do it on the outpatient

20  side.

21      What I find in terms of the two bars on the screen, the

22  bar on the left was the Blue Shield number for outpatients,

23  which again was 6.6 times.  A little higher than the published

24  findings.  6 to 7 times.

25      What I find in Optum is it's more like four to five times.

1  4.3 times.  So basically, again, Blue Shield is at the somewhat

2  higher end of payment levels for outpatients and using the

3  Optum data.  So it's really confirmatory that Blue Shield isn't

4  some low payor that I'm going to somehow going to be biasing my

5  results by using data from Blue Shield.

6  Q.  Got it.  So again, while not stated on this slide, the

7  analysis -- was the analysis that you were doing here, looking

8  at the Optum database, was it also focused on the hospitals

9  that you had built in the geographic area?

10  A.  It was focused on the region.  You recall when I discussed

11  Optum data, I said for privacy reasons individual providers

12  aren't identified in the Optum data, so I looked by county.  I

13  looked at Solano County and the surrounding counties.

14     So it's a slightly different geographic area.  Another

15  reason why I don't rely on it so directly, but it's the same

16  broad region there.  So it's including all hospitals in there,

17  including NorthBay and others.  So, again, it's confirmatory of

18  my conclusions, but I don't rely on it directly.

19  Q.  And the conclusion was that in that region, those

20  hospitals accepting 4.3 times Medicare on the outpatient

21  claims?

22  A.  Correct.  From Optum.  Whereas Blue Shield was paying 6.6

23  times.

24  Q.  Mr. Deal also looked at Medi-Cal.  What the sellers in the

25  geographic area, the comparable hospitals in the geographic

1    area, were selling the services to Medi-Cal for?

2    **A.**    Correct.

3    **Q.**    Can you tell us what you found in that regard?

4    **A.**    Yes.  So here I used the OSHPD data again.  And later I

5    have to do a little adjustment for the same reasons that I

6    needed to adjust for the outpatient/inpatient mix.

7         But what you can see here is a series of bars.  And here

8    I've included NorthBay in the original slide as opposed to

9    doing it in two steps like I did before.

10        What you observe as you look across the bars -- and I'll

11   come back to John Muir in just a moment -- but quite consistent

12   in the 1.2 to 1.7 range.  With the red bar on the right being

13   if you exclude NorthBay, the right bar being if you include

14   NorthBay.

15        Now, NorthBay makes very little difference here, so the

16   actual 1.3 it still rounds to 1.3 even if you include NorthBay

17   there.  So it's not a huge difference.  Any one hospital isn't

18   going to make too much difference here because it's a fairly

19   tight -- tight range.

20        One thing to note on this Medicaid analysis, which is

21   interesting, and I know -- I do a lot of work in Medicaid.  And

22   in particular, we help run a large program in Washington state

23   that's very similar to a program in California.

24        There's two components to Medicaid payments.  There's the

25   actual rates that a hospital gets for each service they

1    provide.  And then there's another large supplemental payment

2    that comes through a separate program.  Think of it almost like

3    a block grant.  The mechanics of it are somewhat complicated,

4    but the net result of that has been that Medicaid has become a

5    relatively better payor for hospitals.  Historically, people

6    would think of, oh, Medicaid was actually less than Medicare.

7    I don't want to provide Medicaid.  Or maybe they do provide,

8    but they don't like it because they're getting paid somewhat

9    less.

10       What's interesting here is that it's actually a better

11   payor than Medicare.  And it's really because of this

12   supplemental program.  The actual rates that are provided are,

13   in my experience, lower than Medicare rates.  In some cases,

14   quite a little lower than Medicare rates.  But the supplemental

15   kind of block payment comes in to that.

16       Here I've actually included both.  So there's an argument

17   that it's really just the rate part that we should use, but

18   here I've actually included both parts of this.  So this is all

19   the Medicaid payments.

20       The particular relevance of that is both that I'm

21   including both elements of it, and I think -- I don't know for

22   sure because the data is reported by the hospitals -- but I

23   have a hypothesis on the John Muir which is noticeably lower

24   than others at .4.  So you see quite a consistent in the

25   others.

1    I have a hypothesis that what's going on there is that

2  they, for whatever reason, in OSHPD they were just reporting

3  the payments for services, not the second part of it.  My

4  understanding is that the other hospitals would be reporting

5  both components to it.  So I think that is probably what

6  explains it, but I don't know.  This is, obviously, the

7  hospital reporting the data there.

8    It doesn't make much quantitative difference.  And in

9  general, I say by using both the rate piece and the block

10 piece, we're actually getting relatively generous Medicare

11 multiples for Medicaid.

12   So that's what I observe with Medicaid.  And I'm using

13 that 1.3 number as the relative payment for the Medicaid

14 portion of the --

15 **Q.**  So just to put a finer point on it.  When hospitals in the

16 geographic area, for example, if they were selling an MRI

17 machine, the use of an MRI machine, and the buyer was a patient

18 who was covered by Medicaid, hospitals -- are you saying that

19 hospitals in the geographic area would be selling that MRI

20 machine for -- the use of the MRI machine for 1.3 times what

21 Medicare would pay?  Is that what you're saying?

22 **A.**  The actual mechanism of payment -- and using the John

23 Muir's example -- they might literally get paid .4 times

24 Medicare for that exact service, and then they get a big

25 supplemental block payment that would bring it up to 1.3 times

1    Medicare.  Again, I'm including both pieces of that in my

2    overall analysis as has been reported by the hospitals.

3    Q.  Mr. Deal, we've gone through a variety of different data

4    points.  We've discussed use of the Optum database for purposes

5    of what private payors are paying in the geographic area -- are

6    getting paid in the geographic area -- as compared to Medicare.

7    We've looked at what Medicaid is paying in the geographic area.

8    We've looked at the Blue Shield data, we've looked at the Optum

9    data, and we've looked at various published studies.

10       So can you tie it all together for us now, Mr. Deal, and

11   tell us, sort of looking at all this evidence, what did you

12   conclude regarding the reasonable value of services in the

13   geographic area?

14   A.  Certainly.  So I've got two or three slides that

15   illustrate this and really summarize what I've been over in

16   terms of my testimony so far.

17       So what I'm showing on the screen right now are the two

18   analyses for private payors.  So you'll note the bar on the

19   left, the OSHPD bar, it was 3.0 times, using the actual OSHPD

20   data.  I've adjusted that upwards to 3.3.  That's to account

21   for the relative mix of inpatients and outpatients.

22       So that's why that number's higher than it was before.

23   Q.  Okay.  So just -- so that we can keep it straight.  We

24   have talked about -- previously you had said that private

25   payors -- that hospitals in the geographic area were accepting

1  three times what Medicare pays from private payors.  You have

2  now adjusted that up to 3.3 times based on the -- I think you

3  said the outpatient/inpatient mix?

4  A.   The specific mix of claims here --

5  Q.   In this case.

6  A.   -- is somewhat more heavily skewed to outpatient than the

7  total hospital.  And since outpatient gets paid more, I've

8  adjusted that upwards to 3.3.  So that's my estimate of what

9  the adjustment needs to be on that.

10 Q.   So take this number.  And if we're adjusting it to the

11 particular mix of claims in this case, that becomes 3.3 times

12 Medicare.

13 A.   Correct.

14      The second bar on this screen is the 4.1.  That doesn't

15 need to be adjusted because it's already adjusted for the

16 inpatient/outpatient mix.  So that's -- the second orange bar

17 is the Blue Shield number.

18      I've overlaid on that just a reminder of what the

19 published findings when one adjusts for inpatient/outpatient

20 which would be 2.7 to 3.2.  If you remember back a little

21 earlier this morning on that.  I'm not using that directly in

22 my calculations, but it's a calibration.  And what you see is,

23 again from OSHPD, a number that's quite consistent with the

24 high-end of those findings.  Blue Shield's actually above both

25 of those.  So Blue Shield's paying somewhat higher than what

1    the published findings would observe.

2        So that's my analysis of private payors, is between 3.3

3    and 4.1, if one were to just focus on private payors.

4        The next slide I've got is just a reminder on what I call

5    the government payors, the other two big payors.  Medicare is

6    the easiest because Medicare is paying one times itself.  It's

7    obviously Medicare.  So that number's easy.  It's 1.

8        Then we talked about the Medi-Cal number a moment ago.

9    And you remember it was 1.3.  Again, here adjusting for the

10   outpatient/inpatient mix, I've taken it up to 1.4.

11   **Q.**   Okay.  And so here we talked about Medicaid paying 1.3

12   times Medicare.  But because that varies slightly between

13   inpatient and outpatient, once you factor in the particular mix

14   of claims we have in this case, that turns out to be 1.4.

15   **A.**   Correct.

16   **Q.**   Okay.  All right.

17   **A.**   So those are the individual data points.

18       This next slide is sort of bringing it all together in the

19   sense that -- in terms of an assignment, again, I certainly

20   have been very clear, I think, on each individual payor; but as

21   -- if the framework, as I understand it, is all payors, what

22   are all payors paying all buyers, all sellers, in the area, one

23   would want to combine all of these data.  And that's what this

24   pie chart is showing here.

25       So we've got Medicare is the gray on the left.  Inside the

1    gray it's the 1 times Medicare we just talked about.  Medi-Cal

2    is the lower right orange bar.  That would be 1.4 times

3    Medicare.

4         My private payor analysis in the upper right of the pie

5    chart is 3.3 to 4.1 times Medicare.

6         Then I've got my little dash lines over to an all-payor

7    analysis, which says let's look at all of the payors here.  And

8    here I've actually got two different numbers.  Focus on the

9    bottom number first.  Which is one needs to kind of weight each

10   of these different pies.  How big is Medicare?  How big is

11   Medicaid?  The bottom of this box on the right is:  Let's look

12   at the regional mix here.  So I look at all the hospitals in

13   the region and I say, How much is Medicare?  How much is

14   Medicaid?  How much is private payor?  As a share of the total.

15   **Q.**  Can we stop there for a second.  When you say, "how much

16   is," are you saying how much are those hospitals in the

17   geographic area, how much are they receiving from Medicare?

18   **A.**  It's sort of what share of their total business.

19   **Q.**  Got it.

20   **A.**  So imagine a world where it was one-third, one-third,

21   one-third.  That's not it, but you would weight each of these

22   numbers by one-third.

23        What I'm doing to get that number on the bottom is I'm

24   looking more precisely at, well, in the whole region what's

25   Medicare as a percentage?  What's Medicaid as a percentage?

1    What's private payor?  And when one weights that for the whole

2    region, you get 2 times Medicare.

3        So that's the number, the all payor number, weighted for

4    how big each payor is in the overall region.  So that's the

5    number there.

6        The number above it, which is slightly lower -- 1.8 times

7    Medicare -- that number is using NorthBay's own mix of

8    patients.  Each hospital, of course, is going to have a little

9    different mix.  Some might have a little more Medicare, some

10   might have a little more Medicaid, some might have a little

11   more private payment there.

12       So I've presented both numbers for the jury to consider on

13   there as to what's the right way to weight these claims.  If

14   one wants to weight them across the whole region, which I think

15   would be a perfectly reasonable interpretation from an economic

16   perspective, you would get 2 times Medicare.  That would be the

17   number.

18       If you say, well, let's look at NorthBay's specific mix, a

19   little lower.  1.8 times Medicare.

20       But that's my overall conclusion from an all-payor

21   analysis as to how to think about that.

22       I've got another little visual on the screen that

23   illustrates that in a slightly different way, as well.  Which

24   is to say the top bar kind of represents all buyers and all

25   sellers as big circles here.  So if one said, I want to think

1  about all payors -- which we've just been talking about, all

2  payors and all hospitals -- that would be on the right.  The

3  1.8 to 2 times Medicare.  Just exactly what we talked about.

4      The numbers just below it are translating that into, well,

5  what percentage of NorthBay's charges does that represent?  So

6  if you look at that number, those two numbers on the bottom,

7  that would be between 12.2 and 13.6 percent of charges.  So

8  focusing on the 2 times number, 2 times Medicare in NorthBay's

9  case is 13.6 times -- excuse me -- 13.6 percent of NorthBay's

10 charges.  That, again, kind of is an aspect of showing just how

11 high charges at NorthBay is that a payment level twice what

12 Medicare pays is still 13.6 percent of Medicare's --

13 **Q.**  Of NorthBay's charges.

14 **A.**  I'm sorry.  Not Medicare's charges.  NorthBay's charges.

15 Thank you very much.

16     Below that, I've shown what the number is just to

17 reinforce that number for private payors.  So I'm presenting

18 both of these numbers.  Obviously, I've given each of the

19 individual elements.  We've had extensive discussion on that.

20 But just a reminder, if one were to use private payors only as

21 the framework, it would be 3.3 to 4.1 times Medicare.

22     I might also just mention there that in my all payor

23 number you have above, I've used just the higher number.  The

24 4.1.  So I'm using the highest of my two numbers for private

25 payor to come up with my 1.8 to 2.0.  Lower -- I'm saying if

1   the determination were to be just looking at private payors,

2   you'd use 3.3 to 4.1 times Medicare.  And again, I'm showing

3   what percent of billed charges that represents at the bottom.

4   21.9 percent to 27.7 percent.

5      So that would be the translation to billed charges.  But

6   my own analysis is really the multiple of Medicare.  I think

7   that's -- in my professional opinion, that would be the

8   appropriate way to think about this.

9   **Q.**   And so if the jury were to remember from your testimony

10  today two numbers, what would those two numbers be in terms of

11  your analysis?

12  **A.**   So I think if I were the jury, I think I would remember 2

13  times Medicare as the upper end of the all-payor analysis, and

14  the range or even the upper end of the private payor number,

15  the 3.3 to 4.1.  That's maybe one number and one range.  But I

16  think that's what I would remember.  And, obviously, the 1.8 is

17  the lower end.  So if you wanted to remember the two ranges it

18  would be these two ranges here.

19     But the all-payor analysis, just to underscore, which is

20  the regional analysis, all buyers, all sellers, that's clearly

21  the top number.

22  **Q.**   That's the 1.8 to 2.

23  **A.**   1.8 to 2.0.

24  **Q.**   So if you were just to put a finer point on it, if one is

25  doing an analysis as to what are all hospitals in the

1  geographic area, what are they accepting from all sellers who

2  they choose to sell their business to -- sorry -- all buyers

3  who they choose to sell their business to, what are they

4  accepting from all buyers, that number would be the 1.8 to 2

5  times Medicare?

6  **A.**   That's correct, yes.

7  **Q.**   And if one were asking for the hospitals in the geographic

8  area, what are they getting in the portion of the transactions

9  that they're choosing to sell to private buyers, then that

10  would be the 4 times Medicare.

11  **A.**   That would be the upper end of that number, yeah.  3.3

12  to --

13  **Q.**   3.3 to 4.1.

14  **A.**   That's correct.

15  **Q.**   All right.  Mr. Deal, you also have looked at Mr. Heil's

16  analysis.  He testified earlier in the week.

17  **A.**   Yes.  That's correct.

18  **Q.**   And you've taken a look at his method, and you have some

19  responses to his method.  Can you take the jury through your

20  view of what he did?

