**Volume 6**

**Pages 897 - 1071**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

| | |
|---|---|
| NorthBay Healthcare Group - ) | |
| Hospital Division, dba NorthBay) | |
| Medical Center and VacaValley ) | |
| Hospital, ) | |
| ) | **NO.  C 17-2929 WHO** |
| Plaintiff, ) | |
| ) | |
| VS. ) | Day:    Monday |
| ) | Date:   February 11, 2019 |
| Blue Shield of California Life ) | |
| & Health Insurance Company; ) | |
| California Physicians' Service,) | |
| dba Blue Shield of California; ) | |
| and Does 1-50, inclusive, ) | |
| ) | San Francisco, California |
| Defendants. ) | |

**JURY TRIAL - VOLUME 6**

<u>**APPEARANCES**</u>:

For Plaintiff:          King & Spalding, LLP
                        633 West 5th Street, Suite 1700
                        Los Angeles, CA  90071
                   **BY:  DARON L TOOCH, ESQ.**
                        **DAVID J. TASSA, ESQ.**

For Defendants:         Manatt, Phelps & Phillips, LLP
                        11355 West Olympic Boulevard
                        Los Angeles, CA  90064
                   **BY:  GREGORY N. PIMSTONE, ESQ.**
                        **JEFFREY J. MAURER, ESQ.**

                        Manatt, Phelps & Phillips, LLP
                        One Embarcadero Center, 30th Floor
                        San Francisco, CA    94111
                   **BY:  AMY B. BRIGGS, ESQ.**

Reported By:            Vicki Eastvold, RMR, CRR
                        Katherine Sullivan, CSR, RMR, CRR

# I N D E X

Monday, February 11, 2019 - Volume 6

|  | **PAGE** | **VOL.** |
|---|---|---|
| **PLAINTIFF'S REBUTTAL WITNESSES** | | |
| | | |
| **HEIL, MICHAEL (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 915 | 6 |
| Further Redirect Examination by Mr. Tooch | 915 | 6 |
| Further Recross-Examination by Mr. Pimstone | 951 | 6 |
| Further Redirect Examination by Mr. Tooch | 971 | 6 |
| | | |
| **EICHENBERGER, LORI (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 976 | 6 |
| Further Redirect Examination by Mr. Tooch | 977 | 6 |
| | | |
| Plaintiff Rests | 982 | 6 |
| Closing Argument by Mr. Tooch | 994 | 6 |
| Closing Argument by Mr. Pimstone | 1008 | 6 |
| Rebuttal Argument by Mr. Tooch | 1058 | 6 |

# E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 150 | | 979 | 6 |

| | |
|---|---|
| 1 | **Monday - February 11, 2019**               **7:36 a.m.** |

2                       **P R O C E E D I N G S**

3                           **---000---**

4     (The following proceedings were held in open court, outside the

5     presence of the jury:)

6          **THE COURT:**  So I have for each of you slightly revised

7     final jury instructions.  I just reorganized what we had, and I

8     took out what had been instruction number 10 which is publicity

9     during trial which I think is unnecessary and duplicative at

10    this point.  Otherwise, they're just reorganized.

11         All right.  So let's go to the motion *in limine*.  And I've

12    just read the plaintiff's response.  So taking it from the top.

13         Ms. Briggs, have you had an opportunity to read the

14    response?

15         **MS. BRIGGS:**  I haven't, Your Honor.  I think you're a

16    faster reader than I am, is really the problem.  I was handed

17    it about three minutes ago so I was making my way through.

18         **MR. TASSA:**  I can tell the Court I finished it about

19    an hour before we came to court.

20         **MS. BRIGGS:**  No.  That was not -- that was not an

21    accusation of any sort.

22         **THE COURT:**  So, it appears to me from reading this --

23    and I just read it in the last ten minutes, I think, or seven

24    minutes -- that you were not, with Ms. Eichenberger, intending

25    to use the exhibits that were objected to.  Is that true?

1      **MR. TASSA:**  None of the ones that were cited in the

2  motion.  There are two documents we plan on going through with

3  Ms. Eichenberger.  One is something that was shown to the jury

4  in one of Mr. Deal's slides.  It's part of the OSHPD accounting

5  manual.  The other is --

6      **THE COURT:**  Is it an exhibit or --

7      **MR. TASSA:**  It was shown -- we are going to ask that

8  it be admitted, yes.

9      **THE COURT:**  All right.  And does it have a number yet?

10  Do I have it?  Can I look at it?

11      **MR. TOOCH:**  I don't have the -- if you have

12  Eichenberger's -- it's going to be slide -- a new exhibit 182.

13  Mr. Deal had a slide where he showed part of the page of the

14  OSHPD manual.  We're showing the whole page and a couple of

15  pages before and after that.

16      **THE COURT:**  Okay.  All right.  Well, so -- we'll be

17  seeing that.  And what else?

18      **MR. TASSA:**  The other is a portion of the NorthBay

19  paid claims data that we produced during discovery and then was

20  reproduced to us by Blue Shield as part of the backup to

21  Mr. Deal's report.  So something that he relied on.

22      **THE COURT:**  So an exhibit that I don't have but that

23  was Mr. Deal's --

24      **MR. TASSA:**  Right.  This is something that hasn't been

25  shown to the jury at this point.  All the other documents cited

1    in the motion will not be introduced.

2         **MS. BRIGGS:**  Your Honor, if I may respond to a couple

3    different points.

4         The first is with respect to their Exhibit Number 182,

5    which is the OSHPD manual.  The point, as I understand it, of

6    Ms. Eichenberger's testimony is going to be that OSHPD does not

7    require that NorthBay report settlements, for example, if it

8    disputes claims with other payors.

9         There are no settlements.  We have discovery responses.

10   They were included.  So that testimony, regardless of whether

11   or not that document is admissible, Ms. Eichenberger should not

12   be taking the stand suggesting to the jury that there are

13   settlements out there that just don't exist because we have

14   those discovery responses.  So that's issue number one.

15        Issue number two, I don't have a problem with the NorthBay

16   paid claims data, so let's just put that to the side.

17        What they've done is essentially stripped the documents

18   that I objected to because they were so riddled with problems,

19   and now they're just going to have Ms. Eichenberger testify

20   effectively about the contents of the documents.  Which for --

21   you know, which presents, obviously, hearsay, kind of best

22   evidence types of problems particularly because they were so

23   problematic.  It's not the kind of thing, it's not the kind of

24   issue for cross-examination to get up there and say -- you

25   know, for me to start introducing now the exhibits that show

1  that her calculation of who paid what and when and why is

2  completely misplaced.

3       The other thing I want to point out is in this motion

4  there's a lot of argument that Ms. Eichenberger should be --

5  will be testifying as to the why payors sometimes pay

6  100 percent of full billed charges.

7       I deposed Ms. Eichenberger.  She has no idea.  She

8  specifically told me during her deposition she did not conduct

9  any claim-by-claim review.  She does not know why.  She doesn't

10  know if it's a mistake.  In fact, what she told me is that for

11  the vast majority of claims that she had a spreadsheet for that

12  showed 100 percent being paid, there were multiple payors on

13  that account.

14       So to allow her to get up and start talking about claims,

15  it's really kind of an end run around the fundamental problem

16  here, which is that there's no evidence of this.

17       **THE COURT:**  And what's going to be the basis of her

18  testimony?  So to go specifically through the substantive

19  points that were raised in the motion *in limine*, with respect

20  to the Medicare testimony, I do think it's already been

21  presented, but if all she's going to say is Medicare pays less,

22  that's okay.  Everybody knows -- that's quite clear.

23       **MR. TASSA:**  We do need that in evidence, Your Honor,

24  in order to make the argument that Mr. Deal's calculations are

25  skewed to the low side.

1      **THE COURT:**  I think it's in evidence, but it's okay.

2   If that's the only thing you're going to use her to do, that's

3   fine.

4      The payment of full billed charges, we've dealt with the

5   exhibits.  Mr. Deal has already said that NorthBay occasionally

6   gets full pay and there were a number of statements that

7   Ms. Eichenberger made in her deposition that were cited in the

8   brief that would indicate that she hasn't done any analysis on

9   this.  I don't know what the basis is for what she's going to

10  say.  I expect to hear an objection the moment she says

11  something about that.

12     **MR. TASSA:**  If I could make a proffer on what I expect

13  her to say.

14     **THE COURT:**  Go ahead.

15     **MR. TASSA:**  I expect her to say that 100 percent of

16  billed charges is what NorthBay's expects when they don't have

17  a contract with another payor.  And, in fact, they quite often

18  get 100 percent of charges when a payor is paying a claim where

19  there's no contract.

20     Frankly, I didn't have the time to go through everything

21  that was cited in the motion, but I was at that deposition.

22  The questions were about specific spreadsheets of claims.

23  There's dozens of spreadsheets that have gone back and forth in

24  this case.  And the questions were about claims listed on a

25  spreadsheet, what is this claim, et cetera.  I don't think her

1    lack of knowledge on that issue -- first of all, I just want to

2    make the point, they're free to cross her on that and they're

3    free to make the point that undermines her credibility.  But

4    she's going to make the general point that when there is a

5    payor with whom they do not have a contract, they expect to get

6    their full billed charges.  They bill their full billed

7    charges, and quite often they get them unless there's a

8    negotiated lower rate.

9            THE COURT:  What does "quite often" mean?

10           MS. BRIGGS:  That's my problem, Your Honor.

11           MR. TASSA:  I think I have to wait for

12   Ms. Eichenberger's testimony, but I understand that would be

13   the substance of her testimony.  They're free to cross her on

14   what "quite often" means.

15           THE COURT:  Well, let's be very clear that when this

16   testimony is being sought, that the foundation for her

17   testimony, the specific foundation for her testimony and

18   knowledge, that it be very clear before some nebulous statement

19   is made.  All right?

20           MR. TASSA:  If I could add just one more thing on

21   that.  She hasn't done an analysis.  She wasn't required to do

22   an analysis.  I understand that goes to her credibility as to

23   that testimony.  But I just don't see the argument that it goes

24   to --

25           THE COURT:  Mr. Tassa, did you hear me?

1    **MR. TASSA:**  I did, Your Honor.

2    **THE COURT:**  So it's true that things go to the weight

3    as long as there's foundation to get it in.  And the question

4    is:  Is there any foundation there?

5    So let's -- that's full pay.  Then the OSHPD data.  Again,

6    the settlements and judgments business, I think she completely

7    gave up.  Or, you did.  Either a lawyer for plaintiffs did or

8    she did in her deposition when this evidence was -- the

9    question was objected to.  So --

10    **MR. TASSA:**  If I could address that issue very

11    quickly.

12    So the settlement issue does not just go to NorthBay OSHPD

13    data.  It goes to OSHPD data in general.  Mr. Deal has

14    testified that hospitals are required to submit that data, and

15    that gets rolled up into OSHPD's data.  And he cited a specific

16    portion of the OSHPD accounting manual.

17    He's wrong about what that accounting manual says.

18    Ms. Eichenberger knows he's wrong, she knows what it says, she

19    has personal knowledge as to what that portion means and how

20    that affects what she reports to OSHPD.  So I think it's

21    important that that come in.  And NorthBay's settlements -- and

22    I can address that issue at a little more length than what was

23    in the motion, but I don't think that issue has anything to do

24    with NorthBay settlements.

25    Now, as to the settlements more broadly, that's not a

1    NorthBay-specific issue. The issue is Mr. Deal used OSHPD data

2    from all of his peer hospitals. That's how he gets his

3    regional geographic area reasonable value. So to the extent

4    those settlements for any hospitals -- not just NorthBay -- are

5    not included in that data or are not required to be reported in

6    the manner that Mr. Deal said they were, that goes to his

7    entire reasonable value analysis. Because the data is used

8    from all hospitals.

9        He has said --

10        **THE COURT:** What portion of the OSHPD data involves

11    the settlements?

12        **MR. TASSA:** So Mr. Deal said on direct that to the

13    extent there are any settlements of any disputes. I think he

14    testified specifically litigation disputes, but I would have to

15    go back and check. That's included in the OSHPD data so the

16    payments would reflect any additional amount paid pursuant to

17    litigation awards or settlements.

18        That was the substance of Mr. Deal's testimony. And he

19    cited a specific portion of the OSHPD reporting manual in

20    support of that testimony.

21        Now, we can give you the portion that we're planning on

22    going through with Ms. Eichenberger. It says nothing of the

23    sort. And she's competent to testify that's not what the

24    portion cited by Mr. Deal means.

25        **THE COURT:** Did you answer my question? My question

1  is -- and maybe you answered it and I just wasn't following it.

2  How material is this in the OSHPD data?  Why is this -- why are

3  you making this significant point, and particularly with this

4  witness?

5      **MR. TOOCH:**  If I may.  He's doing a great job, but let

6  me add this.

7      The whole purpose of Mr. Deal's -- his entire analysis is

8  based upon the OSHPD data.  He says that hospitals are required

9  to true up.  So, for example, the claims in this case.

10     Ms. Eichenberger put in what was paid, not whatever the

11 jury comes back with.  And whatever the jury comes back with,

12 she's not going to go back to 2016 and change the data.  And

13 the reason why she's not going to do it is because she's not

14 required to do it.

15     And so when Mr. Deal says, Oh, the OSHPD data includes

16 true-ups, that's just not true and we want to show that's not

17 true.  Because the portion of this manual is mis-cited and, in

18 fact, people like Ms. Eichenberger who submit the data to OSHPD

19 don't do that.  So that's why it's important for us to attack

20 his credibility on that issue because he's saying something to

21 the jury that's not true.  That hospitals are required to

22 true-up the data and that they do and both are not true.

23     **THE COURT:**  Okay.  So neither of you have answered my

24 question.  You've answered a different question, which is you

25 want to use it for credibility.  But you haven't told me that

1    it's material.

2        Ms. Briggs I'm interested in your reaction to all this.

3        **MS. BRIGGS:**  Thank you, Your Honor.  As I mentioned

4    earlier, this is a bit of a red herring, and frankly a little

5    prejudicial, because there are no settlements.  So we're

6    fighting over facts that don't exist in this case.

7        If NorthBay had put in evidence, for example, that there

8    were settlements that it did not report to OSHPD, that would be

9    -- that would be one thing.  But that's not the state of the

10   record here today.

11       They refused discovery.  They told us the settlements

12   didn't exist.  So for Ms. Eichenberger to get on the stand and

13   start testifying about whether or not nonexistent settlements

14   are or are not included by NorthBay in OSHPD is frankly

15   irrelevant.

16       The second part really goes to what I've heard opposing

17   counsel say about Ms. Eichenberger testifying about what other

18   hospitals put into their OSHPD data and how they understand it.

19   I don't know if there's any basis whatsoever for

20   Ms. Eichenberger to be testifying about that.

21       **THE COURT:**  Certainly seems that that would be true.

22   Again, I'll listen to the questions as they come up, but I do

23   not see how she is able to testify to that.

24       **MR. TASSA:**  Well, she can testify as to the meaning of

25   the OSHPD hospital reporting manual.  It's something she knows

1    about, that she uses, that she has foundation with.

2         **THE COURT:**  I'll listen as you go along.

3         **MR. TASSA:**  And just to address the materiality point,

4    again this is not NorthBay specific.  He said -- Mr. Deal used

5    this OSHPD data to get his reasonable value from all his peer

6    hospitals.  So he doesn't know whether they're litigation or

7    settlements or awards.  And he said that to the extent there

8    are those awards, those are trued up and those are accounted

9    for in his data.

10        Now, he has no basis for saying that.  He cites this

11   portion of the OSHPD accounting manual.  And he's wrong about

12   what it says.

13        **THE COURT:**  You haven't given me any basis, either, to

14   make me think that this is a significant issue in the overall

15   data.  So let's move on.

16        If you -- I'll just be listening to the foundation that's

17   laid, and if I sustain objections I won't be surprised.

18        All right.  So I think that deals with the substantive

19   issues that were raised in the motion *in limine*.

20        **MS. BRIGGS:**  I think it does, too.  Just to make sure

21   that I understand.  You're going to be listening.  You've given

22   some thoughts about what can come in and can't come in.  You're

23   going to be listening and I'm entitled to obviously make my

24   objections as it goes along.

25        **THE COURT:**  Yes.  And I want you to make your

 1   objections.  I don't want to rely on me to object --

 2        **MS. BRIGGS:**  I'm not relying.  Yes, I will.  Thank

 3   you.

 4        **THE COURT:**  -- on your behalf.

 5        **MR. TASSA:**  If I could get more clarification on some

 6   of the issues that were raised just so we have more guidance on

 7   whether there's anything we can't elicit here.

 8        As far as the OSHPD denials go, this is an issue separate

 9   from the settlements.  Mr. Deal has testified that, number one,

10   it's a small issue.  He has no basis for that.

11   Ms. Eichenberger, at least with respect to NorthBay, has

12   firsthand knowledge of that.

13        And number two, she can explain exactly what denials mean

14   and how that gets reported up to OSHPD.  Now, in their motion,

15   Blue Shield seems to suggest that we have to prove whether the

16   denials are true or not in order to show whether they're

17   material or at all relevant to the case.  And that's actually

18   not true.

19        So I gave an example in my response, to the extent there's

20   a denial, even if justified, Mr. Deal only sees the aggregate

21   data.  And so if one of two hospital inpatient days is denied

22   for justifiable reasons, all he sees is the aggregate data and

23   all he can tell is on these two inpatient days this payment was

24   made.  He can't tell that that was because of medical necessity

25   denial.  He just sees something was denied and, therefore,

1    that's the reasonable value.

2        Now, just because something was denied for a medical

3    necessity reason, I don't think either the payor or the

4    hospital in that situation would agree that the value of the

5    service was zero.  And that's the point we're making with that.

6        **THE COURT:**  Well, it's unclear to me why, if there are

7    these huge problems with the OSHPD data, you wouldn't have gone

8    after Mr. Deal on cross-examination in the first place.

9        In the second place, if there are these problems with the

10   OSHPD data, I don't know why your expert wouldn't be the one to

11   be identifying those problems with some data or other

12   foundation that would support it.

13       I will listen to what Ms. Eichenberger has to say, but it

14   seems a very odd way of going after this particular problem.

15       **MR. TASSA:**  So our expert will be addressing some of

16   these issues.

17       **THE COURT:**  Well, that would make more sense.

18       **MS. BRIGGS:**  And, Your Honor, just to attune you.

19   Ms. Eichenberger did testify in her deposition that she had not

20   conducted any analysis in NorthBay's paid claims data as to the

21   volume of these denials.  And obviously, that's very

22   significant.  If we're talking about something on the margins,

23   you know, that would be one thing.  But she didn't do it.  So

24   to allow her to get up and kind of, you know, go on and on

25   about medical necessity denials, or this, that, it's really --

1   it's just painting a very misleading picture.

2       Thank you.

3           **THE COURT:**  They exist.

4           **MS. BRIGGS:**  Of course, they exist.

5           **THE COURT:**  And your expert said, you know, 5 percent

6   and --

7           **MS. BRIGGS:**  That's right.

8           **THE COURT:**  -- and there's 5 percent with Tricare and

9   worker comp.  That adds up to 10 percent as I do the math.  So

10  that's interesting.  But I would beware of shoehorning too much

11  into a witness that doesn't have the proper knowledge to

12  testify.

13          **MR. TASSA:**  Understood, Your Honor.

14          **MS. BRIGGS:**  Thank you.

15          **MR. PIMSTONE:**  Judge, just a couple quick matters.  I

16  know the jury's coming in soon.

17      We may bring a Rule 50 motion depending on what happens

18  with the rebuttal case today.  If we do, our preference would

19  be to bring it after closing and before the case goes to the

20  jury.

21      Does that -- is that consistent with Your Honor?  Or do

22  you prefer us to bring it at a different time?

23          **THE COURT:**  I will deem it made at the end of the

24  rebuttal case.

25          **MR. PIMSTONE:**  Okay.

1    THE COURT:  And then we'll let the jury go do its

2  business.

3    MR. PIMSTONE:  Sure.

4    THE COURT:  And if there was some reason that I was

5  going to grant it rather than to let them --

6    MR. PIMSTONE:  So after rebuttal case would you like

7  me just to formally make the oral motion?

8    THE COURT:  When the jury's -- yes.  At some point

9  after the rebuttal case.  But I'm just going to deem that it's

10  made and you can say whatever you want to say.

11    MR. PIMSTONE:  Understood.  And based on what we're

12  hearing this morning about the rebuttal case, we do have a

13  potential brief surrebuttal which would be that, as has been

14  discussed, Mr. Deal relied on the OSHPD data.

15    On cross-examination, as well as I understand the rebuttal

16  case, NorthBay plans to make the argument that settlements are

17  not included in the OSHPD data.  Mr. Deal did indicate that

18  they had confirmed their understanding with OSHPD itself.  And

19  we have a communication between Analysis Group with OSHPD

20  confirming that settlements are, in fact, included.

21    So to the extent that any further attempt is made to argue

22  this morning that the OSHPD data does not include settlements,

23  we would seek permission to -- just to very briefly introduce

24  that communication.

25    THE COURT:  Okay.  All right.

1      Mr. Tooch?

2          **MR. TOOCH:**  One final thing.  Is the verdict -- form

3    we had submitted different verdict forms.  I wanted to --

4          **THE COURT:**  Yes.

5          **MR. TOOCH:**  -- hear the Court's view on that.

6          **THE COURT:**  You did.  And I think I chose the one that

7    came from Blue Shield.

8          **MR. TOOCH:**  Okay.

9          **THE COURT:**  Was that not posted?

10         **MR. PIMSTONE:**  It was.

11         **MR. TOOCH:**  It was.  I just wasn't clear whether --

12     If it's the one that's posted, that's fine.

13         **THE COURT:**  Do you want to make -- do you want to make

14   some argument with respect to --

15         **MR. TOOCH:**  No, I just was inquiring which one you

16   chose.  That's all.

17         **THE COURT:**  I chose the one that was posted.

18         **MR. TOOCH:**  Thank you.

19         **THE COURT:**  Okay.  If the jury's here I'll be back in

20   a couple minutes.

21              (Recess taken at 8:01 a.m.)

22             (Proceedings resumed at 8:05 a.m.

23                in the presence of the jury)

24         **THE COURT:**  Please be seated everybody.  Good morning,

25   ladies and gentlemen.  Happy Monday.  Welcome back.

1        So as you will recall, in this case the plaintiff rested

2   its case but now has the right to do a rebuttal case after the

3   defense rested.

4        So, Mr. Tooch, who are you going to call in your rebuttal

5   case?  Who's first?

6             **MR. TOOCH:**  Mr. Heil.

7             **THE COURT:**  Come on back up, Mr. Heil.

8                        **MICHAEL HEIL**,

9   called as a witness for the Plaintiff, having been previously

10  duly sworn, testified further as follows:

11            **THE COURT:**  Mr. Heil, you're still under oath.

12            **THE WITNESS:**  Yes, Your Honor.

13            **THE COURT:**  Go ahead.

14            **MR. TOOCH:**  Thank you.

15                **FURTHER REDIRECT EXAMINATION**

16  **BY MR. TOOCH:**

17  **Q.**   Good morning, Mr. Heil.

18  **A.**   Good morning.

19  **Q.**   I'd like to go over some of the testimony that Mr. Deal

20  went through in his direct testimony.

21       If we can go to slide -- Mr. Deal's slide 12, please.

22       Mr. Deal had a slide in his presentation called "Payor Mix

23  in the Geographic Area."

24       Remind us what "payor mix" is?

25  **A.**   Payor mix is often represented by a pie chart like this

1  and it shows the proportion of patients who fall into each of

2  several categories of payor types.

3  **Q.**   And did Mr. Deal use payor mix in -- so, for example, is

4  payor mix how many Medicare patients there are, how many

5  Medi-Cal patients, how many private pay patients?

6  **A.**   That's right.  Those are the main three categories that he

7  has looked at.

8  **Q.**   And did Mr. Deal use payor mix in his calculations of what

9  he says is reasonable value?

10  **A.**   Yes, he did.

11  **Q.**   And did he take into account the amounts paid by Medicare

12  and Medi-Cal in his calculations?

13  **A.**   Yes, he did.

14  **Q.**   And I'd like to go to Exhibit 178-19.

15       Do you recognize this chart?

16  **A.**   Yes.

17  **Q.**   What is it?

18  **A.**   This shows the payor mix using those same three categories

19  for a series of hospitals that Mr. Deal studied.

20  **Q.**   Is this chart from Mr. Deal's report in this case?

21  **A.**   Yes, it is.

22       **MR. PIMSTONE:**  I'm going to object, Your Honor.  This

23  was not introduced.  Mr. Deal did not testify based on this

24  chart.  There's no testimony regarding it.  So it's not

25  appropriate rebuttal.

1    **THE COURT:** Overruled.  I think it goes to the point

2  that's being raised.

3  **BY MR. TOOCH:**

4  **Q.**   According to Mr. Deal's chart, what percentage of patients

5  at NorthBay are Medicare and Medi-Cal beneficiaries?

6  **A.**   Well, it's 21 percent for commercial.  So the difference

7  is the rest of it, which is about 80 percent.

8  **Q.**   Okay.  So is the green part on the top the commercial?

9  **A.**   The green part is the commercial, 21 percent.  So the

10  difference would be actually 79 percent at NorthBay, Medicare

11  and Medi-Cal.

12  **Q.**   If you look at the last bar on Mr. Deal's chart, what does

13  that bar show?

14  **A.**   That shows the summation of the hospitals that he studied.

15  **Q.**   And how does the number of commercial patients at NorthBay

16  compare to the number of commercial patients at the other

17  hospitals?

18  **A.**   The number of commercial patients at NorthBay is

19  significantly lower than for the other hospitals in general.

20  **Q.**   And how does the number of Medi-Cal patients at NorthBay

21  compare to the group?

22  **A.**   The number of Medi-Cal patients, we can see here, is

23  37 percent, and the group is 28.  So it's very significantly

24  higher.

25  **Q.**   And did that affect Mr. Deal's calculations on reasonable

1  value?  The relative percentages of Medi-Cal patients at

2  NorthBay versus commercial patients?

3  **A.**   Yes.

4  **Q.**   Explain to the jury.

5  **A.**   Mr. Deal made calculations where he blended together the

6  certain payment rates from each of those three categories.  And

7  he said that reasonable value should be based upon blending in

8  Medicare and Medi-Cal rates.  And when he did that blending, he

9  blended it in at the payor mix for each of the hospitals.  In

10  this case, NorthBay.  So he was reflecting the high proportion

11  of Medicare and Medi-Cal patients at NorthBay when he made a

12  calculation of reasonable value for NorthBay.

13  **Q.**   So if a hospital has a -- like NorthBay -- has a lot of

14  Medi-Cal patients and a lot of Medicare patients compared to

15  commercial patients, does that drive down the reasonable value

16  of Mr. Heil's -- Mr. Deal's calculations?