21  **A.**   I'd be happy to.  Yes.  So that's sort of the next section

22  of my analysis is what I call the rebuttal of Mr. Heil.

23  Because as I've noted a couple of times along the way, Mr. Heil

24  has come to very different numbers than what the data show

25  based on my analysis.  So I want to both understand why that

1    is, and provide comments on whether or not those are

2    appropriate from an economic perspective.

3    **Q.**   All right.  So can you start off by giving us an overall

4    sense for where Mr. Heil comes out in terms of reasonable value

5    as compared to what you found?

6    **A.**   Certainly.  So in terms of the overview of what I'm going

7    to describe here, the top is sort of this big picture that you

8    were just asking about.  What's causing the bulk of the concern

9    here.  And then I'm going to go through -- he has three

10   methods.  I think he described that.  He applies one-third

11   weight to each one.  I think there's problems with each of

12   those and I'll describe those in more detail.

13       But it may be useful to start with kind of the -- again,

14   the overview, if you will, of my findings and what Mr. Heil has

15   determined and just provide some overall commentary on that.

16       So what's on the screen now, the right-hand side, those

17   three sets of colored bars, are exactly what we've been talking

18   about this morning.  So I'm showing the -- this is all

19   presented as multiples of Medicare, again to be consistent.

20       Private payor findings, the purple bars.  The private

21   payor from the comparable hospitals, the orange bar.  And the

22   all-in all-payor conclusions.

23       So those show exactly the numbers we've just talked about

24   a few moments ago.

25       The left two bars are showing two different things.  The

1    one on the very left says:  For this set of claims, what

2    multiple of Medicare is -- are full billed charges?

3        So if NorthBay -- which I don't understand is the case --

4    but if one were to say we should get full billed charges for

5    this, that would be equivalent to almost 15 times Medicare.

6        Mr. Heil's opinion is the red bar, which is they should

7    get paid 13.1 times Medicare.  That's the equivalent for these

8    claims as to what 88 times of billed charges is.

9        As I note on the right-hand side, that's 3 to 7 times

10   higher than any of those measures on the right.  So it's not

11   even a close call in terms of, you know, his number versus any

12   of the reasonable measures.  And we'll get into this in a

13   moment.

14       But at a very high level, I think that comes out from two

15   problems.  One is, none of his analyses do what I understand

16   the assignment is; which is to look at actual payments for all

17   sellers in the geographic area.  He just doesn't do that.  In

18   fact, he only looks at a subset of payors for NorthBay.  That's

19   the only payment data he looks at.  In fact, he doesn't even

20   really look at payment data, he really looks at contracts on

21   those.

22       And then his only analysis that even considers other

23   hospitals he focuses on billed charges, which as we've talked

24   about, essentially have very little relationship and certainly

25   are not what hospitals get paid there.

1    So I just think he's done the wrong thing which is leading

2    to this.  And there's problems with each of his thee methods.

3    **Q.**  Let's go through and take a look at each of the three

4    methods.

5        And so this is actually -- I think you've taken here sort

6    of a slide here that just discusses Mr. Heil's estimates?

7    **A.**  That's right.  And people may recall this from the

8    testimony.  I've circled at the bottom his conclusion, which is

9    88 percent of billed charges is the right number.  I don't

10   believe he used multiples of Medicare, but just to put it in

11   perspective, again, that's 13.1 times Medicare.  So if Medicare

12   pays $1,000 his opinion is the reasonable value is $13,100.

13       And that's really coming -- it's the average of three

14   different numbers.  The top number is his analysis of the

15   terminated Blue Shield contract.  And literally what he does

16   there is he takes the terminated contract, which there was

17   discussion about quite a bit yesterday, and which is the

18   highest rate of 80 percent, and he adds 15 percentage points to

19   that.  So he gets 95 percent of charges.  That's his first

20   method.  Terminated contract, I call it.

21       The middle one also has a different terminated contract

22   with Kaiser.  Kaiser, like Blue Shield, at one point had a

23   contract.  But like Blue Shield, doesn't have a contract now.

24   And then he's also looking at what I call very small volume,

25   quote-unquote, rental networks.  And I'll describe in a moment

1  what those are.  There's been some discussion, I believe, in

2  the court so far.

3      That actually comes up to a slightly higher percentage

4  interestingly, 96 percent.

5  **Q.**   And he adds 15 percent?

6  **A.**   Yeah.  And again, it's the basis of taking the percentages

7  that he observes in those, averaging them, and then adding

8  another 15 percentage points so he takes the contracts and adds

9  another 15 percent.  I'd note that these are seldom used.

10 They're either terminated, in the case of Kaiser, or seldom

11 used contracts.  Very small volume.  Well under 1 percent of

12 NorthBay's total payments, the rental network contracts.

13     And then finally, this analysis that he -- so, the third

14 one he at least does look at what he calls "peer hospitals."

15 He and I have a different view of what those peer hospitals

16 should be.  He goes a little farther than I do.  He goes up to

17 50 miles in his analysis, and maybe slightly different

18 selection criteria.  It turns out that's actually not driving

19 much difference.  As I'll describe at the end, if you use his

20 peer hospitals you get almost identical numbers to what I do

21 when you look at what I think is the right thing, the actual

22 payment level to those hospitals.

23     But what he's done is he's looked only at billed charges

24 which again are unilaterally set, very little, if any,

25 relationship to what people actually get paid, and he's come up

1    with 73 percent as his percentage for that.  So he averages

2    each of those 3, comes up with 88 percent, and that's his

3    actual opinion here.  Again, equivalent to 13.1 times Medicare.

4         So we'll go through those in a little more detail, but

5    that gives my kind of overview of his methods and some of the

6    concerns with those methods.

7    **Q.**   And I think you've also sort of looked at the data sets

8    that he used?

9    **A.**   That's right.  And here I've kind of summarized what

10   information I've looked at and what information Mr. Heil's

11   looked at.

12        So the first row on this is published findings.  We spent

13   some time this morning talking about my analysis which gives an

14   overview of that.  I looked at those.  Mr. Heil has not looked

15   at any of those published findings, or at least he certainly

16   hasn't presented that analysis.  Nor in some sense, could one.

17   There's no studies out there that would say the appropriate

18   private payment rate is 13 times Medicare.  That's just not

19   accurate.

20        The second one is this payment data from other hospitals

21   in the geographic region.  I've talked a lot about the OSHPD

22   data, the Optum data, the Blue Shield data, all of which looks

23   at the payment levels for the other hospitals.  That's why I've

24   got a green check there.  Mr. Heil doesn't look at any payment

25   data from any hospital other than NorthBay.  He looks at billed

1    charges, but that's not the right thing to look at.  So that's

2    his analysis there.

3         And then payment data from NorthBay -- and this is

4    interesting, actually.  Because you see I've got a green check

5    there.  In my OSHPD data, notwithstanding the fact that they're

6    noticeably above others, I still include that data in my OSHPD

7    analysis.

8         Mr. Heil actually doesn't include all the payment data for

9    NorthBay in any of his analyses.  He includes -- really the

10   only actual current contracts that were in force during the

11   relevant period here were these rental network contracts, or

12   the occasional letter of agreement, it's called.  That

13   represents less than 1 percent of NorthBay's volume when you

14   look at whether those contracts are actually ever used.

15        So his payment data is only representative of one

16   percent -- actually a little less than one percent -- during

17   the relevant period of actual contracts that were in force.

18        So I think fundamentally this explains an awful lot of his

19   findings.  Is that he's not looked at the right information.

20   He hasn't looked at any of the payments for other hospitals,

21   and he's only looked at a very small slice of NorthBay's

22   payments.

23   Q.   All right.  Mr. Deal, let's take a little bit of a closer

24   look at each of Mr. Heil's methods.  And let's start with his

25   weighting of one-third of his analysis on the terminated letter

1  of agreement between Blue Shield and NorthBay.

2      Can you discuss that just for a few minutes as to why you

3  think that is not an appropriate measure?

4  **A.**    Yes.  I think the simplest way to think about this is it

5  actually is terminated.  So which is kind of an obvious point.

6  What I've noted on this slide is that he takes the highest rate

7  there on the theory, I think, that sort of:  Well, we're not

8  going to give any volume discount, so we're going to start with

9  that 80 percent.  And then he adds 15 percentage points to it.

10  He gets to 95 percent.

11      During the relevant period for the claims at issue, Blue

12  Shield was not a willing buyer.  Blue Shield -- so it's a

13  willing buyer/willing seller analysis.  They terminated the

14  contract.  I think there was, again, extensive discussion of

15  that yesterday.

16      When one wants to use a willing buyer/willing seller

17  framework, one doesn't focus on a prior elective contract is

18  the other bullet below this.  So that included both emergency,

19  which often is included just broadly in these contracts, but

20  elective.  And we've talked about the fact that their

21  geographic location is such that they have the opportunity and

22  have chosen to adopt a strategy for elective procedures of

23  essentially demanding relatively high prices.  And for many

24  years Blue Shield paid those, but at some point they said "no."

25  And that's the terminated contract.

1    It's my understanding that they did terminate it because

2   of the rates were excessive and effectively kind of outdated.

3   Again, Mr. Barnes, I think, has testified more to that.

4    But I don't think that's ultimately an appropriate basis

5   for thinking about the claims at issue here when we're looking

6   at willing buyer/willing seller transactions.  All of my prior

7   data was from periods that are relevant for this analysis.

8   **Q.**  So does that terminated contract, does that reflect a

9   current market price for the time period in question?

10  **A.**  No.  No.  That's sort of why we're here.  Is that they

11  don't have a contract.  So it doesn't reflect the current

12  market price for the relevant period.

13  **Q.**  And as you looked at the situation and understand the

14  market, did that -- did you consider that prior contract, that

15  terminated contract, to be a comparable transaction to the

16  valuation of emergency services?

17  **A.**  No.  Again, it's got the elective in it and it's not the

18  relevant time period.  And again, I used the elective overall

19  in my market analysis.  So in OSHPD, it's included.  Not the

20  Blue Shield because it was terminated, but others are included

21  in there.  But certainly, to base one-third of your analysis on

22  a terminated contract that had rates that were really

23  reflective of this opportunity and strategy of NorthBay on the

24  elective side, I don't think that's appropriate.

25  **Q.**  And before we leave this, can you just elaborate a little

1  bit more on your third bullet here which is that the terminated

2  contract reflected higher rates based on the value of having

3  NorthBay in network for elective services?  And my question is,

4  is that a value that Blue Shield still has today?

5  **A.**    No.  That's actually -- what's interesting is the set of

6  claims we're talking about here, of course, are emergency

7  claims.  And patients, as we've described earlier, have an

8  opportunity to go to any emergency room and face similar

9  financial implications of that.

10      Whereas that situation when they were in network, then

11  Blue Shield clearly was getting the benefit of being able to

12  market to people in Solano County and similar locations of

13  having NorthBay.  So there's -- as we've noted, there's a lot

14  of value associated with that.  In fact, you can measure the

15  incremental value to that that payors were willing to pay

16  almost twice as much to have NorthBay in their contract.

17  **Q.**    In the network.  In the networks?

18  **A.**    Sorry.  Yes.  In the networks.  Exactly.  So, again, it's

19  not appropriate in this case where there are no such benefits.

20  Blue Shield isn't able now to market NorthBay as being in

21  network.

22      It's true that people -- Blue Shield people can go to

23  their emergency room, they can go to Kaiser, they can go to any

24  emergency room that's out there.  That's not special to

25  NorthBay.  But he's sort of conflated those two things.

1    **Q.**   And just more generally, does one terminated contract in

2    your view reflect the market payment rate for emergency

3    services in the geographic area?

4    **A.**   No.  I think that's another kind of methodology issue in

5    some sense.  And what I've got on the screen now is really an

6    illustration.  So these are not actual data points here.

7         But what I'm showing is NorthBay on the left, other

8    hospitals on the right.  Again, in a conceptual way.  And

9    saying for each payor -- government payors, private payors --

10   you're going to have a range from higher to lower.  And what

11   I'm showing here at a high level is this methodology -- first

12   of all in the other hospitals -- he's not looked at what any

13   other payor has paid any other hospital.  So it just has a big

14   X over there.

15        And for NorthBay, again, it's -- first of all, it's

16   terminated.  But even setting that aside, it's one payor at one

17   hospital.  Blue Shield at NorthBay.  That's certainly not the

18   overall assignment here.  The overall assignment is to look at

19   all payors in the whole region there.

20        So I put a big X through almost all of them except for

21   one.  And again, he's used a contract here, and it's

22   terminated.  But the important point here is this would imply

23   that reasonable value is specific to each individual contract.

24   That's actually not accurate from an economic perspective.

25        The broad question is:  What's the going rate in the

1  region?  The going rate in the region isn't what you pay or

2  what you pay or what I pay.  It's the overall payment level in

3  the region.  So by choosing -- by sort of focusing just on one

4  payor and one hospital, you're looking at kind of the wrong

5  thing.  And he's applied one-third of his weight to this.

6  **Q.**  Are you saying that the result of Mr. Heil's using this

7  terminated contract was that -- effectively, are you saying

8  that he finds a different reasonable value rate depending on

9  who the carrier is?

10  **A.**  I think that's the implication.  He hasn't literally done

11  a reasonable value calculation for Health Net or Kaiser or

12  others.  But as I understand his approach, it would be -- that

13  would effectively be what he's implying.  Is I want to look at

14  -- you know, Health Net's got a low contract, for instance.

15  Okay, well, maybe then their reasonable value is actually quite

16  a bit lower.

17     That's not the objective of this analysis.  This objective

18  of this analysis is not what should that payor pay or this

19  payor.  The objective is what should -- what are the reasonable

20  value of emergency services in the geographic area?  And all

21  payors should pay that.

22  **Q.**  So when Mr. Heil testified there was an example or

23  hypothetical that was used I think when discussing the Blue

24  Shield contract.  And I think that hypothetical, if I could

25  state it, if I could recall it, is if a customer comes into a

1    hamburger shop and pays $12 for a hamburger day after day, and

2    then comes into the hamburger shop the next week and says, All

3    I want to pay is $4.  You know, would that be appropriate?  Or

4    something like that.

5         And do you think that that's the sort of right framework

6    to be looking at this?

7    **A.**    No.  As I would understand the way you've described that

8    hypothetical, in that case it's equivalent to the elective

9    services.  I don't think it's right -- and this is not what

10   Blue Shield has done -- but I don't think Blue Shield should

11   say:  I still want to be in your network and I still want to be

12   -- send my people there, elective procedures, but I just don't

13   want to pay your rates.  I'm still going to pretend like we

14   have a contract, but I'm going to pays you less.

15        That's the equivalent of:  I still want your hamburger and

16   I'm voluntarily going here, but I just don't want to pay as

17   much.

18        If you can't meet -- a meeting of the minds on the price,

19   you shouldn't do that.  And that wouldn't be the right way to

20   think about it.

21        But that's not the situation here.  The situation here is

22   more of -- it's a forced transaction.  It says:  If we said all

23   jurors have to go nextdoor and get a hamburger after jury

24   service here at 1:00, and you've got to go over there and get

25   it --

1   Q.   And you can only go to that one hamburger place?

2   A.   You've got to go to the closest shop, and that's the one

3   there --

4   Q.   Are you saying in your twist here that if one were to

5   assume that every juror was forced to go to that same hamburger

6   shop to get a hamburger after leaving for the day?