17  **A.**   Yes, it does.  It drives it down.

18  **Q.**   Okay.  If you look at the hospitals in this chart, does

19  Mr. Deal include Kaiser hospitals?

20  **A.**   He does not.

21  **Q.**   And if Kaiser hospitals were included, what would that do

22  to the calculations or the mix?

23  **A.**   Well, the all combined number that you see over to the

24  right is a roll up of all the hospitals that he has studied

25  here.  He has not included Kaiser.  There are a number of

1  Kaiser hospitals, I think four, in the region that he has

2  studied.  And those hospitals, by the way, have very -- have

3  much lower proportions of the Medicare/Medi-Cal combination

4  than the other hospitals.

5       So he has, in doing this, he has excluded a significant

6  number of hospitals that have a much more favorable payor mix.

7  **Q.**  And why do Kaiser hospitals have more commercial members

8  and less Medi-Cal members?

9       **MR. PIMSTONE:**  I'm going to object, Your Honor, to

10  this line of questioning.  Again, it's not rebuttal.

11       **THE COURT:**  Yeah.  Sustained.

12  **BY MR. TOOCH:**

13  **Q.**  Is it appropriate for a valuation expert such as yourself

14  or Mr. Deal to compare the reasonable value of commercial

15  claims, which we're talking about in this case, to

16  Medicare/Medi-Cal claims?

17  **A.**  No, it is not.

18  **Q.**  Why not?

19  **A.**  The standard in the valuation profession for establishing

20  fair market value, and in fact according to the jury

21  instructions that you showed me last week, those standards are

22  very -- are almost identical.  And those standards call for the

23  use of rates that are represented of willing buyers and willing

24  sellers without any coercion or compulsion.  I can't remember

25  what the exact term is in the jury instruction.  Something

1   along those lines.  And Medicare and Medi-Cal rates are not

2   willing buyer/willing seller rates.  They are compelled by

3   government regulation.

4   **Q.**   And when you're doing reasonable value analysis, is one

5   required to compare apples to apples?

6   **A.**   Yes.  That's another reason that the Medicare and Medi-Cal

7   rates should not be used.  First of all, as I've said, they

8   should be reflective of willing buyers and willing sellers.

9   And those rates are not.

10       Secondly, you're right.  Comparability is at the heart of

11  the market method of valuation apples and apples.  And Medicare

12  and Medi-Cal rates are the opposite of apples.  Completely

13  different.

14  **Q.**   How so?

15  **A.**   They represent a unique government-run program where rates

16  are compelled by government regulation, set by political and

17  budgetary issues.  They're not negotiated between the parties.

18  **Q.**   Mr. Deal said that he used OSHPD data.  Are government

19  rates included in the OSHPD data?

20  **A.**   Rates paid by government programs are included in the

21  OSHPD data, yes.

22  **Q.**   Is it just Medicare and Medi-Cal?

23  **A.**   No.  There's a very significant proportion -- significant

24  number of other government programs which are recorded in

25  OSHPD.  They are recorded in a category that Mr. Deal refers to

1   as commercial, but they are not commercial.  They are a series

2   of programs such as worker's compensation, the military program

3   called CHAMPUS, the California Children's Service.  There's a

4   long list of programs that are listed in the OSHPD manual that

5   are to be reported to OSHPD.  But they're reported in the

6   category that is correctly titled "Other Third-Party."

7   Mr. Deal mistakenly refers to that as commercial.

8   Q.   And do those programs have set rates like the Medicare and

9   Medi-Cal programs?

10  A.   Yes, they do.

11  Q.   So are they willing buyer/willing seller situations?

12  A.   They're not.  They're not negotiated.  They're imposed by

13  regulation.

14  Q.   Okay.

15       MR. TOOCH:  I'd like to go to Mr. Deal's slide 25.

16  Q.   In this slide he says that NorthBay -- on the left-hand

17  column -- payments are 5 times the Medicare rate.  And what's

18  the multiple of Medicare that he says?

19  A.   For NorthBay?

20  Q.   Yeah.

21  A.   He says 5.0.

22  Q.   Go to Mr. Deal's slide 34.  What is reflected on this

23  slide?

24  A.   This is payment data from two other data sources.

25  Q.   And so what does the left-hand bar show?

1  **A.**    That's Blue Shield data provided in this case that's for

2  outpatients.

3  **Q.**    And is this what Blue Shield pays other parties?  What

4  does this chart reflect?

5  **A.**    This is what Blue Shield's data shows they paid for

6  outpatients under a series of contracts that Blue Shield has

7  included in that data set.

8  **Q.**    Pays to other hospitals?

9  **A.**    To other hospitals, correct.

10 **Q.**    So what is the amount that Blue Shield pays other

11 hospitals for outpatient services?

12 **A.**    6.6 times Medicare.

13 **Q.**    And what does the blue chart show?

14 **A.**    That's what another data system says some other payors pay

15 some other hospitals.  That's the Optum data source.

16 **Q.**    So does the blue chart show what, according to the Optum

17 data, other hospitals are paid for outpatient services?

18 **A.**    Yes.  That's right.

19 **Q.**    And is there a big difference between the Blue Shield

20 database and the Optum database?

21 **A.**    Yes.  It's significant.  50 percent higher for the Blue

22 Shield database than the Optum.

23 **Q.**    So what numbers are presented to the jury can depend in

24 large part on what database one chooses to --

25        **MR. PIMSTONE:**  Objection.

1   **Q.**   -- get their information from.

2          **THE COURT:**  Yeah.  It's argumentative.

3   **BY MR. TOOCH:**

4   **Q.**   Can an expert like you present a very different picture to

5   the jury depending upon which database you choose your

6   information from?

7   **A.**   Yes.  I would answer the general question this way:

8   Analysts need to make decisions about which databases they're

9   going to use and how they're going to use them, and judgments

10  need to be made.  And different valuators can come to different

11  conclusions about which data sets are valid and how useful they

12  are and how to use them.  So you can come up with very

13  significantly different answers depending on what databases you

14  use and how you use them.

15  **Q.**   If you can go to slide 32.

16         What is reflected on this slide?

17  **A.**   This says it's NorthBay's claims based on what comparable

18  hospitals accept from Blue Shield and says that they would be

19  paid at 4.1 times Medicare.

20  **Q.**   So to put in layman's terms, is this what, according to

21  Blue Shield's data, it shows that it pays other hospitals?

22  **A.**   Under the arrangements that exist in the -- between Blue

23  Shield and those other hospitals in Mr. Deal's study group,

24  yes.

25  **Q.**   Okay.  And so how much, according to this, does Blue

1   Shield pay other hospitals for outpatient services?

2   **A.**   6.6 times Medicare.

3   **Q.**   And what does it pay for inpatient services?

4   **A.**   1.7 times Medicare.

5   **Q.**   And then it appears that Mr. Deal did a 50/50 split.  And

6   what number did he come up with?

7   **A.**   4.1.

8   **Q.**   Is that much different than the 5.0 that you saw in the

9   other slide as to what Blue Shield pays NorthBay?

10  **A.**   Yes.  It's another significant difference.

11  **Q.**   All right.  So let's go to Mr. Deal's slide 57.  What is

12  reflected on this slide?

13  **A.**   Mr. Deal is summarizing what he believes are the volumes

14  of encounters, patient accounts, that I used in my analysis.

15  This is his view of what I did.

16  **Q.**   And if you look at just the rental networks and the

17  letters of agreement, are those 1 percent of all of the claims

18  that are paid at NorthBay?

19  **A.**   Yes.  They're 1 percent of the whole pie.

20  **Q.**   If you --

21  **A.**   Roughly.

22  **Q.**   If you look at the Blue Shield payments compared to all of

23  the payments that NorthBay receives, what percentage would you

24  get from that?

25  **A.**   It's a very small percentage.  I think it's somewhere

1   around 2 percent, if I remember correctly.

2   **Q.**   And so if you take away the government claims from this,

3   does the percentage go up?

4   **A.**   Yes.  As I've indicated, I think that government programs

5   such as Medicare and Medi-Cal should be excluded entirely from

6   this analysis in this case because they don't meet the basic

7   standards of fair market value.

8        So if you take those out, then the percentage of claims in

9   any group will be much larger of the remaining portion that is

10  more or less commercial.  Although as I've said, there's a lot

11  -- there's quite a few government payors in what Mr. Deal calls

12  commercial.

13  **Q.**   In this chart, did Mr. Deal include Kaiser?

14  **A.**   No.  He focused on rental networks and LOA's single case

15  letters of agreement.

16  **Q.**   When you did your analysis, did you include the Kaiser

17  claims?

18  **A.**   I did.

19  **Q.**   When you calculated the payments that are made by the

20  emergency type contracts, as opposed to the steered volume

21  contracts, did you include Kaiser?

22  **A.**   Yes, I did.  Because the Kaiser relationship is a perfect

23  fit for the claims in dispute in this case.  They are emergency

24  only claims, there's no steered business coming from Kaiser to

25  NorthBay.  So they're a perfect fit.

1  **Q.**  If you can go to Exhibit 300, please.

2  Okay.  Do you recall this exhibit from the testimony?

3  **A.**  I do.

4  **Q.**  If you look at the sum of total charges column, we can see

5  Blue Cross has $190 million.  Isn't that correct?

6  **A.**  Correct.

7  **Q.**  And if you look at Kaiser, what does Kaiser have?

8  **A.**  Kaiser is 90 million.

9  **Q.**  And so is that the next highest payor, according to this

10  Exhibit 300 which Blue Shield introduced?

11  **A.**  Yes.

12  **Q.**  So if you include the Kaiser with your number, does the

13  number go up substantially?

14  **A.**  Yes.

15  **Q.**  Let's go to Mr. Deal's slide 13, I believe it is.  Okay.

16  This slide says "I Used Multiple Data Sources to Develop My

17  Statements of Payors."

18  Let's start with the right-hand side.  He says he uses the

19  Optum database.

20  Is Optum a company that's owned by United Healthcare?

21  **A.**  Yes, it is.

22  **Q.**  Is United Healthcare an insurance company?

23  **A.**  It is.  It's the largest, or one of the largest, in the

24  country.

25  **Q.**  Does United Healthcare get to choose what information to

1   put in this database?

2   **A.**   Yes.

3          **MR. PIMSTONE:**  Objection.  Lacks foundation.

4          **THE COURT:**  Would you lay a foundation?

5   **BY MR. TOOCH:**

6   **Q.**   Is someone like you able to audit or review how United

7   Healthcare decides what information to put in its lab?

8   **A.**   No.  Not at all.  This data is like many -- like really

9   all of the data sets Mr. Deal has used, what is accurately

10  referred to as a black box.  There's no way to know, to

11  understand, what's down in the weeds in the data to audit it or

12  analyze it in a careful way.  It's just a giant aggregation.

13  **Q.**   What do you mean by "aggregation?"

14  **A.**   Summation.  It's a big roll up of whatever data that

15  people who operate the database decided to include.

16  **Q.**   Mr. Deal said on direct that this Optum data doesn't

17  reflect what hospitals are included in that database.  Is that

18  true?

19  **A.**   They do not report out which hospitals, or how much volume

20  might be involved, or what kinds of patients in any detail

21  that's useful for this kind of analysis.

22  **Q.**   So doesn't someone like you know whether -- can someone

23  like you know whether or not United Healthcare left out a whole

24  bunch of hospitals from its database?

25  **A.**   I can't know.

1  **Q.**  Can you know whether or not Optum has left out a whole

2  number of claims from its database?

3  **A.**  I can't know that.

4  **Q.**  And in this case, did Mr. Deal provide to you the Optum

5  data that he looked at?

6  **A.**  He did not.

7  **Q.**  Does United Healthcare have access to the Optum database?

8  **A.**  United Healthcare does, yes.

9  **Q.**  It owns the company.

10  **A.**  It owns the company.  I mean, they could get it.  I don't

11  know if they get it regularly, but they certainly could because

12  they own the company.

13  **Q.**  According to your chart, United Healthcare has a contract

14  rate of 70 percent of charges.  Before United Healthcare

15  entered into the contract with NorthBay, could United

16  Healthcare have looked at the Optum database to see whether or

17  not that was a fair rate for NorthBay's charges?

18          **MR. PIMSTONE:**  Objection.  Lacks foundation.

19          **THE COURT:**  Overruled.  You can answer.

20          **THE WITNESS:**  Yes.  United, like all of these large

21  insurance companies, has access to lots of data.  They're in

22  the marketplace negotiating contracts, paying claims, all the

23  time.  And in the case of United Healthcare, they have a

24  special access to even more data with their subsidiary if they

25  wish to use it.  So when they negotiate any rate in any

1   contract they are as well informed a buyer as one could

2   imagine.

3   **BY MR. TOOCH:**

4   **Q.**   Okay.  Let's look at the next data source that Mr. Deal

5   looked at, the Blue Shield data.

6       Like Optum, United Healthcare, does Blue Shield get to

7   choose what information to put in its database?

8   **A.**   It does.  Yes, it does.

9   **Q.**   And do you have any way to verify whether or not Blue

10  Shield has left out certain claims from its database?

11  **A.**   I cannot.  I do not.

12  **Q.**   So -- do you know whether or not Blue Shield includes in

13  its database claims that are in dispute between a hospital and

14  a health plan?  Say, a health plan pays a hospital -- say the

15  rate is 80 percent of charges but the health plan denies

16  certain days for medical necessity.  And the hospital says, No,

17  that was medically necessary and so there's an appeal going on.

18      Do you know whether or not Blue Shield includes those

19  disputed claims in its database?

20  **A.**   I don't know.  All that's been represented about them is

21  that they are -- that the contracts with those hospitals that

22  Mr. Deal studied are all network contracts.  But based on my

23  experience, it is not at all uncommon for payors to underpay

24  rates that are expressed in network contracts.  But the main

25  point is that I don't know if there's underpaid claims or

1    disputed claims.  And no one does.

2    Q.   When you worked at running hospitals, particularly San

3    Jose, was there a collections department at the hospital?

4    A.   Yes.  It's called business service.

5    Q.   What was the purpose of that department?

6    A.   The main activity was two things.  It was to issue bills

7    to payors, and it was to seek to collect appropriate amounts on

8    those accounts.  There was a division that looked at the

9    government programs and then there was a division that looked

10   at the commercial programs.  And they were -- it was a very

11   active part of the business services department in collections.

12   Q.   Were there a lot of claims that were underpaid for a whole

13   variety of reasons?

14   A.   Regularly.

15   Q.   On both government payors and private payors?

16   A.   It occurs in both.  It's much more common in commercial.

17   Q.   So if Blue Shield has data in its database -- let's say a

18   hospital like Stanford -- do we know whether -- do you know, if

19   you're looking at the database, whether or not the information

20   with respect to Stanford in Blue Shield's database is correct

21   with respect to how the Blue Shield and Stanford negotiated the

22   contract?

23   A.   No.  And there's a couple reasons for that.  First of all,

24   we don't have access to the contract.  So we don't know what

25   the contract in your hypothetical between Blue Shield and

1   Stanford is.  We understand from the way the database has been

2   represented that there is a contract, but we don't know what

3   the provisions of it are.

4        Even if we did, we couldn't -- there's not enough data

5   that's being provided here to know whether those claims were

6   paid according to that contract or not.

7   **Q.**   So, for example, if the Blue Shield-Stanford contract says

8   that Blue Shield will pay Stanford 80 percent of charges, and

9   there's claims in there where it's paid, say, at 30, 40,

10  50 percent of charges for a variety of reasons -- medical

11  necessity, no authorization, et cetera -- is there any way to

12  tell by just looking at the data that Mr. Deal looked at

13  whether or not those were correctly paid claims?

14  **A.**   No.  When a commercial insurance company pays a claim,

15  they submit something called an EOB.  That is, basically, a

16  listing of the reasons that they're giving for what they paid.

17  And that amount of -- that kind of information is not

18  available.  So if there was an underpayment for any appropriate

19  reason, or any inappropriate reason, we can't know it from a

20  database like Blue Shield.

21  **Q.**   And as between the contract rates that parties agree upon

22  and what's paid under that contract, which is the more

23  appropriate metric to look at?

24  **A.**   The contract itself is the best basis for this kind of

25  work.  Fair market value definitions say what have a willing

1   buyer and a willing seller agreed would be the rate?  And that

2   the only place to see that is in an actual contract where you

3   can see a document signed and see the values that have been

4   agreed to.

5       That's the absolutely best way.  All of these other

6   approaches that are being used here by Mr. Deal are speculative

7   based on these -- what I'm calling black box data sets.

8   **Q.**   Let's go now to the OSHPD data.  First of all, was the

9   OSHPD data ever supposed to be used by people like you and

10  Mr. Deal to determine fair market value of hospital services?

11  **A.**   No.  I know that it's not intended for that purpose.

12  Because if it were, it would have been presented with all of

13  the information that one needs to know to determine which data

14  points should be used and which shouldn't.

15      There's a well-established principle in the valuation

16  literature that speaks to this.  And it -- there's a text book

17  that's been written on valuation in health care.  It's written

18  by Tim Smith and Mark Dietrich.  It's in its second edition.

19  It's the only text book on this subject.  And then Mark

20  Dietrich has written further beyond that.

21      And he writes that deal terms affect contract rate.  And

22  he writes that an analyst, a valuator, should understand the

23  terms that underlie any data that they're going to use.  And he

24  says that to assume that you can proceed otherwise is just

25  illogical.  He literally says it fails the test of common

1    sense.

2    **Q.**   So if you get a data set like OSHPD or Optum and you don't

3    know how that data is collected in that database, is that a

4    problem for valuation?

5    **A.**   Yes.  It makes this giant roll up virtually useless.  It's

6    just -- we don't know what's in the data.  We don't know what

7    services are in it.  We don't know what types of contracts are

8    in it.  We don't know whether any of the amounts being shown

9    were actually agreed to by both parties.  There's just nothing

10   we can know about them.

11   **Q.**   Okay.  I would like to use the board for a second.

12        I'm writing "OSHPD" at the top.  And Mr. Heil, are there a

13   number of reasons why you say that the OSHPD database is a

14   black box?

15   **A.**   Yes.

16   **Q.**   List one reason.

17   **A.**   Well, one of them is that the data that's in the data set

18   that Mr. Deal has used covers a huge range of types of

19   services.

20   **Q.**   Such as?

21   **A.**   Such as outpatient lab tests, outpatient prescriptions,

22   home health visits, physician clinic visits, outpatient X-rays,

23   outpatient physical therapy treatments when you go many, many

24   times to get your sore back taken care of.

25   **Q.**   Okay.  Let's stop there for a second.  Let's talk about

1    clinics.  What is an outpatient clinic?

2         **MR. PIMSTONE:**  I'm going to object, Your Honor.  This

3    exceeds the scope of rebuttal.

4         **THE COURT:**  It does.  You're making your general

5    point, which is fine, Mr. Tooch.  But let's not dig too deeply

6    into that detail.

7         Sustained.

8    **BY MR. TOOCH:**

9    **Q.**   Okay.  What is another reason why the OSHPD data is,

10   according to you, a black box?

11   **A.**   The data -- portion of the data set that Mr. Deal is

12   using, according to the OSHPD manual, includes many government

13   programs.

14        Mr. Deal has said -- I heard his testimony -- that he

15   acknowledges that, but he thinks it's relatively minor.  The

16   point is, we don't know.  Those programs, like the government

17   military program and workers' comp, there's no information in

18   the OSHPD data to tell us whether those government programs

19   that are in what Mr. Deal calls commercial are significant or

20   insignificant.  We just don't know at any of the hospitals he

21   has studied.

22   **Q.**   What is another reason why the OSHPD data is unreliable?

23   **A.**   We don't -- for the ones that are truly commercial, we

24   don't know how many are paid according to network contracts

25   where the hospital has agreed to a deep discount in exchange

1  for getting that desirable elective volume steered to it as a

2  part of the bargain.  We don't know.

3       I have reason to believe that a large proportion of it is.

4  And I simply say that because all the studies I've done in

5  California and other parts of the country indicate that most

6  commercial transactions happen under a contract.  So I would

7  expect that data is heavily weighted towards those deeply

8  discounted rates, but we don't know even that.  I do that based

9  on general experience.  But the OSHPD data doesn't report out

10  that this is 90 percent network and 10 percent out of network.

11  It just doesn't say.

12  **Q.**  So is that the difference between the comparable contracts

13  that you were talking about and the noncomparable contracts?

14  **A.**  Yes.  What I'm saying is that I believe that, based on

15  general experience, most of the transactions that are making up

16  that giant OSHPD number that Mr. Deal is using are based on

17  deeply discounted rates.  That would be the noncomparable

18  arrangements that has an average rate at NorthBay of

19  62 percent.  And I would -- and the minority would be in the

20  group on most comparable which has an average of 81 percent.

21  But we just don't know what the blend is because OSHPD doesn't

22  tell us.

23  **Q.**  And for purposes of this case are the -- are those

24  contracts that just deal with emergency services the more

25  relevant contracts?

1  **A.**   Yes.  And if OSHPD had been intended to support fair

2  market value determination, among the things it would do is it

3  would break those out.  It would ask the hospitals to report

4  how many are in network and how many are in non-network.  But

5  they weren't intending that.  They know that the apples and

6  apples principle --

7         **MR. PIMSTONE:**  I would object to the witness

8  characterizing OSHPD's intent.

9         **THE COURT:**  Sustained as to that.  So the jury will

10  limit the testimony to what Mr. Heil believes with respect to

11  OSHPD -- what OSHPD believes --

12         **THE WITNESS:**  I would say I believe that it's

13  reasonable that OSHPD understands the apples and apples

14  principle, and I think it's reasonable to assume that had they

15  be intended this to be a data file to be used for cases like

16  this they would have made the distinction.

17  **BY MR. TOOCH:**

18  **Q.**   Are there any other reasons why you think the OSHPD data

19  is a black box?

20  **A.**   Yes.  It's a black box because in the case of network

21  contract rates, as I said a moment ago, it's my experience that

22  many of them, even under many -- in many cases hospitals are

23  underpaid, their agreed-to rates by payors.  And sometimes

24  those get to be significant enough that they might lead to a

25  lawsuit and a resolution at some point down the road.

1    But many times, hospitals throw in the towel.  They,

2    basically, say, Look, I was supposed to get 80 percent, I got

3    70 percent; it's just not enough dollars to undertake a

4    lawsuit.  So they relent.  They're not accepting the

5    70 percent, they're simply not filing a lawsuit.

6    **Q.**   So let's say the claim is worth $10,000 and the hospital

7    is supposed to get paid $8,000, but it gets paid $7,000.  Is

8    that a situation where a hospital would say, Well, I'm not

9    going to go file a lawsuit over $1,000?

10   **A.**   In my experience working in hospitals, both as a

11   consultant and as an executive, the most that a -- the business

12   office would do is call up somebody at the insurance company

13   and say, "I think you've underpaid us.  Can you please fix

14   this?"  If that was -- if they were able to work that out, that

15   would be great.  Sometimes that happens.  If the plan said,

16   "No, we disagree.  We think what we paid you is correct," I

17   cannot imagine that a hospital would undertake any further

18   challenge.

19   **Q.**   Okay.  Any other reasons why you believe the OSHPD

20   database is a black box?

21   **A.**   Then the other significant category is the out-of-network

22   commercial situation where -- such as this case -- where

23   there's a difference of opinion between the two parties about

24   what reasonable value is.  The plan pays what they think it

25   should be.  That's their decision.  And then the hospital

1  states its position, but then has a decision to make there.

2      And, again, in the out-of-network situations, there are

3  very few situations -- now, included in my data are the single

4  case rates.  That's an interesting representation of what

5  happens in that case when there's not a network contract.

6  Sometimes the parties come together and they negotiate what

7  they think is a fair resolution for one patient that's really

8  just like this case, except it's just one patient instead of

9  many patients.

10 Q.  Is that what you refer to as the one-time agreements on

11 your chart?

12 A.  Yes.  There are somewhere between 90 and 100 one-time

13 agreements that we found at NorthBay.  And the hospital and the

14 plan negotiated a rate -- rates -- that averaged 80 -- I can't

15 read it from here, I'm sorry -- 89 percent of charges as the

16 resolution of that issue where they didn't have a contract so

17 that then they didn't have to have a lawsuit.

18     But when the amounts at stake are bigger or more -- it's

19 more likely that a hospital will challenge in an arbitration or

20 a lawsuit like this.

21 Q.  So let's go back to one-time agreements.  Explain how

22 these happen.  Are these for generally emergency patients?

23 A.  They're almost always emergency patients.  If they're

24 elective, the plan might come to the hospital and say:  Our

25 patient is going to come in for a hip operation.  Can we work

1    out a rate?  That would be a one-time prospective agreement.

2         But the 90 or so that we found were emergencies.  There

3    weren't contracts in place, so the parties just had to figure

4    out what to do.  And they negotiated and documented their

5    negotiated result in this thing that is sometimes called an

6    LOA.  It's a contract, it's after the fact, but it's usually a

7    two-page agreement.  Or maybe even an email.

8    **Q.**   Any other reasons why you think OSHPD's a black box?

9    **A.**   Those are the main ones that occur to me at this time.

10   **Q.**   Okay.  Now, I'd like to deal with an issue that Mr. Deal

11   dealt with on direct exam, which is elective versus emergency

12   volumes.

13        On direct you recall Mr. Deal saying that it was improper

14   for you to use the contracts because they included elective

15   services.

16   **A.**   I do recall him saying that, yes.

17   **Q.**   And do you recall him saying that emergency room services

18   are lower than elective services?

19   **A.**   Yes.

20   **Q.**   Does Mr. Deal have that backwards?

21   **A.**   He has it backwards, yes.

22   **Q.**   Explain to the jury why he does.

23   **A.**   In my experience, emergency rates are never lower.

24   They're either the same or they're higher.  They're the same in

25   most network contracts, including NorthBay's contracts where

1    there's no distinction being made between emergency and

2    nonemergency.

3        A patient who has a heart operation of one type on an

4    elective basis, and a patient who has a heart operation on an

5    emergency basis, will be paid at the same rates under the

6    contracts that NorthBay has.  So they're there, the same.

7        But then in the case of the emergency only contracts,

8    whether it's the Kaiser contract, the rental networks which are

9    essentially emergency only or emergency dominant, or the LOA's,

10   which are emergency, those rates we can see have an overall

11   average of 81 which is substantially higher than the rates in

12   the network contracts, which is 62.

13       And so Mr. Deal does have it backwards.  Moreover, it's

14   logical that it goes the way it does.

15   **Q.**   Why?

16   **A.**   Gets back to that managed care bargain.  There's the trade

17   off.  I'm willing to give -- if I'm a hospital I'm willing to

18   give a plan a deeper discount if I can have a large number of

19   elective patients.  They're much easier to take care of.  And

20   you get the volume discount.  It's like wholesale.  You get the

21   benefit -- it's like Costco.  You're getting a volume

22   advantage.