7   A.   That's right.  And there -- the equivalent framework.

8   Obviously, it's a little bit of a silly hypothetical, but I

9   think it illustrates the point.

10      To protect people from being gauged -- so one guy might

11  voluntarily want to go there for 12 times that, but I

12  personally wouldn't.  I don't know if I'd ever pay $12 for a

13  hamburger.  But we wouldn't want that.

14      So the framework is you have to go there, you have to get

15  a hamburger, but all you have to pay is the overall regional

16  rate.  And, you know, we figure out what the right region is,

17  we'd analyze that.  We'd say the overall regional rate's $4, or

18  $4.50, or something like that.  That's what you have to pay.

19  Because you're being forced into it.  We're looking for the

20  regional rate for the hamburger.

21      So you don't get to, then, electively go there at night

22  and over the weekend and say:  I know your price is $12, but I

23  only want to pay $4.50 because that's what I paid when I was a

24  juror.

25      Two different concepts there.  So I think there's a mix-up

1    of the concepts.

2    **Q.**    So if I can tease out a little bit of what you're saying

3    in this admittedly silly hypothetical on hamburgers.

4         That -- if I understand what you're saying, is that the

5    jurors or if anyone were forced to go to the hamburger place

6    and were told all you have to pay is the going rate for a

7    hamburger in the geographic area, then the fact that the

8    hamburger place sells its hamburgers to people who come in

9    voluntarily at $12, that doesn't make a difference.  That's not

10   the governing rate, is what you're saying, for that forced

11   situation.

12   **A.**    That's right.  Now, you certainly might, when you're doing

13   your overall analysis of the region, you might include that --

14   in fact, you would probably include that hamburger stand and

15   say, Oh, that one's $12.  This one over here is $3.  That one

16   is $6.  You want the overall price, so you may factor that data

17   in to your overall regional price.

18        But at that point it becomes the overall regional price.

19   And that is the number -- the $4.50 -- in my continuation of

20   the illustration on that.  That's the number that you would

21   pay, not the $12 that's listed there.

22        Presumably the hamburger stand has voluntarily agreed to

23   be part of this program that the court has set up there so

24   they've opted into this program, if you will.  So once they've

25   opted in and agreed to accept that price, then that is the

1   price.

2   **Q.**   And in that hypothetical, before we leave it, if one

3   particular juror had, the week before, voluntarily gone to that

4   same hamburger place and paid the $12; if that same juror is

5   now being forced along with the other seven to go there as part

6   of this forced transaction, does that one juror now -- is the

7   market price for that sort of forced purchase, is that now --

8   does that juror have to pay more because two weeks ago she went

9   and voluntarily got the hamburger for 12?

10  **A.**   That's not my understanding of the appropriate framework.

11  My understanding of the appropriate framework is in this forced

12  transaction even people that might have voluntarily gone and

13  paid more are paying the 4.50.  People that voluntarily

14  wouldn't have paid that also have to go and they also have to

15  pay the 4.50 number.  Even if they never would go there in

16  other circumstances.

17      So it's not -- the price isn't:  You pay 12, you pay 8,

18  you pay 3, you pay that.  The price is the regional price.

19  **Q.**   So if we were looking at, in that example, the free market

20  rate for the hamburger in the geographic area, and each of the

21  eight jurors went under that compelled forced situation to buy

22  the hamburger at that one place, the market rate in the

23  geographic area wouldn't be $12 for juror 1, $8 for juror 2, $6

24  for juror 3.  It would be sort of one set market rate depending

25  on how the data came out?

**A.**   You could think of it almost like there's a voucher that's

worth $4.50.  And the hamburger stand's agreed to accept that

voucher.  We hand a voucher to each juror.  They get to go

spend it there.  It's the same for each juror.

**Q.**   Mr. Deal, so I think you have some other thoughts in

connection with again using this Blue Shield contract -- this

old Blue Shield contract, as well -- in terms of the 15

percentage points that Mr. Heil adds?

**A.**   That's right.  And again, not only is there kind of I

think a fundamental understanding of the rate framework here

and all the issues we talked about, but he actually adds 15

percentage points to it.  The highest rate I observed was

80 percent, I'm going to add 15 percent, and call it 95?

      And I think he does that, because he sort of says, Well,

oftentimes one says volume discounts, things like that.  So

must be getting some extra value from it.  You don't get that

value now, so we're going to add 15 percent.

      Besides just sort of the optics of that, which are sort of

unusual there, I think it's also the case that he hasn't done

any analysis to say is this exact situation one where there are

significant benefits going to Blue Shield, for instance, that

they don't have now -- or excuse me -- going to the hospital

that they don't have now in terms of prompt payment, things

like that?

      I mean, to me it's clear when one looks at the data that

1  this is not a situation where one would say:  Oh, you need to

2  add 15 percent.  This contract was paying well above what other

3  regional prices were.  So I don't think he's got the direction

4  right on that.  But the effect of it is to make the price even

5  higher there.  I just don't think that's appropriate.

6  **Q.**  Just to be clear on that.  Is your view, when you say he

7  got the direction wrong, is your view -- is that based on your

8  analysis of what you're seeing in the market and whether the

9  terminated contract rate actually reflected a premium to have

10  NorthBay in network?

11  **A.**  That's exactly right.  So even if it were the case -- and

12  it's true that sometimes in-network rates may be lower than

13  out-of-network rates.  So even if there's a theoretical basis

14  for doing that, in this case the in-network rates are much

15  higher than the overall market rates for this type of service.

16  That's why I say even if in some circumstances adding

17  15 percent, if we saw particularly low contract, here it's a

18  high contract.  So you don't want to add 15 percent to an

19  already above-market -- above market in the sense of other

20  regional hospitals.

21  **Q.**  Understood.  Let's move to the second component of

22  Mr. Heil's analysis.  His -- what he calls the -- what he calls

23  the most comparable emergency services contract.  And which I

24  think you indicated was the -- largely, the terminated Kaiser

25  contract, some rental network payments, and then some one off

1    -- I guess individually negotiated letters of agreement?

2    **A.**    That's right.  And I'll take those each one by one.

3        So the top row of his analysis -- and just to start with

4    the bottom of that is he comes up with an average across all of

5    these of 81 percent, and he again adds 15 percent.  So I won't

6    talk about the 15 percent again.  But he adds 15 percent.  So

7    here he gets almost full billed charges.  96 percent of full

8    billed charges.

9        The top row is the Kaiser contract, which again, same

10   logic of Blue Shield.  That it was terminated, so it actually

11   wasn't an active contract.  It also is, of course, one payor

12   and one hospital.  So it's not the right regional analysis

13   looking across not just all private payors but actually all

14   payors.  So it's got the same flaws there, but it's not in

15   force during the period.

16       The second -- just to sort of describe that for a moment.

17       The next few rows are what we call rental networks.  Those

18   were at least in force during the relevant period.  So at least

19   he's got the timing right on those.  That they were active

20   contracts then.  And what he's done again is take -- included

21   those in his overall average.

22       I think there's a couple of problems with those as data

23   points, as well, starting with the fact that they're kind of

24   rental -- not "kind of" -- they are rental networks as opposed

25   to direct contracts.

1    **Q.**   All right.   And before getting into sort of the rental

2    network I wanted to sort of take you up to 30,000 feet a little

3    bit on this particular second method.   And before we get into

4    sort of the individual transactions, does this particular

5    component of Mr. Heil's analysis, in your view, even measure

6    the market prices for the services in the geographic area?

7    Does it even seek to get to that?

8    **A.**   "No" is the short answer, other than in a very, very

9    limited way.   Which is to say, he does look at some prices --

10   or at least the contract prices -- for a few transactions.   So

11   he, basically, has an extremely limited set of actual payments

12   from one hospital.   So he's not -- again, this method doesn't

13   do anything to look at any other hospitals, it doesn't do

14   anything to look at any other payments, and it only looks at a

15   tiny slice of payments for NorthBay.   So it is certainly not

16   consistent with what I understand the assignment to be.

17   **Q.**   And with the exception of the Kaiser contract, which was

18   from an earlier time period, what NorthBay was getting from

19   these rental networks was that included in the data that you

20   used for your analysis?

21   **A.**   Yes.   Again, my analysis with the OSHPD data includes all

22   of these payments.   So notwithstanding the fact it's a very

23   small slice, I actually include that.   Mr. Heil makes that tiny

24   slice one-third, along with the terminated contracts and the

25   LOA's of his analysis, and that's just not accurate.

1   Q.   Just again, does this data tell you anything about what

2   these services are being sold for by -- at other hospitals in

3   the geographic area?

4   A.   It doesn't tell you anything about any other hospital.  It

5   only tells you one percent of NorthBay's payments.  And

6   NorthBay itself is only 15 percent of the total volume in the

7   whole thing.  So it's less than 1 percent of 15 percent.  It's

8   a tiny, tiny slice.

9   Q.   Let's briefly talk about rental networks.

10  A.   Okay.

11  Q.   And the jury's heard some testimony so I don't want to

12  belabor this point.  But can you just give the jury a brief

13  overview again?

14  A.   Yeah.  I think the best analogy to this is like a AAA

15  discount card.  Where AAA has gone and negotiated discounts

16  with restaurants or hotels, or things like that.  Often 10,

17  15 percent kinds of discounts.

18      And then if you're a AAA member, you can sort of see if

19  there's a discount associated with that rate.  And that's

20  equivalent to what payors that sign up with MultiPlan, for

21  instance.  MultiPlan has gone out -- they're equivalent to AAA.

22  They've gone out and negotiated usually fairly modest

23  discounts, but something from quite a number of hospitals, or

24  physicians, others, kinds of things.

25      And then if you're -- usually a small payor, or say

1  someone from out of state, so you're insured in New York state

2  and one of your people is out here on vacation in beautiful

3  northern California and gets injured, has to go to the

4  emergency room.  Well, you sort of say, Well, I'm a member of

5  MultiPlan, I pay to be part of that, let's see what kind of

6  rate they have at that hospital.  And if you like it, you can

7  access it.  If you don't, or you have a different approach, you

8  don't have to use it.  So it's totally voluntary to do it.

9      And then if you do use it, you often pay AAA the

10  equivalent, or MultiPlan, a little extra fee.  That's not paid

11  to the hospital.  That's paid to AAA.  So it's a little

12  different from AAA because when you use it you're paying a

13  little extra to AAA.

14      But it's conceptually the same.  It's a voluntary

15  situation where the payor has an option, but not a requirement,

16  to use that discount.  They're typically fairly modest

17  discounts.  But they're not a direct payment from the payor to

18  the hospital.  So they're kind of -- they're an interesting

19  very small slice of the payment situation.

20  **Q.**  Okay.  And did you look at, Mr. Deal, sort of how

21  frequently these rental networks were actually used?

22  **A.**  I did.  That's what's on the screen here.  The box to the

23  right of the big red box are shares of total private payments.

24  So what that -- I won't go through each number, but 0.2 percent

25  means of all the private payments, that first MultiPlan number

1    represented 0.2 percent.  So one-fifth of one percent of the

2    total volume.

3         The upshot of this is that it's less than 4 percent of

4    private pay, which means it's well under 1 percent of all

5    payors.  So these are very low volume.  The AAA card doesn't

6    get used that much, basically.  It's included in my OSHPD data,

7    but I certainly don't think it's the right basis for one-third

8    of anyone's determination of reasonable value.

9    Q.   All right.  And let's -- I think lastly, we don't need to

10   spend much time on it, are these one-time agreements, as well?

11   A.   Those, again, are very, very small volume.  Those are

12   typically a situation where the patient is already there at the

13   hospital.  They've often gone in for emergency or something

14   like that, and the payor is simply trying to say, you know,

15   rather than potentially go through a dispute, all those kinds

16   of things, can we come to some one-time one-off agreement

17   there?

18        And Mr. Heil looks at some, but not all of those, and

19   includes some of those in his analysis.  But those are not

20   really willing buyer/willing seller in the sense of before the

21   patient is there.  They're typically, in my experience, the

22   patient is already there.  And so you're, basically, trying to

23   say is there, basically, some discount I can negotiate?

24   Q.   Let's put things in perspective before we leave this.  Can

25   you remind the jury how much of NorthBay's actual volume during

1    the disputed period was Mr. Heil considering in this factor?

2    In this factor number 2?

3    **A.**    Yeah.  So what I'm showing here is literally a summation

4    from his own data set here, by payor, on the left side.  And

5    this is total relative volume on the right side.  I have

6    highlighted the plans we were just talking about.  The rental

7    networks.  And you can see my comment on the right is they

8    represent less than 1 percent of total volume of all payors.

9    And that's including the government payors there.  Less than

10   4 percent of private payors.

11   **Q.**    All right.  And have you prepared sort of a 30,000-foot

12   visual if we were just looking at NorthBay as to what

13   percentage of the transactions or the volume did Mr. Heil use?

14   **A.**    Yeah.  And I think I've mentioned this a couple of times.

15   But he doesn't use any of the government data.  He ignores for

16   his purposes of his method 2 the 20 percent of total volume

17   that's the other private payors, and he's using less than

18   1 percent of the actual payments.

19   **Q.**    So --

20   **A.**    So it's a very small slice.  0.6 percent actually.

21   **Q.**    0.6 percent?

22   **A.**    Is the actual number, yes.

23   **Q.**    And so sort of if one's taken down to sort of the service

24   level, if one were looking at the percentage of times that

25   NorthBay was selling a particular service to customers, to

1   different payors -- whether it's an MRI machine, whether it's

2   lab tests, whatever service -- if one is looking at NorthBay

3   selling that service 1,000 times to -- to all the buyers who

4   are buying -- who NorthBay's choosing to sell to -- that orange

5   slice over here represents the government?

6   **A.**   Exactly.

7   **Q.**   And so in that -- well, in that -- my math is not very

8   good, I won't do out of a thousand.  But if we're doing at a

9   hundred, if they're selling that lab test 100 times to the

10  various buyers who it was choosing to sell to, you're saying

11  about 80 percent of the time they'd be selling that service to

12  a government payor?

13  **A.**   Yes.  That's right.  To stay with your thousand number, if

14  you wanted to, you know, 793 times they'd sell it to Medicare

15  or Medicaid, 201 times they'd sell it to other private payors,

16  and 6 times out of a thousand they'd sell it to these

17  particular private payors.  So it's a very small slice.

18  **Q.**   And it's your opinion that all of those sales, all those

19  thousand sales, are willing buyer/willing seller transactions?

20  **A.**   Yes.  That's accurate.  Obviously, there have been

21  disputes on some of them, but the data that gets reported would

22  include the results of any of those disputes.

23  **Q.**   All right.

24          **THE COURT:**   Is this a good time to take a break,

25  Mr. Pimstone.

1    MR. PIMSTONE:  It is, Your Honor.  I'm almost done,

2  but yes, absolutely.

3    THE COURT:  So ladies and gentlemen, we'll take

4  another break for 15 minutes.  Please remember the admonitions.

5    (Recess taken at 11:22 a.m.)

6    (Proceedings resumed at 11:38 a.m.)