23       Whereas emergency patients happen one at a time.  The

24   plans don't steer them.  They just happen randomly out of what

25   happens to patients and where they are.  And they're very much

1    more expensive to take care of because you have to have -- the

2    elective cases happen mostly in the day where you can put

3    patients into the holes in the schedule when you have capacity.

4    The emergencies almost never fit into the holes and they come

5    at night and weekends.  And you have to pay nursing staff and

6    technical staff and doctors to be available to take care of

7    those.

8         So it makes economic sense and hospital management sense

9    that the emergency rates will be substantially higher.

10   Q.   And so is that why when you looked at the different types

11   of contracts at NorthBay you looked at the emergency contracts

12   versus the emergency and elective contracts?

13   A.   Right.  Because that's what this case is.  And Blue Shield

14   is no longer providing any of those steered volume advantages

15   and benefits that it used to.

16   Q.   Okay.  Let's go to slide number 19.

17        What is reflected on this slide, Mr. Heil?

18   A.   The three groups of blue, green and gray bars are three

19   sets of rates that I studied and presented in my work.  The

20   first one is the course of dealings rate.  This was the rate

21   that existed in the contract, at the volumes that are involved

22   here now in this case, which is lower volume since Blue Shield

23   stopped steering the elective patients.

24        And then the green bars are the ones we were just looking

25   at a moment ago.  Those are the rates in the most comparable

1  situations.  And they have an average of 81 percent which is,

2  of course, quite similar to the 80 percent in the course of

3  dealings rate.

4      And then the others are those five network contracts where

5  those plans are steering nonemergency business to NorthBay and

6  getting, as we would expect, greater discounts in exchange for

7  doing that steerage.

8      Off to the right it shows Mr. Deal's reasonable value

9  number.  He has several of them, but they're all very, very low

10 like this.

11 Q.  Okay.  Now, if you can go to Mr. Deal's slide 28, I

12 believe.  Do you recall Mr. Deal's testimony about this slide

13 on direct examination?

14 A.  Yes.

15 Q.  Now, Mr. Deal says:  NorthBay receives higher rates for

16 reasons unrelated to emergency services.  And then he says:

17 NorthBay is important to have in-network for elective services

18 for network access reasons given limited nearby options.

19     Did Blue Shield cancel the contract?

20 A.  Yes, they did.

21 Q.  Before a health plan can cancel a contract, do they have

22 to receive approval from a state agency?

23 A.  Yes.  They have to be in compliance with state regulations

24 about network access to hospitals.  And they're supposed to go

25 to the state and seek approval in advance because the state has

1  determined that it has an interest in having HMO's and PPO's

2  providing reasonable access to the members who they ensure

3  through the plan's insurer.

4      So the state is concerned about -- concerned with this on

5  behalf of patients.

6  **Q.**  What do you mean by "network access"?

7  **A.**  The plans need to show that they have, for nonemergency

8  care, that they have made arrangements with enough hospitals

9  with enough capacity that are close enough.

10  **Q.**  What about with doctors?

11  **A.**  They have standards for primary care doctors and they have

12  standards for specialist doctors, and then they have standards

13  for hospitals.

14  **Q.**  And before a health plan like Blue Shield can terminate

15  the contract with NorthBay, did it have to show to the state

16  agency that it had a sufficient network of hospitals and

17  doctors for elective services in the area?

18  **A.**  Yes.

19  **Q.**  Are there time or mileage limitations which have to be

20  met?

21  **A.**  Yes.  There's a mileage and a time standard.

22  **Q.**  What are they?

23  **A.**  15 miles and 30 minutes.

24  **Q.**  So what do you mean by those?  What does the health plan

25  have to show to the state agency with respect to those?

1    **A.**   They have to show that most patients can have access to

2    hospitals, in this case, within 15 miles or 30 minutes.

3    **Q.**   For their elective services.

4    **A.**   For their elective services.

5    **Q.**   And so then he says:  Given limited nearby options.

6        Do you also recall Mr. Deal saying that NorthBay uses its

7    geography to negotiate aggressively with health plans?

8    **A.**   I do.

9    **Q.**   Okay.  Is NorthBay a more isolated hospital than the other

10   hospitals in its area that it competes with?

11   **A.**   The distances between NorthBay and alternatives that the

12   commercial plans have are very similar to what we see for many

13   of the hospitals in the region.

14   **Q.**   And did you take a map and calculate the mileage distances

15   from NorthBay to other hospitals?

16   **A.**   I did.  Actually, to keep it easy, I took the mileage

17   standard --

18        **MR. PIMSTONE:**  I'm going to object.  Again, Your

19   Honor, it's not part of Mr. Heil's rebuttal report.

20        **MR. TOOCH:**  If I may, Your Honor.

21        **THE COURT:**  Mr. Tooch.

22        **MR. TOOCH:**  Yes, it is, Your Honor.  Mr. Heil --

23   Mr. Deal on direct examination said that NorthBay uses its

24   geography to negotiate aggressively with health plans.  And

25   he's talking about given limited nearby options.

1      This is rebuttal to Mr. Deal's direct examination.

2          **THE COURT:**  I'll overrule the objection.  Go ahead.

3  **BY MR. TOOCH:**

4  **Q.**   Okay.  If you can go to slide number 20, please.

5       Is this a slide that you prepared?

6  **A.**   Yes.

7  **Q.**   What does this slide show?

8  **A.**   It shows the distances from NorthBay to what I considered

9  to be the closest practical alternative that commercial plans

10  have to NorthBay's two campuses.

11  **Q.**   And so what's the distance between VacaValley and Sutter

12  Davis?

13  **A.**   Let me explain before I answer your question about

14  distance, that I've used something called DTI.  Distance time

15  index.  And it's very simply the average of the distance in

16  miles and the time in minutes.  Because the state says you need

17  to consider both, so I just keep it really simple.  Average the

18  two.

19       So if it's 15 and 30, I think the average is 22

20  and-a-half.  So that's what I've used as my simple way of

21  explaining this access question.

22  **Q.**   Okay.  So what's your average distance time from NorthBay

23  VacaValley to Sutter Davis?

24  **A.**   From NorthBay VacaValley campus to Sutter Davis it's 21.

25  **Q.**   And from NorthBay Fairfield, is Sutter Solano the closest

1    alternative?

2    **A.**    It's 18.5.    There are Kaiser hospitals closer.    But

3    theoretically, commercial plans could use Kaiser, and they

4    sometimes do, but it's fairly rare so I just ignored that

5    option and I used the ones that are practical alternatives for

6    the health plans to have as an alternative to NorthBay when

7    they're building their networks and negotiating rates.

8    **Q.**    So are there closer Kaiser hospitals than Sutter Davis and

9    Sutter Solano, but you didn't include them because of --

10    **A.**    Yes.

11    **Q.**    If you can go to slide 21.    Is this another chart that you

12    prepared?

13    **A.**    Yes.    These are some other hospitals that are included in

14    Mr. Deal's study group.

15    **Q.**    Okay.    And so if you look at Sonoma Valley and Queen of

16    the Valley, what's the distance/time average between those two?

17    **A.**    That's 20.

18    **Q.**    And between Queen of the Valley and Sutter Solano, what's

19    that?

20    **A.**    22.

21    **Q.**    And Sutter Solano to John Muir what's the calculation?

22    **A.**    To the John Muir Concord campus it's 22 and-a-half.

23    **Q.**    And then you have Concord to Sutter Delta.    What's that?

24    **A.**    The John Muir Concord campus to Sutter Delta is 18.    And

25    from Walnut Creek to Sutter Delta is 25.5.

1  **Q.**  Why didn't you do the John Muir Concord to the John Muir

2  Walnut Creek?

3  **A.**  Those are two campuses technically now.  I think they may

4  be licensed as separate hospitals, but they're essentially part

5  of one organization.  So a plan is going to be really

6  contracting either with all of John Muir or not.  So I didn't

7  consider them practical alternatives to each other.

8  **Q.**  So if Blue Shield theoretically wanted to terminate its

9  contract with John Muir Concord and Walnut Creek, it would have

10  to look to Sutter Delta or Vallejo for the alternative.

11  **A.**  Right.  That's the way it would work.

12  **Q.**  What is slide 22?  Is this a chart that you prepared?

13  **A.**  Yes.

14  **Q.**  And what does this chart show?

15  **A.**  This summarizes those DTI's that we were just looking at

16  and shows that -- when you look at NorthBay combined, the DTI

17  that plans have available to them, is 19.75.  When they're

18  thinking of alternatives to NorthBay, to go to those two Sutter

19  hospitals.  And that for Mr. Deal's peers -- for a number of

20  Mr. Deal's peers there are similar distances.

21  **Q.**  So based upon just looking at the maps, is NorthBay more

22  isolated than Queen of the Valley or John Muir or Sutter Delta?

23  **A.**  No.  Mr. Deal used the data from those hospitals in his

24  analysis.

25  **Q.**  If you can go back to slide 28, please.  One of the

1    reasons, the third that he gives, is physician coverage.  He

2    says that payors need NorthBay in-network to gain access to

3    NorthBay affiliated physicians for elective services

4    (approximately half of NorthBay physicians are exclusive to

5    NorthBay.)

6        Are there sufficient physicians in the Fairfield and

7    VacaValley area to provide elective services to Blue Shield

8    members?

9    A.    Yes.

10            MR. PIMSTONE:  It lacks foundation.

11   BY MR. TOOCH:

12   Q.    How do you know that?

13            THE COURT:  Overruled.

14            THE WITNESS:  NorthBay produced a medical staff

15   listing and showed hospital affiliations.  So I could see that

16   there was -- while there are some physicians who may only go to

17   NorthBay, there's many physicians that go to other hospitals as

18   well, including the Sutter hospitals that are the most -- the

19   closest practical alternatives.

20   BY MR. TOOCH:

21   Q.    In fact, even according to Mr. Deal's slide, are half of

22   the physicians able to admit patients at hospitals other than

23   NorthBay?

24   A.    Yes.  A payor can have a physician network where they want

25   to work with physicians who go to other hospitals.  If they

1  don't want to use NorthBay, they can use Sutter, for example.

2  There's plenty of physicians available to them as things stand

3  now.  And if they wanted to grow that network, they could go to

4  additional physicians and ask them to do that.

5  **Q.**  Okay.  Let's go to slide 60 of Mr. Deal.  Do you recall

6  this slide during Mr. Deal's direct examination?

7  **A.**  Yes, I do.

8  **Q.**  Okay.  Now, he says that you look at the list price.  Did

9  you look at the list price?

10  **A.**  No -- well, I did do a charge analysis and that's part of

11  my calculation, although I discounted NorthBay's charges

12  significantly when I did the charge analysis.

13      But the majority, numerically, of my opinion uses contract

14  rates which are not list prices.  They are -- in the housing

15  example, they're the equivalent to what you would see written

16  on a sales contract.  We're going to sell this house for

17  $400,000, or whatever the number is would be agreed to.

18  **Q.**  In this chart over here, do you have your three types of

19  analyses that you do?  Sorry.

20  **A.**  Yes.  That's the summary of the three prongs of my

21  analysis.  Two of them are based on what, in the housing

22  example, are the parallel to sales contracts, with the

23  exception I've added that 15 point adjustment because in this

24  case NorthBay has none of the benefits of a certain rate --

25  prompt payment, dispute resolution clauses and has to have a

1  lawsuit here to be -- to get what it believes is a proper

2  payment.

3      But so two of my three are based essentially on the

4  equivalent of sales contracts for houses.

5  **Q.**  And the third, your charge analysis, is that similar to

6  the listing --

7  **A.**  Well, that's similar to, let's say, the seller had in mind

8  what they wanted to ask, and maybe they asked it at some point.

9  But what essentially I've said is they're asking too much so

10  I'm going to -- off the bat I'm going to discount what they're

11  asking for because I don't think they're going to get it

12  eventually.  And so -- it was higher than what they're likely

13  to actually get.

14  **Q.**  So is that why you discounted the rate to 73 percent of

15  charges?

16          **MR. PIMSTONE:**  Objection.  It's leading.

17          **THE COURT:**  Sustained.

18  **BY MR. TOOCH:**

19  **Q.**  Why did you put 73 percent of charges on -- with the

20  charge analysis?

21  **A.**  I did a charge analysis, because I always do a charge

22  analysis.  I'm aware that the charge analysis has the effect of

23  lowering my result.  But I'm consistent in my approach in these

24  cases.  And NorthBay's charges are high compared to most of the

25  market.  I've applied the discount.  And that's why that number

1  is 73.  And then it blends in with the other two and gets to my

2  opinion of 88.

3  **Q.**  Now, finally, when NorthBay had a contract with Blue

4  Shield, what was the highest rate in the contract for the

5  lowest volume?

6  **A.**  80 percent of NorthBay's charges.

7  **Q.**  And has that volume gone down since the termination of the

8  contract?

9  **A.**  The volume has gone down further than that threshold.  So

10  it's below that threshold.

11  **Q.**  So is it fair to ask for more than 80 percent of charges?

12      **MR. PIMSTONE:**  Objection.  Argumentative.  Exceeds the

13  scope of --

14      **THE COURT:**  Sustained.  This is beyond rebuttal.

15      **MR. TOOCH:**  Okay.  I have no further questions.

16      <u>**FURTHER RECROSS-EXAMINATION**</u>

17  BY MR. PIMSTONE:

18  **Q.**  Good morning, Mr. Heil.

19  **A.**  Good morning.

20  **Q.**  I wanted to start off, you had mentioned in your testimony

21  that Mr. Deal looked at the payor mix of the -- of the

22  hospitals payors.  Do you recall that testimony just a few

23  minutes ago when you were discussing payor mix?

24  **A.**  Yes, I do.

25  **Q.**  And you indicated that NorthBay's payor mix was somewhat

1  different than the average payor mix in the region?

2  **A.**   Yes.

3  **Q.**   And you indicated that Mr. Deal did not take that into

4  account in his opinion?  I believe?  You indicated that he

5  didn't take into account whether NorthBay had a different payor

6  mix than the other hospitals?

7            **MR. TOOCH:**  Object.  Misstates the testimony.

8            **THE COURT:**  Overruled.  You can answer it.

9            **THE WITNESS:**  If I said that, I did not mean to say

10  that he didn't take it into account.  Mr. Deal has used a

11  number of different methods to calculate numbers.  In some of

12  them, he used payor mix.  In all of them, he used Medicare and

13  Medi-Cal.  In some of them, he used the unique payor mix at

14  NorthBay.

15  **BY MR. PIMSTONE:**

16  **Q.**   In Mr. Deal's analysis in computing reasonable value, he

17  gave us a variety of different options.  He looked at the

18  NorthBay payor mix and concluded, if you look at NorthBay's

19  payor mix, what would reasonable value be given who NorthBay

20  was choosing to sell its business to.

21       But he also did an analysis looking at the payor mix in

22  the geographic area and saying if you take these claims and run

23  it through the payor mix of all the hospitals, he gave us a

24  value for that as well, correct?

25  **A.**   He did in his testimony and slides last week.  Initially

1    in his report he did the analysis only based on each hospital's

2    unique payor mix.  And then at some point along the line he

3    changed that and introduced an additional way of dealing with

4    payor mix.

5              **MR. PIMSTONE:**  And, Mr. Kotarsky, if we could pull up

6    Mr. Deal's slide 42.

7         Looks like my numbers are a little bit different.  Let's

8    see here.  Why don't we go to slide?

9              **MR. KOTARSKY:**  Pie chart with the geographic area?

10   Slide 4.

11             **MR. PIMSTONE:**  Perfect.  Thank you.

12   **BY MR. PIMSTONE:**

13   **Q.**   Mr. Heil, I take it you were present at Mr. Deal's

14   testimony, correct?

15   **A.**   Yes.

16   **Q.**   And you saw that what Mr. Deal did in his analysis was

17   that after looking at what the payments were using different

18   payors, he gave us all a blended number using NorthBay's payor

19   mix.  And that was if you look at what NorthBay -- if you look

20   at what hospitals in the geographic region were selling these

21   services for to all payors using NorthBay's payor mix, that

22   would be 1.8 times Medicare.  You recall that?

23   **A.**   I wouldn't agree with your term what hospitals were

24   selling their services for.

25   **Q.**   What was -- what they were receiving for the services.

1   **A.**   What they were paid according to certain databases.

2   **Q.**   Okay.  And you recall that that was 1.8 times Medicare

3   using the NorthBay payor mix.

4   **A.**   I'd have to look, but I'll take your word for it.

5   **Q.**   Well, we see his slide here.  Do you disagree with the

6   fact that that's what he presented?

7   **A.**   I think that's what he presented in his reports and his

8   deposition testimony; the 1.8 using NorthBay's payor mix.

9   **Q.**   And you recall Mr. Deal's testimony that if one looks at

10   the payor mix of all the hospitals -- the hospitals in his

11   comparable set -- and you look another their payor mix, that

12   would be 2 times Medicare.  You recall that?

13   **A.**   Yes.  Although that -- he excluded the Kaiser hospitals.

14   **Q.**   Understood.  I'm talking about the hospitals that he used

15   in his set of comparable hospitals.

16   **A.**   Correct.

17   **Q.**   Okay.  Now, you indicated just a few minutes ago that you

18   didn't consider Medicare and Medi-Cal to be willing

19   buyer/willing seller transactions because -- I believe you said

20   because those rates are compelled.  Do you recall that

21   testimony?

22   **A.**   Yes.

23   **Q.**   And what you meant by that is that when a hospital who is

24   participating in the Medicare program or participating in

25   Medi-Cal, when they're selling their services to that buyer,

1    those particular government buyers don't negotiate the rates.

2    **A.**    None of the Medicare rates are negotiated.  Correct.

3    **Q.**    So when you said that the rates are compelled, what you

4    meant is that when NorthBay decides to sell it's services to

5    Medicare or to Medi-Cal there's no rate negotiation.  That's

6    why you believe it was not a willing buyer/willing seller

7    transaction, correct?

8    **A.**    That's not quite correct.  Most of the time when a

9    Medicare patient gets services at any hospital, it's not

10   deciding to agree to sell its services to Medicare; it's

11   required.  Because approximately 60 percent of the Medicare

12   patients at hospitals come in through the emergency department.

13   And as we know, hospitals have no choice about any patients

14   that they -- they have to take care of all patients who

15   present.

16       So for the majority of Medicare patients, any hospital,

17   including NorthBay, must take care of the Medicare patient.

18   And that rate is compelled.

19   **Q.**    Now, the hospitals have to take all comers respective --

20   not just Medicare.  They have to take all patients in the

21   emergency room who have commercial insurance, even if it's

22   non-contracted, or self pays, uninsured patients.  Hospitals in

23   the emergency room have to take all comers.  Correct?

24   **A.**    All comers.

25   **Q.**    So if we're talking about in the elective service, that's

1  where hospitals, if they have a private patient, a commercial

2  patient, there may be a negotiation for rates there in a

3  network contract. Correct?

4  **A.** If there's a private patient, a commercial patient, are

5  you asking about?

6  **Q.** Yeah.

7  **A.** A commercial patient for elective services, that would

8  presumably almost always be covered by either a single case LOA

9  or by a network contract. And that would be typically -- that

10  would be a negotiated rate.

11  **Q.** It may be negotiated, right? I mean, it may well be that

12  you have a private payor who says, You know, I'm not going to

13  negotiate. This is the rate I'm going to pay. And the

14  hospital can decide whether to agree to it or not. It doesn't

15  have to be negotiated, does it?

16  **A.** Right. I was assuming the patient went on and got the

17  care. But if a Blue Shield patient presented to NorthBay and

18  wanted to have elective care today, probably everybody would

19  say, Well, we don't do that anymore. But, theoretically, that

20  could be negotiated on a case-by-case basis.

21  **Q.** Now, the fact that if a hospital chooses to take a

22  Medicare patient in its elective service, the fact that

23  Medicare doesn't negotiate that rate doesn't mean it's not a

24  willing buyer/willing seller transaction, right?

25  **A.** No. That's really not correct. I mean, I understand the

1    point that you and Mr. Deal are trying to argue, but it's just

2    simply not real world.  Let me just -- let me please answer

3    this.  I just think this is important.

4        45 percent of patients are Medicare.  That's the

5    emergencies and the nonemergencies.  If hospitals really had a

6    choice about whether to take care of elective Medicare

7    patients, we'd see hospitals who withdrew from the Medicare

8    program.

9        Mr. Deal has said he's not aware of any hospitals other

10   than a few psychiatric hospitals that have done that; one point

11   on which Mr. Deal and I wholeheartedly agree.  It's very, very

12   rare.  It would be suicidal for a general acute care hospital

13   like we're talking about here to say, We're just not going to

14   be in the Medicare business.

15       And there's a couple reasons for that.  They would lose --

16   they'd still have to take care of the emergencies.  They would

17   lose the elective volume.  And all the physicians who practice

18   at that hospital would say:  I'm not even going to come to this

19   hospital at all anymore.  Let's say you've got a cardiologist

20   who takes care of -- half his patients are under 65 and half

21   are over 65.  If the hospital he would like to be at is not in

22   the Medicare program so he can't do elective heart procedures,

23   that doctor is just not going to work there anymore.  They're

24   going to go somewhere else.

25       So a real world answer is Medicare is compelled on

1   hospitals.  And if it weren't, we'd see hospitals that are --

2   who didn't sign those participating agreements.

3   **Q.**   I think my point is different, Mr. Heil.  And that is, I

4   understand your point to be that hospitals, as a matter of

5   course and a matter of practice, do accept Medi-Cal in their

6   elective business.

7   My question is slightly different.  And that is that the

8   fact that a hospital chooses to sell its business, or a portion

9   of its business, to an entity that doesn't negotiate the rate,

10  that could still be a willing buyer/willing seller transaction,

11  correct?  That's my question to you.

12  **A.**   I just don't agree with that representation.  That's not a

13  willing -- as a hospital administrator, it is not my choice to

14  withdraw from the Medicare program.

15  **Q.**   Let's take -- I know this is sort of a silly example, but

16  let's take another industry.  If I were selling disposable

17  coffee cups.  You know, the paper coffee cups.  And I decided

18  to sell a chunk of my coffee cups to Starbucks.  Let's say I

19  sell 30 percent of my cups to Starbucks.  And Starbucks says,

20  You know what?  We've got some purchasing power.  We think that

21  we're a big seller.  We're not going to negotiate the rate.  We

22  are going to pay you five cents a coffee cup, take it or leave

23  it.  And I decide to sell my coffee cups to Starbucks.

24  Is that a willer buyer/willing seller transaction in that

25  example?

1    **A.**    I guess so, yes.

2    **Q.**    If I decide to sell another 30 percent of those coffee

3    cups to the City of San Francisco.  And I'm not being forced to

4    sell to the City of San Francisco.  City of San Francisco says,

5    I'm going to pay you five cents a coffee cup.  And I decide

6    that I'm going to do that so I can sell out my inventory, so

7    that I can keep my lights on, and so forth.

8        Is that a willing buyer/willing seller transaction in that

9    example?

10   **A.**    I want you to go through that one more time and make sure

11   I'm understanding it.

12   **Q.**    Same example except it's not Starbucks.  But I'm selling

13   to the City of San Francisco.

14   **A.**    Oh.  It's a government entity.

15   **Q.**    A government entity, but I'm not being forced to sell to

16   the government entity.  But practically, in order for me to

17   sell out my inventory, I've concluded that that's what I need

18   to do to keep my lights on.  And City of San Francisco says,

19   I'm going to pay you five cents for each coffee cup.

20       Is that a willing buyer/willing seller transaction?

21   **A.**    Well, it may be, but I'm -- the metaphor breaks down, the

22   parallel that you're putting forward breaks down, because the

23   coffee cup maker doesn't have an emergency department where

24   more than half the cups have to transact at a rate set by the

25   City of San Francisco.  And they don't have the equivalent of

1   doctors who will take all the rest of their business away if

2   they can't bring their Medicare patients to that hospital.

3       So I just -- I understand the point you're trying to make,

4   but I just think going to metaphors that are outside of the

5   subject at hand --

6           **THE COURT:**  Mr. Heil?  Stick with the question.

7           **THE WITNESS:**  Okay.

8   **BY MR. PIMSTONE:**

9   **Q.**  Thank you, Mr. Heil.  You've indicated in your critique of

10  the OSHPD data that you believe that a significant portion -- I

11  think you said contains workers' comp, CHAMPUS, and so forth.

12  Do you recall that testimony?

13  **A.**  It's material.  I don't know how much it is.  We can't

14  know from the OSHPD data.

15  **Q.**  Do you recall Mr. Deal's testimony from his analysis that

16  it's under 4 percent?  Do you recall that?

17  **A.**  I think I heard some estimate by him.  I don't know how he

18  can validate that from the OSHPD data.

19  **Q.**  As you sit here today, you have no knowledge one way or

20  the other as to whether that's correct or incorrect?

21  **A.**  All I know is the OSHPD data doesn't allow any studies to

22  know how much of the data Mr. Deal calls commercial is actually

23  government.

24  **Q.**  You looked, I think in your testimony just a few minutes

25  ago, you discussed what you call your ED-dominant contracts.

1  And I think we've established that those involve Kaiser, the

2  rental networks, and these one off letters of agreement,

3  correct?

4  **A.**   The single case agreements negotiated with commercial

5  health plans.  Yes.

6  **Q.**   Okay.  And, again, I think you testified to this before in

7  cross-examination.  But the Kaiser agreement, that agreement's

8  no longer in effect, right?

9  **A.**   That is correct.

10  **Q.**   That was terminated I think in 2015?

11  **A.**   I don't know.  It was terminated a couple of years ago,

12  yes.

13  **Q.**   And Kaiser is not paying those rates anymore, correct?

14  **A.**   Kaiser has determined what rates it wants to pay.

15  **Q.**   And you understand that Kaiser is paying well less than

16  the old terminated contract, right?

17  **A.**   I do.

18  **Q.**   Just a small point.  When discussing the OSHPD data and

19  the United contract, I think you said that the United contract

20  was 70 percent?  The United contract with NorthBay?

21  **A.**   I don't remember offhand.  If we could look at the slide

22  that would refresh my memory.

23  **Q.**   As you sit here, do you recall that was -- that that

24  contract was 70 percent or whether it was 65 percent?

25  **A.**   I'd like to look at the slide, if I could, please.

1  Q.   I'm happy to go get the slide.  But as you sit here do you

2  recall what the percentage was for that contract?

3  A.   I would like to look.  I do not recall.

4  Q.   In 2018, the most recent year, do you recall what the

5  percentage was for the United contract?