7    THE COURT:  All right.  Please be seated, everybody.

8  Mr. Pimstone, go ahead.

9    MR. PIMSTONE:  Your Honor, I'd like to publish slide

10  19 from NorthBay's demonstratives.

11    THE COURT:  Go ahead.

12  BY MR. PIMSTONE:

13  Q.  Mr. Deal, this is a slide that has been prepared from

14  NorthBay's demonstratives.  I believe it comes out of

15  Mr. Heil's rebuttal report.  Or at least it's a compilation of

16  two slides sort of smooshed together from his report where he

17  is criticizing your method.

18    And in this slide looks like there's data reflecting his

19  conclusion regarding the transactions we discussed.  These

20  rental networks transactions where the average was 81 percent.

21  A.  Yes.

22  Q.  And there was also the in-network contract rates which he

23  didn't use for his mathematical computation, but he averages

24  out to 62 percent.  And then looks like he's got your all-in --

25  your 2 times Medicare, or 1.8 times Medicare analysis, here at

1   12.2 percent.  And he criticizes your method as producing a

2   number that is not in line with those other two values.

3       Do you have sort of a comment to that since this is the

4   one time we're going to hear from you?

5   **A.**   Sure.  Yes.  I think we've been over some of the critique.

6   So first of all, all of his analysis on here is only looking at

7   private payors so he isn't doing any analysis of Medicare or

8   Medi-Cal, which again is part of my 12.2 percentage.  So it's a

9   little apples and oranges, to begin with.

10      But specifically, the bar on the left is the terminated

11  contract.  We've talked about that.  It's one particular payor

12  with one particular hospital.  None of these represent payment

13  rates to any of the other hospitals which represent 85 percent

14  of the volume in the entire region in my analysis.

15      The middle set, the green ones, the left one again is a

16  terminated contract.  It wasn't relevant during the period.

17  And the other bars are the rental networks or the one-time

18  agreement on the right-hand side and again we've talked about

19  that.  It's very small slice of payors.  It's less than

20  1 percent of total payor mix for NorthBay.

21  **Q.**   It's less than 1 percent of what NorthBay gets --

22  **A.**   From all payors, yes.

23  **Q.**   And does that value, that 81 percent, even if it's

24  accurate, does that give you any sense for what the market rate

25  is for the services in the geographic area?

1  **A.**   No.  It doesn't say anything about any other hospital, for

2  one.  And it tells you very little about NorthBay even.  And,

3  of course, he adds 15 percentage points to each of these, too.

4  So he's not showing that.  He's actually even more extreme.

5      The right-hand side he actually isn't even using that for

6  his opinion, where I actually include -- at least there he's

7  talking about other more substantial payors -- I include that

8  in my OSHPD analysis.  He actually doesn't include it in his

9  analysis.  So it's part of the appropriate data set to use from

10 -- when you're looking at the overall OSHPD type analysis, but

11 it's certainly not sufficient.

12 **Q.**   So the values that go into that 62 percent, you include

13 that in your overall mix.  When you're looking at what are

14 sellers, hospitals, getting in the geographic area, those

15 numbers are included in your analysis.

16 **A.**   The actual payment level.

17 **Q.**   The actual payment level, right.

18 **A.**   From the OSHPD data, yes.

19 **Q.**   And do you weight those in accordance with sort of how

20 those compare to the other data points from what other

21 hospitals in the geographic area are selling the services for?

22 **A.**   That's correct.  The overall analysis is weighted by

23 hospital and within each hospital, effectively weighted by

24 payor.

25 **Q.**   Understood.  Let's move on to -- Mr. Heil has one more

1  component to his analysis which is his billed charge analysis.

2  And, Mr. Deal, can you -- if we can go to -- what was your next

3  slide in order?

4  **A.**   Yes.  So the geographic region.

5  **Q.**   The billed charge analysis.

6  **A.**   Right.

7  **Q.**   Can you tell us what your conclusion is as to whether that

8  third factor of Mr. Heil's is appropriate to use?

9  **A.**   Yes.  So as I said earlier, at least with this method

10  Mr. Heil is also thinking about regional issues.  Remember, my

11  analysis is a market analysis of prices in the geographic area.

12  Mr. Heil here has also looked at a geographic area.  He's used

13  a somewhat different set of criteria.  He's actually got two

14  different groups of hospitals, group 1 and group 2.

15      I'm representing each of those, the blue -- again, the

16  blue pluses, if you will, are ones that he includes.  The red

17  ones are -- the orange ones are ones he does not include.  You

18  can see that he's sort of included some and not included others

19  in the broader region.  He goes as far down as San Jose for

20  some of his.  So I think I sort of quibble a little bit with

21  just how far he's gone.  But, in fact, that's actually not

22  really driving much difference here.  At least, again, he's

23  looking at the right geographic concept; that we've got to look

24  at a regional thing.

25      But the big flaw, as I note in the second bullet, is he's

1  looked at the wrong thing.  He's looked at billed charges from

2  the region.  Whereas payments is the appropriate thing to look

3  at.  So it's sort of closer, but still completely not useful

4  for this analysis.

5  **Q.**  And have you prepared a -- sort of an example to show us

6  as to sort of how that might play in other areas?

7  **A.**  Yes.  So this is, again, an example.  And we're all used

8  to kind of a crazy housing market here in the bay area.

9       Imagine a different situation, but there was -- also crazy

10  but in different ways -- where there's list prices and sale

11  prices of houses.  And for whatever reason in this other crazy

12  market, people list their house for several times what they

13  actually expect to get paid for it.

14       So you can see my little example here the question is,

15  Hey, what's the value of my house?  And I've got some recent

16  listing houses -- listing prices, in the neighborhood.  And

17  these are houses that actually sell.  So the top row is, you

18  know, 400,000, 420, 500,000 so on.  So if you simply looked at

19  list prices for this set of comparables you'd say, Oh, what's

20  the value of my house?  $405,000.  That's the number on the

21  right.  That's the average of those list prices.

22       The problem is in this weird housing market I'm

23  describing, the actual sale prices are a fraction of those list

24  prices.  You can see the sale prices on the bottom 100,000,

25  110,000.  We all wish that the prices were really like that in

1    the bay area.  This is my hypothetical.

2        But you can see the actual sale price in this example,

3    lower right, is 102,500.

4        Simplest way to look at this is I'm looking at actual sale

5    prices.  I'm looking at real prices in the market.  Mr. Heil's

6    looking at list prices in the market.  Billed charges

7    unilaterally set by hospitals, no real constraint, and often

8    multiples of what people actually get paid.

9        So that's sort of the framework.  Is that he's just looked

10   at the wrong thing.

11   **Q.**   So in your opinion, does knowing what the 75th percentile

12   is of the list prices of the billed charges, does that tell you

13   anything about the going market rate for the services?  The

14   actual market rate for the services in the geographic area?

15   **A.**   No.  It tells you close to nothing.  The only thing,

16   honestly, that I think this analysis really shows -- at least

17   to me in this next slide -- is just how high NorthBay's charges

18   are relative to others.

19        So what I'm showing here is, as a multiple of Medicare --

20   so this is not payments as a multiple of medical care, this is

21   the list prices or the billed charges relative to Medicare,

22   using OSHPD data -- I'm arraying these from using his own data

23   on geographic peers.  Lowest, Sutter Santa Rosa, to highest.

24   And you can see the highest bar on here is the blue bar,

25   NorthBay Medical Center.  So they're actually, of all of his

1   peers, they actually have the highest billed charges of anybody

2   in his own set of peers.

3       And you can see the lower two bars are -- the combined is

4   6.9 times Medicare.  If you exclude NorthBay it would be 6.8.

5   So they're almost twice as high as anybody else.  So they're

6   essentially irrelevant to begin with, but NorthBay in

7   particular has very high charges.

8   Q.  And I think you've got another graphic here that

9   illustrates that same point?

10  A.  That's right.  So that was using Mr. Heil's peers.

11      If you were to use my peers and my comparable hospitals in

12  the geographic area, you get a very similar number.  Which is

13  to say, the other hospitals are -- they set their list prices

14  about 6 or 7 times what Medicare pays, and NorthBay sets it

15  almost twice as high.  So just illustrating kind of the

16  disconnect between both billed charges and actual payments and

17  the fact that there's a lot of variation and hospitals can

18  essentially set their billed charges wherever they want.  Which

19  means if you're very, very high in your billed charges, it's

20  not that surprising that 2 times Medicare looks like a small

21  percentage of billed charges.  Billed charges are very, very

22  high.

23  Q.  Now, did you -- I know that you said that you quibble a

24  little bit with Mr. Heil's sort of comparable hospitals, how

25  many he used.  Did you undertake an analysis as to whether if

1    you took Mr. Heil's list of hospitals and you computed -- and

2    you looked at the OSHPD data -- to see what were those

3    hospitals actually getting in the market for their services?

4    Did you do that analysis?

5    **A.**    I did, yes.

6    **Q.**    What did you find?

7    **A.**    Again, on the next slide, I show here if one looks at the

8    right thing, if you use his own set of hospitals but look at

9    payments, you know, the short version is you get almost an

10   identical multiple of Medicare as to my analysis.  You get 2.6

11   to 2.8 times Medicare.

12       So, you know, any differences between Mr. Heil and myself

13   are really not driven by his set of hospitals versus my set of

14   hospitals; they're driven by him looking at billed charges.

15   Whereas if he'd actually looked at payments, he would have come

16   up with a very different conclusion.

17   **Q.**    Okay.  So if you could wrap it up for us, Mr. Deal, and

18   just sort of give us again a summation of what your opinion is

19   and if there are any, like, one or two take-aways we should

20   keep in mind what those take-aways are.

21   **A.**    Yes.  Just very, very quickly just to remind the jury what

22   -- the task that I undertook, the factors I considered, was to

23   look at the going rate, meaning payments, in the geographic

24   area, the geographic region, considering the facts and

25   circumstances there.  Looking at actual claims and services at

1    issue there.  Didn't focus on costs or the quality or the

2    billed charges.  We just talked about the billed charges.  Or

3    any other services.

4        So that was my task.  I understand that's consistent with

5    the jury instruction.

6        And then ultimately to sort of summarize, via a little

7    graphic here.  In my analysis at the top -- this is like a

8    little version of that slide I showed earlier.  From an

9    all-payor perspective, if you look at all payors, Medicare,

10   Medicaid, private payors; all sellers, NorthBay and the others

11   for OSHPD and the others for Blue Shield; all hospitals; you

12   would get, using all payors, 1.8 to 2 times Medicare.  We

13   talked about that.

14   **Q.**   Let me stop you there for just a second to let that point

15   sink in for all of us.

16       So if we were looking at what is the going market rate in

17   the geographic area for all of the sellers when they were

18   selling to all of the buyers who they choose to sell to --

19   they're not being forced to sell to, but they choose to sell

20   to -- that number is 1.8 to 2 times Medicare?

21   **A.**   That's right.  And if one were to focus just on the

22   private payors, it would be the 3.3 to 4.1 times Medicare.  And

23   I've noted that on there, as well.  That would be -- on the

24   left, that would be a smaller set of the payors because that

25   would just be a smaller circle just looking at private payors.

1    So that would be excluding the big payors of Medicare and

2    Medi-Cal, Medicaid.

3         So that's my approach.  Those are my calculations.

4         And then down below I've kind of summarized visually a

5    little bit what Mr. Heil has done and I think the concerns that

6    I have with those.

7         So you can see on the seller picture, rather than looking

8    at all hospitals, his first two methods only look at NorthBay.

9    So they don't consider other sellers at all.  And his first

10   method -- the terminated Blue Shield contract -- looks at one

11   payor.  Of course, it looks at the terminated contract, as

12   well.  But just in terms of the visual on it.  So it's a small

13   one payor, small subset of payors, for just one hospital.  Not

14   looking at prices in the market.

15        The second one is looking at more payors.  It's a Kaiser

16   terminated contract.  Again, terminated.  Active contracts

17   during the time period it was very, very small volume.  We

18   talked about that.  The 1 percent.  So both of those two

19   methods are looking at very small pieces of the overall

20   payment -- pie, if you will -- and just one hospital.

21        And the third one he at least is looking at all hospitals.

22   Again, a little different set of geographic hospitals, but

23   that's not what's driving it.  Unfortunately, he looks at

24   billed charges only.  So you can see he hasn't looked at any

25   payors in the sense of he hasn't looked at any actual payment

1  levels.  If he had, would have come up to a very similar

2  conclusion to my own.

3        **MR. PIMSTONE:**  Mr. Deal, thank you.  I have no further

4  questions.

5        **THE COURT:**  Mr. Tooch.

6        **MR. TOOCH:**  Thank you.

7                    <u>**CROSS-EXAMINATION**</u>

8  **BY MR. TOOCH:**

9  **Q.**  Good morning, Mr. Deal.

10 **A.**  Good morning.  Close to afternoon.  But, good morning.

11 **Q.**  NorthBay has two hospital campuses, right?

12 **A.**  That's correct.

13 **Q.**  One in Fairfield and one in Concord, right?

14 **A.**  NorthBay?

15 **Q.**  One in VacaValley.  Sorry.  I'm mixing up the hospitals.

16 **A.**  Okay.

17 **Q.**  The one in Fairfield has a trauma center, right?

18 **A.**  That's right.

19 **Q.**  And it has a NIC-U?

20 **A.**  I believe that's true.

21 **Q.**  And a cath lab?

22 **A.**  I believe that's also true.

23 **Q.**  And a chest pain center?

24 **A.**  Yes.

25 **Q.**  And a primary stroke center?

1    **A.**    What was that last one?

2    **Q.**    A primary stroke center?

3    **A.**    I know they have a stroke center, yes.

4    **Q.**    And VacaValley doesn't have any of those, right?

5    **A.**    I don't believe they do.

6    **Q.**    So of the two campuses, which would you say provides the

7    more complex work?

8    **A.**    Well, I think you just went through the available services

9    are more at Fairfield.  I assume that they provide similar for

10   the similar kind of patient that would go to each one.

11   **Q.**    Which hospital would provide more complex services between

12   Fairfield and VacaValley?

13   **A.**    Fairfield would have more complex services available.

14   **Q.**    Let's go to slide number 9.  This is the slide from your

15   presentation.  We discussed the CMI.  Right?

16   **A.**    Yes.

17   **Q.**    And CMI's case index.  Right?

18   **A.**    Yes.

19   **Q.**    And you said it's a way to look at the relative severity

20   of patients' injury or illnesses.  Right?

21   **A.**    In general, that's right.

22   **Q.**    And I think you said that if you look at the trauma

23   hospitals, they're more severe than the non-trauma hospitals.

24   Right?

25   **A.**    Directionally, that's right.

1  **Q.**   And the CMI for NorthBay Medical Center, this is

2  Fairfield, right?

3  **A.**   Yes.

4  **Q.**   Is 1.4?

5  **A.**   That's accurate, yes.

6  **Q.**   Okay.  If you can go to slide 10, please.  If you could

7  blow that up, Mike.  This is VacaValley, right?

8  **A.**   Sure.

9  **Q.**   And you said has a case mix index of 1.4?

10  **A.**   That's not my independent view.  It's the data that's

11  reported.