6  A.   In 2018 it was 65 percent.

7  Q.   Okay.  And you critiqued the use of the Optum data because

8  you said that it was a black box.  And you suggested the

9  possibility that Optum could be monkeying with that data in

10 some way or choosing to exclude certain data.  Do you recall

11 that testimony?

12 A.   I wasn't suggesting -- I wouldn't like my testimony to be

13 implying that I think they're monkeying with it.  I simply was

14 asked the question:  Who determines what data goes in there?

15 And the answer is:  The company.

16 Q.   And you would agree that Optum is a commonly used database

17 in disputes between hospitals and commercial health plans?

18 A.   It is used.  It is -- I see it fairly often.  It has to be

19 used with great caution and for the right purpose.

20 Q.   You would agree that use of the Optum database, the Optum

21 database is helpful with respect to looking at hospital and

22 physician charges and payments?

23 A.   I don't believe it's -- for payments.  It may be useful.

24 But there's so much we don't know about what hospitals are in

25 it, what the volumes are, whether they're contract rates, with

1   steered business or not, whether there's disputed payments,

2   that it becomes not useful, in my opinion, when the standard is

3   willing buyer/willing seller, fair market value, and when the

4   standard is what would a willing buyer and willing seller agree

5   to pay?

6   **Q.**   Mr. Heil, I'd like to show you an article that you wrote

7   for National Litigation Consultants Review?

8   **A.**   Yes.

9         **MR. PIMSTONE:**   Mr. Kotarsky, can we pull up trial

10  Exhibit 301?

11        **MR. KOTARSKY:**   Can you have the clerk turn on the jury

12  monitor?

13        **MR. PIMSTONE:**   It's an article that Mr. Heil authored,

14  Your Honor.  I'm just going to cross-examine him based on that

15  article.

16        **THE COURT:**   Yeah.  He can look at it.  He can look at

17  it, but not the jury.

18        **MR. TOOCH:**   And can I look --

19        **MR. PIMSTONE:**   Can we publish it to Mr. Heil?

20        **THE COURT:**   Is it on your screen?

21        **THE CLERK:**   Should be able to see it on your screen.

22  **BY MR. PIMSTONE:**

23  **Q.**   And Mr. Heil, I take it that you're familiar with this

24  article?

25  **A.**   Yes.

1   **Q.**   You authored the article?

2   **A.**   I coauthored it, yes.

3   **Q.**   Coauthored the article?

4         **MR. PIMSTONE:**  Your Honor, may we publish?

5         **THE COURT:**  Why don't you just read him what you want

6   to --

7         **MR. PIMSTONE:**  Sure.  Absolutely.

8      Mr. Kotarsky, can we turn to the third page?

9   **BY MR. PIMSTONE:**

10  **Q.**   And here I'll direct your attention, Mr. Heil, to the

11  left-hand column beginning with "three sources of data for

12  disputes between hospitals and commercial health plans."  Do

13  you see that?

14  **A.**   Yes.

15  **Q.**   And you've got a few paragraphs there on three data

16  sources that you indicate are commonly used for disputes

17  between hospitals and commercial health plans?  Do you see

18  that?

19  **A.**   I do.

20  **Q.**   And I'd like to just take you through a couple -- a few of

21  those sources.

22        **MR. PIMSTONE:**  Your Honor, can we publish yet, or

23  should I just take it through --

24        **THE COURT:**  You can publish this portion.

25        **MR. PIMSTONE:**  Thank you.

1  BY MR. PIMSTONE:

2  Q.   All right.  Now Mr. Heil, here you have a section of the

3  article "Three sources for data for disputes between hospitals

4  and commercial health plans."  Do you see that?

5  A.   I do.

6  Q.   And the first source you say here is public data on

7  inpatient and outpatient hospital services (state and

8  national).

9      Do you see that?

10 A.   I do.

11 Q.   And in item number (c) you reference something in Florida;

12 item (b), a Tennessee database; in item (c) you refer to the

13 OSHPD database?  Is that correct?

14 A.   Well, it refers to several OSHPD databases.  When I'm

15 referring to the patient discharge data set, I'm referring to a

16 patient line item data set called the PDD.  And when I'm

17 referring to ambulatory surgery in emergency department, I'm

18 referring to something called the E-DAS.  And when I'm

19 referring to the hospital level data on utilization and

20 financial performance, I'm referring to the part of the OSHPD

21 data Mr. Deal has used.

22 Q.   You indicate after that -- all I'm asking you is is this a

23 accurate statement of what you wrote:  These data are excellent

24 for charges and allow normalization for intensity with DRG

25 weight?

1    **A.**    Yes.  Of course, I go on and say more about what it's --

2          **THE COURT:**  If you'd just --

3          **THE WITNESS:**  Okay.  Yes.  That's correct.

4          **THE COURT:**  -- respond to the.  You can just answer

5    the question that you're asked, Mr. Heil, that would be great.

6          **THE WITNESS:**  Yes.  That is correct.  This highlighted

7    part.

8    **BY MR. PIMSTONE:**

9    **Q.**    And if we go to the second data source here, it's

10   proprietary data.  Do you see that?

11   **A.**    Yes.

12   **Q.**    And is one of the data sets that you recognize here under

13   your data sources commonly used for disputes betweens hospitals

14   and commercial health plans, is it the Optum database?

15   **A.**    Yes.

16   **Q.**    And you indicate here, am I correct, you say:  These data

17   are helpful for hospital and physician charges and payments.

18        That was your statement?

19   **A.**    That is correct, yes.

20          **THE COURT:**  Mr. Pimstone, is this a good time to break

21   or are you about wrapped up?

22          **MR. PIMSTONE:**  I've probably got about ten more

23   minutes, Your Honor, so we can --

24          **THE COURT:**  All right.  So ladies and gentlemen, we'll

25   take our first break of the morning.  Please remember the

1    admonitions.

2                    (Recess taken at 9:36 a.m.)

3                    (Proceedings resumed at 9:55 a.m.)

4         **THE COURT:**  Mr. Pimstone, are you ready to go?

5         **MR. PIMSTONE:**  Yes, Your Honor, I think so.

6         **THE COURT:**  Okay.

7        (Jury enters at 10:01 a.m.)

8         **THE COURT:**  All right.  Please be seated, everybody.

9        Mr. Pimstone, please go ahead.

10        **MR. PIMSTONE:**  Thank you.  Thank you, Your Honor.

11   **BY MR. PIMSTONE:**

12   **Q.**   Mr. Heil, you mentioned in your rebuttal testimony the --

13   I think you mentioned the Blue Shield arrangement with

14   Stanford.

15        Do you recall that?

16   **A.**   Mr. Tooch asked me about -- I think he gave me an example.

17   He asked me about a possible agreement between Stanford and

18   Blue Shield.

19   **Q.**   Right.  And you said that -- that it was hard for you to

20   respond since you didn't know that contract, you didn't know

21   the contract rates and whether Stanford received less money

22   from Blue Shield than the contract rates.

23        Do you recall that?

24   **A.**   I think I do.

25   **Q.**   All right.  Were you aware, Mr. Heil, that that contract

1  was produced to you, that you could have examined that

2  contract?  Were you aware of that?

3  **A.**  I don't recall that.

4  **Q.**  Okay.  And you understand -- you also, I take it, are not

5  aware of the dispute resolution mechanisms in that contract in

6  case Stanford was paid something less than it was owed.  Are

7  you aware what recourse Stanford had?

8  **A.**  As I say, I'm not recalling that contract.

9  **Q.**  But you generally understand that if a hospital is paid

10  less than it believes it's owed in a network relationship, that

11  hospitals have, typically, dispute resolution mechanisms,

12  whether it's arbitration or other mechanisms, to resolve

13  disputes?

14  **A.**  Yes.  Typically, there's a meet and confer provision

15  first, and then there may be a branch to arbitration or

16  litigation.

17  **Q.**  And the hospital, just like the health plan, in the event

18  of a dispute, has the option of going through the dispute

19  resolution; and if that results in additional money being paid,

20  that's one possible outcome?

21  **A.**  Yes, it is.

22  **Q.**  Okay.  And both parties have the option, if they choose

23  not to do that, to accept what -- what the payments were

24  without any further dispute resolution.  You can either dispute

25  it or you can accept it.

1   **A.**   I don't -- my experience is not that -- even -- is not as
2   follows:  I don't believe that it is the case that when a
3   hospital chooses to not file a lawsuit that it has necessarily
4   accepted the rate.
5   **Q.**   It has chosen, in that instance, not to go after any
6   additional money; is that correct?
7   **A.**   That's correct.
8   **Q.**   The hospital may not be happy about it, but the hospital,
9   at that point, has decided that with respect to that particular
10  claim that the amounts that it received, for all intents and
11  purposes, are going to represent, you know, the hospital's --
12  what the hospital was going to accept for that particular
13  payment?
14  **A.**   That's not been my experience as a hospital executive.
15  Normally, when I find that situation I have to make a prudent
16  decision is the cost of further challenge prudent given the
17  amount of underpayment.
18  **Q.**   If you -- last topic, Mr. Heil.
19       You talked about some driving distances with respect to
20  NorthBay and some other hospitals.  Do you recall that?
21  **A.**   Yes.
22  **Q.**   And I think -- just sticking with NorthBay for a second, I
23  think you said that the driving distance to the closest
24  alternative hospital, at least for VacaValley, was Davis; is
25  that right?

1  **A.**   I believe so, yes.

2  **Q.**   So if a health plan didn't have NorthBay in its network, a

3  nonKaiser plan like Blue Shield didn't have NorthBay in its

4  network, and it wanted to market to people living in Vacaville,

5  those people would have to go off to Davis for their care, for

6  their elective care?

7  **A.**   For their elective care, yes.

8  **Q.**   Okay.  And then you also looked at some driving times with

9  respect to some other non-NorthBay hospitals?

10  **A.**   Correct.

11  **Q.**   And, Mr. Heil, my last couple of questions here.  The

12  driving time between one hospital and another hospital sort of

13  whether how geographically isolated that hospital is, that --

14  what that tells you is if a person couldn't go to Hospital A,

15  how long would it take them to get to the next available

16  hospital; correct?  That's pretty much what you were doing?

17  **A.**   Yes, time and distance.

18  **Q.**   Right.

19  **A.**   I combined the two, as you know.

20  **Q.**   And that doesn't tell you anything about whether that

21  particular hospital -- that doesn't tell you anything about its

22  pricing strategy, right, it's negotiating strategy?

23      You could have two hospitals, each of which has the same

24  degree of relative isolation, but those two hospitals could

25  have different strategies as to how they deal with commercial

1  carriers and the rates that they negotiate; correct?

2  **A.**    Yes.   Each hospital has its own unique set of objectives

3  and needs, and each payor does as well.  And they negotiate and

4  come to agreement.

5          **MR. PIMSTONE:**  Thank you very much.  No further

6  questions, Mr. Heil.

7              **THE COURT:**  Mr. Tooch, anything else?

8          **MR. TOOCH:**  Yes, Your Honor.

9      If you could put up Exhibit 301-3, which was the article

10  that Blue Shield just introduced and referred to.

11     (Document displayed.)

12              **FURTHER REDIRECT EXAMINATION**

13  BY MR. TOOCH:

14  **Q.**    Now, if you go to the right said of that page, you

15  mentioned --

16          **MR. TOOCH:**  Well, let's look at the whole right side,

17  Mike.  Thanks.

18  BY MR. TOOCH:

19  **Q.**    You mentioned those three databases, and you say "Paid

20  claim files have methodology limitations."

21     Explain what is in the section right after the one that

22  Blue Shield pointed you to.

23  **A.**    So paid claims files usually refer to line item, one

24  patient at a time, files that show some information about the

25  patient and then amount billed and amounts paid as of the time

1    the report was run.

2        And then in the case of these big databases, that data is

3    just dumped into the big databases on an undifferentiated

4    basis.  But paid claims files are usually containing a lot of

5    detail.

6    **Q.**  So in the second paragraph you say:  In many cases the

7    cost of further adjudication is high enough that the prudent

8    decision is not to, quote, accept the underpayment, in the

9    sense that the provider relents in an effort to be properly

10   paid but does not truly accept the payment made by the health

11   plan.

12       What do you mean that --

13       **MR. PIMSTONE:**  I'm going to object, Your Honor.  I

14   believe Mr. Tooch --

15       **THE COURT:**  You misread the sentence.  Why don't you

16   try it again.

17       **MR. TOOCH:**  I'm sorry.

18       "In many cases the cost of further adjudication is high

19   enough that the prudent decision is to accept the underpayment,

20   in the sense that the provider relents in efforts to be

21   properly paid, but does not truly accept the payment made by

22   the health plan."

23       **THE WITNESS:**  Correct.

24   BY MR. TOOCH:

25   **Q.**  What did you mean there?

1  **A.**   Well, that's another way of expressing what I was saying

2  in answer to some other questions, that oftentimes either in an

3  in-network or an out-of-network situation if the hospital

4  thinks there's been an underpayment they have a decision to

5  make, which is whether to challenge and how much to challenge.

6      And sometimes the business prudent thing to do is to

7  accept -- and the reason I put "accept" in quotes here, is that

8  they're not really a willing seller.  They're simply, as I say,

9  relenting or throwing in the towel because the payor has the

10  upper hand, they have the money.

11  **Q.**   You go on to say:  "Such underpayments should not be

12  included when an analyst seeks to understand the true levels of

13  the amounts accepted."

14      Why do you say that?

15  **A.**   An analyst who's working under fair market value

16  standards -- or, as I've said, I believe the standards are

17  virtually identical to the jury instructions you reviewed to

18  me -- what we are seeking here is what is truly accepted, not,

19  quote, accepted.

20      So what I'm saying here is that the analyst should be

21  knowledgeable about whether the rates are truly accepted or

22  whether it's a throwing-in-the-towel situation, and exclude the

23  ones that don't represent willing seller, willing buyer.

24  **Q.**   And then, finally, in the last paragraph of that section

25  you say:  "Another problem with efforts to analyze paid claims

1    files is that when a provider succeeds in being properly paid

2    after an extended adjudication process that may take years, the

3    full amount paid across a large set of claims is rarely

4    reflected in paid claims files at claim-level detail.  Rather,

5    a lump sum adjustment is made in the provider's aggregate

6    financial statements years after the paid claims file was last

7    updated."

8         What did you mean there?

9         **MR. PIMSTONE:**  Object again, Your Honor.  This exceeds

10   the scope of cross, and I did not ask him about the paid claims

11   files portion of this article.

12        **THE COURT:**  Overruled.

13        **THE WITNESS:**  I'll use an example to illustrate what

14   I'm talking about.

15        In a case, let's say, where the disputed claims are 2016,

16   a paid claims file or an OSHPD file will reflect what had been

17   paid so far by the payor.  Typically, in disputes like this, we

18   don't get to know the result of the case, what the jury awards

19   or what the arbitrator determines, until many years later.

20        I presume there will be a decision here in 2019 for claims

21   here in 2016.  Any correction of an amount due to NorthBay

22   would occur -- would probably be actually paid in 2020.

23        And I want to just take a minute because I think this

24   speaks to another one of the things that Mr. Deal has

25   misunderstood.  When that payment is made in 2020, the hospital

1    will have a decision to make:  How will it reflect, in its

2    financial statements, that new income?

3        And another question it will have is will it go back and

4    amend an OSHPD filing in 2016.  And, first off, what hospitals

5    seek to do is to accurately reflect their financial statements

6    to anybody who reads them.

7        So hospitals have choices about where to put -- where to

8    record that additional income.  They're not at all consistent

9    in how they do that.  Some of them record it in patient

10   revenue.  Some of them record it in other operating revenue.

11   And some of them record it in what's called below the line,

12   meaning extraordinary adjustments.  So there is not consistency

13   in how hospitals record what might result from a process like

14   this.

15       Whatever a hospital does in 2020 will get reflected in

16   2020 OSHPD data, but we're never going to be able to connect it

17   back to 2016.  I've never known a hospital to go back and amend

18   OSHPD filings four years ago.  If they do it, if some do it,

19   they do it very, very inconsistently.

20       So Mr. Deal is making a huge leap of faith here.  He's

21   assuming that it all, sort of, comes out in the wash.  But it

22   really cannot be relied upon that any resolutions down the

23   line, that will happen in lump sum, will ever be recorded in --

24   in a data set like OSHPD or Optum or Blue Shield's database.

25       **MR. TOOCH:**  No further questions, Your Honor.

1      THE COURT:  All right.

2      MR. PIMSTONE:  Nothing further, Your Honor.

3      THE COURT:  All right.  Thank you, Mr. Heil.  You're

4  excused.

5      MR. TOOCH:  Your Honor, plaintiff calls Lori

6  Eichenberger.

7      THE COURT:  All right.  Let me see the lawyers just

8  for a moment, to the side.

9      (The following proceedings were heard at the sidebar:)

10      THE COURT:  I wanted to make sure where we are

11  timewise.  You have an hour and 49 minutes left, by my

12  calculations, just in case you weren't aware.  And you've got 2

13  hours and 24 minutes.

14      MR. PIMSTONE:  Okay.

15      THE COURT:  Just wanted everybody to know.

16      MS. BRIGGS:  Thank you.

17      MR. TOOCH:  Okay.  Thanks.

18      (Sidebar concluded.)

19      THE COURT:  So please be seated, Ms. Eichenberger.

20  And you're still under oath.

21      THE WITNESS:  Okay.

22                          **LORI EICHENBERGER**,

23  called as a witness for the Plaintiff, having been previously

24  duly sworn, testified further as follows:

25

1             **<u>FURTHER REDIRECT EXAMINATION</u>**

2  **BY MR. TOOCH:**

3  **Q.**   Thank you.  Good morning.

4  **A.**   Good morning.

5        **MR. TOOCH:**  Go to Mr. Deal's slide 5, please.

6    (Document displayed.)

7  **BY MR. TOOCH:**

8  **Q.**  On direct examination Mr. Deal said that he did not look

9  at billed charges because not many health plans pay billed

10  charges.

11     In the case of NorthBay --

12        **MS. BRIGGS:**  Objection, Your Honor.  Misstates

13  Mr. Deal's testimony.

14        **THE COURT:**  Overruled.  You can proceed.

15        **MR. TOOCH:**  Okay.

16  **BY MR. TOOCH:**

17  **Q.**  In the case of NorthBay, for those health plans that don't

18  have contracts with NorthBay, do a lot of them pay at

19  NorthBay's billed charges?

20  **A.**   Yes.

21        **MS. BRIGGS:**  Objection, Your Honor.  Lacks foundation.

22        **THE COURT:**  Yes.  Sustained.  If you're going to go

23  here, Mr. Tooch, lay the foundation please.

24        **MR. TOOCH:**  Okay.

25

BY MR. TOOCH:

Q.   Do you know what health plans that don't have contracts

with NorthBay pay NorthBay?

A.   Yes, I do.

Q.   How do you know that?

A.   It's a part of my job responsibility at NorthBay to know

what we're being paid by any given payor, to make sure that

we're paid appropriately, to help the managed care department,

you know, in implementing contracts if it's a contracted payor.

It's part of my job.

Q.   Are you involved in negotiating those one-off agreements

with non-contracted payors?

A.   I am.

Q.   Of the payors that don't have contracts with NorthBay,

about how many of them pay NorthBay's full billed charges?

A.   50 to 60 percent of them.

Q.   Okay.

     MR. TOOCH:  Go to Mr. Deal's slide 28, please.

     (Document displayed.)

BY MR. TOOCH:

Q.   On the -- this slide is entitled "NorthBay receives higher

rates for reasons unrelated to emergency services."

     The third section down he says:  "Payors need NorthBay

in-network to gain access to NorthBay-affiliated physicians for

elective services, paren, approximately half of NorthBay

1  physicians are exclusive to NorthBay."

2      In this case, did you obtain information for the attorneys

3  as to how many physicians have privileges at NorthBay only, and

4  physicians at NorthBay and at other facilities?

5  **A.**  I did.

6        **MR. TOOCH:**  If you could show Ms. Eichenberger Exhibit

7  150.  Don't publish it yet.

8        **THE COURT:**  So this will not be published.  150.

9        **MS. BRIGGS:**  No objection.

10        **THE COURT:**  What's the exhibit number?

11        **MR. TOOCH:**  150.

12        **THE COURT:**  Okay.

13        **MR. TOOCH:**  I'm going to move this into evidence.

14  Apparently there's no objection.

15        **MS. BRIGGS:**  No objection.

16        **THE COURT:**  All right.  It will be admitted.

17      (Trial Exhibit 150 received in evidence.)

18  **BY MR. TOOCH:**

19  **Q.**  Ms. Eichenberger, what is Exhibit 150?

20  **A.**  It's a list of physicians, and it lists which hospitals

21  they have privileges to admit patients and treat patients in.

22  **Q.**  Okay.  So looking at the first entry for Dr. Philip

23  Adamson, what type of doctor is he?

24  **A.**  He's an obstetrician-gynecologist.

25  **Q.**  And what is reflected in the column "Staff Membership"?

1  **A.**  That he has active privileges at both NorthBay Medical

2  Center and Sutter Auburn Hospital.

3  **Q.**  So does Dr. Adamson can he admit patients at both NorthBay

4  and at Sutter?

5  **A.**  Yes, he can.

6  **Q.**  And looking at the entry for Dr. Anthony Agadzi, what type

7  of doctor is he?

8  **A.**  He is an ophthalmologist.

9  **Q.**  And does he have admitting privileges at NorthBay and

10  other hospitals?

11  **A.**  He has courtesy privileges at Sutter -- oh, the Surgery

12  Center for Sutter, at NorthBay Surgery Center, at NorthBay

13  VacaValley Hospital, and at Sutter Solano in Vallejo.

14  **Q.**  Okay.  And let's just do one more.  Looking at Dr. Maqbool

15  Ahmed.  What kind of doctor is he?

16  **A.**  He's an intensivist.  He's a critical care physician.

17  **Q.**  Does he have privileges at NorthBay and other hospitals?

18  **A.**  Yes, he has privileges at NorthBay Emergency Center and at

19  Mercy General in Sacramento.

20  **Q.**  So does this document reflect whether the doctors have

21  exclusive admitting privileges at NorthBay and whether they

22  have admitting privileges at other hospitals?

23  **A.**  Yes, it does.

24  **Q.**  Ms. Eichenberger, how many people work in your collections

25  department?

1    A.    Twenty-two.

2    Q.    And what do -- are those 22 collection people broken down

3    in any way?

4    A.    Yes.  We have them broken down.  There's a group that

5    focuses on Medicare; and then there's another group that

6    focuses on Medi-Cal; and then the remainder are assigned to

7    commercial insurance business.

8    Q.    How many are assigned to Medicare?

9    A.    Three.

10   Q.    And how many are assigned to Medi-Cal?

11   A.    Three.

12   Q.    And how many are assigned to commercial business?

13   A.    The remainder, so 16.

14   Q.    Sixteen.  And why is that?

15   A.    Commercial claims are often hard to collect on and require

16   a lot more effort.  And so the 16 folks are separated, you

17   know, by different type of -- or by different insurance plans.

18         So some may have Blue Shield and some may have Aetna and

19   Cigna.  And they work to appeal underpayments or short pays.

20   And it takes that many people to get that work done.

21   Q.    Have you done any studies to determine how many commercial

22   claims are underpaid?

23   A.    I have.

24   Q.    And is that a recent analysis?

25   A.    Within --

1    **MS. BRIGGS:**  Objection, Your Honor.  This witness was

2  asked about this during deposition and did not testify that she

3  had undertaken any study.

4    **THE COURT:**  Is that the case, Mr. Tooch?

5    **MR. TOOCH:**  I wasn't at the deposition so I don't know

6  the exact -- I just don't know one way or the other on that.

7    **THE COURT:**  All right.  So then you may not go into

8  this line of questioning.

9    **MR. TOOCH:**  Fair enough.

10    If you can go to Mr. Deal's slide 32.

11    (Document displayed.)

12  **BY MR. TOOCH:**

13  **Q.**   In his testimony Mr. Deal said he used a 50/50 split for

14  in-network and out-of-network claims.  Of the 1600 claims at

15  issue in this case, what percentage of them are out-of-network

16  claims?

17  **A.**   94 percent.

18    **MR. TOOCH:**  No further questions, Your Honor.

19    **THE COURT:**  Ms. Briggs, any cross-examination?

20    **MS. BRIGGS:**  No questions, Your Honor.

21    **THE COURT:**  All right.  Thank you, Ms. Eichenberger.

22    **THE WITNESS:**  Thank you.

23    **MR. TOOCH:**  We have no further witnesses to call.  So

24  plaintiff rests.

25    **THE COURT:**  All right.  So, ladies and gentlemen, the

1  evidence is in.

2      Let me talk to the lawyers for just a second and figure

3  out what we're going to do next.

4      (Sidebar not reported.)

5          **THE COURT:**  All right, ladies and gentlemen.  I wanted

6  to make sure that we were organized, but now all of the

7  evidence is to you and we're able to proceed with the closing

8  statements.  And before we do that, I'm going to instruct you

9  on the law.

10     And then the way that this will happen is Mr. Tooch will

11  give his opening of the closing in -- of the closing arguments.

12  We'll take a break, and then NorthBay, either Mr. Pimstone or

13  Ms. Briggs, will argue, give their presentation on what they

14  think that you learned.  Then Mr. Tooch gets a chance to reply,

15  and then the case will go to you.

16     And we should be right pretty close to the 1:00 o'clock

17  time at the end of the day.

18     All right.  Members of the jury, now that you've heard all

19  the evidence, it's my duty to instruct you on the law that

20  applies in this case.  A copy of these instructions will be

21  sent to the jury room for you to consult during your

22  deliberations.

23     It's your duty to find the facts from all the evidence in

24  the case.  To those facts you will apply the law as I give it

25  to you.  You must follow the law as I give it to you whether

 1  you agree with it or not.  And you must not be influenced by

 2  any personal likes or dislikes, opinions, prejudices, implicit

 3  bias or sympathy.  That means that you must decide the case

 4  solely on the evidence before you.  You will recall that you

 5  took an oath to do that.

 6      Please don't read into these instructions, or anything I

 7  may say or do, or that I have done that I have an opinion

 8  regarding the evidence or what your verdict should be.

 9      As a reminder, I will give you a brief summary of the

10  position of the parties:

11      The plaintiff, NorthBay Healthcare Group, provided medical

12  services to patients who presented to the emergency departments

13  as NorthBay's hospitals and who had healthcare coverage from

14  the Blue Shield defendants.

15      The plaintiff and the defendants disagree on the

16  reasonable value of the services.  In this case, it will be

17  your duty to determine the reasonable value of services at

18  issue.

19      NorthBay is entitled to be paid the reasonable value of

20  the services that were provided to Blue Shield's members.

21      The reasonable value of the services is the "going rate"

22  for the services, or the reasonable market value at the current

23  market prices.  Reasonable market value, or fair market value,

24  is the price that a "willing buyer would pay to a willing

25  seller, neither being under compulsion to buy or sell, and both

1    having full knowledge of all pertinent facts."