12  **Q.**   I thought you said that the case mix index reflects how

13  severe the patients are at the hospital?

14  **A.**   As a concept, that's right.

15  **Q.**   And I thought you said the patients at Fairfield are more

16  severe than the patients at VacaValley because it has a trauma

17  center, a NIC-U center, a chest pain center.  But in your chart

18  you show the case mix index for VacaValley as higher than the

19  case mix index for Fairfield.

20  **A.**   This is based on the reported data.  So I think what

21  you're mixing up here, Mr. Tooch, is the idea that:  Are there

22  available services that might be high acuity?  And you might

23  have some patients that are relatively severe.  But you've got

24  to think about the mix of patients there.  So it could be that,

25  for instance, at Fairfield you've got a few patients that are

1  using some of those high tech services that might be higher

2  acuity, but you might have lots of low acuity patients as well.

3      So you can't certainly look at just the CMI and say, aha,

4  is there some problem here?  Or something like this.  This is

5  accounting for all the different patients.  It's a calculated

6  number.

7  **Q.**  If you go back to slide 9, please.  Blow that up a little

8  bit.  You can see that John Muir Walnut Creek has a level 2

9  trauma center, right?

10  **A.**  Yes.

11  **Q.**  And John Muir Concord does not.

12  **A.**  Correct.

13  **Q.**  And according to your slide, John Muir Walnut Creek has a

14  case mix index of 1.5, and John Muir Medical Center at Concord

15  has 1.86.

16  **A.**  That's reported data.

17  **Q.**  Are you saying that -- you're saying that the services at

18  John Muir Concord are more complex than the services at John

19  Muir Walnut Creek?

20  **A.**  I think that's an inaccurate statement of my opinion.  My

21  opinion is that based on the actual patients who go there and

22  the case mix that's assigned to each one, the average is higher

23  at Concord than Walnut Creek.

24      You're making a different statement, Mr. Tooch.  You're

25  saying the services that are available.  They may be more

1    complex.  That doesn't mean the average patient is more severe

2    from a case mix perspective.

3    **Q.**  So CMI is not a way to look at which hospital provides

4    more complex services, is it?

5    **A.**  I don't think I ever said that.  If I did, I was a slight

6    misspoken of it.  It's a way of showing what the average

7    severity of a patient who's there is.

8    **Q.**  Because if you're suffering from a trauma, you want to go

9    to John Muir Walnut Creek, and not John Muir Concord, because

10   they can treat you in a trauma.  Right?

11   **A.**  All else equal, that sounds right to me.

12   **Q.**  And the fact that there's five patients -- five more

13   patients at John Muir Concord who don't need trauma and say

14   they just need regular ER, compared to, say, two patients at

15   John Muir Walnut Creek who do need trauma, that doesn't tell

16   you about the severity of what that hospital can do.  In other

17   words, it doesn't tell you of the competency of a hospital,

18   does it?

19   **A.**  I don't think I ever said that it did.  But it's certainly

20   not a description of the complete list of services that are

21   available, if that's your question.  That's not what it is.

22   **Q.**  Okay.  So I believe you said on direct exam at 8:33 am

23   that you can't get exact matches between hospitals.  Right?

24   **A.**  I think that's fair in the sense that any analysis that

25   looks at geographic peers, there's obviously going to be some

1   differences between them.  Sure.

2   **Q.**   And so you try to get as close as you can, right?

3   **A.**   Overall, sure.  I mean, it's a balance between, obviously,

4   wanting similar kinds of hospitals, wanting them geographically

5   similar, wanting a certain number of them to have enough to

6   look at.  So it's a judgment.  It's a professional judgment.

7   **Q.**   You listed NorthBay as a level 3 trauma center, didn't

8   you?

9   **A.**   Yes.

10  **Q.**   You did not mention that it's verified by the American

11  College of Surgeons as a level 2 trauma center.

12  **A.**   That's right.  I'm using the consistent data here that's

13  reported to the state.  I'm aware -- I think we talked about

14  this in my deposition -- that there's other designations and

15  they may be a different level under other designations.  I'm

16  not trying to evaluate their trauma center.

17  **Q.**   And in your deposition you said you didn't know the

18  difference between verification by ACS or certification by the

19  county?

20          **MR. PIMSTONE:**  Object as to form, Your Honor.

21          **THE COURT:**  Is that true?

22          **THE WITNESS:**  I said I certainly don't know the

23  details of those things.  I know there's different

24  designations, but I certainly don't know the specific how one

25  is designated under one versus the other.  That's not what I've

1  been asked to study.

2  **BY MR. TOOCH:**

3  **Q.**   You don't know the difference between a level 2 trauma

4  center and level 3 trauma center, correct?

5  **A.**   Not in terms of any of the specific services, things like

6  that, no.

7  **Q.**   And you also did not know when you did your report what

8  level of NIC-U NorthBay had.  Right?

9  **A.**   I don't even remember us talking about that, but I don't

10  know specifically.

11  **Q.**   Okay.  And you don't know the difference between a NIC-U

12  level 1, 2, 3 or 4.  Right?

13  **A.**   I know there are differences in levels, but I certainly

14  don't know the specifics of what causes one to be one versus

15  the other.

16  **Q.**   And you also don't know what being certified as a chest

17  pain center means, do you?

18  **A.**   Same answer.  I'm aware that there are these

19  certifications from various bodies, but I've not been asked to

20  do any kind of clinical analysis here.

21  **Q.**   And the same with respect to a stroke center or a cancer

22  center.  Correct?

23  **A.**   Same answer.  I'm aware that there are various

24  designations, but I'm certainly not offering clinical opinions.

25  **Q.**   Now, in your calculations you used payor mix, right?

1    **A.**    You're talking about for my all-payor analysis?

2    **Q.**    Yes.

3    **A.**    Yes.  That's right.

4    **Q.**    You look at Medicare payments and Medi-Cal payments and

5    commercial payments.  Right?

6    **A.**    Yeah.  I think I was very clear that I showed each of them

7    separately.  And then for my all-payor analysis, I combined

8    them together.

9    **Q.**    In fact, in your report you said it was necessary to look

10   at Medicare and Medi-Cal to determine reasonable value.

11   **A.**    From an all-payor perspective, I agree with that.

12   **Q.**    Okay.  Now, you said Medicare is a willing buyer/willing

13   seller situation, didn't you?

14   **A.**    I agree with that, yes.

15   **Q.**    And you're saying a hospital can choose not to accept

16   Medicare.

17   **A.**    Almost nobody does, but they can.

18   **Q.**    Can you name one hospital that doesn't accept Medicare?

19   **A.**    Not a specific name.  I know there's some private

20   psychiatric hospitals, for instance, that don't.  But almost

21   every hospital does.

22   **Q.**    Other than a few private psychiatric hospitals, every

23   hospital accepts Medicare, don't they?

24   **A.**    Voluntarily, sure.

25   **Q.**    If they have an emergency room and a Medicare patient goes

1  there, they have to accept the Medicare rate, right?

2  **A.**   If they're a Medicare hospital, sure.

3  **Q.**   Even if they're not a Medicare hospital.  If they have an

4  emergency room and a patient goes there, they have to accept

5  the Medicare rate.

6  **A.**   Well, as a practical matter, almost all of them do accept

7  Medicare.  I think maybe what you're asking is if

8  hypothetically there was somebody who wasn't in Medicare?  Is

9  that what you're asking?

10  **Q.**   No.

11  **A.**   Maybe I'm a little confused by your question.

12  **Q.**   Medicare patient has an accident, goes to the emergency

13  room at a hospital, that hospital has to accept Medicare.

14  **A.**   I agree with that.  Again, as a practical matter, almost

15  all hospitals are -- you know, they accept Medicare.  So that's

16  exactly right.

17  **Q.**   And the hospitals can negotiate the rate with Medicare,

18  right?

19  **A.**   No, no.  That's right.  I think we talked about that.

20  **Q.**   You can't negotiate your taxes with the IRS, right?  Your

21  tax rate.  The tax rate is the tax rate, right?

22  **A.**   That's right, yeah.

23  **Q.**   You can choose not to work, right?  So you don't have to

24  pay income taxes.  But the tax rate is the tax rate, right?

25  **A.**   That would have other implications for your life, but,

1  yes, the tax rate is the tax rate.

2  **Q.**   If hospitals didn't accept Medicare, that would have other

3  implications for the hospitals.  Right?

4  **A.**   Sure.  I'm sure that answer is true.  I'm not sure if you

5  have something specific in mind.  But hospitals would look

6  different if they didn't take Medicare.  I agree with that.

7  **Q.**   So it's not a willing buyer/willing seller situation, is

8  it?

9  **A.**   I strongly disagree with that statement.  I think it is a

10  willing buyer/willing seller situation.

11  **Q.**   You charge $735 per hour for your work that you did in

12  this case, right?

13  **A.**   That's accurate.

14  **Q.**   And you expect to be paid $735 an hour, right?

15  **A.**   Yes.

16  **Q.**   If at the end of the case Blue Shield doesn't think your

17  testimony was that great and it only pays you $20 an hour, you

18  would not be a willing seller of your services at $20 an hour,

19  would you?

20  **A.**   No, but you're -- I think your hypothetical is that we

21  both understand up front.  They don't have to hire me, I don't

22  have to work for them.  We agree on $735 an hour.  I do the

23  work.  I expect to be paid $735 an hour.  It's a voluntary

24  elective type situation.  For them to come out after the fact

25  and say, you know, "I know we agreed on 735, but how about 20

1    bucks," is your hypothetical.  I wouldn't be happy.  That

2    wouldn't be fair.  And it wouldn't be legal, I don't think.

3    **Q.**   And you wouldn't be a willing seller at that rate, either,

4    right?

5    **A.**   I was a willing seller at 735.  I wouldn't be a willing

6    seller at 20.

7    **Q.**   Okay.  So if there's a contract, a retainer contract,

8    between you and Blue Shield which says you get paid 735, but

9    you're only getting $20 per hour, the fact that you're only

10   getting $20 per hour doesn't reflect the reasonable value of

11   your services, does it?

12   **A.**   I'm not sure if that's different from the hypothetical you

13   just said.  If there was an overall agreement that said any

14   work I do for Blue Shield is 735 an hour, and then for whatever

15   reason Blue Shield said I only want to pay you 20?  That seems

16   like that would be inconsistent with our agreement.  So --

17   **Q.**   So if United Healthcare has a contract with NorthBay for

18   78 percent of charges, but it only pays 20 percent of its

19   charges -- that's what NorthBay's getting -- that's not an

20   accurate reflection of what the parties agreed to as a willing

21   buyer/willing seller.  Correct?

22   **A.**   If I understand your hypothetical, I guess not.  I'm not

23   sure I quite understand it.  So you're saying if there was an

24   agreement, it was very clear to pay X percent, and for some

25   reason they paid less than that?  I'm not quite sure I'm quite

1    --

2    **Q.**    That's exactly it.

3    **A.**    Sounds from your hypothetical like that would be

4    inconsistent with the agreement.  But, obviously, there could

5    be probably lots of reasons that one would want to understand

6    as to why what was happening.

7    **Q.**    So what the hospital gets isn't an indication of what's a

8    willing buyer/willing seller price.  If there's a contract for

9    a willing buyer and a willing seller, and they've got a written

10   contract signed by both parties which says "I'm going to pay

11   you 78 percent of charges," the fact that United pays NorthBay

12   20 percent of charges, and that's what NorthBay gets, that

13   doesn't reflect what the willing buyer/willing seller

14   agreed-upon price is, does it?

15   **A.**    That doesn't sound like that's at all the situation in

16   health care.  I'm not sure this hypothetical you're providing.

17   I don't understand that payors are in the business of violating

18   their contracts in any significant way, so I don't -- your

19   hypothetical seems off base to me.

20   **Q.**    You've never worked at a hospital, have you?

21   **A.**    I've worked for many hospitals.  I've not been actually

22   employed by a hospital.

23   **Q.**    And you've never worked in the collection department of a

24   hospital, have you?

25   **A.**    I have not worked in collection.  I've been involved in

1   many disputes between hospitals and payors, but I've never

2   worked in collections department.

3   **Q.**   There's a lot of disputes between hospitals and payors of

4   a collection of correct payments of the --

5   **A.**   There certainly are a variety -- these are complex --

6   oftentimes complex contracts and situations.  So, sure, there's

7   definitely some disputes that happen.

8   **Q.**   You're making a lot of money out of those types of cases,

9   aren't you?

10  **A.**   I mean, you can define "a lot of money."  But certainly,

11  for instance, here I am being paid $735 an hour to work on this

12  dispute.  So, yes, it's certainly an area of my practice.  No

13  question about it.

14  **Q.**   And Mr. Pimstone and me also make a lot of money.  This is

15  what we do almost 100 percent of the time.  We litigate these

16  types of cases where I represent the hospitals, he represents

17  the insurance companies, over disputes regarding payment.

18  There's a lot of disputes regarding payment, aren't there?

19  **A.**   There certainly can be, yes.  As a percentage of the total

20  volume of payments, it's pretty small.  But, obviously, they

21  happen.  And sometimes the amounts are significant enough to --

22  for the parties to actually go to litigation like this.

23  **Q.**   Now, let's go to slide number 5, I believe it is.

24       Okay.  *Quantum meruit*.  That means reasonable value,

25  right?

1  **A.**   Yes, I believe that's the actual translation.

2  **Q.**   Okay.  And you have going rate for services.  Right?

3  **A.**   That's my understanding, yes.

4  **Q.**   You don't say what the willing buyer/willing seller price

5  is, do you?

6  **A.**   You mean an actual price?  No, I don't list a price on

7  this slide.

8  **Q.**   No, not the actual price.  The concept of a willing

9  buyer/willing seller is not on this slide, is it?

10 **A.**   Not on this particular slide, no.  I think we talked about

11 it.

12 **Q.**   You looked at the factors considered, actual going rates

13 in the geographic region.  You didn't actually do that, did

14 you?

15 **A.**   I very much did.

16 **Q.**   You didn't look at contracts, prices between hospitals and

17 insurance companies, did you?

18 **A.**   I think I was very clear in my testimony I looked at

19 actual payments.

20 **Q.**   What the hospital gets.  Not what they agreed upon.

21 **A.**   Again, you seem to be driving the big distinction between

22 those two.  To the extent there's a contract between a payor

23 and a hospital, there's obviously some dispute sometimes that

24 occur in those situations.  This is not a contract situation,

25 for instance, right here.  That's part of what's driving this.

1    But as a general matter, my experience is that payors honor

2    contracts with hospitals and vice versa.

3    **Q.**    I am actually drawing a big distinction between what's an

4    agreed-upon price between a hospital and a -- what the -- an

5    insurance company.  What the insurance company actually pays.

6    **A.**    Under a contract?

7    **Q.**    Under a contract.  Yes.

8    **A.**    I'm just trying to understand your hypothetical.  You're

9    saying in your view there's widespread violation of contracts

10   by payors?

11   **Q.**    Yes.

12   **A.**    That's not my experience.  There's obviously disputes over

13   terms, but it's not my experience that, you know, the large

14   sophisticated payors are in the business of, you know,

15   violating the contracts.

16   **Q.**    Okay.  Now, you -- let's look at the factors you didn't

17   consider.  You did not consider billed charges, right?