2       In determining the reasonable value for the services at

3    issue, you may consider a wide variety of evidence reflective

4    of the market rate for the services in the geographic area.

5       The burden is on plaintiff to prove, by a preponderance of

6    the evidence, the reasonable value of the services at issue.

7    When a party has the burden of proving any claim by a

8    preponderance of the evidence, it means you must be persuaded

9    by the evidence that the claim is more probably true than not

10    true.

11       You should base your decision on all of the evidence,

12    regardless of which party presented it.

13       The evidence you are to consider in deciding what the

14    facts are consists of: the sworn testimony of any witness; the

15    exhibits that are admitted into evidence; any fact to which the

16    lawyers have agreed; and any fact that I have instructed you to

17    accept as proved.

18       In reaching your verdict, you may consider only the

19    testimony and exhibits received into evidence. Certain things

20    are not evidence, and you may not consider them in deciding

21    what the facts are. I will list them for you:

22       Arguments and statements by lawyers are not evidence. The

23    lawyers are not witnesses. What they have said in their

24    opening statements, closing arguments, and at other times is

25    intended to help you interpret the evidence, but it's not

1  evidence.  If the facts as you remember them differ from the

2  way the lawyers have stated them, your memory of them controls.

3       Questions and objections by lawyers are not evidence.

4  Attorneys have a duty to their clients to object when they

5  believe a question is improper under the rules of evidence.

6  You should not be influenced by the objection or by the Court's

7  ruling on it.

8       Testimony that's excluded or stricken, or that you've been

9  instructed to disregard, is not evidence and must not be

10  considered.  In addition, some evidence was received only for a

11  limited purpose; when I have instructed you to consider certain

12  evidence only for a limited purpose, you must do so and you may

13  not consider that evidence for any other purpose.

14       Anything you may have seen or heard when the Court wasn't

15  in session is not evidence.  You are to decide the case solely

16  at the evidence received at trial.

17       Evidence may be direct or circumstantial.  Direct evidence

18  is direct proof of a fact, such as testimony by a witness about

19  what that witness personally saw or heard or did.

20  Circumstantial evidence is proof of one or more facts from

21  which you could find another fact.  You should consider both

22  kinds of evidence.  The law makes no distinction between the

23  weight to be given to either direct or circumstantial evidence.

24  It's for you to decide how much weight to give to any evidence.

25       There are rules of evidence that control what can be

1 received into evidence. When a lawyer asks a question or

2 offers an exhibit into evidence and a lawyer on the other side

3 thinks that is not permitted by the rules of evidence, that

4 lawyer may object. If I overrule the objection, the question

5 may be answered or the exhibit received. If I sustain the

6 objection, the question cannot be answered, and the exhibit

7 cannot be received. Whenever I sustained an objection to a

8 question, you must ignore the question and must not guess what

9 the answer might have been.

10     Sometimes I may order that evidence be stricken from the

11 record and that you disregard or ignore that evidence. That

12 means when you're deciding the case, you must not consider the

13 stricken evidence for any purpose.

14     In deciding the facts of the case, you may have to decide

15 which testimony to believe and which testimony not to believe.

16 You may believe everything a witness says, or part of it, or

17 none of it.

18     In considering the testimony of any witness, you may take

19 into account: The opportunity and ability of the witness to

20 see or hear or know the things testified to; the witness's

21 memory; the witness's manner while testifying; the witness's

22 interest in the outcome of the case, if any; the witness's bias

23 or prejudice; if any; whether other evidence contradicted the

24 witness's testimony; the reasonableness of the witness's

25 testimony in light of all the evidence; and any other factors

1  that bear on believability.

2  Sometimes a witness may say something that's not

3  consistent with something else he or she said.  Sometimes

4  different witnesses will give different versions of what

5  happened.  People often forget things or make mistakes in what

6  they remember.  Also, two people may see the same event but

7  remember it differently.  You may consider these differences,

8  but do not decide that testimony is untrue just because it

9  differs from other testimony.

10  However, if you decide that a witness has deliberately

11  testified untruthfully about something important, you may

12  choose not to believe anything that witness said.  On the other

13  hand, if you think the witness testified untruthfully about

14  some things but told the truth about others, you may accept the

15  part you think is true and ignore the rest.

16  The weight of the evidence as to a fact does not

17  necessarily depend on the number of witnesses who testify.

18  What's important is how believable the witnesses were and how

19  much weight you think their testimony deserves.

20  You have heard testimony from Mr. Heil, Mr. Deal, and

21  Mr. Pugh, who testified to opinions and the reasons for their

22  opinions.  This opinion testimony was allowed because of the

23  education or experience of these witnesses.

24  Such opinion testimony should be judged like any other

25  testimony.  You may accept it or reject it, and give it as much

weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

Certain charts and summaries not admitted into evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

Certain charts and summaries have been admitted into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the testimony or other admitted evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

At the beginning of the case, I urged you to pay close attention to the trial testimony as it's given. During deliberations you will not have a transcript of the trial testimony.

You may have taken notes to help you remember the evidence. If you did take notes, please keep them to yourself until you go to the jury room to decide the case. When you leave, your notes should be left in the jury room. No one will read your notes.

Whether or not you took notes, you should rely on your own

memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of other jurors.

Before you begin your deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listing send to their views.

And it's important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it's right, or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the

 1   case or to the issues it involves.  Except for discussing the

 2   case with your fellow jurors during your deliberations:  Do not

 3   communicate with anyone in any way and do not let anyone else

 4   communicate with you in any way about the merits of the case or

 5   anything to do with it, although I have no information that

 6   there will be news reports about this case.

 7        This includes discussing the case in person, in writing,

 8   by phone or electronic means, via email, via text messaging or

 9   any Internet chat room, blog, website or application, including

10   but not limited to Facebook, YouTube, Twitter, Instagram,

11   LinkedIn, Snapchat or any other forms of social media.  This

12   applies to communicating with your family members, your

13   employer, the media or the press, and the people involved in

14   the trial.  If you are asked or approached in any way about

15   your jury service or anything about this case, you must respond

16   that you've been ordered not to discuss the matter and to

17   report the contact to the Court.

18        Do not read, watch, or listen to any news or media

19   accounts or commentary about the case or anything to do with

20   it; do not do any research such as consulting dictionaries,

21   searching the Internet or using other reference materials, and

22   do not make any investigation or in any other way try to learn

23   about the case on your own.  Do not visit or view anyplace

24   discussed in this case, and do not use Internet programs or

25   other devices to search for or view anyplace discussed during

1   the trial.  Also, do not do any research about this case, the

2   law, or the people involved, including the parties, the

3   witnesses or the lawyers, until you have been excused as

4   jurors.  If you happen to read or hear anything touching on

5   this case in the media, turn away and report it to me as soon

6   as possible.

7       These rules protect each party's right to have this case

8   decided only on evidence that's been presented here in court.

9   Witnesses here in court take an oath to tell the truth, and the

10  accuracy of their testimony is tested through the trial

11  process.

12      If you do any research or investigation outside the

13  courtroom, or gain any information through improper

14  communications, then your verdict may be influenced by

15  inaccurate, incomplete or misleading information that has not

16  been tested by the trial process.  Each of the parties is

17  entitled to a fair trial by an impartial jury, and if you

18  decides the case based on information not presented in court,

19  you will have denied the parties a fair trial.  Remember, you

20  have taken an oath to follow the rules, and it's very important

21  that you follow these rules.

22      A juror who violates these restrictions jeopardizes the

23  fairness of the proceedings, and a mistrial could result that

24  would require the entire trial process to start over.  If any

25  juror is exposed to any outside information, please notify the

1    Court immediately.

2        If it becomes necessary during your deliberations to

3    communicate with me, you may send a note through the clerk,

4    signed by any one or more of you.  No member of the jury should

5    ever attempt to communicate with me except by a signed writing.

6    I will not communicate with any member of the jury on anything

7    concerning the case except in writing or here in open court.

8    If you send out a question, I will consult with the lawyers

9    before answering, which may take some time.  You may continue

10   your deliberations while waiting for the answer to any

11   question.  Remember that you are not to tell anyone, including

12   the Court, how the jury stands, whether in terms of vote count

13   or otherwise, until after you have reached a unanimous verdict

14   or have been discharged.

15       A verdict form has been prepared for you.  After you have

16   reached unanimous agreement on a verdict, your plea siding

17   juror should complete the verdict form according to your

18   deliberations, sign and date it, and advise the clerk that you

19   are ready to return to the courtroom.

20       So I'm going to show you the norm of the verdict that

21   you'll be asked to fill out.

22       (Document displayed.)

23          **THE COURT:**  So this is the verdict form, and it says,

24   "The reasonable value of the services at issue in this case is"

25   blank.

1      And you've heard two different ways of how the value is

2  expressed by the parties.  One is as a percentage of the billed

3  charges of NorthBay.  The other one is a multiple of Medicare.

4      And it's going to be up to you to decide what the best way

5  of expressing the reasonable value of the services is by using

6  one of those two ways of looking at it.

7      And I think the lawyers will take some time during their

8  closing to explain that to you further.

9      So those are the instructions in the case.

10     Mr. Tooch, why don't you proceed.

11         **MR. TOOCH:**  Thank you, Your Honor.  If I may move the

12  podium.

13         **THE COURT:**  Yes.  Please go ahead.

14         **MR. TOOCH:**  Thank you, Your Honor.

15                      **CLOSING ARGUMENT**

16         **MR. TOOCH:**  Thank you, ladies and gentlemen.

17     I want to thank you for your attendance and your

18  attentiveness to all of the witnesses that testified.

19     Now is my chance to go over the evidence that's been

20  presented in the case and to tell you why I think that supports

21  our position.

22     So what is this case about?  The case is about a hospital,

23  NorthBay, that has two campuses, and they operate as one

24  system.  They're a small hospital in a community that serves

25  low income people.

1    What is NorthBay's mission?  Three things: advanced

2    medicine, close to home, compassionate care.

3    What does "advanced medicine" mean?  Well, you heard from

4    a number of the clinical witnesses and from Ms. Eichenberger

5    talked about it's a Level II trauma center.  It has a neonatal

6    intensive care unit.  It has a chest pain center.  It has a

7    certified chest pain center, a cardiac cath lab, a primary

8    stroke center that's certified, a cancer center.  A

9    neuroscience center.  That's where Dr. Zusman works.  And it's

10   a magnet hospital for a certification for nurses.

11   None of the other hospitals in the area have all of these

12   services in one location.  NorthBay is a one-stop shop.

13   Some Kaiser hospitals have a trauma center, but then they

14   don't have a neuroscience center or a NICU.  Some Sutter

15   hospitals have a NICU, but they don't have a trauma center.

16   NorthBay doesn't have that luxury.  If it's going to

17   provide neonatal intensive care units, it has to provide it at

18   one of its two hospitals or the members of the community don't

19   get that service.

20   Now, NorthBay doesn't have to provide these advanced

21   services.  As you recall, I asked Ms. Eichenberger, Are you

22   required to do so?

23   I asked Ms. Venezio, the trauma nurse, When you lost out

24   to Kaiser Vacaville, when they got the county designation as a

25   Level II trauma center, you didn't have to go for trauma

1  designation?

2      She said, Yeah.

3      So I said, Why did you do so?

4      She said, Because the members of our community need it.

5      And how do we know that the members of the community need

6  it?  Well, if you recall Exhibit 155-3, NorthBay saw more

7  trauma patients than Kaiser did.  If you look at the chart,

8  NorthBay had 641 total patients in 2017, in its trauma unit,

9  and Kaiser had 433.

10     So NorthBay could have chosen not to be a trauma hospital,

11  and the members of its community would have not have had the

12  services that are there.

13     NorthBay does not have to have a NICU, doesn't have to be

14  certified as a chest pain center or a primary stroke center.

15  But it does because it believes the members of this community,

16  even though they're low income, deserve the best quality care

17  that they can get.

18     What does "close to home" mean?  It means that they get

19  the care in the community.

20     Ms. Eichenberger testified that a lot of these patients

21  are Medicare patients and Medi-Cal patients.  They don't have

22  the means to travel and their families don't have the means to

23  travel to have these services in far distances.  So that's what

24  "close to home" means.

25     What is compassionate care?  You heard Ms. Eichenberger

1    testify about the cancer patient who was divorced and had no

2    money, and they provided the care for free.

3        You've heard the passion of Dr. Zusman.  Have you ever

4    heard a doctor testify or talk about his or her practice with

5    the passion that Dr. Zusman brings to this -- to her practice?

6        She testified when she was at Kaiser, because they're

7    under the capitation model, most of the services are pushed to

8    nonsurgical care, and the opposite was at Sutter.  When she was

9    at Sutter, most of the care was pushed towards surgeries.

10       At NorthBay it's based upon what the patient needs.  If

11   they need surgery, they get surgery.  If they can treat the

12   tumor or the concussion with non-surgery means, they do it in

13   non-surgery means.

14       So Mr. Pugh testified for Blue Shield on quality.

15   Blue Shield's position is that emergency services are emergency

16   services; OB services are OB services.  Where you get them

17   doesn't really make a difference.  One hospital is just like

18   another hospital.

19       But it does make a difference where you get these

20   services.  Mr. Pugh said he was an expert on quality, but he

21   just looked at the numbers on websites.  He didn't go

22   underneath those numbers and try to understand those numbers.

23       You will recall I went through with him the emergency

24   services on Exhibit 173-A, page 2.

25       (Document displayed.)

1    **MR. TOOCH:**  Of all the hospitals on Mr. Pugh's list,

2    only NorthBay had "very high" level.  That's over 60,000 people

3    a year go through NorthBay's emergency room.

4        And if you go to the first page of that, 84 percent of the

5    people who are having a stroke received a brain scan within 45

6    minutes.  And the average time, I believe it's on page 2, that

7    patients were seen at NorthBay was 16 minutes.

8        So have you ever been to a very busy emergency department

9    and been seen by a nurse or doctor within 16 minutes?  It does

10   make a difference.  Emergency care at one hospital is not the

11   same as emergency care at another hospital.

12       So why is all this discussion and why is all the evidence

13   about the type of services that NorthBay provides relevant to

14   this case?

15       Well, because this is about the reasonable value of

16   services at NorthBay.  It's not about the reasonable value of

17   services at Sutter or Kaiser Vacaville or another hospital.

18   It's the services at NorthBay.

19       If you can go to 176-D.

20       This is the Leapfrog score for Sutter Solano.  If this

21   case was about Sutter Solano, they don't have a trauma center.

22   Is the reasonable value of services at NorthBay more than the

23   services at Sutter Solano?  Yes.  Why?  Because they have

24   better services.

25       As you can tell by now, I like to give analogies.  Let's

1  talk about BMWs versus Jettas.  Both cars get you from point A

2  to point B, but people pay a lot more for a BMW.  Why?  It's a

3  better car.

4      You may not know much about cars, like me, but you know

5  that people pay a lot more for a BMW than a Jetta.  The

6  reasonable value of a BMW is more than the reasonable value of

7  a Jetta.

8      Take two brain surgeons.  One brain surgeon is like

9  Dr. Zusman, top of her class, very successful in treating brain

10  tumors.  Another is a mediocre brain surgeon who has not had a

11  lot of success in treating brain tumors.

12      If you or a family member had to choose, who would you go

13  to?  And would you be willing to pay the higher-quality brain

14  surgeon more money?  Yes, because your life is at issue.

15      So the reasonable value of services at NorthBay is higher

16  than the reasonable value of services at these other facilities

17  because it provides better services, more services in one

18  location, and that it strives to be the best hospital that it

19  can be.

20      The next thing we talked about was NorthBay contracts.  We

21  introduced evidence through Ms. Eichenberger, who testified

22  about the contracts, and Mr. Heil, as well, who talked about

23  those contracts in his charts.

24      If you can go to Mr. Heil's slide A.

25      These were the top insurance companies in California:

1  Blue Cross, Aetna, Cigna, United, HealthNet.

2      It is undisputed that these insurance companies pay these

3  rates to NorthBay.  Those facts are not disputed by Blue Shield

4  in this case.  No witness from Blue Shield came up and said

5  those are not the rates that these companies are currently

6  paying NorthBay.

7      Some rates are higher.  Some rates are lower.  Some like

8  Blue Cross have lots of members.  Some, like HealthNet, have

9  very few members.  But these today are willing buyers of

10 NorthBay services at these rates.  And the average of those

11 rates is 62 percent of charges.

12     Go to slide 9, please.

13     Mr. Heil also talked about the emergency of these

14 contracts.  And Mr. Heil explained why these are more relevant

15 to the other contracts because the other contracts had elective

16 services and emergency services.  And under those contracts,

17 Blue Cross, Aetna, Cigna, steered their members towards

18 NorthBay for the elective services.  They said, go to NorthBay

19 for elective services.

20     These contracts only deal with emergency services, and

21 they're more like the situation that we have in this case,

22 where we're dealing with emergency services only.

23     So that's why Mr. Heil says these are the more comparable

24 emergency services contracts.  They're like the 3-bedroom

25 versus the 2-bedroom apartments.

1    And these facts are not disputed either.  There is no

2 dispute that Kaiser paid these rates, 80 percent of charges,

3 for 14 years, 2001 to 2005 [sic], that MultiPlan, Interplan,

4 PHCS, and First Health are paying those rates today.  Or the

5 companies that contract with them pay those rates today, or

6 that they're one-time agreements at 80 to 90 percent of

7 charges.

8    These facts are not in dispute.  And the average of those

9 contract rates is 81 percent average.

10    Mr. Heil talked about why he added the 15 points.  And he

11 said, so, if take 81 from 100, you get 19 points.  So why is

12 NorthBay willing to discount its rates from 100 percent to

13 81 percent in these situations?  It's not getting any volume.

14    Mr. Heil talked about the value of these contracts:  An

15 agreed upon rate and timely payment.  He used the example of an

16 employee.  It's more important to the employee than the

17 employer to know how much he or she is going to get paid and

18 when I'm going to get paid, because the employer holds the

19 money.

20    Now, Blue Shield does not deny these facts.  So what did

21 it do?  It tries to minimize the importance of these contracts.

22    We can go to Exhibit 300.  This was an exhibit that

23 NorthBay introduced during the course of this trial.  And it

24 tried to argue that if you look at only First Health,

25 Interplan, and those types of contracts, it's only 1 percent of

1   the business at NorthBay if you compare it to all the other

2   business, including Medicare, Medi-Cal, and all the other

3   payors.

4       But if you look at the Blue Shield business, it's only

5   1.5 percent of the total.  And if you look at the HealthNet

6   business, it's more than the HealthNet business.  And if you

7   include Kaiser, like Mr. Heil did, it's even a larger portion

8   of the business.

9       So it's not a small part of the business.  And if you take

10  away Medicare and Medi-Cal, as I will argue later that you

11  should -- because Medicare and Medi-Cal is government business,

12  it's not the same as commercial business -- those percentages

13  go up.

14      Now, the next thing Blue Shield says is, well, NorthBay

15  and Kaiser had terminated their contracts.  Blue Shield's

16  attorney even used the term "old contracts" in a number of his

17  questions.  Blue Shield said you should totally ignore these

18  contracts because they have terminated.  Blue Shield terminated

19  its contract; Kaiser terminated its contract.

20      Well, think of the hamburger example.  Guy goes to the

21  restaurant for eight years, he eats the $12 hamburger,

22  willingly pays the $12 hamburger.  And one day he wakes up and

23  says, oh, it's not worth $12, it's worth $4.  What's the first

24  thing you're going to say to him?  Sir, man, dude, you paid $12

25  for that hamburger willingly for eight years.

1    It's the same in this case.  The jury instruction on

2 reasonable value in this case -- and I think I have a board

3 which says it.  I don't.

4    But you will recall that it says is what the reasonable

5 value for out-of-network services is what a willing buyer and a

6 willing seller agreed to pay.  What is that?  The contract

7 rate.

8    So in order to determine out-of-network situation as to

9 what's the reasonable value, you look at what willing buyers

10 and willing sellers have agreed to pay.  And what's that?  The

11 contract.

12    Go to slide 5, please.

13    So for eight years Blue Shield willingly paid these rates

14 to NorthBay.  If the volume went up, they paid less.  If the

15 volume went low, they paid more.  It's like buying a coke at

16 7-Eleven versus buying a coke at Costco.  The more you buy, the

17 cheaper it gets.  That's what this contract says.

18    And the volume today has gone below 55 inpatients.  So the

19 reasonable value is more than the 80 percent of charges.

20    Go to slide 28, please.

21    NorthBay receives high rates from its payors for elective

22 services.  Well, you just heard Ms. Eichenberger and Mr. Heil

23 today.  That's not true.

24    You can go to slide 8, please.  These are the contracts

25 for emergency and elective services.  Average 62 percent.

1    Go to slide 9.  These are the contracts that are just for

2  emergency services.  The average is 81 percent.

3    So if you take out elective services, you can see that

4  emergency services are more than elective services.  That's in

5  black and white in the contracts.

6    Then Mr. Deal said, well, NorthBay negotiates aggressively

7  because of its geography, because it's isolated.

8    Well, today, on slide 20 and 21, Mr. Heil talked about how

9  close is NorthBay to the other hospitals?

10    And if you go to 21, how close are the competing hospitals

11  are to each other?

12    And if you go to slide 22, when you look at this, NorthBay

13  is not more isolated than the other hospitals.  Its geography

14  is no different than the other hospitals in its area.

15    So that argument doesn't work.

16    You also heard that the Department of Managed Healthcare,

17  the State agency, has to approve Blue Shield's termination of

18  its contract before it terminated the contract with NorthBay.

19    What did North -- what did Blue Shield have to prove to

20  the State agency before it terminated the contract?  That it

21  had sufficient network access in the area, that it had

22  sufficient hospitals and doctors in the area to serve its

23  patients for elective services.

24    We assume that Blue Shield told the State agency the

25  truth.  So if it told the State agency the truth, then

Blue Shield has sufficient hospitals and doctors in the area.

And you heard Ms. Eichenberger today, there's a whole list of doctors that have admitting privileges at NorthBay and at other hospitals such as Sutter.

We also heard from Mr. Barnes. And he said, well, the whole situation changed in 2014. The ACA came into existence, and CalPERS decided that instead of sending all the business to Blue Shield it was going to make Blue Shield compete with the other health plans in the area.

Did Mr. Barnes change the contract in 2014? Did he change it in 2015? No.

What Mr. Barnes is saying, what Blue Shield is saying is that they cannot compete with the other health plans in Solano County. That's what they're saying.

Blue Cross, Aetna, Cigna, United, HealthNet still contract with NorthBay, still sell insurance in the community in Solano County. And they're not saying, like Blue Shield is saying, Oh, we can't compete at the rates that we agreed to in our contract, so we're going to terminate our contract. We'll pay whatever we want. We'll force NorthBay to sue us and then we'll let the jury -- hopefully they'll come out with a low rate so we don't have to pay what the market is paying.

That's Blue Shield's strategy. That's why we're here, because it can't compete with other health plans, so it wants you to do their job.

1    Blue Shield doesn't have a right to sell insurance in

2 Solano County.  It's not obligated to.  It chooses to do so.

3    Blue Shield didn't have to terminate the contract.  It

4 doesn't have to sell insurance in Solano County.  And so it's

5 not forced into doing what it's doing.

6    Blue Shield is in this situation because it chose it.  And

7 that was the final words that Mr. Deal said on the stand.  Yes,

8 they chose this situation.  And I think the words he used was

9 "And now they are paying for it."

10    But even after they terminated the contract, even after

11 they knew about the ACA and CalPERS, what did Blue Shield

12 offer?  50.5 percent of charges.  Mr. Barnes agreed with that.

13 That's not disputed.  Even with all this information, they're

14 at 55 percent of charges.

15    Now, NorthBay said, no, I'm sorry, we cannot go that low.

16 That's not a sufficient rate for us.

17    So if we go back to Mr. Heil's slide 5, this is what the

18 parties agreed to.

19    So the volume now is less than 55, which they should be

20 paying 80 percent of charges.  So -- and Blue Shield wants to

21 pay less than the highest volume of 65 percent of charges.  It

22 wants its cake and eat it too.  You're getting low volume from

23 us.  We want our rates lower than the lowest rate that we

24 agreed to in our contract.

25    That's not fair.  That's not reasonable.

1    Go to Mr. Heil's slide 7, please.

2    Remember this slide.  The gray bar is the volume of

3 patients, Blue Shield patients at NorthBay.  First it went up,

4 then it went down, then it went up a little bit.  And you can

5 see the blue line is when the contract was terminated, the

6 volume went down precipitously.

7    Blue Shield is saying, yeah, even though you've got this

8 low volume today we -- it wants the lowest contract rates that

9 are possible.

10    Now let's talk about NorthBay's charges.  There's

11 evidence, Blue Shield's counsel is going to come in and talk

12 about how high NorthBay's charges are.

13    Mr. Heil looked at NorthBay's charges.  He includes it in

14 the three things that he looked at.  He looked at the

15 Blue Shield contracts, he looked at the other comparable

16 contracts, and he looked at the charges.

17    He didn't shy away from the charges.  He didn't run away

18 from the charges.  What he did is he said, yes, I see that

19 these charges are high.  And so what am I going to do?  I'm

20 going to reduce my reasonable value calculation.  And I think

21 he had a number of 73 percent.  He said, I'm going to reduce it

22 down to 73 percent for that factor.

23    So he takes into account the charges.  He didn't run away

24 from them.  He's not trying to pull one over on the jury.  He's

25 saying, yes, the charges are high, and I factored that in to my

1  reasonable value calculation.

2      And Mr. Heil comes up with a reasonable value of

3  88 percent of charges.  This is just 8 percent more than what

4  Blue Shield agreed to in its contract with NorthBay.  It is

5  based upon real tangible evidence, the contracts on which

6  Blue Shield agreed to with NorthBay, the contract that Aetna,

7  Cigna, United agreed to, the contract that Kaiser and the

8  contracts that all of the ear parties agreed to.  And he takes

9  into account charges.

10      There is a solid basis for Mr. Heil's opinion, and

11  88 percent of charges is the reasonable value of services.

12      Thank you.

13          **THE COURT:**  All right.  Ladies and gentlemen, let's

14  take a 10-minute break, and then we'll come back and we'll hear

15  the defendant's closing statement.  And then Mr. Tooch will

16  have a few more comments, and then the case will go to you.

17              (Recess taken at 11:09 a.m.)

18          (Proceedings resumed at 11:25 a.m.)

19          **THE COURT:**  All right.  Please be seated, everybody.

20  Mr. Pimstone, go ahead.

21          **MR. PIMSTONE:**  Thank you, Your Honor.