18   **A.**    Other than what I've described in here to show that

19   they're not relevant for the analysis.  But I certainly don't

20   base my analysis on billed charges.

21   **Q.**    That's because you say that the hospitals get to choose

22   what they set as their prices.  Right?

23   **A.**    They're unilaterally set.  I agree with that.  And the

24   actual payments are typically a fraction of those billed

25   charges.  So as my housing example -- the list prices are

1  multiples of what you actually sell.  It wouldn't make sense to

2  look at list prices to determine the value.

3  **Q.**  We'll get to that in one second.

4      I lost my train of thought.  But you said that -- did you

5  say that insurance companies don't pay hospitals full billed

6  charges?

7  **A.**  I said -- I don't think I said that.  I think I said there

8  may be some situations where there are full billed charges.

9  But certainly on an overall basis it's very rare to see,

10  certainly in any significant level of payment, full billed

11  charges.  It happens occasionally.

12  **Q.**  It's rare because -- first of all, let's take out Medicare

13  and Medi-Cal because those are government rates.

14  **A.**  I think they're relevant, but I'm happy to take them out

15  for your hypothetical.

16  **Q.**  In the commercial context, right?

17  **A.**  Okay.

18  **Q.**  In most situations, there's a contract between the

19  insurance company and the hospital, right?

20  **A.**  I agree that sort of if one thinks about the overall

21  volume of transactions between payors, insurance companies, and

22  providers, hospitals, most of those would be governed by some

23  type of contract, yes.

24  **Q.**  And those contracts are, by definition, a discount off of

25  charges.  Right?

1    **A.**    Yes.  That's certainly my general experience.

2    **Q.**    They're less than the billed charges, right?

3    **A.**    Almost always, yes.

4    **Q.**    There would be no reason to enter into a contract if it

5    wasn't less than billed charges, right?

6    **A.**    I suppose not.  I suppose one could think of some

7    theoretical reason why you might do it.  Prompt payment or

8    something like that.  But in general, I agree with you that

9    billed charges are not representative of market rates.  And

10   almost no contract that I've seen between a payor and a

11   hospital would pay full billed charges.

12   **Q.**    So when you say that hospitals don't get paid their full

13   billed charges, you're looking at it -- if you look at Medicare

14   and if you look at Medi-Cal and if you look at contracted

15   situations and non-contracted situations.  But if you take away

16   the Medicare, the Medi-Cal, and contracted situations, in

17   non-contracted situations hospitals get paid their billed

18   charges quite often, don't they?

19   **A.**    I don't think I'd agree with that "quite often."

20   Certainly the situation we're in right now is exactly what

21   you're describing, which is a non-contracted situation.  It's

22   not my experience that hospitals get paid full billed charges

23   in those situations.

24        In elective situation where someone voluntarily says "I'm

25   going to go to a hospital that's not in network for my elective

1  care," there it's relatively more common.  You might see it

2  there.

3  **Q.**   Let's go to slide 28, please.

4       This slide is entitled "NorthBay Receives Higher Rates for

5  Reasons Unrelated to Emergency Services."  And then you say:

6  NorthBay is important to have in-network for elective services

7  for network access reasons given limited nearby options.

8       And then you also say that:  It's important to have

9  NorthBay in network for elective services in order to

10  successfully market their plans to local health care

11  purchasers.  And payors need NorthBay in network to gain access

12  to NorthBay-affiliated physicians.

13       Now, there are access rules in California, aren't there?

14  **A.**   Yes.  Are you referring to like the Department of Managed

15  Health Care rules on how far away you have to have providers

16  and things like that?  Sure.

17  **Q.**   Exactly.

18  **A.**   I think Mr. Barnes talked about that, too.

19  **Q.**   And, in fact, there are regulations which deal with those

20  types of network access.  Right?

21  **A.**   I know there are.  It's not an area I've studied in

22  detail.

23  **Q.**   Before a health plan can terminate a contract, the health

24  plan has to prove to the Department of Managed Health Care that

25  it has sufficient network access at alternative hospitals,

1    doesn't it?

2    **A.**    That's consistent with my understanding, yes.

3    **Q.**    So before Blue Shield could terminate its contract with

4    NorthBay, it had to prove to the Department of Managed Health

5    Care that there were sufficient other elective services options

6    in the area, physician coverage, specialist needs.  Right?

7    **A.**    Yes.

8    **Q.**    And so either Blue Shield was telling the truth to the

9    Department of Managed Health Care and there are sufficient

10   network access in the area, or Blue Shield wasn't telling the

11   truth to the Department of Managed Health Care.  Right?

12   **A.**    I certainly believe Blue Shield was telling the truth to

13   the Department of Managed Health.

14   **Q.**    Let's assume Blue Shield was telling the truth.  If Blue

15   Shield was telling the truth -- by the way, do you know what

16   the mileage requirements are?

17   **A.**    I don't remember off the top of my head.

18   **Q.**    Does 15 miles sound appropriate to you?

19   **A.**    That wouldn't surprise me.  I think maybe you even

20   mentioned that in my deposition now that you're refreshing my

21   memory.  That sounds about right.

22   **Q.**    So before Blue Shield could terminate the contract with

23   NorthBay, it had to prove to the department that it had all of

24   these services within 15 miles of where the people live.

25   **A.**    You're probably getting beyond my knowledge of any

1    specifics.  I certainly agree that my understanding is that

2    Blue Shield -- or, anybody who's terminating a provider that

3    was otherwise in their network would need to kind of make sure

4    that they were able to show they were able to meet the network

5    access requirements.  So I'm assuming that they did that, but I

6    didn't see that filing.

7    **Q.**  Blue Shield actually terminated the contract, right?

8    **A.**  Correct.

9    **Q.**  And it's not having network access problems because

10   according to Blue Shield it doesn't have network access

11   problems in the area.

12   **A.**  Well, I think maybe what you're misunderstanding is the --

13   I agree they're not violating the law.  And my note here is

14   it's important to have them in network.  It's not impossible to

15   not have them in network.  But given that 15-mile requirement,

16   for instance, it's a challenge, for sure.  So the point isn't

17   that nobody could ever terminate a contract with NorthBay.

18   Blue Shield chose to do it.  I think Mr. Barnes said it was --

19   had a number of challenges associated with it, one of which is

20   satisfying the access issue.  Not impossible to do it, but

21   certainly a challenge.

22   **Q.**  Is Blue Shield required to sell insurance in Solano

23   County?

24   **A.**  Not to my knowledge.

25   **Q.**  I'll get back to that in a second.

1      Let's look at the slide 13, please.  These are the data

2  sources that you used, right?

3  **A.**   Yes.

4  **Q.**   OSHPD, Blue Shield data, and Optum, right?

5  **A.**   And the published findings at the top, yes.

6  **Q.**   Okay.  OSHPD -- sorry.  Let's start with Optum at the

7  bottom.  Optum is owned by United Healthcare, right?

8  **A.**   Yes.  That's accurate.

9  **Q.**   And United Healthcare is an insurance company.  Right?

10 **A.**   Among other things, yes.

11 **Q.**   And you said something on direct like Optum disguises who

12 the hospitals and payors are.  What do you mean by that?

13 **A.**   So in Optum you can see individual claims.  You can see

14 the geographic location broadly, like county level or zip -- I

15 think it's three-digit zip code.  It doesn't say this

16 particular patient went to this particular hospital.  So --

17 that's what I meant by it doesn't identify individual

18 providers.

19 **Q.**   So United Healthcare gets to choose what information to

20 put in its database, right?

21 **A.**   I mean, not quite sure what you mean by that.  Certainly

22 they're making decisions about which fields to include.  I

23 think they describe what the completeness of the data is.

24 **Q.**   But --

25 **A.**   They don't pick and choose, if that's your question.

1   **Q.**   Well, United Healthcare was sued by the attorney general

2   in New York for having a flawed database, wasn't it?

3   **A.**   I think you're referring to the -- well, the Ingenix?

4   **Q.**   Yes.   Ingenix was a company owned by United Healthcare,

5   right?

6   **A.**   That doesn't sound wrong, but I don't actually know.

7   **Q.**   And there was a settlement with the AMA, which is the

8   American Medical Association, for $350 million to settle the

9   lawsuit over United Healthcare's flawed database, wasn't there?

10  **A.**   My recollection of that, which I wasn't involved in any

11  way as an expert or otherwise, was the concern wasn't with the

12  underlying data.   The concern was with some of the calculations

13  that were happening with Ingenix in terms of throwing out

14  certain data points, for instance, outliers, things like that.

15  That's my recollection of that.   That's not an issue at all

16  with the Optum data here.   I have access to all the data.

17  **Q.**   You've audited the data?

18  **A.**   I haven't audit in the sense of comparing to the

19  underlying payors, if that's what you mean.

20  **Q.**   So you don't know whether or not United cherry-picks what

21  claims to put in its database, do you?

22  **A.**   I'm quite confident that they don't do that.   We've been

23  using Optum, and many others have used the Optum database, for

24  many types of analyses over the years.   So I'm quite confident

25  that that data is not being cherry-picked in the way that

1   you're describing there.

2   **Q.**   So because you've used it often, you think that the data

3   is correct.

4   **A.**   I've used it often, many others have used it often, it's a

5   part of public studies.  I'm not aware of any litigation around

6   cherry-picking claims.  So to the best of my knowledge, that's

7   certainly not an issue with the Optum database, which it is a

8   different database than the Ingenix.

9   **Q.**   But you still can't see what hospitals are included in the

10  Optum database, can you?

11  **A.**   I can see which counties, and they're including all the

12  hospitals in the counties, but I can't see the specific names.

13  **Q.**   Well, how do you know they're including all the hospitals

14  in the county if they don't include the names?

15  **A.**   Because that's the whole point of the database is to

16  provide all the claims associated with a particular region.

17  **Q.**   That's what United says.

18  **A.**   Yes.

19  **Q.**   Does United Healthcare have access to Blue Shield's

20  contracts with hospitals?

21  **A.**   Not sure what you mean "access to."

22  **Q.**   Does it have copies of them?

23  **A.**   I don't know.  My guess is no.  But I don't know.

24  **Q.**   And United Healthcare doesn't have access to Blue Cross's

25  contracts, right?

1  **A.**   Again, my assumption is that they wouldn't have copies of

2  their competitor's contracts.

3  **Q.**   So the data that's in Optum's database doesn't reflect

4  what those insurance companies have agreed upon as a price,

5  right?

6  **A.**   I think it reflects exactly what I described, which is

7  this large self-insured plans, it's what they pay for services

8  at the detail level in a geographic area.

9  **Q.**   Next you looked at Blue Shield's data, right?

10  **A.**   Yes.

11  **Q.**   Blue Shield is an insurance company, right?

12  **A.**   They are, yes.

13  **Q.**   And Blue Shield gets to decide what to put in its

14  database, right?

15  **A.**   Not sure what you mean there.  In the sense of they decide

16  what fields are in their database?  Is that what you mean?

17  **Q.**   Yeah.  It can pick and choose what claims to put in, what

18  claims not to put in?

19  **A.**   No.

20  **Q.**   Why not?

21  **A.**   If I understand your -- the way you're describing it is --

22  that's certainly not my experience.  So this data is data that

23  I specifically requested from Blue Shield to say:  I want data

24  from all these hospitals, I want all the claims data.  I don't

25  want you to just pick and choose and show me a few that you

1    want.

2        I've done many, many times and I'm highly confident that

3    Blue Shield is not picking and choosing data as you're

4    describing.

5    **Q.**   You've been hired by Blue Shield as an expert a number of

6    times, haven't you?

7    **A.**   And many other payors and hospitals, yes.

8    **Q.**   Blue Shield doesn't have the access to the Blue Cross's

9    contracts, right?

10   **A.**   As a broad understanding, that would be accurate, yes.

11   **Q.**   Okay.  If you could look at -- I think it's slide 12 --

12       Slide 44, please.

13   **A.**   Okay.

14   **Q.**   On the left-hand side of the --

15       Explain what the left-hand bar is.  The 14.9.

16   **A.**   Yeah.  So that's looking at the specific services at issue

17   in this litigation, looking at what the billed charges were for

18   those services and what Medicare would have paid for each of

19   those services.  So it's looking at that ratio.

20   **Q.**   So you're saying that that's 14.9 times Medicare, right?

21   **A.**   Yeah.  So if Medicare would have paid, let's say, a

22   million dollars for all of these claims together, the charges

23   for those claims would be 14.9 million.

24   **Q.**   And you're saying that number's accurate, right?

25   **A.**   It is accurate, yes.

1   **Q.**   You prepared a report in this case, right?

2   **A.**   Yes.

3   **Q.**   Okay.  And if you can go to Exhibit 178 in your binder.

4   If you look at the fourth page of that -- that's the first page

5   of your report.

6   **A.**   I don't have it.

7   **Q.**   Oh, you don't have a binder.

8           **MR. TOOCH:**  May I approach?

9           **THE COURT:**  You may.

10  **BY MR. TOOCH:**

11  **Q.**   If you go to 178.4.  That's the first page of your report,

12  right?

13  **A.**   Yes.

14  **Q.**   Okay.  I'd like to turn to page 178-22.  And this is a --

15  that's a chart in your report, right?

16  **A.**   I agree with that.

17          **MR. TOOCH:**  Permission to publish this chart, Your

18  Honor.

19          **THE COURT:**  Any objection to that?

20          **MR. PIMSTONE:**  No, Your Honor.

21          **THE COURT:**  Go ahead.

22          **MR. TOOCH:**  Mike, if you can blow up the chart a

23  little bit.

24  **BY MR. TOOCH:**

25  **Q.**   Now, you see on the left-hand side of that chart you're

1    saying the multiple of Medicare payment is 12.4, right?

2    **A.**    Right.  That's correct.

3    **Q.**    Not 14.9.

4    **A.**    No.  They're measuring different things.

5    **Q.**    So is it 12.4 multiple of Medicare or 14.9?

6    **A.**    Both.

7    **Q.**    It's both?

8    **A.**    14.9 is the specific claims at issue.  12.4 is all of

9    Medicare's business.

10   **Q.**    So it's how you slice and dice the data is how you can get

11   to higher percentages, right?

12   **A.**    Not sure exactly if that's a question.  Certainly, when I

13   look at the specific claims at issue, I literally have the data

14   on what was charged for each claim, and I have the data on what

15   Medicare is.

16       It's not at all surprising that a subset of all of

17   Medicare business would have a somewhat different multiple

18   there.  So that's not surprising in the least.  And they're

19   both accurate numbers.

20   **Q.**    So if -- if you came to me with a chart which said 12.4,

21   and I said, "Mr. Deal, could you slice and dice the data little

22   bit differently to make the number higher," you could do that,

23   right?

24   **A.**    I'm not sure what you mean to make the number higher.  If

25   you ask me a question that would be relevant for to this

1  litigation like, Mr. Deal, let's focus on the subset of claims

2  that are at issue in this litigation.  What would that multiple

3  be?  It happens to be 14.9.  It would be what the facts are in

4  the case.  It might be higher, it might be lower there.

5      So I'm not in the business of doing results-oriented

6  analysis.