22                  **<u>CLOSING ARGUMENT</u>**

23      Good morning, ladies and gentlemen.  Well, this is the fun

24  part.  Well, the fun part for us attorneys where we get to take

25  everything that you heard over the last week or so, plus the

1   jury instructions, and sort of piece it together and make

2   sense.

3       And I wanted to start off today with the law.  Because

4   ultimately, you know, that is what you're going to be asked to

5   do, which is apply the law to the facts.  And the law here is

6   expressed in special jury instruction number 1.  Reasonable

7   value.  And it is -- it is comprised of three different parts.

8       The first section is what is the goal?  The goal is to

9   come up with a determination of reasonable value.  Because

10  NorthBay's entitled to be paid reasonable value for the

11  services.  No more, no less.

12      The second part of this tells you what to look at in

13  coming up with reasonable value.  And what the Court has

14  instructed is that the reasonable value of the services is the

15  going rate for the services, or the reasonable market value at

16  current market prices.

17      Then the Court has further instructed you, well, what do

18  you look at in determining the reasonable market value at

19  current market prices?  You look at what they call willing

20  buyer/willing seller transactions.  Which are, what are willing

21  buyers willing to pay for those services, and what are willing

22  sellers willing to sell the services for when neither of them

23  is forced together into the situation like we have in the

24  emergency situation.

25      So emergency services are odd because what you have is you

have parties that are sort of flung together by circumstance. The patient is taken to a particular emergency room, the closest emergency room. They're not choosing and picking where they're going. The health plan or the health insurer is not picking that hospital like they do for elective services. The health plan is not saying: We want you to go only to contracted hospital. And, of course, the hospital has to treat all the patients.

And so what the law is telling you here is that -- you've got a funny situation with emergency services because these are forced transactions. And what the law is telling you is to try to figure out what the services are worth, look to other situations. Look to other situations where those same services, that MRI, those lab tests, that room and board, is being sold in transactions where people aren't forced together. Where they have the ability to negotiate, where they have the ability to come to an agreement as to what the services are worth. And that will tell you, when you have parties who are willing buyers/willing sellers that will tell you what the services are really worth. And then you take that and you apply them here.

So that's what you look at. Willing buyer/willing seller transactions relating to current market prices.

What is current market prices? Those are the prices for the disputed period. So you look at willing buyer/willing

1    seller transactions during the disputed time period.  And you

2    say to yourself:  What are hospitals selling that same service

3    for?  What are they selling that MRI for?  What are they

4    selling that room and board for?  And you apply it to the

5    situation.

6         And the third paragraph tells you what is the scope of

7    your inquiry?

8         So paragraph 1 is the goal, to determine reasonable value.

9         Paragraph 2 is what kinds of transactions do we look at to

10   determine reasonable value?  Willing buyer/willing seller

11   transactions.

12        And number 3 is the scope of the inquiry.  Which is in

13   determining the reasonable value, you look at a wide variety of

14   evidence reflective of the market rate for the services in the

15   geographic area.

16        So that is telling you what the scope is that you look at.

17   And it's your goal to determine what is the going rate for

18   those services in the geographic region?  What is that MRI

19   being sold for by NorthBay and other hospitals in willing

20   buyer/willing seller transactions in the geographic area?  What

21   are those lab tests being sold for in willing buyer/willing

22   seller transactions during the disputed time period in the

23   geographic area?

24        Because your goal ultimately here -- and this is super

25   important because it's a huge difference between the parties.

1    Blue Shield understands the law to be that your goal is to

2    determine the going market rate in the geographic area.  That's

3    what the jury instruction says.  And so that's what we did.

4         And I've touched on this a little bit.  But why look --

5    why does the law do this -- why look at the market rate in the

6    geographic area?  Well, the reason you look at the market rate

7    in the geographic area is because, as I've said before, these

8    are forced transactions.  We didn't pick NorthBay, the patient

9    didn't pick NorthBay, NorthBay didn't pick the patient.  They

10   were thrust together by circumstance.

11        So Blue Shield and the patient didn't make a voluntary

12   choice to pay NorthBay's rates.  It didn't make any voluntary

13   choice to seek out NorthBay and say, You know what?  Even

14   though you may be paid more in the geographic area than your

15   peers, we're voluntarily accepting that.

16        Blue Shield didn't say that.  The patient didn't say that.

17        And so I'll get, a little bit later, to the idea of what

18   NorthBay gets for elective services in the geographic market.

19   But the point here is that Blue Shield has no criticism of

20   NorthBay attempting to negotiate high rates in full network

21   contracts with willing buyers and willing sellers.

22        Now, we're not here, we're not sitting here on public

23   policy to say, Should NorthBay be doing that?  Should they be

24   trying to exact as much money in full-network contracts as they

25   can?  We're not here to sort of debate that public policy

1    point.  And I'm not here to suggest to you that you should

2    punish NorthBay for anything it does in its full network rates.

3    We know the rates are high, but that's not the point.  The

4    point is that NorthBay is able to and does negotiate very

5    favorable rates for full network contracts with health plans

6    and with health insurers who then get access to all of

7    NorthBay's elective services in the geographic region.

8        But that's not the issue.  The issue is we need to look at

9    the market rate.  And when a provider like NorthBay, or when a

10   physician -- these aren't physician services here -- but when a

11   provider like NorthBay chooses to participate in the emergency

12   market -- now we're not talking about the full network elective

13   services here.  When they choose to participate in the

14   emergency market they don't get to charge those same network

15   rates that they get with willing buyer/willing sellers.  What

16   they're entitled to at that point is the market rate, the going

17   market rate for the services in the geographic area.

18       In the jury instruction it says market rate in the

19   geographic area, singular.  The regional rate.  It doesn't say

20   market rates, plural.  It's not a separate rate for each

21   patient who comes in the door.  Your goal is to determine what

22   is the going market rate in the geographic area for those

23   services.

24       And that has two consequences.  Why do you do that?  Well,

25   it protects the provider.  It protects the provider from being

 1   paid less than what similarly situated providers are getting

 2   paid in the geographic area.  So Blue Shield cannot come in and

 3   say, Well, the going rate for that MRI, if you look at what

 4   MRI's are being sold for in willing buyer/willing seller

 5   transactions, if MRI's are being sold for $1,000 for that

 6   service Blue Shield can't come in and say:  Even though the

 7   regional rate is $1,000, you're only entitled to $500.

 8       So it protects the provider.  But just remember, the

 9   provider is being forced into this transaction and so the

10   market rate requiring Blue Shield to pay the market rate

11   protects the provider against being underpaid below the

12   regional market rate.

13       But establishing a regional market rate in the geographic

14   area, which is your task, also protects the patient and it

15   protects the plan.  Because, again, they didn't choose that

16   provider.  They didn't voluntarily agree to pay twice or three

17   or four or five times the going market rate for that particular

18   service.  And so when a provider chooses, like NorthBay, to

19   participate in the emergency market, that's also to protect the

20   patient and to protect the health plan to say:  You didn't pick

21   that provider, you didn't voluntarily agree to go to that

22   provider and pay way more than the market rate.  And so because

23   this is an emergency service, all you need to pay, the

24   reasonable value, is the market rate.  So it protects both

25   sides.

1    The claims in dispute here, just very briefly.  If you add
2  up the charges, it's about 50/50 between out outpatient and
3  inpatient in terms of charges.  And the claims are split about
4  53 percent to about 47 percent, mostly VacaValley, and
5  47 percent is NorthBay.  So we're talking about charges and
6  services from both sides here.
7    I want to talk a little bit more about forced
8  transactions.  I've sort of introduced the concept.  This was
9  Mr. Deal's slide.  And he explained, as I've said already, that
10  these are forced transactions based on all the features that
11  you've heard about already.
12    Ms. Eichenberger also was asked those similar questions
13  and she was asked:  Would you agree that health insurers or
14  health plans have to pay the hospital?  She said, Yes, as she
15  needed to.  And would you agree that those health plans can't
16  tell their members where to go for emergency services?  No,
17  they can't.
18    So, again, these are forced transactions by parties sort
19  of thrust together by the unfortunate circumstance of an
20  emergency.
21    There were certain hypotheticals, and we heard some this
22  morning, as well, about hamburgers.  And Dr. Zusman's
23  hypothetical about paying more when one is choosing a brain
24  surgeon.  And I wanted to sort of dwell on that because these
25  hypotheticals, they may be silly, but they sort of illustrate

1   the differences between the parties here.

2       The hypothetical that you heard from Dr. Zusman was, Well,

3   if you are choosing a brain surgeon, not for an emergency but

4   for an elective procedure, wouldn't you think it's appropriate

5   to pay more for a higher quality brain surgeon?  And the

6   answer, of course, is "yes."

7       I don't disagree with that.  But, again, is that a forced

8   transaction in that hypothetical?  The answer is "no" to that.

9   The hypothetical was:  If I wanted to go out there and I had

10  the choice between brain surgeons, and I had the choice between

11  picking a brain surgeon at a certain price, and picking the

12  world's expert at twice that price, would I agree to pay more

13  for the world's expert?  Of course, I would.  But that's my

14  choice at that point.

15      The difference here is that if a patient gets taken to an

16  emergency room in an emergency for a brain issue, they're not

17  picking, they're not making the choice to say, That doctor

18  who's operating, I'm going to pay five times more for that

19  doctor because she happens to be the world's expert.  There's

20  no choice going on there.

21      And so the hypothetical, I think, that we modified was if

22  you were going into the emergency room, and let's say there

23  were three brain surgeons, three neurosurgeons who staff the

24  emergency room.  They didn't have to.  It's just they chose to

25  do that as part of their practice.  And let's say Doctor No. 1

1  would charge $1,000.  Doctor No. 2 would charge $1,000 in their

2  elective practice for the procedure.  And Doctor 3 would charge

3  $10,000, ten times more, because that doctor for one reason or

4  another, maybe based on their location, maybe based on their

5  skill, when people were choosing them voluntarily they get paid

6  more.

7      The question is, when those three doctors are staffing the

8  emergency room and when the patient comes in and is randomly

9  assigned one of those doctors because they have no choice, is

10 that patient now obligated to pay ten times more for the

11 emergency procedure because through luck of the draw they got

12 Doctor No. 3 as opposed to Doctors 1 and 2?

13     That's the relevant question.  Which is, that we are not

14 dealing here with voluntary transactions.  When those three

15 doctors agreed to staff the emergency room, no one is telling

16 them what they can get in the elective market.  No one is

17 saying to Doctor 3, You shouldn't get ten times more in the

18 elective market.

19     What we are telling those doctors is when you choose to

20 provide emergency services you are agreeing to receive the

21 going market rate for your services because those patients

22 aren't choosing you, they're not agreeing to pay more.

23     And the same is true with respect to hospitals.  If my

24 appendix burst and the closest hospital at the time is

25 NorthBay, as opposed to a hospital ten miles down the road, I

haven't made any decision to pay five or six times more for an

MRI as an emergency patient just because they may get that in

their full network contracts.

So, again, when NorthBay agrees to participate in the

emergency market, that's a different calculus.  Now what

they're saying is, We are agreeing to be paid the going market

rate in the geographic area.  We don't get to charge what we

want anymore.

Mr. Heil's hypothetical.  You voluntarily pay $12 for a

hamburger and then one day you come in you want to pay $4.

Again, not the same situation, is it?  If I'm going to a

hamburger joint and I'm paying $12 for a hamburger voluntarily,

and then one day I come in and no one's forcing me to buy a

hamburger and I say I only want to pay $4.  Of course, the

seller at that point, it's a voluntary transaction.  The seller

can say, Buzz off.  I'm not going to take $4 for a hamburger.

My price is $12.

The seller can do that.  It's a willing buyer/willing

seller situation.

Mr. Deal had a different hypothetical.  He said -- again,

a silly hypothetical.  Let's say you've got your hamburger

outside the courtroom.  Hamburger place outside the courtroom

that charges $12.  But let's say there's a certain forced

element now.  So the jurors, all of you, are told as a

condition of jury service, You must buy a hamburger after 1:00

1    each day.  You must go to that one place and you must buy a

2    hamburger.

3        Well, of course, you would want to be protected against

4    price gouging.  Because you've got no choice.  You're being

5    told I've got to go to that hamburger place.  I have no choice.

6    So if the law were to say -- the law were to protect you and

7    say, Well, all you have to pay is the going market rate in the

8    geographic area for that hamburger.  Now, do you have to pay

9    the $12?  Well, if the going market rate for a hamburger in the

10   area is $4, then that's all that you are required to pay.  And

11   it doesn't matter whether Juror Number 1 or Juror Number 2

12   voluntarily the day before bought a hamburger at $12.  That's

13   irrelevant.

14       The point is that when you are going there in a forced,

15   compelled situation, and the law is saying all you need to pay

16   is the going market rate in the geographic area, at that point

17   you are protected.  You're protected even if you had paid $12

18   voluntarily the day before or the week before.  But when you

19   are forced into the transaction, that's where the protection

20   comes in, the market rate protection.

21       The other area of law that I wanted to touch on briefly is

22   the burden of proof.  The burden of proof here is on NorthBay.

23   The burden of proof is on NorthBay to prove by a preponderance

24   of the evidence the reasonable value of the services at issue.

25       What does this mean?

1    This means that it was NorthBay's burden in this case to

2  prove the market rate for the services in the geographic area.

3    If we go back to jury instruction number 1 (indicating):

4  Wide variety of evidence reflective of the market rate for

5  services in the geographic area.

6    That was NorthBay's burden here.  So the question is, did

7  NorthBay carry its burden to put in evidence from which you

8  could -- from which you could find the reasonable value of the

9  services, the market rate of the services, in the geographic

10  area?  Did they do that?

11    They didn't.  Mr. Heil has admitted to you that he did not

12  perform a regional market analysis.  I asked him that question

13  I think three or four times in cross-examination.

14    And here from the trial transcript at page 460 I said:

15  Mr. Heil, to be very clear, what payors are paying other

16  hospitals in the geographic area was not used in your

17  mathematical value in this case, is that right?  That is

18  correct.

19    And I asked him again:  What other hospitals in the

20  geographic area are accepting for their services was not used

21  in the calculation of reasonable value in this case?  That's

22  correct.

23    I asked him a question again:  Mr. Heil, your analysis

24  does not seek to measure the reasonable market value of the

25  emergency services in each geographic area, does it?  Answer:

It seeks to evaluate the reasonable value of the services in dispute here at NorthBay.

I clarified. Let me ask the question again. Mr. Heil, your analysis does not seek to measure the reasonable market value of the services in the geographic area, correct? Answer: Just at NorthBay.

I'm not usually this persistent, but I really wanted an answer to that question and so I asked it yet again.

And I said, So the answer to that is my statement is correct. Your analysis does not seek to measure the reasonable market value of the services in the geographic area, correct? Mr. Heil finally answered the question. He said, That's correct.

So in a case where NorthBay had the burden of proof to prove the market rate for the services in the geographic area, its expert did not do that analysis. It didn't.

So what did NorthBay do? NorthBay had analysis that had three components. Factor one, factor two, factor three.

Factor one. One-third of its analysis was what did one seller, NorthBay, used to get from one buyer, Blue Shield, under a now terminated contract? Tells you nothing about the market rate for the services in the geographic area.

Factor two. He looked at what did one seller, NorthBay, get or used to get, in the case of Kaiser, from a small fraction of buyers? Again, doesn't tell you anything about the

1   market rate for the services in the geographic area.

2       Mr. Heil's third analysis.  What NorthBay and regional

3   hospitals charge, their billed charges -- again, I'll go into

4   all of that -- says nothing about the market rate for the

5   services in geographic area.

6       So summing it all up just briefly before going into

7   Mr. Heil's analysis in more detail.  Special instruction number

8   1 for reasonable value required Mr. Heil -- required NorthBay

9   to determine the market rate for the services in the geographic

10  area.

11      What is the regional rate?  Again, to protect Blue

12  Shields, to protect the patients.  All we're entitled to pay is

13  the going rate for those services in the geographic area.  And

14  Mr. Heil says:  I didn't do that analysis.  The only evidence

15  -- the only evidence of the market rate for the services in

16  geographic area came from Mr. Deal in this case.

17      Mr. Tooch said something this morning in his closing.  He

18  said Blue Shield doesn't want to pay what the market is paying.

19  That's what he told you just a few minutes ago.  That couldn't

20  be more wrong.  That is exactly what Blue Shield wants in this

21  case.  Blue Shield, for these services, wants to pay the

22  regional going market rate for the services in the geographic

23  area.  That's exactly what Blue Shield wants to pay.  And all

24  of Blue Shield's analysis was an attempt to try to figure out

25  what that rate was.

1    Let's just do a gut check here before getting into these

2  rates in more detail as to sort of where we are in terms of

3  orders of magnitude.

4    I'm going to present to you -- I'm going to go through

5  with you in a few minutes -- Mr. Deal's analysis where he

6  showed that through published findings, as well as through

7  studies of Blue Shield's data, as well as studies of Optum

8  data, and OSHPD data, that if one is looking at what the

9  regional area hospitals are getting for these services from

10  private payors, you see different values ranging from about 3.3

11  to 4.1 times Medicare.  That's only if you look at what the

12  hospitals are selling to one segment of the market.  To private

13  payors.

14    And if you're looking at what the comparable hospitals in

15  the geographic area, including NorthBay, if you're looking at

16  what NorthBay and the hospitals in the area are getting for

17  these same services from all of the buyers that they sell to,

18  that turns out to be between 1.8 and 2 times Medicare.  And

19  I'll go into that in more detail.

20    And just sort of as a gut check right now, because a lot

21  of this is common sense, Mr. Heil's analysis is notwithstanding

22  that data; that he's urging you to determine that reasonable

23  value is 13.1 times Medicare.  13.1 times Medicare.

24    So when a Medicare patient comes in and NorthBay sells

25  that MRI for $1,000, he's saying that you should determine that

1  the reasonable value for that same MRI machine when a Blue

2  Shield member uses it in an emergency is $13,100.

3     Let's look at Mr. Heil's analysis.  Again, he did three

4  things.  He looked at the terminated Blue Shield contract.  He

5  looked at some other small contracts, and we'll get to that in

6  a few minutes.  Then he did a billed charge analysis to get to

7  88 percent.  88 percent of billed charges, again, that's 13.1

8  times Medicare.

9     Let's first talk about his factor 1, which is the

10 terminated Blue Shield contract.  What he does is he takes the

11 highest value from that contract, which is 80 percent, and adds

12 another 15 percentage points to it.  And the fact is that you

13 heard copious testimony -- and I'll get into that in just a few

14 minutes -- the reason Blue Shield agreed to pay those rates in

15 2008 and for the life of that contract related to market

16 conditions that changed and that related to the tremendous

17 value associated with having a full network contract.  Blue

18 Shield being able to market its products in Solano County with

19 NorthBay in network.  A value of that Blue Shield doesn't have

20 anymore.

21    And Mr. Deal told you that when you look at an old

22 contract, that one looks at -- you would look at the benefits

23 to the hospital and the benefits to the payor.  Mr. Heil never

24 did that.  He didn't look at -- he told you that he didn't do

25 any analysis of the benefits to Blue Shield.  That he didn't

sort of drill down into the particular market to say how
valuable was it for Blue Shield to have that market analysis --
sorry -- that network contract?  He didn't talk to the customer
base to determine how important is it to you when you're
purchasing policies to have NorthBay in network?  Would you
even consider a plan that didn't have NorthBay in network?  He
didn't do any of that.

     But you did hear testimony from Mr. Barnes.  And
Mr. Barnes said that -- and he was very candid -- he said that
all other things being equal, Blue Shield wanted its members to
have access to care locally.  It wanted to have that NorthBay
arrangement.  Blue Shield did not want to terminate that Blue
Shield arrangement.  Mr. Barnes told you that.

     I did ask Mr. Heil about the Blue Shield value.  I asked
him.  I said:  So when Blue Shield used to have that contract
in place it got to advertise to buyers, to purchasers, to
employer groups, to CalPERS, to individuals.  It got to say to
them:  If you live in Fairfield and Vacaville and you get to go
to NorthBay for your elective services and pay the low
in-network rate.  And Mr. Heil agreed, yes, that is a benefit
Blue Shield used to have.

     I asked him.  I said, Does Blue Shield have that benefit
anymore?  When Blue Shield is marketing its products now to
people who live in Fairfield and Vacaville, does Blue Shield
get to say you can go to NorthBay for your elective services at

1    low in-network rates?  Mr. Heil agreed with me.  Blue Shield

2    doesn't have that benefit anymore.

3        Again, so those rates that Blue Shield were paying under

4    the old contract, Blue Shield's not getting the benefit for

5    those rates anymore.  That doesn't exist.

6        And Ms. Eichenberger was asked, as well, if you look at

7    the last question and answer:  Is it true that a Blue Shield

8    member, where NorthBay is no longer contracted, would not have

9    access to NorthBay's elective services?  And she agreed.  Not

10   without a specific authorization or agreement.  No, they

11   wouldn't.  So all of those great services, the cancer services,

12   the wellness center, the other services that were sort of

13   testified to, Blue Shield members don't have access to that

14   anymore.

15       Mr. Barnes also told you that NorthBay's situated in a

16   very unique situation.  He's the contracting director at Blue

17   Shield.  He knows this market.  Mr. Barnes said there are not

18   any competitors right in the market, the competitors are far

19   away, there's a travel distance, and so members perceive there

20   being a great value having NorthBay in network.

21       Mr. Barnes candidly said, These are clients that we don't

22   get anymore.  The people who want care locally, the people who

23   don't want to have to travel to Davis or travel to Napa to go

24   to a hospital, they're not buying those Blue Shield products

25   anymore.  So that old rate that NorthBay wants to use and then

1   add 15 percentage points to it, Blue Shield's not getting the

2   value anymore out of that contract.

3      And Blue Shield also -- remember the jury instruction says

4   the one thing we do is we look at willing buyer/willing seller

5   transactions at current market prices?  So what you want to do

6   is you want to look at what are these services being sold for

7   during the disputed period in willing buyer/willing seller

8   transactions?

9      Well, Blue Shield was not a willing buyer/willing seller

10   at that old contract price.  That's not a current market price.

11   That's an old market price based on old conditions.  And

12   Mr. Heil agreed that one does not have a willing buyer/willing

13   seller transaction once the contract ends and there's no

14   agreement as to price.  He agreed on that.

15      So is the old Blue Shield contract, is that a willing

16   buyer/willing seller transaction at current market prices?

17   Does that reflect a willing buyer/willing seller transaction

18   for the 2017-2018 period?  It doesn't.

19      Mr. Barnes agreed.  Same thing.  As of December 1, 2016,

20   Blue Shield was not a willing buyer of NorthBay's services at

21   80 percent.

22      And Blue Shield testified -- you heard evidence, ladies

23   and gentlemen, of what happened with that contract.  Why Blue

24   Shield terminated the contract.  And Mr. Heil agreed that

25   market changes matter.  I asked him.  I asked him, If you're

 1  going to look at an old transaction and you're actually going
 2  to give it some weight -- and I'll argue in a minute that this
 3  really shouldn't be given any weight, but even if you were --
 4  would you want to know?  Would you want to know whether the
 5  conditions that caused Blue Shield to pay those kinds of rates
 6  before when those are still applicable?  Would that be
 7  important to you?  Mr. Heil said, Yeah, it would be.  But he
 8  didn't look at that.

 9        So let's talk about the changed market.  Mr. Barnes told
10  you that back in 2008 Blue Shield had an exclusive CalPERS
11  arrangement.  CalPERS offered two products; the Kaiser product,
12  and then for people who didn't want to use Kaiser it offered
13  Blue Shield.  And Mr. Barnes told you that Blue Shield made
14  commitments to CalPERS to have NorthBay in network so that
15  CalPERS members who lived in the Fairfield-Vacaville area would
16  have access to care locally.  They wouldn't have to travel.  So
17  Blue Shield's big customer, CalPERS at the time, the evidence
18  was, that Blue Shield made the commitment to CalPERS, which is
19  why it entered into the contract.

20        Mr. Barnes told you that situation changed over the course
21  of years.  CalPERS, instead of having an exclusive relationship
22  with Blue Shield, decided to go to competitive bidding.  Blue
23  Shield lost a lot of its CalPERS business.  The volume dropped
24  as a result of that.  And so the market circumstances that
25  might have made sense for Blue Shield to enter into this

1    contract back in 2008 started not to apply anymore.

2         Mr. Barnes also told you that the Affordable Care Act

3    became effective in 2014, and the data relating to all of that

4    became sort of -- Blue Shield started accumulating that data

5    and seeing the results in 2015 when they started to reevaluate

6    the NorthBay arrangement.

7         And Mr. Barnes told you the Affordable Care Act brought in

8    a series of people who were much more price sensitive.  A lot

9    of these people didn't have insurance before, were being

10   brought into the market.  Now you're not talking about big

11   employer groups like CalPERS.  You're talking about individuals

12   and family buying health insurance who were very price

13   sensitive.

14        And they wanted to be involved in Covered California.

15   Blue Shield didn't want to pull out of Covered California.  It

16   felt it had an obligation to the state and to Californians to

17   participate in that product.  And it wanted to offer affordable

18   health care to people who were very price sensitive.  And Mr.

19   Barnes told you that the rates that they were getting from

20   NorthBay just didn't allow Blue Shield to do that.

21        And so Mr. Barnes said that in evaluating the new dictates

22   of the Affordable Care Act, and the desire for Blue Shield to

23   offer affordable health coverage to Californians under the

24   Affordable Care Act, and with the changes in CalPERS, the

25   contract just didn't make any sense anymore to Blue Shield.  It

1   couldn't -- the price strategy didn't make sense.

2       Mr. Tooch said something a few minutes ago, Well, does

3   that mean Blue Shield can't compete with other health plans?

4   That's not the case.  Blue Shield made a decision that in order

5   to offer affordable health coverage in the region, that those

6   prices were too high.  And it also saw, Mr. Barnes said, when

7   it looked at the data that NorthBay was offering better deals

8   to other people that it wasn't giving to Blue Shield.  Now,

9   Blue Shield didn't have the ability of looking at the data to

10  see who it was, but we saw a some of that here.

11      We saw NorthBay had a contract with HealthMed at the same

12  time for 38 percent of billed charge, when it was charging Blue

13  Shield 80 percent.  And Mr. Heil told you this morning that

14  HealthMed was a low volume buyer.

15      So they had contracts with other people in place at far

16  more advantageous price points than Blue Shield.  And Blue

17  Shield saw that through the data and decided that it couldn't

18  continue that anymore.

19      Mr. Barnes also told you that the market had changed in

20  other respects.  Remember that old contract Blue Shield only

21  got credit for inpatients?  And Mr. Barnes told you that over

22  the course of the contract a lot of services that used to be

23  inpatient services now are done on outpatient; and Blue Shield

24  wasn't getting credit for any of that volume in terms of

25  lowering the rate.  So the contract, again, as medicine changed

1    over the years, that contract didn't make sense anymore.