7  **Q.**  We don't really know what you did to get the 14.9 number

8  or the 12.4 number, do we?

9  **A.**  I think I've very clearly described what I did.

10  **Q.**  All right.  Let's go to slide number 15, please.

11  **A.**  We're done with the book?

12  **Q.**  We may be.

13      So let's take that down for a second.

14      How are Medicare claims paid?

15  **A.**  You mean the prospective payment system?

16  **Q.**  Exactly.

17  **A.**  They're paid on, basically, a per -- a per patient or per

18  case kind of basis.

19  **Q.**  And when did the prospective payment system come into

20  existence?

21  **A.**  In the 1980s.

22  **Q.**  And how were Medicare -- how are hospitals paid under the

23  Medicare program before the prospective payment system?

24  **A.**  That was really before I started doing any analysis with

25  them.  I think it was a cost basis, as I recall.  But honestly,

1    I've not been a consultant in the period of time where that was

2    in force.  It's always been prospective payment.

3    **Q.**    Have you ever heard the term a "hospital cross report"?

4    **A.**    Oh, yes.

5    **Q.**    And that's how hospitals were paid before the prospective

6    payment system, right?

7    **A.**    They still have to file -- these are very large documents

8    with lots of information in them.  They still file hospital

9    cost reports.

10   **Q.**    And if Medicare did not -- and then Medicare paid the

11   hospitals based upon their costs, right?

12   **A.**    Again, you're going back to history, really, before I

13   became a consultant.  But that was sort of generally my

14   understanding.  That's a long time ago now.

15   **Q.**    If the hospital didn't like what Medicare was paying it,

16   it could file an appeal, right?

17   **A.**    Again, you're really getting -- I mean, you're talking

18   about 30 years ago or more.  So that doesn't sound wrong, but

19   you're out of the area of my analysis.

20   **Q.**    I'm not that old.  And then when there was a -- and then

21   it would go through litigation, right?  Or you don't know that.

22   **A.**    Again, you're really -- you're talking about the 1980s

23   here?

24   **Q.**    Yes.

25   **A.**    Which was when I was in high school and college then.  So

1    I don't know exactly the process.

2    **Q.**   And there were cost report settlements, right?

3    **A.**   You can keep asking me these questions, but I honestly

4    don't know the details.

5    **Q.**   Okay.  Put up slide number 15, please.

6         Let's go to the -- you're saying that this applies to

7    commercial claims, don't you?

8    **A.**   I agree with that.

9    **Q.**   It doesn't apply to commercial claims, does it?

10   **A.**   Including the settlements?

11   **Q.**   Yes.  Look at paragraph 2.  The contractual adjustments

12   accounts must be adjusted to reflect cost reimbursement

13   settlement with offsetting debit or credit going to the

14   appropriate receivables from third-party payors.

15        This is a settlement under a Medicare cost report dispute.

16   It doesn't have anything to do with this case, does it?

17   **A.**   I think you're absolutely wrong on that.  Notice it says

18   third-party payor accounts.  That's exactly the private payors

19   that I'm looking at.  We've also confirmed this with direct

20   conversations with OSHPD.

21   **Q.**   Let's go to slide number 25.  This says -- according to

22   this slide, you're saying -- what is the 5 times -- 5.0

23   multiple of Medicare payment for the NorthBay column?

24   **A.**   What does that represent?

25   **Q.**   Yeah, please.

1  **A.**   That's the private payor overall multiple of Medicare for

2  NorthBay.

3  **Q.**   So let me see if I'm understanding that correctly.  So

4  what you're saying is that that's what private payors, private

5  insurance companies, Blue Cross, Blue Shield, et cetera, are

6  paying NorthBay, right?

7  **A.**   Yes.  Among other payors.  But sure.

8  **Q.**   And you think that's outrageous, right?

9        **MR. PIMSTONE:**  Objection, Your Honor.

10       **THE WITNESS:**  I didn't say --

11 **BY MR. TOOCH:**

12 **Q.**   You think that's very high.  I apologize.  Yes.  You think

13 that's very high.

14 **A.**   I think it's high, and it is high.  Yes, I agree with

15 that.

16 **Q.**   If you can go to slide number 32.  This is what Blue

17 Shield is paying NorthBay, right?

18 **A.**   No.

19 **Q.**   This is NorthBay's claims based upon what comparable

20 hospitals accept from Blue Shield would be paid at 4.1 times

21 Medicare.  Explain what this slide is.

22 **A.**   This is what Blue Shield would have paid for those same

23 set of claims at all of the other comparable hospitals taken

24 together.  So this is a -- 4.1 times Medicare is effectively

25 Blue Shield's payment level to all comparable hospitals for the

1  same mix of claims.

2  **Q.**  So the 5.0 is what all other payors are paying NorthBay?

3  **A.**  Yes.

4  **Q.**  So --

5  **A.**  What all payors are paying NorthBay.  I mean, all

6  third-party.

7  **Q.**  Private payors.

8  **A.**  Private payors.

9  **Q.**  Private payors.

10  **A.**  Well, I guess to be precise, there's a couple of small

11  government programs in there, too.  Worker's comp and some

12  others.  But we'll use private payors as certainly the vast

13  majority of it.

14  **Q.**  And the private payors you mean the Blue Crosses, Blue

15  Shields of the world?

16  **A.**  Yes.

17  **Q.**  And the 4.1 is what Blue Shield would pay other hospitals

18  for the same service, right?

19  **A.**  Those are not exactly comparable numbers.  I agree that

20  4.1 is what they would say for the comparable services.  The

21  5.0 is what payors are paying given the actual mix of patients.

22  So that would need to get adjusted to be a true comparable

23  number.

24  **Q.**  So according to your two charts, there's not much

25  difference between 4.1 and 5.0, is there?

1   **A.**   Well, they're not measuring the same thing.   So -- as I

2   just said.   To make them comparable, you'd have to adjust the

3   5.0 for the same mix.   Let's just say hypothetically it was

4   6.0.

5   **Q.**   Look at slide number 15.   The outpatient is -- No.   Where

6   you were.

7        If you look at the outpatient side, that's 6.6 times

8   Medicare, right?

9   **A.**   Yes.   That's accurate, yes.

10  **Q.**   That's higher than what -- the average that NorthBay was

11  paid, 5.0.   Right?

12  **A.**   I agree mathematically it's a higher number.   They're

13  different things, so it's not really relevant.   But they are --

14  literally one's higher than the other.

15  **Q.**   Emergency services are outpatient services, aren't they?

16  **A.**   Well, they're certainly inpatients who start in the

17  emergency room.

18  **Q.**   Emergency services -- if somebody goes to emergency room

19  and then they are -- for a broken arm, get a cast, they go

20  home.   That's an outpatient service, right?

21  **A.**   Yes.   My daughter just broke her wrist last week, for

22  example.

23  **Q.**   If you get admitted to the hospital that's not an

24  emergency service.   That's an inpatient service, right?

25        **MR. PIMSTONE:**   Objection, calls for a legal

1    conclusion.

2         **THE COURT:**  If you know.

3         **THE WITNESS:**  I think you're getting into more of a

4    clinical area here, so I'm not -- I don't know that I have any

5    analysis.  I mean, if you have to go to the -- get admitted and

6    you go to the ICU, something like that -- all these claims

7    certainly started in the emergency room.

8    BY MR. TOOCH:

9    **Q.**  Let's go to slide number 25.  This is -- I believe you

10   said you looked at NorthBay's payments compared to other

11   teaching hospitals, right?

12   **A.**  Yes.  You'll recall this was just sort of -- I was

13   interested given that NorthBay was meaningfully above the other

14   -- my peers -- to sort of get a sense for how that compared to

15   some of the teaching hospitals.  I did it both with OSHPD data

16   and with Blue Shield data.

17   **Q.**  And you're saying that NorthBay's getting paid twice as

18   much -- almost twice as much as Stanford, but twice as much as

19   UC Davis, right?

20   **A.**  As a multiple of Medicare on an overall basis for the

21   hospital using the OSHPD data, yes, that's right.

22   **Q.**  That's not true, is it?

23   **A.**  It's certainly true using the OSHPD data, yes.

24   **Q.**  You don't have a contract between -- you don't have any

25   contracts between private payors and Stanford, right?

1    **A.**    I don't, no.

2    **Q.**    You don't have any contracts between private payors and UC

3    Davis, right?

4    **A.**    I don't, no.

5    **Q.**    So you don't know what the rates agreed to in those

6    contracts are.

7    **A.**    I'm not comparing sort of rates on written documents.  I'm

8    looking what they actually get paid.

9    **Q.**    What they get.  Not what the contract rates are.  Right?

10   **A.**    That's true of all of my analysis.  I understand the

11   assignment is to look at actual payments.

12   **Q.**    Fair to say you didn't look at any contract rates, right?

13   **A.**    The only contract rates I looked at were the ones I was

14   critiquing Mr. Heil on that he referred to.  I don't think it's

15   the right thing for the analysis, so I certainly didn't have

16   access to --

17        Not sure how you'd get access to all of those -- maybe a

18   subpoena or something -- to get contracts from a bunch of

19   different hospitals and payors.

20   **Q.**    You could have subpoenaed the contracts from other

21   hospitals, couldn't you?

22   **A.**    Not me personally.

23   **Q.**    The lawyers could have, right?

24   **A.**    I don't know.  It's not necessary.  We didn't do it.

25   But -- so I don't know.

1   **Q.**   You didn't ask them to.

2   **A.**   I didn't ask them to.  It certainly wasn't necessary for

3   the analysis.

4   **Q.**   So you don't know that NorthBay's contracts with United is

5   twice the amount of NorthBay's -- of -- I'm sorry.  Let's take

6   Blue Shield.  You have Blue Shield's contract, right?

7   **A.**   I have the terminated Blue Shield contract.

8   **Q.**   Is it fair to say that you don't -- you can't prove this

9   (indicating) chart with any contract rates.  Right?

10  **A.**   I guess in the sense of you're asking the question, it's

11  true.  It's not -- absolutely not necessary.  It's not

12  something I would ever undertake.  So -- but I haven't done it.

13  **Q.**   So you don't have the contracts.  You said you looked at

14  the actual payments.  Right?

15  **A.**   Correct.  As reported to OSHPD.

16  **Q.**   Show us a claim where United Healthcare paid NorthBay

17  twice as much as it paid Stanford.

18  **A.**   I don't have claim level data.

19  **Q.**   So we don't know whether this chart is accurate.

20  **A.**   I can tell you this is data that each of those hospitals

21  report to the state, and NorthBay reports to the state.  So

22  it's certainly my overall experience, having worked with this

23  data for decades, that it -- it's accurate data.  Obviously,

24  it's -- there's always going to be a little bit of issues at

25  the margin, which I talked about in my analysis.  But it's

1  overall very accurate data and I'm quite confident in it.

2  **Q.**   And if there's a problem with the data, there's a problem

3  with your chart, isn't there?

4  **A.**   I think that's almost a tautology.  You know, if there's a

5  problem with an input, there may be a problem with an output,

6  sure.

7  **Q.**   Exactly.  Garbage in, garbage out.

8       **MR. PIMSTONE:**  Argumentative.

9       **THE WITNESS:**  This is not garbage, but I agree with

10  that concept.

11      **THE COURT:**  Let's move on to the next.

12  **BY MR. TOOCH:**

13  **Q.**   So it's fair to say that you have not one example of one

14  claim where NorthBay's been paid twice as much as Stanford or

15  UC Davis.

16      **THE COURT:**  That's argument.  Let's go on.

17  **BY MR. TOOCH:**

18  **Q.**   Let's talk about hamburgers.

19  **A.**   You'll make me hungry.  It's quarter till, but sure.

20  **Q.**   Maybe you can go out for a hamburger afterwards.

21  **A.**   Jury's anxious to get to the hamburgers I promised them.

22  **Q.**   Okay.  Now, you said that if a guy goes to a restaurant

23  for eight years, voluntarily pays $12 for a hamburger, and then

24  decides one day that he doesn't think it's worth $12.  That you

25  can ignore what he's done over the past eight years, right?

1   A.   Not sure quite your hypothetical.  I don't think we were

2   talking about a specific number of years.  But that's not

3   relevant, I think, for the analysis.

4        I think what I said -- and certainly what I intended to

5   say -- was in a voluntary situation if I'm going to a

6   restaurant because I like it, I like where it's located, I like

7   the flavor of their sauces, whatever, maybe I go and I pay $12

8   for the hamburger.

9        In that voluntary situation if I -- I might do that for

10  years, as I understand your hypothetical, and then I suddenly

11  say I'd rather that $4 for that burger.  You can say that, but

12  that's not the willing buyer/willing seller price.

13  Q.   And the Blue Shield contract was in place with NorthBay

14  for eight years, right?

15  A.   Sounds right.

16  Q.   Now on direct examination you said if the jury are forced

17  to go to the restaurant, and then they're forced to pay $12;

18  that's not the correct analogy, is it?

19  A.   I think it is.  I think what I said is in a forced

20  transaction like an emergency service here, my hypothetical was

21  focused on one particular restaurant but you can certainly

22  imagine a situation where you're forced to go to the nearest

23  hamburger restaurant.  And various restaurants have

24  participated in this same program.

25  Q.   Earlier on in the cross-examination, you said that Blue

1  Shield is not forced to sell insurance in Solano County.

2  Correct?

3  **A.**   You're probably getting beyond the real scope of my

4  understanding.  But I don't think -- I mean, I think they could

5  decide not to sell insurance.

6  **Q.**   That's what you said before.  They're not obligated to

7  sell insurance in Solano County, right?

8  **A.**   At a very high level, they have some choices on things.

9  I'm not an expert on exactly what those regulations are.  But,

10 yeah, at a high level, over time, they could presumably change

11 what -- they could stop selling it everywhere if they wanted

12 to.

13 **Q.**   So even when they terminated the contract, they continued

14 to voluntarily sell insurance in Solano County, right?

15 **A.**   That's my understanding.

16 **Q.**   So they weren't forced to sell insurance in Solano County,

17 right?

18 **A.**   I agree with that.  But I don't see that's at all relevant

19 to the analogy.

20 **Q.**   Well, Blue Shield is the buyer in this situation, isn't

21 it?

22 **A.**   It's the ultimate payor, sure.  The patients are the ones

23 that need the services.

24 **Q.**   But Blue Shield is the buyer of the services in the

25 willing buyer/willing seller situation.

1  **A.**   Yes.

2  **Q.**   Now, do you know that at insurance companies they have

3  analytical departments?

4  **A.**   Generally, yes.

5  **Q.**   Okay.  Were you here for Mr. Barnes' testimony?

6  **A.**   I was here for most of it.  Not necessarily all of it, but

7  yes, I heard him reference that.

8  **Q.**   He referenced that there's this whole group of analytics

9  people at his -- at Blue Shield that help the contract

10  negotiators, right?

11  **A.**   Like their own little analysis group maybe.

12  **Q.**   Yes.  Like your group.  In-house.  Right?

13  **A.**   Something like that, I suspect.  I don't know the group

14  particularly.  But I'm sure they're data analytic people like

15  we are at our firm.

16  **Q.**   And you assume that they're competent, right?

17  **A.**   I would assume so.

18  **Q.**   And United Healthcare has the same types of analytic

19  people as well, right?