2        And this is just some more testimony from Mr. Barnes

3    explaining that under the changes in medicine, that contract

4    became outdated because it only related to inpatients; whereas,

5    a lot of Blue Shield's volume to NorthBay that used to be

6    inpatient was now being handled on an outpatient basis.

7        In Mr. Heil's original testimony he was asked:  Well, is

8    it important why someone buys a product at a particular price

9    or not?  He said, No, it's not important.  Then in

10   cross-examination I asked him that question.  And I said:

11   Mr. Heil, wouldn't you want to know if you were looking at the

12   reasons why someone paid a certain amount under a contract,

13   wouldn't you want to know whether those conditions -- that

14   those market forces were still applicable?  And he then at that

15   point sort of conceded.  He said, Yeah, I'd want to know as

16   much as I could.  I'd want to know as much as I could.  And he

17   said, again:  I would want to know as much as I could about the

18   market then -- the market now and then.

19       But Mr. Heil didn't do that analysis.  He made no attempt

20   to determine whether the market conditions had changed.

21       Another issue that is relevant here is -- let's think

22   about this a little bit -- one-third of Mr. Heil's analysis is

23   what did Blue Shield used to pay?  What did Blue Shield used to

24   pay?  And what that means is that his reasonable value

25   calculation is unique to Blue Shield.  Because if he were doing

1  that same -- Mr. Heil admitted if he were doing that same

2  valuation, what is the reasonable value of that MRI machine,

3  but the patient were not a Blue Shield member but covered by

4  another plan that had a different course of dealing, Mr. Heil's

5  number would change.

6      So let's say Health Net no longer can a contract, and a

7  Health Net patient came in.  And that patient -- the prior

8  course of dealing instead of being 80 percent is 38 percent.

9  Mr. Heil said, Yeah, I would do that same analysis and I would

10  come out at a different reasonable value price.

11      And so Mr. Heil's analysis, which is looking at sort of

12  the old Blue Shield contract, what does that mean?  What is the

13  implication?  Does that get you to a single market rate for

14  services in the geographic area for that MRI?  It doesn't.  It

15  doesn't.  His analysis is idiosyncratic.  It gives you only the

16  market rate for that particular patient insured by that

17  particular health plan.

18      His analysis doesn't give you a single market rate in the

19  geographic area.  It doesn't even attempt to do that.  And I

20  asked him that.  I said:  Under your reasonable value analysis,

21  the reasonable value of that exact same procedure, that stent,

22  that MRI, would be different for each of those patients.  Do

23  you remember that example?  I gave him the example of patients,

24  one of whom was a Blue Shield, one of whom was covered by a

25  different carrier.  And he answered:  Yeah, it would be.

1    And then I asked him.  I said:  That same procedure, that

2  stent, that MRI, you would come up with a different reasonable

3  value calculation depending on which hospital it was?  And he

4  said:  Yes, I would.  And so I asked him.  I said:  So when you

5  do your reasonable value analysis, there is no one market rate

6  for the services in the geographic area.  You're not -- he's

7  not trying to establish a regional market rate.

8    I asked him.  I said:  So your reasonable rate analysis

9  would mean that the rate would differ.  The reasonable rate

10  would differ.  The market rate would differ depending on who

11  happens to be covering the patient, who's ensuring the patient,

12  and where the procedure was done.  And he said:  Yes.

13    And that's really, isn't it, the more fundamental point?

14  The more fundamental point is that if -- your job is to

15  establish what is the regional market rate?  What is the market

16  rate in the geographic area for that service?  And a regional

17  market rate doesn't depend on what one seller does with one

18  buyer.  It just doesn't.

19    In determining the market rate for the services, what

20  you're doing is you are looking at -- what you should be

21  looking at, we would urge, is all the data relating to what

22  that service is being sold for by all the sellers in the region

23  to all the buyers in the region to determine what the market

24  rate is.  And knowing what one buyer used to pay -- used to pay

25  one seller, it doesn't tell you anything about that.

1    Now Mr. Deal uses -- he uses individual buyer

2   transactions, but he puts them all together.  He says, Okay,

3   NorthBay, you sell that MRI to a lot of different buyers, what

4   are you selling it for?  He looks at the other hospitals in the

5   geographic area and he says, You're selling that MRI to a bunch

6   of buyers, what are you selling it for?  He pulls that data all

7   together to come up with the regional market rate for that MRI.

8    And lastly, I asked Mr. Heil, I said, Knowing what one

9   buyer bought -- this is the Camry example I gave him -- but

10  knowing what one buyer bought a car for five years earlier, or

11  even two years earlier, or even one year earlier, or even six

12  months earlier, it doesn't matter.  The time doesn't matter.

13   Would that tell you anything about the fair market value

14  of that car in the geographic area as sold to all buyers?

15  Mr. Heil conceded.  He said, That's correct, it does not.  It

16  does not.

17   And so to sum it up, I asked him on this first factor, I

18  said:  Mr. Heil, this analysis you did of the old Blue Shield

19  contract, does it in any way measure the rates paid to or

20  accepted by other hospitals in the geographic area?  And he

21  said, No, it doesn't.

22   So if we're looking at NorthBay's burden of proof here,

23  NorthBay's burden of proof to establish the market rate,

24  singular, of the services in the geographic area, he had three

25  factors.  We've just talked about one factor and Mr. Heil just

1  acknowledged that that factor didn't even attempt to measure

2  the rates paid to or accepted by any other hospital in the

3  geographic area.  He admitted that to you.

4      Let's look at factor 2.  Factor 2 was the terminated

5  Kaiser contract, those rental networks.  And the Kaiser

6  contract I'm not going to spend much time on that other than to

7  say that like the old Blue Shield contract, that's a terminated

8  arrangement.  There was evidence that Kaiser and NorthBay are

9  in litigation, that Kaiser is not paying those rates anymore.

10 That contract ended in 2015.  It is not a current market price.

11 And Mr. Heil agreed that one does not have a willing

12 buyer/willing seller transaction once the contract ends and

13 there's no agreement as to price.  So is that contract evidence

14 of current market pricing for the disputed period?  It's not.

15     You heard a lot about these rental networks, the MultiPlan

16 arrangement.  And the point here is that these are hardly ever

17 used.  These are, as Mr. Deal said, sort of like a AAA

18 discount.  That MultiPlan goes out to hospitals and negotiates

19 a minor discount off the billed charges, and the health plans

20 and insurers, if they sign up with MultiPlan, they get to

21 decide.  They get to look at the rate and say, You know what?

22 Do we want to pay it?  Do we not want to pay it?  They're not

23 obligated.  They're not forced into anything.

24     And those contracts are hardly used because really they're

25 just such a small discount off of billed charges.  Those rates

1  are really high.

2      So I'm not going to spend much time talking about those

3  arrangements.  You heard a lot about them.  There's no direct

4  contract between Blue Shield and NorthBay or between any other

5  entity and NorthBay.  Blue Shield is contracting with

6  MultiPlan.  NorthBay is contracting with MultiPlan.  And Blue

7  Shield gets to decide, Do we want to use the MultiPlan rate or

8  don't we?  And that's all that arrangement is.

9      Mr. Heil acknowledged that -- the end users that pretty

10  much use these rental networks are not your Blue Shields, your

11  Blue Crosses, your Aetnas.  But they're pretty much

12  out-of-state payors.  Largely, small payors who really sort of

13  use it only if one of their members is traveling in California.

14  The volume is low.  The rate is less important because it's

15  only one transaction.  And so he acknowledged that these rental

16  networks are largely used for these out-of-state payors.

17      And Ms. Eichenberger acknowledged, as well, that if one of

18  these patients is treated at NorthBay, the payors -- she was

19  asked:  Do they have to use a MultiPlan contract?  She said:

20  No.  Mr. Heil acknowledged that these are low usage contracts,

21  as the evidence showed.  Mr. Deal showed you that, as well.

22      And so, again, you know, this factor 2 of Mr. Heil's

23  analysis, which is the Kaiser contract, the MultiPlan

24  contracts -- and if you look at these rental networks and

25  letters of agreement, I think Mr. Deal said that they represent

1 .6 percent of NorthBay's sales.  So when NorthBay is selling

2 that MRI machine to 1,000 patients, the rates that he was using

3 for these rental networks and for the letters of agreement

4 represent 6 sales out of 1,000.  And he's not looking at the

5 other 994.

6      And Mr. Heil acknowledged.  He said:  Look, the reason why

7 I'm even looking at these is just because NorthBay has a

8 contract with MultiPlan, with First Health, and with PHCS.  Mr.

9 Heil said:  Look, even if these rates were so high that not a

10 single payor ever wanted to pay them, he still would have used

11 them.  He still would have used them.  So the only reason that

12 he used those rates is simply that NorthBay entered into a

13 contract with MultiPlan and these entities, even if those rates

14 were so high that no one ever wanted to use them.

15      And on these one-off agreements, Mr. Heil ignored a number

16 of the agreements.  But again, these are just agreements that

17 were rarely used and represent just a tiny fraction of

18 NorthBay's business.

19      And I asked Mr. Heil again for this factor number 2.  I

20 said:  Mr. Heil, like I did with factor 1, the old Blue Shield

21 contract, I said, when you were measuring what NorthBay does

22 with these rental networks and with Kaiser -- what you used to

23 do with Kaiser -- were you measuring in any way the rates that

24 were paid to or accepted by any other hospital in the

25 geographic area?

 1    I asked him this question.  I said:  Mr. Heil, did you do

 2  this analysis (indicating)?  In this factor number 2, did you

 3  do the analysis?  Does it get us anywhere?  And he said:  I did

 4  not.  He said:  That's correct.  Factor 2 does not in any way

 5  measure the rates paid to or accepted by any other hospital in

 6  geographic area.  It is NorthBay only.

 7    And again, think of the burden of proof.  NorthBay has the

 8  burden of proof.  We've gone through two factors.  The Blue

 9  Shield contract, and these rental network contracts.  Mr. Heil

10  admitted to you for both of those factors that he didn't do the

11  analysis.  He did not -- neither of these factors sought to

12  establish what the regional rate is in the geographic area for

13  those services.  What in the region, in the geographic area,

14  are MRI's being sold for by hospitals?  Neither of these

15  factors get to that.

16    His last analysis, again -- remember, NorthBay's burden of

17  proof.  His last analysis relates to the hospitals billed

18  charges.  And here for the first time, and the only time,

19  Mr. Heil looks past NorthBay.  He looks at other hospitals

20  here.  And he says:  I'm going to look at NorthBay's billed

21  charges.  I'm going to look at the other hospitals' billed

22  charges.  And here he does a survey.  But he looks at the wrong

23  thing.

24    If you were doing an analysis as to what is the market

25  rate for the services, the actual market rate for the services,

1  looking at billed charges doesn't tell you anything.  Yeah,

2  some people may pay billed charges, other people may not pay

3  billed charges.  You're not getting any information from that

4  factor as to what is the actual going rate for the services?

5  All you are getting is what is the list prices for the

6  services.  It doesn't tell you anything about the market rate

7  for the services in the geographic area.  Nothing.

8      Just like, as Mr. Deal said, if you were doing a survey of

9  house prices in San Francisco, does knowing what the list

10  prices for the houses -- does that tell you anything about the

11  sales prices?  Does that tell you anything about the actual

12  market value of the houses?  It doesn't.

13      In order to find the actual market value of the houses, or

14  anything for that matter, the actual market value for Camrys,

15  the actual market prices for anything, you have to look at what

16  are those products or services actually being sold for.  Not,

17  what is the seller listing its hoped for.

18      And in this third analysis, this is the last analysis that

19  NorthBay did, they didn't do anything to tell you what the

20  going market rate was for the services in the geographic area.

21      And I asked Mr. Heil on this third one.  I said:  In

22  coming up with your analysis, I said to him, you didn't think

23  that the rates that were agreed to between payors and other

24  hospitals other than NorthBay should be used in the calculation

25  of reasonable value?  He said:  Correct.

1    I asked him, essentially:  Do you agree that the going

2  rate for the services, what these hospitals actually accept in

3  the geographic area, did you think that that's relevant?  And

4  he said:  No.  He said:  No.

5    I asked him again.  I said:  Mr. Heil, what other

6  hospitals -- what other hospitals in the geographic area are

7  accepting for their services was not used in the calculation of

8  reasonable value in this case.  And he agreed.  That is

9  correct.

10    And then I asked him again focusing on this last factor of

11  his.  I said:  It is true, is it not, that a hospital's billed

12  charges, if not paid by payors, that those don't reflect

13  willing buyer/willing seller transactions, right?  And he said:

14  That's correct.

15    So he agreed in two things here.  He said, number one:  I

16  didn't undertake an analysis as to what hospitals in the

17  geographic area were actually getting for these services.  I

18  didn't do a regional market analysis.  He didn't do it.

19    And then he agreed that what he did do, which is looking

20  at hospital billed charges, does not reflect willing

21  buyer/willing seller transactions, as you are required to look

22  at in factor number 2.

23    So that's the sum total of the evidence presented by

24  NorthBay in this case.  Three factors.  Mr. Heil admitted that

25  not one of the three factors ever actually got to or answered

1    the question here which is:  What is the actual going rate?

2    The actual market rate for the services in the geographic area?

3         I want to pause here and just say that while Mr. Heil did

4    look at billed charges, there are actually some interesting

5    observations that come from that.  Number one, that NorthBay's

6    billed charges are really high.  And no one's disputed that.

7    This is a high-charging hospital.  In fact, their charges are,

8    Mr. Deal determined, to be double the charges for the

9    comparable hospitals in the geographic area.

10            **MR. TOOCH:**  Objection.  No evidence on that.

11            **MR. PIMSTONE:**  There actually was.

12            **THE COURT:**  Overruled.

13        Ladies and gentlemen, just remember that what the lawyers

14   say isn't evidence.  They're presenting their perspective on

15   what has been presented to you.  And it's your memory and

16   understanding of the testimony that controls.

17            **MR. PIMSTONE:**  So what you're seeing here in this

18   particular slide is Mr. Deal's testimony that through the OSHPD

19   analysis it showed that NorthBay's billed charges are nearly

20   twice as high as the comparable hospitals that he used in the

21   geographic area.

22        And Mr. Deal actually told you that he did an analysis.

23   He took Mr. Heil's list of comparable hospitals, which is

24   slightly different than Mr. Deal's.  Mr. Deal said:  Look, what

25   are those hospitals actually getting in the OSHPD data for

1  their services?  And he found that those hospitals actually got

2  between 2.6 and 2.8 times Medicare.  So when you didn't look at

3  their billed charges but you looked at what they were actually

4  getting for their services in the geographic market, that it

5  turned out to be 2.6 to 2.8 times Medicare which is roughly

6  what Mr. Deal's comparable list of hospitals got as well.

7       You heard a lot in this trial about these full network

8  contracts that NorthBay had with Blue Cross and Aetna and

9  Cigna.  And I asked Mr. Heil.  I said:  In looking at your

10  three factors, I didn't see that you used those rates at all.

11  And I asked him.  I said:  Did you factor those contracts

12  mathematically into your reasonable value calculation?  And he

13  said he did not.  I asked him.  I said:  You've stated in your

14  report you believe it would not be proper to conduct a

15  reasonable value analysis factoring in those full network

16  rates.  And he agreed.  That it wouldn't be proper.

17       So again, the evidence that you heard from Mr. Heil didn't

18  have anything to do with these Blue Cross or Cigna or Aetna

19  contracts.  It had to do with the rental networks, the old

20  Kaiser agreement, and the old Blue Shield agreement, and billed

21  charges.

22       You heard Mr. Tooch talk this morning again about

23  NorthBay's quality, about these various offerings that NorthBay

24  had.  And neither -- but the fact is that neither Mr. Heil nor

25  Mr. Deal factored quality into reasonable value calculation.

 1    And why is that the case?

 2        That's the case because, again, think about myself or

 3    yourself if we're taken to the emergency room, we're not

 4    picking that emergency room.  We're not picking -- we're not

 5    picking the particular doctor who's treating us.  And if just

 6    by random chance the place you get taken to believes that

 7    they're high quality and in their elective business gets three

 8    times what the market gets, you don't have to pay that as an

 9    emergency patient because you didn't make the choice, the

10    voluntary choice, to go to a place that's getting three times

11    as much.  You didn't make the voluntary choice to be treated by

12    a doctor who in her elective practice, you know, believes she's

13    high quality and charges more for it.

14        You are protected in the emergency context by only having

15    to pay the regional market rate.  And if all you need to pay

16    for emergency services is the regional market rate, then what a

17    particular provider thinks about its own quality at that point

18    doesn't matter.  Right?  Because all you need to pay for is to

19    be competently treated to treat your emergency condition and it

20    doesn't matter whether that provider, in some other context

21    when people are choosing to go to them and have the choice to

22    pay those higher rates, it doesn't matter that that doctor or

23    that hospital is able to get higher rates because of any

24    perceived quality issues.

25        As an emergency patient, you're not making that voluntary

1    choice to go to that entity.  You're not making that voluntary

2    choice to go to that doctor.  So all you have to pay is the

3    going market rate.  So quality's just irrelevant.  Mr. Heil and

4    Mr Deal didn't adjust their calculations at all based on

5    hospital quality.

6        And I asked Mr. Heil.  I asked him whether he made any

7    determination that any particular patient who was in the

8    disputed set here, did any of them get taken to NorthBay

9    particularly because of NorthBay's -- any unique offering of

10   NorthBay?  We've heard a lot about the NIC-U unit, we've heard

11   a lot about sort of other cancer centers.  I asked him:  Did

12   you make any analysis that any particular patient went to

13   NorthBay because NorthBay had some particular offering that

14   another hospital didn't?  He said:  No, I didn't consider that

15   at all.

16       And I asked him.  I said:  Would you agree that the

17   reasonable value should not be mathematically altered one way

18   or the other based on hospital quality?  And he said:  Yeah.  I

19   haven't modified my opinion based on quality.

20       And you heard from Mr. Pugh.  And he looked at a bunch of

21   objective metrics.  Because, look, the reality is if you put

22   any hospital executive up there from any hospital they're going

23   to talk about how high quality they are.  And even if quality

24   were relevant -- and it's not for the reasons I've explained --

25   Mr. Pugh's analysis was NorthBay was pretty average.  There

1  were some measures it did better in, some measures it did worse

2  in.  But on average, NorthBay was a pretty average hospital.

3      So what I've done is I've talked right now about the case

4  that NorthBay built and whether NorthBay satisfied its burden

5  of proof to tell you what is the market rate for the services

6  in the geographic area.

7      And the answer is, it didn't.  But Blue Shield did make an

8  attempt to do that.  And Mr. Deal told you sort of how he built

9  his analysis.  He looked at OSHPD data.  You've heard a lot

10  back and forth.  You heard Mr. Deal's response to Mr. Heil when

11  Mr. Deal testified.  And he said that the OSHPD data is

12  commonly used in these kind of analyses.  It's the standard in

13  the industry.  He said that it includes, even in the commercial

14  database, it includes a small percentage -- he said under

15  4 percent in NorthBay's case -- of government business.  Of

16  military dependents, workers' compensation.

17      Now, even those are willing buyer/willing seller

18  transactions.  But to the extent that NorthBay tried to sort of

19  indicate that some percentage of the database related to these

20  other programs, Mr. Deal said:  I looked at NorthBay's data and

21  it was under 4 percent.

22      So it's really a *de minimus* amount.  Mr. Deal told you --

23  we don't have to read this entire text.  You remember his

24  testimony.  He told you that -- again, this is just going to

25  the fact that a very small percentage of the OSHPD data relates

1  to these other programs.

2      So what did Mr. Deal do in determining market value?

3  Well, the one thing he did was he looked at -- exactly what the

4  jury instruction said -- he looked at the market rate for the

5  services in the geographic area and he built his hospitals.  He

6  said:  Okay, I'm going to sort of pick a hospital set to go

7  from.  And because we need to look at all willing buyers and

8  all willing sellers, he said, I'm going to look at who the

9  willing sellers are, which is the hospitals, and I'm going to

10  look at who the buyers are.  The buyers are Medicare, Medi-Cal

11  and private payors.  And he looked at all of those.

12      And there was a lot of discussion here over the course of

13  the last week about, Well, when you look at willing

14  buyer/willing seller transactions should you look at only what

15  hospitals are selling to patients who are insured by private

16  entities like Blue Shield or Blue Cross?  Or should you also

17  consider what hospitals are getting when they sell their

18  business to Medicare and Medi-Cal, as well?

19      And that's an interesting question.  We give you both

20  answers.  We work out the values in both directions.  And

21  ultimately, the evidence was in this case that NorthBay does

22  not have to be a participating provider in Medicare or

23  Medi-Cal.  Ms. Eichenberger acknowledged that she doesn't

24  believe that they do.

25      And so what Mr. Heil tells you is, Well, yeah, they don't

1  have to be, but practically speaking a lot of hospitals that's

2  just what they do.  And so that doesn't make -- that's not a

3  willing buyer/willing seller transaction.

4      So in the coffee cup example, if I'm selling half of my

5  coffee cups to the government and half of my coffee cups to

6  non-government sources, those are both willing buyer/willing

7  seller transactions.  And the fact that the government may not

8  negotiate, that doesn't matter.  If the government is not

9  negotiating rates, and I'm still choosing to sell to the

10 government, that is where the willing buyer/willing seller

11 piece of it comes in.  Just like if I were selling to

12 Starbucks, and Starbucks didn't want to negotiate.  And I said,

13 Well, fine.  I'll take your rate.  That would still be a

14 willing buyer/willing seller transaction.

15     So when one is looking at what is the regional market rate

16 for the services, when one is looking at what is that MRI being

17 sold for for all people who are using the MRI in the region?

18 If NorthBay is selling that MRI 80 percent of the time to

19 people who are covered by the Medicare and Medi-Cal, and it's

20 agreeing to accept that price in willing buyer/willing seller

21 transactions, then that counts just as much as anything else.

22     And the fact that NorthBay may think, Well, you know what?

23 Practically speaking it would be difficult for us not to accept

24 Medicare because we've got beds to fill, we've got doctors we

25 need to have on staff.  Again, those are considerations that go

1  into whether it makes sense for NorthBay as a business to do

2  business with Medicare.  That doesn't make it not a willing

3  buyer/willing seller transaction.  That just suggests that

4  NorthBay has made the calculation that, Yes, in order to get

5  the doctors we want to practice at our hospitals, and in order

6  to fill the beds that we need to fill, that's -- those are

7  sales we want to make.  And the fact that NorthBay doesn't get

8  to negotiate those rates doesn't make it a forced transaction.

9  It is still a willing buyer/willing seller transaction.

10      So what Mr. Deal did is he explains here in his testimony

11  why Medicare and Medi-Cal are still willing buyer/willing

12  seller transactions.  That the hospitals have choice whether to

13  sell to those entities, those buyers, or not.

14      And Mr. Deal looked at the comparable hospitals in the

15  region.  Because, again, the task is to determine the going

16  market rate.

17      What did he look at?  He looked at published studies, he

18  looked at OSHPD data, he looked at Blue Shield data, he looked

19  at Optum data.  He looked at a variety of different data;

20  that's including Optum I think he used as a cross-check.

21      What did he tell you?  Mr. Deal told you that OSHPD is the

22  industry standard with respect to examining hospital pricing.

23  All hospitals report their charges and their payments to OSHPD

24  and that it's commonly used by experts like him in determining

25  regional pricing.  He said that OSHPD takes into account

1 additional amounts received by hospitals so it does reflect

2 willing buyer/willing seller transactions.

3     And Mr. Heil seemed to agree with that this morning.  He

4 seemed to acknowledge that when there are settlements that are

5 made, those settlements are reported in the OSHPD data.

6 Mr. Heil noted that in some cases there may be a time lag.  So

7 a service maybe that was offered a few years ago, maybe a

8 settlement in subsequent year.  And I think Mr. Deal's

9 testimony is it all comes out in the wash.  That if you're

10 looking at a large data set with lots of hospitals and tens of

11 thousands of charges, each year you'll have additional payments

12 that those hospitals are receiving and reporting.  They may

13 relate to that year or they may relate to the prior year.  But

14 the data set, the dollars that are being reported by the

15 hospitals include those settlements and include amounts.  So it

16 all comes out in the wash.

17     Mr. Deal said that denials are a small percentage.

18 Medicare -- and Medicare denies, too.  So if you're comparing

19 what hospitals are getting from Medicare and you're comparing

20 that to what hospitals are getting from private plans, there

21 are denials in both sets of data.  And so to the extent that a

22 small percentage of claims are denied, mathematically that

23 doesn't make a difference because you've got denials in both

24 sets that you're comparing against each other.  That's what

25 Mr. Deal told you.

1      Mr. Deal confirmed -- he told you that he confirmed with

2   OSHPD -- that settlements and additional amounts were included

3   in the data.

4      Let's talk about the -- there we go.  The published

5   studies.  Mr. Deal told you that the published studies show

6   that -- and some of these relate to the San Francisco area --

7   that hospitals get paid generally between 288 percent and

8   317 percent of Medicare.  That's what the published studies

9   show you.  Between 2.8 and -- looks like 3.2 if do you the

10  math.  Between 2.8 and 3.2 percent of Medicare.

11     Mr. Deal also told you -- there we go -- Mr. Deal also

12  told you what hospitals in the geographic area are accepting

13  from private payors.  And what he told you is that if you

14  include NorthBay in the mix -- because, remember, we're doing a

15  regional market study.  So we don't exclude NorthBay from that.

16  NorthBay, even though it gets more for a variety of reasons

17  than some other hospitals, we're including NorthBay's data in

18  our data because we're doing a market rate.

19     And so if you look at actually the average of what

20  NorthBay -- of what the hospitals are getting without NorthBay

21  in the geographic area, and this is again from private payors,

22  that's 2.8 times Medicare.  If you include NorthBay in the mix,

23  because NorthBay is getting 5 times Medicare, that gets you up

24  to about 3 times Medicare.  Mr. Deal later takes that up to

25  3.3, if you recall, because he did an adjustment based on the

1  inpatient/outpatient services at issue.  Mr. Deal actually

2  adjusts that 3 number up to 3.3.  And we'll get to that in just

3  a few minutes.

4      We'll see that even if you look at the premiere teaching

5  hospitals in the area -- if you look at Stanford, you look at

6  Davis, you look at UCLA, UC San Francisco -- all of them are

7  getting between 1.9 and 2.8 times Medicare from private payors.

8  And if you look at -- and, again, that's compared to NorthBay,

9  which is getting 5.

10     So again, if you're using as a gut check what is

11 reasonable to pay?  And you ask yourself, Well, what is

12 Stanford getting?  What is Davis getting?  What's UCLA getting?

13 You'll see that the numbers are all sort of in the 1.9 to 2.8

14 range, not the 13.1 times Medicare which Mr. Heil tells you is

15 reasonable value in this case.