20  **A.**   That would be my strong presumption.  I haven't studied

21  that, but it's my strong presumption.

22  **Q.**   And Cigna and Aetna, Blue Cross, right?

23  **A.**   Again, that seems right to me.  I'd be kind of surprised

24  if they didn't.  In fact, I'd be quite surprised if they

25  didn't.

1  Q.   The -- you can go to Mr. Heil's slide.  8, please.  I

2  believe we have a board about this.

3       So let's look at Cigna, for example.  Cigna pays

4  78 percent of charges.  Is their analytic department

5  incompetent?

6  A.   I haven't studied that, but I wouldn't expect that they

7  would be.

8  Q.   What multiple of Medicare is 78 percent of charges?

9  A.   Probably about 10.

10  Q.   That contract is still in effect, right?

11  A.   I'm not aware that it's been terminated, no.

12  Q.   So Cigna voluntarily pays NorthBay for its services, the

13  variety of services that it provides, at 78 percent of charges,

14  right?

15  A.   Sure.  After the elective services we talked about, sure.

16  Q.   And emergency services.  Right?

17  A.   Typically those would also include emergency.  I think my

18  complete discussion was really that the reason that I observed

19  that is because of the elective services.  But the contracts

20  include both, yes.

21  Q.   So even if we assume that your multiple of Medicare

22  calculations are correct, that would be a very high multiple of

23  Medicare, wouldn't it?

24  A.   I agree with that.  And I think that's what's reflective

25  of that bar that shows five times.  NorthBay is a very -- my

1  experience, they're very aggressive and the amount they're

2  getting paid is much higher than many other hospitals.

3  **Q.**  But Cigna's analytic department can figure that out,

4  right?

5  **A.**  I mean, can figure out what?

6  **Q.**  The multiple of Medicare.

7  **A.**  I would hope so.

8  **Q.**  If they can't figure it out, they can hire to do so,

9  right?

10  **A.**  That would be great.  But sure.  I assume they could

11  probably do it on their own.

12  **Q.**  I'll put in a good word.

13  **A.**  Thank you.

14  **Q.**  And United is one of the largest companies in America,

15  right?

16  **A.**  It's a very large company.  I agree with that.

17  **Q.**  And they're voluntarily paying 70 percent of charges to

18  NorthBay, right?

19  **A.**  For their contract that covers elective and emergency

20  services, sure.

21  **Q.**  And that's assuming your calculations are correct, that's

22  a high multiple of Medicare.  Right?

23  **A.**  All of those numbers are quite high multiples of Medicare.

24  That's probably something like eight times Medicare.  Or maybe

25  nine times.  Something like that.

1  **Q.**   And at the lowest volume, Blue Shield was willing to pay

2  80 percent of charges, right?

3  **A.**   Under the prior contract, yes.  That was at the lowest

4  volume, yes.

5  **Q.**   That was -- they willingly did that, right?

6  **A.**   Willing in the sense of the agreement which I talked

7  about, too.  You may not be happy it, but they were willing,

8  sure.

9  **Q.**   They could have hired you years ago, right?

10  **A.**   Yes, I'm sure they could have.  They didn't to the

11  analysis on this, but they probably could have, sure.  And --

12  yeah, I don't disagree with any of those frameworks.  They are

13  getting paid a lot of money relative to others there.

14  **Q.**   And assuming your calculations are correct, that's a high

15  multiple of Medicare, right?

16  **A.**   I very much agree with that.

17  **Q.**   And were you aware that after the contract terminated --

18  you were here for the end of Mr. Barnes's testimony?

19  **A.**   The end of Mr. Barnes's testimony, yes, I was.

20  **Q.**   He talked about the ACA and CalPERS and all that kind of

21  --

22  **A.**   I heard that, yes.

23  **Q.**   Even after the contract terminated, Blue Shield offered

24  50.5 percent of charges, didn't they?

25  **A.**   To have them in their elective network, yes.

1  **Q.**   So Blue Shield was a willing buyer at 50.5 percent of

2  charges that -- they made that offer, right?

3  **A.**   I presume so.  Again, for the elective services, yes.

4  **Q.**   Mr. Heil's reasonable value opinion is 88 percent of

5  charges, right?

6  **A.**   That's correct.

7  **Q.**   Not much higher than 80 percent of charges, which was in

8  the Blue Shield contract.  Right?

9  **A.**   I agree mathematically that that's about ten percent

10  higher than the 80 percent.  It's not the right framework.

11  That's the big problem with what he's done.  I agree with your

12  math on that, but that's not the right framework.  I'm looking

13  at prices, market prices in the geographic area, and Mr. Heil's

14  88 percent is nowhere close.

15  **Q.**   The 80 percent NorthBay, got a benefit for that because

16  Blue Shield was still steering patients towards NorthBay,

17  right?

18  **A.**   That's an interesting question.  I mean, presumably, yes,

19  in the sense that they were in network.  With a very broad

20  network, there's not actually that much steerage that can

21  happen there.  So somewhat, certainly.

22      I would -- my overall analysis of this is that Blue Shield

23  was getting -- must have been getting tremendous benefits by

24  having them in network, being able to sell there.  And I

25  believe NorthBay was very much taking advantage of that.

1  **Q.**   And when the contract terminated, NorthBay wasn't getting

2  the steered volume, and so with the rate should go up, right?

3  **A.**   No.

4  **Q.**   The lower the volume, the higher the price.  That's the

5  way that the -- NorthBay and Blue Shield set out their

6  agreement.  Right?

7  **A.**   I agree generally with that directional relationship,

8  although there's a question of how much one can steer.  But I

9  think you're very much off base in terms of your understanding

10  of -- and Mr. Heil is -- of these contracts.

11        That Blue Shield was getting -- In order to pay those

12  kinds of rates, Blue Shield was getting tremendous benefits

13  from having them in their elective network.  Because those are

14  much higher rates than other hospitals.  So the benefit really

15  flows the other direction.

16  **Q.**   Blue Shield --

17  **A.**   Blue Shield was getting the benefit.  Once they

18  terminated, they're not getting the benefit.

19  **Q.**   But they voluntarily terminated.  They chose not to get

20  the benefit, right?

21  **A.**   I agree.  And I believe they're paying the price for it.

22        **MR. TOOCH:**  No further questions.

23        **THE COURT:**  Mr. Pimstone, anything further?

24        **MR. PIMSTONE:**  Just one or two questions, Your Honor.

25

1

**REDIRECT EXAMINATION**

2  BY MR. PIMSTONE:

3  Q.   The OSHPD data that you looked at, Mr. Deal, that

4  included, I think as you said, any payments that were made

5  originally, plus any supplemental payments that resulted from

6  settlements or resolution of disputes?

7  A.   That's correct.

8  Q.   So if a hospital had a particular contract rate that said

9  we get paid $100, and if for one reason or another the plan

10  paid that hospital $90, and the hospital brought that to the

11  plan's attention, appealed that, or litigated with the plan and

12  got the extra $10; that extra $10 would that be included in the

13  OSHPD data?

14  A.   Yes.

15  Q.   You talked a few minutes ago about what the hospital gets

16  and that the OSHPD data reflects what the hospital gets.  The

17  fact that the OSHPD data also includes these supplemental

18  resolution payments, is it your opinion that the OSHPD data

19  reflects what the hospitals are accepting in the geographic

20  area for their services?

21  A.   Again, using and accepting the way I've described it, they

22  obviously weren't happy, potentially, about a subset of them

23  and disputed them, there's litigation, other kinds of things,

24  but ultimately there's a resolution of that and one accepts a

25  verdict from a court, things like that.  So, yes, in that sense

1    it's accepted.

2    **Q.**    Okay.  There was a discussion about the fact that a

3    portion of the business -- the sales of the hospital's services

4    in geographic area -- was to Medicare and Medicaid?

5    **A.**    Yes.

6    **Q.**    And that a portion of that is to private commercial

7    payors?

8    **A.**    Correct.  Those are the three big payors.

9    **Q.**    And you've used -- you've given the jury tools to look at

10   both what hospitals are accepting for private payors only as

11   well as for all payors.

12   **A.**    That's correct, yes.

13   **Q.**    And am I correct it was your opinion that the 2.0 number,

14   which was all payors, is the right framework if you're looking

15   at all willing buyer/willing seller transactions?

16   **A.**    Yes.  It's the high-end of the range, but I think it's

17   certainly a very reasonable number to use.

18   **Q.**    And if we could end the day, Mr. Deal, just on sort of a

19   brief hypothetical to illustrate -- just to see whether we have

20   this straight.

21        Your analysis would apply in other industries, as well,

22   where a seller chooses to sell a portion of its product to the

23   government and a portion of its product to private industry?

24   **A.**    That's correct.  So if you have a large contract with the

25   government, and you say I want to know the overall price,

1  market price, in a geographic area, you'd look at all payors.

2  **Q.**  Let's just pick a product.  Let's say paper disposal

3  coffee cups like you get at Starbucks.

4      If you were the manufacturer of private disposal coffee

5  cups and one assumed that a portion of your sales went to the

6  City of San Francisco or the federal government for use in

7  their office buildings, and you chose to sell the rest of your

8  product to Starbucks or Costco or Peet's Coffee.

9      In that instance, if one was not being forced to sell to

10  the government, would that be an appropriate analogy to use

11  sort of in looking at other industries where you might have

12  sales, a portion of which involve government?

13          **MR. TOOCH:**  That's leading, Your Honor.

14          **THE COURT:**  It's also getting beyond the scope.  I

15  don't know whether you need to go here, Mr. Pimstone.

16          **MR. PIMSTONE:**  Okay.  I understand.

17          **THE COURT:**  But try again if you need to.

18  **BY MR. PIMSTONE:**

19  **Q.**  In that situation, my simple question is:  If one were

20  looking in that hypothetical to look at what the manufacturers

21  of coffee cups were getting when selling to the entire market,

22  what would you look at?

23  **A.**  I'd look at all payors, including government payors.  So

24  if my assignment is I want the market price for a geographic

25  area for all payors, I would certainly include the government.

1              **MR. PIMSTONE:**  Thank you.  No further questions.

2              **THE WITNESS:**  You're welcome.

3              **THE COURT:**  Mr. Tooch, anything further?

4              **MR. TOOCH:**  No, Your Honor.

5              **THE COURT:**  Mr. Deal, you can step down.  Thank you.

6              **THE WITNESS:**  Thanks, so much.

7         (Witness excused.)

8              **THE COURT:**  Mr. Pimstone, we're very close to the

9    witching hour.  I'm wondering, do you have any further

10   witnesses for Monday?  I'm not going to make you call anybody

11   now, but -- is your case resting or are you doing something

12   else?

13             **MR. PIMSTONE:**  We are resting, Your Honor.

14             **THE COURT:**  All right.

15        All right.  So ladies and gentlemen, we are --

16        And you're standing.  Were you standing up to say

17   something, Mr. Tooch or --

18             **MR. TOOCH:**  No.  Just out of respect.

19             **THE COURT:**  Thank you.  That's very nice of you.

20        So ladies and gentlemen, we're done for the day.  So now

21   the plaintiff has put on its case, the defendant has put on its

22   case, and the plaintiff is entitled to put on a rebuttal case.

23   And that rebuttal case will go on on Monday morning.

24        But we are at the -- the rebuttal case is a lot shorter

25   than the other cases.  And I can't tell you how long it's going

1    to be, but I will tell you this:  That we are going -- we're

2    very close to the conclusion of all of the evidence.  And

3    whether the evidence ends and closing statements occur on

4    Monday, or whether just the evidence ends on Monday, then

5    closing statements will be on Tuesday.  So if you can orient

6    your schedules to that so that we won't be -- we won't be

7    finishing up at 1:00 p.m.  Because once the case goes to you,

8    it's up to you what -- how long you deliberate.  So think about

9    that over the weekend.  And we'll come back on Monday morning

10   at 8:00 for the conclusion of the evidence.

11        So again, you've heard a lot about this case, but it's not

12   over.  There is the rebuttal case.  And then I'm going to

13   instruct you on the law again and the lawyers are going to try

14   to summarize what they think you should have taken from the

15   evidence.  And at that point you'll be able to start your

16   deliberations and figure out what the reasonable value of

17   services are.

18        So between now and then keep an open mind.  Don't do any

19   research.  Don't talk about the case to anybody.  And come back

20   promptly Monday morning at 8 and we'll get things rolling.

21        Thank you very.much for your attention.

22        (The jurors exiting the courtroom.)

23   (The following proceedings were held in open court, outside the

24   presence of the jury:)

25        **THE COURT:**  Please be seated, everybody.

1    Mr. Tooch, how long do you think your rebuttal case will

2    be?

3         **MR. TOOCH:**  I would say at most an hour and-a-half for

4    both witnesses, Mr. Heil and Ms. Eichenberger.

5         **THE COURT:**  Your direct on both of them would be in

6    the area of an hour and-a-half.

7         **MR. TOOCH:**  Yeah, that's my best estimate, yes.

8         **THE COURT:**  So --

9         **MR. TOOCH:**  It may be less than that, but I want to be

10   conservative.

11        **THE COURT:**  Sure.  So I think you should be prepared

12   to proceed with closing on Monday.  And -- so that's -- that's

13   one thing.

14        The second thing is jury instructions.  Is there anything

15   in addition to what you've already provided that you think we

16   ought to include?

17        **MR. TOOCH:**  No, Your Honor.

18        **MR. PIMSTONE:**  At this time, no, Your Honor.  If

19   something comes up in the rebuttal case that would require a

20   curative instruction we would reserve the right to -- the

21   ability to do that.  But at this point, no.

22        **THE COURT:**  All right.

23        **MR. TOOCH:**  Just a question.  Is there anything in

24   this courtroom with respect to opening closing in closing

25   arguments, closing -- opening --

1    **THE COURT:**  The -- it is important that you lay out

2    every argument that you have in the opening part of your

3    closing so that the defense has a fair opportunity to meet all

4    of those arguments.  And then in rebuttal, the last part is

5    really to rebut what they've had to say.

6        So you can repeat yourself a little bit, but don't add new

7    arguments that you haven't done before.  So that's the only --

8    and I don't think that's unique.

9        **MR. TOOCH:**  Fair enough.

10       **THE COURT:**  So is there anything else we need to do

11   before the weekend?

12       **MR. PIMSTONE:**  I don't think so.

13       **MR. TOOCH:**  No.

14       **THE COURT:**  Have a good weekend, everybody.

15       **MR. PIMSTONE:**  Would it be appropriate for -- just

16   briefly -- for me to take you and Mr. Tooch aside for a small

17   private conference for a minute or two?

18       **THE COURT:**  Sure.

19       (Court adjourned at 1:02 p.m.)

20                          -   -   -   -

21

22

23

24

25

```
 1

 2                    CERTIFICATE OF REPORTERS

 3         We certify that the foregoing is a correct transcript

 4    from the record of proceedings in the above-entitled matter.

 5

 6    DATE:   Saturday, February 9, 2019

 7

 8

 9    _____
                  Vicki Eastvold, RMR, CRR
10                  Official Court Reporter

11

12

13
                 _____
14          Katherine Powell Sullivan, CSR #5812, RMR, CRR
                        Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```