16     Why does NorthBay get more?  Again, why NorthBay gets more

17 is largely irrelevant.  Because if you're doing a market survey

18 of the regional rate, it doesn't really matter.  But it is

19 interesting to note.  And what Mr. Barnes, who works in that

20 area, says, Well, NorthBay's in a unique situation.  They don't

21 have any local competitors.  Their competitors are far away.

22 Mr. Deal said the closest hospital is about 15 miles from these

23 guys.

24     And if you look at the data, the objective data, as to the

25 fact that NorthBay is getting far more than Stanford, far more

1   than UCLA, UC San Francisco, far more than their geographic

2   peers, Mr. Deal said:  Look.  Empirically what we can observe

3   is that NorthBay is taking its geographic isolation and its

4   using it to its benefit in its strategy.  That is NorthBay's

5   pricing strategy.  That's what they do.

6       Now, Mr. Heil tells you today:  Well, I will looked at

7   some other hospitals and they're also geographically isolated.

8   But if you look at what those hospitals are getting for their

9   services, they're not getting anywhere what NorthBay is

10  getting.  And what Mr. Deal said is just knowing that a

11  hospital is geographically isolated doesn't tell you anything

12  about how aggressive that hospital is in, basically,

13  negotiating for the absolute highest possible rates it can get.

14  NorthBay has chosen a pricing strategy which is that it uses

15  its geographic isolation to exact very high rates, much higher

16  rates for elective services than other hospitals do.  And

17  that's the reason why NorthBay's rates are so high.

18      And so when you hear from NorthBay:  Well, look at what

19  Blue Cross is paying us, look what Aetna is paying us, look at

20  what United is paying us.  Even though Mr. Heil doesn't use

21  those mathematically in his calculation, this gives you the

22  answer.  That in order to get the benefit of having NorthBay in

23  network in that local area, those plans have decided for their

24  marketing strategy we're just going to go ahead and bite the

25  bullet and pay.

1   Now, does that mean that now when we're pricing emergency

2   services that what NorthBay is able to get in its full network

3   contracts, does that mean that that's relevant now to pricing

4   emergency services?  It's not.  Well, it's relevant only in the

5   sense that NorthBay's data should be included with everyone

6   else's data.  Right?  That what NorthBay gets should be

7   included with what all the geographic peers get.

8   But what NorthBay gets certainly is not the market rate

9   for the services in the geographic area.

10   Mr. Deal also did an analysis of what Blue Shield -- if we

11   took those exact same services that are at issue and we said

12   what other hospitals in the geographic area have -- if Blue

13   Shield had paid them, what would they have accepted for those

14   services?

15   The blended rate for outpatient/inpatient is about 4.1

16   times Medicare.  So, again, if you took all the hospitals in

17   the geographic area and you said what would they have accepted

18   for those exact same services?  The answer is 4.1 times

19   Medicare.  Not 13.1 times Medicare, which is what Mr. Heil's

20   view is.  It's 4.1 times Medicare.

21   Mr. Deal, just sort of as an academic interest, said:

22   Well, if Blue Shield had paid for these exact same services

23   that are at issue here, if Blue Shield had paid premiere

24   teaching hospitals -- UC Davis, Stanford, UC San Francisco,

25   UCLA -- what would they have accepted from Blue Shield?  That

 1    would have been about 4.7 times Medicare.

 2        So let's put it all together here.  If one looks at what

 3    the -- if one looks at what private payors pay using the OSHPD

 4    data, that's 3.3 times Medicare.  Remember?  It was 3.0 and I

 5    told you he adjusted up to 3.3, making sure that he had the

 6    right outpatient/inpatient mix.

 7        If one looks at what Blue Shield would have paid hospitals

 8    in the geographic area, that gets you to 4.1 times Medicare.

 9    Again, what are we doing here?  We're building a market rate.

10    Right now we're only looking at a segment of the buyers.  We're

11    only looking at the private buyers.  And so if we're looking at

12    what is the market, the geographic peers, including NorthBay,

13    what are they accepting from -- using the OSHPD data and what

14    are they accepting using the Blue Shield data?  That gets you

15    between 3.3 and 4.1.

16        And Mr. Deal also then looked at, again, let's look at the

17    other part of the market.  Remember, NorthBay sells -- 80 out

18    of 100 times it sells that MRI, it's selling to Medicare or

19    Medi-Cal.  So Mr. Deal looked at, well, what is the market rate

20    for the services if one is only looking at the government

21    buyers?  Well, of course, Medicare is just 1.0 because that's

22    standard that you're measuring it against.  And Medi-Cal is

23    1.4.  So Medi-Cal actually, including supplemental payments,

24    pays a little bit more than Medicare.

25        So Mr. Deal then put it all together.  He said:  Okay.

1   What I'm doing is I'm doing a regional market rate survey

2   analysis.  And so what he said is:  If I'm looking at what are

3   all the hospitals in the area, including NorthBay, we're

4   including NorthBay's data so this number is driven up by

5   NorthBay's data.  If one is looking at what are all of these

6   services being sold for by all the sellers to all the buyers,

7   and I'm looking -- he also looks at the mix.  He looks at what

8   percentage sold to Medicare, what percentage sold to Medi-Cal,

9   what percentage sold to private payors.  That gets you to

10  between 1.8 and 2 times Medicare.  If you're looking at

11  NorthBay's payor mix, that's 1.8 times Medicare.  And if you're

12  looking at the payor mix in the geographic area, what are all

13  of these services being sold for in the geographic area to all

14  of the buyers, the answer is it's 2 times Medicare.

15      So again putting it all together here, what you've got is

16  you've got Mr. Deal's analysis.  If you look at all payors what

17  they're buying from all hospitals, that's 1.8 to 2 times

18  Medicare.  And if you convert that to billed charges, that's

19  12.2 percent to 13.6 percent of billed charges.

20      So if you were doing the analysis here of what is the

21  market rate for the services in the geographic area, taking

22  into account all willing buyer/willing seller transactions,

23  whether the buyer is a government buyer or a private buyer, the

24  answer is it's 1.8 to 2 times Medicare, or 12.2 to 13.6 percent

25  of charges.

1   And if one were to look at -- if one would say let's just

2   forget about what NorthBay and other hospitals are selling

3   these same services to, to Medicare and Medi-Cal, if you're

4   only looking to what they sell the services to to private

5   buyers, then the results you get is 3.3 to 4.1 times Medicare.

6   Remember, 4.1 is what Blue Shield would have paid all the other

7   hospitals.  And the 3.3 is what all the hospitals were selling

8   the services to to all the buyers.  To all the private buyers.

9   That would be 3.3 to 4.1 times Medicare, which is 21.9 percent

10  to 27.7 percent of billed charges.

11  So that's the number that you would use if whatever reason

12  you wanted to exclude the Medicare or Medi-Cal sales and only

13  look at what's this MRI, room and board, being sold to to a

14  portion of the market, which are the private buyers.  That's

15  3.3 to 4.1 times Medicare.

16  So putting it all together, Mr. Heil's analysis is that

17  he believes that NorthBay's entitled to 13.1 times Medicare.

18  The published findings show that these services are being sold

19  for 2.7 to 3.2 times Medicare.  The services, if you look at

20  the actual geographic area, the market rate in the geographic

21  area, including all sales to -- including sales to private

22  buyers, to Medi-Cal and to Medicare, that's 1.8 to 2 times

23  Medicare.  And if one were only looking at sales to commercial

24  patients, that would be 3.3 to 4.1 times Medicare.

25  And so what should you do in this case?  Well, the one

thing that you could do -- this is the verdict form.  The one

thing that you could do if you wanted to exclude all the times

that hospitals in the geographic area are selling to Medicare

or Medi-Cal -- and I would urge you not to do that -- because

those are voluntary sales just like the sales are to a Blue

Shield member or Blue Cross member or an Aetna member.  These

are willing buyer/willing seller sales.  The hospitals are not

compelled to sell that MRI machine in its elective service to

Medicare or Medi-Cal, but they are.

And so if you're looking at a true market analysis of the

entire market, all willing buyer/willing seller transactions,

that wouldn't -- that would get you to a lower number than 3.3

times Medicare.  But if all you were doing was looking at what

those services sold for to private buyers, then that would get

you to 3.3 times Medicare.

And, again, what you should do.  What you should do in

this case, if we've at all been persuasive in our presentation

to you, is to say that the reasonable value for the services,

the going market rate for the services in the geographic area,

is 2 times Medicare.  Remember, I said it was 1.8 to 2 times

Medicare?  Well, it's fine to go on the higher side of that to

use the payor mix.  That's more advantageous to NorthBay here.

And if you were doing a true market survey, a true market

analysis, as to what are these services being sold for in all

willing buyer/willing seller transactions during that period of

1    time, then the answer is it would be 2 times Medicare.

2        Thank you very much.

3            **THE COURT:**  All right.  Thank you.  Mr. Tooch?

4            **MR. TOOCH:**  Thank you.  Thank you, Your Honor.

5        Can I use that for a second?

6            **MR. PIMSTONE:**  Of course.

7                        <u>**REBUTTAL ARGUMENT**</u>

8            **MR. TOOCH:**  Mike, can you put up jury instruction

9    number 3.

10        Mr. Pimstone's entire closing was based upon this last

11    paragraph (indicating.)  And he says that this last paragraph

12    means that Mr. Heil had to do a market survey.

13        Let's read what this paragraph says:  In determining the

14    reasonable value for the services at issue, you may consider a

15    wide variety of evidence reflective of the market rate for the

16    services in the geographic area.

17        There's no requirement.  There's no requirement that in

18    order to meet our burden of proof we had to do a market survey.

19    "May" does not mean "shall."  "May" does not mean "must."

20    There is no requirement that NorthBay had to do a market

21    survey.  None whatsoever.

22        Mr. Pimstone's entire closing was based on the premise

23    that NorthBay had to do a market survey.  Not true.

24        So now we're wrapping the case and you have to make a

25    decision.  You've got two very different positions over here.

1    You have Mr. Heil which says that 88 percent of charges is the

2    reasonable value.  And you have Mr. Deal which says that

3    12.2 percent is the reasonable value.  So how do you make this

4    decision?

5        Well, we have a jury instruction.  The first jury

6    instruction is number 9.  This deals with the credibility of

7    witnesses.  You can listen to Mr. Deal and Mr. Heil and figure

8    out who's more credible.  Then look at jury instructions number

9    11 and 12 very carefully.

10       If you blow those up.  Just one of them is fine, Mike.

11       Look at the sentence.  The second sentence:  Charts and

12   summaries are only as good as the evidence that supports them.

13       None of Mr. Deal's charts were admitted into evidence.

14   And those charts are only as good as the evidence that supports

15   them.  And there was no evidence in this case, other than

16   Mr. Deal's testimony, to support those charts.  So let's look

17   at those charts.

18       Let's go to slide 19.  No -- Mr. Heil's slide 19.

19       All right.  This is a slide which, basically, talks about

20   the Blue Shield contract at 80 percent of charges, the ED

21   contracts with Kaiser and MultiPlan, et cetera.  The in-network

22   contracts with Blue Cross and Aetna, et cetera.  And then

23   Mr. Heil's 12.2 percent.

24       What is Mr. Heil saying?  Mr. Heil is saying:  Only I know

25   the reasonable value of the services at NorthBay.  Blue Shield

1  for eight years didn't know what it was doing at 80 percent of

2  charges.  Kaiser didn't know what it was doing for 14 years.

3  MultiPlan, Interplan, all of those don't know what they're

4  doing.  They have the contracts in existence today.  The

5  one-off agreements which Ms. Eichenberger talked about.  The

6  United agreements, those payors don't know what they're doing.

7  Aetna doesn't know what it's doing paying at 67 percent of

8  charges.  Blue Cross doesn't know what it's doing paying at

9  57 percent of charges.

10     Yeah, they got these huge analytical departments.  You

11  heard Mr. Barnes.  They have all these analytical departments

12  but they don't know what they're doing.  United Healthcare at

13  70 percent of charges owns the Optum database and it doesn't

14  know what it's doing contracting with NorthBay at 70 percent of

15  charges.  Only I, Mr. Deal, know the true value of the

16  reasonable value of the services.  And all of those payors are

17  wrong.  All of those major corporations are wrong.

18     Well, Mr. Heil, what did you base it on?  Well, I based it

19  on three databases.  One by Optum, one by United Healthcare,

20  one by Blue Shield, one of the plaintiffs in this case, and one

21  run by the government.  And they have lots of numbers in them.

22  Did you show those numbers to the jury?  No.  I just showed

23  them charts.  Well, how do we know that your charts are

24  truthful and accurate?  Trust me.  Well, let's look at your

25  charts.

1    Let's go to Deal's slide 9.

2    No, it is -- that's not the right one.

3    (Pause.)

4    **MR. TOOCH:**  All right.  That's fine.  You're right,

5  I'm wrong.  He says:  Look at the comparable hospitals.

6  Remember he talked about the case mix index.  So he says:  All

7  right.  I'm going to use comparable hospitals, but a number of

8  them don't have trauma units.  A number of them don't have

9  NIC-U's.  In fact, he admitted he doesn't know the difference

10  between a level 1, level 2, level 3 trauma.  Doesn't know the

11  difference between level 1, level 2, level 3 NIC-U unit.

12    Let's go to Mr. Deal slide 25.  He says that NorthBay's

13  payments are double what Stanford's payments are.  Are double

14  and UC Davis' payments are.  Where's the evidence that supports

15  that?

16    Blue Shield has a copy of its contract with Stanford.  It

17  has a copy of its contract with UC Davis.  Did they enter that

18  contract into evidence?  Did they show it to you?  Why not?

19  They have that contract.  Think why didn't Blue Shield enter

20  its contracts with these other payors.  The reason is --

21    **MR. PIMSTONE:**  I would object, Your Honor.  This could

22  have been presented --

23    (REPORTER'S NOTE:  The court reporter asked for a repeat

24  of the objection, but it was still partially inaudible.)

25    **THE COURT:**  Sustained.  It's improper argument.

1    **MR. TOOCH:**   Is there any evidence that supports the

2  5.0 number?  No.

3     Well, Mr. Deal says that he uses claims to show this.  Was

4  there any evidence of any claims introduced in this case?

5     **MR. PIMSTONE:**  Objection.  Same objection.

6     **THE COURT:**  The answer to that question is "yes."  The

7  testimony of Mr. Deal is evidence.

8     **MR. TOOCH:**  I understand that, Your Honor.

9     Other than the testimony of Mr. Deal, is there any

10  evidence to show that Blue Shield, in fact, pays NorthBay

11  double what it pays Stanford?  They could have brought claims

12  in here.  They didn't.

13     Let's go back to slide 8 of Mr. Deal.  That's not it,

14  Mike.  Deal slide 8.  No.  It's the comparable hospital ones.

15  Go to Deal slide 9.

16     All right.  In this slide he says he uses comparable

17  hospitals.  Let's look at who the hospitals are.  Sutter Davis,

18  Kaiser Walnut Creek, Kaiser Vallejo, and Kaiser Vacaville.  And

19  on the other slide he talks about Kaiser Antioch.  Okay?

20     So he says that the comparable hospitals include the four

21  Kaiser hospitals.  Let's go to Mr. Deal's report, Exhibit

22  178-19.

23     **MR. PIMSTONE:**  I object, Your Honor.  It's well beyond

24  --

25     **THE COURT:**  Mr. Tooch, if you wanted to raise this, at

1    a minimum, it should have been in your opening of your closing.

2        So, sustained.

3        **MR. TOOCH:**  When he does his analysis of the

4    reasonable value of -- his calculations for reasonable value,

5    Mr. Deal doesn't use the Kaiser hospitals.  He excludes the

6    Kaiser hospitals from his calculations of reasonable value.

7    Why?  Because, as Mr. Heil said, if you include the Kaiser

8    hospitals they have a lot more commercial members than the

9    other hospitals.

10        If you go to slide 44.  In his closing argument,

11   Mr. Pimstone said that Heil's opinion is that NorthBay's paid

12   13.1 times -- it's charges are 13.1 times Medicare.  But if you

13   go to Mr. Deal's report 178-22 -- and you can blow up the

14   left-hand column -- you can see that it's 12.4 in the report.

15   Well, is it 13.1 or is it 12.4?  Well, let's use 13.1 because

16   it looks worse to the jury.

17        You can go to Mr. Deal's slide 25.  He says that

18   NorthBay's charges are -- the payments to NorthBay are 5 times

19   Medicare.

20        Let's go to slide 32 of Mr. Deal.  Well, he says, if you

21   look at the outpatients it's 6.6.  What Blue Shield pays other

22   hospitals is 6.6 Medicare, and the inpatient is 1.7 times

23   Medicare.  And Mr. Deal did a 50/50 split.  But if you heard

24   Ms. Eichenberger, one of the last things that she said is that

25   94 percent of the claims in this case are outpatient emergency

1  room services.  So you can change that last number depending

2  upon whether you do a 50/50 split or a 94, 6 percent split.

3       **MR. PIMSTONE:**  Again, Your Honor, this is well beyond

4  the scope of rebuttal.

5       **THE COURT:**  You are really heading past it, Mr. Tooch,

6  I have to say.  So I'm going to overrule that objection, but

7  please stay within the proper scope of rebuttal.

8       **MR. TOOCH:**  It's easy for consultants to slice and

9  dice information to present very different views to you.  Ask

10  yourself:  Are these -- is Mr. Deal trustworthy?  Are these

11  charts trustworthy?  Let's compare that to Mr. Heil, what

12  Mr. Heil did.  He based his analysis on contracts.  Real

13  contracts, real evidence.  You can touch them, you can read

14  them, you can take them back to the jury room.  You can see

15  whether or not his information is based upon what was actually

16  in place.

17       Mr. Heil does not say he knows more than the insurance

18  companies.  He says just the opposite.  He's saying these

19  insurance companies know what they're doing.  Blue Cross knows

20  what it's doing.  United Healthcare knows what it's doing.

21       He's saying if you look at what their contracting, their

22  paying, the in-network at 81 percent, the out-of-network much

23  higher.  He's saying, I'm just giving you an analysis of what

24  the insurance companies in this area value NorthBay's services.

25  And that's what they value NorthBay's services.

1    The reasonable value in this case is 88 percent of

2  charges.  And at the end of the day, this case is about

3  numbers, yes, but it's about health care.  It's about a

4  hospital, a small hospital, that's trying its best to provide

5  the best services to the people in this community.  That's what

6  it's about.

7    It's a nonprofit hospital.  It is not there to make money.

8  It is there to provide the best services.  At the end of the

9  day, that's what this case is about.  It's not about coffee

10  cups, it's not about hamburgers.  It's about health care

11  services.

12    When you get the verdict form, NorthBay requests,

13  beseeches you, to write in 88 percent of charges.  That's the

14  fair value.  That's the reasonable value.

15    And thank you for your time.

16    **THE COURT:**  All right.  Thank you, Mr. Tooch.

17    So ladies and gentlemen, it is now to you.  Ms. Davis will

18  lead you into the jury room and you can begin your

19  deliberations.

20    (Off-the-record discussion with the deputy clerk.)

21    **THE COURT:**  Ms. Davis was trying to be sure that you

22  had gotten your instructions on deliberation.  And I usually

23  separate those out, but I gave them to you at the beginning of

24  -- or, before the closing statements were made.  And if you

25  have in any way forgotten them, you'll find them in writing in

**PROCEEDINGS**

1  your own personal copy of the jury instructions.

2  So if you will go into the jury room now and choose

3  foreperson, figure out what your schedule is, and then move

4  forward in the deliberations as you choose.

5  We'll be in recess.

6  (The jury exiting the courtroom.)

7  (The following proceedings were held in open court, outside the

8  presence of the jury:)

9  **THE COURT:**  So Ms. Davis will figure out what the

10  schedule is for the jury both today and then tomorrow,

11  hopefully, and she'll be able to convey that to you so that

12  you'll know.

13  While the jury is out, I want to make sure that everybody

14  is within 15 minutes of the courtroom.  And make sure that

15  Ms. Davis has the contact information that is the best contact

16  information that you have.

17  The only other -- well, so, Mr. Pimstone, I'd like you to

18  make whatever record you want to make now with respect to the

19  motion other than I know you have -- I have deemed that you

20  have made a Rule 50 motion.  If you want to tell me what the

21  subject of it -- subjects are, that's fine.  I don't think you

22  have to go into great detail.

23  **MR. PIMSTONE:**  I'm not going to.  Thank you, Your

24  Honor.

25  I think the subject matter of the motion largely comes

1  from what you heard in closing argument, which was that

2  NorthBay had the burden of proof -- or, has the burden of proof

3  -- to determine reasonable value; that the parties had agreed

4  on a jury instruction that fairly reflects the law in this

5  area; and that the jury instruction noted that in determining

6  reasonable value.  The jury may consider a wide variety of

7  evidence reflective of the market rate of the services in each

8  geographic area.  And that NorthBay didn't do that.

9       The argument that I made to the jury is that when one is

10  dealing in the emergency market, as compared with the elective

11  market, that there's a reason why one looks at regional market

12  rate, and that is to protect all sides.  But particularly here,

13  to protect the patient and to protect the health plan or the

14  insurer because they didn't choose to go to that particular

15  provider.  And in the situation where you do not choose

16  voluntarily to go to a high-priced provider or to a provider

17  that views itself as being well situated geographically, or

18  high quality, or whatever the considerations that might occur

19  in a voluntary elective transaction; that those don't apply

20  here.

21       And that -- so when one is dealing in the emergency

22  market, providers are entitled to get paid the regional market

23  rate.  And the *Children's Hospital* case, we believe, stands for

24  that proposition.  The *Goel versus Regal* case also talks about

25  the going market rate in the geographic area.

1       And what we heard from NorthBay was a case that really was

2   more focused on the kinds of considerations that might occur if

3   we were doing a *quantum meruit* valuation of an elective

4   service.

5       So, for example, if there were a situation where I went

6   ahead and chose a brain surgeon who I knew was three times

7   market because I wanted to do that voluntarily, and then I

8   didn't pay that brain surgeon.  And there was no agreement as

9   to price.  It may well be in a case like that that one would

10  look to see, well, you know, what does she get in the elective

11  market?  And, you know, what were the factors that went into

12  that choice of mine?

13      When one is dealing in the emergency market, I think

14  you're dealing with a very different kind of *quantum meruit*

15  analysis.  And because of the forced aspect of that, that's why

16  we look to regional pricing.  NorthBay had the burden of

17  putting on a case like that, and it didn't.

18          **THE COURT:**  All right.  Mr. Tooch, is there anything

19  -- so I'm not going to grant the motion.  I'm not going to take

20  the case away from the jury.  Is there anything that you want

21  to say on the record at this point with respect to that other

22  than what you've already argued to the jury?

23          **MR. TOOCH:**  No, Your Honor.  Just that *Children's*

24  *Hospital* says that in determining reasonable value, one may

25  look to contracts to determine reasonable value.

1  **THE COURT:**  I think the -- I may see this in

2  post-trial briefing from either one of you, but my reading of

3  *Children's Hospital* and my understanding of the law is that

4  there's a wide variety of evidence that is permissible.  This

5  jury can decide whether it is more relevant to look at one

6  sliver of evidence in the geographic region at NorthBay, or at

7  the whole swath including governmental payments.  Or they might

8  choose something that's a combination of those things.  But --

9  so, I appreciate the argument.

10  Speaking of post-trial motions, my idea which I came up

11  with this morning -- so if you have a different one I'm

12  interested in -- is that within 28 days of the verdict that if

13  anybody wants to file a new trial motion that that's the time

14  period to do it.  I'm not going to enter a judgment on this

15  verdict.  The verdict's going to just sit there for awhile.

16  Within that 28-day period, you should come up with the

17  stipulation on what the verdict means in a monetary sense for

18  the case.  So you describe to me a process of experts agreeing

19  or the issue coming to me for determination.  But I'd like to

20  see what that is within the 28-day periods.

21  And then on April 23, I will set a case management

22  conference which could also be the date -- whatever Wednesday

23  is around there -- a new trial motion is ripe for hearing,

24  we'll do that.  So hopefully that will give the parties enough

25  time to figure out what the jury verdict means to the rest of

1    the case.

2            MR. TOOCH:  If I may, just a clarification on that.

3            THE COURT:  Sure.

4            MR. TOOCH:  I believe you said that we should

5    stipulate what the verdict means in a monetary sense.

6            THE COURT:  Yes.

7            MR. TOOCH:  It may not be possible.  It may be a

8    process that we need to go through to apply whatever the jury

9    comes back with as to all the claims.  I don't know whether we

10   can calculate it within 28 days.  So we'll meet and confer --

11           THE COURT:  Meet and confer.  And if you come back to

12   me and say, "We're doing this, but 28 days is too short a

13   period of time," I'll believe you.

14           MR. TOOCH:  Okay.  Thank you.

15           THE COURT:  All right.

16       Yeah.  Mr. Maurer.

17           MR. MAURER:  Just a piece of housekeeping with respect

18   to the physical exhibits.  So we had sent an email to

19   NorthBay's counsel on Friday saying:  Here's an electronic copy

20   of the exhibits that we believe have been admitted and we'll

21   bring an binder down to court.  Which I have done, you know,

22   this morning.  So we can just essentially have a set we can all

23   look through and agree, okay, this is the set that goes to the

24   jury.

25       So I have -- I briefly discussed it with Mr. Tassa this

1  morning, but they haven't provided a response.  Again, I just

2  wanted to be certain all parties understand exactly what's

3  being given to the jury and have an opportunity to look at it.

4  At this point, I don't think we're quite comfortable with that.

5      **THE COURT:**  So tell me what the problem is.

6      **MR. TASSA:**  No problem.  I wasn't able to complete my

7  review over the weekend.

8      We completed our review.  We have one addition to make to

9  the electronic set.  And then, if necessary, we can go through

10  the binders just to make sure that matches the electronic set.

11      **THE COURT:**  So talk to each other.  If there's a

12  problem that I need to resolve, I will do that.  And then

13  communicate what the answer is to Ms. Davis so that the jury

14  gets them.

15      **MR. MAURER:**  Will do, Your Honor.  Thank you.

16      **THE COURT:**  All right.  Good luck to everybody.

17      (Court adjourned at 1:01 p.m.)

18

19                          –   –   –   –

20

21

22

23

24

25

```
 1

 2                    CERTIFICATE OF REPORTERS

 3          We certify that the foregoing is a correct transcript

 4     from the record of proceedings in the above-entitled matter.

 5

 6     DATE:   Monday, February 11, 2019

 7

 8

 9     _____
                 Vicki Eastvold, RMR, CRR
10               Official Court Reporter

11

12

13

14     _____
            Katherine Powell Sullivan, CSR #5812, RMR, CRR
15                  Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```